**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TUBI, INC.,<br>315 Montgomery St., Floor 11<br>San Francisco, CA 94104<br><br>     Plaintiff,<br><br> v.<br><br>KELLER POSTMAN LLC,<br>1101 Connecticut Ave., N.W., Suite 1100<br>Washington, D.C. 20036<br><br>     Defendant. | Civil Action No.<br><br><br>**COMPLAINT AND DEMAND FOR A**<br>**JURY TRIAL** |

**COMPLAINT**

Plaintiff Tubi, Inc. ("Plaintiff" or "Tubi"), for its Complaint seeking declaratory relief, injunctive relief, and damages against Keller Postman LLC ("Keller Postman"), alleges as follows:

**NATURE OF THE ACTION**

1.  This is an action for declaratory relief, injunctive relief, and damages arising from the law firm Keller Postman's scheme to manufacture and file meritless arbitration claims *en masse* and induce tens of thousands of purported users of Tubi's free content streaming service to breach their express agreements with Tubi to provide mandatory notice and participate in an informal dispute resolution process. Keller Postman's motivations are clear: It wanted to avoid a contractual provision—the one Keller Postman interfered with—that required Tubi users to provide specific facts that led to their disputes as part of the informal dispute resolution process. While a simple task for an individual user with a real dispute, it is impossible for Keller Postman

under the law firm's unethical business model.  Instead, Keller Postman wrongfully had its clients breach this provision to attempt to force Tubi to face tens of millions of dollars in non-refundable and upfront filing fees with the arbitration service, despite having insufficient details to support the claims against Tubi.  Keller Postman hoped to leverage the prospect of those fees into an unjust settlement so that it above others would profit even though the claims it has filed are at best meritless and at worst frivolous.

2.     Keller Postman's business model is exactly what it has done here.  It solicits and causes others to solicit claimants on social media via an online questionnaire; after enlisting these individuals as clients, it does not adequately screen their claims, including whether the information provided on the questionnaire is truthful and forms the basis of a valid claim; and Keller Postman then files tens of thousands of simultaneous arbitration claims against its target company, often including thousands of fraudulent claims, which can require the target company to face millions of dollars in non-reimbursable arbitration fees regardless of the merit of the claims.

3.     Keller Postman's conduct is riddled with ethical violations from beginning to end. Individuals can sign up to file demands against the target company in as little as two minutes.  On information and belief, Keller Postman signs up clients without sufficiently investigating the claims to determine whether the information its clients provided on the questionnaire is truthful. Keller Postman brings arbitration demands knowing it cannot actually provide individualized legal advice and obtain informed consent.  In following this model by filing nearly 24,000 substantively identical demands against Tubi, Keller Postman not only violated these ethical obligations, but it also affirmatively induced its clients to *breach* their binding agreements with Tubi.   On information and belief, Keller Postman has induced this breach without its clients' informed consent.  Keller Postman relies on an agreement between Tubi and its users—the Terms of Use—

that calls for disputes to be resolved in arbitration; but that *same agreement* requires a Tubi user to provide notice to Tubi and participate with Tubi in an informal resolution process as a *precondition* to arbitration.  To comply with this precondition, the user simply needs to provide Tubi with notice of the dispute and the specific facts giving rise to the dispute.  This process is intended to avoid the very fees and expenses Keller Postman was and is trying to force Tubi to incur.  Yet Keller Postman has blithely ignored that provision by filing arbitration demands despite knowing and acknowledging that not one of its clients had satisfied this precondition.  Keller Postman has done so because it is unwilling to put in the time it needs to learn specific facts for each of its clients that give rise to the disputes.  Instead, Keller Postman filed nearly 24,000 identical claims that provide no specific facts about its clients outside of their names, physical addresses, and email addresses.  Just by filing these barebones and cookie-cutter claims, Keller Postman hoped to have Tubi quickly settle for an unreasonable amount or face tens of millions of dollars' worth of non-refundable arbitration fees.

4.      Keller Postman has acted maliciously, with bad faith, and independently of any desire to protect its clients.  The demands Keller Postman filed on behalf of its clients are specious and indicate the firm's malicious intent.  Keller Postman alleges that 23,736 purported Tubi users were "victims" of discrimination because they received targeted advertising based on their age, gender, or sex—information which they disclosed to Tubi knowing that Tubi would use it to personalize their experiences on the streaming service.  Yet, not *one* claim identifies the age, gender, or sex of the claimant; specifies which advertisement that the claimant wanted to receive or did not want to receive; alleges that the claimant did or did not take advantage of a business opportunity as a result of receiving or not receiving an advertisement; states when the offending conduct occurred; or alleges how the claimant was supposedly injured by the targeted advertising.

Further, based on Tubi's analysis of the claimants, more than approximately 30% do not appear to be Tubi account holders. Thousands of other claims suffer from additional fatal flaws, such as never having used Tubi to stream content (and therefore never receiving advertising—targeted or not), never having received an ad on Tubi, and not having viewed Tubi content inside the statutes of limitations for the claims they bring.

5.     Keller Postman's scheme to force Tubi into a settlement based on fear of a massive upfront arbitration bill has failed. Tubi was able to convince the arbitration service to consolidate the claims made by registered users, meaning it will not be on the hook for nearly $48 million in upfront and non-refundable fees. But it still has faced and faces an expensive arbitration process that would not be taking place absent Keller Postman's tortious interference. Keller Postman manufactured claims against Tubi, failed to conduct an investigation to learn specific facts about each of its clients' claims, and filed tens of thousands of cookie-cutter claims to force Tubi into an arbitration that should not be taking place.

6.     In short, Keller Postman has induced its clients' breach of the notice and informal dispute resolution provisions of Tubi's Terms of Use that required users to provide specific facts giving rise to their disputes as a precondition to filing demands for arbitration. By doing so, Keller Postman has disadvantaged its clients, forcing them into a forum with no jurisdiction over their meritless claims and where they are destined to lose their invalid and unsupportable claims.

## JURISDICTION AND VENUE

7.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties. Tubi is a citizen of Delaware and California. On information and belief, Keller Postman is a citizen of Illinois, Virginia, Louisiana, Ohio, Tennessee, Florida, Massachusetts, and Texas, based on its partners' states of domicile.

8.      The amount in controversy exceeds $75,000.

9.      The Court has further remedial authority pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*

10.     Venue is proper in the District of Columbia because a substantial part of the events or omissions giving rise to the claims occurred in the District of Columbia.  Keller Postman maintains, manages, operates, and owns an office in the District of Columbia and regularly conducts business in the District of Columbia.  Warren Postman, Keller Postman's managing partner and counsel of record for the 23,736 arbitration demands underlying the claims,[1] is licensed and practices law in the District of Columbia.  Albert Pak, another Keller Postman partner and counsel of record for the 23,736 arbitration demands, is licensed and practices law in the District of Columbia.  Through its District of Columbia office and the actions of these two partners, Keller Postman caused the submission of the abusive mass arbitration demands and engaged in other conduct that gives rise to this dispute.  Keller Postman sent all correspondence, including the correspondence discussed below, from its District of Columbia partners on its District of Columbia letterhead.

**THE PARTIES**

11.     Plaintiff Tubi, Inc. is a corporation that is incorporated in Delaware and has its principal place of business in San Francisco, California.  Tubi provides a premium ad-supported video-on-demand streaming service that allows both registered and unregistered users to stream movies and television shows from its large content library for free.  Tubi's service is available to millions of customers in the District of Columbia and the rest of the United States.

---

[1] Keller Postman originally filed 23,747 demands but, on May 7, 2024, Keller Postman withdrew eleven of the claims without explanation.

12.    Defendant Keller Postman is a law firm and a limited liability company.  Keller Postman maintains an office in the District of Columbia and transacts substantial business in the District of Columbia.  Mr. Postman—one of the law firm's two named partners—and Mr. Pak are based in the law firm's District of Columbia office.  Mr. Postman and Mr. Pak have filed the arbitration demands, transmitted correspondence, and otherwise furthered the tortious interference against Tubi from the firm's District of Columbia office.

**OTHER RELEVANT ENTITIES**

13.    Keller Postman uses Troxel Law LLP ("Troxel Law"), a law firm based in New York, to help it solicit claimants for mass arbitrations.  Troxel Law holds itself out as a legitimate law firm with an A+ rating with the Better Business Bureau and bills itself as a client-friendly law firm that secures hassle-free compensation for victims of corporate wrongdoing:

## About Us

Troxel Law helps individuals and their families, who've been hurt or ripped off by a large company.

We believe the legal process should be **easy**, **fair** and as **stress free** as possible.

We've helped tens of thousands of victims of corporate negligence, workers, and consumers recover hundreds of millions of dollars.
Our Tylenol birth injury legal team is located across four time zones and can be reached 24/7 by phone or text at (312) 270-0714











14.    In reality, Troxel Law appears on the Better Business Bureau as an unaccredited entity with an "F" rating.  And many claimants—the very individuals Troxel purports to assist— who have signed up for Troxel's supposed representation subsequently filed complaints with the

Better Business Bureau stating that the phone number listed on the firm's website is inoperable, and they are never able to reach counsel again, even to end the representation agreement effectuated through the online portal. Ex. 1. Troxel did not provide an answer to these claims to the Better Business Bureau.

15.     JAMS is the world's largest private alternative dispute resolution provider. Its services include private arbitrations and mediations. As discussed below, Keller Postman filed with JAMS its 23,736 demands for arbitration against Tubi.

## STATEMENT OF FACTS

**I.**     **Keller Postman's Business Model of Defrauding Both Businesses and its Own Clients.**

16.     Keller Postman has pioneered "mass arbitration"—that is, soliciting clients with promises of free money, bringing tens of thousands of simultaneous arbitration claims against a company, and demanding that the company pay tens of millions of dollars in up-front arbitration costs based on those claims if the company chooses not to settle quickly.[2] The firm boasts that its strategy is to pursue "hundreds of thousands of individual arbitrations" assisted by "technology to pursue thousands of individual claims all at once." Ex. 2.

17.     Keller Postman partners with Troxel Law and other plaintiff firms to solicit "clients" using social media platforms, including Instagram and YouTube. On information and belief, to find potential claimants, Keller Postman, Troxel Law, and other plaintiff firms use targeted advertising on these platforms—the same manner of advertising that forms the sole basis

---

[2] The U.S. Chamber of Commerce Institute for Legal Reform recently published a report that provides additional details about the mass arbitration playbook and the ethical issues that it poses. *See* U.S. CHAMBER OF COM. INST. FOR LEGAL REFORM, MASS ARBITRATION SHAKEDOWN: COERCING UNJUSTIFIED SETTLEMENTS (2023), https://instituteforlegalreform.com/wp-content/uploads/2023/02/Mass-Arbitration-Shakedown-digital.pdf.

for their claims of discrimination in the mass arbitration against Tubi.

18.     Keller Postman's solicitations on social media do not explain critical facts to its prospective clients, including the nature of the claim, the terms of the representation, or even the firm that will be representing them.  Instead, the advertisements are often by a partner firm, such as Troxel Law—an entity without much presence beyond a poorly functioning website containing invalid links.

19.     The advertisements claim that the target company may owe thousands of dollars to anyone that has used its service, and that anyone can sign up to file a claim by submitting answers to a short questionnaire:



Ex. 3.

20.     On information and belief, once Keller Postman has gathered a large number of sign-ups, it processes the claims without sufficient further investigation.

21.     Having solicited thousands (or, as here, tens of thousands) of clients, Keller Postman generates identical, boilerplate arbitration demands for each client and tries to have the

responding party pay the non-refundable upfront costs for all arbitrations.  The demands contain no relevant facts pertinent to the individual claimants.  Instead, in a conclusory manner, Keller Postman asserts in the demands that the company violated the applicable statute.  Keller Postman then ships hard copies of the demands from its District of Columbia office to an arbitration provider.

22.     Keller Postman cannot and has no desire to obtain the necessary information to learn specific facts that give rise to the disputes that the firm has manufactured.  Doing so, while necessary under ethics rules, would slow down Keller Postman's efforts to obtain as much money for the firm based on as little work as possible.

23.     In fact, Keller Postman is well aware that many of its arbitration demands will be fraudulent: Its marketing campaign is structured to avoid obtaining basic information that would weed out fraudulent claims.  And based on other mass arbitrations it has brought, it knows that a significant number of the claims will be fraudulent.  But from Keller Postman's perspective, the viability of its clients' claims does not matter.  The number of claims is more important to Keller Postman than the merit of the claims the firm brings.  Under Keller Postman's business model, even if its clients' claims are uniformly meritless, the up-front costs for the responding party are so high that it is usually cheaper for the companies to settle than arbitrate.

24.     Consider numbers similar to here.  Suppose the company against whom Keller Postman has filed mass arbitration claims must pay $2,000 per claimant to private arbitration service JAMS as an up-front arbitration fee.  If Keller Postman obtains 24,000 clients through online and social media solicitations, then files all those arbitration demands simultaneously, the company faces a bill of $48 million—which it could owe regardless of the outcome of the arbitration demands.  No matter how meritless the claims, the company could feel pressure to

quickly provide a significant fee to Keller Postman to go away before the company must pay the $48 million.  And most targeted companies settle.  This has been Keller Postman's business model.

25.     On information and belief, Keller Postman distributes a portion of the settlement proceeds to its clients and, with its partner firms, keeps 40% or more of the amount recovered as profit.

26.     These are not class action cases.  By choosing to represent tens of thousands of claimants, Keller Postman takes on ethical duties, including a duty of loyalty, to each one of its clients.  As recognized in D.C. Ethics Opinion 386, aggregating settlements in non-class action cases imposes difficult ethical dilemmas because lawyers must have detailed and continued communications with their clients throughout the process.  And without judicial oversight, aggregate settlements are ripe for abuses.  "[T]here is little doubt that non-class aggregate settlements present particular concerns due to a lack of court oversight of the resolution of the matter."  D.C. Ethics Op. 386 (B).

27.     There is nothing wrong with a firm representing multiple clients simultaneously or taking a percentage of recovery, so long as the lawyers comply with the ethics rules.  But Keller Postman's scheme is unethical in how it (i) weaponizes the arbitration process and (ii) breaches its fiduciary duties towards its own clients.  Keller Postman only has made these issues worse based on its tortious interference against Tubi.

       a.     ***Keller Postman's ethical lapses in weaponizing the arbitration process:***

          i.     The District of Columbia Rules of Professional Conduct (the "D.C. Rules") obligate attorneys to "inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions."  Rule 3.1 cmt. 2.

ii.      Keller Postman does not, and cannot, adequately vet its clients through its mass client sign-up campaign.  The firm's focus on technical infrastructure, gathering clients, and rushing to file cases leaves no space for adequately investigating the factual or legal claims of any one claimant.  It undertakes insufficient effort to ensure that the information being provided by its clients is truthful.

iii.      Indeed, the solicitations are intentionally barebones: on information and belief, Keller Postman deliberately avoids obtaining the information it would need to recognize many claims are frivolous—even though "[b]lind reliance on the client is seldom a sufficient inquiry" under Federal Rule of Civil Procedure 11.  *S. Leasing Partners, Ltd. v. McMullan*, 801 F.2d 783, 788 (5th Cir. 1986), *overruled in part on other grounds by Thomas v. Cap. Sec. Servs., Inc.*, 836 F.2d 866 (5th Cir. 1988) (en banc).  The barebones nature of these solicitations is no accident—Keller Postman solicits its clients this way so that it can maximize the number of claims it brings, while maintaining plausible deniability that it was aware its clients' claims are fraudulent.

iv.      Keller Postman routinely pursues claims that minimal investigation would reveal are frivolous, such as claims brought by people who did not even use the service in question but merely clicked a button from a law firm solicitation with the lure of receiving free money.

v.      Normally a lawyer does not benefit from bringing a frivolous claim, but Keller Postman does: Frivolous or not, Keller Postman gambles that a company will pay a global settlement with all claimants that allows Keller Postman to profit greatly, all to make the claims go away to avoid paying the arbitration fees.

vi.    Keller Postman relies on a woefully inadequate claimant vetting process.  Previous claims brought by Keller Postman show large swaths of customers with no records of transacting with the target company, customers located in states where companies do not provide any service, and large numbers of duplicate and/or patently fake submissions of names. *See In re CenturyLink Sales Pracs. & Sec. Litig.,* No. CV 17-2832, 2020 WL 3513547, at *3 (D. Minn. June 29, 2020) ("CenturyLink could not identify any potential customer account that could be connected with some of [Keller Postman's] clients; some clients claimed to receive services at addresses in states in which CenturyLink does not provide services."); Decl. of Rodger Cole ¶ 21, *In re Intuit Free File Litig.*, No. 3:19-cv-2546-CRB (N.D. Cal. Dec. 7, 2020), ECF No. 192 (8,320 demands withdrawn in mass arbitration after investigation revealed many claimants who were not customers or users of its service, had no basis for a legal claim against Intuit, or were duplicate demands).

b.    ***Keller Postman's breaches of fiduciary duties to its clients:***

i.    Every aspect of Keller Postman's relationship with its clients—from the sign-up process, to the bringing of demands, to the negotiation of settlements—is riddled with ethical violations.

ii.    Indeed, Keller Postman has been named a defendant in multiple lawsuits filed based on the firm's involvement in prohibited telemarketing practices to solicit potential clients.  *See* Ex. 4 (Compl., *Cacho v. Keller Postman LLC*, No. 6:23-cv-01109-PGB-LHP (M.D. Fla. June 12, 2023), ECF No. 1); Ex. 5 (Compl., *Dominguez v. Keller Postman LLC*, No. 3:23-cv-00185-FM (W.D. Tex. May 5, 2023), ECF No. 1); Ex. 6 (Compl., *Gonzalez v. Keller Postman LLC*, No. 3:23-cv-00145-DCG (W.D. Tex. Apr. 10, 2023), ECF No. 1).  Specifically, Keller Postman has been accused of having commissioned numerous unwanted calls to urge the

recipients to participate in mass legal representation, well after being told by recipients not to call again.  *Id*.  The firm's egregious practices have included, among other things, calling the same individual as many as 33 times in a two-month span.  *Id*.  Rather than contest those complaints, Keller Postman quickly settled them.

> iii.    The Civil Justice Association of California ("CJAC") recently sent a letter to the State Bar of California, in which it criticized the overbroad advertisements firms like Keller Postman use that "make it appear that individuals are merely signing up to participate in an investigation or a class action, rather than an individual arbitration proceeding in which the claimant must engage personally."  Ex. 7 (Letter from Jaime Huff, Vice President and Counsel, Public Policy, CJAC, to Enrique Zuniga, Public Trust Liaison, State Bar of California at 2, *Hoeg v. Samsung*, No. 1:23-cv-01951 (N.D. Ill. Aug. 28, 2023), ECF No. 44-4).  Once Keller Postman's clients sign up, the law firm fails to give them the legal representation to which they are ethically entitled.

28.    "[N]o matter how many different clients a lawyer represents, the lawyer owes a duty of zealous representation to each individual"—a duty unmitigated simply "because a lawyer represents multiple plaintiffs."  *In re Valsartan N-Nitrosodimethylamine (NDMA), Losartan, & Irbesartan Prods. Liab. Litig.*, No. 19-2875(RBK/JS), 2020 WL 955059, at *3 (D.N.J. Feb. 27, 2020).  Keller Postman's business model depends on a small number of lawyers representing tens of thousands of claimants simultaneously.  That business model renders it incapable of offering adequate legal advice to each client—so it does not.

29.    On information and belief, at the outset of the solicitation, Keller Postman does not tell its potential clients basic information regarding the nature of the claims they are bringing.  Nor does Keller Postman disclose to its clients that the client may be breaching his or her own

arbitration agreements, creating potential liability.  This violates the basic ethical requirement that attorneys must "communicate[] adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."  D.C. Rule 1.0(e); *see also* D.C. Rules 1.2(c), (e), 1.7(b).  The lawyer must ensure that the client "possesses information reasonably adequate to make an informed decision," in the form of a "communication" with the client that includes "a disclosure of the facts and circumstances giving rise to the situation, any explanation reasonably necessary to inform the client or other person of the material advantages and disadvantages of the proposed course of conduct and a discussion of the client's or other person's options and alternatives."  D.C. Rule 1.0 cmt. 2.

30.     When it comes to settlement, Keller Postman's breach of its ethical duties towards its clients becomes particularly apparent.  To begin, Keller Postman breaches its ethical duty towards *all* its clients by failing to obtain informed consent from them *before* settling.  Neither the firm nor the individual client knows the strength of the client's claims, so informed consent is impossible.  The clients do not have the realistic option of saying "no" to the proposed settlement offer and causing Keller Postman to pursue their claims to judgment.  They are simply told they will receive a little bit of money.  This ethical breach follows from Keller Postman's business model: A single firm cannot individually consult 20,000 people before it settles a claim on their behalf.  *See* Richard Zitrin, *Regulating the Behavior of Lawyers in Mass Individual Representations: A Call for Reform*, 3 ST. MARY'S J. ON LEGAL MALPRACTICE & ETHICS 86, 88 (2013) ("Even for honest lawyers who are simply trying to fit the round peg of multiple representations into the square rigid hole of the applicable ethics rules … the task proves virtually impossible.").

31.    Indeed, upon information and belief, rather than negotiate settlements on each client's behalf, Keller Postman's practice is for it to enter into a "master settlement" with the respondent without obtaining its clients' informed consent, and then dole out settlement sums to the claimants.

32.    This ethical breach harms Keller Postman's clients.  Different Keller Postman clients are in different positions based on different facts and would rationally make different settlement analyses.  For example, Keller Postman's claims against Tubi relate to targeted advertising.  Those who purportedly were harmed because they bought a product after viewing a certain advertisement may be in a different position than those who saw the advertisement and decided not to buy that item.  Yet Keller Postman is incapable of, and cannot, provide individual advice to its clients.  It has no way of assessing the strength of any particular client's case or the individual harm the client may have suffered.  Nor does it ever have the ability to assess each client's appetite for risk.  Having saved on the cost of providing ethical legal representation— Keller Postman profits.

33.    The CJAC letter summarizes the ethical violation inherent in this arrangement, particularly with respect to settlement:

> Businesses faced with mass arbitration may have good reason to respond with individualized settlement offers.  Such offers are often tied to the merits of the particular claims, which vary from claimant to claimant.  These offers can make legitimate claimants whole (or more than whole) without the need for any further adversarial proceedings.  And (as in civil litigation) defendants sometimes make "nuisance-value" settlement offers that individual plaintiffs would accept when they know that their claims are meritless.

> Yet there is reason to doubt that at least some lawyers threatening or filing mass arbitration filings are engaging in the thousands—or even tens or hundreds of thousands—of individualized communications needed to meaningfully convey and discuss settlement offers with each of their clients.  Certainly plaintiffs' counsel have little incentive to engage in these discussions.  The threat of a mass arbitration filing is most acute when the filing is imminent (unless the defendant agrees to settle, of course), and once the demands are filed, the business has a very short time to try and resolve the demands before it is required to

pay case-management, administrative, and arbitrator fees on top of the filing fees it has already paid.  Lawyers pursuing mass arbitrations are unlikely to forgo the leverage from these looming fees by having meaningful settlement discussions with each of their clients.  But that is what the ethics rules require.

Ex. 7 at 3.

## II.  Tubi's Platform and Terms of Use Set Forth a Specific Dispute Resolution Protocol.

34.     Tubi provides a premium ad-supported video-on-demand streaming service that allows users to stream movies and television shows from its large content library for free.  Tubi's service is available in the United States (including in the District of Columbia), Canada, Mexico, Central America, and Australia.

35.     While registration is not necessary to stream content, users can register an account with Tubi using an email address.  Registered users have access to certain additional and personalized features.

36.     As part of the registration process, the user must agree to Tubi's Terms of Use (the "Terms").  For purposes of this Complaint, Keller Postman purported to initiate arbitration under the Terms that existed between May 1, 2022, and April 18, 2024.  Exs. 8 (Terms of Use dated May 1, 2022) & 9 (Terms of Use dated April 18, 2024).

37.     Section 10 of the Terms, titled "ARBITRATION AGREEMENT AND CLASS ACTION WAIVER," requires that disputes between Tubi and a user be resolved via an arbitration filed with JAMS.  Section 10 also requires that, prior to initiating arbitration, both Tubi and any user engage in an informal dispute resolution process.

38.     The informal dispute resolution process starts with either Tubi or the user sending a formal Notice of Dispute.  Specifically, a party believing there is a dispute:

> must first send by mail to the other a written Notice of Dispute ("Notice") that sets forth the name, address, and contact information of the party giving notice, the ***specific facts***

***giving rise to the Dispute***, the Tubi Service to which the Notice relates, and the relief requested.

Ex. 8 § 10(7) (emphasis added).

39.     The Notice of Dispute containing the specific facts giving rise to the dispute starts a 45-day period in which the user and Tubi "may try to reach a settlement of the Dispute." *Id*. Only if Tubi and the user do not resolve the Dispute within 45 days may a party initiate arbitration. *Id*. § 10(8).

### III.     Keller Postman's Unlawful Scheme to Interfere with Tubi's Users' Contractual Relationship with Tubi and Coerce Tubi into Settlement for Counsel's Personal Benefit.

40.     This case presents the standard Keller Postman scheme, except with a notable twist. Specifically, on top of the ethical issues from solicitation through settlement, Keller Postman has concocted a scheme to induce clients with registered accounts to breach the important conditions precedent to arbitration agreed to in the Terms because Keller Postman felt that breaching those terms would allow it try to weaponize the arbitration provisions.

41.     Some of Keller Postman's conduct fits its normal pattern: Keller Postman has lodged approximately 23,736 cookie-cutter arbitration demands against Tubi with JAMS, each stating: "When Claimant streamed videos on Tubi ... Claimant watched multiple advertisements that Tubi interspersed throughout the videos Claimant was streaming."  Keller Postman did not verify the accuracy of that accusation with respect to any of its clients.

42.     Instead, Keller Postman solicited its clients *en masse*, relying on automated technology as a substitute for investigation and without adequately vetting the prospective claims. Upon information and belief, Keller Postman deployed its frequent partner in Troxel Law to lure prospective clients to Keller Postman.  *See* Exs. 10–11.

43.     Beginning no later than March of 2024, Troxel Law, on behalf of Keller Postman, published advertisements, including Instagram ads and YouTube videos, to lure potential claimants to sign up for claims against Tubi.  Ex. 11 at 5; Ex. 12.  Many of the advertisements are not associated with any firm at all; others mention only Troxel Law.  Exs. 10–12.

44.     Keller Postman and Troxel Law enticed Tubi users to "[s]ign up for a Tubi Compensation Claim" by completing "a short qualification questionnaire," Ex. 13, further promising the user that the questionnaire would only "take[] 2 to 3 minutes" to complete.  Ex. 14.  The questionnaire consisted of just "a couple questions" consisting of a bare minimum of basic identifying information:



45.     As typical, the solicitation process was not capable of obtaining the information Keller Postman needed to vet its clients' cases.  The questionnaire did not ask the individuals to provide factual details about their personal experience with Tubi's service, including when they

registered for Tubi, what information they voluntarily provided to Tubi, how often they watched content on Tubi, or even *whether they had ever seen an advertisement on Tubi*.  Needless to say, if a claimant has never seen an advertisement on Tubi, the claimant has neither an arbitrable nor a valid claim.

46.     Keller Postman's and Troxel Law's solicitation did not even tell the potential claimants what the bases for their claims were.  Instead, they only dangled the prospect of hundreds to thousands of dollars for a couple of minutes of work filling out a questionnaire.

47.     With inadequate additional investigation, the next step in Keller Postman's process following completion of the questionnaire was "a representation agreement" to sign up the potential claimants as clients.

### Keller Postman Sends 23,747 Arbitration Demands—Including Fraudulent Ones—to JAMS and Demands Payment of Fees

48.     From there, Keller Postman received the barebones claimant information in its office in the District of Columbia to generate 23,747 substantively identical arbitration demands that speciously allege, without providing any meaningful facts pertaining to any individual claimant, that Tubi "engage[d] in illegal discriminatory advertising against Claimant on the basis of Claimant's age, sex, *or* gender."  *See, e.g.*, Ex. 15 (emphasis added).  The demands do not allege which one.  The demands proceed to allege that the unspecified practices somehow violate California's Unruh Civil Rights Act, codified as Cal. Civ. Code §§ 51–52.  *Id*.  Warren Postman, Keller Postman's named and managing partner based in the District of Columbia, signed and submitted each of the demands to JAMS and caused them to be served on Tubi.

49.     The demands Keller Postman filed with JAMS reflect the law firm's lack of investigation.  Keller Postman did not adequately verify the accuracy of that accusation with respect to each individual claimant.  Indeed, Keller Postman did not individually verify whether

each claimant had even registered an account with Tubi.  Notably absent from each demand are allegations about: (a) the claimant's age, sex, or gender; (b) which advertisement the claimant wanted to receive or did not want to receive, and when this occurred; (c) which business opportunity the claimant entered into or did not enter into as a result of receiving or not receiving an advertisement, and when this occurred; and (d) what harm the claimant suffered.  Keller Postman's theory is that any user of any age, any sex, or any gender was discriminated against based on their receipt or non-receipt of any advertisement, no matter how much or how little they used the service, no matter whether it caused the user to change their actions or behavior, and no matter whether they *wanted* to receive targeted advertising.  For example, under this theory, an 80-year-old would be entitled to a significant payment every time she received an advertisement for leisure travel and did not receive an advertisement for baby diapers; and a healthy 18-year-old would be entitled to a significant payment every time she received an advertisement to attend college but did not receive an advertisement for a fiber supplement.

50.    As is typical in Keller Postman's cases, reams of claims against Tubi are plainly frivolous.  Tubi has analyzed the 23,736 claims submitted by Keller Postman that are still pending.  That analysis reveals that even a simple inquiry would have shown Keller Postman that more than 40% are frivolous even if Keller Postman managed to prove that Tubi's advertising practices were unlawful (to be clear, they were not).  For example:

a.    As noted above, users register for Tubi accounts using their email addresses, but more than 30% of Keller Postman's claimants have ***never*** been registered users based on the email addresses Keller Postman provided to JAMS, meaning that none of those claimants provided personal information to Tubi as alleged in the demands.

b.      More than 11% of claimants have accounts but have never streamed advertisements on Tubi using those accounts.

c.      Approximately 30% of claimants have not viewed any content in the two years before Keller Postman filed the claims, which means their claims are time barred under the Unruh Act's statute of limitations.

d.      Still more registered for Tubi accounts only after Keller Postman solicited clients on social media by telling people that they were entitled to money if they had a Tubi account.

### Keller Postman Deliberately Causes Claimants to Breach the Contractually-Mandated 45-Day Dispute Resolution Period

51.     But this case is even worse than usual.  Unlike other cases, Keller Postman has intentionally and unilaterally caused its clients with registered accounts to breach the Terms of Use so that the law firm could engage in its scheme and try to profit to the detriment of others, including its clients.

52.     Every single one of the registered Tubi users on whose behalf Keller Postman has filed an arbitration demand was obliged under the Terms to serve a notice that contained specific facts giving rise to the dispute, as part of an informal dispute resolution process.  Keller Postman has caused these users to breach their agreements by not serving the notices, not providing the specific facts giving rise to their disputes, and skipping the 45-day period designed to allow the users and Tubi to try to informally resolve their dispute without the costly expense they now all face.  *See* Ex. 8 § 10(7).

53.     Keller Postman knew about these mandatory, binding provisions.  In fact, in its arbitration demands, it declared, without any legal support, that the 45-day provision was "illusory, unconscionable, and therefore unenforceable."  It made this contention because Keller Postman

could not provide specific facts giving rise to each of the nearly 24,000 disputes.  After receiving the arbitration demands, Tubi pointed out on several occasions that Keller Postman offered no analysis for its statements about the informal dispute resolution terms, and explained why the provision is enforceable.  Despite having many chances, Keller Postman was unable to provide any case law or other legal support for its assertion.

54.     By proceeding to lodge arbitration demands with JAMS, Keller Postman knowingly and intentionally caused its clients with registered accounts to breach the very arbitration agreement that it invokes as the basis for their filings.  *E.g.*, Ex. 15 (asserting that "Claimant makes this demand pursuant [sic] the arbitration agreement contained in Section 10 of Tubi's Terms of Use, effective as of May 1, 2022.").  Keller Postman caused this breach because the firm did not want to go through the process of learning the specific facts giving rise to each of its clients' disputes.  Had its clients complied with these provisions, it would have frustrated the firm's efforts to maximize its personal gain while doing as little work as possible.  Keller Postman's business model does not allow for it to obtain and detail specific facts for its nearly 24,000 clients.

55.     To state the obvious, it was unethical and tortious for Keller Postman to induce its own clients to breach an agreement for its own personal gain.  Keller Postman cannot lawfully induce its clients to breach a contract, or at the very least without obtaining the informed consent from each client after explaining the risks.  *See* D.C. Rules 1.2(e), 8.4(c), (d).  Keller Postman knew that causing its clients to breach the Terms carried potential consequences for its clients, including exposing its clients to the risk of having their claims dismissed by the arbitrator for failure to comply with the arbitration agreement, and creating potential liability for its clients.  Keller Postman at least was required to discuss with its clients the consequences of breaching the

Terms and to assist its clients to "make a good faith effort to determine the validity, scope, meaning or application of the law."  D.C. Rule 1.2(e).  On information and belief, Keller Postman has not done so.

56.     Keller Postman cannot use its clients in furtherance of its own profit-making scheme.  At the core, Keller Postman has created a conflict of interest with its clients by placing its clients in a position where they cannot lawfully recover.  Keller Postman's clients are better off complying with the Terms.  Among other reasons, a user complying with the Terms would eliminate any risk of dismissal for failure to meet the condition precedent, would minimize the risk of being sanctioned for filing a frivolous claim, and would provide the parties with a genuine opportunity to amicably resolve the dispute to both parties' satisfaction.  But Keller Postman is worse off complying with those terms because it would be required to individually investigate each of its clients' claims (which of course is also an ethical requirement it does its best to ignore), and investigating each claim would undermine Keller Postman's business model of extracting quick settlements without spending time on legal work.  The rules of professional ethics prohibit lawyers from selling out their clients this way.  D.C. Rules 1.7, 1.3 cmt. 1 ("This duty requires the lawyer to pursue a matter on behalf of a client despite … personal inconvenience to the lawyer" and to act "with commitment and dedication to the interests of the client.").

57.     Keller Postman's improper tactics are further evidenced by its subsequent conduct. Despite intentionally causing the claimants to violate the Terms of Use, Keller Postman offered to give Tubi the very 45-day stay of the arbitration proceedings that it had already contracted for— but only if Tubi paid for mediation and ignored the notice provision that required the claimants to provide specific details of their claims before filing a demand for arbitration.  This shows Keller Postman's actions are not about vindicating its clients' rights; they are to extort a settlement.

58.     On April 19, 2024, Tubi's counsel emailed JAMS with a copy to Warren Postman. Ex. 16.  Among other things, Tubi's counsel stated: "[T]he claims appear to be a rushed effort to force Tubi into settlement on non-meritorious claims based on JAMS's current policy regarding mass arbitrations.  In rushing to file, Keller Postman caused its purported clients to breach the Terms that call for notice and a 45-day informal dispute resolution process.  The claims themselves acknowledge that Keller Postman and the users were aware of these provisions, yet they breached them anyway."

59.     In addition, on April 25, 2024, Tubi's counsel sent a letter to Mr. Postman, informing him that based on Tubi's preliminary sampling of the arbitration demands, Keller Postman had not complied with its ethical obligation to verify the factual representations in each of its clients' claims before bringing the actions. Ex. 17.  Among other things, the letter explained that the preliminary sampling revealed that more than 40% of the claimants were fraudulent.  The letter asked Keller Postman to explain what actions it took to ensure the accuracy of the factual representations in its arbitration demands and, consistent with its ethical obligations, asked it to withdraw any demands that it had not individually vetted.

60.     After receiving the April 19, 2024 email and the April 25, 2024 letter, Keller Postman partner Albert Pak sent a responsive letter to JAMS on April 26, 2024.  Ex. 18.  In this letter, written on Keller Postman's District of Columbia office's letterhead and with Warren Postman's signature, the law firm failed to address the obvious deficiencies Tubi's counsel had identified.  Instead, Keller Postman asserted in a conclusory fashion that each claimant met the filing requirements necessary to commence the arbitration and urged JAMS to "immediately" proceed with initiating the arbitration proceedings as to all claimants, calling Tubi's assertions about the frivolous nature of the claims "baseless[] and conclusor[y]." *Id.* at 3.  In other words,

Keller Postman, through its partners located in the District of Columbia, advocated that JAMS should invoice Tubi nearly $48 million in non-refundable filing fees, rather than withdrawing the claims so it could conduct a more robust investigation to eliminate the fraudulent and frivolous claims.

61.     Keller Postman further revealed its gameplan to try to strongarm Tubi into making payments unrelated to the merits of the claims in letters signed by Warren Postman, transmitted by Albert Pak, and sent to JAMS on April 30, 2024 and May 5, 2024.  In those letters, Keller Postman argued that JAMS should decline to consolidate for any purpose the nearly 24,000 substantively identical demands because doing so would not result in Tubi having to pay nearly $48 million in fees.  In those letters, Keller Postman did not contest that (a) the arbitration demands share common issues of fact; (b) they are in the same procedural posture; (c) consolidation will streamline proceedings and expedite results; and (d) it would be untenable to arbitrate all 23,747 claims individually.  Nor did it dispute that consolidation would achieve the goal of JAMS providing efficient and cost-effective dispute resolution.  Instead, Keller Postman's primary objection was that consolidation would "result in JAMS issuing one consolidated filing fee" rather than JAMS "assessing a fee on each Claimant's individual claim."  In other words, Keller Postman did not even try to hide that its true motivation in objecting to consolidation was to attempt to force Tubi to face tens of millions in filing fees.

62.     On information and belief, Keller Postman rushed to file these demands for arbitration and disregarded the mandatory notice and the 45-day informal dispute resolution period because it was aware JAMS was about to reform its rules to curtail the mass arbitration abuses by Keller Postman and other firms.  Indeed, counsel for Tubi repeatedly suggested that filing before the pending reform was the firm's motivation, and Keller Postman never denied that fact.  Then,

on May 1, 2024, approximately two weeks after Keller Postman had served the 23,747 demands for arbitration on Tubi, JAMS adopted its reformed rules for mass arbitrations. Ex. 19. In announcing the new rules, JAMS stated that they were "intended to facilitate the fair, expeditious and efficient resolution of mass arbitrations," and to relieve the "administrative burden and onerous fees, as well as delay and potential unfairness to all Parties, all of which may impair the integrity of the Arbitration process." Ex. 20. Under the new rules, Tubi would not have had to pay upfront and non-refundable fees per demand—upwards of approximately $48 million. Instead, it would be required to pay only up to $7,500. Ex. 21. But Keller Postman's whole goal was to impair the integrity of the arbitration process, to have unfairness to Tubi and even Keller Postman's clients pervade the proceedings, and to force Tubi to settle using the threat of onerous fees. For this reason, Keller Postman opposed having JAMS apply the reformed rules. Ex. 15.

63. Keller Postman's actions in furtherance of its scheme did not stop there. On May 7, 2024, Keller Postman, in 23,736 individual letters signed by Warren Postman and transmitted by Albert Pak, demanded $3,000 per claimant—or a total of $71,208,000 to settle the matter. Keller Postman employed another cut-and-paste effort—demanding the same amount of money for each client, regardless of whether they have registered Tubi accounts, ever watched an advertisement, only signed up so that they could file a claim, or viewed any content during the statute of limitations.

64. Throughout, Keller Postman has attempted to put the onus on Tubi to inform Keller Postman which of its clients filed fraudulent claims. But Keller Postman may not shift its ethical duties or its clients' contractual burdens to Tubi. Keller Postman is ethically required to investigate each claim before filing it. And to the extent its clients are Tubi users, they are contractually required to provide Tubi with the "specific facts giving rise to the Dispute." Ex. 8 § 10(7).

65.     On May 15, 2024, Tubi's counsel participated in a meeting with Mr. Postman and Mr. Pak, which Mr. Postman took from Keller Postman's District of Columbia office.   In the meeting, Mr. Postman and Mr. Pak refused to withdraw the claims to allow their clients and Tubi to engage in the informal dispute resolution process discussed in the Terms.  Further, Mr. Postman and Mr. Pak refused to provide information on the specific facts giving rise to the claims.  They could not and would not provide Tubi's counsel the age, gender, or sex of any claimant.  Despite being asked on several occasions, they refused to discuss *whether they even have* information indicating that any claimant received or did not receive a particular advertisement.  This conduct shows why Keller Postman tortiously interfered with its clients' contracts with Tubi: the law firm has conducted an insufficient investigation and cannot provide specific facts giving rise to the dispute.

66.     In the same meeting, Tubi's counsel asked Mr. Postman if his theory is that targeted advertising based even in part on age, sex, or gender is unlawful under the Unruh Act.  Mr. Postman indicated that is his theory.  When Tubi's counsel asked whether Keller Postman solicits clients using similar targeted advertising, Mr. Postman and Mr. Pak refused to answer the question.

67.     Keller Postman's submissions and letters, including those to JAMS and to Tubi, reflect an improper effort to use a portion of the Terms to wage war against Tubi but disregard the provisions that are meant to allow Tubi and its customers to resolve their disputes in an amicable and non-adversarial manner.  Keller Postman picks and chooses which provisions fit its scheme and ignores those that do not.  Keller Postman did not send the demands for arbitration or its letters in a good-faith effort to represent its clients zealously.  To the contrary, its clients would have been better off following the process set forth in the arbitration agreement and avoiding the risk of dismissal, potential counterclaims, and potential sanctions.  Instead, Keller Postman had an ulterior

motive.  In direct opposition to the interests of those clients without obviously fraudulent claims, Keller Postman sent the demands for arbitration and its letters to JAMS to induce JAMS to immediately send Tubi a nearly $48 million bill so as to extort a quick settlement in which Keller Postman would benefit above all others, and which would preclude any need for Keller Postman to educate itself about the facts of its clients' claims.

68.     As mentioned above, Keller Postman's efforts to force Tubi into a settlement based not on merit but instead on fear of a massive upfront arbitration bill have failed.  Further, on May 20, 2024, JAMS agreed to consolidation, which means that Tubi will pay thousands, rather than millions, to begin the arbitration.  JAMS decided that the issue of whether the claimants met the precondition for arbitration should be left to the still-to-be assigned arbitrator.  Regardless, Tubi has been injured and will continue to be injured by Keller Postman's tortious interference.  For example, Tubi was forced to hire counsel to contest whether the claims should be arbitrated and whether JAMS should issue a $48 million invoice, and to argue for consolidation.  Tubi will have to pay ongoing fees to the arbitrator and to JAMS, along with attorneys' fees that it would not have had to pay but for Keller Postman's tortious interference.  These arbitration and attorneys' fees, which should have been unnecessary but for Keller Postman's tortious interference, will result in damage to Tubi well in excess of $75,000.  The claims are not ripe for arbitration because Keller Postman's clients have not met the precondition for arbitration, and Keller Postman has caused its clients to breach that binding term because it was incapable of providing, and unwilling to make the effort to provide, specific facts giving rise to the dispute.

69.     Simply put, Keller Postman has acted in bad faith, with actual malice, and independent of any desire to protect its clients.  It committed its tortious acts with fraud, ill will,

recklessness, wantonness, oppressiveness, willful disregard of Tubi's rights, and has otherwise aggravated Tubi's injury.

70.     If not enjoined by this Court, Keller Postman will continue to improperly interfere with the Terms of Use agreements between Tubi and its users.

## CLAIM I

### TORTIOUS INTERFERENCE

71.     Tubi incorporates by reference and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

72.     Tubi has valid contractual relationships with users of its platform, all of whom necessarily agreed to the Terms of Use.

73.     The Terms set forth an informal dispute resolution provision, which expressly required a user to provide Tubi with notice and specific facts giving rise to the dispute, followed by a 45-day period for the parties to engage in an informal dispute resolution process to reach a settlement.

74.     Keller Postman had knowledge of the Terms before filing the 23,747 demands for arbitration.  By improperly lodging demands for arbitration, Keller Postman intentionally caused users to breach their agreements with Tubi and fail to perform their obligations under the Terms.

75.     Keller Postman wanted to interfere with the users' performance of their obligations and knew that its actions were substantially certain to cause such interference.  Keller Postman further knew that its actions were certain or substantially certain to interfere with Tubi's business.  Yet Keller Postman nevertheless induced users to breach their agreements for its own financial gain.

76.     Keller Postman has acted with a desire to harm Tubi that was independent of any desire to protect its clients.  Keller Postman has acted with actual malice and bad faith.

77.     Keller Postman's tortious interference was the proximate cause of the users' failure to perform their obligations under the Terms.

78.     Tubi has suffered damages caused by Keller Postman's interference in excess of $75,000.

## CLAIM II

### DECLARATORY RELIEF

79.     Tubi incorporates by reference and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

80.     An actual and substantial controversy exists between Tubi and Keller Postman concerning the legality of Tubi's alleged conduct.

81.     This dispute is ripe.  Keller Postman has filed nearly 24,000 frivolous and/or improper arbitration demands on behalf of its clients against Tubi in breach of the clients' contractual relationships and/or premised on false statements and a misapplication of the Unruh Act.

82.     Resolution of the legal questions at issue by this Court is thus necessary, as there exists no adequate remedy at law and Tubi will be irreparably harmed if Keller Postman maintains existing and future arbitrations against Tubi based on the same legal theory or process violations.

83.     Tubi is entitled to a declaration that: (a) Keller Postman has tortiously interfered with the valid and binding notice and informal dispute resolution provisions of the Terms of Use; (b) the allegations in the claims Keller Postman filed in the purported mass arbitration against Tubi

do not provide specific facts to support Unruh Act claims; and (c) Keller Postman has violated its ethical duties in bringing the demands for arbitration.

## **PRAYER FOR RELIEF**

WHEREFORE, Tubi respectfully requests that the Court award the following relief:

84.     A declaration that: (a) Keller Postman has not provided sufficient notice under the Terms, including "specific facts" for each Unruh Act claim; and (b) Keller Postman has tortiously interfered with the valid and binding notice and informal dispute resolution provisions of the Terms;

85.     Injunctive and equitable relief as is necessary to protect Tubi by: (a) restraining Keller Postman, its employees, representatives, agents, and all persons or entities acting in concert with them during the pendency of this action and thereafter perpetually from filing and prosecuting arbitration demands against Tubi before the users have gone through the notice and informal dispute process detailed in Section 10 of the Terms; (b) requiring Keller Postman to withdraw the demands for arbitration it filed with JAMS; and (c) in the alternative to the relief in (b), ordering stays of all arbitration proceedings, including the payment of any invoices by Tubi, during the pendency of this action;

86.     Award of compensatory, special, and punitive damages in an amount to be determined at trial;

87.     Pre-judgment and post-judgment interest on any portion of damages that is awarded for a liquidated amount;

88.     Tubi's reasonable costs and attorney's fees incurred in this action; and

89.     Any such other and further relief as the Court deems just and proper.

DATED: May 31, 2024               JENNER & BLOCK LLP

                                  By: /s/  Kelly M. Morrison
                                  _____
                                      Brandon D. Fox (*pro hac vice forthcoming*)
                                      bfox@jenner.com
                                      Kelly M. Morrison (D.C. Bar No. 1046293)
                                      kmorrison@jenner.com
                                      Sati Harutyunyan (D.C. Bar No. 1049009)
                                      sharutyunyan@jenner.com
                                      515 South Flower Street, Suite 3300
                                      Los Angeles, CA  90071-2246
                                      Telephone:  (213) 239-5100
                                      Facsimile:  (213) 239-5199


                                      *Attorneys for Plaintiff*

## JURY DEMAND

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Tubi, Inc. hereby requests a jury trial.


DATED: May 31, 2024                    JENNER & BLOCK LLP

                                       By: /s/  Kelly M. Morrison
                                           Brandon D. Fox (*pro hac vice forthcoming*)
                                           bfox@jenner.com
                                           Kelly M. Morrison (D.C. Bar No. 1046293)
                                           kmorrison@jenner.com
                                           Sati Harutyunyan (D.C. Bar No. 1049009)
                                           sharutyunyan@jenner.com
                                           515 South Flower Street, Suite 3300
                                           Los Angeles, CA  90071-2246
                                           Telephone:  (213) 239-5100
                                           Facsimile:  (213) 239-5199


                                       *Attorneys for Plaintiff*

# EXHIBIT 1





**Complaints**

# Troxel Law, LLP

Civil Lawyer

View Business profile

## Need to file a complaint?

BBB is here to help. We'll guide you through the process.

File a Complaint

## Complaint Details

Note that complaint text that is displayed might not represent all complaints filed with BBB. See details.

**Complaint Type:**
Service or Repair Issues
**Status:**
Unanswered

 **Initial Complaint**
01/16/2024

I missed out on a potential $500,000.00 payment for a discrimination case by the usda because this sub standard law firm did not do what they said they would do by submitting my application on time. I was told per phone conversation that lasted over an hour everything was in order and that attorneys would reach out to me should they have any questions or updates. It is easy to see why they have an F rating with the BBB and so many negative reviews. I am experiencing high anxiety and severe panic attacks along with deep depression over this law firm not displaying honor, respect, moral integrity. Their unethical practices will be no doubt be the cause of my demise do to the before medical conditions Im now experiencing over this.

We use cookies to give users the best content and online experience. By clicking "Accept All Cookies", you agree to allow us to use all cookies. Visit our Privacy Policy to learn more.

**Status:**
Unanswered



**Initial Complaint**
01/11/2024

The beginning of October I signed up with Troxel Law to be represented by them in the **** farmers discrimination act. After signing with them I did an initial interview, signed what I needed to, provided the documents they asked for, and was told they would be in contact if anything else was needed. On December 28th I received an email that they needed more information from me so I called the provided number, and waited for a reply to talk to. When I did get one on the line the call was disconnected. So I used the link to set up a call back, which was missed on their end. I used the link to set up another call back just after new years which was also missed and tried a 3rd time to no avail. I've tried calling in and waiting on the phone line. They said the wait was about 5 mins and I was waiting close to a half hour before pressing the option to leave a voice-mail with all the info needed to call me back and what it was about. I never heard anything so I tried again a bit later with another voice-mail. I have tried my best to meet their requests, some which had already been provided and when I talk to the initial rep in October she had said everything was signed and completed. Now I've received an email stating I did not fulfill the requirements nor sign the agreement (which I have an email that states I did) and so they will drop my case. I also looked up their website to see of there were other numbers to call and when I called the one on the page it sent me to a Medical phone line. Now it is probably too late for me to sign up with anyone else or to submit by myself and now my business and farm will suffer again due to them.

**Complaint Type:**
Service or Repair Issues
**Status:**
Unanswered



**Initial Complaint**
10/13/2023

I was told that triple law claim was a lie and I signed over my sons information for no reason. I do not want his information to be out to the public.



**Customer response**
11/07/2023

Better Business Bureau:

At this time, **I have not been contacted by Troxel Law, LLP** regarding complaint **ID ********.**

Sincerely,

We use cookies to give users the best content and online experience. By clicking "Accept All Cookies", you agree to allow us to use all cookies. Visit our Privacy Policy to learn more.

**Complaint Type:**
Product Issues
**Status:**
Unanswered

 **Initial Complaint**
09/19/2023

I keep getting emails some times 30 a day I wish trowel law to remove my email ****************** from there mailing list.there is no opt out anywhere on there requests for info from me

 **Customer response**
10/13/2023

Better Business Bureau:

At this time, **I have not been contacted by Troxel Law, LLP** regarding complaint **ID ********.**but it seems the annoying emails have stopped, so maybe your request for a response to me has worked. Will keep my fingers crossed.
Thanks

Sincerely,

********************

**Complaint Type:**
Service or Repair Issues
**Status:**
Resolved

 **Initial Complaint**
07/10/2023

I filled out a Tylenol claim after seeing the ad on *********. Instantly I regretted it after trying to research the firm. I came on this site and saw that many were trying to get in touch and failed. I called them and received a voice message. I informed them I was recording the message and left my name , number, date and time of the voice message and that I was withdrawing my application and access to medical records. I got a call back in a half hour and they withdrew it. And I asked them to document it with sending me an email of my withdrawal. I received the email right after. Hope this helps some other parents.

 **Customer response**
07/10/2023

We use cookies to give users the best content and online experience. By clicking "Accept All Cookies", you agree to allow us to use all cookies. Visit our [Privacy Policy](#) to learn more.

Sincerely,

****************************

**Complaint Type:**
Sales and Advertising Issues
**Status:**
Unanswered

 **Initial Complaint**
05/15/2023

One day I was online and noticed it said You can file a claim if you were pregnant and took Tylenol acetaminophen and your child has ADHD or autism. I looked up online a few different law firms I can make this claim with. One of them was called Troxel law firm. So I filed a claim with this law firm and at first they were in contact with me a lot. Once I signed the packet which I uploaded to you I've barely heard back from them. I've been trying to email them I've been calling them haven't heard back. So I went online to the law firm's website and got a number that's on their page. When you call the number it's a recording of a girl asking pretty much if I want to hook up. It seems like a *** hotline. Now I'm panicking because I did sign a few papers with them One of them being my son's medical records and another pretty much saying they're my law firm for this case and how much I have to pay them. I'm freaking out can somebody please help me get a hold of them so I can drop my claim with them. I do not want to go any further but again I haven't heard back from them please help. My son is severely autistic and he's Also nonverbal the last thing I need is somebody trying to get his medical records for some kind of scam. How do I stop this. And not just that what are they trying to do use my son's medical records to scam money I don't get it please help thank you

**Complaint Type:**
Service or Repair Issues
**Status:**
Unanswered

 **Initial Complaint**
05/01/2023

I want to be able to unsubscribe I'm getting spam

We use cookies to give users the best content and online experience. By clicking "Accept All Cookies", you agree to allow us to use all cookies. Visit our [Privacy Policy](#) to learn more.

**Complaint Type:**
Service or Repair Issues
**Status:**
Unanswered

 **Initial Complaint**
03/31/2023

5/27/2022 Information was sent to me in regards to a case against Tylenol for harm to a child while pregnant. I looked into the case and the firm to see if it was legit which it was. When I was pregnant I did use that medication and my son does have ADHD and Autism. So I was in contact with this law firm more then once and I signed the Doc sign on 5/27/22 as well. Ever since then I have not heard from anyone nor have they tried to reach out to me or answered any of my emails. I do not wish to have this firm or any of their employees represent me . I want all documents to be null and voided. They are not working in a proper legal manner they don't value their cases and they are frauds. I do not want them to have access to my sons medical records @ all. If nothing is done about this company than legal action against them will be taking. 06/9/22 and 7/13/22 was the last emails I received from this firm and it was nothing but ******** in the email. I reached out to them on 11/2/22,12/6/22 , and today and still nothing.

**Complaint Type:**
Product Issues
**Status:**
Unanswered

 **Initial Complaint**
03/30/2023

Spoke with Troxel Law about the Camp Legume water lawsuit in July of 2022. My husband served at the base and died of cancer after 3 different bouts with cancer. They had me DocuSign a form and took some information. They said I would be receiving paperwork in the mail within 2 months. It is now March 2023. I have received no paperwork. I have made multiple calls and left several messages with my name a number. I have not been able to contact them. My husband's death should not be in vain. I would like to discontinue with this company. I will be sending registered mail stating this to them on March 31st 2023.

**Complaint Type:**
Product Issues
**Status:**
Unanswered

 **Initial Complaint**
03/27/2023

We use cookies to give users the best content and online experience. By clicking "Accept All Cookies", you agree to allow us to use all cookies. Visit our Privacy Policy to learn more.



which included my name, address and phone number. I provided nothing in regards to my SSN or credit card numbers. I received an email from them stating the following: Please check your email for information about the law and arbitration process You will soon receive a series of emails explaining the law that applies to your claims and the process we will use in our attempts to resolve them. We will also send you regular updates by email. We ask that you check your email, both inbox and spam/junk folders, once a week during the course of your case, and advise us of any changes to your contact information. You pay nothing unless we recover money for you The retainer you signed lays out our fee agreement in detail, but the bottom line is that you dont pay us anything unless and until we win something for you, and you will never owe us more than the total amount of recovery we obtain on your behalf.I do not want to be in a legal agreement with this company. It appeared to be a class action settlement open to the public.

| 1 | 2 | 3 | Next ▶ |

*Some consumers may elect to not publish the details of their complaints, some complaints may not meet BBB's standards for publication, or BBB may display a portion of complaints when a high volume is received for a particular business. ↩

BBB Business Profiles may not be reproduced for sales or promotional purposes.

BBB Business Profiles are provided solely to assist you in exercising your own best judgment. BBB asks third parties who publish complaints, reviews and/or responses on this website to affirm that the information provided is accurate. However, BBB does not verify the accuracy of information provided by third parties, and does not guarantee the accuracy of any information in Business Profiles.

When considering complaint information, please take into account the company's size and volume of transactions, and understand that the nature of complaints and a firm's responses to them are often more important than the number of complaints.

BBB Business Profiles generally cover a three-year reporting period. BBB Business Profiles are subject to change at any time. If you choose to do business with this business, please let the business know that you contacted BBB for a BBB Business Profile.

As a matter of policy, BBB does not endorse any product, service or business.

## BBB Rating & Accreditation

# F

THIS BUSINESS IS NOT BBB ACCREDITED

Search for Accredited

We use cookies to give users the best content and online experience. By clicking "Accept All Cookies", you agree to allow us to use all cookies. Visit our Privacy Policy to learn more.

**Customer Reviews are not used in the calculation of BBB Rating**

[Reasons for BBB Rating](#)

## Contact Information

📍 195 Montague St
    Brooklyn, NY 11201-3628

🌐 [Visit Website](#)

📞 [(929) 295-4157](#)

## Complaints Summary

**26** total complaints in the last 3 years.

**11** complaints closed in the last 12 months.

© 2024, International Association of Better Business Bureaus, Inc., separately incorporated Better Business Bureau organizations in the US and Canada, and BBB Institute for Marketplace Trust, Inc. All rights reserved. *In Canada, trademark(s) of the International Association of Better Business Bureaus, used under License.

We use cookies to give users the best content and online experience. By clicking "Accept All Cookies", you agree to allow us to use all cookies. Visit our [Privacy Policy](#) to learn more.



## Complaints

# Troxel Law, LLP

Civil Lawyer



**Not BBB Accredited**

View Business profile

**Need to file a complaint?**
BBB is here to help. We'll guide you through the process.

File a Complaint

## Complaint Details

Note that complaint text that is displayed might not represent all complaints filed with BBB. See details.

**Complaint Type:**
Order Issues
**Status:**
Unanswered



**Initial Complaint**
03/10/2023

I joined a lawsuit against ****** via an ad on Instagram from Troxel law by way of ********************. After joining I reread the contract and the fees agreed to are higher than what would come from the suit. The contract said you could cancel the engagement within 24 hours by emailing ***************************** which I did. I never heard back from them. I tried calling them via their 800 number and their ******* office number and the recording said there's a high call volume and someone would get back to me if I left a message. This was their outgoing message every time I called. They have not responded to any emails or calls even though I emailed ***************************** within 8 hours of the contract signing to cancel. This seems like a SUPER shady way for these forms to get people to essentially sign on to a case and agree to giving any resulting proceeds to the law firms.

We use cookies to give users the best content and online experience. By clicking "Accept All Cookies", you agree to allow us to use all cookies. Visit our Privacy Policy to learn more.

**Complaint Type:**
Customer Service Issues
**Status:**
Unanswered

 **Initial Complaint**
02/23/2023

I am unable to reach this law firm to request a TURN DOWN letter. Im interested in pursuing my case with a more reputable firm. Their evasiveness is evidence they are a possible scam.

 **Customer response**
04/02/2023

At this time, I have been contacted directly by Troxel Law, LLP regarding complaint ID ********, **however my complaint has NOT been resolved because:**

**[Your Answer Here]**

No I have not heard from Troxel law

**In order for the BBB to appropriately process your response, you MUST answer the question above.**

Sincerely,

*************************

**Complaint Type:**
Order Issues
**Status:**
Unanswered

 **Initial Complaint**
01/27/2023

This firm, Troxel Law firm sent me docu sign documents to sign in a claim that Tylenol caused my son ******* Autism. I signed the second document by mistake and would like to withdraw all consent and documents signed. I tried to reach out to them but all numbers listed hung up after first ring. To make it clear, I do not want this firm representing me.

We use cookies to give users the best content and online experience. By clicking "Accept All Cookies", you agree to allow us to use all cookies. Visit our Privacy Policy to learn more.

Better Business Bureau:

At this time, **I have not been contacted by Troxel Law, LLP** regarding complaint **ID ********.**

Sincerely,

---

**Complaint Type:**
Product Issues
**Status:**
Unanswered

 **Initial Complaint**
01/11/2023

It has to do with a ******** a breach of contract that they did and how they got my information and I contacted these people and they said that they were going to send me money and it's never happened and I know that the Judgment was made on ******** to pay all of their people who got breached can you please help me really like my money

---

**Complaint Type:**
Product Issues
**Status:**
Unanswered

 **Initial Complaint**
01/11/2023

I was approached by Troxel Law through email. My family was stationed at Camp L and I filed paperwork with them on behalf of my brother and father both deceased and my sister, who was born at Camp L and now has cancer. And myself with liver disease. I signed paperwork with all of our info on 7/14/22. I have tried a few times to get an update but I receive nothing! I want to withdraw my information so I can refile with someone who will keep in touch with me. Immediately please.

---

**Complaint Type:**
Order Issues
**Status:**
Unanswered

 **Initial Complaint**

We use cookies to give users the best content and online experience. By clicking "Accept All Cookies", you agree to allow us to use all cookies. Visit our Privacy Policy to learn more.

card information.

**Complaint Type:**
Service or Repair Issues
**Status:**
Unanswered

 **Initial Complaint**
12/21/2022

On or before 8/10/22 I was solicited by Troxel Law LLC/*********/Post in regards to the Camp Le June toxic waste water claim. After speaking on the phone with a rep they sent a document via Docusign.net to sign. I sign the document before completely reading the contract which stated they wanted 40% of the claim. As per the following I tried to contact the immediately to cancel the contract before any services were provided."Termination of this Agreement. If this Agreement is terminated before the case is resolved, Client gives Attorneys a lien against any subsequent recovery in this case for Attorneys time and expenses. If an offer has been negotiated, Attorneys will have a lien upon any subsequent recovery equal to 40% of the offer, or an amount to compensate for time and expenses, whichever is greater. Client may terminate Attorneysrepresentation of Client at any time by providing written notice to Attorneys at the address of their principal office. Attorneys may withdraw from representation of Client at any time if they determine prosecution of the claim is not practicable." also"Contingency Fee. Client will only owe a legal fee if Attorneys collect compensation on Clients behalf. If Attorneys are unable to collect anything on Clients behalf, Client will owe nothing. If Attorneys obtain settlement or judgment for Client, Client will pay to Attorneys forty percent (40%) of the gross recovery, before reimbursement of expenses, divided among the attorneys as follows: 90% to ************************* and 10% to Troxel Law LLP. If any judgment is rendered pursuant to 28 U.S.C. 1346(b), or if any settlement is made pursuant to 28 U.S.C. **** or ****, attorneys fees will be capped to the extent required by 28 U.S.C. ****. The fee set forth in this Agreement is not set by law but is negotiable prior to signing the Agreement."This I was not in agreement with therefore I have tried to contact them serval times by phone and received no answer.

**Complaint Type:**
Service or Repair Issues
**Status:**
Unanswered

 **Initial Complaint**
12/14/2022

This firm, Troxel Law firm sent me docu sign documents to sign in a claim that chemical relaxers caused my fibroids. I signed the second document by mistake and would like to withdraw all consent and documents signed. I tried to reach out to them but all numbers listed

We use cookies to give users the best content and online experience. By clicking "Accept All Cookies", you agree to allow us to use all cookies. Visit our Privacy Policy to learn more.

**Complaint Type:**
Product Issues
**Status:**
Unanswered

      **Initial Complaint**
08/17/2022

This company emailed me and tricked me into signing some docu sign in regards to me being born at camp ******* and promised false hope in getting a settlement and then not replying or returning calls or emails. Now my information is out and I would like all of my information ands documents that they have for me returned and that they don't try to file a case with the camp ******* on my behalf . Thanks *****************************.

      **Customer response**
09/13/2022

At this time, I have been contacted directly by Troxel Law, LLP regarding complaint ID ********, **however my complaint has NOT been resolved because:**

**[Your Answer Here]**

 I have not talked to a human but was sent an email with a link to watch some hearing on the matter and was not able to open the link. Tried to call company again and no answer.

**In order for the BBB to appropriately process your response, you MUST answer the question above.**

Sincerely,

*****************************

**Complaint Type:**
Order Issues
**Status:**
Unanswered

      **Initial Complaint**
07/12/2022

5/21/2022 I filled out some papers concerning Camp ******* toxic water claim. I found out that

We use cookies to give users the best content and online experience. By clicking "Accept All Cookies", you agree to allow us to use all cookies. Visit our Privacy Policy to learn more.



anything online or ********* I want people to beware. Thank you for your cooperation in this matter. I hope you can help me.

Prev.    | 1 |    | 2 |    | 3 |    Next ►

*Some consumers may elect to not publish the details of their complaints, some complaints may not meet BBB's standards for publication, or BBB may display a portion of complaints when a high volume is received for a particular business. ↵

BBB Business Profiles may not be reproduced for sales or promotional purposes.

BBB Business Profiles are provided solely to assist you in exercising your own best judgment. BBB asks third parties who publish complaints, reviews and/or responses on this website to affirm that the information provided is accurate. However, BBB does not verify the accuracy of information provided by third parties, and does not guarantee the accuracy of any information in Business Profiles.

When considering complaint information, please take into account the company's size and volume of transactions, and understand that the nature of complaints and a firm's responses to them are often more important than the number of complaints.

BBB Business Profiles generally cover a three-year reporting period. BBB Business Profiles are subject to change at any time. If you choose to do business with this business, please let the business know that you contacted BBB for a BBB Business Profile.

As a matter of policy, BBB does not endorse any product, service or business.

## BBB Rating & Accreditation



**F**

THIS BUSINESS IS NOT BBB ACCREDITED

Search for Accredited
Businesses in this category

**Years in Business:** 5

**Customer Reviews are not used in the calculation of BBB Rating**

Reasons for BBB Rating

We use cookies to give users the best content and online experience. By clicking "Accept All Cookies", you agree to allow us to use all cookies. Visit our Privacy Policy to learn more.

Business Complaints | Better Business Bureau Profile

📍 195 Montague St
Brooklyn, NY 11201-3628

🌐 [Visit Website](#)

📞 [(929) 295-4157](#)

## Complaints Summary

**26** total complaints in the last 3 years.

**11** complaints closed in the last 12 months.

© 2024, International Association of Better Business Bureaus, Inc., separately incorporated Better Business Bureau organizations in the US and Canada, and BBB Institute for Marketplace Trust, Inc. All rights reserved. *In Canada, trademark(s) of the International Association of Better Business Bureaus, used under License.

We use cookies to give users the best content and online experience. By clicking "Accept All Cookies", you agree to allow us to use all cookies. Visit our [Privacy Policy](#) to learn more.





**Complaints**

# Troxel Law, LLP

Civil Lawyer

View Business profile

**Need to file a complaint?**
BBB is here to help. We'll guide you through the process.

File a Complaint

## Complaint Details

Note that complaint text that is displayed might not represent all complaints filed with BBB. See details.

**Complaint Type:**
Sales and Advertising Issues
**Status:**
Unanswered



**Initial Complaint**
06/30/2022

I filed a claim through *********************************** on 05/14/2022 and had not heard anything from the law firm. Their website states that they have 24/7 service; however, I tried to call to follow up on the claim and it went right to voicemail. I began to investigate and I am very worried that this was a scam and I provided a lot of detailed medical information, as well as SSN and personal identifying information for both myself and my son. I need to know if this is a legitimate business or if I have been scammed and what to do to protect myself and my son from identity theft and/or any other negative repercussions.

We use cookies to give users the best content and online experience. By clicking "Accept All Cookies", you agree to allow us to use all cookies. Visit our Privacy Policy to learn more.

Unanswered



### Initial Complaint
05/24/2022

Troxel Law, LLP *************************** LLC failed to disclose their success fee amounts upon signing up for TurboTax Settlement Inquiry. Their website states they take out 40% of claim if claim is won. They say my amount due to me is $139.08. They say theyre deducting $250 for attorneys fees and $24.93 legal Theyre falsely advertising that they only take 40% but they're scamning people alot more than what their terms ob their website state. Theyre supposed to be fair & fighting for customer rights who were scammed initially but turning right around to rip off these same consumers who thought they were finding justice & getting back at least a portion of what they were scammed That's hypocritical! Unacceptable!!! And likely to get them in the same situation as turbo tax being sued. I want my full amount due to me! They're required to pay us back what we're due. Theyre sending a document to everyone to sign giving them authorization to take out whatever share they State in their amount due & deducted. I did not sign. I know my rights. And they are fraudulently taking **** or more consumers for much more than they advertise. There was no mention of amount on claim form & no agreement period saying the amount. But their website says 40%. Then suddenly their website page is broken where that states those details, but I have a screen shots. I wish for my request of full amount 60% due to me be sent. They are not entitled to more than stated in terms & advertised. I'll agree to the 40% to you. That's not even making up for what I was scammed out of by turbo Tax in the first place.But it's better than nothing. *************************



### Customer response
07/21/2022

I have not had any communication with Troxel them regarding this complaint. I told the legal team about it tho. Better Business Bureau:

At this time, **I have not been contacted by Troxel Law, LLP** regarding complaint **ID **********.

Sincerely,

*************************

**Complaint Type:**
Sales and Advertising Issues
**Status:**
Unanswered



### Initial Complaint
05/19/2022

I was an idiot and without thinking signed medical releases for me and my son. It was a knee

We use cookies to give users the best content and online experience. By clicking "Accept All Cookies", you agree to allow us to use all cookies. Visit our Privacy Policy to learn more.



**Customer response**
07/18/2022

Better Business Bureau:

At this time, **I have not been contacted by Troxel Law, LLP** regarding complaint **ID ********.**

Sincerely,

***************************

**Complaint Type:**
Service or Repair Issues
**Status:**
Unanswered



**Initial Complaint**
09/28/2021

They said they represented a class action law suit against Century link. Promised me a monetary amount. When I tried to contact them - url not available, phone rings with no answer and another number said to call back later.



**Customer response**
09/28/2021

Dear ***********************:

When you signed up for *********** services you likely agreed to a process called arbitration. An arbitration is like a lawsuit. But instead of suing in court, you go through a faster process, handled by a private, nonprofit organization called the ********************************* often called AAA. Instead of a judge or jury, your claim is decided by an arbitrator, chosen by AAA. Heres how it works:

The Demand We file a demand for arbitration on your behalf.

The Filing Fee AAA requires a filing fee to begin new cases.CenturyLinkwill pay all or the majority of this fee. We will advance any amount that you are responsible for.

We use cookies to give users the best content and online experience. By clicking "Accept All Cookies", you agree to allow us to use all cookies. Visit our [Privacy Policy](#) to learn more.

handled, with input from both parties.

Discovery and Motion Practice Depending on what the arbitrator allows, both sides may be able to ask the other side questions and ask for documents and other evidence. This information gathering process is called discovery. We may need your help during this phase to help us answer questions about your use of the websites. The parties can then ask the arbitrator to make preliminary decisions about the law.

The ArbitrationThe arbitration itself will be like a trial but less formal. It is also possible that the arbitration will be done on the papers, meaning that, instead of having a trial where the lawyers, witnesses, and arbitrator all get together in person, the arbitrator will allow the parties to submit their evidence and arguments in writing.

The Decision The arbitrator will then decide who wins.

Please keep in mind two things: First, the parties can settle at any time, so there is no guarantee we will get all the way through this process. Second, it is hard to predict how long it will take to reach a decision or settlement.

If you have any questions, please email us ************************************ call us at*************And please tell us right away if your contact informationemail, address, phone numberchanges.

The *************************** Team

CenturyLinkls Claims - *************************************************************** *****
sent to:***********************************

What's the status of thiscase?

Show quoted text

We use cookies to give users the best content and online experience. By clicking "Accept All Cookies", you agree to allow us to use all cookies. Visit our Privacy Policy to learn more.

\*Some consumers may elect to not publish the details of their complaints, some complaints may not meet BBB's standards for publication, or BBB may display a portion of complaints when a high volume is received for a particular business. ↵

BBB Business Profiles may not be reproduced for sales or promotional purposes.

BBB Business Profiles are provided solely to assist you in exercising your own best judgment. BBB asks third parties who publish complaints, reviews and/or responses on this website to affirm that the information provided is accurate. However, BBB does not verify the accuracy of information provided by third parties, and does not guarantee the accuracy of any information in Business Profiles.

When considering complaint information, please take into account the company's size and volume of transactions, and understand that the nature of complaints and a firm's responses to them are often more important than the number of complaints.

BBB Business Profiles generally cover a three-year reporting period. BBB Business Profiles are subject to change at any time. If you choose to do business with this business, please let the business know that you contacted BBB for a BBB Business Profile.

As a matter of policy, BBB does not endorse any product, service or business.

## BBB Rating & Accreditation



**THIS BUSINESS IS NOT BBB ACCREDITED**

Search for Accredited
Businesses in this category

**Years in Business:** 5

**Customer Reviews are not used in the calculation of BBB Rating**

Reasons for BBB Rating

## Contact Information

📍 195 Montague St
Brooklyn, NY 11201-3628

🌐 Visit Website

We use cookies to give users the best content and online experience. By clicking "Accept All Cookies", you agree to allow us to use all cookies. Visit our Privacy Policy to learn more.

## Complaints Summary

**26** total complaints in the last 3 years.

**11** complaints closed in the last 12 months.

© 2024, International Association of Better Business Bureaus, Inc., separately incorporated Better Business Bureau organizations in the US and Canada, and BBB Institute for Marketplace Trust, Inc. All rights reserved. *In Canada, trademark(s) of the International Association of Better Business Bureaus, used under License.

We use cookies to give users the best content and online experience. By clicking "Accept All Cookies", you agree to allow us to use all cookies. Visit our Privacy Policy to learn more.

# **EXHIBIT 2**



Parents of Preemies with NEC: You May Be Owed Compensation. Contact Us Today For a **Free Case Evaluation**.



# Mass Arbitrations
**PRACTICE**

We level the playing field for our clients when contracts written by defendants force them into arbitration.

OVERVIEW                                                              ⌄

OVERVIEW    TEAM    NEWS

Keller Postman pursues hundreds of thousands of individual arbitrations simultaneously for employees and consumers who are forced into arbitration. Large corporations often compel injured employees and consumers to give up their right to go to court and instead participate in a process designed by the business to favor itself. Keller Postman puts power on our clients' side by outmatching even the largest corporations with ample resources, expert lawyering, and the latest technology to pursue thousands of individual claims all at once.

Keller Postman has single-handedly changed the way big corporations think about arbitration clauses.

Our team has successfully represented plaintiffs in complex mass-arbitration proceedings throughout the United States, including:

- Wage-and-hour disputes
- Employee-misclassification claims
- Consumer-product disputes
- Other types of contract-related disputes



**Get a Free Case Evaluation**

START YOUR CASE

## What Is Arbitration?

Arbitration is an out-of-court dispute-resolution proceeding that serves as an alternative to litigation. Arbitration differs from litigation in a few key respects:

- In litigation, a judge or jury decides the case. In arbitration, the parties choose an arbitrator to resolve the dispute.
- Arbitration involves many of the same elements as a court case, but it follows a less formal, more streamlined process. The rules governing arbitration are also different from—and less rigid than—the rules governing litigation.
- An arbitrator's decision is usually binding on the parties and cannot be appealed or reviewed by a court except in limited circumstances.

## Potential Challenges of Arbitration for Plaintiffs

Large corporate defendants often prefer arbitration to litigation because consumers and employers are typically required to bring claims individually in arbitration and cannot rely on the efficiencies of class actions the way they can in court. This gives large companies leverage over plaintiffs in several ways:

- Consumers or employees often have trouble finding a lawyer willing to represent a client with a small or medium-sized claim.
- Plaintiffs sometimes are required to pay a filing fee to pursue an arbitration, and that fee can represent a significant percentage of the total value of the claim.
- Although arbitration is intended to be simpler and faster than litigation, some defendants use their greater resources to complicate and delay the process.

## How Keller Postman Levels the Playing Field for Plaintiffs

In bringing the resources necessary to arbitrate claims at a large scale, we provide access to justice for thousands of employees and consumers who are contractually barred from participating in class actions. Exploited employees and consumers can now turn the arbitration game against the companies that harmed them. And judges now call companies out for their hypocrisy when they object to the terms of the arbitration process that they insisted on–or even designed–in the first place.

In terms of disrupting the status quo, Keller Postman's arbitration strategy is one of the most significant developments in the area of civil litigation.

# Our Team

Meet the attorneys who lead this practice.



**Warren Postman**
Managing Partner



**Ashley Keller**
Senior Partner



**Ben Whiting**
Partner



**Albert Pak**
Partner



**Patrick Huber**
Associate



**Ethan Ames**
Associate



**Melinda Maxson**
Attorney

VIEW MORE

# **EXHIBIT 3**



Attorney Advertising

## Sign up for a Tubi Compensation Claim

Tubi is accused of misusing information. We're helping users get compensation.

If you used Tubi, sign up for a compensation claim

**Signing up is free and takes 2 to 3 minutes**

### Sign up for a Compensation Claim

First Name

Last Name

Email

Phone Number

**Sign Up for a Claim**

Clicking the button will take you to a short qualification questionnaire.

We may follow up with you by phone and text pursuant to our privacy policy. By signing up, you agree to our terms and conditions.

**Many may qualify for hundreds to thousands in compensation under consumer protection laws.**



TROXEL LAW

## Tubi Compensation Claim

Thank you for contacting us about your potential Tubi compensation claim.

To sign-up, just answer a couple questions below. If we believe you qualify for a claim, you will be taken to some short forms that let us bring a claim as your attorney and hopefully get you compensation.

It costs nothing to sign-up. This is not a class action. If we believe you have a claim, we will work to quickly get you the most compensation possible.

Do you have an account with Tubi?

● Yes
○ No

Have you streamed videos, TV or movies on tubitv.com or the mobile app anytime after May 2022?

● Yes
○ No

When did you last use your Tubi account?

Apr ⇕   2024 ⇕

Did you watch videos on Tubi while living in California?

○ Yes
● No



Yes
No

Have you streamed videos, TV or movies on tubitv.com or the mobile app
anytime after May 2022?

Yes
No

When did you last use your Tubi account?

Apr     2024

Did you watch videos on Tubi while living in California?

Yes
No

Is taliaeve210@gmail.com the email associated with your Tubi account?

Yes
No

Have you already consulted with or hired another lawyer to bring a claim
against Tubi?

Yes
No

Continue

# **EXHIBIT 4**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| **JOSHUA CACHO,** a Florida resident,<br><br>    **Plaintiff,**<br><br>  v.<br><br>**KELLER POSTMAN LLC,** a Illinois Limited<br>Liability Company,<br><br><br>    **Defendant.** | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § |

**PLAINTIFF'S ORIGINAL COMPLAINT**

**PARTIES**

1. The Plaintiff is JOSHUA CACHO ("Plaintiff") a natural person, resident of the Middle

District of Florida, and was present in Florida for all calls, in this case in Seminole County,

Florida.

2. Defendant KELLER POSTMAN LLC ("KELLER") is a Limited Liability Company

organized and existing under the laws of Illinois, with its principle address located at 150 N

Riverside Plaza Suite 4270 Chicago, Illinois, 60606, United States, and can be served via CEO

Adam Gerchen at 150 N Riverside Plaza Suite 4100 Chicago, Illinois, 60606, United States.

**JURISDICTION AND VENUE**

3. Jurisdiction. This Court has federal-question subject matter jurisdiction over Plaintiff's

TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v. Arrow*

1

*Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).

## PERSONAL JURISDICTION

4.     This Court has specific personal jurisdiction over Defendant KELLER because they

have repeatedly placed calls to Florida residents, derive revenue from Florida residents, and

they sell goods and services to Florida residents, including Plaintiff.  Defendant Keller provides

legal services to Florida residents.

5.     This Court has supplemental subject matter jurisdiction over Plaintiff's claims arising

under Florida Statutes § 501.059 and § 501.601 because the claims arise from the same nucleus

of operative fact, i.e., Defendant KELLER's telemarketing robocalls to Plaintiff, and adds little

complexity to the case.

## VENUE

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a

substantial part of the events giving rise to the claims—the calls and sale of goods and services

directed at Florida residents, including the Plaintiff—occurred in this District and because the

Plaintiff resides in this District.

7.     This Court has venue over Defendant KELLER because the calls at issue were sent by

or on behalf of the above-named Defendant to Plaintiff, a Florida resident.

## THE TELEPHONE CONSUMER PROTECTION ACT

### OF 1991, 47 U.S.C. § 227

8.     In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing

equipment that could target millions of consumers *en masse*. Congress found that these calls were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally. *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

9.      The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

10.     The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

11.     The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

12.     Separately, the TCPA bans telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

13.     The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated there under. 47 U.S.C. § 227(c)(5).

14.     According to findings of the FCC, the agency vested by Congress with authority to issue

---

[1] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

regulations implementing the TCPA, automated or prerecorded telephone calls are a greater

nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

15.     The FCC also recognizes that "wireless customers are charged for incoming calls whether

they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing*

*the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

16.     The FCC requires "prior express written consent" for all autodialed or prerecorded

telemarketing robocalls to wireless numbers and residential lines.  In particular:[A] consumer's

written consent to receive telemarketing robocalls must be signed and be sufficient to show that

the consumer:  (1) received clear and conspicuous disclosure of the consequences of providing

the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded

messages by or on behalf of a specific seller; and (2) having received this information, agrees

unambiguously to receive such calls at a telephone number the consumer designates. In addition,

the written agreement must be obtained without requiring, directly or indirectly, that the

agreement be executed as a condition of purchasing any good or service.

17.     *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of*

*1991*,27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC

regulations "generally establish that the party on whose behalf a solicitation is made bears

ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing*

*the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

18.     The FCC confirmed this principle in 2013, when it explained that "a seller ... may be

held vicariously liable under federal common law principles of agency for violations of either

section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter*

*of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

19.     Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d

946, 951 – 52 (9th Cir. 2009).

20.     The TCPA defines an ATDS as "equipment which has the capacity – (A) to store or

produce telephone numbers to be called, using a random or sequential umber generator; and (B)

to dial such numbers. *Id.* at § 227(a)(1)

21.     As to what type of dialing equipment constitutes an ATDS, the TCPA vests to the Federal

Communication Commission ("FCC") the responsibility to promulgate regulations implementing

the TCPA's requirements. *Id.* at § 227(a)(1).

22.     Over the last nineteen years, the FCC has repeatedly recognized that a predictive dialer is

an ATDS that is subject to regulation by the TCPA. In its 2003 Order, the FCC also defined a

"predictive dialer" holding:

[A] predictive dialer is equipment that dials numbers and, when certain computer software is

attached, also assists telemarketers in predicting when a sales agent will be available to take

calls. The hardware, when paired with certain software, has the capacity to store or

produce numbers and dial those numbers at random, in sequential order, or from a database of

numbers. As commenters point out, in most cases, telemarketers program the numbers to be

called into the equipment, and the dialer calls them at a rate to ensure that when a consumer

answers the phone, a sales person is available to take the call.[1]

23.     In 2008, the FCC affirmed "that a predictive dialer constitutes an automatic

telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers."[2]

24.     A corporate officer involved in the telemarketing at issue may be personally liable under

the TCPA. *E.g., Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist.

LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate

actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

### FLORIDA STATUTES § 501.059

25.　Florida Statutes § 501.059 makes it a violation to "make or knowingly allow a telephone sales call to be made if such call involves an automated system for the selection or dialing of telephone numbers or the playing of a recorded message when a connection to a number called without the prior express written consent of the called party." Fla. Stat. § 501.059(8)(a).

26.　A "telephone sales call" is defined as a 'telephone call, text message, voicemail transmission to a consumer for the purpose of soliciting a sale of any consumer goods or services, soliciting an extension of credit for consumer goods or services, or obtaining information that will or may be used for the direct solicitation of a sale of consumer goods or services or an extension of credit for such purposes." Fla. Stat. § 501.059(j).

27.　"Prior express written consent" means an agreement in writing that: Fla. Stat. § 501.0059(g).

　　1.　Bears the signature of the called party;

　　2.　Clearly authorizes the person making or allowing the placement of a telephonic sales calls by telephone call, text message, or voicemail transmission to deliver or cause to be delivered to the called party a telephone sales call using an automated system for the selection or dialing of telephone numbers, the playing of a recorded message

6

when a connection is completed to a number called, or the transmission of a

prerecorded voicemail;

3.  Includes the telephone number to which the signatory authorizes a telephonic sales

call to be delivered; and

4.  Includes a clear and conspicuous disclosure informing the called party that;

    a.  By executing the agreement, the called party authorizes the person making or

        allowing the placement of a telephonic sales call to deliver or cause to be

        delivered a telephonic sales call to the called party using an automated system

        for the selection or dialing of telephone numbers or playing of a recorded

        message when a connection is completed to a number called; and

    b.  He or she is not required to directly or indirectly sign the written agreement or

        to agree to enter into such agreement as a condition of purchasing any

        property, goods, or services.

**28.**    A person aggrieved by a violation of this section may bring an action to recover actual

damages or $500, whichever is greater. Fla. Stat. § 501.059(10)(a)(2).

**29.**    If the court finds that the defendant willfully or knowingly violated this section or rules

adopted pursuant to this section, the court may, in its discretion, increase the amount of the

award to an amount equal to not more than three times the amount available under paragraph (a).

Fla. Stat. § 501.059(10)(a)(2)(b).

## FLORIDA TELEMARKETING ACT

**30.**    A commercial telephone seller or salesperson making a commercial telephone solicitation

call may not use technology that deliberately displays a different caller identification number

than the number the call is originating from to conceal the true identity of the caller. Fla. Stat. §

7

501.616(7)(b).

31.     A commercial telephone seller or salesperson may not transmit more than three

commercial telephone solicitation phone calls from any number to a person over a 24-hour

period on the same subject matter or issue, regardless of the phone number used to make the call.

Fla. Stat. § 501.616(6)(b).

32.     In addition to any other penalties or remedies provided under law, a person who is injured

by a violation of the provisions of this part may bring a civil action for recovery of actual

damages and/or punitive damages, including costs, court costs, and attorney's fees.  No provision

of this part shall be construed to limit any right or remedy provided under law.  Fla. Stat. §

501.625.

**FACTUAL ALLEGATIONS**

33.     Plaintiff's personal cell phones (407) 577-3881, and (407) 577-3823 have both been

registered on the National Do-Not-Call Registry for more than thirty-one (31) days prior to the

first call received from Defendant KELLER.

34.     Plaintiff personally registered the cell phones at issue in this case on the National-Do-

Not-Call Registry.

35.     Plaintiff never asked the National Do-Not-Call Registry administrator to remove him

from the National Do-Not-Call Registry and Plaintiff was on the National Do-Not-Call Registry

at all times relevant to this Complaint.

36.     Defendant KELLER operates as a tort claim law firm.

37.     KELLER hired anonymous telemarketers to place telephone solicitation phone calls

because KELLER is barred by ethics from directly placing unsolicited phone calls on their own

behalf.

38.     **Call #1,** *See Table A*, on December 28, 2022, at 3:14 PM Plaintiff received a call from

8

812-895-0931. Plaintiff answered the phone and said "dhello", only after repeating "hello" multiple times did he hear a loud audible "BEEP" sound, then a several seconds delay (signifying the use of a predictive dialer, with the capability of making random and or sequential number generated calls), and then was connected to Defendant KELLER's foreign telemarketer "John".

39.      John stated "hello, my name is John and I'm calling on behalf of Camp Lejune US Marine base…". Before Defendant KELLER's telemarketer could finish Plaintiff loudly stated he was on the do not call list and not interested and to please not call back, and then hung up the phone.

40.      **Calls #2-6**, *See Table A*, were all the same need for multiple "hello's", followed by a loud "beep" and same script as call #1, yet with different telemarketer's names, Amanda, Catherine, Daniel, Eric, and Edward. On each of the calls Plaintiff would tell them he wasn't interested and to stop calling.

41.      **Call #7**, *See Table A*, on March 13, 2023, at 5:24 PM Plaintiff received a call from 808-582-1890. Plaintiff answered with "hello", and after saying "hello" multiple times was greeted by a loud beep and then "Mark Edward calling on behalf of Camp Lejune Us Marine base…" Out of frustration Plaintiff went along with the call and gave false information for the sole purpose of identifying the party responsible for the annoying calls.

42.      Mark proceeded to ask the details of his father, whom Plaintiff informed him was in Camp Lejeune, such as name, date of birth, age of death, illness he had, and the time that he was at Camp Lejeune.

43.      Defendant KELLER's telemarketer also asked for Plaintiff's personal details as well, such as name, address, and email address.

44.      Defendant's telemarketer then stated to Plaintiff that he would connect the call to a

9

licensed agent in his area even if Plaintiff's number was registered to a national do not call list.

**45.** Eventually Mark transferred Plaintiff to KELLER's telemarketer Kobe. After Mark introduced Plaintiff, he released himself from the call and Kobe took over.

**46.** Kobe gathered more information from Plaintiff and informed Plaintiff he would pass along the information to his attorneys.

**47.** While on the call with KOBE, Plaintiff received an email with a contract from Defendant KELLER. *See Exhibit A.*

**48.** Table A below displays the calls Plaintiff received from Defendant's KELLER.

TABLE A

| No. | Date | Time | CallerID | Notes |
|-----|------|------|----------|-------|
| 1 | Dec 28, 2022 | 3:14 PM | (812) 895-0931 | Unauthorized automated call - John - Camp Lejeune |
| 2 | Jan 28, 2023 | 5:18 PM | (407) 571-0681 | Unauthorized automated call - Amanda - Camp Lejeune |
| 3 | Jan 31, 2023 | 1:28 PM | (407) 915-3174 | Unauthorized automated call - Catherine Smith - Camp Lejeune |
| 4 | Feb 08, 2023 | 4:29 PM | (407) 538-7718 | Unauthorized automated call - Daniel - Camp Lejeune |
| 5 | Feb 23, 2023 | 1:49 PM | (407) 539-0891 | Unauthorized automated call - Eric Johnson - Camp Lejeune |
| 6 | Mar 10, 2023 | 4:17 PM | (407) 268-4325 | Unauthorized automated call - Edward - Camp Lejeune |
| 7 | Mar 13, 2023 | 5:24 PM | (808) 582-1890 | Unauthorized automated call - Mark Edward - Camp Lejeune- transferred to Kobe, received email with contract from Defendant KELLER |

**49.** Plaintiff did not have an established business relationship with Defendant, nor did Plaintiff consent to any of these calls.

**50.** Plaintiff did not provide his phone number to Defendant at any point.

**51.** Plaintiff sent an internal do-not-call policy request to Defendant KELLER to emails info@KELLERpostman.com, and clientservices@KELLERpostman.com on March 27, 2023,

which are emails listed on Defendant KELLER's website www.KELLERpostman.com, under the contact us section.

52.     Despite these emails, Defendant KELLER failed and/or refused to send Plaintiff a do-not-call policy.

53.     Upon information and belief, Defendant KELLER did not have a written do-not-call policy while it was sending Plaintiff the calls.

54.     Upon information and belief, Defendants KELLER did not train their agents who engaged in telemarketing on the existence and use of any do-not-call list.

55.     Such conduct violates the TCPA and its implementing regulations, 47 CFR § 64.1200(d)(3)(requiring telemarketers to honor and record DNC requests when made).

56.     KELLER knew or should have known that its conduct would violate the TCPA and its regulations because KELLER operates in a highly regulated telephone solicitation industry.

57.     KELLER knew or should have known the requirements for making TCPA compliant telemarketing calls and thus knew or should have known that the calls complained of herein violated the TCPA and its regulations.

58.     KELLER is currently being sued for violating TCPA and other state violations, where they placed 33 telemarketing calls to an individual, *See Gonzalez v. KELLERPOSTMAN LLC et al No. 3:2023cv00145 (W.D.TX., April 10, 2023).*

59.     On information and belief, KELLER used an automatic telephone dialing system, as defined by 47 U.S.C. § 227(a)(1), to make the calls.

60.     Plaintiff infers an ATDS was used because:

        A. Plaintiff heard a long pause, had to say hello many times, and heard a long pause
           before hearing a loud beep and being connected to a live agent, signifying the use of a

'Predictive Dialer', in 2008 the FCC affirmed "that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of auto dialers.

B. Random or sequential generation explains how Defendant obtained and dialed Plaintiff.

**61.** No emergency necessitated these calls.


## VICARIOUS LIABILITY OF DEFENDANT KELLER

**62.** Defendant KELLER is vicariously liable for the telemarketing calls that generated the leads on their behalf.

**63.** The FCC is tasked with promulgating rules and orders related to the enforcement of the TCPA. 47 U.S.C. § 227(b)(2).

**64.** The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

**65.** The FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 565 ¶ 10 (2008) (recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

**66.** The FCC confirmed this principle in a declaratory ruling holding that sellers such as Post may not avoid liability by outsourcing telemarketing:

[A]llowing the seller to avoid potential liability by outsourcing its

telemarketing activities to unsupervised third parties would leave
consumers in many cases without an effective remedy for telemarketing
intrusions. This would particularly be so if the telemarketers were
judgment proof, unidentifiable, or located outside the United States, as is
often the case. Even where third-party telemarketers are identifiable,
solvent, and amenable to judgment limiting liability to the telemarketer
that physically places the call would make enforcement in many cases
substantially more expensive and less efficient, since consumers (or law

enforcement agencies) would be required to sue each marketer separately
in order to obtain effective relief. As the FTC noted, because sellers may
have thousands of independent marketers, suing one or a few of them is
unlikely to make a substantive difference for consumer privacy.

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnote omitted)

(alteration marks and internal quotation marks omitted).

67.    More specifically, *Dish* held that, even in the absence of evidence of a formal contractual

relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the

telemarketer "has apparent (if not actual) authority" to make the calls. *Id.* at 6586 ¶ 34.

68.    The ruling rejected a narrow view of TCPA liability, including the assertion that a seller's

liability requires a finding of formal agency and immediate direction and control over the third-

party who placed the telemarketing call. *Id.* at 6587 ¶ 36 & n.107.

69.    To the contrary, the FCC—armed with extensive data about robocalls and Americans'

complaints about them—determined that vicarious liability is essential to serve the TCPA's

remedial purpose of protecting Americans from "unwanted telemarketing invasions." *Id.* at 6587

¶ 36.

70.    Vicarious liability is important because reputable, traceable, and solvent companies that

benefit from illegal telemarketing are "in the best position to monitor and police TCPA

compliance by third-party telemarketers." *Id.* at 6588 ¶ 37.

71.    Defendant KELLER is legally responsible for ensuring that the affiliates that make

telemarketing calls on its behalf comply with the TCPA when so doing.

72.     Defendant KELLER knowingly and actively attempted to accept business that originated through illegal telemarketing.

73.     Defendant KELLER knew (or reasonably should have known) that their telemarketers were violating the TCPA on their behalf but failed to take effective steps within their power to force the telemarketers to cease that conduct.

74.     By hiring a company to make calls on their behalf, Defendant KELLER "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency ("Restatement").

75.     Moreover, Defendant KELLER maintained interim control over the actions of their telemarketers.

76.     For example, Defendant KELLER had absolute control over whether, and under what circumstances, they would accept a customer from their telemarketers.

77.     Furthermore, Defendant KELLER had day-to-day control over the actions of its telemarketers, including the ability to prohibit them from using an ATDS to contact potential customers of Defendant KELLER and the ability to require them to respect the National Do Not Call Registry.

78.     Defendant KELLER also gave interim instructions to their telemarketers by providing lead-qualifying instructions and lead volume limits.

79.     Defendant KELLER donned their telemarketers with apparent authority to make the calls at issue. Thus, the telemarketers pitched "Camp Lejeune injury claims" in the abstract.

80.     Apparent authority turns on whether a third party believes the principal authorized its agent to act and the belief is "traceable" to a manifestation of the principal. Restatement § 2.03 cmt. c.

81.     "[A]pparent authority can arise in multiple ways and does *not* require that 'a principal's manifestation must be directed to a specific third party in a communication made directly to that person.'" *Dish*, 28 FCC Rcd. at 6586 ¶ 34 n.102 (quoting Restatement § 2.03 cmt. c).

82.     A principal may make a manifestation "by directing an agent to make statements to third parties or directing or designating an agent to perform acts or conduct negotiations, placing an agent in a position within an organization, or placing an agent in charge of a transaction or situation." Restatement § 2.03 cmt. c.

83.     Defendant KELLER's telemarketers transferred customer information, including Plaintiff's contact information, directly to Defendant KELLER. Thus, the telemarketer had the "ability . . . to enter consumer information into the seller's sales or customer systems," which the FCC has explained to show apparent agency. *Dish*, 28 FCC Rcd. at 6592 ¶ 46.

84.     Finally, the FCC has held that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

85.     Defendant KELLER is the liable party as the direct beneficiary of the illegal telemarketing as they stood to gain Plaintiff as a customer when telemarketers solicited Plaintiff for "Camp Lejeune injury claims" on their behalf.

## INJURY, HARM, DAMAGES, and ACTUAL DAMAGES
## AS A RESULT OF THE CALLS

86. Defendant KELLER's calls harmed Plaintiff by causing the very harm that Congress

sought to prevent—a "nuisance and invasion of privacy."

87.   Defendant KELLER's calls harmed Plaintiff by trespassing upon and interfering with

Plaintiff's rights and interests in Plaintiff's cellular telephone.

88.   Defendant KELLER's calls harmed Plaintiff by intruding upon Plaintiff's seclusion.

89.   Plaintiff has been harmed, injured, and damaged by the calls including, but not limited to:

reduced device storage, reduced data plan usage, anger, frustration, invasion of privacy, and

more frequent charging of Plaintiff's cell phone.


## PLAINTIFF'S CELL PHONES ARE RESIDENTIAL NUMBERS


90.   The calls were to Plaintiff's cellular phones (407) 577-3881, (407) 577-3823 which are

Plaintiff's personal cell phones that he uses for personal, family, and household use. Plaintiff

maintains no landline phones at his residence and has not done so for at least 15 years and

primarily relies on cellular phones to communicate with friends and family. Plaintiff also uses

his cell phones for navigation purposes, sending and receiving emails, timing food when

cooking, and sending and receiving text messages. Plaintiff further has his cell phones registered

in his personal name, pays the cell phones from his personal accounts, and the phones are not

primarily used for any business purpose.

## CAUSES OF ACTION:

### COUNT ONE:

**Violations of the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by Automated Telemarketing
Without Prior Express Written Consent**

91.   Plaintiff re-alleges and re-adopts paragraphs 1 through 90 of the Complaint as if fully

set forth herein.

92.     Defendant KELLER and/or their affiliates or agents violated the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), at least seven (7) times by placing non-emergency telemarketing automated calls to Plaintiff's cellular telephone number using an automatic telephone dialing system without prior express written consent.

93.     Plaintiff was statutorily damaged at least seven (7) times under 47 U.S.C. § 227(b)(3)(B) by Defendant by the calls described above, in the amount of $500.00 per call.

94.     Plaintiff was further statutorily damaged because Defendant KELLER willfully or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount to $1,500.00 as permitted under U.S.C. § 227(b)(3)(C) for each and every willful and/or knowing violation.

95.     Plaintiff is also entitled to and does seek an injunction prohibiting Defendant KELLER and their affiliates and agents from violating the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by placing non-emergency telemarketing automated text messages to any cellular telephone number using an ATDS without prior express written consent.

## COUNT TWO:

### (Violation of the TCPA "Sales Call/DNC" Prohibition, 47 U.S.C. 227(c), and 47 C.F.R. § 64.1200(C))

96.     Plaintiff re-alleges and re-adopts paragraphs 1 through 90 of the Complaint as if fully set forth herein.

97.     Defendant KELLER called Plaintiff's private residential telephone number which was successfully registered on the National Do-Not-Call Registry more than thirty-one (31) days prior to the calls for the purposes of commercial solicitation, in violation of 47 U.S.C. §

227(c)(3)(F), and 47 C.F.R. § 64.1200(c)(2).

98.     Plaintiff was statutorily damaged at least seven (7) times under 47 U.S.C. § 227(c)(3)(F)

by Defendant KELLER by the telemarketing calls described above, in the amount of $500.00

per call.

99.     Plaintiff was further statutorily damaged because Defendant KELLER willfully and/ or

knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the

damage amount as permitted under U.S.C. § 227(c)(5) for each and every willful and/or knowing

violation.

100.    Plaintiff is entitled to an award up to $1,500 in damages for each knowing or willful

violation of 47 U.S.C. § 227(c)(3)(F).

### COUNT THREE:

### Telemarketing Without Mandated Safeguards, 47 C.F.R. § 64.1200(d)

101.    Plaintiff re-alleges and re-adopts paragraphs 1 through 90 of the Complaint as if fully

set forth herein.

102.    The foregoing acts and omissions of Defendant KELLER and/or their affiliates or

agents constitute multiple violations of FCC regulations by making telemarketing solicitations

despite lacking the following:

        a.  A written policy, available upon demand, for maintaining a do-not-call list, in

            violation of 47 C.F.R. § 64.1200(d)(1)[1]

        b.  Training for the individuals involved in the telemarketing on the existence of and

            use of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2)[2]; and,

    c.  In the solicitations, the name of the individual caller and the name of the person or entity on whose behalf the call is being made, in violation of 47 C.F.R. § 64.1200(d)(4).[3]

**103.**    Plaintiff is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

**104.**    Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(c)(5).

## COUNT FOUR

### (Violations of Florida Statutes § 501.059)

**105.**    Plaintiff re-alleges and re-adopts paragraphs 1 through 90 of the Complaint as if fully set forth herein.

**106.**    Defendant KELLER and/or their affiliates and authorized representatives called Plaintiff using automated means without Plaintiff's express written consent. Fla. Stat. § 501.059(8)(a).

**107.**    Defendant KELLER did not have Plaintiff's prior express written consent when making the telephonic solicitation calls. Fla. Stat. § 501.059(1)(g).

**108.**    Plaintiff is entitled to an award of at least $500 in damages for each such violation of Fla. Stat. § 501.059(8)a) pursuant to Fla. Stat. § 501.059(10)(a)(2).

**109.**    Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. Fla. Stat. § 501.059(10)(a)(b).

## COUNT FIVE

### (Violations of Florida TELEMARKETING ACT)

110.    Plaintiff re-alleges and re-adopts paragraphs 1 through 90 of this Complaint as if fully set forth herein.

111.    Defendant KELLER and/or their affiliates and authorized representatives called Plaintiff using automated dialing equipment that intentionally transmitted false caller identification information. Fla. Stat. 501.616(7)(b).

112.    In addition to any other penalties or remedies provided under law, a person who is injured by a violation of the provisions of this part may bring a civil action for recovery of actual damages and/or penalties and/or punitive damages, including costs, court costs, attorney's fees. No provision of this part shall be construed to limit any right or remedy provided under law. Fla. Stat. 501.625

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Joshua Cacho prays for judgment against Defendants as follows:

A.    Leave to amend this Complaint to name additional DOESs as they are identified and to conform to the evidence presented at trial;

B.    A declaration that actions complained of herein by Defendants violates the TCPA and Fla. Stat. 501.059 and Florida Telemarketing Act;

C.    An award of $1500 per call in statutory damages arising from the TCPA 54 U.S.C §227(b) intentional violations jointly and severally against the corporations for 7 calls.

D.    An award of $1500 per call in statutory damages arising from the TCPA 47 U.S.C

§227(c) intentional violations jointly and severally against the corporations for 7 calls.

E.     An award of $1500 per call in statutory damages arising from the TCPA 47 U.S.C

§ 227(c)(5) intentional violations jointly and severally against the corporations for 7 calls.

F.     An award of $1,500 per call in statutory damages arising from 501.059(8)(a)

intentional violations, pursuant to Fla. Stat. § 501.059(10)(a)(b) for 7 calls.

G.     An award of $25,000 in punitive damages arising from intentional violations of

Fla. Stat. 501.616(7)(b) for all calls made.

H.     An award to Plaintiff of interest, costs and attorneys' fees, as allowed by law and

equity.

I.     Such further relief as the Court deems necessary, just, and proper.

### JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

June 12, 2023,                                  Respectfully submitted,


Joshua Cacho
Plaintiff, Pro Se
164 Estella Road
Lake Mary, Florida 32746
407-577-3881

# EXHIBIT 5

### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | |
|---|---|
| **PAOLA DOMINGUEZ,** | § |
| | § |
| **Plaintiff,** | § |
| | § |
| v. | § |
| | § |
| **KELLER POSTMAN LLC,** an Illinois Limited | § |
| Liability Company, and **NATIONAL INTAKE** | § |
| **CENTER** | § |
| | § |
| **Defendant.** | § |
| | § |

**EP23CV0185**

## COMPLAINT

Plaintiff, PAOLA DOMINGUEZ, brings this action against Defendant KELLER

POSTMAN LLC and NATIONAL INTAKE CENTER, and alleges based on personal

knowledge and information, and belief, as follows:

## PRELIMINARY STATEMENT

1.      As the Supreme Court recently explained, "Americans passionately disagree about many

things. But they are largely united in their disdain for robocalls. The Federal Government

receives a staggering number of complaints about robocalls—3.7 million complaints in 2019

alone. . .  For nearly 30 years, the people's representatives in Congress have been fighting back."

*Barr v. Am. Ass'n of Pol. Consultants LLC*, 140 S. Ct. 2335, 2343 (2020).

2.      Plaintiff Paola Dominguez ("Plaintiff") brings this action under the Telephone Consumer

Protection Act ("TCPA"), 47 U.S.C. § 227, alleging that Defendant KEELER POSTMANT LLC

("Keller") sent a series of automated telemarketing calls for the purposes of commercial

1

solicitation by contacting Plaintiff's cellular telephone number listed on the National Do-Not-Call Registry, which is prohibited by the TCPA.

3.    Plaintiff never consented to receive any of these phone calls, which were placed to him for telemarketing purposes.

## PARTIES

4.    Plaintiff PAOLA DOMINGUEZ ("Plaintiff"), is a natural person, who resides in El Paso, Texas, is a citizen of the State of Texas, and was the individual who received the alleged phone calls in this case on her private mobile telephone, and was a resident of Texas during the calls, in this case in El Paso County, Texas

5.    Defendant KELLER POSTMAN LLC ("Keller") is a professional limited liability company organized and existing under the laws of Illinois, with a principal address of 150 N. Riverside Plaza, STE 4100, Chicago, Illinois 60606, and can be served via registered agent Zina Bash, 501 Congress Avenue, Suite 150, Austin, Texas 78701.

6.    Defendant NATIONAL INTAKE CENTER, LLC ("National") is a limited liability company organized and existing under the laws of Nevada and can be served via the entity's manager Richard Fonbuena at 3320 N Buffalo Dr, Ste 208, Las Vegas, NV, 89129

## JURISDICTION AND VENUE

7.    **Subject Matter Jurisdiction**. This Court has federal-question subject matter jurisdiction over Plaintiff's TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v. Arrow Fin. Ser's., LLC*, 565 U.S. 368, 372 (2012). This Court has supplemental subject matter jurisdiction over Plaintiff's claim arising under Texas Business and Commerce Code 302.101 because that claim arises from the same nucleus of operative fact, i.e., Defendant's telemarketing robocalls to Plaintiff; adds little complexity to the case.

2

8.    **Personal Jurisdiction**. This Court has specific personal jurisdiction over Defendant because they have repeatedly placed calls to Texas residents, the phone calls were purposefully directed into this forum, and Defendant performs legal representation in this forum.

9.    **Venue.** Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to the claims the calls and sale of goods and services directed at Texas residents, including Plaintiff occurred in this District and because Plaintiff was residing in the Western District of Texas when she received a substantial if not every single call from Defendant that are the subject matter of this lawsuit.

## Statutory Background

### The Telephone Consumer Protection Act

10.    In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing ... can be an intrusive invasion of privacy[.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

### The TCPA Prohibits Automated Telemarketing Calls

11.    The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service ... or any service for which the called party is charged for the call." See 47 U.S.C. § 227(b)(l)(A)(iii).

12.    The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. § 227(b)(l)(A). See 47 U.S.C. § 227(b)(3).

13.     According to findings by the Federal Communication Commission ("FCC"), the agency

Congress vested with authority to issue regulations implementing the TCPA, such calls are

prohibited because, as Congress found, automated or prerecorded telephone calls are a greater

nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and

inconvenient.

14.     The FCC also recognized that "wireless customers are charged for incoming calls

whether they pay in advance or after the minutes are used." *In re Rules and Regulations*

*Implementing the Tel. Consumer Prot. Act of 1991*, CG Docket No. 02-278, Report and Order,

18 F.C.C. Rcd. 14014, 14115 ¶ 165 (2003).

15.     In 2013, the FCC required prior express written consent for all autodialed or prerecorded

telemarketing calls ("robocalls") to wireless numbers and residential lines. Specifically, it

ordered that:

> [A] consumer's written consent to receive telemarketing robocalls must be signed
> and be sufficient to show that the consumer: (1) received "clear and conspicuous
> disclosure" of the consequences of providing the requested consent, i.e., that the
> consumer will receive future calls that deliver prerecorded messages by or on
> behalf of a specific seller; and (2) having received this information, agrees
> unambiguously to receive such calls at a telephone number the consumer
> designates.[] In addition, the written agreement must be obtained "without
> requiring, directly or indirectly, that the agreement be executed as a condition of
> purchasing any good or service.[]" In the Matter of Rules & Regulations
> Implementing the Tel. Consumer Prot. Act of 1991, 27 F.C.C. Rcd. 1830, 1844
> (2012) (footnotes omitted).

The National Do-Not-Call Registry

16.     The National Do Not Call Registry allows consumers to register their telephone numbers

and thereby indicate their desire not to receive telephone solicitations at those numbers. See 47

C.F.R. § 64.1200(c)(2). A listing on the Registry "must be honored indefinitely, or until the

registration is cancelled by the consumer or the telephone number is removed by the database administrator." Id.

17.     The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2).

18.     The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

## The Texas Business and Commerce Code § 302.101

19.     The Texas Business and Commerce Code requires sellers to obtain a registration certificate from the Secretary of State to make telephone solicitations inside the state of Texas or to residents in the state of Texas.

20.     Plaintiff may seek damages for violations of Texas Business and Commerce Code § 302.101 of up to $5,000 per violation, reasonable costs of prosecuting the action, court costs, investigation costs, depositions expenses, witness fees, and attorney's fees.

21.     Texas Business and Commerce Code § 302.101 provides a private right of action. A violation of Chapter 302 "is a false, misleading, or deceptive act or practice under Subchapter E, Chapter 17" and is enforceable as such; "A public or private right or remedy prescribed by Subchapter E, Chapter 17, may be used to enforce [Chapter 302." Tex. Bus. & Com. Code §302.303.

## Factual Allegations

22.     At all times relevant hereto, Plaintiff maintained and used a residential cellular telephone line, phone number ending in 6911.

**23.**     Plaintiff personally registered her cellular telephone ending in 6911 on the National Do-Not-Call Registry on January 16, 2022.

**24.**     Plaintiff registered her phone number on the Do-Not-Call list in order to obtain solitude from invasive and harassing telemarketing calls. The telemarketing calls prevented Plaintiff from using her phone for legitimate purposes.

**25.**     Plaintiff received at least five (5) telemarketing calls soliciting legal representation between April 7, 2023, and April 10, 2023, to her personal cell phone number, without her prior express written consent and not related to an emergency purpose.

**26.     Call 1:** On February 22, 2023, Plaintiff received a phone call that displayed 915-296-6647 on the caller identification.  Plaintiff answered the phone and the representative solicited Plaintiff for Camp Lejeune representation.  Plaintiff hung up the phone as she did not need the service.

**27.     Call 2:** On February 22, 2023, Plaintiff received a phone call that displayed 915-296-6647 on the caller identification.  Plaintiff was unable to answer this phone call.

**28.     Call 3:** On February 22, 2023, Plaintiff received a phone call that displayed 707-302-3411 on the caller identification.  Plaintiff answered the phone and the representative solicited Plaintiff for Camp Lejeune representation.  Plaintiff hung up the phone as she did not need the service.

**29.     Call 4:** On February 30, 2023, Plaintiff received a phone call that displayed 915-549-4984 on the caller identification.  Plaintiff answered the phone and the representative solicited Plaintiff for Camp Lejeune representation.  Plaintiff hung up the phone as she did not need the service.

30.     **Call 5:** February 30, 2023, Plaintiff received a phone call that displayed 915-372-6846 on the caller identification. Plaintiff answered the phone and the representative solicited Plaintiff for Camp Lejeune representation. Plaintiff hung up the phone as she did not need the service.

31.     **Call 6:** On March 1, 2023, Plaintiff received a phone call that displayed 915-303-0323 on the caller identification. Plaintiff answered the phone and the representative solicited Plaintiff for Camp Lejeune representation. Plaintiff hung up the phone as she did not need the service.

32.     **Call 7:** On March 2, 2023, Plaintiff received a phone call that displayed 915-499-0626 on the caller identification. Plaintiff answered the phone and the representative solicited Plaintiff for Camp Lejeune representation. Plaintiff hung up the phone as she did not need the service.

33.     **Call 8:** On March 2, 2023, Plaintiff received a phone call that displayed 915-225-6529 on the caller identification. Plaintiff answered the phone and the representative solicited Plaintiff for Camp Lejeune representation. Plaintiff hung up the phone as she did not need the service.

34.     **Call 9:** On March 14, 2023, Plaintiff received a phone call that displayed 731-312-8439 on the caller identification. Plaintiff answered the phone and the representative solicited Plaintiff for Camp Lejeune representation. The representative identified herself as "CJ." Plaintiff had received at least eight Camp Lejeune solicitation phone calls at this point and was agitated, annoyed, and felt harassed. Therefore, Plaintiff feigned interest in Defendant Keller's legal services.

35.     The telemarketer in Paragraph 34, through information and belief, was an offshore telemarketer based outside the laws and jurisdiction of the United States. This telemarketer eventually transferred Plaintiff to an agent who identified himself has "Mario." Mario is an agent of Defendant National.

36. **Call 10:** On March 16, 2023, Plaintiff received a phone call that displayed 810-688-6451 on the caller identification. Plaintiff answered the phone and the representative solicited Plaintiff for Camp Lejeune representation. The agent on the phone informed Plaintiff he had spoken to Plaintiff about a month ago. Plaintiff went along with the process and was eventually sent a retainer agreement to hire Defendant Keller to represent Plaintiff in Camp Lejeune litigation. Plaintiff was sent the contract by "Jack."

37. **DNC Request #1.** Upon receipt of the contract, Jack attempted to coerce Plaintiff into immediately signing the contract without allowing time to read the contract. Plaintiff informed Jack she was not interested in signing and to not call back.

38. **Call 11:** On March 16, 2023, at 11:28 AM, Plaintiff received a phone call that displayed 651-384-1806 on the caller identification. Plaintiff answered the phone and the representative attempted to get Plaintiff to sign the contract. Plaintiff declined as she had already told Defendants she was not interested and to not call again.

39. **Call 12:** On March 16, 2023, at 11:30 AM, Plaintiff received a phone call that displayed 651-384-1806 on the caller identification. Plaintiff ignored this phone call as the telemarketer had immediately called Plaintiff after just being told two minutes prior Plaintiff was not interested.

40. **Call 13:** On March 16, 2023, at 11:33 AM, Plaintiff received a phone call that displayed 531-200-6920 on the caller identification. Plaintiff answered this call and it was the same telemarketer calling from a different number to trick Plaintiff into answering the phone because Plaintiff had ignored her harassing phone call in Paragraph 39.

41. **Call 14: DNC Request # 2:** On March 16, 2023, Plaintiff received a phone call that displayed 612-315-6509 on the caller identification. Plaintiff answered the phone and the

representative attempted to coerce Plaintiff into signing the contract.  Plaintiff declined and asked the representative not to call back.

42.     **Call 15: DNC Request # 3**:  On March 17, 2023, Plaintiff received a phone call that displayed 612-315-6509 on the caller identification.  Plaintiff answered the phone and the representative attempted to coerce Plaintiff into signing the contract.  Plaintiff declined and asked the representative not to call back.

43.     **Call 16: DNC Request # 4**:  On March 17, 2023, Plaintiff received a phone call that displayed 612-315-6509 on the caller identification.  Plaintiff answered the phone and the representative attempted to coerce Plaintiff into signing the contract.  Plaintiff declined and asked the representative not to call back.

44.     The following is a table detailing the telephone calls sent by Defendant to Plaintiff's cell phone number:

TABLE A

| Call: | Date: | Caller ID: | Time: | Notes: |
|---|---|---|---|---|
| 1 | 02/22/2023 | 915-296-6647 | 1:10 PM | Camp Lejeune telemarketer |
| 2 | 02/22/2023 | 915-296-6647 | 1:23 PM | Missed call |
| 3 | 02/22/2023 | 707-302-3411 | 1:39 PM | Camp Lejeune telemarketer |
| 4 | 02/30/2023 | 915-549-4984 | 2:40 PM | Camp Lejeune telemarketer |
| 5 | 02/30/2023 | 915-372-6846 | 3:08 PM | Camp Lejeune telemarketer |
| 6 | 03/01/2023 | 915-303-0323 | 9:59 AM | Camp Lejeune telemarketer |
| 7 | 03/02/2023 | 915-499-0626 | 10:40 AM | Camp Lejeune telemarketer |
| 8 | 03/02/2023 | 915-225-6529 | 10:41 AM | Camp Lejeune telemarketer |
| 9 | 03/14/2023 | 731-312-8439 | 2:29 PM | Marie |
| 10 | 03/16/2023 | 810-688-6451 | 10:14 AM | Jack sent a contract |
| 11 | 03/16/2023 | 651-384-1806 | 11:28 AM | Camp Lejeune telemarketer |
| 12 | 03/16/2023 | 651-384-1806 | 11:30 AM | Declined call |
| 13 | 03/16/2023 | 531-200-6920 | 11:33 AM | Camp Lejeune telemarketer |
| 14 | 03/16/2023 | 612-315-6509 | 11:37 AM | DNC request |
| 15 | 03/17/2023 | 713-673-3334 | 11:07 AM | DNC request |
| 16 | 03/17/2023 | 915-929-2912 | 12:10 PM | DNC request |

45.     On May 5, 2023, Plaintiff conducted a search for Defendant on

https://direct.sos.state.tx.us/telephone/TelephoneSearch.asp, and Defendant did not have a solicitation registration certificate on file with the Texas Secretary of State as required to make telephone solicitations to Texas residents. Plaintiff is a Texas resident.

46.     Defendant did not have Plaintiff's prior express written consent to make any of these telemarketing calls.

47.     Prior to these unsolicited telephone communications, Plaintiff has never done any business with Defendant, and Plaintiff never provided Defendant with her cellular telephone number.

48.     Plaintiff received the calls on her private mobile telephone, as defined and set forth in 47 CFR § 64.1200(a)(1)(iii). Plaintiff's telephone number is registered with T-Mobile as a cellular telephone number and is used for personal purposes.

49.     Defendants are not organizations exempt from the TCPA.

50.     Defendants' calls to Plaintiff were "telephone solicitations" as defined by the TCPA.

51.     Defendants' calls to Plaintiff were "unsolicited advertisements" as defined by the TCPA.

52.     Defendant Keller is a law firm well aware of the regulations regarding the TCPA and the ethical prohibition surrounding unsolicited direct advertising to consumers with whom no preexisting relationship exists.

53.     Keller made the conscious decision to ignore the law and their ethical guidelines in pursuit of economic gain and each and every phone call placed by Defendant Keller was a knowing and willful violation of the TCPA and TBCC.

54.     In summary, Plaintiff received sixteen (16) telemarketing calls from Defendant to Plaintiff's personal cell phone number which is registered on the National Do-Not-Call list.

55.     No emergency necessitated the calls.

## DEFENDANT KELLER IS LIABLE FOR THE PHONE CALLS PLACED BY THE DEFENDANT NATIONAL INTAKE

56.     Keller is "vicariously liable" under federal common law principles of agency for TCPA violations committed by third-party telemarketers," such as National.  In re Joint Pet. filed by Dish Network, LLC, 28 F.C.C.R. 6574, 6582 (2013).

57.     Keller markets legal representation through direct telephone solicitation by its hired National telemarketers, who act on its behalf.  Defendant National transfers live, hot leads to Keller and Keller accepts the leads.  National was Keller's agent when it made the prohibited calls on behalf of, and with the actual authority from, National pursuant to a contract that governs National's telemarketing for Keller.

58.     Keller directs, controls, authorizes, and pays National to generate live-transfer leads for Defendant's legal services through telephone solicitation.  Moreover, it requires, authorizes, or at least permits National's telemarketers to solicit explicitly for Camp Lejeune representation.

59.     Keller sets the criteria for qualifying leads, which National must follow, and National live-transfers leads qualified on those criteria exclusively to Keller.  Plaintiff is unaware of the qualifying thresholds, but the salient question is whether the potential client was stationed at Camp Lejeune when they were stationed at Camp Lejeune, and whether there was some type of cancer or physical impairment that manifested as a result of the Camp Lejeune stay.

60.     On information and belief, Keller writes or at least approves the call script National telemarketers use when qualifying leads for Keller.

61.     National telemarketers are Keller's associates and do nothing to disturb the impression that National telemarketers work for, and speak and act on behalf of, Keller.

62.     From National telemarketer's initial call through Defendant Keller's acceptance of a

completed representation application, the telemarketing of Keller's legal representation

constitutes a singular, coordinated marketing effort devised, authorized, directed, and controlled

by Keller, the principal, with National acting as Keller's agent.

63.     National, acting with actual authority, made the prohibited calls, qualified Plaintiff

according to Keller's criteria, and then live-transferred Plaintiff to Keller's advisor to continue

marketing legal representation.

## INJURY, HARM, DAMAGES, AND ACTUAL

## DAMAGES AS A RESULT OF THE CALLS

64.     Defendants' calls harmed Plaintiff by causing the very harm that Congress sought to

prevent—a "nuisance and invasion of privacy."

65.     Defendants' calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's

rights and interests in Plaintiff's cellular telephone.

66.     Defendants' calls harmed Plaintiff by intruding upon Plaintiff's seclusion.

67.     Defendants' calls reduced Plaintiff's storage, reduced Plaintiff's data plan, and angered,

and frustrated Plaintiff.

## Violations of the Texas Business and Commerce Code § 302.101

68.     Defendants' actions violated the Texas Business and Commerce Code 302.101 by placing

solicitation phone calls to a Texas resident without having a registration certificate and bond on

file with the Texas Secretary of State.

69.     Plaintiff may seek damages for violations of Texas Business and Commerce Code §

302.101 of up to $5,000 per violation, reasonable costs of prosecuting the action, court costs,

investigation costs, depositions expenses, witness fees, and attorney's fees.

70.     Texas Business and Commerce Code § 302.101 provides a private right of action.  A violation of Chapter 302 "is a false, misleading, or deceptive act or practice under Subchapter E, Chapter 17" and is enforceable as such: "A public or private right or remedy prescribed by Subchapter E, Chapter 17, may be used to enforce [Chapter 302." Tex. Bus. & Com. Code § 302.303.

71.     The use or employment by any person of a false, misleading, or deceptive act or practice" causes "economic damages or damages for mental anguish." Tex. Bus. & Com. Code § 17.50

### CAUSES OF ACTION

### I.  FIRST CLAIM FOR RELIEF

### (Violation of the TCPA "Sales Call/DNC" Prohibition, 47 U.S.C. § 227(c) et seq.)

### (Against All Defendants)

72.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in paragraphs 1-71.

73.     Defendants called Plaintiff's private residential telephone number which was successfully registered on the National Do-Not-Call Registry more than thirty-one (31) days prior to the calls, in violation of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. § 64.1200(c)(2).

74.     Plaintiff was statutorily damaged at least sixteen (16) times under 47 U.S.C. § 227(c)(3)(F) by Defendants by the telephone calls described above, in the amount of $500.00 per call.

75.     Plaintiff was further statutorily damaged because Defendants willfully or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount as permitted under U.S.C. § 227(c)(5) for each and every willful or knowing violation.

76.     As a result of Defendants' violations of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. §
64.1200(c)(2), Plaintiff seeks $500 in statutory damages, or $1,500.00 if trebled, for each and
every violation, pursuant to 47 U.S.C. § 227(c)(3)(F).

77.     Pursuant to 47 U.S.C. § 227(c)(5)(A), Plaintiff also seeks a permanent injunction
prohibiting Defendants and their affiliates and agents from making non-emergency telemarketing
robocalls to cellular telephone numbers without the prior express written consent of the called
party.

## II. SECOND CLAIM FOR RELIEF

### (Violations of The Texas Business and Commerce Code 302.101)

#### (Against All Defendants)

78.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every
allegation set forth in paragraphs 1-71.

79.     The foregoing acts and omissions of Defendant and/or their affiliates or agents constitute
multiple violations of the Texas Business and Commerce Code 302.101, by making non-
registered solicitation calls to Plaintiff's cellular telephone number without her prior express
written consent.

80.     Plaintiff is entitled to an award of up to $5,000 in damages for each such knowing or
willful violation. Texas Business and Commerce Code 302.302(a).

81.     Plaintiff is entitled to an award for all reasonable costs of prosecuting the action,
including court costs and investigation costs, deposition expenses, witness fees and attorney's
fees. Texas Business and Commerce Code 302.302(d).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Paola Dominguez prays for judgment against Defendant jointly
and severally as follows:

A.      Leave to amend this Complaint to name additional DOES as they are identified and to conform to the evidence presented at trial;

B.      A declaration that actions complained of herein by Defendants violated the TCPA and Texas state law;

C.      An injunction enjoining Defendants and their affiliates and agents from engaging in the unlawful conduct set forth herein;

D.      An award of $1,500 per call in statutory damages arising from the TCPA § 227(b) intentional violations jointly and severally against the corporation for sixteen (16) calls;

E.      An award of $1,500 in statutory damages arising from sixteen (16) violations of the Texas Business and Commerce code 302.101.

F.      An award to Plaintiff of damages, as allowed by law under the TCPA;

G.      An award to Plaintiff of pre-judgment and post-judgment interest, and costs, as allowed by law and equity

H.      Such further relief as the Court deems necessary, just, and proper.

May 5, 2023,                                        Respectfully submitted,

                                                    Paola Dominguez
                                                    Plaintiff, Pro Se
                                                    2316 Bill Howard Pl.
                                                    El Paso, TX 79936
                                                    915-383-6911
                                                    pdomin14@gmail.com

# **EXHIBIT 6**

JUDGE DAVID GUADERRAMA

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

FILED

2023 APR 10   AM 10: 25

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____ DEPUTY

| | |
|---|---|
| **YAZMIN GONZALEZ,** | § |
| | § |
| **Plaintiff,** | § |
| | § |
| **v.** | § |
| | § |
| **KELLER POSTMAN LLC,** an Illinois limited | § |
| Liability company | § |
| | § |
| **Defendant.** | § |
| | § |

EP23CV0145

## COMPLAINT

Pro Se Plaintiff Yazmin Gonzalez files this Complaint against Defendant Keller Postman

LLC for violations of (1) the federal Telephone Consumer Protection Act ("TCPA") and its

regulations and (2) the Texas Business and Commerce Code ("TBCC") law governing telephone

solicitation, alleging as follows:

### INTRODUCTION

1.      Beginning in February 2023, Plaintiff began to receive a barrage of illegal telemarketing

calls made on behalf of Defendant Keller Postman LLC ("Keller") by an unknown anonymous

telemarketer soliciting Camp Lejeune legal representation.

2.      Plaintiff seeks redress under the TCPA and TBCC, demanding that the calls stop.

### JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over Count I under 28 U.S.C § 1331, because

the claims arise under the federal Telephone Consumer Protection Act, 47 U.S.C. § 227. *See*

1

*Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 386-87 (2012) (holding that federal courts have federal question jurisdiction over private actions brought under the TCPA).

4.       The Court has supplemental jurisdiction over Count II under 28 U.S.C § 1367.

5.       This Court has personal jurisdiction over Keller because Defendant purposefully availed itself to the State of Texas and to this District, and there is a sufficient relationship between Defendant's purposeful contacts with Texas and the litigation:

      a)   Defendant targets Texas when marketing small business loans and regularly conducts business in this District, including telephone solicitation.

      b)   Its agent John Doe Telemarketer, called Plaintiff's El Paso-area phone number (with area code 915) to generate leads for Keller's legal services.

      c)   These calls to Texas Plaintiff injured Plaintiff in Texas, creating a causal link among Defendant, the forum, and the litigation that exceeds the non-causal affiliation that is sufficient to support personal specific jurisdiction. *See Ford Motor Co. v Mont. Eight Jud. Dist. Ct.*, 141 S. Ct. 1017 (2021).

      d)   Venue is proper under 28 U.S.C. § 1391(b)(2).

## PARTIES AND OTHER ENTITIES

6.       Plaintiff YAZMIN GONZALEZ is a natural person domiciled in Texas who received the incessant and intrusive calls made on behalf of Defendant to market small business loans via a merchant cash advance.

7.       Defendant KELLER POSTMAN LLC ("Keller") is a limited liability corporate law firm organized and existing under the laws of Illinois and can be served via registered agent Zina Bash at 501 Congress Avenue Suite 150, Austin, TX 74701. Defendant Keller Postman's place of business is 150 N Riverside Plz Ste 150, Chicago, IL 60606.

8.      Non-named Party JOHN DOE is an unknown anonymous telemarketer that made phone calls on behalf of and at the direction of Keller in exchange for financial considerations.

**FACTUAL ALLEGATIONS**

9.      The TCPA was enacted to protect consumers' privacy interests by prohibiting unwanted, repetitive, and invasive telephone solicitations.

10.     Plaintiff successfully registered her phone number ending in 1859 on the National Do-Not-Call Registry ("DNC") in March 2022.

11.     Plaintiff successfully registered her phone number ending in 2376 on the National Do-Not-Call Registry ("DNC") in February 2022.

12.     Keller is a law firm licensed that markets itself as "Leading efforts to get justice for water contamination victims at Camp Lejeune."

13.     Keller hired anonymous John Doe telemarketer(s) to place telephone solicitation phone calls because Keller is barred by ethics from directly placing unsolicited phone calls on their own behalf.

14.     On March 31, 2023, Plaintiff searched the Texas Secretary of State website at https://direct.sos.state.tx.us/telephone/telephonesearch.asp and did not find a valid Texas telephone solicitation registration for Defendant Keller.

15.     Plaintiff is the subscriber to a cellular telephone service for this phone number, uses the phone for residential purposes, and does not use the telephone for any business purposes.

16.     On or about February 21, 2023, Plaintiff began receiving such calls from Defendant to her El Paso-area cellular telephone number 915-XXX-2376.

17.     On or about February 17, 2023, Plaintiff began receiving such calls from Defendant to her El Paso-area cellular telephone number 915-XXX-1859.

3

18.     Plaintiff was so aggravated with the phone calls she asked a coworker with a healthcare background to obtain the identity of the law firm making the unsolicited phone calls.

### Phone Calls to Phone Number Ending in 1859

19.     Call#1. On February 17, 2023, Plaintiff received a phone call that displayed 915-621-9455 on the caller identification.  Plaintiff answered the phone and was solicited for Camp Lejeune legal representation.  Plaintiff disconnected the call.

20.     Call#2. On February 17, 2023, Plaintiff received a phone call that displayed 301-936-1029 on the caller identification.  Plaintiff answered the phone and was solicited for Camp Lejeune legal representation.  Plaintiff disconnected the call.

21.     Calls #3-4.  Plaintiff received two additional calls that displayed 301-936-1029 on the call identification on February 17, 2023, and February 25, 2023.

22.     Call #5.  On February 26, 2023, Plaintiff received a phone call that displayed 915-821-1265 on the caller identification.  Plaintiff was solicited for Camp Lejeune legal representation. Plaintiff discontinued the call.

23.     Call#6.  On February 26, 2023, Plaintiff received a phone call that displayed 915-852-26589 on the caller identification.  Plaintiff was solicited for Camp Lejeune legal representation. Plaintiff discontinued the call.

24.     Call #7.  On March 16, 2023, Plaintiff received a phone call that displayed 915-821-1984 on the caller identification.  Plaintiff answered the phone and yet again was solicited for Camp Lejeune legal representation by an anonymous telemarketer.  Plaintiff was aggravated from all the calls and decided to continue the process to determine who was constantly calling Plaintiff. Plaintiff went through the process.

25.     Plaintiff was transferred by the anonymous telemarketer in Call#7 from paragraph 24 to "Colette" who sent Plaintiff a contract from Defendant Keller for Camp Lejeune legal representation.

26.     Call #8.  On March 16, 2023, Plaintiff received a phone call from phone number 770-583-7714.  The telemarketer began to again solicit Plaintiff for Camp Lejeune legal solicitation. This was a cold-call solicitation not connected to the previous call in which Plaintiff was sent a contract.  The telemarketer asked Plaintiff all of the qualifying questions and then transferred Plaintiff to Jake.  During the call, the call Jake realized Plaintiff already had already been a contract and asked that Plaintiff sign the contract that had already been sent.

27.     Call #9.  On March 16, 2023, Plaintiff received a phone call that displayed 702-852-6587 on the caller identification.  Plaintiff answered the phone and was solicited cold-call solicited for Camp Lejeune legal representation.

28.     Call #10.  On March 16, 2023, Plaintiff received a phone call that displayed 915-821-1637 on the caller identification.  Plaintiff answered the phone and was solicited cold-call solicited for Camp Lejeune legal representation.

29.     The agent behind the call in Paragraph 28 asked Plaintiff qualifying questions and then transferred her to another agent. The agent behind the call identified herself as "Colette from National Intake Center for Camp Lejeune toxic water legal action."

30.     Plaintiff continued with the call and received an email from certifier@vinesign.com. containing the retainer for Defendant Keller Postman's legal services. Plaintiff declined to sign the contract.

**Calls to Phone Number Ending in 2376**

31.     Call #1.  On February 21, 2023, Plaintiff received a phone call that displayed 516-853-2780 on the caller identification.  Plaintiff answered the phone and was solicited for Camp Lejeune legal representation.  Plaintiff disconnected the call.

32.     Call #2.  On February 21, 2023, Plaintiff received a phone call that displayed 646-699-3891 on the caller identification.  Plaintiff answered the phone and was solicited for Camp Lejeune legal representation.  Plaintiff disconnected the call.

33.     Call #3.  On February 22, 2023, Plaintiff received a phone call that again displayed 646-699-3891 on the caller identification.  Plaintiff recognized the phone number and knew it was for Camp Lejeune.  Plaintiff's coworker, who has a medical background, answered the phone so that Plaintiff could determine who was behind the constant Camp Lejeune phone calls.  The qualifying questions were answered and Plaintiff was live transferred Plaintiff to another agent. The agent sent an email from andrea.mangal@1888goanswer.com. containing the retainer for Defendant's legal services.

34.     Call #8.  On February 23, 2023, Plaintiff received a phone call that displayed 325-308-0612.  This was a direct call from "Chris" from Defendant Keller.

35.     Call #10.  On February 23, 2023, Plaintiff received a phone call that displayed 325-308-0612 on the caller identification.  This call came from the same "Jake" who also called Plaintiff on her phone number ending in 1859.  Jake sent Plaintiff a contract from Defendant Keller to enroll Plaintiff in their Camp Lejeune legal services.

36.     DNC request # 1.  Call #11.  On February 23, 2023, Plaintiff received a phone call that displayed 702-664-1487 on the caller identification.  "Jake from Keller Postman" made the phone call.  Plaintiff informed Jake she was not interested and asked Jake to not call again.

37.     DNC request #2. Call # 14. On February 24, 2024, Plaintiff received a phone call displaying 516-853-2480 on the caller identification. Plaintiff was solicited for Camp Lejeune representation. Plaintiff asked the telemarketer to not call again.

38.     DNC request #3. Call #18. On February 27, 2023, Plaintiff received a text message from phone number 516-730-0242 from Defendant asking Plaintiff to sign the documents. Plaintiff replied back with a Do Not Call request.

39.     DNC request #4. Call #19. On February 27, 2023, Plaintiff received a text message from phone number 516-856-9015 from Defendant asking Plaintiff to sign the documents. Plaintiff replied back with a Do Not Call request.

40.     DNC request #5. Call #22. On March 6, 2023, at 9:34 AM, Plaintiff received a phone call that displayed 646-699-3891 on the caller identification. Plaintiff answered the phone directly from Defendant Keller. Plaintiff informed Defendant she was not interested and to not call again.

41.     DNC request #6. Call #22. On March 6, 2023, at 9:52 AM, Plaintiff received a phone call that displayed 646-699-3891 on the caller identification. Plaintiff answered the phone directly from Defendant Keller. Plaintiff informed Defendant she was not interested and to not call again.

42.     Defendant used a series of phone numbers to call Plaintiff. Many of the phone numbers used 915 area codes in order to make it seem as though the call was local. This spoofed caller identification is a purposeful violation of the Truth in Caller ID Act of 2009.

43.     Plaintiff received at least 33 telephone calls on behalf or, and by, Defendant Keller from a number of various phone numbers. Table A below lists the phone calls received by Plaintiff.

44.     TABLE A below displays calls for phone number ending in 2376 made to Plaintiff

TABLE A:

| Number: | Date | Time | Caller ID | Notes |
|---|---|---|---|---|
| 1. | 02/21/2023 | 9:32 AM | 516-853-2780 | Telemarketer soliciting Camp Lejeune |
| 2. | 02/22/2023 | 12:55 PM | 646-699-3891 | Telemarketer soliciting Camp Lejeune |
| 3. | 02/22/2023 | 1:21 PM | 646-699-3891 | Agent sent contract |
| 4. | 02/23/2023 | 7:20 AM | 516-853-2780 | Missed call |
| 5. | 02/23/2023 | 9:43 AM | 646-699-3891 | Missed call |
| 6. | 02/23/2023 | 9:55 AM | 516-853-2780 | Telemarketer soliciting Camp Lejeune |
| 7. | 02/23/2023 | 11:03 AM | 516-853-2780 | Telemarketer soliciting Camp Lejeune |
| 8. | 02/23/2023 | 11:13 AM | 325-308-0612 | Chris from Intake Center |
| 9. | 02/23/2023 | 11:20 AM | 516-853-2780 | Telemarketer soliciting Camp Lejeune |
| 10. | 02/23/2023 | 11:23 AM | 325-308-0612 | Chris from Intake Center and Jake from Keller |
| 11. | 02/23/2023 | 12:51 PM | 702-664-1487 | Jake from Keller |
| 12. | 02/23/2023 | 1:44 PM | 516-853-2480 | Missed call |
| 13. | 02/24/2023 | 12:51 PM | 516-853-2480 | Missed call |
| 14. | 02/24/2023 | 4:03 PM | 516-853-2480 | DNC – not interested |
| 15. | 02/25/2023 | 8:36 AM | 646-699-3891 | Missed call |
| 16. | 02/26/2023 | 1:11 PM | 646-699-3891 | Telemarketer soliciting Camp Lejeune |
| 17. | 02/27/2023 | 8:05 AM | 646-699-3891 | Telemarketer soliciting Camp Lejeune |
| 18. | 02/27/2023 | 9:44 AM | 516-730-0242 | DNC request |
| 19. | 02/27/2023 | 10:45 AM | 516-856-9015 | DNC Request |
| 20. | 02/28/2023 | 8:25 AM | 646-699-3891 | Missed call |
| 21. | 03/01/2023 | 9:34 AM | 646-699-3891 | Direct call from Keller Postman |

| 22. | 03/06/2023 | 9:52 AM | 646-699-3891 | Not interested |
| 23. | 03/09/2023 | 12:07 PM | 646-699-3891 | Not interested |

45.     Table B below displays calls for phone number ending in 1859 to Plaintiff.

TABLE B

| Number: | Date | Time | Caller ID | Notes |
|---|---|---|---|---|
| 1 | 02/17/2023 | 8:37 AM | 915-621-9455 | Telemarketer soliciting Camp Lejeune |
| 2. | 02/17/2023 | 2:49 PM | 301-936-1029 | Telemarketer soliciting Camp Lejeune |
| 3. | 02/17/2023 | 2:52 PM | 301-936-1029 | Telemarketer soliciting Camp Lejeune |
| 4. | 02/25/2023 | 9:48 AM | 301-936-1029 | Telemarketer soliciting Camp Lejeune |
| 5. | 02/26/2023 | 2:10 PM | 915-821-1265 | Telemarketer soliciting Camp Lejeune |
| 6. | 02/27/2023 | 1:04 PM | 915-852-2659 | Telemarketer soliciting Camp Lejeune |
| 7. | 03/16/2023 | 11:26 AM | 915-821-1984 | Telemarketer soliciting Camp Lejeune. Transferred to Colette who sent contract. |
| 8. | 03/16/2023 | 1:06 AM | 770-583-7714 | Telemarketer soliciting Camp Lejeune. Transferred to Jake who asked Plaintiff to sign the contract. |
| 9. | 03/16/2023 | 4:22 PM | 702-852-6587 | Telemarketer soliciting Camp Lejeune |
| 10 | 03/16/2023 | 4:22 PM | 702-852-6587 | Telemarketer soliciting Camp Lejeune |

46.     Plaintiff did not have an established business relationship with Defendant, nor did

Plaintiff consent to any of these calls.

47.     Plaintiff did not provide her phone number to Defendant at any point.

48.     On information and belief, Keller used an automated telephone dialing system, as defined

by 47 U.S.C. § 227(a)(1), to make calls.

49.     Although is not bringing claims for 227(b), Plaintiff infers an ATDS was used because:

     a)   Several calls came in rapid succession, including four calls within three minutes on two different occasions;

     b)   Plaintiff heard a long pause and dead airtime upon answering calls but before being connected to a live agent; and

     c)   Random or sequential generation explains how Defendant obtained and dialed Plaintiff's number, considering Plaintiff did not give it to Defendant or otherwise consent to the calls.

50.     Defendant's placement of nonemergency telephone calls to Plaintiff's cellular telephone using an ATDS without Plaintiff's prior express consent violated 47 U.S.C § 227(b) and 47 C.F.R. § 64.1200(a).

51.     Defendant's placement of multiple calls within a twelve-month period to Plaintiff's residential phone line, listed on the National DNC Registry since March 2022, violated 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c).

52.     Defendant's violations described in paragraphs 50-51 were knowing and willful because KELLER had "reason to know, or should have known, that [its] conduct would violate the statute." *Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 899 (W.D. Tex. 2001).  Bad faith is not required.

53.     KELLER knew or should have known that its conduct would violate the TCPA and its regulations because KELLER operates in a highly regulated telephone solicitation industry.

54.     KELLER knew or should have known the requirements for making TCPA-compliant telemarketing calls and thus knew or should have known that the calls complained of herein violate the TCPA and its regulations.

## VICARIOUS LIABILITY OF KELLER FOR JOHN DOE'S TCPA VIOLATIONS

55.     Keller is "vicariously liable" under federal common law principles of agency for TCPA

violations committed by third-party telemarketers," such as John Doe.  In re Joint Pet. filed by

Dish Network, LLC, 28 F.C.C.R. 6574, 6582 (2013).

56.     Keller markets legal representation through direct telephone solicitation by its hired John

Doe telemarketers, who act on its behalf.  John Doe transfers live, hot leads to Keller and Keller

accepts the leads.  John Doe was Keller's agent when it made the prohibited calls on behalf of,

and with the actual authority from, John Doe pursuant to a contract that governs John Doe's

telemarketing for Keller.

57.     Keller directs, controls, authorizes, and pays John Doe to generate live-transfer leads for

Defendant's legal services through telephone solicitation.  Moreover, it requires, authorizes, or at

least permits John Doe telemarketers to solicit explicitly for Camp Lejeune representation.

58.     Keller sets the criteria for qualifying leads, which John Doe must follow, and John Doe

live-transfers leads qualified on those criteria exclusively to Keller.  Plaintiff is unaware of the

qualifying thresholds, but the salient question is whether the potential client was stationed at

Camp Lejeune, when they were stationed at Camp Lejeune, and whether there was some type of

cancer or physical impairment that manifested as a result of the Camp Lejeune stay.

59.     On information and belief, Keller writes or at least approves the call script John Doe

telemarketers use when qualifying leads for Keller.

60.     John Doe telemarketers are Keller's associates and do nothing to disturb the impression

that John Doe telemarketers work for, and speak and act on behalf of, Keller.

61.     From John Doe telemarketer's initial call through Defendant Keller's acceptance of a

completed representation application, the telemarketing of Keller's legal representation

constitutes a singular, coordinated marketing effort devised, authorized, directed, and controlled by Keller, the principal, with John Doe acting as Keller's agent.

62.     John Doe, acting with actual authority, made the prohibited calls, qualified Plaintiff according to Keller's criteria, and then live-transferred Plaintiff to Keller's advisor to continue marketing legal representation.

### INJURY, HARM, DAMAGES, AND ACTUAL DAMAGES TO PLAINTIFF

63.     Plaintiff has been denied the use of her phone, enjoyment of his phone, and had the functionality of her phone decreased because of unnecessary charging, erosion of phone memory, and had her privacy invaded by the harassing telemarketing calls.

64.     Defendant's calls harmed Plaintiff by causing the very harm that Congress sought to prevent a "nuisance and invasion of privacy."

65.     Plaintiff has been annoyed, harassed, and irritated by unauthorized calls placed on behalf of Defendant.

66.     Defendant's calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone by placing unwanted telemarketing calls to Plaintiff

### COUNT I – DNC Violations
### Violation of the TCPA, 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)

67.     Plaintiff incorporates by reference each and every paragraph of this complaint as if fully set forth herein.

68.     The TCPA prohibits telephone solicitation of residential telephone subscribers whose numbers are registered on the National Do-Not-Call Registry, 47 U.S.C. § 227(c)(5).

69.     Even though Plaintiff's number has been registered on the National DNC Registry since March 2022, KELLER made unsolicited telephone solicitations to Plaintiff's residential telephone line, without Plaintiff's consent, and thereby violated 47 U.S.C § 227(c) and 47 C.F.R. § 64.1200(c) (the "DNC Violations").

70.     Plaintiff suffered the following injuries from each and every phone call:  invasion of privacy; intrusion on Plaintiff's right of seclusion; occupation of Plaintiff's telephone line by unwelcome calls, rendering the phone unavailable for legitimate calls; inconvenience; loss of usefulness of Plaintiff's phone; unnecessary expenditure of Plaintiff's phone's battery power; degradation of the battery; and trespass to Plaintiff's chattel, namely her cellular telephone.

71.     Under § 227(c)(5), Plaintiff is entitled to receive up to $500 in damages for each violation of 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c).  Because the violations were knowing and willful, *see* Paragraphs 50-51, the Court may award up to $1500 per violation.

72.     Accordingly, Plaintiff seeks and order under Section 227(c)(5) awarding $1500 for each DNC Violation.

### COUNT II
### Violation of Tex. Bus. Org & Com. Code § 302.101

73.     Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein.

74.     In addition to the harm of illegal telephone solicitations, Texas law recognizes the difficulty of holding businesses that make them accountable.

75.     To address that problem, Texas law requires "sellers" engaged in telemarketing to register with the state and provide the public the information necessary to hold a seller accountable:  the seller's legal name, any assumed names, any organizational documents, the address for the principal place of business, each phone number used in telemarketing, names of

officers and directors, and the name and address of the agent for service of process.  Tex. Bus. &
Com. Code § 302.001. *et. seq.*

76.   The registration requirements reflect an important public policy of Texas:  to "protect
persons against false, misleading, or deceptive trade practices in the telephone solicitation
business." *Id.* § 302.003.  The law must be "liberally construed and applied to promote [that]
purpose." *Id.*  Moreover, sellers must post financial security to ensure their compliance, and an
"attempted waiver of a provision of this chapter is void."  *Id.* §§ 302.004, 302.107.

77.   Chapter 302 defines a "seller" as a "person who makes a telephone solicitation on the
person's own behalf." Id. § 302.001(5),  A "telephone solicitation" is "a telephone call a seller or
salesperson initiates to induce a person to purchase, rent, claim, or receive an item."  *Id.* §
302.001(7).  "Item," in turn, means "property or a service."  *Id.* § 302.001(1).  Money obtained
through a loan is "property." And a quick close to deliver funds to small businesses within days
is a service." *Id.* § 302.001(1).

78.   KELLER is a "seller" because it makes telephone solicitations on its own behalf through
salespersons, including both (a) those it "employ[s]" – such as "Steve," "John," "Matt," "Shaun,"
and "AJ," and those it 'authorize[s] – such as third party telemarketers. Id. § 302.001(4)-(5).
The "items" it induces purchasers to receive are loans and a rapid close.  And the called parties
are "purchasers" because they are "solicited to become…obligated for [the loans].'  Id. §
302.001(3).

79.   KELLER engages in "telephone solicitation" because they initiate telephone calls to
induce small businesses to take loans through KELLER's quick closings for small businesses.
Id. § 302.001(1), (3), (7).

80.     Because "a person makes a telephone solicitation if the person effects at attempts to effect a telephone solicitation," telephone calls initiated by "Steve," "John," "Matt," "Shaun," and "AJ" are attributable both to them individually and to KELLER. *See Id.* § 302 (emphasis added).

81.     Texas law requires those whose products or services are offered through telephone solicitation from or to a location located in Texas to provide information about their telemarketing activities and obtain a registration certificate from the State. Tex. Bus. & Com. Code § 302.101.  The purpose of the requirement is to "protect persons against false, misleading, or deceptive practices in the telephone solicitation business." *Id.* at 302.003.  KELLER effected the solicitations because it brought about and made them happen by employing or authorizing these salespersons to make the telephone solicitations and paying them to do so. *See* Effect, Black's Law Dictionary (11th ed. 2019) ("To bring about; to make happen.").

82.     Because the telephone solicitations were made to Plaintiff, a "purchaser located in this state" of Texas, KELLER was obligated to comply with the registration and related requirements of Texas Business & Commerce Code § 302.001, *et seq*.

83.     Defendant failed to comply, committing numerous independent violations of Texas law, including at least the following:

  a)  Failure to obtain a certificate of registration for the business locations(s) from which each of the telephone solicitations was made;

  b)  Failure to post the registration certificate in a conspicuous place at each such location;

  c)  Failure to post in close proximity to the registration certificate the name of each individual in charge of the location;

d) Failure to file an addenda providing the required registration information for each salesperson;

e) Failure to make available at each location a copy of the entire registration statement and any addenda for inspection by a purchaser or by a representative of a government agency; and

f) Failure to post a $10,000 bond, letter of credit, or certificate of deposit to secure Defendant's compliance with Chapter 302.

g) Failure to appoint Texas' Secretary of State agent for service of process.

h) Failure to provide the complete street address of both (i) the location from which each solicitation was made and (ii) Defendant's principal location.

84.     Each solicitation is a separate violation for which KELLER is subject to a penalty up to $5,000. *Id.* § 302.101, 302.302(a).

85.     Defendant's violations of Chapter 302 harmed Plaintiff because she had to spend hours to track down information that should have been publicly available.  To this day, Plaintiff does not have sufficient information about KELLER, the locations from which the calls were made, and the persons responsible for them.

86.     Plaintiff seeks to recover from Defendant "a civil penalty of not more than $5,000 *for each violation*."

87.     Plaintiff is further "entitled to recover all reasonable costs prosecuting this action, including court costs and investigation costs, deposition expenses, witness fees, and attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

A.     Leave to amend this Complaint to name additional DOESs as they are identified and to conform to the evidence presented at trial;

B.     A declaration that actions complained of herein by Defendant violate the TCPA and Texas state law;

C.     An injunction enjoining Defendant and their affiliates and agents from engaging in the unlawful conduct set forth herein;

D.     An award of $1500 per call in statutory damages arising from the TCPA § 227(b) intentional violations jointly and severally against the corporation for 33 calls;

E.     An award of $1500 per call in statutory damages arising from the TCPA § 227(c) intentional violations jointly and severally against the corporation for 33 calls;

F.     An award of $5,000 in statutory damages arising from violations of the Texas Business and Commerce code 302.101 for 31 calls;

G.     An award to Ms. Gonzalez of damages, as allowed by law under the TCPA;

H.     An award to Ms. Gonzalez of interest, costs and attorneys' fees, as allowed by law and equity;

I. Such further relief as the Court deems necessary, just, and proper.


Dated:  April 6, 2023,                                      Respectfully submitted,


                                                            Yazmin Gonzalez
                                                            Plaintiff, Pro Se
                                                            14205 Charles Pollock
                                                            El Paso, TX 79938
                                                            915-820-1859


17

I.     **Demand for Jury Trial**

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: April 6, 2023,

Yazmin Gonzalez
Plaintiff, Pro Se
14205 Charles Pollock
El Paso, TX 79938
915-820-1859

# **EXHIBIT 7**

July 6, 2023

Mr. Enrique Zuniga
Public Trust Liaison
The State Bar of California
845 S. Figueroa Street
Los Angeles, CA 90017-2515

**Re:**    **Request for Inquiry into Potential Ethical Issues Arising in the Context of Mass Arbitration Filings**

Dear Mr. Zuniga,

Congratulations on your appointment as the first Public Trust Liaison for the California State Bar! By way of introduction, my name is Jaime Huff and I am the Vice President and Counsel for the Civil Justice Association of California (CJAC). We are a more than 40-year-old nonprofit organization representing a broad and diverse array of businesses and professional associations. A trusted source of expertise in legal reform and advocacy, we confront legislation, laws, and regulations that create unfair litigation burdens on California businesses, employees, and communities.

We are reaching out to express our concern about a phenomenon that has grown in California and across the nation in recent years: abusive "mass arbitrations," in which counsel threaten to file massive numbers of identical arbitration demands against a business—which would immediately obligate the business to pay huge fees to the arbitration provider—to extract a settlement unrelated to the merits of the claims.

As you well know, arbitration greatly benefits consumers and workers who are able to have their disputes resolved fairly in a faster and more efficient manner than in California's overcrowded courts. When handled appropriately, there is nothing inherently wrong with the same set of lawyers representing multiple bona fide clients who seek to pursue legitimate claims. Arbitration enables those claims to be resolved on the merits at a low cost.

But for certain lawyers who have abused the arbitral process, resolution of their clients' claims on the merits is not the goal. Instead, their goal is to use the threat of arbitration fees to coerce settlements unrelated to the merits of the underlying claims. These lawyers use online solicitations to amass as large a pool of clients as possible. That way, they can threaten the targeted business with ever-greater arbitration fees, which the business must pay even if it wins every case. These lawyers' goal is to make it too expensive for the business to defend itself; the only option is to settle.[1]

---

[1] A recent report published by the U.S. Chamber of Commerce Institute for Legal Reform, attached to this letter, provides additional details about the mass arbitration playbook and the ethical issues that it poses. *See* U.S. Chamber of Commerce Institute for Legal Reform, *Mass Arbitration Shakedown: Coercing Unjustified Settlements* (Feb. 28, 2023), https://instituteforlegalreform.com/wp-content/uploads/2023/02/Mass-Arbitration-Shakedown-digital.pdf ("*Mass Arbitration Shakedown*").

July 6, 2023
Page 2

Reasonable observers can debate the policy implications of the rise in mass arbitrations. But when some lawyers treat their clients as fungible entries on a spreadsheet designed to maximize settlement payments and concomitant attorneys' fees—rather than treating their clients as unique individuals with claims to be resolved—ethical abuses predictably can and do occur. Unscrupulous or negligent lawyers may transgress the ethical rules relating to vetting claims, creating an attorney-client relationship, soliciting clients, and communicating with their clients. They may also run afoul of the rules prohibiting the unauthorized practice of law.

Below we discuss some of the issues that are implicated by reports about publicly disclosed mass arbitrations—almost all of which include arbitration demands or threatened arbitration demands involving California claimants or California defendants.[2] And because many threatened or actual mass arbitrations are never made public; the reported issues may be only the tip of the iceberg.

**Failure to vet claims** - because complaints or arbitration demands, and threats to file them, make factual assertions about a client's situation at the time of filing, lawyers are required to investigate and disclose whether their clients are legitimate claimants.[3] Yet business defendants, including businesses located in California, have alleged numerous ways in which lawyers filing or threatening to file mass arbitrations in the names of people recruited online have not properly vetted their putative clients' claims. For example, businesses have alleged that they have faced arbitration demands or threatened arbitration demands brought on behalf of:

- fake or fictitious claimants;
- claimants who are deceased or incarcerated, and thus almost certainly never authorized an arbitration filing;
- individuals who were never consumers of or workers for the defendant, yet assert claims as if they were;
- individuals who are in bankruptcy, and therefore aren't permitted to assert claims outside the bankruptcy process;
- multiple purported individuals who turn out to be the same person;
- individuals who never authorized the filing; and
- individuals already represented by other lawyers in pursuing similar claims against the same company.[4]

Businesses also have argued that the online solicitations used to recruit claimants nationwide, including recruiting of claimants residing in California, worsen the problem because the solicitations are misleading. For example, some businesses have reported that the advertisements make it appear that individuals are merely signing up to participate in an investigation or a class action, rather than an individual arbitration proceeding in which the claimant must engage personally. Businesses also have argued that advertisements describe the claims at issue in

---

[2] *See Mass Arbitration Shakedown*, *supra*, at 19-21 (providing examples of publicly reported mass arbitrations).

[3] *See*, *e.g.*, ABA Model R. of Prof. Conduct 3.1 ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous …."). As the comments to the rule make clear, lawyers bringing an action have an obligation to "inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions." *Id.* cmt. 2; *see also Mass Arbitration Shakedown*, *supra*, at 35-38. California's ethical rules similarly require lawyers to have "probable cause" to "bring or continue an action." Cal. R. of Prof. Conduct 3.1(a).

[4] *See Mass Arbitration Shakedown*, *supra*, at 36-38; *see also id.* at 38 (discussing findings by a federal district court judge in California about insufficiently supported arbitration demands).

July 6, 2023
Page 3

misleading ways (causing individuals without claims to believe they are affected when they are not).[5]

There has been little to no consequence for the filing or threatened filing of these bogus demands. Unlike in court cases governed by Federal Rule of Civil Procedure 11 or California Code of Civil Procedure § 128.7, businesses have no ready mechanism to seek sanctions against lawyers who file frivolous claims in arbitration. Rather, the mass arbitration filers typically just voluntarily cross the bogus claimants off their list of clients once the defendant identifies them—essentially outsourcing to defendants the vetting that the mass arbitration filers were ethically obligated to conduct *before* bringing the claims. That result turns the ethical rules on their head. And if the arbitration already has been filed, as is sometimes the case, the business already has been forced to pay arbitration fees that are not refunded merely because the arbitration is later withdrawn.

**Failure to convey settlement communications and offers or to obtain informed consent to aggregate settlements** - another problem that occurs when some lawyers purport to represent thousands of individual clients is that they are unable to meet their ethical obligations to communicate with each of their individual clients.

For example, the ethical rules require lawyers to notify clients promptly of all settlement offers.[6] The rules also give clients the right to decide whether to accept or reject the offer and require lawyers to abide by that decision.[7]

Businesses faced with mass arbitration may have good reason to respond with individualized settlement offers. Such offers are often tied to the merits of the particular claims, which vary from claimant to claimant. These offers can make legitimate claimants whole (or more than whole) without the need for any further adversarial proceedings. And (as in civil litigation) defendants sometimes make "nuisance-value" settlement offers that individual plaintiffs would accept when they know that their claims are meritless.

Yet there is reason to doubt that at least some lawyers threatening or filing mass arbitration filings are engaging in the thousands—or even tens or hundreds of thousands—of individualized communications needed to meaningfully convey and discuss settlement offers with each of their clients.[8] Certainly plaintiffs' counsel have little incentive to engage in these discussions. The threat of a mass arbitration filing is most acute when the filing is imminent (unless the defendant agrees to settle, of course), and once the demands are filed, the business has a very short time to try and resolve the demands before it is required to pay case-management, administrative, and arbitrator fees on top of the filing fees it has already paid. Lawyers pursuing mass arbitrations are unlikely to forgo the leverage from these looming fees by having meaningful settlement discussions with each of their clients. But that is what the ethics rules require.

Relatedly, these lawyers often insist on aggregate settlements rather than individualized ones, under which claimants with stronger claims get larger recoveries, claimants with weaker claims get less, and bogus claimants get nothing at all. These lawyers use the threat of arbitration fees that

---

[5] *See id.* at 32-34.

[6] *See* Cal. R. of Prof. Conduct 1.4.1 ("A lawyer shall promptly communicate to the lawyer's client ... all amounts, terms, and conditions, of any written offer of settlement made to the client."); ABA Model R. of Prof. Conduct 1.4.

[7] *See* Cal. R. of Prof. Conduct 1.2(a) ("A lawyer shall abide by a client's decision whether to settle a matter."); ABA Model Rule 1.2(a).

[8] *See Mass Arbitration Shakedown, supra,* at 38-39.

July 6, 2023
Page 4

even false claims can trigger in order to increase the payoff. The ethics rules require that each client give informed consent to an aggregate settlement.[9] But it is hard to see how lawyers pursuing mass arbitrations designed to extract aggregate settlements can adequately represent both those clients who want to accept whatever settlement the firm decides is fair and those clients who do not. Rather than protecting their individual clients' interests, as the ethical rules require, the lawyers may only be looking out for their own bottom line.

**Unauthorized practice of law** - unfortunately, some lawyers pursuing mass arbitrations do not seem to care where they are licensed to practice, instead simply soliciting consumers or workers across the country—including in California—in order to maximize the number of arbitrations they can threaten to file.

This approach, however, is highly likely to result in the unauthorized practice of law. Many states do not permit law firms to prepare or file arbitration demands or negotiate settlements on behalf of claimants who live in states where their lawyers are not admitted to practice.[10] Such law firms are likely routinely ignoring the requirements of programs like California's Out-of-State Arbitration Counsel (OSAAC) program, which requires the out-of-state attorney to associate with a California attorney, complete an application process for each arbitration taking place in California, and obtain the arbitrator's approval.[11]

Nor could a Florida or Texas lawyer, for example, justify soliciting residents of our state and filing mass arbitrations on their behalf in California by invoking Model Rule of Professional Conduct 5.5(c). That rule applies only when, among other circumstances, the client has previously been represented by the lawyer, or lives in or has substantial contacts with the lawyer's home state.[12]

In sum, the State Bar should investigate these serious alleged ethical violations in the mass-arbitration context. Given the potential for literally hundreds of thousands of ethical violations, this issue could rival the Tom Girardi scandal that has brought discredit to our profession in California. If the Bar finds these ethical concerns to be well founded, it should propose mechanisms to prevent California lawyers, and out-of-state lawyers purporting to pursue arbitrations here, from undermining the State's ethical standards and rules of professional conduct. If you have any questions or would like to chat further, please contact me at jhuff@cjac.org or at 916-956-2905.

Sincerely,

Jaime Huff
Vice President and Counsel, Public Policy

---

[9] *See* Cal. R. of Prof. Conduct 1.8.7 ("A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients, ... unless each client gives informed written consent."); ABA Model R. of Prof. Conduct 1.8(g) (similar); *see also Mass Arbitration Shakedown, supra,* at 39-40.

[10] *See* Cal. R. of Prof. Conduct 5.5(a)-(b); ABA Model R. of Prof. Conduct 5.5(a)-(b); *see also Mass Arbitration Shakedown, supra,* at 30-31.

[11] *See* Cal. Code of Civil Proc. § 1282.4; *see also* https://www.calbar.ca.gov/Admissions/Special-Admissions/Out-of-State-Attorney-Arbitration-Counsel-OSAAC.

[12] *See Mass Arbitration Shakedown, supra,* at 31-32.

# EXHIBIT 8

**Terms of Use**

**Effective as of** May 1, 2022

Welcome to Tubi, Inc. ("**Tubi**," "**we**," "**our**" or "**us**"). Please read these Tubi Terms of Use (the "**Terms of Use**") and our Privacy Policy, available at https://www.tubitv.com/static/privacy ("**Privacy Policy**"), carefully because they govern your access and use of our video streaming service offering a selection of television shows, movies, clips, and other audio-video content (collectively, the "**Content**") accessible via our website located at www.tubi.tv and www.tubitv.com (the "**Tubi Site**"), our applications ("**Apps**") and our player for viewing the Content (the "**Video Player**"), in addition to any other features, tools, applications, materials, or other services offered from time to time by Tubi in connection with its business, however accessed. To make these Terms of Use easier to read, the Tubi Site, Apps, Video Player and our services are referred to collectively as the "**Tubi Services**." A list of our affiliated companies ("**Affiliates**") is available at www.foxcorporation.com.

By visiting, accessing, or using any of the Tubi Services, you agree to be bound by these Terms of Use. It is important that you carefully read through these Terms of Use and also whenever we update them or whenever you access or use the Tubi Services. If you have any questions or comments about these Terms of Use, please submit your questions at www.tubitv.com/static/support and select "Terms of Use & Privacy Policy" from the list of available topics. If you have general questions about Tubi or how to use it, please visit our Help Center at https://tubitv.com/help-center/.

**IMPORTANT NOTICE REGARDING ARBITRATION: BY USING ANY TUBI SERVICES AND ACCEPTING THESE TERMS OF USE YOU ARE AGREEING (WITH LIMITED EXCEPTION) TO RESOLVE ANY DISPUTE BETWEEN YOU AND US THROUGH BINDING, INDIVIDUAL ARBITRATION RATHER THAN IN COURT. YOU AND TUBI WAIVE THE RIGHT TO BRING OR PARTICIPATE IN A CLASS ACTION IN CONNECTION WITH SUCH DISPUTES. PLEASE REVIEW CAREFULLY SECTION 10 TITLED "ARBITRATION AGREEMENT AND CLASS ACTION WAIVER" BELOW FOR DETAILS REGARDING ARBITRATION (INCLUDING THE PROCEDURE TO OPT OUT OF ARBITRATION).**

**1. CHANGES TO THE TERMS OF USE BY TUBI**

Tubi may amend these Terms of Use at any time by posting the amended Terms of Use on the Tubi Services (available at https://www.tubitv.com/static/terms). Any amendment to these Terms of Use will be effective upon posting on the Tubi Services. Your continued use of the Tubi Services after any such amendment is posted constitutes your acknowledgement and acceptance of such amendment. If you do not agree to be bound by the updated Terms of Use, then, except as otherwise provided in Section 10, you may not access or otherwise use the Tubi Services. Because the Tubi Services are evolving over time we may change or discontinue all or any part of the Tubi Services, at any time and without notice, at our sole discretion and without liability to you. Tubi may also impose limits on certain features and services offered on the Tubi Services or restrict your access to parts or all of the Tubi Services without notice or liability

**2. ACCESS AND USE OF THE TUBI SERVICES**

    a. **Age Limitations and Restrictions.** The Tubi Services are not directed to nor intended to be accessed or used by children under the age of 13. If you are under the age of 13, you are not permitted to access, use or register to use the Tubi Services or to otherwise provide your personal information to Tubi. If you are at least 13 and under 18 years of age, you may register with Tubi only if you have the consent of your parent or guardian, in which case your parent or guardian will be required to consent to these Terms of Use on your behalf. Access to Content may be restricted due to age appropriateness. Accessing the Tubi Services and/or the Content from territories where Tubi does not offer the Tubi Services is prohibited.

    b. **Registration and Your Information.**

        i. If you want to use certain features of the Tubi Services you will need to create an account ("**Account**"). You can do this with your email address via the Tubi Site or Apps, or using your account with certain third-party social networking services such as Facebook (each, an "**SNS Account**"). If you choose the SNS

Account option, please note that we will create your Account by extracting from your SNS Account certain personal information such as your name and email address and other personal information that your privacy settings on the SNS Account permit us to access.

        ii. It is important that you provide us with accurate, complete and up-to-date information for your Account and you agree to update such information to keep it accurate, complete and up-to-date. If you do not, we may suspend or terminate your Account. You agree that you will keep your password and Account information secure and that you will not disclose your Account password to anyone else and you will notify us immediately of any unauthorized use of your Account. You are responsible for all inaccuracies in your Account information and all activities that occur under your Account, regardless of whether or not you know about them.

    c. **Your License**. Subject to your compliance with these Terms of Use, Tubi grants you a limited, revocable, non-exclusive, non-transferable license, with no right to sublicense, to view and use the Tubi Services in connection with your permitted use thereof, including accessing and viewing the Content on a streaming-only basis through the Video Player, solely for personal, non-commercial purposes as set forth in these Terms of Use.

    d. **The Content**. The Content is available for permissible viewing on or through the Tubi Services.

You may only access and view the Content personally and for a non-commercial purpose in compliance with these Terms of Use. You may not either directly or through the use of any device, software, internet site, web-based service, or other means remove, alter, bypass, avoid, interfere with, or circumvent any copyright, trademark, or other proprietary notices marked on the Content, Tubi Services or any digital rights management mechanism, device, or other content protection or access control measure associated with the Tubi Services or the Content, including geo-filtering mechanisms. You may not use technologies to access or use the Tubi Services or Content from territories where Tubi does not have rights or does not offer services. You may not either directly or through the use of any device, software, internet site, web-based service, or other means copy, download, stream capture, reproduce, duplicate, archive, distribute, make available, upload, publish, modify, translate, broadcast, perform, display, sell, transmit or retransmit the Tubi Services or Content unless expressly permitted by Tubi in writing. You may not incorporate the Content into, or stream or retransmit the Content via, any hardware or software application or make it available via frames or inline links unless expressly permitted by Tubi in writing. Furthermore, you may not create, recreate, distribute, or advertise an index of any significant portion of the Content unless authorized by Tubi. You may not seek to develop, build, or otherwise promote a business, product, or service utilizing the Tubi Services or the Content, whether or not for profit. The Tubi Services and Content covered by these restrictions includes without limitation any text, graphics, layout, interface, technology, logos, photographs, audio and video materials, and stills. In addition, you are strictly prohibited from creating derivative works or materials that otherwise are derived from or based on in any way the Tubi Services or the Content, including without limitation montages, mash-ups and similar videos, wallpaper, desktop themes, greeting cards, and merchandise, unless it is expressly permitted by Tubi in writing. The foregoing prohibitions apply even if you intend to give away the derivative materials free of charge.

    e. **The Video Player**. You may not modify, enhance, remove, interfere with, or otherwise alter in any way any portion of the Video Player, its underlying technology, any digital rights management mechanism, device, or other content protection or access control measure incorporated into the Video Player. This restriction includes, without limitation, disabling, reverse engineering, modifying, interfering with or otherwise circumventing the Video Player in any manner that

enables users to view the Content without: (i) displaying visibly both the Video Player and all surrounding elements (including the graphical user interface, any advertising, copyright notices, and trademarks) of the webpage where the Video Player is located; and (ii) having full access to all functionality of the Video Player, including, without limitation, all video quality and display functionality and all interactive, elective, or click-through advertising functionality.

f. **The Apps**.

    i.    Subject to your compliance with these Terms of Use, Tubi grants you a limited, revocable, non-exclusive, non-transferable license, with no right to sublicense, to download and install a copy of the Apps on a consumer electronics device (e.g., a mobile phone, tablet, television, or computer) that you own or control and to run such single copy solely for your own personal non-commercial purposes on such consumer electronics device.

    ii.    You may not copy an App, except to make a copy for backup or archival purposes. Except as expressly permitted in these Terms of Use, you may not: (1) copy, modify or create derivative works based on the Apps; (2) distribute, transfer, sublicense, lease, lend or rent the Apps to any third party; (3) reverse engineer, decompile or disassemble the Apps; or (4) make the functionality of the Apps available to multiple users through any means. Tubi reserves all rights in and to the Apps not expressly granted to you under these Terms of Use.

g. **Accessing Apps from App Store**. The following terms apply to any App accessed through or downloaded from any app store or distribution platform (like the Apple App Store or Google Play) where the App may now or in the future be made available (each an "**App Provider**"). You acknowledge and agree that:

    i.    These Terms of Use are concluded between you and Tubi, and not with the App Provider, and Tubi (not the App Provider), is solely responsible for the App.

    ii.    The App Provider has no obligation to furnish any maintenance and support services with respect to the App.

    iii.    In the event of any failure of the App to conform to any applicable warranty, you may notify the App Provider, and to the maximum extent permitted by applicable law, the App Provider will have no other warranty obligation whatsoever with respect to the App. Any other claims, losses, liabilities, damages, costs or expenses attributable to any failure to conform to any warranty will be the sole responsibility of Tubi.

    iv.    The App Provider is not responsible for addressing any claims you have or any claims of any third party relating to the App or your possession and use of the App, including, but not limited to: (1) product liability claims; (2) any claim that the App fails to conform to any applicable legal or regulatory requirement; and (3) claims arising under consumer protection or similar legislation.

    v.    In the event of any third party claim that the App or your possession and use of that App infringes that third party's intellectual property rights, Tubi will be solely responsible for the investigation, defense, settlement and discharge of any such intellectual property infringement claim to the extent required by these Terms of Use.

    vi.    The App Provider, and its subsidiaries, are third-party beneficiaries of these Terms of Use as related to your license to the App, and that, upon your acceptance of the Terms of Use, the App Provider will have the right (and will be deemed to have accepted the right) to enforce these Terms of Use as related to your license of the App against you as a third-party beneficiary thereof.

    vii.    You represent and warrant that (1) you are not located in a country that is subject to a U.S. Government embargo, or that has been designated by the U.S. Government as a terrorist-supporting country; and (2) you are not listed on any U.S. Government list of prohibited or restricted parties.

    viii.    You must also comply with all applicable third party terms of service when using the App.

h. **Ownership**. As between you and Tubi, Tubi and/or Tubi's licensors exclusively own, control and retain all right, title and interest in and to the Tubi Services and the Content, including all associated intellectual property rights. You acknowledge that the Tubi Services, including without limitation the Content, are protected by copyright, trademark, and other laws of the United States and foreign countries. You agree not to remove, alter or obscure any copyright, trademark, service mark or other proprietary rights notices incorporated in or accompanying the Tubi Services, including without limitation the Content.

i. **Your Responsibilities and Tubi's Enforcement Rights**. You can access and use the Tubi Services and Content for lawful personal, non-commercial, and appropriate purposes only. You agree not to engage in any conduct that:

    i.    violates the rights of others, including patent, trademark, trade secret, copyright, moral rights or other intellectual property rights, or rights of privacy, publicity, or other proprietary rights, harasses or harms another individual, impersonates any person or entity, or otherwise misrepresents yourself or your affiliation with any person or entity; or (2) is fraudulent, false, misleading or deceptive;

    ii.    uses technology or other means to access, index, frame, search or link to the Tubi Services (including the Content) that is not authorized by Tubi; remove, avoid, deactivate, descramble disable, bypass, or circumvent any technological measure implemented by Tubi or any of Tubi's providers or any other third party (including another user) to protect Tubi Services, including without limitation content protection or access control mechanisms intended to prevent the unauthorized download, stream capture, linking, framing, reproduction, access to, or distribution of the Tubi Services;

    iii.    accesses, tampers with, or uses non-public areas of the Tubi Services, Tubi's computer systems, or the technical delivery systems of Tubi's providers;

    iv.    involves accessing the Tubi Services (including the Content) through any automated means, including "robots," "spiders," or "offline readers" (other than by individually performed searches on publicly accessible search engines for the sole purpose of, and solely to the extent necessary for, creating publicly available search indices - but not caches or archives - of the Tubi Services, excluding those search engines or indices that host, promote, or link primarily to infringing or unauthorized content);

    v.    uses any meta tags or other hidden text or metadata utilizing a Tubi trademark, logo URL or product name without Tubi's express written consent

    vi.    access the Tubi Services, including without limitation Content, or any portion thereof, for any commercial purpose or for the benefit of any third party or in any manner not permitted by these Terms of Use;

vii.  deciphers, decompiles, disassembles or reverse engineers any of the software used to provide the Tubi Services;

viii.  interferes with the access of any user, host or network, including, without limitation, by sending a virus, overloading, flooding, spamming, or mail-bombing the Tubi Services;

ix.  introduces viruses or any other computer code, files, or programs that interrupt, destroy, or limit the functionality of any computer software or hardware or telecommunications equipment;

x.  damages, disables, overburdens, impairs, or gains unauthorized access to the Tubi Services, including Tubi's servers, computer network, or user accounts;

xi.  removes, modifies, disables, blocks, obscures or otherwise impairs any advertising in connection with the Tubi Services (including the Content);

xii.  uses the Tubi Services to advertise or promote services that are not expressly approved in advance in writing by Tubi;

xiii.  probe, scan or test the vulnerability of any Tubi system or network or breach any security or authentication measures;

xiv.  collects or stores personally identifiable information from Tubi Services without Tubi's authorization;

xv.  violates, or encourages conduct that would violate, any applicable law or regulation, constitute a criminal offense or give rise to civil liability;

xvi.  violates these Terms of Use or any guidelines or policies posted by Tubi;

xvii.  interferes with any other party's use and enjoyment of the Tubi Services; or

xviii.  encourages or enables any other individual to do any of the foregoing or attempts to do any of the foregoing.

We have the right to investigate violations of these Terms of Use or conduct or activity that may affect the Tubi Services. We may also consult and cooperate with law enforcement authorities to prosecute users who violate the law.

If Tubi determines in its sole discretion that you are violating any of these Terms of Use, we may (i) notify you, (ii) use technical measures to block or restrict your access or use of the Tubi Services, (iii) suspend or terminate your Account or access to the Tubi Services and Content, and/or (iv) use any other available legal or equitable remedy. In either case, you agree to immediately stop accessing or using in any way (or attempting to access or use) the Tubi Services and Content, and you agree not to circumvent, avoid, or bypass such restrictions, or otherwise restore or attempt to restore such access or use.

i.  **No Spam/Unsolicited Communications**. We know how annoying and upsetting it can be to receive unwanted email or instant messages from people you do not know. Therefore, no one may use the Tubi Services to provide personal information or otherwise collect information about users for the purpose of sending, or to facilitate or encourage the sending of, unsolicited bulk or other communications. You understand that we may take any technical remedies to prevent spam or unsolicited bulk or other communications from entering, utilizing, or remaining within our computer or communications networks. If you Post (as defined below in Section 4) or otherwise send spam, advertising, or other unsolicited communications of any kind through the Tubi Services, you acknowledge that you will have caused substantial harm to Tubi and that the amount of such harm would be extremely difficult to measure. As a reasonable

estimation of such harm, you agree to pay Tubi $50 for each such unsolicited communication you send through the Tubi Services.

k.  **Downloads**. In order to participate in certain Tubi Services or access certain Content, you may be notified that it is necessary to download software or other materials or agree to additional terms and conditions. Unless otherwise provided by these additional terms and conditions, they are hereby incorporated into these Terms of Use.

l.  **Suspension/Discontinuation**. We hope not to, but we may change, suspend, or discontinue - temporarily or permanently - some or all of the Tubi Services (including the Content and the devices through which the Tubi Services are accessed), with respect to any or all users, at any time without notice. You acknowledge that Tubi may do so in Tubi's sole discretion. You also agree that Tubi will not be liable to you for any modification, suspension, or discontinuance of the Tubi Services.

m.  **Internet Access Charges**. You are responsible for any costs you incur to access the internet.

n.  **Customer Service; Availability**. If we can be of help to you, please do not hesitate to contact our customer service department by visiting our customer service web page on tubitv.com. You acknowledge that from time to time the Tubi Services may be inaccessible or inoperable for any reason, including, without limitation: (i) equipment malfunctions; (ii) periodic maintenance procedures or repairs which Tubi may undertake from time to time; or (iii) causes beyond the control of Tubi or which are not reasonably foreseeable by Tubi.

**3. PRIVACY POLICY**. Use of the Tubi Services is also governed by the Tubi Privacy Policy available at https://www.tubitv.com/static/privacy, which is incorporated into and is a part of these Terms of Use by this reference. You acknowledge and agree that your access or use of Tubi Services or Content is also subject to our Privacy Policy.

**4. USER MATERIAL**. Any licenses you have previously granted to Tubi and/or Tubi's users to the reviews, comments, or other materials (collectively, "**User Material**") you may have published, transmitted, submitted, or posted (collectively, "**Post**") to Tubi Services continue under these Terms of Use. Further, any representations and warranties that you own the User Material or otherwise have the right to grant the license to your User Materials that you hereby grant to Tubi, and that the Posting of your User Material does not violate any right of any party, including privacy rights, publicity rights, and intellectual property rights, continue to be valid and have full effect. In addition, you agree to pay for all royalties, fees, and other payments owed to any party by reason of your Posting User Material. Tubi continues to disclaim any guarantees of confidentiality with respect to any User Material.

**Third Party Posts**. You agree to waive any legal or equitable rights or remedies you may have against Tubi with respect to User Material provided by other users. You acknowledge that Posts are public and Tubi cannot guarantee the accuracy or security of any information provided through such Posts; you access and make such disclosures at your own risk. Tubi is not responsible for the content or accuracy of any information contained in a Post, and shall not be responsible for any decisions made based on such information. Tubi prohibits disclosing any inappropriate content or information, personal or sensitive information on or through the Tubi Services.

**5. LINKED DESTINATIONS AND ADVERTISING**.

**Third Party Destinations**. The Tubi Services (including the Apps) may contain links to third-party websites or resources, or destinations. You will not infer or assume that Tubi endorses, operates, controls, is responsible for or is connected with these or other third-party websites, resources or destinations, even if they link to Tubi Services and even if such websites, resources, or destinations are operated by a person (including legal entity) affiliated or otherwise connected with Tubi. We provide these links only as a convenience and are not responsible for the content, products or services on or available from those websites, resources, and destinations or links displayed on such websites. You acknowledge sole responsibility for and assume all risk arising from, your use of any third-party websites, resources, and destinations, and release Tubi from any responsibility and liability to you for any content or other materials hosted and served from any such websites, resources, or destination. These Terms of Use

do not govern your use of any other websites, resources, or destinations.

**Advertisements**. Tubi is not responsible for advertisements or any third party material posted on any of the Tubi Services, nor is Tubi responsible for the products or services provided by advertisers. Any dealings you have with advertisers found while using the Tubi Services are between you and the advertiser, and you agree that Tubi is not liable for any loss or claim that you may have against an advertiser.

**6. TRADEMARKS**. Tubi, the Tubi logo, www.tubi.tv, www.tubitv.com, and other Tubi marks, graphics, logos, scripts, and sounds are trademarks, registered or otherwise, and trade dress of Tubi, Inc.. You may not copy, download or exploit any of the Tubi trademarks.

**7. FEEDBACK**. It is Tubi's policy not to accept unsolicited submissions, including scripts, story lines, articles, fan fiction, characters, drawings, information, suggestions, ideas, or concepts ("**Unsolicited Submissions**"). Tubi's policy is to delete any such submission without reading it. Therefore, any similarity between an Unsolicited Submission and any elements in any Tubi creative work, including a film, series, story, title, or concept, would be purely coincidental. We welcome feedback, comments and suggestions for improvements to the Tubi Services ("**Feedback**"). You can submit Feedback by emailing us at [feedback@tubi.tv](mailto:feedback@tubi.tv) (subject line: "Feedback"). You grant to us a non-exclusive, worldwide, perpetual, irrevocable, fully-paid, royalty-free, sublicensable and transferable license under any and all intellectual property rights that you own or control to use, copy, modify, create derivative works based upon and otherwise exploit the Feedback for any purpose.

**8. DISCLAIMER OF WARRANTIES, LIMITATION OF LIABILITY, AND INDEMNITY**

THE TUBI SERVICES AND CONTENT ARE PROVIDED "AS-IS" AND "AS AVAILABLE." TUBI DOES NOT GUARANTEE OR PROMISE ANY SPECIFIC RESULTS FROM USE OF OR CONTINUOUS AVAILABILITY OF THE TUBI SERVICES OR CONTENT. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, TUBI EXPRESSLY DISCLAIMS ANY WARRANTIES AND CONDITIONS OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT, AND WARRANTIES IMPLIED FOR A COURSE OF PERFORMANCE OR COURSE OF DEALING. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, TUBI MAKES NO WARRANTY THAT YOUR USE OF THE TUBI SERVICES OR CONTENT WILL BE UNINTERRUPTED, TIMELY, SECURE OR ERROR-FREE, THAT DEFECTS TO THE TUBI SERVICES OR CONTENT WILL BE CORRECTED, THAT THE TUBI SERVICES, CONTENT OR THE SERVERS ON WHICH THEY ARE AVAILABLE WILL BE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS, OR THAT ANY INFORMATION OBTAINED BY YOU ON, THROUGH OR IN CONNECTION WITH THE TUBI SERVICES OR THIRD PARTY SERVICES (INCLUDING, BUT NOT LIMITED TO, THROUGH USER CONTENT OR THIRD PARTY ADVERTISEMENTS) WILL BE ACCURATE, RELIABLE, TIMELY OR COMPLETE. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, TUBI WILL NOT BE RESPONSIBLE FOR ANY LOSS OR DAMAGE (INCLUDING BUT NOT LIMITED TO LOSS OF DATA, PROPERTY DAMAGE, PERSONAL INJURY OR DEATH) RESULTING FROM USE OF THE TUBI SERVICES, CONTENT, PROBLEMS OR TECHNICAL MALFUNCTION IN CONNECTION WITH USE OF THE TUBI SERVICES, CONTENT, ATTENDANCE AT A TUBI EVENT, ANY MATERIAL DOWNLOADED OR OTHERWISE OBTAINED IN CONNECTION WITH THE TUBI SERVICES OR CONTENT, ANY USER CONTENT, ANY THIRD PARTY ADVERTISEMENT OR THIRD PARTY SERVICE TRANSMITTED ON, THROUGH OR IN CONNECTION WITH THE TUBI SERVICES, OR THE CONDUCT OF ANY USERS OF THE TUBI SERVICES OR CONTENT, WHETHER ONLINE OR OFFLINE. YOUR USE OF POSTS, THIRD PARTY ADVERTISEMENTS, THIRD PARTY SERVICES, AND THE GOODS OR SERVICES PROVIDED BY ANY THIRD PARTIES IS SOLELY YOUR RESPONSIBILITY AND AT YOUR OWN RISK.

YOU ACKNOWLEDGE AND AGREE THAT YOUR USE OF THE TUBI SERVICES AND CONTENT, AND ANY INFORMATION TRANSMITTED OR RECEIVED IN CONNECTION THEREWITH, MAY NOT BE SECURE AND MAY BE INTERCEPTED BY UNAUTHORIZED PARTIES. YOU ASSUME RESPONSIBILITY, TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW, FOR THE ENTIRE COST OF ANY MAINTENANCE, REPAIR OR CORRECTION TO YOUR COMPUTER SYSTEM OR OTHER PROPERTY OR RECOVERY OR RECONSTRUCTION OF LOST DATA NECESSITATED BY YOUR USE OF THE TUBI SERVICES.

**LIMITATION OF LIABILITY**

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, TUBI'S LIABILITY TO YOU FOR ANY CAUSE WHATSOEVER AND REGARDLESS OF THE FORM OF THE ACTION, WILL AT ALL TIMES BE LIMITED TO THE AMOUNT PAID, IF ANY, BY YOU TO TUBI FOR THE TUBI SERVICES AND CONTENT DURING THE TERM OF YOUR USE OF THE TUBI SERVICES. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, TUBI WILL NOT BE LIABLE TO YOU OR ANY THIRD PARTY FOR ANY DAMAGES OTHER THAN THE AMOUNT PAID, IF ANY, BY YOU TO TUBI FOR THE TUBI SERVICES DURING THE TERM OF YOUR USE OF THE TUBI SERVICES, INCLUDING ANY OTHER GENERAL, DIRECT, INDIRECT, COMPENSATORY, CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, SPECIAL OR PUNITIVE DAMAGES, AND INCLUDING, WITHOUT LIMITATION, LOST PROFIT DAMAGES ARISING FROM YOUR USE OF OR INABILITY TO ACCESS OR USE THE TUBI SERVICES OR CONTENT.

YOU ACKNOWLEDGE AND AGREE THAT ANY DAMAGES YOU INCUR ARISING OUT OF TUBI'S ACTS OR OMISSIONS OR YOUR USE OF TUBI SERVICES OR CONTENT ARE NOT IRREPARABLE AND ARE INSUFFICIENT TO ENTITLE YOU TO AN INJUNCTION OR OTHER EQUITABLE RELIEF RESTRICTING THE AVAILABILITY OF OR ANY PERSON'S ABILITY TO ACCESS OR USE ANY PORTION OF THE TUBI SERVICES OR CONTENT.

THE LIMITATIONS IN THIS SECTION APPLY WHETHER THE ALLEGED LIABILITY IS BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR ANY OTHER BASIS, EVEN IF TUBI HAS BEEN ADVISED OF THE POSSIBILITY OF ANY SUCH DAMAGES.

**INDEMNITY**

YOU AGREE TO INDEMNIFY AND HOLD TUBI, ITS AFFILIATES, STATIONS AFFILIATED WITH TUBI, PRODUCERS OF CONTENT, EACH ADVERTISER, SPONSOR AND THEIR ADVERTISING AGENCIES, SUBCONTRACTORS AND OTHER PARTNERS, AND THEIR RESPECTIVE OFFICERS, AGENTS, PARTNERS AND EMPLOYEES, HARMLESS FROM ANY LOSS, LIABILITY, CLAIM, OR DEMAND, INCLUDING, BUT NOT LIMITED TO, REASONABLE ATTORNEYS' FEES, MADE BY ANY THIRD PARTY DUE TO OR ARISING OUT OF OR IN CONNECTION WITH YOUR USE OR MISUSE OF THE CONTENT OR THE TUBI SERVICES (INCLUDING, WITHOUT, LIMITATION, ANY USE OF YOUR ACCOUNT, WHETHER OR NOT AUTHORIZED BY YOU), YOUR BREACH OF THESE TERMS OF USE, YOUR VIOLATION OF ANY RIGHTS OF ANOTHER, OR ANY CONTENT THAT YOU TRANSMIT THROUGH THE TUBI SERVICES.

**9. NOTICE AND PROCEDURE FOR CLAIMS OF COPYRIGHT INFRINGEMENT.** We respect copyright law and expect our users to do the same. It is our policy to terminate in appropriate circumstances subscribers or account holders who have been adjudicated as repeat infringers on Tubi Services. We accept proper notifications of claimed copyright infringements that comply with the appropriate subsection of 17 U.S.C. § 512 regarding material or information location tools residing on our Tubi Services. Please direct notifications of claimed copyright infringements to Tubi's copyright agent by completing the form at [www.tubitv.com/static/support](http://www.tubitv.com/static/support) and selecting "Content" from the list of available topics. You may also contact us by mail at:

Attention: Copyright Agent
Tubi, Inc.
315 Montgomery St, 16th Floor
San Francisco, CA 94104

**10. ARBITRATION AGREEMENT AND CLASS ACTION WAIVER**

(1) Tubi, including its Affiliates, agents, employees, predecessors in interest, successors, and assigns, and you agree that any Dispute (as defined herein) between you and Tubi, regarding any aspect of your relationship with Tubi, will be resolved in a binding, confidential, individual and fair arbitration process, and not in court. **Each of you and Tubi agrees to give up the right to sue in court.** The terms of this Section 10 are referred to in these Terms of Use as the "**Arbitration Agreement**".

(2) The term "**Dispute**" is to be given the broadest possible meaning that will be enforced, and shall include any dispute,

claim, demand, count, cause of action, or controversy between you and Tubi, whether based in contract, statute, regulation, ordinance, tort (including, but not limited to, fraud, misrepresentation, fraudulent inducement, negligence, or any other intentional tort), or any other legal or equitable theory. The term "Dispute" specifically includes, but is not limited to, any disputes, actions, claims, or controversies between you and the Tubi that arise from or in any way relate to or concern any Content, products or services provided by Tubi including but not limited to the Tubi Services (as defined above), this Arbitration Agreement, any other aspect of these Terms of Use (including their applicability and their conformance to applicable law), any billing disputes, and any disputes relating to telephonic, text message, or any other communications either of us received from the other. The only exceptions to this Arbitration Agreement are that (i) each of you and Tubi retains the right to sue in small claims court and (ii) each of you and Tubi may bring suit in court against the other to enjoin infringement or other misuse of intellectual property rights. Disputes over whether these exceptions apply shall be resolved by the court in which such action has been brought; all other disputes over arbitrability shall be resolved by the arbitrator.

(3) **Each of you and Tubi also agrees to give up the ability to seek to represent, in a class action or otherwise, anyone but each of you and Tubi** (see paragraph 9 below).

(4) There is no judge or jury in arbitration, and court review of an arbitration award is limited. An arbitrator must follow this Arbitration Agreement. The arbitrator, however, can award on an individual basis the same damages and relief as a court (including injunctive and declaratory relief, or statutory damages); provided that they are recoverable under these Terms of Use.

(5) These Terms of Use evidence a transaction in interstate commerce, and thus the Federal Arbitration Act, 9 U.S.C. §§ 1-16, governs the interpretation and enforcement of this Arbitration Agreement. This Arbitration Agreement shall survive termination of the Terms of Use.

(6) Any arbitration between you and Tubi will be conducted by the Judicial Arbitration and Mediation Services, Inc. ("**JAMS**"), pursuant to the JAMS Streamlined Arbitration Rules & Procedures effective July 1, 2014 (the "**JAMS Rules**"), as modified by this agreement to arbitrate. The arbitration shall be conducted by a single, neutral arbitrator, and if you and Tubi cannot agree on who that single arbitrator will be, the arbitrator will be appointed pursuant to the JAMS Rules, with the participation and involvement of Tubi and you pursuant to JAMS Rule 12. The JAMS Rules are available on its website at http://www.jamsadr.com/rules-streamlined-arbitration/. The Consumer Arbitration Minimum Standards are available at https://www.jamsadr.com/consumer-minimum-standards/. The arbitrator is bound by these Terms of Use.

(7) If either you or Tubi wish to arbitrate a claim, you or Tubi must first send by mail to the other a written Notice of Dispute ("**Notice**") that sets forth the name, address, and contact information of the party giving notice, the specific facts giving rise to the Dispute, the Tubi Service to which the Notice relates, and the relief requested. Your Notice to the Tubi must be sent by mail to: Arbitration Notice of Dispute, 2121 Avenue of the Stars, 7th Floor, Los Angeles, California, 90067. Tubi will send any Notice to you at the contact information we have for you or that you provide. It is the sender's responsibility to ensure that the recipient receives the Notice. During the first 45 days after you or we send a Notice to the other, you and we may try to reach a settlement of the Dispute.

(8) If you and we do not resolve the Dispute within 45 days, either you or we may initiate arbitration in accordance with the JAMS Rules. Further instructions on submitting a Demand for Arbitration may be found at http://www.jamsadr.com/files/Uploads/Documents/JAMS_Arbitration_Demand.pdf. In addition to filing this Demand for Arbitration with JAMS in accordance with its rules and procedures, you must send a copy of this completed Demand for Arbitration to the Tubi at the address listed above to which you sent your Notice of Dispute.

(9) You and the Tubi acknowledge and agree to abide by the following rules for arbitration:

(a) YOU AND TUBI MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, REPRESENTATIVE OR MULTI-CLAIMANT PROCEEDING, AND THE ARBITRATOR SHALL HAVE NO POWER TO AWARD

CLASS-WIDE RELIEF; (b) Tubi will pay arbitration costs as required by the JAMS Consumer Arbitration Minimum Standards and consistent with paragraph 10 below; (c) the arbitrator may award any individual relief or individual remedies that are permitted by applicable law and these Terms of Use; and (d) each side pays his, her or its own attorneys' fees, except as otherwise provided in paragraph 10 below.

(10) JAMS charges filing and other fees to conduct arbitrations. Ordinarily, the claimant has to pay the filing fee to initiate arbitration, but if you wish to commence an arbitration against Tubi, you and the Tubi acknowledge and agree to abide by the following:

a.   If you are seeking to recover less than $10,000 (inclusive of attorneys' fees), Tubi will pay the filing fee on your behalf or reimburse your payment of it.

b.   If you are seeking to recover $10,000 or more, you will have to pay the filing fee charged by JAMS, but Tubi will reimburse the filing fee if you prevail on all claims decided upon by the arbitrator.

c.   Tubi and you agree that, if the claims to be arbitrated total less than $10,000 (inclusive of attorneys' fees), the claim ordinarily should be decided on written submissions only, without a telephonic or in-person hearing. Tubi will not request a hearing for any claims totaling less than $10,000. This provision shall not be construed by the arbitrator to deprive you of any rights you may have to a telephonic or in-person hearing in your hometown area pursuant to the JAMS Rules.

d.   Tubi and you agree that, if the claims to be arbitrated total $10,000 or more, the arbitration will occur in a manner and place consistent with the JAMS Rules.

(11) Regardless of how the arbitration proceeds, each of you and Tubi shall cooperate in good faith in the exchange of non-privileged documents and information as necessary in accordance with the JAMS Rules, and the arbitrator shall issue a reasoned written decision sufficient to explain his or her findings and conclusions.

(12) Each of you and Tubi may incur attorneys' fees during the arbitration. Each side agrees to pay his, her or its own attorneys' fees unless the claim(s) at issue permit the prevailing party to be paid its attorneys' fees, and in such instance, the fees awarded shall be determined by the applicable law(s). In addition to whatever rights you may have to recover your attorneys' fees under applicable law, if you prevail in the arbitration, and if Tubi failed to make a settlement offer to you before the arbitration or the amount you win is at least 25% greater than Tubi's highest settlement offer, then Tubi will pay your reasonable attorneys' fees in addition to the amount the arbitrator awarded. If Tubi wins the arbitration, you will be responsible for your own attorneys' fees. In addition, if the arbitrator, at the request of the winning party, finds that the losing party brought a claim or asserted a defense frivolously or for an improper purpose, then regardless of the amount in dispute, the arbitrator must order the losing party to pay both sides' arbitration fees and may order the losing party to pay the winning party's reasonable attorneys' fees, unless such an award of fees is prohibited by applicable law.

(13) The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief, only to the extent necessary to provide relief warranted by that party's individual claim, only as permitted by applicable law, and only to the extent that declaratory and injunctive relief are permitted by these Terms of Use. The arbitrator shall have no authority to award punitive, exemplary, multiplied or consequential damages or any other relief not allowed under this Arbitration Agreement. The arbitrator also may not order Tubi to pay any monies to or take any actions with respect to persons other than you, unless Tubi explicitly consents in advance, after an arbitrator is selected, to permit the arbitrator to enter such an order. Further, unless Tubi expressly agrees, the arbitrator may not consolidate other persons' claims with yours, and may not otherwise preside over any form of a representative, multi-claimant or class proceeding.

(14) You and Tubi agree to maintain the confidential nature of the arbitration proceeding and shall not disclose the fact of the arbitration, any documents exchanged as part of any mediation, proceedings of the arbitration, the arbitrator's decision and the existence or amount of any award, except as may be necessary to prepare for or conduct the arbitration (in which case anyone becoming privy to confidential information must undertake to preserve its confidentiality), or except as may be necessary in

connection with a court application for a provisional remedy, a judicial challenge to an award or its enforcement, an order confirming the award, or unless otherwise required by law or court order. In keeping with the confidential nature of the arbitration, You and Tubi agree that an order confirming award is only necessary if the obligations of the award have not been performed. Therefore, before taking any steps to confirm the arbitration award, the party seeking confirmation of the award must give the other party notice of its intention to confirm the award. If the party who would be the respondent in any such confirmation proceeding performs its obligation under the terms of the arbitration award within 15 business days of such notice, the party who gave notice of its intent to confirm the award shall not seek to confirm or otherwise enforce the award.

(15) With the exception of subpart (a) in paragraph (9) (i.e., the waiver of the ability to proceed on behalf of multiple claimants or a purported class), if any part of this Arbitration Agreement is deemed invalid, unenforceable, or illegal, then the balance of this Arbitration Agreement shall remain in effect and be construed in accordance with its terms as if the invalid, unenforceable, or illegal provision were not contained. If, however, subpart (a) in paragraph (9) is found invalid, unenforceable or illegal, then the entirety of this Arbitration Agreement shall be null and void, but the rest of these Terms of Use, including the provisions governing where actions against Tubi must be pursued, the choice of governing law, and our mutual waiver of the right to a trial by jury, will remain in effect and apply to any claim that, for this or any other reason, proceeds in court rather than in arbitration.

**11. TERMINATION**. We may terminate your access to and use of the Tubi Services, at our sole discretion, at any time and without notice to you. Without limiting the forgoing, we may, at our sole discretion, without notice to you, terminate or restrict your Account or your use of the Tubi Services, including the Content, or any portion thereof, at any time, without liability, if Tubi determines in its sole discretion that you have breached these Terms of Use, violated any law, rule, or regulation, engaged in other inappropriate conduct, place an undue burden on our networks or servers or for any other business reason or no reason. We may further use technology to limit activities, such as the number of calls to the Tubi servers being made, and you agree to respect these limitations and not take any steps to circumvent, avoid, or bypass them.

You may cancel your Account via the functionality provided in Tubi Services.

Upon any termination, discontinuation or cancellation of the Tubi Services or your Account, the following Sections will survive 2(b)(ii), 2(f)(ii), 2(g), 2(h), 6, 8, 10, 11, and 12.

**12. GENERAL INFORMATION**

**Export Controls**. Software and the transmission of applicable technical data, if any, in connection with the Tubi Services are subject to export controls. You agree to comply with all applicable laws regarding software and the transmission of technical data exported from the United States or the country in which you reside.

**Choice of Law and Forum**.

These Terms of Use are governed by, and construed in accordance with, the laws of the State of Delaware, without regard to its conflict of law provisions.

Except with respect to Disputes to be resolved through an arbitration process in accordance with the Arbitration Agreement contained above, you and Tubi agree to submit to the exclusive jurisdiction of the courts located in Delaware to resolve any Dispute arising out of the Agreement or the Tubi Services. YOU HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT YOU MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION (INCLUDING, BUT NOT LIMITED TO, ANY CLAIMS, COUNTERCLAIMS, CROSS-CLAIMS, OR THIRD PARTY CLAIMS) ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT.

YOU AGREE THAT ANY CAUSE OF ACTION YOU MAY HAVE ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE TUBI SERVICES, OR CONTENT MUST BE COMMENCED WITHIN ONE (1) YEAR AFTER SUCH CAUSE OF ACTION ACCRUES. AFTER SUCH PERIOD, SUCH CAUSE OF ACTION SHALL BE PERMANENTLY BARRED.

**No Waiver/Reliance**. If you see other parties violating these Terms of Use, you may let us know at feedback@tubi.tv (subject line: "TOU Violation"). You may not rely upon Tubi's response with respect to one party or one situation as any indication of what Tubi might do with respect to another party or another situation, even if the parties or situations appear to you to be similar. Similarly, if we fail to act in response to a violation of these Terms of Use, you should not assume that we do not object to the violation or even that we are aware of it. In addition, you may not construe a waiver of any provision of these Terms of Use with respect to any party as a waiver of that provision (or any other provision) with respect to either that party or any other party. Further, Tubi's decision to delay exercising or enforcing any right or remedy under these Terms of Use will not constitute a waiver of such right or remedy. Even if Tubi acts in a way that appears to you to be inconsistent with these Terms of Use, Tubi's action will not be deemed a waiver or constructive amendment of these Terms of Use. Tubi's failure to enforce any right or provision of these Terms of Use will not be considered a waiver of such right or provision. The waiver of any such right or provision will be effective only if in writing and signed by a duly authorized representative of Tubi. Except as expressly set forth in these Terms of Use, the exercise by either party of any of its remedies under these Terms of Use will be without prejudice to its other remedies under these Terms of Use or otherwise.

**Integration, Amendment, and Severability**. Please note that these Terms of Use, including any end user license agreement that might accompany Tubi authorized applications, features and devices, constitute the entire legal agreement between you and Tubi and govern your use of the Tubi Services (including your use of the Content) (but excludes any services, if any, that Tubi may provide to you under a separate signed written agreement), and completely replace any prior oral or written understandings or agreements between you and Tubi in relation to the Tubi Services, including Content. Except as set forth in Section 1 above, these Terms of Use may not be amended or varied except in a writing signed by Tubi. Although we understand that electronic or digital signatures are frequently viewed as the equivalent of traditional written signatures these days, for these purposes, a signature or "signed" writing or written agreement may not include an electronic or digital signature. These Terms of Use operate to the fullest extent permissible by law. If any provision of these Terms of Use is held to be unlawful, void, or unenforceable, you and we agree that the provision will be enforced to the maximum extent permissible and the other provisions of these Terms of Use will remain in full force and effect.

**Assignment**. You may not assign or transfer these Terms of Use, by operation of law or otherwise, without Tubi's prior written consent. Any attempt by you to assign or transfer these Terms of Use, without such consent, will be null. Tubi may freely assign or transfer these Terms of Use without restriction. Subject to the foregoing, these Terms of Use will bind and inure to the benefit of the parties, their successors and permitted assigns

**Notices**. Any notices or other communications provided by Tubi under these Terms of Use, including those regarding modifications to these Terms of Use, will be given: (i) via email; or (ii) by posting to the Services. For notices made by e-mail, the date of receipt will be deemed the date on which such notice is transmitted.

**Contact**. If you have any questions about these Terms of Use, please submit your questions at www.tubitv.com/static/support and select "Terms of Use & Privacy Policy" from the list of available topics. If you have general questions about Tubi or how to use it, please visit our Help Center at https://tubitv.com/help-center/.

# **EXHIBIT 9**

# Terms of Use

**Effective as of** April 18, 2024

Thank you for your interest in and use of our products, services, software, Activities, Apps, Content, User Content, and Video Player contained or accessible therein and as described further below (the "**Tubi Services**"). Tubi, Inc. ("**Tubi**", "**we**", "**us**", or "**our**") provides these Tubi Services to you ("**you**" or "**your**"), subject to the terms contained in this Tubi Terms of Use (this "**Terms of Use**"). Please read these Terms of Use and our Privacy Policy, available at https://www.tubitv.com/static/privacy ("**Privacy Policy**"), carefully because they govern your access and use of the Tubi Services. A list of our affiliated companies ("**Affiliates**") is available at www.foxcorporation.com.

The Tubi Services offer you the ability to select television shows, movies, clips, and other audio–video content (collectively, the "**Content**") for viewing through our player (the "**Video Player**"), in addition to any other features, tools, applications, materials, community pages, Messaging services, Social Features, Posting User Content, contests, promotions, sweepstakes, games and other services (individually and collectively, the "**Activities**"). The Tubi Services are accessible via our website located at www.tubi.com, www.tubi.tv, and www.tubitv.com (the "**Tubi**

**Site**") and our applications available on certain mobile, television, and other consumer electronic device (the "**Apps**", and each, an "**App**").

By visiting, accessing, or using any of the Tubi Services, you agree to be bound by these Terms of Use. It is important that you carefully read through these Terms of Use and also whenever we update them or whenever you access or use the Tubi Services. If you have any questions or comments about these Terms of Use, please submit your questions at www.tubitv.com/static/support and select "Report an issue/Get help" then "Terms of Use & Privacy Policy" from the list of available topics. If you have general questions about Tubi or how to use it, please visit our Help Center at www.tubitv.com/help-center.

**IMPORTANT NOTICE REGARDING DISPUTE RESOLUTION: BY ACCESSING AND/OR USING ANY TUBI SERVICES YOU AND WE AGREE TO BE BOUND BY THESE TERMS OF USE (WITH LIMITED EXCEPTIONS) AND TO RESOLVE ANY DISPUTE BETWEEN US THROUGH A DISPUTE RESOLUTION PROCEDURE DESCRIBED IN SECTION 11 BELOW. YOU AND TUBI WAIVE THE RIGHT TO BRING OR PARTICIPATE IN A CLASS ACTION IN CONNECTION WITH SUCH DISPUTES. PLEASE REVIEW CAREFULLY SECTION 11 TITLED "INFORMAL DISPUTE RESOLUTION PROCEDURE, ARBITRATION AGREEMENT,**

**AND CLASS ACTION WAIVER" BELOW FOR DETAILS REGARDING THIS DISPUTE RESOLUTION PROCEDURE (INCLUDING THE PROCEDURE TO OPT OUT OF ARBITRATION).**

## 1. CHANGES TO THE TERMS OF USE BY TUBI

Tubi may modify these Terms of Use at any time by posting the modified Terms of Use on the Tubi Services (available at [www.tubitv.com/static/terms](www.tubitv.com/static/terms)). Any modification to these Terms of Use will be effective upon posting on the Tubi Services. Your continued access and/or use of the Tubi Services after any such modification is posted constitutes your acknowledgement and acceptance of the Terms of Use, as modified. If you do not agree to be bound by the modified Terms of Use you may not access or otherwise use the Tubi Services. Because the Tubi Services are evolving over time, we may change or discontinue all or any part of the Tubi Services, at any time and without advance notice, at our sole discretion and without liability to you. Tubi may also impose limits on certain features and/or Activities offered via the Tubi Services or restrict your access to parts or all of the Tubi Services without notice or liability.

## 2. ACCESS AND USE OF THE TUBI SERVICES AND CONTENT

a. **Age Limitations and Restrictions.** The Tubi Services

are not directed to nor intended to be accessed or used by children under the age of 13. If you are under the age of 13, you are not permitted to access, use, or create an Account to use the Tubi Services or to otherwise provide your personal information to Tubi. If you are at least 13 and under 18 years of age, you may use or create an Account with Tubi only if you have the consent of your parent or guardian, in which case your parent or guardian will be required to consent to these Terms of Use on your behalf. Access to Content, User Content, or Activities may be restricted due to age appropriateness, technical, or other legal considerations determined in Tubi's sole discretion. Accessing the Tubi Services, including any Content or User Content contained therein, from or within territories where Tubi does not offer the Tubi Services is prohibited.

b. **Registration and Your Information.**

 i. If you want to use certain features of or participate in certain Activities, including Social Features on the Tubi Services you will need to create an account ("**Account**"). You can do this with your email address, or using your account with certain third-party social networking services such as Google and Apple (each, an "**SNS Account**"). If you choose the SNS Account option, please note

that we will create your Account by extracting from your SNS Account certain personal information such as your name and email address, and other personal information that your privacy settings on the SNS Account permit us to access.

ii.  It is important that you provide us with accurate, complete, and up-to-date information for your Account, and you agree to update such information to keep it accurate, complete, and up-to-date. If you do not, we may suspend or terminate your Account. You agree that you will keep your password and Account information secure, that you will not disclose your Account password to anyone else, and you will notify us immediately of any unauthorized use of your Account. You are responsible for all inaccuracies in your Account information and all activities that occur under your Account, regardless of whether or not you know about them.

c.  **Tubi Limited License**. Subject to your compliance with these Terms of Use, Tubi grants you a limited, revocable, non-exclusive, non-transferable license, with no right to sublicense, to view and use the Tubi Services, as we have intended, in connection with your permitted use thereof, including (i) accessing and

viewing (1) User Content, and (2) Content on a streaming-only basis through the Video Player, and (ii) accessing, using, and/or participating in any Activities, all solely for personal, non-commercial purposes as set forth in these Terms of Use.

d. **The Content**. The Content is available for permissible viewing on or through the Tubi Services.

You may only access and view the Content personally and for non-commercial purposes in compliance with these Terms of Use. You may not either directly or through the use of any device, software, internet site, web-based service, or other means remove, alter, bypass, avoid, interfere with, or circumvent any copyright, trademark, or other proprietary notices marked on the Content, Tubi Services or any digital rights management mechanism, device, or other content protection or access control measure associated with the Tubi Services or the Content, including geo-filtering mechanisms. You may not use technologies to access or use the Tubi Services or Content from or within territories where Tubi does not have rights nor offers the Tubi Services. You may not either directly or through the use of any device, software, internet site, web-based service, or other means copy, download, stream capture, reproduce,

duplicate, archive, distribute, make available, upload, publish, modify, translate, broadcast, perform, display, sell, transmit or retransmit the Tubi Services or Content unless expressly permitted by Tubi in writing. You may not incorporate the Content into, or stream or retransmit the Content via any hardware or software application or make it available via frames or inline links unless expressly permitted by Tubi in writing. Furthermore, you may not create, recreate, distribute, or advertise an index of any portion of the Content unless authorized by Tubi in writing. You may not seek to develop, build, or otherwise promote a business, product, or service utilizing the Tubi Services or the Content, whether or not for profit. The Tubi Services and Content covered by these restrictions includes without limitation any text, graphics, layout, interface, technology, logos, photographs, audio and video materials, and stills. In addition, you are strictly prohibited from creating derivative works or materials that otherwise are derived from or based on in any way the Tubi Services or the Content, including without limitation montages, mash-ups and similar videos, wallpaper, desktop themes, greeting cards, and merchandise, unless it is expressly permitted by Tubi in writing. The foregoing prohibitions apply even if you intend to give away the derivative materials free of charge.

e. **The Video Player**. You may not modify, enhance, remove, interfere with, or otherwise alter in any way any portion of the Video Player, its underlying technology, any digital rights management mechanism, device, or other content protection or access control measure incorporated into the Video Player. This restriction includes, without limitation, disabling, reverse engineering, modifying, interfering with or otherwise circumventing the Video Player in any manner that enables users to view the Content without: (i) displaying visibly both the Video Player and all surrounding elements (including the graphical user interface, any advertising, copyright notices, and trademarks) of the webpage where the Video Player is located; and (ii) having full access to all functionality of the Video Player, including, without limitation, all video quality and display functionality and all interactive, elective, or click-through advertising functionality.

f. **The Apps**.

    i. Subject to your compliance with these Terms of Use, Tubi grants you a limited, revocable, non-exclusive, non-transferable license, with no right to sublicense, to download and install a copy of the Apps on a consumer electronics device (e.g., a mobile phone, tablet, television, or computer) that

you own or control, and to run such single copy solely for your own personal, non-commercial purposes on such consumer electronics device.

ii. You may not copy an App, except to make a copy for backup or archival purposes. Except as expressly permitted in these Terms of Use, you may not: (1) copy, modify or create derivative works based on the Apps; (2) distribute, transfer, sublicense, lease, lend or rent the Apps to any third party; (3) reverse engineer, decompile or disassemble the Apps; or (4) make the functionality of the Apps available to multiple users through any means. Tubi reserves all rights in and to the Apps not expressly granted to you under these Terms of Use.

g. **Accessing Apps from App Store**. The following terms apply to any App accessed through or downloaded from any app store or distribution platform (like the Apple App Store or Google Play) where the App may now or in the future be made available (each an "**App Provider**"). You acknowledge and agree that:

i. These Terms of Use are concluded between you and Tubi, and not with the App Provider, and Tubi (not the App Provider), is solely responsible for the App.

ii.  The App Provider has no obligation to furnish any maintenance and support services with respect to the App.

iii.  In the event of any failure of the App to conform to any applicable warranty, you may notify the App Provider, and to the maximum extent permitted by applicable law, the App Provider will have no other warranty obligation whatsoever with respect to the App. Any other claims, losses, liabilities, damages, costs or expenses attributable to any failure to conform to any warranty will be the sole responsibility of Tubi.

iv.  The App Provider is not responsible for addressing any claims you have or any claims of any third party relating to the App, or your possession and use of the App, including, but not limited to: (1) product liability claims; (2) any claim that the App fails to conform to any applicable legal or regulatory requirement; and (3) claims arising under consumer protection or similar legislation.

v.  In the event of any third-party claim that the App or your possession and use of that App infringes that third party's intellectual property rights, Tubi will be solely responsible for the investigation, defense, settlement and discharge of any such intellectual

property infringement claim to the extent required by these Terms of Use.

vi. The App Provider, and its subsidiaries, are third-party beneficiaries of these Terms of Use as related to your license to the App, and that, upon your acceptance of the Terms of Use, the App Provider will have the right (and will be deemed to have accepted the right) to enforce these Terms of Use as related to your license of the App against you as a third-party beneficiary thereof.

vii. You represent and warrant that (1) you are not located in a country that is subject to a U.S. Government embargo, or that has been designated by the U.S. Government as a terrorist-supporting country; and (2) you are not listed on any U.S. Government list of prohibited or restricted parties.

viii. You must also comply with all applicable third-party terms of service when using the App.

h. **Ownership**. As between you and Tubi, Tubi and/or Tubi's licensors exclusively own, control and retain all right, title, and interest in and to the Tubi Services and the Content, including all associated intellectual property rights. You acknowledge that the Tubi Services, including without limitation the Content, are

protected by copyright, trademark, and other laws of the United States and foreign countries. You agree not to remove, alter or obscure any copyright, trademark, service mark or other proprietary rights notices incorporated in or accompanying the Tubi Services, including without limitation the Content.

i. **Your Responsibilities and Tubi's Enforcement Rights**. You can access and use the Tubi Services and Content for lawful personal, non-commercial, and appropriate purposes only. You agree not to engage in any conduct that:

   i. violates the rights of others, including patent, trademark, trade secret, copyright, moral rights or other intellectual property rights, or rights of privacy, publicity, or other proprietary rights, harasses or harms another individual, impersonates any person or entity, or otherwise misrepresents yourself or your affiliation with any person or entity; or is fraudulent, false, misleading or deceptive;

   ii. uses technology or other means to access, index, frame, search or link to the Tubi Services (including the Content and/or User Content) that is not expressly authorized by Tubi; remove, avoid, deactivate, descramble disable, bypass, or

circumvent any technological measure implemented by Tubi, any of Tubi's service providers, or any other third party (including another user) to protect Tubi Services, including without limitation content protection or access control mechanisms intended to prevent the unauthorized download, stream capture, linking, framing, reproduction, access to, or distribution of the Tubi Services;

iii.  accesses, tampers with, or uses non-public areas of the Tubi Services, Tubi's computer systems, or the technical delivery systems of Tubi's service providers;

iv.  involves accessing the Tubi Services (including the Content and/or User Content) through any automated means, including "robots," "spiders," or "offline readers" (other than by individually performed searches on publicly accessible search engines for the sole purpose of, and solely to the extent necessary for, creating publicly available search indices – but not caches or archives – of the Tubi Services, excluding those search engines or indices that host, promote, or link primarily to infringing or unauthorized content);

v.  uses any meta tags or other hidden text or

metadata utilizing a Tubi trademark, logo, URL, or product name without Tubi's express written consent;

vi. access the Tubi Services, including without limitation Content, or any portion thereof, for any commercial purpose or for the benefit of any third party or in any manner not permitted by these Terms of Use;

vii. deciphers, decompiles, disassembles or reverse engineers any of the software used to provide the Tubi Services;

viii. interferes with the access of any user, host or network, including, without limitation, by sending a virus, overloading, flooding, spamming, or mail-bombing the Tubi Services;

ix. introduces viruses or any other computer code, files, or programs that interrupt, destroy, or limit the functionality of any computer software or hardware or telecommunications equipment;

x. damages, disables, overburdens, impairs, or gains unauthorized access to the Tubi Services, including Tubi's servers, computer network, or user accounts;

xi.  removes, modifies, disables, blocks, obscures or
     otherwise impairs any advertising in connection
     with the Tubi Services (including the Content
     and/or User Content);

xii.  uses the Tubi Services, without our express written
      consent, for any commercial or unauthorized
      purpose, including communicating or facilitating
      any commercial advertisements, promoting any
      products or services, solicitation, or spamming;

xiii.  probes, scans or tests the vulnerability of any Tubi
       Services, including any Tubi system or network, or
       breach any security or authentication measures;

xiv.  collects or stores personally identifiable
      information from Tubi Services without Tubi's
      express written authorization;

xv.  violates, or encourages conduct that would violate,
     any applicable law or regulation, constitute a
     criminal offense or give rise to civil liability;

xvi.  violates these Terms of Use or any guidelines or
      policies posted by or on behalf of Tubi, including
      the Intellectual Property Policy;

xvii.  interferes with any other party's use and enjoyment
       of the Tubi Services; or

xviii.   encourages or enables any other individual to do
        any of the foregoing or attempts to do any of the
        foregoing.

You will not use the Tubi Services, the Tubi Content, or
User Content, including but not limited to any text,
photographs, images, audio/video clips, "look and feel,"
metadata, or compilations of the Tubi Service, Content
or User Content, for the development of any media,
material, entertainment programming, or software
program, including, but not limited to, training or
otherwise developing a machine learning or artificial
intelligence system or algorithm.

We have the right to investigate violations of these
Terms of Use or conduct or activity that may affect the
Tubi Services. We may also consult and cooperate with
law enforcement authorities to prosecute users who
violate the law.

If Tubi determines in its sole discretion that you are
violating any of these Terms of Use, we may (i) notify
you, (ii) use technical measures to block or restrict your
access or use of the Tubi Services, (iii) limit, suspend, or
terminate the availability of any Activities, Content, or
User Content, (iv) suspend or terminate your Account or
access to the Tubi Services, and/or (v) use any other
available legal or equitable remedy. In either case, you

agree to immediately stop accessing or using in any way (or attempting to access or use) the Tubi Services, any Activities, Content, or User Content (as applicable), and you agree not to circumvent, avoid, or bypass such restrictions, or otherwise restore or attempt to restore such access or use.

j. **Downloads and Additional Terms**. Additional software, materials and/or supplemental terms may apply to your use of certain Tubi Services ("**Additional Terms**"), which may include terms and conditions relating to Activities. For example, Activities related to voting or contest rules, or accessing certain Content or User Content via the Tubi Services. Such Additional Terms may also have certain age or geographic restrictions. You are responsible for complying with any such Additional Terms. We will provide any such Additional Terms, including for or related to features of the Tubi Services that are provided by third parties, to you or post them on the Tubi Services to which they apply, and they are incorporated by reference into these Terms. If there is a conflict between these Terms and any such Additional Terms, the Additional Terms will control solely for such particular use.

k. **Suspension/Discontinuation of Tubi Services**. We hope not to, but we may change, suspend, or

discontinue - temporarily or permanently - some or all of the Tubi Services (including any Activities, Content, User Content, and the Apps through which the Tubi Services are accessed), with respect to any or all users, at any time without notice or liability to you. You acknowledge that Tubi may do so in Tubi's sole discretion. You also agree that Tubi will not be liable to you for any modification, suspension, or discontinuance of any part of the Tubi Services.

l. **Internet Access Charges**. You are responsible for any fees and costs you incur to access the Internet and use the Tubi Services.

m. **Customer Service; Availability**. Tubi provides a wealth of help-related articles in case you are experiencing issues or have questions about the Tubi Services at the Tubi Help Center at www.tubitv.com/help-center. If you need additional assistance, please contact our customer service team through the form available at the Tubi Help Center. You acknowledge that from time to time the Tubi Services may be inaccessible or inoperable for any reason, including, without limitation: (i) equipment malfunctions; (ii) periodic maintenance which Tubi may undertake from time to time; or (iii) causes beyond the control of Tubi or which are not reasonably foreseeable by Tubi, such as internet

outages.

## 3. PRIVACY POLICY

Use of the Tubi Services is governed by the Tubi Privacy Policy available at www.tubitv.com/static/privacy, which is incorporated into and is a part of these Terms of Use by this reference. You acknowledge and agree that your access and/or use of Tubi Services is subject to our Privacy Policy.

## 4. COMPLIANCE WITH POLICIES

While using the Tubi Services, including accessing, using, and/or participating in any Activities, you agree that you will comply with all posted policies, including Intellectual Property Policy set forth in Section 10 below, as we may update from time to time. Tubi prohibits disclosing any inappropriate content or information, personal or sensitive information on or through or in connection with the Tubi Services. Tubi may at any time, in its sole discretion, remove User Content, disable, limit, or terminate your ability to Post User Content or participate in any Activities, and terminate your Account if you fail to comply with our posted policies.

If you become aware of any misuse of the Tubi Services, including in violation of these Terms of Use, please report it immediately to Tubi by clicking www.tubitv.com/static/support, selecting "Report an

Issue/Get Help" and then "Terms of Use & Privacy Policy," and providing the details of the issue you're reporting in the body of the request you submit to us.

## 5. USER CONTENT

The Tubi Services may include opportunities for you to upload, post, transmit, make available or otherwise distribute ("**Post**" or "**Posting**") text, images, audio, video or other content, including Messages (as defined below) and any content that incorporates sound recordings from your personal music library, background noise, and ambient noise ("**User Content**") via the Tubi Services. Except as may be explicitly requested in connection with particular Activities, Tubi is not requesting, and is unwilling to review any User Content, ideas, or materials relating to or containing characters, storylines, treatments, scripts, artwork, visual or audio-visual content, or other artistic or creative works (whether relating to pre-existing Tubi properties or not). Except as expressly set forth in these Terms of Use or in a separate written agreement between you and Tubi, Tubi does not claim any ownership rights in the User Content that you Post via the Tubi Services and you will continue to own all rights in and to your User Content, excluding any Feedback or except to the extent your User Content contains or is otherwise derived from materials, content, or elements owned by Tubi or any of our Affiliates (e.g.,

characters, trademarks, or other elements or intellectual property created or owned by us). You further understand that you are responsible for all User Content that you Post via the Tubi Services. Please select the User Content you Post carefully as User Content will be considered non-confidential and non-proprietary. Do not Post any User Content you consider to be confidential or proprietary.

a. **License to User Content**. You hereby grant us an unconditional, perpetual, irrevocable, worldwide, royalty-free, fully paid up, sub-licensable through multiple tiers (including through-to-the audience and to other users of the Tubi Services), transferable, non-exclusive license to use, reproduce, adapt, prepare derivative works based on, publicly display, publicly perform, distribute, incorporate in other works, and/or otherwise exploit, in whole or in part, User Content in any manner, in any format, and on any platform, and in any media now known, or hereafter invented or developed, without further notice to you, and without the requirement of compensation or additional permission from you or any other person or entity. You further hereby grant us a royalty-free license to use your name or user name, image, voice, and likeness to identify you as the source of any of your User Content. Your ability to provide an image, voice, and likeness may be subject to limitations due to age restrictions imposed

by applicable law wherein you reside or are accessing the Tubi Services.

b.  You represent and warrant that (i) you own all User Content Posted by you via the Tubi Services, or are otherwise authorized to grant the license above, (ii) you have all the necessary rights, permissions, and clearances from any third party who appears in or has otherwise provided or contributed to any aspect of the User Content, and (iii) your Posting of User Content via the Tubi Services does not and will not violate nor misappropriate any right of any party, including any privacy rights, publicity rights, and intellectual property rights. You further represent and warrant that your license grant under these Terms of Use will continue to be valid and have full effect, even following any termination of your Account or your use of the Tubi Services. In addition, you agree to pay for all royalties, fees, and other payments owed to any party, including any guilds or unions, or performing rights organizations, by reason of your Posting User Content via Tubi Services.

c.  **Use and Distribution of User Content**. You agree that Tubi may give you attribution for your User Content, but we are not required to do so. To the extent permitted by applicable law, you hereby waive and agree not to assert

any "moral rights" or other proprietary rights in any User Content against us, our Affiliates, our licensees, our representatives, or other users. The rights you grant to us in this Section 5 include, but are not limited to the right to reproduce sound recordings (and make mechanical reproductions of the musical works embodied in such sound recordings), and publicly perform and communicate to the public sound recordings (and the musical works embodied therein), all on a royalty-free basis.

d. **Public Nature of Tubi Services**. You acknowledge that any User Content you elect to Post is done so voluntarily and you have no expectation of privacy or confidentiality with respect to any User Content you Post, and that no fiduciary relationship exists between us and you or any other party based on the User Content. Although we may offer you the ability to Post User Content anonymously, we may store information related to you or the device you used to Post User Content. We make no guarantees to remove User Content from the Tubi Services or other platforms, and we may retain User Content in our backup files, including after termination of your Account.

e. **You are Responsible for Your User Content**. You understand that Tubi does not control User Content

Posted by users via the Tubi Services and, as such, you understand that you may be exposed to offensive, inaccurate, or otherwise objectionable User Content. Tubi assumes no responsibility or and disclaims all liability for User Content you may find inappropriate, offensive, or otherwise objectionable, regardless of whether Tubi elects to monitor User Content or user conduct. If you believe User Content violates our policies, please submit a request as detailed in Section 4 above. Tubi does not assume any responsibility for User Content other than Tubi Content, nor does it assume any obligation to modify or remove any User Content you may find inappropriate, offensive, or otherwise objectionable, or for the conduct of any user participating in any Activities on the Tubi Services.

f. **Messages and Social Features**. The Tubi Services may offer users the ability to send messages and post comments, including any replies to messages and comments (collectively "**Messages**" or "**Messaging**"), and repost, react to, share, bookmark, or otherwise interact with other users, their Messages, and User Content (collectively, "**Social Features**"). Messages and Social Features may be open to the public generally, to all users of the Tubi Services, registered users of the Tubi Services, or to a select group of users of the Tubi Services. Tubi reserves the right, but

disclaims any obligation or responsibility, to limit your ability to send Messages or use any Social Features, and to restrict or remove your Messages or Social Features, or refuse to include your User Content on the Tubi Services for any reason at any time, in Tubi's sole discretion, and without notice to you.

g. **Deleting Your User Content**. If you ask us to delete your User Content from the Tubi Services, Tubi will delete your User Content within a reasonable period of time and continue to use your User Content until the deletion has taken full effect. Tubi may retain User Content in our archives of the Tubi Services, which are not publicly available. Furthermore, to the extent that Tubi made use of your User Content before you deleted it, Tubi will retain the right to make such pre-existing uses available even after your User Content is deleted. You acknowledge that (i) deletion of your User Content from Tubi Services will not result in, and Tubi assumes no responsibility for, the deletion of such User Content by any third parties who were provided with or had access to such User Content prior to your deleting it from the Tubi Services, and (ii) termination of your Account or your use of the Tubi Services will not result in the immediate or automatic deletion of your User Content consistent with these Terms of Use.

Please visit our Help Center at www.tubitv.com/help-center for more information on how to delete your Account. If you delete your Account, you will not be able to reactivate your Account or retrieve any of the User Content or information you have Posted.

## 6. LINKED DESTINATIONS AND ADVERTISING

a. **Third Party Destinations**. The Tubi Services (including the Apps) may contain links to third-party websites or resources, or destinations. You will not infer or assume that Tubi endorses, operates, controls, is responsible for or is connected with these or other third-party websites, resources or destinations, even if they link to Tubi Services and even if such websites, resources, or destinations are operated by a person (including legal entity) affiliated or otherwise connected with Tubi. We provide these links only as a convenience and are not responsible for the content, products, or services on or available from those websites, resources, and destinations or links displayed on such websites. You acknowledge sole responsibility for and assume all risk arising from, your use of any third-party websites, resources, and destinations, and release Tubi from any responsibility and liability to you for any content or other materials hosted and served from any such websites, resources, or destination. These Terms of Use do not

govern your use of any other websites, resources, or destinations.

b. **Advertisements**. Tubi is not responsible for advertisements or any third-party material posted on any of the Tubi Services, nor is Tubi responsible for the products or services provided by advertisers or by other users. Any dealings you have with advertisers or other users found while using the Tubi Services are between you and the advertiser or user, and you agree that Tubi is not liable for any loss or claim that you may have against an advertiser or user.

## 7. TRADEMARKS

Tubi, the Tubi logo, www.tubi.tv, www.tubitv.com, and other Tubi marks, graphics, logos, scripts, and sounds are trademarks, registered or otherwise, and trade dress and the intellectual property of Tubi, Inc.. You may not copy, download or exploit any of Tubi's intellectual property, including the Tubi trademarks.

## 8. FEEDBACK

It is Tubi's policy not to accept unsolicited submissions, including scripts, story lines, articles, fan fiction, characters, drawings, information, suggestions, ideas, or concepts ("**Unsolicited Submissions**"). Tubi's policy is to delete any

such submission without reading it. Therefore, any similarity between an Unsolicited Submission and any elements in any Tubi creative work, including a film, series, story, title, or concept, would be purely coincidental. We welcome feedback, comments and suggestions for improvements to the Tubi Services ("**Feedback**"). You can submit Feedback by emailing us at feedback@tubi.tv (subject line: "Feedback"). You grant to us an unconditional, non-exclusive, worldwide, perpetual, irrevocable, fully-paid, royalty-free, sublicensable and transferable license under any and all intellectual property rights that you own or control to use, copy, modify, create derivative works based upon and otherwise exploit the Feedback for any purpose.

## 9. DISCLAIMER OF WARRANTIES, LIMITATIONS OF LIABILITY, AND INDEMNITY

SOME JURISDICTIONS MAY NOT PERMIT THE EXCLUSION OF CERTAIN WARRANTIES. TO THE EXTENT APPLICABLE LOCAL LAW SPECIFICALLY AND EXPRESSLY PROHIBITS SUCH EXCLUSIONS, THOSE SUCH EXCLUSIONS SET FORTH BELOW MAY NOT APPLY TO YOU.

THE TUBI SERVICES AND CONTENT ARE PROVIDED "AS-IS" AND "AS AVAILABLE." TUBI DOES NOT GUARANTEE OR PROMISE ANY SPECIFIC RESULTS FROM USE OF OR CONTINUOUS AVAILABILITY OF THE TUBI SERVICES OR CONTENT. TO THE FULLEST EXTENT PERMITTED BY

APPLICABLE LAW, TUBI EXPRESSLY DISCLAIMS ANY WARRANTIES AND CONDITIONS OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT, AND WARRANTIES IMPLIED FOR A COURSE OF PERFORMANCE OR COURSE OF DEALING. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, TUBI MAKES NO WARRANTY THAT YOUR USE OF THE TUBI SERVICES OR CONTENT WILL BE UNINTERRUPTED, TIMELY, SECURE OR ERROR-FREE, THAT DEFECTS TO THE TUBI SERVICES OR CONTENT WILL BE CORRECTED, THAT THE TUBI SERVICES, CONTENT OR THE SERVERS ON WHICH THEY ARE AVAILABLE WILL BE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS, OR THAT ANY INFORMATION OBTAINED BY YOU ON, THROUGH OR IN CONNECTION WITH THE TUBI SERVICES OR THIRD PARTY SERVICES (INCLUDING, BUT NOT LIMITED TO, THROUGH USER CONTENT OR THIRD PARTY ADVERTISEMENTS) WILL BE ACCURATE, RELIABLE, TIMELY OR COMPLETE. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, TUBI WILL NOT BE RESPONSIBLE FOR ANY LOSS OR DAMAGE (INCLUDING BUT NOT LIMITED TO LOSS OF DATA, PROPERTY DAMAGE, PERSONAL INJURY OR DEATH) RESULTING FROM USE OF THE TUBI SERVICES, CONTENT, USER CONTENT, PROBLEMS OR TECHNICAL MALFUNCTION IN CONNECTION WITH USE OF THE TUBI

SERVICES, CONTENT, ATTENDANCE AT A TUBI EVENT, ANY MATERIAL DOWNLOADED, POSTED OR OTHERWISE OBTAINED IN CONNECTION WITH THE TUBI SERVICES OR CONTENT, ANY USER CONTENT, ANY THIRD PARTY ADVERTISEMENT OR THIRD PARTY SERVICE TRANSMITTED ON, THROUGH OR IN CONNECTION WITH THE TUBI SERVICES, OR THE CONDUCT OR USER OF ANY USER(S) OF THE TUBI SERVICES OR CONTENT, WHETHER ONLINE OR OFFLINE. YOUR USE OF POSTS, USER CONTENT, THIRD PARTY ADVERTISEMENTS, THIRD PARTY SERVICES, AND THE GOODS OR SERVICES PROVIDED BY ANY THIRD PARTIES IS SOLELY YOUR RESPONSIBILITY AND AT YOUR OWN RISK.

YOU ACKNOWLEDGE AND AGREE THAT YOUR USE OF THE TUBI SERVICES AND CONTENT, AND ANY INFORMATION TRANSMITTED OR RECEIVED IN CONNECTION THEREWITH, INCLUDING USER CONTENT, MAY NOT BE SECURE AND MAY BE INTERCEPTED BY UNAUTHORIZED PARTIES. YOU ASSUME RESPONSIBILITY, TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW, FOR THE ENTIRE COST OF ANY MAINTENANCE, REPAIR OR CORRECTION TO YOUR COMPUTER SYSTEM OR OTHER PROPERTY OR RECOVERY OR RECONSTRUCTION OF LOST DATA NECESSITATED BY YOUR USE OF THE TUBI SERVICES.

**LIMITATION OF LIABILITY**

SOME JURISDICTIONS MAY NOT PERMIT THE EXCLUSION OR LIMITATION OF CERTAIN LIABILITIES. TO THE EXTENT APPLICABLE LOCAL LAW SPECIFICALLY AND EXPRESSLY PROHIBITS SUCH EXCLUSIONS OR LIMITATIONS, THOSE SUCH EXCLUSIONS OR LIMITATIONS SET FORTH BELOW MAY NOT APPLY TO YOU.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, TUBI'S LIABILITY TO YOU FOR ANY LOSS, CAUSE OR ACTION WHATSOEVER AND REGARDLESS OF THE FORM OF THE LOSS, CAUSE OR ACTION, WILL AT ALL TIMES BE LIMITED TO THE AMOUNT PAID, IF ANY, BY YOU TO TUBI FOR THE TUBI SERVICES AND CONTENT DURING THE TERM OF YOUR USE OF THE TUBI SERVICES. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, TUBI WILL NOT BE LIABLE TO YOU OR ANY THIRD PARTY FOR ANY DAMAGES OTHER THAN THE AMOUNT PAID, IF ANY, BY YOU TO TUBI FOR THE TUBI SERVICES DURING THE TERM OF YOUR USE OF THE TUBI SERVICES, INCLUDING ANY OTHER GENERAL, DIRECT, INDIRECT, COMPENSATORY, CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, SPECIAL OR PUNITIVE DAMAGES, AND INCLUDING, WITHOUT LIMITATION, LOST PROFIT DAMAGES ARISING FROM YOUR USE OF OR INABILITY TO POST, ACCESS, OR USE ANY TUBI SERVICES, CONTENT, OR USER CONTENT.

YOU ACKNOWLEDGE AND AGREE THAT ANY DAMAGES YOU INCUR ARISING OUT OF TUBI'S ACTS OR OMISSIONS OR YOUR USE OF THE TUBI SERVICES, CONTENT, OR USER CONTENT ARE NOT IRREPARABLE AND ARE INSUFFICIENT TO ENTITLE YOU TO AN INJUNCTION OR OTHER EQUITABLE RELIEF RESTRICTING THE AVAILABILITY OF OR ANY PERSON'S ABILITY TO ACCESS OR USE ANY PORTION OF THE TUBI SERVICES, CONTENT,T OR USER CONTENT. THE LIMITATIONS IN THIS SECTION APPLY WHETHER THE ALLEGED LIABILITY IS BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR ANY OTHER BASIS, EVEN IF YOU OR TUBI HAVE BEEN ADVISED OF THE POSSIBILITY OF ANY SUCH DAMAGES. FOR CLARIFICATION, THESE TERMS DO NOT LIMIT TUBI'S LIABILITY FOR FRAUD, FRAUDULENT MISREPRESENTATION, DEATH, OR PERSONAL INJURY TO THE EXTENT THAT APPLICABLE LAW WOULD PROHIBIT SUCH A LIMITATION.

## INDEMNITY

YOU AGREE TO INDEMNIFY AND HOLD TUBI, ITS AFFILIATES, CREATORS AND LICENSORS OF CONTENT, EACH ADVERTISER, SPONSOR AND THEIR ADVERTISING AGENCIES, SUBCONTRACTORS AND OTHER PARTNERS, AND THEIR RESPECTIVE OFFICERS, AGENTS, PARTNERS AND EMPLOYEES, HARMLESS FROM AND AGAINST ANY

LOSS, LIABILITY, CLAIM, ACTION OR DEMAND, INCLUDING, BUT NOT LIMITED TO, REASONABLE ATTORNEYS' FEES, MADE BY ANY THIRD PARTY DUE TO OR ARISING OUT OF OR IN CONNECTION WITH YOUR USE OR MISUSE OF THE CONTENT OR USER CONTENT, OR THE TUBI SERVICES (INCLUDING, WITHOUT, LIMITATION, ANY USE OF YOUR ACCOUNT AND ANY POSTS MADE UNDER YOUR ACCOUNT, WHETHER OR NOT AUTHORIZED BY YOU), YOUR BREACH OF THESE TERMS OF USE, YOUR VIOLATION OF ANY RIGHTS OF ANOTHER, OR ANY CONTENT, INFORMATION, OR MATERIAL THAT YOU TRANSMIT VIA THE TUBI SERVICES.

## 10. NOTICE AND PROCEDURE FOR CLAIMS OF COPYRIGHT INFRINGEMENT

We respect copyright law and expect our users to do the same. It is our policy to terminate Accounts of those users who repeatedly violate Tubi's intellectual property rights or the intellectual property rights of others.

If you believe that any material, Content, or User Content residing on or linked to from the Tubi Services infringes your intellectual property rights, including your Copyright, you may either (1) submit a written notification of claimed infringement to Tubi's copyright agent by completing the form at www.tubitv.com/static/support by first selecting "Report and Issue/Get Help," then "Specific Content (movie,

series, episode)", and then "Copyright Infringement" from the list of available topics, or (2) contact us by mail by sending Tubi's designated Copyright Agent a written notification of claimed infringement. Your written notification must contain substantially all of the following information:

a. identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works are covered by a single notification, a representative list of such works;

b. identification of the claimed infringing material and information reasonably sufficient to permit us to locate the material on the Tubi Services (such as the URL(s) of the claimed infringing material);

c. information reasonably sufficient to permit us to contact you, such as an address, telephone number, and an email address;

d. a statement by you that you have a good faith belief that the disputed use is not authorized by the copyright owner, its agent, or the law;

e. a statement by you that the above information in your notification is accurate and a statement by you, made under penalty of perjury, that you are the owner of an exclusive right that is allegedly infringed or are

authorized to act on the owner's behalf; and

f.  your physical or electronic signature.

Tubi's Copyright Agent for notification of claimed infringement can be as follows:

Attention: Copyright Agent
Tubi, Inc.
315 Montgomery St, 16th Floor
San Francisco, CA 94104

This contact information is exclusively for the purpose of notifying Tubi of claimed infringement. Please be advised that requests sent to the Copyright Agent without the appropriate subject line or for purposes other than communication about copyright claims may not be reviewed or responded to.

If you Posted User Content or other material to Tubi Services that Tubi removed due to a notice of claimed infringement from a copyright owner, Tubi will take reasonable steps promptly to notify you that the User Content or other material has been removed or disabled. This notice may be by means of a general notice on the Tubi Service or by written or electronic communication to such address(es) you have provided to Tubi, if any.

You may provide counter-notification in response to such

notice in a written communication directed to the Copyright Agent as described above, that includes the following:

a. identification of the User Content or other material that has been removed or to which access has been disabled and the location at which the User Content or other material appeared before it was removed or access to it was disabled;

b. a statement by you, under penalty of perjury, that you have a good faith belief that the User Content or other material was removed or disabled as a result of mistake or misidentification of the material to be removed or disabled;

c. your name, address, telephone number, and a statement that you consent to the jurisdiction of the Federal District Court for the judicial district in which your address is located, or if your address is outside of the United States, for any judicial district in which Tubi may be found, and that you will accept service of process from the person who provided notification requesting the removal or disabling of access to the material or such person's agent; and

d. your physical or electronic signature.

Please note that, under 17 U.S.C. §512(f), any person who

knowingly makes material misrepresentations in a notification of claimed infringement or any counter-notification may be liable for damages.

## 11. INFORMAL DISPUTE RESOLUTION PROCEDURE, ARBITRATION AGREEMENT, AND CLASS ACTION WAIVER

You understand that Tubi is a free streaming service without any subscription fees. So that Tubi can maintain the ability to offer you and other users this free service, you and we agree to the following mechanisms for resolving any Dispute between us:

a. The term "**Dispute**" is to be given the broadest possible meaning that will be enforced, and shall include any dispute, claim, demand, count, cause of action, or controversy between you and Tubi, whether based in contract, statute, regulation, ordinance, tort (including, but not limited to, fraud, misrepresentation, fraudulent inducement, negligence, or any other intentional tort), or any other legal or equitable theory. The term "Dispute" specifically includes, but is not limited to, any disputes, actions, claims, or controversies between you and Tubi that arise from or in any way relate to or concern any Content, products or services provided by Tubi including but not limited to the Tubi Services (as defined above), this Section 11, any other aspect of

these Terms of Use (including their applicability and their conformance to applicable law), and any disputes relating to telephonic, text message, or any other communications either of us received from the other. The only exceptions to this paragraph are that (i) each of you and Tubi retains the right to sue in small claims court; (ii) each of you and Tubi may bring suit in court against the other to enjoin infringement or other misuse of intellectual property rights; and (iii) each of you and Tubi may bring suit in court to determine the enforceability of Section 11.b. and/or Section 11.k.

b. **Mandatory Informal Dispute Resolution Process**. You and Tubi agree that good-faith, informal efforts to resolve disputes often can result in a prompt, cost-effective, and mutually beneficial outcome. Therefore, if either you or Tubi wants to bring or resolve a Dispute, you or Tubi must follow the mandatory informal dispute resolution process as a precondition to the ability to file an arbitration demand or lawsuit:

    i. **Notice**. You or Tubi must first send by mail to the other a written Notice of Dispute ("**Notice**") that sets forth the name, address, and contact information of the party giving notice, the specific facts giving rise to the Dispute, the Tubi Service to which the Notice relates, and the relief requested,

including damages, if any, and a detailed calculation for them. Your Notice also must contain your email address and (if different) the email address associated with your Tubi account. Our Notice must also be sent to your email address associated with your Tubi account, and you consent to receive any such Notice as part of these dispute resolution terms. You and we must include in any Notice to each other a personally signed statement (from you or us—not from your or our counsel) verifying the accuracy of the contents of the Notice, and if you are represented by counsel, your signed statement authorizing Tubi to disclose your Tubi account details to your attorney while seeking to resolve your claim. We each must individualize our Notice, meaning it can concern only our Dispute and no other person's Dispute. You must send your Notice to Tubi by email to arbitration-notices@tubi.tv or by mail to: Arbitration Notice of Dispute, Tubi, Inc., 2121 Avenue of the Stars, 12th Floor, Los Angeles, California, 90067. In the case of a Dispute initiated by you or us, it is the sender's responsibility to prove that the sender provided the notice in the manner that is required in this paragraph.

ii. **Good Faith Effort to Informally Resolve Dispute**.

After receipt of a completed Notice, the parties shall engage in a good faith effort to resolve the Dispute for a period of 60 days (which can be extended by agreement). You and Tubi agree that, after receipt of the completed Notice, the recipient may request an individualized telephone or video settlement conference and both parties will personally attend (with counsel, if represented). You and Tubi agree that the parties (and counsel, if represented) shall work cooperatively to schedule the conference at the earliest mutually convenient time and to seek to reach a resolution. If you and Tubi do not reach an agreement to resolve the issues identified in the Notice within 60 days after the completed Notice is received (or a longer time if agreed to by the parties), you or Tubi may commence a proceeding as noted below.

c. **Arbitration Agreement**. If you and we do not resolve the Dispute within 60 days of the submission of the Notice in accordance with the Informal Dispute Resolution Procedures, Tubi, including its Affiliates, agents, employees, predecessors in interest, successors, and assigns, and you agree that any Dispute between you and Tubi, regarding any aspect of your relationship with Tubi, will be resolved in a binding, confidential, individual and fair arbitration process, and

not in court, subject to the exceptions noted in Section 11.h below. Thus, subject to those exceptions, you and Tubi agree to give up the right to sue in court, including that you and Tubi agree to waive their right to a jury trial.

d. **Controlling Law Regarding Arbitration Process and Agreement to Arbitrate**. These Terms of Use evidence a transaction in interstate commerce, and thus the Federal Arbitration Act ("**FAA**"), 9 U.S.C. §§ 1–16, governs the interpretation and enforcement of the provisions in Section 11 related to the arbitration process. The agreements in Section 11 shall survive termination of the Terms of Use. Any original action to compel arbitration under Section 4 of the FAA (or analogous state law) must be brought in a state or federal court located in New York City, unless mandated by law to be filed in another state or federal court. If the FAA is found to not apply to any issue regarding the interpretation or enforcement of the parties' agreement to arbitrate, then that issue shall be determined by the laws of the State of New York. Any arbitration between you and Tubi will be administered by the American Arbitration Association ("**AAA**") pursuant to their then-applicable rules, including their mass arbitration supplementary rules and mass arbitration fee schedule, as applicable, as modified by this Section 11. AAA's rules and fee schedules can be found at www.adr.org. Except

in the event of a Mass Filing as described in Section 11.k below, the arbitration shall be conducted by a single, neutral arbitrator. If you and Tubi cannot agree on an arbitrator, the arbitrator will be appointed pursuant to the AAA's rules.

e. **Alternative Arbitration Provider**. If AAA is not available to arbitrate, including because it is not able to administer the arbitration(s) consistent with the rules, procedures, and terms of Section 11, including those described in Section 11.k, the parties will select an alternative arbitration provider. If the parties cannot agree on an appropriate alternative arbitration provider, then the parties will ask a court of competent jurisdiction to appoint an arbitrator pursuant to 9 U.S.C. § 5 that is able to administer the arbitration(s) consistent with the rules, procedures, and terms of this Section 11, including, as applicable, Section 11.k. This Section 11 will govern to the extent it conflicts with the arbitration provider's rules. For arbitrations before the AAA, the AAA's Consumer Arbitration Rules and Optional Rules For Emergency Measures of Protection shall apply.

f. **Filing Fee and Costs**. The initiating party must pay all filing fees for the arbitration. Your and Tubi's responsibility to pay other administrative and arbitrator

costs will be as set forth in the applicable arbitration provider's rules, unless the arbitrator determines the claims are frivolous. If a claim is determined to be frivolous, the claimant is responsible for reimbursing the respondent for its portion of all such administrative, hearing, and/or other fees incurred as a result of the frivolous claim.

g. **Waiver of Fees and Costs**. You may qualify for a waiver of certain arbitration costs under the applicable arbitration provider's rules or other applicable law. If you meet the standard for proceeding in forma pauperis in federal court, the state court of your residence, or the state court where the arbitration is brought, cannot obtain a waiver from the arbitration provider of any filing fees you are required to pay, and the arbitration provider refuses to administer the arbitration without your payment of said fees, Tubi will pay the filing fees for you.

h. **Enforceability of Certain Provisions of Section 11**. Notwithstanding Section 11.c. through Section 11.g., a claim regarding enforceability of any portion of Section 11.b and/or Section 11.k must be brought in federal or state court. Courts shall have the exclusive authority to determine: (i) the enforceability of any or all of the procedures set forth in Section 11.b and/or Section 11.k;

and (ii) if any or all the procedures set forth in Section 11.b and/or Section 11.k are unenforceable, whether that or those procedures are severable from the remaining provisions of Section 11 and the consequences of said severance. If the court determines that Section 11.b is enforceable, it will also decide whether the party seeking to arbitrate the Dispute complied with the process in Section 11.b.

i. **You and Tubi also agree to give up the ability to seek to represent, in a class action or otherwise, anyone but each of you and Tubi, including in arbitration and in state or federal court. Therefore:**

YOU AND TUBI MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, REPRESENTATIVE OR MULTI-CLAIMANT PROCEEDING, AND THE ARBITRATOR SHALL HAVE NO POWER TO AWARD CLASS-WIDE RELIEF.

j. You understand there is no judge or jury in arbitration, and court review of an arbitration award is limited. An arbitrator must follow the dispute resolution process described in Section 11. Subject to Section 11.h, the arbitrator has exclusive authority to resolve all issues relating to the parties' Dispute. The arbitrator will have

the authority to grant motions dispositive of all or part of any claim. The arbitrator can award on an individual basis the same damages and relief as a court (including injunctive and declaratory relief, or statutory damages); provided that they are recoverable under these Terms of Use. The arbitrator will issue a written award and statement of decision describing the essential findings and conclusions on which the award is based, including the calculation of any damages awarded. The award of the arbitrator is final and binding upon you and us.

k. **Related Cases and Mass Filings**. If your Notice involves claims similar to those of at least 25 other customers, and if you and those other customers are represented by the same lawyers, or by lawyers who are coordinating with each other, or if Tubi asserts 25 or more similar demands for arbitration or counterclaims against similarly–situated parties, within a period of 60 days or otherwise close in proximity, you and we agree that these claims will be related ("**Related Cases**"), and this shall be called a "**Mass Filing**." The following procedures will apply to a Mass Filing:

  i. *Acknowledgment of Related Cases procedure*. If you or Tubi, or your or our counsel, files a demand for arbitration that has Related Cases, then you and we agree that the demand for arbitration shall be

subject to the additional protocols set forth in this Section 11.k. If the parties disagree as to whether a series of filings fits within the definition of Mass Filing above, the arbitration provider shall resolve the disagreement. You and we also acknowledge that the adjudication of the dispute may be delayed and that any applicable statute of limitations shall be tolled from the time of filing of the demand for arbitration, and pending resolution of the proceedings described in this Section 11.k.

ii. *Bellwether Arbitrations*. Bellwether proceedings are encouraged by courts and arbitration administrators where there are multiple disputes involving similar claims against the same or related parties. The parties shall select ten individual arbitration claims (five per side), designated the "Initial Test Cases," to proceed to arbitration. Only the Initial Test Cases shall be filed with the arbitrator. All other claims shall be held in abeyance. This means that the filing fees will be paid only for the Initial Test Cases; for all other demands for arbitration, the filing fees (together with any arbitrator consideration of the other demands) will be in abeyance, and neither You nor Tubi will be required to pay any such filing fees. You and Tubi also agree that neither you nor we shall be

deemed to be in breach of this Section 11 for failure to pay any such filing fees, and that neither you nor we shall be entitled to any contractual, statutory, or other remedies, damages, or sanctions of any kind for failure to pay any such filing fees. If, pursuant to this subsection, a party files non-Bellwether Arbitrations with the arbitration provider, the parties agree that the arbitration provider shall hold those demands in abeyance and not refer them to the arbitrator pending resolution of the Initial Test Cases. Unless the claims are resolved in advance or the schedule is extended, the arbitrators will render a final award for the Initial Test Cases within 120 days of the initial pre-hearing conference.

iii. *Global Mediation*. Following the resolution of the Initial Test Cases, the parties agree to engage in a global mediation of all the remaining individual arbitration claims ("**Global Mediation**"), deferring any filing costs associated with the non-Initial Test Cases until the Initial Test Cases and subsequent Global Mediation have concluded. After the final awards are provided to the mediator in the Initial Test Cases, the mediator and the parties shall have 90 days to agree upon a substantive methodology and make an offer to resolve the outstanding cases. If the Parties are unable to resolve the

outstanding claims during the Global Mediation, the unresolved Disputes may then be administered by the arbitration provider pursuant to this Agreement's Batch Arbitration provision below and the arbitrator's fee schedule for mass filings, unless the parties mutually agree otherwise in writing. You and we also acknowledge that any applicable statute of limitations shall be tolled pending resolution of the Bellwether Arbitration and Global Mediation process.

iv. *Batch Arbitration*. To increase the efficiency of administration and resolution of arbitrations, you and Tubi agree that in the event the Bellwether Arbitration and Global Mediation processes described above do not resolve the Disputes, the arbitration provider will (1) administer the remaining arbitration demands in batches of 50 demands per batch; (2) appoint one arbitrator for each batch; and (3) provide for the resolution of each batch as a single consolidated arbitration with one set of filing and administrative fees due per side per batch, one procedural calendar, one hearing (if any) in a place to be determined by the arbitrator, and one final award ("**Batch Arbitration**"). The final award will provide for individual merit decisions for each separate claimant within the

single batch arbitration award. If the arbitration provider will not administer the Batch Arbitration with one set of filing and administrative fees due per side per batch, then the arbitration provider's mass arbitration fee schedule shall apply. AAA's mass arbitration fee schedule is available on its website at www.adr.org/rules. For mass arbitrations before any other arbitration provider, if applicable, you and Tubi agree that its mass arbitration fee schedule shall apply, as necessary.

v. *Opting Out*. If your claim is not resolved as part of the Bellwether Arbitration and Global Mediation process outlined above, the parties shall also have the opportunity to opt out of arbitration and bring the pending Dispute to the state or federal courts located in New York City, unless mandated by law to be filed in another state or federal court. The parties have 30 days of the failed Global Mediation process to opt out. This shall not provide an opportunity for either party to opt out of arbitration for other claims. You may opt out of arbitration by providing written notice of your intention to opt out to the arbitration provider and to Arbitration Opt Out Notice, Tubi, Inc., 2121 Avenue of the Stars, 12th Floor, Los Angeles, California, 90067 via USPS Priority Mail or hand delivery, by email to

arbitrationoptout@tubi.tv, or by notice to the attorney representing Tubi in the arbitration proceeding. This written notice must be signed by you, even if it is also signed by your attorney. The written notice cannot be signed by an agent or other representative of yours in lieu of your signature. It must include a statement that you wish to opt out of arbitration within 30 days after the conclusion of the Global Mediation process. Tubi may exercise its equivalent opt-out right by sending written notice to you or your attorney, agent, or representative if you are represented.

vi. *Enforcement of Subsection*. A Court of competent jurisdiction shall have the power to enforce Section 11.k, including by injunctive, declaratory, or other relief.

l. **Live Testimony**. You must appear to testify at any arbitration hearing personally, virtually, or in another manner authorized by law or the arbitration provider. You agree that if you fail to appear in one of these forms to testify, you consent to have the arbitrator order that the case be closed immediately.

m. **Discovery and Information Exchange**. Regardless of how the arbitration proceeds, each of you and Tubi shall cooperate in good faith in the exchange of non-

privileged documents and information as necessary in accordance with the arbitration provider's rules.

n. **Attorney's Fees and Fee Shifting**. Each of you and Tubi may incur attorneys' fees during the arbitration. Each side agrees to pay his, her or its own attorneys' fees unless the claim(s) at issue permit(s) the prevailing party to be paid its attorneys' fees, and in such instance, the fees awarded shall be determined by the applicable law(s).

o. **Restrictions on Forms of Relief**. The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief, only to the extent necessary to provide relief warranted by that party's individual claim, only as permitted by applicable law, and only to the extent that declaratory and injunctive relief are permitted by these Terms of Use. The arbitrator shall have no authority to award punitive, exemplary, multiplied or consequential damages or any other relief except those allowed under the law and these Terms of Use, including Section 9's Limitation of Liability provisions. The arbitrator also may not order you or Tubi to pay any monies to or take any actions with respect to persons other than you or Tubi, respectively, unless you or Tubi explicitly consents in advance, after an arbitrator is selected, to permit the

arbitrator to enter such an order, as applicable. Further, unless you and Tubi expressly agree, or subject to the provisions of Section 11.k above, the arbitrator may not consolidate other persons' claims with yours or ours, and may not otherwise preside over any form of a representative, multi-claimant or class proceeding.

p. **Confidentiality**. You and Tubi agree to maintain the confidential nature of the arbitration proceeding and shall not disclose the fact of the arbitration, any documents exchanged as part of any mediation, proceedings of the arbitration, the arbitrator's decision and the existence or amount of any award, except as may be necessary to prepare for or conduct the arbitration (in which case anyone becoming privy to confidential information must undertake to preserve its confidentiality), or except as may be necessary in connection with a court application for a provisional remedy, a judicial challenge to an award or its enforcement, an order confirming the award, or unless otherwise required by law or court order. In keeping with the confidential nature of the arbitration, you and Tubi agree that an order confirming the award is only necessary if the obligations of the award have not been performed. Therefore, before taking any steps to confirm the arbitration award, the party seeking confirmation of the award must give the other party

notice of its intention to confirm the award. If the party who would be the respondent in any such confirmation proceeding performs its obligation under the terms of the arbitration award within 15 business days of such notice, the party who gave notice of its intent to confirm the award shall not seek to confirm or otherwise enforce the award.

q. **Severability of Portions of Section 11**. With the exception of Section 11.i and Section 11.k (i.e., the waiver of the ability to proceed on behalf of multiple claimants or a purported class and the Mass Filing procedure), if any part of Section 11 is deemed invalid, unenforceable, or illegal, then the balance of Section 11 shall remain in effect and be construed in accordance with its terms as if the invalid, unenforceable, or illegal provision were not contained. If, however, either or both Section 11.i or/and Section 11.k is found invalid, unenforceable or illegal, then the remainder of Section 11 and this paragraph shall be null and void, but the rest of these Terms of Use, including the provisions governing in which court actions against Tubi must be pursued and the choice of governing law will remain in effect and apply to any claim that, for this or any other reason, proceeds in court rather than in arbitration.

r. **Court Proceedings**. If a court issues a decision

precluding or refusing to compel arbitration of any Dispute, the Dispute must be brought in the state or federal courts located in New York City, unless otherwise mandated by law to be filed in another state or federal court. For Disputes deemed not to be subject to arbitration, neither you nor Tubi shall be precluded from participating in a class-wide settlement of those claims if brought by another Tubi user or third party.

## 12. TERMINATION

We may terminate your access to and use of the Tubi Services, at our sole discretion, at any time and without notice to you. Without limiting the forgoing, we may, at our sole discretion, without notice to you, terminate or restrict your Account or your use of the Tubi Services, including ability to Post User Content and/or to access Content or any portion thereof, at any time, without liability, if Tubi determines in its sole discretion that you have breached these Terms of Use, violated any law, rule, or regulation, engaged in other inappropriate conduct, place an undue burden on our networks or servers, or for any other business reason or no reason. We may further use technology to limit activities, such as the number of calls being made to the servers or systems used to provide the Tubi Services, and you agree to respect these limitations and not take any steps to circumvent, avoid, or bypass them.

You may cancel your Account via the functionality provided in the Tubi Services.

Upon any termination, discontinuation or cancellation of the Tubi Services or your Account, the following Sections will survive: Section 2.b.ii., Section 2.f.ii, Section 2.g, Section 2.h, Sections 5 through 9, and Sections 11 through 13.

## 13. GENERAL INFORMATION

**Export Controls**. Software and the transmission of applicable technical data, if any, in connection with the Tubi Services are subject to export controls. You agree to comply with all applicable laws regarding software and the transmission of technical data exported from the United States or the country in which you reside.

**Choice of Law and Forum**. These Terms of Use are governed by, and construed in accordance with, the laws of the State of New York, without regard to its conflict of law provisions.

Except with respect to Disputes to be resolved through the process in accordance with the Section 11 above, you and Tubi agree to submit to the exclusive jurisdiction of the federal or state courts located in New York City, unless otherwise mandated by law, to resolve any Dispute arising out of the Agreement or the Tubi Services.

YOU HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT YOU MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION (INCLUDING, BUT NOT LIMITED TO, ANY CLAIMS, COUNTERCLAIMS, CROSS-CLAIMS, OR THIRD-PARTY CLAIMS) ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT.

YOU AND WE AGREE THAT ANY CAUSE OF ACTION YOU OR WE MAY HAVE ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE TUBI SERVICES, OR CONTENT MUST BE COMMENCED WITHIN ONE (1) YEAR AFTER SUCH CAUSE OF ACTION ACCRUES. AFTER SUCH PERIOD, SUCH CAUSE OF ACTION SHALL BE PERMANENTLY BARRED.

**No Waiver/Reliance**. If you see other parties violating these Terms of Use, you may let us know at feedback@tubi.tv (subject line: "TOU Violation"). You may not rely upon Tubi's response with respect to one party or one situation as any indication of what Tubi might do with respect to another party or another situation, even if the parties or situations appear to you to be similar. Similarly, if we fail to act in response to a violation of these Terms of Use, you should not assume that we do not object to the violation or even that we are aware of it. In addition, you may not construe a waiver of any provision of these Terms of Use with respect to any party as a waiver of that provision (or any other

provision) with respect to either that party or any other party. Further, Tubi's decision to delay exercising or enforcing any right or remedy under these Terms of Use will not constitute a waiver of such right or remedy. Even if Tubi acts in a way that appears to you to be inconsistent with these Terms of Use, Tubi's action will not be deemed a waiver or constructive amendment of these Terms of Use. Tubi's failure to enforce any right or provision of these Terms of Use will not be considered a waiver of such right or provision. The waiver of any such right or provision will be effective only if in writing and signed by a duly authorized representative of Tubi. Except as expressly set forth in these Terms of Use, the exercise by either party of any of its remedies under these Terms of Use will be without prejudice to its other remedies under these Terms of Use or otherwise.

**Integration, Amendment, and Severability**. Please note that these Terms of Use, including any end user license agreement that might accompany Tubi Apps, features and devices, constitute the entire legal agreement between you and Tubi and govern your use of the Tubi Services (including your use of the Content) (but excludes any services, if any, that Tubi may provide to you under a separate signed written agreement), and completely replace any prior oral or written understandings or agreements between you and Tubi in relation to the Tubi Services, including Content. Except as set forth in Section 1 above, these Terms of Use may not be

amended, modified, or varied except in a writing signed by Tubi. Although we understand that electronic or digital signatures are frequently viewed as the equivalent of traditional written signatures these days, for these purposes, a signature or "signed" writing or written agreement may not include an electronic or digital signature. These Terms of Use operate to the fullest extent permissible by law. If any provision of these Terms of Use is held to be unlawful, void, or unenforceable, you and we agree that the provision will be enforced to the maximum extent permissible and the other provisions of these Terms of Use will remain in full force and effect.

**Assignment**. You may not assign or transfer these Terms of Use, by operation of law or otherwise, without Tubi's prior written consent. Any attempt by you to assign or transfer these Terms of Use, without such consent, will be null. Tubi may freely assign or transfer these Terms of Use without restriction. Subject to the foregoing, these Terms of Use will bind and inure to the benefit of the parties, their successors and permitted assigns.

**Notices**. Any notices or other communications provided by Tubi under these Terms of Use, including those regarding modifications to these Terms of Use, will be given: (i) via email; or (ii) by posting to the Services. For notices made by e-mail, the date of receipt will be deemed the date on which

such notice is transmitted.

**Contact**. If you have any questions about these Terms of Use, please submit your questions at www.tubitv.com/static/support by selecting "Report an issue/Get Help" then "Terms of Use & Privacy Policy" from the list of available topics. If you have general questions about Tubi or how to use it, please visit our Help Center at www.tubitv.com/help-center.

# **EXHIBIT 10**



# **EXHIBIT 11**





4:05

Many people likely qualify for hundreds to thousands in compensation under consumer protection laws.

## How to Sign Up for a Compensation Claim

Signing up takes about 2-3 minutes

**1.** Fill out the contact form on this page. Enter your full legal name.

Once you submit the form you will be taken to a short questionnaire.

**2.** If we believe you qualify for compensation based on your responses, you can sign up for a claim from your phone or computer by completing a representation agreement and



4:05 📷   🔋 📶 🛰 📵 4G: 75% 🔋

**3.** Once we receive your documents we'll review your answers and start working on your potential claim.

**It is free to sign up and you owe nothing unless we get you compensation.**



People who used Tubi streaming services are likely entitled to significant compensation

## Users Can Sign Up for Compensation

### Tubi Violated California Consumer Protection Laws

Tubi is accused of discriminating against its users.

People who signed up for the streaming service may be eligible to sign up for a claim.

## Many people who signed up for Tubi may be entitled to compensation

We believe that Tubi violated



laws due to its misuse of users'
information and discriminatory
practices.

Many individuals could be entitled to
thousands of dollars in compensation.

### We are helping users get compensation

If you signed up for a Tubi
account, you likely qualify for a
compensation claim.

We make the sign up process

as easy and straightforward as possible.

Signing up is free and takes 2 to 3 minutes.



f you signed up for a Tubi account, you
likely qualify for a claim

**Sign Up in 2-3 minutes**

### About Us

We are product liability and consumer
protection attorneys who have
represented thousands of individuals
who were harmed or defrauded.





## About Us

We are product liability and consumer protection attorneys who have represented thousands of individuals who were harmed or defrauded.

- Jeremy Troxel, Partner
  Troxel Law, LLP

Our legal team makes it easier for consumers to receive compensation. This is an Attorney Advertisement. Troxel Law, LLP, 195 Montague St., 14th Floor, Brooklyn NY, 11201, is responsible for the content of this advertisement. Licensed only in the State of New York. In other states, the firm will associate with counsel licensed in that state. Not accepting cases in all jurisdictions. No attorney-client relationship is formed by your use of this website or by any communication you send or receive through this site. The content and features on this website shall not be construed as legal advice. The hiring of a lawyer is an important decision that should not be based solely upon advertisements. No representation is made that the quality of the legal services to be performed is greater than the quality of legal services performed by other lawyers. Prior results do not guarantee a similar outcome. Free background information is available upon request.

Terms and Conditions. Privacy Policy



# **<u>EXHIBIT 12</u>**



# **EXHIBIT 13**



Attorney advertising

## Sign up for a Tubi Compensation Claim

Tubi is accused of illegally misusing information. We're helping users get compensation.

If you used Tubi, sign up for a compensation claim



Signing up is free and takes 2 to 3 minutes.

First Name

Last Name

Email

Phone Number

**Sign Up for a Claim**

Clicking the button will take you to a short qualification questionnaire.

We may follow up with you by phone and text pursuant to our privacy policy. By signing up, you agree to our terms and conditions.

Many people likely qualify for hundreds to thousands in

# **EXHIBIT 14**



# **EXHIBIT 15**



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6**.

| | | | | |
|---|---|---|---|---|
| **RESPONDENT NAME** | Tubi, Inc. | | | |
| **ADDRESS** | 2121 Avenue of the Stars, 7th Floor | | | |
| **CITY** | Los Angeles | **STATE** CA | **ZIP** 90067 | |
| **PHONE** | **FAX** | **EMAIL** | | |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | |
| **FIRM/ COMPANY** | |
| **ADDRESS** | |
| **CITY** | **STATE** **ZIP** |
| **PHONE** **FAX** | **EMAIL** |

## FROM CLAIMANT

Add more claimants on **page 7**.

| | | | |
|---|---|---|---|
| **CLAIMANT NAME** | ██████████ | | |
| **ADDRESS** | ██████████ | | |
| **CITY** | ██████ | **STATE** ██ | **ZIP** ████ |
| **PHONE** ██████ **FAX** | **EMAIL** ██████████ | | |

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | | | |
|---|---|---|---|
| **REPRESENTATIVE/ATTORNEY** | Warren Postman | | |
| **FIRM/ COMPANY** | Keller Postman LLC | | |
| **ADDRESS** | 1101 Connecticut Avenue, N.W., Suite 1100 | | |
| **CITY** | Washington | **STATE** D.C. | **ZIP** 20036 |
| **PHONE** (312) 741-5220 **FAX** (312) 971-3502 | **EMAIL** tubusservice@kellerpostman.com | | |



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

☐    If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION. A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

Tubi, Inc. ("Tubi"), operates an ad-supported video streaming service through its website (tubitv.com) and mobile applications that is used by tens of millions of consumers across the country. ▇▇▇▇ ("Claimant") is one of those consumers.

In or after May 2022, while living in California, Claimant maintained a Tubi account under the email address▇▇▇▇▇▇, and used Tubi's ad-supported video streaming service through Tubi's website (tubitv.com) or mobile application. When Claimant streamed videos on Tubi during that time, Claimant watched multiple advertisements that Tubi interspersed throughout the videos Claimant was streaming.

Claimant was required to provide Tubi with information about Claimant's age, sex, or gender when Claimant signed up for Tubi's ad-supported video streaming service. Tubi then used this information to engage in illegal discriminatory advertising against Claimant on the basis of Claimant's age, sex, or gender.

Targeted advertising on the basis of age, sex, or gender violates California's Unruh Civil Rights Act, Cal. Civ. Code §§ 51–52. That law prohibits discrimination based on age, sex, or gender generally. *See* Cal. Civ. Code §§ 51(b), (e)(5)–(6); *Candelore v. Tinder, Inc.*, 19 Cal. App. 5th 1138, 1145 (2018). And that prohibition applies to companies that target consumers with advertising based on their age, sex, or gender. *See Liapes v. Facebook, Inc.*, 95 Cal. App. 5th 910, 920–27 (2023), *review denied* (Jan. 10, 2024). In addition, the Unruh Civil Rights Act authorizes $4,000 in statutory damages for "each and every offense." Cal. Civ. Code § 52(a). Tubi is thus liable for $4,000 each time its discriminatory advertising has affected Claimant.

Claimant seeks statutory and punitive damages, restitution, attorneys' fees and costs, injunctive relief, and any other relief that the arbitrator deems proper. Claimant currently estimates that the monetary portion of that relief sought to be at least $16,000, and demands that amount in addition to reasonable injunctive relief that ends Tubi's discriminatory practices.

The Notice of Dispute provision in Claimant's arbitration agreement with Tubi is illusory, unconscionable, and therefore unenforceable. It requires Claimant to give Tubi written notice of a dispute and to wait for 45 days before initiating an arbitration against Tubi, but it imposes no obligation on Tubi to do anything during that 45-day wait period. Tubi "may try to reach a settlement" during that time, but need not do so. This 45-day wait period therefore serves no purpose other than delay. Nevertheless, if Tubi is willing to commit to explore a settlement in good faith and to pay for a mediation session, Claimant is willing to participate in good faith in the mediation session and to stay this arbitration for up to 45 days while the parties mediate.

AMOUNT IN CONTROVERSY (US DOLLARS)    at least $16,000

# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT

This demand is made pursuant to the arbitration agreement which the parties made as follows. *Please cite location of arbitration provision and attach two copies of entire agreement.*

ARBITRATION PROVISION LOCATION

Claimant makes this demand pursuant the arbitration agreement contained in Section 10 of Tubi's Terms of Use, effective as of May 1, 2022.  Those terms, including the arbitration agreement, are attached to this demand.

## RESPONSE

The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. *Send the original response and counter-claim to the claimant at the address stated above with two copies to JAMS.*

## REQUEST FOR HEARING

REQUESTED LOCATION    OAKLAND, CA

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)

*See: Comprehensive Rule 16.1*

☐ By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

| SIGNATURE | /s/ Warren Postman | DATE | April 5, 2024 |
|---|---|---|---|

| NAME (PRINT/TYPED) | Warren Postman |
|---|---|

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

Completion of this section is <u>required for all consumer or employment claims</u>.

## CONSUMER AND EMPLOYMENT ARBITRATION

Please indicate if this is a CONSUMER ARBITRATION. For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*, as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:

☑ <u>YES</u>, this **is** a CONSUMER ARBITRATION.

☐ <u>NO</u>, this **is not** a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1. The contract is with a consumer party, as defined in these standards;
2. The contract was drafted by or on behalf of the non-consumer party; and
3. The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1. An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2. An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3. An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4. An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

NOTE: JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter. In addition, JAMS may treat a matter as a consumer matter and apply the Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

## EMPLOYMENT MATTERS

If this is an EMPLOYMENT matter, Claimant must complete the following information:

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ Less than $100,000      ☐ $100,000 to $250,000      ☐ More than $250,000      ☐ Decline to State

## WAIVER OF ARBITRATION FEES

In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees. In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.

**Terms of Use**

**Effective as of** May 1, 2022

Welcome to Tubi, Inc. ("**Tubi**," "**we**," "**our**" or "**us**"). Please read these Tubi Terms of Use (the "**Terms of Use**") and our Privacy Policy, available at https://www.tubitv.com/static/privacy ("**Privacy Policy**"), carefully because they govern your access and use of our video streaming service offering a selection of television shows, movies, clips, and other audio-video content (collectively, the "**Content**") accessible via our website located at www.tubi.tv and www.tubitv.com (the "**Tubi Site**"), our applications ("**Apps**") and our player for viewing the Content (the "**Video Player**"), in addition to any other features, tools, applications, materials, or other services offered from time to time by Tubi in connection with its business, however accessed. To make these Terms of Use easier to read, the Tubi Site, Apps, Video Player and our services are referred to collectively as the "**Tubi Services**." A list of our affiliated companies ("**Affiliates**") is available at www.foxcorporation.com.

By visiting, accessing, or using any of the Tubi Services, you agree to be bound by these Terms of Use. It is important that you carefully read through these Terms of Use and also whenever we update them or whenever you access or use the Tubi Services. If you have any questions or comments about these Terms of Use, please submit your questions at www.tubitv.com/static/support and select "Terms of Use & Privacy Policy" from the list of available topics. If you have general questions about Tubi or how to use it, please visit our Help Center at https://tubitv.com/help-center/.

**IMPORTANT NOTICE REGARDING ARBITRATION: BY USING ANY TUBI SERVICES AND ACCEPTING THESE TERMS OF USE YOU ARE AGREEING (WITH LIMITED EXCEPTION) TO RESOLVE ANY DISPUTE BETWEEN YOU AND US THROUGH BINDING, INDIVIDUAL ARBITRATION RATHER THAN IN COURT. YOU AND TUBI WAIVE THE RIGHT TO BRING OR PARTICIPATE IN A CLASS ACTION IN CONNECTION WITH SUCH DISPUTES. PLEASE REVIEW CAREFULLY** SECTION 10 TITLED "ARBITRATION AGREEMENT AND CLASS ACTION WAIVER" BELOW **FOR DETAILS REGARDING ARBITRATION (INCLUDING THE PROCEDURE TO OPT OUT OF ARBITRATION).**

**1. CHANGES TO THE TERMS OF USE BY TUBI**

Tubi may amend these Terms of Use at any time by posting the amended Terms of Use on the Tubi Services (available at https://www.tubitv.com/static/terms). Any amendment to these Terms of Use will be effective upon posting on the Tubi Services. Your continued use of the Tubi Services after any such amendment is posted constitutes your acknowledgement and acceptance of such amendment. If you do not agree to be bound by the updated Terms of Use, then, except as otherwise provided in Section 10, you may not access or otherwise use the Tubi Services. Because the Tubi Services are evolving over time we may change or discontinue all or any part of the Tubi Services, at any time and without notice, at our sole discretion and without liability to you. Tubi may also impose limits on certain features and services offered on the Tubi Services or restrict your access to parts or all of the Tubi Services without notice or liability

**2. ACCESS AND USE OF THE TUBI SERVICES**

   a. **Age Limitations and Restrictions.** The Tubi Services are not directed to nor intended to be accessed or used by children under the age of 13. If you are under the age of 13, you are not permitted to access, use or register to use the Tubi Services or to otherwise provide your personal information to Tubi. If you are at least 13 and under 18 years of age, you may register with Tubi only if you have the consent of your parent or guardian, in which case your parent or guardian will be required to consent to these Terms of Use on your behalf. Access to Content may be restricted due to age appropriateness. Accessing the Tubi Services and/or the Content from territories where Tubi does not offer the Tubi Services is prohibited.

   b. **Registration and Your Information.**

      i. If you want to use certain features of the Tubi Services you will need to create an account ("**Account**"). You can do this with your email address via the Tubi Site or Apps, or using your account with certain third-party social networking services such as Facebook (each, an "**SNS Account**"). If you choose the SNS

Account option, please note that we will create your Account by extracting from your SNS Account certain personal information such as your name and email address and other personal information that your privacy settings on the SNS Account permit us to access.

      ii. It is important that you provide us with accurate, complete and up-to-date information for your Account and you agree to update such information to keep it accurate, complete and up-to-date. If you do not, we may suspend or terminate your Account. You agree that you will keep your password and Account information secure and that you will not disclose your Account password to anyone else and you will notify us immediately of any unauthorized use of your Account. You are responsible for all inaccuracies in your Account information and all activities that occur under your Account, regardless of whether or not you know about them.

   c. **Your License**. Subject to your compliance with these Terms of Use, Tubi grants you a limited, revocable, non-exclusive, non-transferable license, with no right to sublicense, to view and use the Tubi Services in connection with your permitted use thereof, including accessing and viewing the Content on a streaming-only basis through the Video Player, solely for personal, non-commercial purposes as set forth in these Terms of Use.

   d. **The Content**. The Content is available for permissible viewing on or through the Tubi Services.

You may only access and view the Content personally and for a non-commercial purpose in compliance with these Terms of Use. You may not either directly or through the use of any device, software, internet site, web-based service, or other means remove, alter, bypass, avoid, interfere with, or circumvent any copyright, trademark, or other proprietary notices marked on the Content, Tubi Services or any digital rights management mechanism, device, or other content protection or access control measure associated with the Tubi Services or the Content, including geo-filtering mechanisms. You may not use technologies to access or use the Tubi Services or Content from territories where Tubi does not have rights or does not offer services. You may not either directly or through the use of any device, software, internet site, web-based service, or other means copy, download, stream capture, reproduce, duplicate, archive, distribute, make available, upload, publish, modify, translate, broadcast, perform, display, sell, transmit or retransmit the Tubi Services or Content unless expressly permitted by Tubi in writing. You may not incorporate the Content into, or stream or retransmit the Content via, any hardware or software application or make it available via frames or inline links unless expressly permitted by Tubi in writing. Furthermore, you may not create, recreate, distribute, or advertise an index of any significant portion of the Content unless authorized by Tubi. You may not seek to develop, build, or otherwise promote a business, product, or service utilizing the Tubi Services or the Content, whether or not for profit. The Tubi Services and Content covered by these restrictions includes without limitation any text, graphics, layout, interface, technology, logos, photographs, audio and video materials, and stills. In addition, you are strictly prohibited from creating derivative works or materials that otherwise are derived from or based on in any way the Tubi Services or the Content, including without limitation montages, mash-ups and similar videos, wallpaper, desktop themes, greeting cards, and merchandise, unless it is expressly permitted by Tubi in writing. The foregoing prohibitions apply even if you intend to give away the derivative materials free of charge.

   e. **The Video Player**. You may not modify, enhance, remove, interfere with, or otherwise alter in any way any portion of the Video Player, its underlying technology, any digital rights management mechanism, device, or other content protection or access control measure incorporated into the Video Player. This restriction includes, without limitation, disabling, reverse engineering, modifying, interfering with or otherwise circumventing the Video Player in any manner that

enables users to view the Content without: (i) displaying visibly both the Video Player and all surrounding elements (including the graphical user interface, any advertising, copyright notices, and trademarks) of the webpage where the Video Player is located; and (ii) having full access to all functionality of the Video Player, including, without limitation, all video quality and display functionality and all interactive, elective, or click-through advertising functionality.

f. **The Apps**.

    i.    Subject to your compliance with these Terms of Use, Tubi grants you a limited, revocable, non-exclusive, non-transferable license, with no right to sublicense, to download and install a copy of the Apps on a consumer electronics device (e.g., a mobile phone, tablet, television, or computer) that you own or control and to run such single copy solely for your own personal non-commercial purposes on such consumer electronics device.

    ii.    You may not copy an App, except to make a copy for backup or archival purposes. Except as expressly permitted in these Terms of Use, you may not: (1) copy, modify or create derivative works based on the Apps; (2) distribute, transfer, sublicense, lease, lend or rent the Apps to any third party; (3) reverse engineer, decompile or disassemble the Apps; or (4) make the functionality of the Apps available to multiple users through any means. Tubi reserves all rights in and to the Apps not expressly granted to you under these Terms of Use.

g. **Accessing Apps from App Store**. The following terms apply to any App accessed through or downloaded from any app store or distribution platform (like the Apple App Store or Google Play) where the App may now or in the future be made available (each an "**App Provider**"). You acknowledge and agree that:

    i.    These Terms of Use are concluded between you and Tubi, and not with the App Provider, and Tubi (not the App Provider), is solely responsible for the App.

    ii.    The App Provider has no obligation to furnish any maintenance and support services with respect to the App.

    iii.    In the event of any failure of the App to conform to any applicable warranty, you may notify the App Provider, and to the maximum extent permitted by applicable law, the App Provider will have no other warranty obligation whatsoever with respect to the App. Any other claims, losses, liabilities, damages, costs or expenses attributable to any failure to conform to any warranty will be the sole responsibility of Tubi.

    iv.    The App Provider is not responsible for addressing any claims you have or any claims of any third party relating to the App or your possession and use of the App, including, but not limited to: (1) product liability claims; (2) any claim that the App fails to conform to any applicable legal or regulatory requirement; and (3) claims arising under consumer protection or similar legislation.

    v.    In the event of any third party claim that the App or your possession and use of that App infringes that third party's intellectual property rights, Tubi will be solely responsible for the investigation, defense, settlement and discharge of any such intellectual property infringement claim to the extent required by these Terms of Use.

    vi.    The App Provider, and its subsidiaries, are third-party beneficiaries of these Terms of Use as related to your license to the App, and that, upon your acceptance of the Terms of Use, the App Provider will have the right (and will be deemed to have accepted the right) to enforce these Terms of Use as related to your license of the App against you as a third-party beneficiary thereof.

    vii.    You represent and warrant that (1) you are not located in a country that is subject to a U.S. Government embargo, or that has been designated by the U.S. Government as a terrorist-supporting country; and (2) you are not listed on any U.S. Government list of prohibited or restricted parties.

    viii.    You must also comply with all applicable third party terms of service when using the App.

h. **Ownership**. As between you and Tubi, Tubi and/or Tubi's licensors exclusively own, control and retain all right, title and interest in and to the Tubi Services and the Content, including all associated intellectual property rights. You acknowledge that the Tubi Services, including without limitation the Content, are protected by copyright, trademark, and other laws of the United States and foreign countries. You agree not to remove, alter or obscure any copyright, trademark, service mark or other proprietary rights notices incorporated in or accompanying the Tubi Services, including without limitation the Content.

i. **Your Responsibilities and Tubi's Enforcement Rights**. You can access and use the Tubi Services and Content for lawful personal, non-commercial, and appropriate purposes only. You agree not to engage in any conduct that:

    i.    violates the rights of others, including patent, trademark, trade secret, copyright, moral rights or other intellectual property rights, or rights of privacy, publicity, or other proprietary rights, harasses or harms another individual, impersonates any person or entity, or otherwise misrepresents yourself or your affiliation with any person or entity; or (2) is fraudulent, false, misleading or deceptive;

    ii.    uses technology or other means to access, index, frame, search or link to the Tubi Services (including the Content) that is not authorized by Tubi; remove, avoid, deactivate, descramble disable, bypass, or circumvent any technological measure implemented by Tubi or any of Tubi's providers or any other third party (including another user) to protect Tubi Services, including without limitation content protection or access control mechanisms intended to prevent the unauthorized download, stream capture, linking, framing, reproduction, access to, or distribution of the Tubi Services;

    iii.    accesses, tampers with, or uses non-public areas of the Tubi Services, Tubi's computer systems, or the technical delivery systems of Tubi's providers;

    iv.    involves accessing the Tubi Services (including the Content) through any automated means, including "robots," "spiders," or "offline readers" (other than by individually performed searches on publicly accessible search engines for the sole purpose of, and solely to the extent necessary for, creating publicly available search indices - but not caches or archives - of the Tubi Services, excluding those search engines or indices that host, promote, or link primarily to infringing or unauthorized content);

    v.    uses any meta tags or other hidden text or metadata utilizing a Tubi trademark, logo URL or product name without Tubi's express written consent

    vi.    access the Tubi Services, including without limitation Content, or any portion thereof, for any commercial purpose or for the benefit of any third party or in any manner not permitted by these Terms of Use;

vii.    deciphers, decompiles, disassembles or reverse engineers any of the software used to provide the Tubi Services;

viii.    interferes with the access of any user, host or network, including, without limitation, by sending a virus, overloading, flooding, spamming, or mail-bombing the Tubi Services;

ix.    introduces viruses or any other computer code, files, or programs that interrupt, destroy, or limit the functionality of any computer software or hardware or telecommunications equipment;

x.    damages, disables, overburdens, impairs, or gains unauthorized access to the Tubi Services, including Tubi's servers, computer network, or user accounts;

xi.    removes, modifies, disables, blocks, obscures or otherwise impairs any advertising in connection with the Tubi Services (including the Content);

xii.    uses the Tubi Services to advertise or promote services that are not expressly approved in advance in writing by Tubi;

xiii.    probe, scan or test the vulnerability of any Tubi system or network or breach any security or authentication measures;

xiv.    collects or stores personally identifiable information from Tubi Services without Tubi's authorization;

xv.    violates, or encourages conduct that would violate, any applicable law or regulation, constitute a criminal offense or give rise to civil liability;

xvi.    violates these Terms of Use or any guidelines or policies posted by Tubi;

xvii.    interferes with any other party's use and enjoyment of the Tubi Services; or

xviii.    encourages or enables any other individual to do any of the foregoing or attempts to do any of the foregoing.

We have the right to investigate violations of these Terms of Use or conduct or activity that may affect the Tubi Services. We may also consult and cooperate with law enforcement authorities to prosecute users who violate the law.

If Tubi determines in its sole discretion that you are violating any of these Terms of Use, we may (i) notify you, (ii) use technical measures to block or restrict your access or use of the Tubi Services, (iii) suspend or terminate your Account or access to the Tubi Services and Content, and/or (iv) use any other available legal or equitable remedy. In either case, you agree to immediately stop accessing or using in any way (or attempting to access or use) the Tubi Services and Content, and you agree not to circumvent, avoid, or bypass such restrictions, or otherwise restore or attempt to restore such access or use.

j.    **No Spam/Unsolicited Communications**. We know how annoying and upsetting it can be to receive unwanted email or instant messages from people you do not know. Therefore, no one may use the Tubi Services to provide personal information or otherwise collect information about users for the purpose of sending, or to facilitate or encourage the sending of, unsolicited bulk or other communications. You understand that we may take any technical remedies to prevent spam or unsolicited bulk or other communications from entering, utilizing, or remaining within our computer or communications networks. If you Post (as defined below in Section 4) or otherwise send spam, advertising, or other unsolicited communications of any kind through the Tubi Services, you acknowledge that you will have caused substantial harm to Tubi and that the amount of such harm would be extremely difficult to measure. As a reasonable

estimation of such harm, you agree to pay Tubi $50 for each such unsolicited communication you send through the Tubi Services.

k.    **Downloads**. In order to participate in certain Tubi Services or access certain Content, you may be notified that it is necessary to download software or other materials or agree to additional terms and conditions. Unless otherwise provided by these additional terms and conditions, they are hereby incorporated into these Terms of Use.

l.    **Suspension/Discontinuation**. We hope not to, but we may change, suspend, or discontinue - temporarily or permanently - some or all of the Tubi Services (including the Content and the devices through which the Tubi Services are accessed), with respect to any or all users, at any time without notice. You acknowledge that Tubi may do so in Tubi's sole discretion. You also agree that Tubi will not be liable to you for any modification, suspension, or discontinuance of the Tubi Services.

m.    **Internet Access Charges**. You are responsible for any costs you incur to access the internet.

n.    **Customer Service; Availability**. If we can be of help to you, please do not hesitate to contact our customer service department by visiting our customer service web page on tubitv.com. You acknowledge that from time to time the Tubi Services may be inaccessible or inoperable for any reason, including, without limitation: (i) equipment malfunctions; (ii) periodic maintenance procedures or repairs which Tubi may undertake from time to time; or (iii) causes beyond the control of Tubi or which are not reasonably foreseeable by Tubi.

**3. PRIVACY POLICY**. Use of the Tubi Services is also governed by the Tubi Privacy Policy available at https://www.tubitv.com/static/privacy, which is incorporated into and is a part of these Terms of Use by this reference. You acknowledge and agree that your access or use of Tubi Services or Content is also subject to our Privacy Policy.

**4. USER MATERIAL**. Any licenses you have previously granted to Tubi and/or Tubi's users to the reviews, comments, or other materials (collectively, "**User Material**") you may have published, transmitted, submitted, or posted (collectively, "**Post**") to Tubi Services continue under these Terms of Use. Further, any representations and warranties that you own the User Material or otherwise have the right to grant the license to your User Materials that you hereby grant to Tubi, and that the Posting of your User Material does not violate any right of any party, including privacy rights, publicity rights, and intellectual property rights, continue to be valid and have full effect. In addition, you agree to pay for all royalties, fees, and other payments owed to any party by reason of your Posting User Material. Tubi continues to disclaim any guarantees of confidentiality with respect to any User Material.

**Third Party Posts**. You agree to waive any legal or equitable rights or remedies you may have against Tubi with respect to User Material provided by other users. You acknowledge that Posts are public and Tubi cannot guarantee the accuracy or security of any information provided through such Posts; you access and make such disclosures at your own risk. Tubi is not responsible for the content or accuracy of any information contained in a Post, and shall not be responsible for any decisions made based on such information. Tubi prohibits disclosing any inappropriate content or information, personal or sensitive information on or through the Tubi Services.

**5. LINKED DESTINATIONS AND ADVERTISING**.

**Third Party Destinations**. The Tubi Services (including the Apps) may contain links to third-party websites or resources, or destinations. You will not infer or assume that Tubi endorses, operates, controls, is responsible for or is connected with these or other third-party websites, resources or destinations, even if they link to Tubi Services and even if such websites, resources, or destinations are operated by a person (including legal entity) affiliated or otherwise connected with Tubi. We provide these links only as a convenience and are not responsible for the content, products or services on or available from those websites, resources, and destinations or links displayed on such websites. You acknowledge sole responsibility for and assume all risk arising from, your use of any third-party websites, resources, and destinations, and release Tubi from any responsibility and liability to you for any content or other materials hosted and served from any such websites, resources, or destination. These Terms of Use

do not govern your use of any other websites, resources, or destinations.

**Advertisements**. Tubi is not responsible for advertisements or any third party material posted on any of the Tubi Services, nor is Tubi responsible for the products or services provided by advertisers. Any dealings you have with advertisers found while using the Tubi Services are between you and the advertiser, and you agree that Tubi is not liable for any loss or claim that you may have against an advertiser.

**6. TRADEMARKS**. Tubi, the Tubi logo, www.tubi.tv, www.tubitv.com, and other Tubi marks, graphics, logos, scripts, and sounds are trademarks, registered or otherwise, and trade dress of Tubi, Inc.. You may not copy, download or exploit any of the Tubi trademarks.

**7. FEEDBACK**. It is Tubi's policy not to accept unsolicited submissions, including scripts, story lines, articles, fan fiction, characters, drawings, information, suggestions, ideas, or concepts ("**Unsolicited Submissions**"). Tubi's policy is to delete any such submission without reading it. Therefore, any similarity between an Unsolicited Submission and any elements in any Tubi creative work, including a film, series, story, title, or concept, would be purely coincidental. We welcome feedback, comments and suggestions for improvements to the Tubi Services ("**Feedback**"). You can submit Feedback by emailing us at feedback@tubi.tv (subject line: "Feedback"). You grant to us a non-exclusive, worldwide, perpetual, irrevocable, fully-paid, royalty-free, sublicensable and transferable license under any and all intellectual property rights that you own or control to use, copy, modify, create derivative works based upon and otherwise exploit the Feedback for any purpose.

**8. DISCLAIMER OF WARRANTIES, LIMITATION OF LIABILITY, AND INDEMNITY**

THE TUBI SERVICES AND CONTENT ARE PROVIDED "AS-IS" AND "AS AVAILABLE." TUBI DOES NOT GUARANTEE OR PROMISE ANY SPECIFIC RESULTS FROM USE OF OR CONTINUOUS AVAILABILITY OF THE TUBI SERVICES OR CONTENT. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, TUBI EXPRESSLY DISCLAIMS ANY WARRANTIES AND CONDITIONS OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT, AND WARRANTIES IMPLIED FOR A COURSE OF PERFORMANCE OR COURSE OF DEALING. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, TUBI MAKES NO WARRANTY THAT YOUR USE OF THE TUBI SERVICES OR CONTENT WILL BE UNINTERRUPTED, TIMELY, SECURE OR ERROR-FREE, THAT DEFECTS TO THE TUBI SERVICES OR CONTENT WILL BE CORRECTED, THAT THE TUBI SERVICES, CONTENT OR THE SERVERS ON WHICH THEY ARE AVAILABLE WILL BE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS, OR THAT ANY INFORMATION OBTAINED BY YOU ON, THROUGH OR IN CONNECTION WITH THE TUBI SERVICES OR THIRD PARTY SERVICES (INCLUDING, BUT NOT LIMITED TO, THROUGH USER CONTENT OR THIRD PARTY ADVERTISEMENTS) WILL BE ACCURATE, RELIABLE, TIMELY OR COMPLETE. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, TUBI WILL NOT BE RESPONSIBLE FOR ANY LOSS OR DAMAGE (INCLUDING BUT NOT LIMITED TO LOSS OF DATA, PROPERTY DAMAGE, PERSONAL INJURY OR DEATH) RESULTING FROM USE OF THE TUBI SERVICES, CONTENT, PROBLEMS OR TECHNICAL MALFUNCTION IN CONNECTION WITH USE OF THE TUBI SERVICES, CONTENT, ATTENDANCE AT A TUBI EVENT, ANY MATERIAL DOWNLOADED OR OTHERWISE OBTAINED IN CONNECTION WITH THE TUBI SERVICES OR CONTENT, ANY USER CONTENT, ANY THIRD PARTY ADVERTISEMENT OR THIRD PARTY SERVICE TRANSMITTED ON, THROUGH OR IN CONNECTION WITH THE TUBI SERVICES, OR THE CONDUCT OF ANY USERS OF THE TUBI SERVICES OR CONTENT, WHETHER ONLINE OR OFFLINE. YOUR USE OF POSTS, THIRD PARTY ADVERTISEMENTS, THIRD PARTY SERVICES, AND THE GOODS OR SERVICES PROVIDED BY ANY THIRD PARTIES IS SOLELY YOUR RESPONSIBILITY AND AT YOUR OWN RISK.

YOU ACKNOWLEDGE AND AGREE THAT YOUR USE OF THE TUBI SERVICES AND CONTENT, AND ANY INFORMATION TRANSMITTED OR RECEIVED IN CONNECTION THEREWITH, MAY NOT BE SECURE AND MAY BE INTERCEPTED BY UNAUTHORIZED PARTIES. YOU ASSUME RESPONSIBILITY, TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW, FOR THE ENTIRE COST OF ANY MAINTENANCE, REPAIR OR CORRECTION TO YOUR COMPUTER SYSTEM OR OTHER PROPERTY OR RECOVERY OR RECONSTRUCTION OF LOST DATA NECESSITATED BY YOUR USE OF THE TUBI SERVICES.

**LIMITATION OF LIABILITY**

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, TUBI'S LIABILITY TO YOU FOR ANY CAUSE WHATSOEVER AND REGARDLESS OF THE FORM OF THE ACTION, WILL AT ALL TIMES BE LIMITED TO THE AMOUNT PAID, IF ANY, BY YOU TO TUBI FOR THE TUBI SERVICES AND CONTENT DURING THE TERM OF YOUR USE OF THE TUBI SERVICES. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, TUBI WILL NOT BE LIABLE TO YOU OR ANY THIRD PARTY FOR ANY DAMAGES OTHER THAN THE AMOUNT PAID, IF ANY, BY YOU TO TUBI FOR THE TUBI SERVICES DURING THE TERM OF YOUR USE OF THE TUBI SERVICES, INCLUDING ANY OTHER GENERAL, DIRECT, INDIRECT, COMPENSATORY, CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, SPECIAL OR PUNITIVE DAMAGES, AND INCLUDING, WITHOUT LIMITATION, LOST PROFIT DAMAGES ARISING FROM YOUR USE OF OR INABILITY TO ACCESS OR USE THE TUBI SERVICES OR CONTENT.

YOU ACKNOWLEDGE AND AGREE THAT ANY DAMAGES YOU INCUR ARISING OUT OF TUBI'S ACTS OR OMISSIONS OR YOUR USE OF TUBI SERVICES OR CONTENT ARE NOT IRREPARABLE AND ARE INSUFFICIENT TO ENTITLE YOU TO AN INJUNCTION OR OTHER EQUITABLE RELIEF RESTRICTING THE AVAILABILITY OF OR ANY PERSON'S ABILITY TO ACCESS OR USE ANY PORTION OF THE TUBI SERVICES OR CONTENT.

THE LIMITATIONS IN THIS SECTION APPLY WHETHER THE ALLEGED LIABILITY IS BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR ANY OTHER BASIS, EVEN IF TUBI HAS BEEN ADVISED OF THE POSSIBILITY OF ANY SUCH DAMAGES.

**INDEMNITY**

YOU AGREE TO INDEMNIFY AND HOLD TUBI, ITS AFFILIATES, STATIONS AFFILIATED WITH TUBI, PRODUCERS OF CONTENT, EACH ADVERTISER, SPONSOR AND THEIR ADVERTISING AGENCIES, SUBCONTRACTORS AND OTHER PARTNERS, AND THEIR RESPECTIVE OFFICERS, AGENTS, PARTNERS AND EMPLOYEES, HARMLESS FROM ANY LOSS, LIABILITY, CLAIM, OR DEMAND, INCLUDING, BUT NOT LIMITED TO, REASONABLE ATTORNEYS' FEES, MADE BY ANY THIRD PARTY DUE TO OR ARISING OUT OF OR IN CONNECTION WITH YOUR USE OR MISUSE OF THE CONTENT OR THE TUBI SERVICES (INCLUDING, WITHOUT, LIMITATION, ANY USE OF YOUR ACCOUNT, WHETHER OR NOT AUTHORIZED BY YOU), YOUR BREACH OF THESE TERMS OF USE, YOUR VIOLATION OF ANY RIGHTS OF ANOTHER, OR ANY CONTENT THAT YOU TRANSMIT THROUGH THE TUBI SERVICES.

**9. NOTICE AND PROCEDURE FOR CLAIMS OF COPYRIGHT INFRINGEMENT**. We respect copyright law and expect our users to do the same. It is our policy to terminate in appropriate circumstances subscribers or account holders who have been adjudicated as repeat infringers on Tubi Services. We accept proper notifications of claimed copyright infringements that comply with the appropriate subsection of 17 U.S.C. § 512 regarding material or information location tools residing on our Tubi Services. Please direct notifications of claimed copyright infringements to Tubi's copyright agent by completing the form at www.tubitv.com/static/support and selecting "Content" from the list of available topics. You may also contact us by mail at:

Attention: Copyright Agent
Tubi, Inc.
315 Montgomery St, 16th Floor
San Francisco, CA 94104

**10. ARBITRATION AGREEMENT AND CLASS ACTION WAIVER**

(1) Tubi, including its Affiliates, agents, employees, predecessors in interest, successors, and assigns, and you agree that any Dispute (as defined herein) between you and Tubi, regarding any aspect of your relationship with Tubi, will be resolved in a binding, confidential, individual and fair arbitration process, and not in court. **Each of you and Tubi agrees to give up the right to sue in court**. The terms of this Section 10 are referred to in these Terms of Use as the "**Arbitration Agreement**".

(2) The term "**Dispute**" is to be given the broadest possible meaning that will be enforced, and shall include any dispute,

claim, demand, count, cause of action, or controversy between you and Tubi, whether based in contract, statute, regulation, ordinance, tort (including, but not limited to, fraud, misrepresentation, fraudulent inducement, negligence, or any other intentional tort), or any other legal or equitable theory. The term "Dispute" specifically includes, but is not limited to, any disputes, actions, claims, or controversies between you and the Tubi that arise from or in any way relate to or concern any Content, products or services provided by Tubi including but not limited to the Tubi Services (as defined above), this Arbitration Agreement, any other aspect of these Terms of Use (including their applicability and their conformance to applicable law), any billing disputes, and any disputes relating to telephonic, text message, or any other communications either of us received from the other. The only exceptions to this Arbitration Agreement are that (i) each of you and Tubi retains the right to sue in small claims court and (ii) each of you and Tubi may bring suit in court against the other to enjoin infringement or other misuse of intellectual property rights. Disputes over whether these exceptions apply shall be resolved by the court in which such action has been brought; all other disputes over arbitrability shall be resolved by the arbitrator.

**(3) Each of you and Tubi also agrees to give up the ability to seek to represent, in a class action or otherwise, anyone but each of you and Tubi** (see paragraph 9 below).

(4) There is no judge or jury in arbitration, and court review of an arbitration award is limited. An arbitrator must follow this Arbitration Agreement. The arbitrator, however, can award on an individual basis the same damages and relief as a court (including injunctive and declaratory relief, or statutory damages); provided that they are recoverable under these Terms of Use.

(5) These Terms of Use evidence a transaction in interstate commerce, and thus the Federal Arbitration Act, 9 U.S.C. §§ 1-16, governs the interpretation and enforcement of this Arbitration Agreement. This Arbitration Agreement shall survive termination of the Terms of Use.

(6) Any arbitration between you and Tubi will be conducted by the Judicial Arbitration and Mediation Services, Inc. ("**JAMS**"), pursuant to the JAMS Streamlined Arbitration Rules & Procedures effective July 1, 2014 (the "**JAMS Rules**"), as modified by this agreement to arbitrate. The arbitration shall be conducted by a single, neutral arbitrator, and if you and Tubi cannot agree on who that single arbitrator will be, the arbitrator will be appointed pursuant to the JAMS Rules, with the participation and involvement of Tubi and you pursuant to JAMS Rule 12. The JAMS Rules are available on its website at http://www.jamsadr.com/rules-streamlined-arbitration/. The Consumer Arbitration Minimum Standards are available at https://www.jamsadr.com/consumer-minimum-standards/. The arbitrator is bound by these Terms of Use.

(7) If either you or Tubi wish to arbitrate a claim, you or Tubi must first send by mail to the other a written Notice of Dispute ("**Notice**") that sets forth the name, address, and contact information of the party giving notice, the specific facts giving rise to the Dispute, the Tubi Service to which the Notice relates, and the relief requested. Your Notice to the Tubi must be sent by mail to: Arbitration Notice of Dispute, 2121 Avenue of the Stars, 7th Floor, Los Angeles, California, 90067. Tubi will send any Notice to you at the contact information we have for you or that you provide. It is the sender's responsibility to ensure that the recipient receives the Notice. During the first 45 days after you or we send a Notice to the other, you and we may try to reach a settlement of the Dispute.

(8) If you and we do not resolve the Dispute within 45 days, either you or we may initiate arbitration in accordance with the JAMS Rules. Further instructions on submitting a Demand for Arbitration may be found at http://www.jamsadr.com/files/Uploads/Documents/JAMS_Arbitration_Demand.pdf. In addition to filing this Demand for Arbitration with JAMS in accordance with its rules and procedures, you must send a copy of this completed Demand for Arbitration to the Tubi at the address listed above to which you sent your Notice of Dispute.

(9) You and the Tubi acknowledge and agree to abide by the following rules for arbitration:

(a) YOU AND TUBI MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, REPRESENTATIVE OR MULTI-CLAIMANT PROCEEDING, AND THE ARBITRATOR SHALL HAVE NO POWER TO AWARD

CLASS-WIDE RELIEF; (b) Tubi will pay arbitration costs as required by the JAMS Consumer Arbitration Minimum Standards and consistent with paragraph 10 below; (c) the arbitrator may award any individual relief or individual remedies that are permitted by applicable law and these Terms of Use; and (d) each side pays his, her or its own attorneys' fees, except as otherwise provided in paragraph 10 below.

(10) JAMS charges filing and other fees to conduct arbitrations. Ordinarily, the claimant has to pay the filing fee to initiate arbitration, but if you wish to commence an arbitration against Tubi, you and the Tubi acknowledge and agree to abide by the following:

a.  If you are seeking to recover less than $10,000 (inclusive of attorneys' fees), Tubi will pay the filing fee on your behalf or reimburse your payment of it.

b.  If you are seeking to recover $10,000 or more, you will have to pay the filing fee charged by JAMS, but Tubi will reimburse the filing fee if you prevail on all claims decided upon by the arbitrator.

c.  Tubi and you agree that, if the claims to be arbitrated total less than $10,000 (inclusive of attorneys' fees), the claim ordinarily should be decided on written submissions only, without a telephonic or in-person hearing. Tubi will not request a hearing for any claims totaling less than $10,000. This provision shall not be construed by the arbitrator to deprive you of any rights you may have to a telephonic or in-person hearing in your hometown area pursuant to the JAMS Rules.

d.  Tubi and you agree that, if the claims to be arbitrated total $10,000 or more, the arbitration will occur in a manner and place consistent with the JAMS Rules.

(11) Regardless of how the arbitration proceeds, each of you and Tubi shall cooperate in good faith in the exchange of non-privileged documents and information as necessary in accordance with the JAMS Rules, and the arbitrator shall issue a reasoned written decision sufficient to explain his or her findings and conclusions.

(12) Each of you and Tubi may incur attorneys' fees during the arbitration. Each side agrees to pay his, her or its own attorneys' fees unless the claim(s) at issue permit the prevailing party to be paid its attorneys' fees, and in such instance, the fees awarded shall be determined by the applicable law(s). In addition to whatever rights you may have to recover your attorneys' fees under applicable law, if you prevail in the arbitration, and if Tubi failed to make a settlement offer to you before the arbitration or the amount you win is at least 25% greater than Tubi's highest settlement offer, then Tubi will pay your reasonable attorneys' fees in addition to the amount the arbitrator awarded. If Tubi wins the arbitration, you will be responsible for your own attorneys' fees. In addition, if the arbitrator, at the request of the winning party, finds that the losing party brought a claim or asserted a defense frivolously or for an improper purpose, then regardless of the amount in dispute, the arbitrator must order the losing party to pay both sides' arbitration fees and may order the losing party to pay the winning party's reasonable attorneys' fees, unless such an award of fees is prohibited by applicable law.

(13) The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief, only to the extent necessary to provide relief warranted by that party's individual claim, only as permitted by applicable law, and only to the extent that declaratory and injunctive relief are permitted by these Terms of Use. The arbitrator shall have no authority to award punitive, exemplary, multiplied or consequential damages or any other relief not allowed under this Arbitration Agreement. The arbitrator also may not order Tubi to pay any monies to or take any actions with respect to persons other than you, unless Tubi explicitly consents in advance, after an arbitrator is selected, to permit the arbitrator to enter such an order. Further, unless Tubi expressly agrees, the arbitrator may not consolidate other persons' claims with yours, and may not otherwise preside over any form of a representative, multi-claimant or class proceeding.

(14) You and Tubi agree to maintain the confidential nature of the arbitration proceeding and shall not disclose the fact of the arbitration, any documents exchanged as part of any mediation, proceedings of the arbitration, the arbitrator's decision and the existence or amount of any award, except as may be necessary to prepare for or conduct the arbitration (in which case anyone becoming privy to confidential information must undertake to preserve its confidentiality), or except as may be necessary in

connection with a court application for a provisional remedy, a judicial challenge to an award or its enforcement, an order confirming the award, or unless otherwise required by law or court order. In keeping with the confidential nature of the arbitration, You and Tubi agree that an order confirming award is only necessary if the obligations of the award have not been performed. Therefore, before taking any steps to confirm the arbitration award, the party seeking confirmation of the award must give the other party notice of its intention to confirm the award. If the party who would be the respondent in any such confirmation proceeding performs its obligation under the terms of the arbitration award within 15 business days of such notice, the party who gave notice of its intent to confirm the award shall not seek to confirm or otherwise enforce the award.

(15) With the exception of subpart (a) in paragraph (9) (i.e., the waiver of the ability to proceed on behalf of multiple claimants or a purported class), if any part of this Arbitration Agreement is deemed invalid, unenforceable, or illegal, then the balance of this Arbitration Agreement shall remain in effect and be construed in accordance with its terms as if the invalid, unenforceable, or illegal provision were not contained. If, however, subpart (a) in paragraph (9) is found invalid, unenforceable or illegal, then the entirety of this Arbitration Agreement shall be null and void, but the rest of these Terms of Use, including the provisions governing where actions against Tubi must be pursued, the choice of governing law, and our mutual waiver of the right to a trial by jury, will remain in effect and apply to any claim that, for this or any other reason, proceeds in court rather than in arbitration.

**11. TERMINATION**. We may terminate your access to and use of the Tubi Services, at our sole discretion, at any time and without notice to you. Without limiting the forgoing, we may, at our sole discretion, without notice to you, terminate or restrict your Account or your use of the Tubi Services, including the Content, or any portion thereof, at any time, without liability, if Tubi determines in its sole discretion that you have breached these Terms of Use, violated any law, rule, or regulation, engaged in other inappropriate conduct, place an undue burden on our networks or servers or for any other business reason or no reason. We may further use technology to limit activities, such as the number of calls to the Tubi servers being made, and you agree to respect these limitations and not take any steps to circumvent, avoid, or bypass them.

You may cancel your Account via the functionality provided in Tubi Services.

Upon any termination, discontinuation or cancellation of the Tubi Services or your Account, the following Sections will survive 2(b)(ii), 2(f)(ii), 2(g), 2(h), 6, 8, 10, 11, and 12.

**12. GENERAL INFORMATION**

**Export Controls**. Software and the transmission of applicable technical data, if any, in connection with the Tubi Services are subject to export controls. You agree to comply with all applicable laws regarding software and the transmission of technical data exported from the United States or the country in which you reside.

**Choice of Law and Forum**.

These Terms of Use are governed by, and construed in accordance with, the laws of the State of Delaware, without regard to its conflict of law provisions.

Except with respect to Disputes to be resolved through an arbitration process in accordance with the Arbitration Agreement contained above, you and Tubi agree to submit to the exclusive jurisdiction of the courts located in Delaware to resolve any Dispute arising out of the Agreement or the Tubi Services. YOU HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT YOU MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION (INCLUDING, BUT NOT LIMITED TO, ANY CLAIMS, COUNTERCLAIMS, CROSS-CLAIMS, OR THIRD PARTY CLAIMS) ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT.

YOU AGREE THAT ANY CAUSE OF ACTION YOU MAY HAVE ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE TUBI SERVICES, OR CONTENT MUST BE COMMENCED WITHIN ONE (1) YEAR AFTER SUCH CAUSE OF ACTION ACCRUES. AFTER SUCH PERIOD, SUCH CAUSE OF ACTION SHALL BE PERMANENTLY BARRED.

**No Waiver/Reliance**. If you see other parties violating these Terms of Use, you may let us know at feedback@tubi.tv (subject line: "TOU Violation"). You may not rely upon Tubi's response with respect to one party or one situation as any indication of what Tubi might do with respect to another party or another situation, even if the parties or situations appear to you to be similar. Similarly, if we fail to act in response to a violation of these Terms of Use, you should not assume that we do not object to the violation or even that we are aware of it. In addition, you may not construe a waiver of any provision of these Terms of Use with respect to any party as a waiver of that provision (or any other provision) with respect to either that party or any other party. Further, Tubi's decision to delay exercising or enforcing any right or remedy under these Terms of Use will not constitute a waiver of such right or remedy. Even if Tubi acts in a way that appears to you to be inconsistent with these Terms of Use, Tubi's action will not be deemed a waiver or constructive amendment of these Terms of Use. Tubi's failure to enforce any right or provision of these Terms of Use will not be considered a waiver of such right or provision. The waiver of any such right or provision will be effective only if in writing and signed by a duly authorized representative of Tubi. Except as expressly set forth in these Terms of Use, the exercise by either party of any of its remedies under these Terms of Use will be without prejudice to its other remedies under these Terms of Use or otherwise.

**Integration, Amendment, and Severability**. Please note that these Terms of Use, including any end user license agreement that might accompany Tubi authorized applications, features and devices, constitute the entire legal agreement between you and Tubi and govern your use of the Tubi Services (including your use of the Content) (but excludes any services, if any, that Tubi may provide to you under a separate signed written agreement), and completely replace any prior oral or written understandings or agreements between you and Tubi in relation to the Tubi Services, including Content. Except as set forth in Section 1 above, these Terms of Use may not be amended or varied except in a writing signed by Tubi. Although we understand that electronic or digital signatures are frequently viewed as the equivalent of traditional written signatures these days, for these purposes, a signature or "signed" writing or written agreement may not include an electronic or digital signature. These Terms of Use operate to the fullest extent permissible by law. If any provision of these Terms of Use is held to be unlawful, void, or unenforceable, you and we agree that the provision will be enforced to the maximum extent permissible and the other provisions of these Terms of Use will remain in full force and effect.

**Assignment**. You may not assign or transfer these Terms of Use, by operation of law or otherwise, without Tubi's prior written consent. Any attempt by you to assign or transfer these Terms of Use, without such consent, will be null. Tubi may freely assign or transfer these Terms of Use without restriction. Subject to the foregoing, these Terms of Use will bind and inure to the benefit of the parties, their successors and permitted assigns

**Notices**. Any notices or other communications provided by Tubi under these Terms of Use, including those regarding modifications to these Terms of Use, will be given: (i) via email; or (ii) by posting to the Services. For notices made by e-mail, the date of receipt will be deemed the date on which such notice is transmitted.

**Contact**. If you have any questions about these Terms of Use, please submit your questions at www.tubitv.com/static/support and select "Terms of Use & Privacy Policy" from the list of available topics. If you have general questions about Tubi or how to use it, please visit our Help Center at https://tubitv.com/help-center/.

# **EXHIBIT 16**

| | |
|---|---|
| **From:** | Fox, Brandon |
| **Sent:** | Friday, April 19, 2024 7:15 AM |
| **To:** | MLevington@jamsadr.com |
| **Cc:** | wdp@kellerpostman.com; Unikowsky, Adam G.; Kastanek, Andrianna D.; Ward, John F.; Salas, Manuel A. |
| **Subject:** | Purported mass arbitration against Tubi Inc. |

Mr. Levington,

We represent Tubi Inc. in the purported mass arbitration filed by Keller Postman against my client.  We ask that JAMS refrain from initiating any arbitration proceedings or issuing any invoices to Tubi for filing and/or case management fees for three reasons.

First, the claims appear to be a rushed effort to force Tubi into settlement on non-meritorious claims based on JAMS's current policy regarding mass arbitrations.  In rushing to file, Keller Postman caused their purported clients to breach the Terms of Use that calls for notice and a 45-day informal resolution process.  The claims themselves acknowledge that Keller Postman and the users were aware of these provisions, yet they breached them anyway.  The arbitration agreement in the May 2022 Terms of Use expressly notes that the purpose of that period is to allow the parties sufficient time to resolve any dispute before incurring the costs of filing any claims.  The attempt to sidestep these provisions threatens to fundamentally deprive the parties of their important rights.  Tubi disputes that JAMS has jurisdiction because the purported claimants breached the notice and informal dispute provisions, which were conditions precedent to filing a demand for arbitration.

Second, we understand that JAMS is updating its policy in short order and we believe that Tubi and the purported claimants should have an opportunity to see those policies to determine the changes and whether they apply to this attempt at a mass arbitration.  To the extent they implicate fees and the administration of mass arbitrations, these are material revisions even if JAMS were to believe it has jurisdiction of the claims. Putting aside the deficiencies noted above, this is relevant to the would-be claimants, too, each of whom under the current rules and the May 2022 TOU are obligated to pay the JAMS filing fee of $250 to initiate any arbitration.

Third, the claims are frivolous on their face and are no more than an attempt to try to force Tubi to pay highly unreasonable settlements in the face of exorbitant arbitration fees.  For example, in our sampling of the claims, which allege discrimination under the Unruh Act based on Tubi's alleged targeted advertising, not one states that a user did or did not receive a specific targeted ad or that they did or did not take advantage of a business opportunity as a result of receiving or not receiving an ad.  It is therefore not even close to the only case the claims cite asserting that companies that target consumers with advertising based on their age, sex, or gender violate the Unruh Act.  In *Liapes*, there was a specific advertisement for life insurance that the user said she did not receive.  She alleged that, as a result, she was not able to take advantage of that specific opportunity.  The claims we have sampled are identical to each other and do not allege anything close to sufficient to violate the Unruh Act.

We appreciate your attention to this email.  Please provide any service in this case to the following individuals:

Brandon Fox (bfox@jenner.com)

Adam Unikowsky (aunikowsky@jenner.com)

Andrianna Kastanek (akastanek@jenner.com)

John Ward (jward@jenner.com)

Manu Salas (msalas@jenner.com)


Thank you.

Brandon Fox

# **EXHIBIT 17**

515 SOUTH FLOWER STREET, SUITE 3300 LOS ANGELES, CA 90071-2246

# JENNER&BLOCK LLP

Brandon Fox
Tel: 213-239-5101
BFox@jenner.com

April 25, 2024

Warren Postman, Esq.
Keller Postman LLC
1101 Connecticut Avenue, N.W., Suite 1100
Washington, D.C. 20036

   Re: *Tubi Inc.*

Dear Mr. Postman,

  As you know, I represent Tubi Inc. in the purported mass arbitration your law firm has filed against it. I am aware that your response to JAMS to my April 19, 2024 email is due tomorrow. I am writing to express concern that, based on our preliminary sampling of your arbitration demands, you have not complied with your ethical obligation to verify the factual representations in each of your client's claims before bringing the actions.

  Specifically, our preliminary analysis suggests that at least 40% of the claimants did not watch any content on Tubi using any registered account during the period in question. Our preliminary analysis shows this occurred for various reasons, including that:

- More than 30% have never been registered users based on the email addresses you provided to JAMS, meaning that none of those claimants provided personal information to Tubi as alleged in the demands.
- Approximately 7% have never watched any content even though they have registered accounts.
- Approximately 5% have watched content but not during the statute of limitations period.

  If an individual did not register for Tubi, or registered for Tubi but did not watch any content, the factual representations in that individual's arbitration demand would be false. For example, it would *not* be the case that "Claimant watched multiple advertisements that Tubi interspersed throughout the videos Claimant was streaming," which is the factual premise of that Claimant's Unruh Act claim. As a result, the claims would be frivolous—and indeed fraudulent.

  You are ethically obligated to ensure that the statements in each of your clients' arbitration demands is factually accurate. Based on this preliminary assessment, it appears you have not done so. I note that your solicitation did not ask whether any of the claimants ever watched Tubi content using their accounts, whether they ever watched a commercial, or when they first or last watched any Tubi content. It also appears that a significant number of claimants registered their accounts

April 25, 2024
Page 2

only after your solicitation, and for the sole purpose of filing their demands for arbitration. Unless you made additional efforts following the solicitation to vet your clients' claims, you would not have had access to the information needed to ensure that the assertions in your arbitration demands are accurate and not fraudulent.

Please explain what steps you have taken to ensure the accuracy of the factual representations in your arbitration demands. If you have not adequately vetted the accuracy of those statements, you are ethically obligated to withdraw the demands.

I also note that these issues would have come to light had the claimants gone through the required notice and informal dispute process called for by the Terms of Use that were in place from May 2022 to April 2024. Instead, you have unilaterally caused your clients to breach these terms, while failing to adequately vet their claims.

Nothing in this letter is intended to waive any argument regarding other ethical violations your firm may have committed in connection with your arbitration demands or any other argument. Tubi reserves all rights.

Sincerely,

Brandon Fox

# **EXHIBIT 18**

# Keller | Postman

April 26, 2024

Matthew Levington
Arbitration Practice Manager – West
JAMS, Inc.
MLevington@jams.adr

      **Re:**    **Claimants v. Tubi, Inc. - JAMS Ref. 1601003760**

Mr. Levington:

This letter responds to Tubi's email of April 19, 2024.  Tubi's email is long on bluster—baselessly impugning the motives of Claimants' counsel and conclusorily stating that Claimants' claims are "frivolous"—but fails to offer any legal basis to support Tubi's attempts to delay and obstruct Claimants from proceeding with the arbitrations to which they are entitled.

Claimants filed their individual arbitration demands against Tubi pursuant to the parties' arbitration agreement, including the delegation agreement contained therein.  Each Claimant has met the filing requirements necessary to commence the arbitration.  Accordingly, JAMS should proceed without delay to administer each such arbitration.  California law plainly states that JAMS "shall immediately provide an invoice for any fees and costs required before the arbitration can proceed."  Cal. Code Civ. Proc. § 1281.97(a)(2).

None of Tubi's arguments for delay has any legal support.

**First**, Tubi points to a pre-arbitration notice provision in the parties' arbitration agreement, asserting that it "calls for . . . a 45-day informal resolution process . . . to allow the parties sufficient time to resolve any dispute" before arbitrating them—and arguing that compliance with that "informal resolution process" is a condition precedent for each Claimant's arbitration.

That argument both misreads the parties' arbitration agreement and ignores the parties' delegation agreement.

As each Claimant explained in the arbitration demand, the pre-arbitration notice provision that Tubi cites is illusory, unconscionable, and therefore unenforceable.  While it purports to require each Claimant to give Tubi written notice of a dispute and to wait for 45 days before initiating an arbitration, it imposes no obligation on Tubi to do anything during that 45-day wait period.  Tubi asserts that the purpose of this 45-day wait period is to "allow the parties sufficient time to resolve any dispute"—but the provision does not reflect that purpose.  It is clear that, while Tubi "may try to reach a settlement" during that time, it need not do so.  This 45-day wait period therefore serves no purpose other than delay, is illusory, and is unconscionable.

Tubi's own response confirms that it is only seeking delay.  Claimants noted in their arbitration demands that they are willing to participate in good faith in a mediation session.  But Tubi ignored that good-faith proposal and instead attempted to smear Claimants' claims as frivolous.

Keller | Postman

That approach only verifies that, while Tubi wants Claimants' claims delayed an additional 45 days, it clearly has no desire to actually resolve these claims (which it supposedly believes are frivolous).

Even absent a delegation agreement, "courts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration." *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 34 (2014); *see also Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) ("[I]ssues of procedural arbitrability, *i.e.*, whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide."); *Pacelli v. Augustus Intel., Inc.*, 459 F. Supp. 3d 597, 610–12 (S.D.N.Y. 2020) (collecting cases holding that disputes over various conditions precedent to arbitration are for arbitrators to decide).

But in all events, Tubi's claim that Claimants must comply with the 45-day notice provision, as well as Claimants' argument that this provision is unenforceable, are expressly delegated to an arbitrator.  The parties here agreed to arbitrate their disputes pursuant to the *JAMS Streamlined Arbitration Rules & Procedures*, of which Rule 8(b) states:  "Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator."  So the dispute over the "interpretation" of the pre-arbitration notice provision, whether framed as a "[j]urisdictional" dispute or an "arbitrability" dispute, is for an arbitrator to decide.  Moreover, the Tubi arbitration terms further underscore this requirement, stating that, except for two categories not at issue here—i.e., disputes over whether Claimant can file the instant claims in small claims court and over whether either party may bring an injunction action in court to protect intellectual property rights—"all other disputes over arbitrability shall be resolved by the arbitrator."

Thus, Tubi's first objection to proceeding with arbitration is in fact an affirmative reason *to proceed* with arbitration.  The parties should swiftly proceed to arbitrate their disputes over the interpretation, validity, and enforceability of the pre-arbitration notice provision.

**Second**, Tubi states its "understand[ing]" that JAMS is updating its policy in short order," which update may "implicate fees and the administration of mass arbitrations."  Tubi then states that Claimants "should have an opportunity to see those policies," since each Claimant "under the current rules and the May 2022 TOU are obligated to pay the JAMS filing fee of $250 to initiate any arbitration."

As an initial matter, Claimants are not aware of any public announcement that "JAMS is updating its policy in short order" or that such updates may implicate how each Claimant's arbitration against Tubi will proceed.

As for Tubi's stated concern for Claimants and their "obligat[ions] to pay the JAMS filing fee of $250 to initiate any arbitration," Claimants filed their arbitration demands with JAMS with an understanding of the JAMS filing requirements.  Claimants wish to proceed to arbitrate their disputes with Tubi without delay.  And now that Claimants have filed their arbitration demands, California law requires JAMS to "immediately" issue invoices that must be paid before the arbitrations can proceed. Cal. Code Civ. Proc. § 1281.97(a)(2).  Tubi drafted and imposed on Claimants arbitration terms that incorporated the current JAMS rules.  Claimants have met the filing requirements under those rules and are entitled to proceed with the arbitrations Tubi agreed to.  They do not wish to delay their arbitrations because Tubi apparently no longer wants to arbitrate under the rules it imposed on Claimants.  Absent Claimants' consent, Cal. Code Civ. Proc. § 1281.97(a)(2) creates no discretion for JAMS to wait until it makes certain policy updates.

# Keller | Postman

**Third**, Tubi baselessly and conclusorily asserts that Claimants' allegations "are frivolous on their face" and are advanced for improper purposes.  Tubi is hardly the first defendant to claim "I didn't do it."  But it is puzzling why Tubi believes JAMS should refuse to administer an arbitration on this ground.  Tubi can make its losing arguments to arbitrators.  At this stage, there is no rule that a respondent can escape an arbitration agreement simply by asserting that claimants' claims are frivolous.  To the contrary, even "wholly groundless" arguments for arbitrability must be sent to arbitrators to decide.  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019).

*        *        *

JAMS should proceed expeditiously with its administration of Claimants' arbitrations so that arbitrators can address Tubi's arguments.

Sincerely,

Warren D. Postman

# **EXHIBIT 19**





**JAMS Announces Mass Arbitration Procedures and Guidelines**

Procedures designed to facilitate the fair, expeditious and efficient resolution of mass arbitrations

**Irvine, Calif.** – JAMS, the largest private provider of alternative dispute resolution (ADR) services worldwide, is pleased to announce it has created Mass Arbitration Procedures and Guidelines, effective immediately. These procedures are intended to facilitate the fair, expeditious and efficient resolution of mass arbitrations.

Within these procedures, mass arbitration is defined as 75 or more similar demands for arbitration filed against the same party or related parties by individual claimants represented by either the same law firm or law firms acting in coordination.

**JAMS is committed to developing policies, procedures and guidelines that support the clients we serve throughout each step of the arbitration process. We believe that these procedures will support the mass arbitration process and help promote the fair, efficient resolution of cases.**

*- Chris Poole, JAMS CEO*

A key feature of the procedures is the designation of a process administrator from the JAMS panel of neutrals. Because the filing of dozens, hundreds or even thousands of claims may create delays and involve significant fees, the process administrator can work with the parties and serve in a variety of key functions, including hearing and determining preliminary and administrative matters in a mass arbitration, resolving disputes about the interpretation and applicability of the procedures, and determining whether threshold jurisdictional and arbitrability disputes are arbitrable.

> **The introduction of our Mass Arbitration Procedures is another way we are refining our services to meet the evolving needs of our clients. JAMS has taken a thoughtful and measured approach in the development of these procedures, and we are confident that they will serve as an essential resource.**
> *- Liz Carter, JAMS senior vice president of operations*

The procedures were developed to be consistent with the core arbitration values of efficiency and fairness. Unlike other providers, JAMS does not include either mandatory mediation or test cases in these procedures. While mediation is always encouraged, the impetus for these procedures is to enable the Process Administrator to work with the parties to design a reasonable process to support the efficient resolution of the case. The JAMS Mass Arbitration Procedures and Guidelines can be found here.

**About JAMS – *Local Solutions. Global Reach.***

Founded in 1979, JAMS is the largest private provider of alternative dispute resolution services worldwide. JAMS successfully resolves and manages business and legal disputes by providing efficient, cost-effective and impartial ways to overcome barriers at any stage of conflict. JAMS offers customized in-person, virtual and hybrid resolution services locally and globally through a combination of industry-specific experience, first-class client service, the latest technology and highly trained mediators and arbitrators. With a roster of over 400 neutrals and 29 locations, JAMS resolves thousands of the world's important cases every year. JAMS neutrals are adept at managing the resolution process whether they are conducting in-person, virtual or hybrid hearings.

More information is available at www.jamsadr.com, and you can connect with us on LinkedIn, Facebook, X and our JAMS ADR blog. To learn about diversity, equity and inclusion initiatives at JAMS, visit www.jamsadr.com/diversity/.

*About JAMS — Local Solutions. Global Reach.*

*Founded in 1979, JAMS is the largest private provider of alternative dispute resolution services worldwide. JAMS successfully resolves and manages business and legal disputes by providing efficient, cost-effective and impartial ways to overcome barriers at any stage of conflict. JAMS offers customized in-person, virtual and hybrid resolution services locally and globally through a combination of industry-specific experience, first-class client service, the latest technology and highly trained mediators and arbitrators. With a roster of over 400 neutrals and 29 locations, JAMS resolves thousands of the world's important cases every year. JAMS neutrals are adept at managing the resolution process whether they are conducting in-person, virtual or hybrid hearings.*

**EXPLORE MORE ON THESE TOPICS:**

## Featured People



**Elizabeth Carter Esq**

**Case Manager**

*http://www.jamsadr.com/carter/*



**Christopher K. Poole**

**Case Manager**

*http://www.jamsadr.com/poole/*

# **<u>EXHIBIT 20</u>**



## JAMS Mass Arbitration Procedures and Guidelines

*Effective May 1, 2024*

These Mass Arbitration Procedures and Guidelines ("Procedures") are intended to facilitate the fair, expeditious and efficient resolution of Mass Arbitrations, as defined in Procedure 1(c) hereof.

The filing of dozens, hundreds or even thousands of individual claims may create administrative burden and onerous fees, as well as delay and potential unfairness to all Parties, all of which may impair the integrity of the Arbitration process. To alleviate that burden and those concerns, JAMS has determined that certain proceedings may benefit from the designation of a Process Administrator, as defined in Procedure 3 of these Procedures, but only where the Parties have agreed to the application of these Procedures in a pre- or post-dispute written agreement. When these Procedures are in effect, filing and other fees and expenses are billed according to the applicable Mass Arbitration Fee Schedule, and the Process Administrator's compensation is at the rate set forth in the Process Administrator's General Fee Schedule.

The focus of these Procedures is on leveraging administrative and procedural decision-making. The authority and duties of JAMS, as prescribed in the Agreement of the Parties, are typically carried out by administrative staff, the National Arbitration Committee ("NAC") or the office of JAMS General Counsel or their designees. Under these Procedures, JAMS designates a Process Administrator to carry out those functions so that the Process Administrator can work with the Parties, and make such determinations as necessary, to set a procedure for the hearing of the Mass Arbitration claims by the Arbitrator(s), consistent with the core arbitration values of efficiency and fairness. Unlike other providers, JAMS does not include either mandatory mediation or test cases in these Procedures. While mediation is always encouraged, the impetus of these Procedures is to enable the Process Administrator to work with the Parties to design a reasonable process so that cases can be heard as soon as practicable.

**Procedure 1**
**Scope of Procedures**

(a) These Procedures shall apply to Mass Arbitrations, as defined in Procedure 1(c) hereof, that are administered by JAMS, provided the Parties have agreed to the application of these Mass Arbitration Procedures and Guidelines in a pre- or post-dispute written agreement.

(b) These Procedures, and decisions of the Process Administrator hereunder, supplement the Arbitration Rules that otherwise apply, except that where inconsistencies exist between these Procedures or the Process Administrator's decisions, on the one hand, and the applicable Arbitration Rules or JAMS Minimum Standards, on the other, the Process Administrator has the authority to determine whether these Procedures and decisions hereunder shall control.

(c) For purposes of these Procedures, a Mass Arbitration is defined as 75 or more similar Demands for Arbitration, or such other amount as is specified in the Parties' agreement(s), filed against the same Party or related Parties by individual Claimants represented by either the same law firm or law firms acting in coordination.

(d) Once designated, the Process Administrator, as defined in Procedure 3 hereof, operates as the designee of the NAC and performs functions typically performed by the NAC, as further set forth in Procedure 3. The Process Administrator may consult with JAMS after designation.

(e) JAMS may, in its discretion, assign the Mass Arbitration to a Process Administrator based out of any of its Resolution Centers.

(f) JAMS may amend these Procedures without notice. The Procedures in effect when the first Demands are filed shall apply to the Mass Arbitration unless the NAC or the Process Administrator, if designated, determines otherwise.

(g) If any of these Procedures is determined to be in conflict with a provision of applicable law, the provision of law will govern over the Procedure in conflict, and no other Procedure will be affected.

(h) These Procedures do not apply to class action arbitrations.

**Procedure 2**
**Filing Requirements**

(a) A Demand for Arbitration Form and applicable arbitration agreement must be submitted for each Claimant.

(b) Each Demand must include the first and last name, physical address and email address of the Claimant, as well as representative information.

(c) Each Demand also must be accompanied by a sworn declaration from counsel averring that the information in the Demand is true and correct to the best of the representative's knowledge.

(d) The time for filing Answers, Counterclaims, and Amended Claims will be determined at the initial administrative conference referred to in Procedure 3(c) hereof or as soon as practicable thereafter.

**Procedure 3**

**Process Administrator**

(a) JAMS may designate a Process Administrator to hear and determine preliminary and administrative matters in a Mass Arbitration. Following designation, the Process Administrator may consult as needed with JAMS.

(b) Although an adjunct of the NAC and not an Arbitrator, upon designation, the Process Administrator shall, within three business days, notify the Parties of any circumstance likely, based on the information provided by the Parties, to affect the Process Administrator's ability to be impartial or independent. Any challenge to the Process Administrator shall be made within five business days of the designation of the Process Administrator. JAMS will promptly review and decide any such challenge. JAMS' decision shall be final.

(c) The Process Administrator shall convene an initial administrative conference as soon as practicable to discuss procedural matters relating to the administration of the Arbitration. After consultation with the Parties at the initial administrative conference, or such adjourned conferences as may be necessary, the Process Administrator shall establish a schedule for the consideration of the procedural issues impacting the administration of the Arbitration. The schedule and procedures shall provide a reasonable opportunity for the Parties to be heard.

(d) The Process Administrator, for purposes of convenience, may hold administrative conferences and hearings, if any, in person or virtually by telephone or videoconference, or using other communications technology, with participants in one or more geographical places, or in combined form.

(e) The Process Administrator shall determine such preliminary and administrative matters as may be necessary to ensure the orderly and efficient resolution of the claims brought in a Mass Arbitration, consistent with the terms of the controlling agreements, procedural fairness and the integrity of the Arbitration process. As a designee of JAMS, the Process Administrator shall have authority over those matters left to determination by JAMS under the applicable Rules, such as Rules 6(a), 6(b), 6(e) and 11(c) of the JAMS Comprehensive Arbitration Rules & Procedures, as well as determinations as to conditions precedent relating to the commencement of the Mass Arbitration, including:

(i) Whether the Parties have met the filing requirements of these Procedures and the applicable Rules;

(ii) Whether, subject to Procedure 4 hereof, applicable conditions precedent have been met and, if applicable, how the Parties can meet the conditions precedent and how to proceed if they have not met those conditions precedent;

(iii) Which Demands for Arbitration, including subsequently filed Demands, should be included as part of the Mass Arbitration;

(iv) Which JAMS Rules apply to the proceedings;

(v) Disputes over whether the <u>JAMS Consumer Arbitration Minimum Standards</u> or <u>Employment Arbitration Minimum Standards</u> apply;

(vi) Whether to batch, consolidate or otherwise group the Demands or claims in the Mass Arbitration, whether for purposes of discovery, arbitrator appointments, merits hearings or otherwise. Any such grouping may be based on Claimants' geographic location, hearing location(s) specified in the Parties' arbitration provision and any other factor(s) the Process Administrator deems relevant and conducive to fair and efficient administration;

(vii) The location(s) of the merits hearing(s), but only to the extent such location bears on issues of procedural fairness or the determinations under Procedure 3(e)(vi) hereof;

(viii) Any other non-merits issues affecting case administration the Process Administrator deems appropriate to determine so that the Mass Arbitration may proceed in a fair and efficient manner;

(ix) The matters set forth in Procedures 4 and 5 hereof not prescribed to JAMS; and

(x) Any other issue(s) the Parties agree in writing to submit to the Process Administrator.

(f) The Process Administrator may make such decisions and set such procedures as the Process Administrator deems necessary or advisable to render administrative determinations under these Mass Arbitration Procedures.

(g) The administrative determinations of the Process Administrator shall contain the reasons for such determination.

(h) When the Process Administrator issues administrative determinations based on the specific facts of individual Arbitrations within the Mass Arbitration, the Process Administrator must document them in separate written communications setting forth the individual Arbitration determinations. The Process Administrator shall determine the form of such determinations, including whether to combine them into a single or multiple written communications with the Parties.

(i) The Process Administrator's prior administrative decisions shall be binding in subsequently filed cases determined to be part of the Mass Arbitration unless the Process Administrator determines *sua sponte* or on application of a Party for good cause shown that case-specific decisions are required. Such application must be made within two weeks of the filing of the new case(s).

**Procedure 4**

**Interpretation of Procedures and Jurisdiction**

(a) Once designated, the Process Administrator shall resolve disputes about the interpretation and applicability of these Procedures. The resolution of the issue by the Process Administrator shall be final.

(b) The Process Administrator may determine whether threshold jurisdictional and arbitrability disputes are arbitrable, subject to final determination by the Arbitrator(s) or a court.

(c) If the Process Administrator determines that jurisdictional or arbitrability issues are not arbitrable, the Process Administrator, after consulting with the Parties' representatives, may determine whether to suspend administration pending a court ruling and, if suspended, the duration of such suspension.

(d) The determinations of the Process Administrator shall be binding on the Arbitrator(s), unless such determinations are deemed provisional by these Procedures or by the Process Administrator.

## Procedure 5
### Arbitrator Selection, Disclosure and Replacement

(a) The Parties may mutually agree upon a process for selection of the Arbitrator(s) to determine the merits, and JAMS will facilitate any such selection process.

(b) Absent such agreement, the Process Administrator shall, after consulting the otherwise applicable Rule and consulting with the Parties, determine the selection process for the Arbitrator(s), including any needed modifications to the applicable arbitrator selection Rule.

(c) When compiling a list of Arbitrator candidates, JAMS will follow the criteria, if any, set forth in the Parties' agreement.

(d) If for any reason appointments cannot be made from the submitted candidate lists or such other procedure agreed to by the Parties or determined by the Process Administrator, JAMS shall have the authority to administratively appoint the Arbitrator(s).

(e) Disputes concerning the manner of appointment of the Arbitrator shall be decided by the Process Arbitrator, but challenges and disqualification requests based on the Arbitrator's disclosures or conduct shall be decided by the NAC.

(f) The same Arbitrator may be assigned to multiple cases.

(g) The Process Administrator shall not be appointed Arbitrator for any case in the Mass Arbitration, absent consent of the Parties.

## Procedure 6
### Merits Hearing

The Arbitration(s) shall proceed pursuant to the applicable Rules and any determinations of the Process Administrator.

## Procedure 7
### Fees

(a) When a Mass Arbitration is filed pursuant to these Procedures, the Parties shall pay JAMS' initial filing fee as set forth in the **JAMS Mass Arbitration Fee Schedule available here**.

(b) If JAMS determines that either the <u>JAMS Consumer Arbitration Minimum Standards</u> or the <u>Employment Arbitration Minimum Standards</u> apply, the obligation to pay fees under these Procedures shall be allocated consistent with those Minimum Standards, subject to review by the Process Administrator pursuant to Procedure 3(e)(v).

(c) Fees for the Process Administrator shall be as set forth in their General Fee Schedule in effect at the time of the Mass Arbitration filing.

(d) Fees for the Arbitrator(s) shall be as set forth in their General Fee Schedule in effect at the time of the Arbitrator's appointment.

# **EXHIBIT 21**

# Mass Arbitration Procedures Fee Schedule

**NON-REFUNDABLE FILING FEE\***
$7,500 – Regardless of the number of cases
$7,500 – Counterclaims

- Entire Filing Fee must be paid in full for JAMS to assign a Process Administrator.
- For arbitrations arising out of employer-promulgated plans, the most that employees, in the aggregate, may be required to pay is $2,500. The employer must bear the remainder of the employees' share of the Filing Fee and all Case Management Fees. Any questions or disagreements about whether a matter arises out of an employer-promulgated plan or an individually negotiated agreement or contract will be determined by JAMS.
- For arbitrations arising out of pre-dispute arbitration clauses between companies and individual consumers, JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses, Minimum Standards of Procedural Fairness applies. In those cases, when consumers (as defined by those Minimum Standards) initiate arbitration against the company, the most that the consumers, in the aggregate, may be required to pay is $2,500. The company must bear the remainder of the consumers' share of the Filing Fee and all Case Management Fees.

## PROCESS ADMINISTRATOR FEE

- The Process Administrator will bill at the rate reflected in their General Fee Schedule.

## CASE MANAGEMENT FEE

- 13% of Professional Fees
- The Case Management Fee includes access to an exclusive nationwide panel of judges, attorneys, and other ADR experts, dedicated services including all administration through the duration of the case, document handling, and use of JAMs conference facilities including after hours and on-site business support.  Weekends and holidays are subject to additional charges.

## ARBITRATOR APPOINTMENT FEE

- One arbitration filing fee, at the standard rate ($2,000 for a two-party matter and $3,500 for matters involving three or more parties), shall be assessed for each arbitrator appointed regardless of the number of cases or groups of cases the arbitrator is appointed to or the number of times the arbitrator is appointed to cases in the Mass Arbitration.

## GENERAL ARBITRATION POLICIES

- Unused hearing time is non-refundable.
- Hearing fees, including all applicable Case Management Fees, are non-refundable if time scheduled (or a portion thereof) is cancelled or continued after the cancellation date unless the Arbitrator's time can be rescheduled with a hearing in another matter. The cancellation policy exists because time reserved and later cancelled generally cannot be replaced. In all cases involving non-refundable time, the cancelling or continuing party is responsible for the fees of all parties.
- A retainer for anticipated preparation and follow-up time will be billed to the parties. Any unused portion will be refunded.
- Refund Policy: Overpayments are issued to the billing contact on the matter regardless of the paying party.
- All fees are due and payable in advance of services rendered and by any applicable due date as stated in a hearing confirmation letter.  JAMS reserves the right to cancel your hearing if fees are not paid by all parties by the applicable cancellation date and JAMS confirms the cancellation in writing.
- Receipt of payment for all fees is required prior to service of an arbitration order or award.
- Parties that, through mutual agreement, have held their case in abeyance for one year will be assessed an initial abeyance fee of $500, and $500 every six months thereafter. If a party refuses to pay the assessed fee, the other party or parties may opt to pay the entire fee on behalf of all parties, otherwise the matter will be closed.

JAMS agreement to render services is with the attorney, the party, and/or other representatives of the party.

www.jamsadr.com • Updated 4/30/2024

\*50% of the Filing Fees will be refunded if the matter is withdrawn within 5 days of filing.  After 5 days, the Filing Fee is non-refundable.