## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TUBI, INC.,
     Plaintiff,

v.

KELLER POSTMAN LLC,
     Defendant.

Case No. 1:24-cv-01616-ACR

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF KELLER POSTMAN LLC'S MOTION TO DISMISS COMPLAINT WITH PREJUDICE

KELLER POSTMAN LLC
  Warren D. Postman (Bar ID 995083)
  Albert Y. Pak (Bar ID 888314242)
1101 Connecticut Avenue N.W.
Suite 1100
Washington, DC 20036
(202) 918-1123
wdp@kellerpostman.com
albert.pak@kellerpostman.com

  Kiran N. Bhat (Bar ID 1021898)
2333 Ponce De Leon Boulevard
Suite R-240
Coral Gables, FL 33134
(305) 845-4684
kiran.bhat@kellerpostman.com

*Attorneys for Defendant*

Dated:  September 25, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

INDEX OF EXHIBITS .................................................................................................. viii

INTRODUCTION ............................................................................................................ 1

FACTS ............................................................................................................................. 6

    I.   Keller Postman's clients arbitrate per the Terms. ................................................ 7

    II.   Tubi tries to block the arbitrations to avoid the fees it obligated itself to pay ................ 10

    III.  After failing to stop the arbitrations, Tubi files this lawsuit. ............................. 12

ARGUMENT .................................................................................................................. 12

    I.   The Court should dismiss the tortious interference claims. ............................... 14

        A.   Tubi does not allege breach because the Terms' delegation clause requires Claimants to arbitrate their threshold dispute about the enforceability of the delay provision. ........................................................................................ 15

        B.   Tubi does not allege damages because the purported breach had no impact on Tubi's costs. ................................................................................................... 17

        C.   Tubi alleges facts showing that Keller Postman acted in service of, not independently of, its clients' interests. ............................................................ 19

            1.   Allegations that are consistent with lawful conduct do not support a claim of unlawful conduct simply because the Plaintiff recites the legal standard and alleges that it is met. ................................................................. 20

            2.   Tubi has not adequately pleaded that Keller Postman possessed an interest other than benefitting its clients and has in fact confessed that Keller Postman was motivated by its clients' interests. ......................................... 22

            3.   Tubi's various attacks on Keller Postman and Claimants' underlying claims cannot substitute for Tubi's failure to plead a motive independent of the clients' interests. ....................................................................... 25

        D.   Tubi's theory, if embraced, would chill countless legal representations. ............... 30

    II.   The Court should dismiss the declaratory relief claims. ................................... 32

        A.   The Court should not duplicate the arbitrator's work. ............................... 32

        B.   Tubi lacks standing to seek declaratory relief related to Keller Postman's obligations to Tubi's adversaries. ............................................................... 33

III.  The Court should dismiss this tactical lawsuit with prejudice. ........................................36

IV.  Alternatively, the Court should stay this case as Tubi arbitrates the core issues beneath this case with Keller Postman's clients. ...............................................39

    A.  Tubi's claims are based on an issue referable to arbitration...................................39

    B.  Keller Postman has the right to enforce the Terms..................................................41

CONCLUSION...............................................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbas v. Foreign Pol'y Grp., LLC*,
   783 F.3d 1328 (D.C. Cir. 2015) ........................................................39

*Abernathy v. DoorDash, Inc.*,
   438 F. Supp. 3d 1062 (N.D. Cal. 2020) ..........................................6, 38

*Adams v. Postmates*,
   414 F. Supp. 3d 1246 (N.D. Cal. 2019), *aff'd*, 823 F. App'x 535
   (9th Cir. 2020).................................................................................7, 38

*Aeronaves de Mexico, S. A. v. Triangle Aviation Servs., Inc.*,
   389 F. Supp. 1388 (S.D.N.Y. 1974), *aff'd*, 515 F.2d 504 (2d Cir. 1975) ..............................33

*Arena v. Intuit Inc.*,
   No. 19-cv-02546, 2021 WL 834253 (N.D. Cal. Mar. 5, 2021) ............25

*Arthur Andersen LLP v. Carlisle*,
   556 U.S. 624 (2009)....................................................................5, 39, 42

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..........................................................3, 21, 22, 24

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011).............................................................................37

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...........................................................3, 20, 21, 22, 24

*BG Grp., PLC v. Republic of Argentina*,
   572 U.S. 25 (2014)...............................................................................43

*Bhole, Inc. v. Shore Invs., Inc.*,
   67 A.3d 444 (Del. 2013) ......................................................................15

*Bitstamp Ltd. v. Ripple Labs Inc.*,
   No. 15-cv-01503, 2015 WL 4692418 (N.D. Cal. Aug. 6, 2015) ............43

*Carnegie v. Household Int'l, Inc.*,
   376 F.3d 656 (7th Cir. 2004) ...............................................................37

*Casco Marina Dev., L.L.C. v. D.C. Redevelopment Land Agency*,
   834 A.2d 77 (D.C. 2003) ...............................................................14, 17

*In re Centurylink Sales Pracs. & Secs. Litig.*,
   No. 17-md-02795, 2020 WL 3513547 (D. Minn. June 29, 2020) ....................................25, 35

*In re Cnty. of L.A.*,
   223 F.3d 990 (9th Cir. 2000) ...............................................................................................30

*Colyer v. Smith*,
   50 F. Supp. 2d 966 (C.D. Cal. 1999) ..................................................................................34

*CPB Contractors Pty Ltd. v. Chevron Corp.*,
   No. 16-cv-05344, 2017 WL 7310776 (N.D. Cal. Jan. 17, 2017) .........................................41

*Fischer v. Estate of Flax*,
   816 A.2d 1 (D.C. 2003) ......................................................................................................27

*Fox v. Computer World Servs. Corp.*,
   920 F. Supp. 2d 90 (D.D.C. 2013) .....................................................................................42

*Fraidin v. Weitzman*,
   611 A.2d 1046 (Md. App. Ct. 1992) ..............................................................3, 15, 19, 23, 24

*Franchise Tax Bd. v. Constr. Laborers Vacation Tr. for S. Cal.*,
   463 U.S. 1 (1983) ...............................................................................................................33

*Goldman v. KPMG, LLP*,
   173 Cal. App. 4th 209 (2009) .............................................................................................43

*\*Goldschmidt v. Paley Rothman Goldstein Rosenberg & Cooper, Chartered*,
   935 A.2d 362 (D.C. 2007) ............................................................................3, 15, 19, 23, 24

*Grigson v. Creative Artists Agency L.L.C.*,
   210 F.3d 524 (5th Cir. 2000) ..............................................................................................42

*Haase v. Sessions*,
   835 F.2d 902 (D.C. Cir. 1987) ...........................................................................................34

*Heckman v. Live Nation Ent., Inc.*,
   686 F. Supp. 3d 939 (C.D. Cal. 2023) ...............................................................................29

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
   586 U.S. 63 (2019) ..............................................................................................16, 28, 44

*\*Hill v. GE Power Systems, Inc.*,
   282 F.3d 343 (5th Cir. 2002) ........................................................................................40, 41

*Howsam v. Dean Witter Reynolds, Inc.*,
   537 U.S. 79 (2002) .............................................................................................................43

*Hurley v. Emigrant Bank*,
   No. 19-cv-0011, 2019 WL 5537330 (N.D. Tex. Oct. 25, 2019)............................................42

*Appeal of Infotechnology, Inc.*,
   582 A.2d 215 (Del. 1990) ....................................................................................................30

*Intuit Inc. v. 9,933 Individuals*,
   No. 20 STCV 22761, 2020 WL 7094231 (Cal. Super. Ct. L.A. Cnty. Oct. 6,
   2020) (unpublished), *aff'd*, No. B308417, 2021 WL 3204816
   (Cal. Ct. App. July 29, 2021) ...........................................................................................7, 38

*Ixchel Pharma, LLC v. Biogen, Inc.*,
   470 P.3d 571 (Cal. 2020) .....................................................................................................15

*Kelleher v. Dream Catcher, L.L.C.*,
   278 F. Supp. 3d 221 (D.D.C. 2017) ...............................................................................42, 43

*Kramer v. Toyota Motor Corp.*,
   705 F.3d 1122 (9th Cir. 2013) .............................................................................................42

*L.A. Airways, Inc. v. Davis*,
   687 F.2d 321 (9th Cir. 1982) .................................................................................................4

*Liapes v. Facebook, Inc.*,
   95 Cal. App. 5th 910 (2023), *review denied* (Jan. 10, 2024) .............................................1, 8

*Little v. Auto Stiegler, Inc.*,
   63 P.3d 979 (Cal. 2003) .......................................................................................................29

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992).......................................................................................................34, 35

*Matthew A. Goldstein, PLLC v. U.S. Dep't of State*,
   153 F. Supp. 3d 319 (D.D.C. 2016), *aff'd*, 851 F.3d 1 (D.C. Cir. 2017)...............................34

*Morowitz v. Marvel*,
   423 A.2d 196 (D.C. 1980) ...................................................................................................27

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983)................................................................................................................41

*\*Nave v. Newman*,
   140 A.3d 450 (D.C. 2016) .......................................................................................19, 23, 24

*Optyl Eyewear Fashion Int'l v. Style Cos.*,
   760 F.2d 1045 (9th Cir. 1985) .............................................................................................34

*Pandolfi v. AviaGames, Inc.*,
No. 23-cv-05971, 2024 WL 4051754 (N.D. Cal. Sept. 4, 2024)............................................29

*Paul v. Howard Univ.*,
754 A.2d 297 (D.C. 2000) ...............................................................................................14, 15

*Paul v. Jud. Watch, Inc.*,
571 F. Supp. 2d 17 (D.D.C. 2008) ........................................................................................30

*Powers v. Ohio*,
499 U.S. 400 (1991)...............................................................................................................34

*Ragone v. Atl. Video at Manhattan Ctr.*,
595 F.3d 115 (2d Cir. 2010)..................................................................................................42

*Riley v. BMO Harris Bank, N.A.*,
61 F. Supp. 3d 92 (D.D.C. 2014) ...............................................................................42, 43, 44

*Schick v. Lerner*,
193 Cal. App. 3d 1321 (1987) ..............................................................................................30

*Shenandoah Assocs. Ltd. v. Tirana*,
322 F. Supp. 2d 6 (D.D.C. 2004) ...........................................................................2, 3, 19, 23

*Sherman v. CLP Res., Inc.*,
No. 12-cv-8080, 2015 WL 13542762 (C.D. Cal. Feb. 4, 2015) ............................................36

*Tannatt v. Varonis Sys., Inc.*,
No. 18-cv-12589, 2019 WL 830482 (D. Mass. Feb. 21, 2019) .............................................33

*Tenneco Auto., Inc. v. El Paso Corp.*,
No. CIV.A. 18810-NC, 2007 WL 92621 (Del. Ch. Jan. 8, 2007) ............................................4

*Tokura Const. Co. v. Corporacion Raymond, S. A.*,
533 F. Supp. 1274 (S.D. Tex. 1982) .....................................................................................32

*Usme v. CMI Leisure Mgmt., Inc.*,
106 F.4th 1079 (11th Cir. 2024) ...........................................................................................42

*Welborn v. Internal Revenue Serv.*,
218 F. Supp. 3d 64 (D.D.C. 2016)........................................................................................36

*Wilton v. Seven Falls Co.*,
515 U.S. 277 (1995)...............................................................................................................33

*Wolfrich Corp. v. United Servs. Auto. Ass'n*,
149 Cal. App. 3d 1206 (1983) ..............................................................................................30

*In re Yarn Processing Pat. Validity Litig.*,
530 F.2d 83 (5th Cir. 1976) ...................................................................27

**Statutes**

*9 U.S.C. § 3 ...................................................................5, 14, 39, 40, 41, 42, 44

Cal Civ. Proc. Code § 1281.97 ...................................................................18

Declaratory Judgment Act, 28 U.S.C. § 2201...................................................32

**Other Authorities**

*Bennett v. Corcoran*, No. 2021-L-001899 (Ill. Cir. Ct. Feb. 19, 2021)........................................31

Br. of the Chamber of Com. of the U.S. as Amicus Curiae Supporting Pet'rs, *Am.
Express Co. v. Italian Colors Rest.*, 570 U.S. 228 (2012) (No. 12-133), 2012
WL 6759408 ...................................................................37

J. Maria Glover, *Mass Arbitration*, 74 Stan. L. Rev. 1283, 1283 (2022) ................................37, 38

J. Maria Glover, *Recent Developments in Mandatory Arbitration Warfare:
Winners and Losers (So Far) in Mass Arbitration*, 100 Wash. U.L. Rev. 1617
(2023)...................................................................38

*Pat the Manager, LLC v. Chance the Rapper, LLC, et al*., No. 2020-L-012697 (Ill.
Cir. Ct. Nov. 30, 2020) ...................................................................31

Restatement (Second) of Contracts § 34 (Am. L. Inst. 1981).......................................28

Restatement (Third) of the Law Governing Lawyers § 57 (Am. L. Inst. 2000).......................3, 19

1 Williston on Contracts § 4:34 (4th ed.).......................................................28

## INDEX OF EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| 1 | Excerpts from Petition for Review, *Liapes v. Facebook, Inc.*, No. S282529 (Cal. Oct. 31, 2023) |
| 2 | Excerpts from *JAMS Streamlined Arbitration Rules & Procedures* (July 1, 2014) |
| 3 | W. Postman Letter to M. Levington (JAMS) (Apr. 30, 2024) |
| 4 | *JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses Minimum Standards of Procedural Fairness* (July 15, 2009) |
| 5 | Excerpts from Transcript of Pre-Motion Conference, *Tubi Inc. v. Keller Postman, LLC*, No. 1:24-cv-1616 (D.D.C. Sept. 4, 2024) |
| 6 | JAMS Invoice No. 7216606 (June 20, 2024) |

**INTRODUCTION**

Plaintiff Tubi, Inc. ("Tubi") sues Keller Postman for giving its clients legal advice that Tubi disagrees with.  Tubi's main claim is that Keller Postman induced its clients to breach Tubi's Terms of Use ("Terms") by filing arbitration demands without waiting until 45 days after first providing notice of their claims to Tubi.  But the Complaint makes clear that Keller Postman's clients dispute the enforceability of this 45-day delay provision and that the Terms *require* arbitration of disputes over contract enforceability.  Accordingly, initiating the arbitrations was compliance, not breach.  Nor did the timing of that initiation cause any damages to Tubi, as Tubi's allegations confirm that it was unwilling to resolve any claims informally prior to the commencement of arbitrations.  In all events, a contracting party cannot sue its counterparty's lawyers for giving legal advice unless it shows that the lawyers were motivated by an interest that was independent of their clients' interests.  Here, Tubi's Complaint confesses that Keller Postman's interests were derivative of their clients' interests, not independent from them.  The Court should dismiss the Complaint.

Through its free video streaming platform, Tubi served advertisements that were targeted based on age, sex, and gender—a practice that, under published appellate precedent, violates California law and gives rise to statutory damages.  *See Liapes v. Facebook, Inc.*, 95 Cal. App. 5th 910, 920–27 (2023), *review denied* (Jan. 10, 2024).  Tubi's Terms bar consumers from bringing these claims in a class action and require them to arbitrate claims against the company individually. But when Tubi learned that Keller Postman represented many consumers who would each arbitrate discriminatory advertising claims against it ("Claimants"), Tubi filed this lawsuit against its opponents' lawyers seeking a court order stopping the arbitrations.

To prevail on its claims, Tubi must show, among other things:  (1) that Keller Postman caused its clients to breach their contract with Tubi; (2) that this breach caused Tubi damages; and

(3) that Keller Postman was motivated in causing the breach by a goal *independent* of serving its clients.  Tubi's Complaint does not establish *any* of these things.

First, the demands filed by Keller Postman's clients challenge the enforceability of the 45-day delay provision in Tubi's Terms, and the Terms unambiguously require that these threshold disputes be filed in arbitration, not in court.  Keller Postman therefore ensured *compliance* with the Terms when it filed arbitration demands for its clients challenging the enforceability of the delay requirement.  Tubi cannot show that the filing of the demands was a breach, and its Complaint should be dismissed on this ground alone.

Second, Tubi's Complaint fails to allege any actual injury from the timing of the notice it received from Keller Postman's clients.  Keller Postman filed demands for its clients between April 5 and April 16, 2024.  But Tubi was not required pay any arbitration costs for those demands until July 20, 2024.  In the interim, Keller Postman repeatedly offered to discuss resolving its clients' claims with Tubi informally before the arbitration commenced.  Indeed, Keller Postman offered to stay the arbitrations if Tubi was interested in discussing a resolution.  Tubi rejected these offers, making clear that it had no desire to resolve any claims before the arbitrations proceeded.  Tubi was perfectly entitled under the Terms to refuse to attempt any resolution of the claims prior to arbitration.  But a claim for tortious interference requires a showing of actual damages, and Tubi's Complaint fails to plead how the timing of the notice Tubi received increased Tubi's costs at all.  This failure is an independent ground for dismissal.

Third, Tubi's Complaint—when examined for well-pleaded facts rather than conclusory legal labels—does not show that Keller Postman was motivated by a desire independent of serving its clients.  Courts have broadly recognized immunity from tortious interference claims for attorneys who "advise[] or assist[] a client to make or break a contract."  *See Shenandoah Assocs.*

*Ltd. v. Tirana*, 322 F. Supp. 2d 6, 10 (D.D.C. 2004) (quoting Restatement (Third) of the Law Governing Lawyers § 57 (Am. L. Inst. 2000)).  To overcome that immunity, a plaintiff must show that the attorney "possess[es] a desire to harm which is *independent* of the desire to protect his client." *Goldschmidt v. Paley Rothman Goldstein Rosenberg & Cooper, Chartered*, 935 A.2d 362, 381 (D.C. 2007) (emphasis added) (quoting *Fraidin v. Weitzman*, 611 A.2d 1046, 1080 (Md. App. Ct. 1992).  Here, Tubi's Complaint alleges, at bottom, that Keller Postman committed a tort because it sought to gain leverage over Tubi *for its clients*.  That is not a motive independent of the desire to assist a client.  Indeed, because Keller Postman operates exclusively on a contingent contract, the firm, by definition, has no incentive to take a position that it does not think will maximize the recovery for its clients.

Tubi attempts to fill the logical hole in its Complaint by (1) repackaging self-serving attacks leveled against Keller Postman by defendants in unrelated cases; (2) collecting mundane observations about Keller Postman's initial communications with its clients and then asking the Court to infer something pernicious; and (3) asserting that the legal position taken by Claimants in the arbitrations is meritless.  The Court should not be distracted from the governing legal framework by these spurious attacks.  Criticisms by adversaries in unrelated cases are not probative of Keller Postman's motives in this case, particularly given that every one of these attacks was rejected by the courts that considered them.  Tubi's descriptions of Keller Postman's communications with its clients are artfully incomplete in a manner that renders them worthless upon scrutiny.  The merits of Claimants' positions in the arbitrations are not legally relevant but are well-grounded on established precedent in any event.

Under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), plaintiffs cannot describe conduct that is wholly consistent with lawful

activity and then survive a motion to dismiss by simply reciting the elements of the governing legal test.  That principle is highly relevant here.  Tubi is suing Keller Postman for doing what lawyers do:  giving legal advice to benefit their clients, even if it harms their client's adversary.  Allegations that Keller Postman hoped to make money from a contingency fee do not create a plausible inference that Keller Postman was motivated by a desire independent of benefitting its clients.  Nor does Tubi's conclusory recitation of the legal standard.  (Dkt. 1 ¶ 69) ("Keller Postman has acted . . . independent of any desire to protect its clients.").  That is doubly true where Tubi's Complaint in fact confesses that the purported breach at issue was motivated by Keller Postman's desire "to force Tubi to settle [with Keller Postman's clients] using the threat of onerous fees." (*Id.* ¶ 62).

Because Tubi's Complaint alleges nothing out of the ordinary, embracing Tubi's tort theory would set a dangerous precedent.  It would chill "uninhibited advice by agents to their principals" and replace that advice with the judgments of aggrieved opponents.  *See L.A. Airways, Inc. v. Davis*, 687 F.2d 321, 328 (9th Cir. 1982).  And it would invite parties to all disputes to alienate adversaries from their attorneys, who normally "benefit from a privilege against tortious interference with contract claims *because* they are so closely related to the parties to the contract." *See Tenneco Auto., Inc. v. El Paso Corp.*, No. CIV.A. 18810-NC, 2007 WL 92621, at *6 n.33 (Del. Ch. Jan. 8, 2007) (emphasis added).

Tubi lets the mask slip when it complains that it faces a "process that would not be taking place absent Keller Postman . . . ." (Dkt. 1 ¶ 5).  In other words, consumers are pursuing claims against Tubi that they may not have brought absent Keller Postman's legal advice.  That is true of countless lawsuits in which a law firm identifies a legal theory, informs the affected individuals that they may have a legal claim, and offers to pursue the claim for them in exchange for

compensation.  Encouraging clients to seek redress for Tubi's tortious conduct is not *itself* tortious conduct.  Tubi clearly would prefer a system in which lawyers could not encourage consumers to bring legal claims but instead must sit in their offices, waiting for consumers to identify their legal rights on their own and then seek out a lawyer to represent them, one by one.  But these desires are insufficient and improper grounds for a tortious interference claim, and no attempts at artful pleading can cure the fundamental legal defects with Tubi's claims.  The Court should dismiss the Complaint with prejudice.

If the Court does not dismiss the Complaint, the Federal Arbitration Act ("FAA") requires the Court to stay this case while Tubi arbitrates the arbitrable issues integral to this suit with Keller Postman's clients.  9 U.S.C. § 3.  Where an issue in a suit is referable to arbitration, Section 3 requires that courts grant applications to stay proceedings until the arbitration resolves.  *Id.* Section 3 can be enforced by a litigant in court regardless of whether they are a party to the underlying arbitration agreement.  *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630, 630 n.4 (2009).  The Section 3 standard for a stay is met here.  Tubi has alleged a valid agreement to arbitrate with Keller Postman's clients.  (Dkt. 1 ¶ 72).  The core issue Tubi must prove to prevail— that Keller Postman's clients breached the Terms by challenging the delay provision in arbitration before complying with it—is plainly arbitrable under that agreement:  "JAMS decided that the issue of whether the claimants met the precondition for arbitration should be left to the still-to-be assigned arbitrator."  (*Id.* ¶ 68).  This suit is therefore intertwined with and derivative of the pending arbitrations.  Allowing the suit to proceed before the arbitration resolves would risk undermining the arbitrations pending between Tubi and Claimants and remove the issue to an improper forum, in violation of the FAA.  In this context, and as court after court has held, Keller Postman has the right to a stay under Section 3.

## FACTS

Keller Postman is a law firm that pioneered the practice—sometimes called "mass arbitration"—of representing thousands or tens of thousands of individuals simultaneously in arbitration.  (Dkt. 1 ¶¶ 16–19).  Though companies routinely lash out at Keller Postman for initiating mass arbitrations, consumers are enforcing the very arbitration agreements companies like Tubi draft and impose on users.  (*Id.* ¶¶ 6, 16, 21).  Corporations draft and impose these agreements to reduce the economic incentive to bring smaller claims by requiring consumers to arbitrate individually and forgo participation in more efficient forms of dispute resolution, such as class actions.  (*Id.*, Ex. 8 at 130).  Tubi and similarly situated companies are no doubt frustrated when Keller Postman refuses to permit these agreements to achieve their aim of avoiding liability, as Keller Postman's efforts have resulted in high-profile successes that have netted consumers hundreds of millions of dollars.  (*Id.* ¶¶ 16, 21, 25, 31).

The arbitration agreements Keller Postman enforces for consumers often obligate companies to pay arbitration initiation fees.  (*Id.* ¶¶ 5, 21); (*id.*, Ex. 8 at 130).  Despite drafting their contracts *ex ante* to assume these costs, companies faced with mass arbitration *ex post* characterize consumer requests that companies pay these costs as "extortion."  (*Id.* ¶¶ 5, 24, 27–28, 60, 61).  Companies also seek to evade claims by accusing consumers' lawyers of ethics violations and proposing an end to mass arbitrations.  (*Id.* ¶¶ 20–23, 27–33).

Time and again, arbitrators and courts have rejected corporate attempts to slander Keller Postman for its work representing consumers and employees, observing that Keller Postman and its clients were complying with the agreements corporations drafted and noting the hypocrisy of corporations which refuse to comply with the procedures they impose on individuals.  *See, e.g.*, *Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062, 1067–68 (N.D. Cal. 2020) (criticizing the "irony" that a company "faced with having to actually honor its side of the bargain, now blanches

at the cost" because it "never expected that so many would actually seek arbitration . . . .  This hypocrisy will not be blessed . . . ."); *Adams v. Postmates*, 414 F. Supp. 3d 1246, 1252 n.2 (N.D. Cal. 2019), *aff'd*, 823 F. App'x 535 (9th Cir. 2020) ("Postmates expends considerable energy accusing Petitioners of using the cost of the arbitration process as a means of coercing Postmates into settling their claims expeditiously. . . . [T]he possibility that Postmates may now be required to submit a sizeable arbitration fee in response to each individual arbitration demand is a direct result of the mandatory arbitration clause and class action waiver that Postmates has imposed."); *Intuit Inc. v. 9,933 Individuals*, No. 20 STCV 22761, 2020 WL 7094231, at *13 (Cal. Super. Ct. L.A. Cnty. Oct. 6, 2020) (unpublished), *aff'd*, No. B308417, 2021 WL 3204816 (Cal. Ct. App. July 29, 2021) ("In this case, Intuit is a bit like the dog that caught the car.  It got the Consumers' claims out of class litigation and into arbitration, then realized that this was a large class and that resolving the claims individually would be hopelessly expensive.").  Tubi dusts off these oft-rejected themes and presents them anew, but its own Complaint reveals that Keller Postman has merely done what any good attorney should do:  adopt the readings of the law that give their clients the best chance at favorably resolving their legal claims.

## I.    Keller Postman's clients arbitrate per the Terms.

Keller Postman represents 23,736 consumers who each asserted before JAMS that they received discriminatory advertising from Tubi in violation of California's Unruh Civil Rights Act (the "Unruh Act").  (Dkt. 1 ¶¶ 10, 36, 48); (*id.*, Ex. 15 at 207–16).  Tubi asserts—based on its narrow construction of the claims in the demands and the applicable law—that the demands are "frivolous."  (*Id.* ¶ 50).  But this legal assertion is plainly subject to arbitration under the Terms. And as the Complaint alleges, JAMS accepted the sufficiency of the demands and initiated the arbitrations.  (*Id.* ¶¶ 5, 68).

Tubi includes legal argument masquerading as factual allegations that Keller Postman's clients' Unruh Act claims are frivolous.  (*Id.* ¶¶ 48–49).  But contrary to Tubi's legal argument, the Unruh Act claims are well grounded in precedent:  a recent appellate decision makes clear that companies like Tubi violate the Unruh Act if they employ tools that let advertisers target advertisements based on age or gender.  *See Liapes*, 95 Cal. App. 5th at 920–27 (holding consumer stated a claim for discriminatory advertising by alleging "Facebook engaged in intentional discrimination by designing and employing ad tools that expressly make distinctions based on gender and age when creating the target audience for insurance ads").  In a petition to the California Supreme Court for review, Facebook highlighted that "the Court of Appeal embraced plaintiff's boundless theory of liability.  In its view, so long as the intended or actual audience for ads depends in any way on age or gender, an Unruh Act claim challenging those ads can survive a demurrer."  Ex. 1, Pet. for Rev. at 25, *Liapes v. Facebook, Inc.*, No. S282529 (Cal. Oct. 31, 2023).  The California Supreme Court denied review over this objection and denied a request to depublish the decision, electing instead to let the decision remain precedential.  Tubi of course is free to take a narrower reading of *Liapes* or argue to an arbitrator that it was wrongly decided.  But it is not frivolous for a Claimant to argue for the reading of *Liapes* that was taken by Facebook's counsel before the California Supreme Court.

Keller Postman's clients each understood that they were subject to the JAMS arbitration agreement in Tubi's Terms.  (Dkt. 1 ¶¶ 36, 54); (*id.*, Ex. 15 at 209); (*id.*, Ex. 8 at 126).  The Terms require that each consumer raise claims individually and bar any "PURPORTED CLASS, REPRESENTATIVE OR MULTI-CLAIMANT PROCEEDING . . . ."  (*Id.* at 130).  The Terms also purport to impose a 45-day delay period before a consumer can arbitrate against Tubi:

> If either you or Tubi wish to arbitrate a claim, you or Tubi must first send by mail
> to the other a written Notice of Dispute ("Notice") that sets forth the name, address,

and contact information of the party giving notice, the specific facts giving rise to the Dispute, the Tubi Service to which the Notice relates, and the relief requested. . . . During the first 45 days after you or we send a Notice to the other, you and we may try to reach a settlement of the Dispute. . . . If you and we do not resolve the Dispute within 45 days, either you or we may initiate arbitration . . . .

(*Id.*).

Keller Postman's clients took the position that this requirement was unconscionable and unenforceable. And because the Terms state that any "disputes over arbitrability shall be resolved by the arbitrator" (*id.*) and incorporate arbitral rules stating the same, this threshold dispute was itself a basis for commencing arbitration. *See also* Ex. 2, *JAMS Streamlined Arbitration Rules & Procedures* (July 1, 2014) ("JAMS Rules"), at 11, Rule 8(b) (stating that "[j]urisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are the proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator.").

Keller Postman's clients accordingly each filed an arbitration demand that challenged the enforceability of the delay provision. Specifically, each demand challenged the provision as "illusory, unconscionable and therefore unenforceable" because it required the Claimant "to give Tubi written notice of a dispute and to wait for 45 days before initiating an arbitration against Tubi," while "impos[ing] no obligation on Tubi to do anything during that 45-day wait period." (Dkt. 1, Ex. 15 at 208).

After the consumers filed their demands but before JAMS had commenced the arbitrations,[1] Keller Postman repeatedly offered to engage with Tubi to resolve or narrow the

---

[1] Under the JAMS Rules, the filing of an arbitration demand does not commence an arbitration. Rather, an arbitration is commenced only after (1) JAMS determines that the initial filing requirements are met; (2) the parties have an opportunity to raise threshold administrative issues; and (3) filing fee has been paid. *See* Ex. 2 at 7, 9-10 (JAMS Rules 5(b), 6).

parties' disputes.  First, Keller Postman offered on behalf of each client to "stay the arbitration for up to 45 days" while the parties explored informal resolution.  (*Id.*).  Tubi declined this offer. (Dkt. 1 ¶ 57).  When Tubi asserted that many of the claims were "specious" and "frivolous," including because it did not believe certain Claimants had registered accounts, (*id.* ¶¶ 50, 59); (*id.*, Ex. 17 at 221–22), Keller Postman again offered to engage in informal discussions to narrow the dispute.  Specifically, Keller Postman assured Tubi that it had "of course conducted additional vetting of [C]laimants' claims beyond the initial questions you have seen" and had "no desire to impose arbitration costs on Tubi for claims that are not well supported."  (*Id.* ¶ 61); *see also* Ex. 3, W. Postman Letter to M. Levington (JAMS) (Apr. 30, 2024), at 5.[2]  Therefore, Keller Postman proposed that Tubi identify the individual Claimants it was asserting had invalid claims and Keller Postman would either rebut Tubi's position or withdraw the arbitration for any Claimant who could not rebut Tubi's showing.  Ex. 3 at 5.  Tubi again refused, failing to identify the name of a single individual whom they contended had a facially meritless claim.  (Dkt. 1 ¶¶ 57, 64).  On May 7, 2024, Keller Postman again offered to engage in informal resolution efforts before the commencement of the arbitrations, sending individual letters on behalf of each client that made an opening demand and offered to resolve the Claimant's claim on an individual basis.  (*Id.* ¶ 63). Tubi again refused to engage, making clear that it had no desire to attempt informal resolution of a single claim or dispute prior to the commencement of the arbitrations.  (*Id.* ¶ 64).

## II.    Tubi tries to block the arbitrations to avoid the fees it obligated itself to pay.

After receiving Keller Postman's clients' demands, Tubi purported to issue new terms of use on April 18, 2024.  (*Id.*, Ex. 9 at 133–91).  The revisions included many new onerous procedures designed to deter consumer claims.  Notably, the revisions converted the Terms' delay

---

[2] Tubi references (Dkt. 1 ¶ 64), but does not attach, the letter attached to this motion as Exhibit 3.

provision into a "Mandatory Informal Dispute Resolution Process," thereby turning Tubi's non-binding option to try to reach a settlement of the noticed dispute into a binding obligation to do so. *Compare* (*id.*, Ex. 8 at 130), *with* (*id.*, Ex. 9 at 170–73).

The next day, Tubi wrote JAMS administrators demanding that JAMS "refrain from initiating any arbitration proceedings or issuing any invoices to Tubi . . . ." (*Id.*, Ex. 16 at 218). Tubi wanted to avoid the initiation fees it had obligated itself to pay in the Terms, which it now characterized as extortion. (*Id.* ¶¶ 5, 24, 60, 61, 62); *see also* (*id.*, Ex. 8 at 130) (requiring Tubi to "pay arbitration costs as required by" the JAMS *Consumer Minimum Standards of Procedural Fairness*); Ex. 4, *JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses Minimum Standards of Procedural Fairness* (July 15, 2009), at 3 ("[W]hen a consumer initiates arbitration against the company, the only fee required to be paid by the consumer is $250 . . . ."). Tubi also argued that it did not need to arbitrate because JAMS lacked jurisdiction, as the consumers had not complied with the delay provision before challenging it. (*Id.*, Ex. 16 at 218). Tubi also contended that it should not have to arbitrate because JAMS was about to change its rules to reduce the fees Tubi would have to pay. (*Id.*). Those rules, however, apply only where "the Parties have agreed to the application" of the rules "in a pre- or post-dispute written agreement." (Dkt. 1, Ex. 20 at 233).

For their part, Keller Postman's clients pointed out to JAMS that they only sought to enforce the Terms Tubi drafted and that the law required JAMS to proceed with each consumer's claims expeditiously. (*Id.*, Ex. 18 at 224–25); (*id.* ¶ 61). Further, as noted above, Keller Postman referenced its offer to Tubi to address Tubi's claims of frivolity and withdraw any claims for clients who could not rebut Tubi's assertions, as it had "no desire to impose arbitration costs on Tubi for claims that are not well supported." (*Id.* ¶ 61); *see also* Ex. 3 at 5.

As a fallback position, Tubi argued that if JAMS were to initiate the arbitrations over Tubi's objections, JAMS should consolidate them—in breach of the Terms' provision to the contrary—so that Tubi would not have to pay the full amount of the fees it had agreed to pay when it drafted and imposed the Terms.  (Dkt. 1 ¶¶ 61, 68).  JAMS rejected Tubi's request to close the arbitrations, explaining that the dispute over the enforceability of the notice provision itself was a dispute for an arbitrator to resolve.  (*Id.* ¶ 68).  But JAMS granted Tubi's request for consolidation over the Claimants' objections, notwithstanding the Terms' express bar on "multi-claimant proceeding[s]."  (*Id.* ¶ 68); (*id.*, Ex. 8 at 130).

## III.   After failing to stop the arbitrations, Tubi files this lawsuit.

For all its maneuvering, Tubi had not extinguished the consumers' claims, which remained before JAMS.  And Tubi presumably knew it could not ask the Court to interfere directly with the arbitrations brought by Keller Postman's clients.  So, Tubi repackaged its arguments and filed the Complaint, seeking an order that Keller Postman "withdraw the demands for arbitration it filed with JAMS" or that JAMS "stay[] all arbitration proceedings, including the payment of any invoices by Tubi, during the pendency of this action"; and damages and attorneys' fees.  (*Id.* ¶¶ 84–88).  In other words, Tubi asks this Court to issue relief allowing it to avoid the arbitrations its Terms mandate.

Tubi raises two causes of action.  Count 1 alleges tortious interference with Tubi's Terms because Keller Postman advised its clients to arbitrate their disputes over the enforceability of the delay provision.  (*Id.* ¶¶ 71–78).  Count 2 asks the Court to issue a declaration confirming (a) the tortious interference claim; (b) Tubi's legal conclusion on the sufficiency of Keller Postman's clients' JAMS demands; and (c) Tubi's views of Keller Postman's duties.  (*Id.* ¶¶ 79–83).

## ARGUMENT

The Court should dismiss both counts with prejudice, for three independent reasons.

First, Tubi has not alleged that Keller Postman caused a breach of the Terms by counseling its clients to file arbitration demands when they did.   Keller Postman's clients dispute the enforceability of the Terms' 45-day delay provision.   And the Terms and the law clearly require that this dispute be raised with an arbitrator.   Far from breaching any contract, Keller Postman's clients followed the Terms by initiating arbitrations regarding the enforceability of the Terms. Tubi offers no coherent explanation of how else Keller Postman's clients could have challenged the enforceability of the delay provision or how complying with the Terms' delegation clause was a breach of the Terms.

Second, the Complaint does not allege injury resulting from the purported breach because Tubi elected not to engage in informal dispute resolution prior to the commencement of the arbitrations.   Tubi had every right to make that choice.   But having made that choice, Tubi cannot identify any costs that it incurred as a result of the timing of Claimants' notice of their claims.

Third, Tubi's Complaint does not include well-pleaded facts (as opposed to conclusory legal labels) that give rise to a plausible claim that Keller Postman was motivated by an interest independent of benefitting its clients.   Parties cannot sue their opponents' lawyers for giving advice they disagree with.   The only exception to this rule is if attorneys counsel their clients to breach a contract to benefit the attorneys' interests independent from the clients' interest.   Tubi's Complaint fails to identify any interest Keller Postman held independent of its clients.   Indeed, such independence is impossible, as Keller Postman represents clients on a contingent basis.   Keller Postman's pecuniary interest, which Tubi complains about, is therefore inexorably and directly linked to the firm's clients' interests.   In fact, Tubi's own Complaint confesses that the supposed breach was motivated by a desire to obtain a settlement for Keller Postman's clients.  (Dkt. 1 ¶ 62).

Because the Complaint does not adequately plead a tortious interference claim, the Court should dismiss all of Count 1 (Tortious Interference) as well as the portion of Count 2 (Declaratory Relief) that merely seeks a declaration regarding Tubi's tortious interference claim. The remaining portions of Count 2 fail because the merits issue on which Tubi seeks a declaration—the sufficiency of Keller Postman's clients' claims—is delegated to the arbitrator, and because Tubi lacks standing to win a declaration about Keller Postman's duties to its clients.

Alternatively, if the Court does not dismiss, the Court should stay this case while Tubi arbitrates the core issues underpinning this suit—the merits of the underlying discrimination claims and the enforceability of the Terms' delay provision—with the Claimants, Keller Postman's clients. Without such a ruling, Tubi would circumvent the FAA, advancing consideration of issues it committed to resolve in arbitration with the Claimants through the procedural trick of suing those clients' lawyers in court. As explained below, where the issues in a lawsuit are intertwined with issues one party has agreed to arbitrate, Section 3 calls for courts to stay proceedings until the arbitration is had. This is true regardless of whether the litigant seeking a stay is also a party to the arbitration agreement. Because the Terms commit the core questions underpinning this suit to an arbitrator, the Court should, if it decides not to dismiss, stay this suit until Tubi and the Claimants complete arbitration of those issues.

## I.    The Court should dismiss the tortious interference claims.

"[T]he elements of tortious interference with contract are: '(1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of a breach of the contract; and (4) damages resulting from the breach.'" *Casco Marina Dev., L.L.C. v. D.C. Redevelopment Land Agency*, 834 A.2d 77, 83 (D.C. 2003) (quoting *Paul v. Howard Univ.*, 754 A.2d 297, 309 (D.C.

2000)).[3]  However, where, as here, the allegedly tortious conduct is legal advice, courts will not recognize a claim unless the plaintiff shows that the attorney "possess[es] a desire to harm which is *independent* of the desire to protect his client."  *Goldschmidt*, 935 A.2d at 381 (emphasis added) (quoting *Fraidin*, 611 A.2d at 1080).

The Court should dismiss Tubi's tortious interference claims because the Complaint does not include well-pleaded facts, as distinct from conclusory legal labels, showing (1) that Keller Postman caused its clients to breach the Terms, (2) that the timing of Keller Postman's filings led to any actual damages, or (3) that Keller Postman pursued an interest independent of benefitting its clients.  Each of these are required elements of Tubi's claims, so failure on any one factor requires dismissal.

### A.    Tubi does not allege breach because the Terms' delegation clause requires Claimants to arbitrate their threshold dispute about the enforceability of the delay provision.

In addition to requiring that Claimants bring their underlying discrimination claims in arbitration, the Terms contain a "delegation clause," which also requires that Claimants arbitrate any threshold arguments about the interpretation and enforceability of the Terms.  Specifically, the Terms state that "disputes over arbitrability shall be resolved by the arbitrator."  (Dkt. 1, Ex. 8 at 130).  And the Terms also incorporate the JAMS Rules, which confirm that "disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought . . . shall be submitted to and ruled on by the Arbitrator."  Ex. 2 at 11 (JAMS Rule 8(b)).  Such delegation provisions have become common in arbitration clauses drafted by corporations,

---

[3] Defendant believes the law of the District of Columbia should control Tubi's tortious interference claims because the Complaint focuses primarily on decisions made by Keller Postman there. (Dkt. 1 ¶¶ 55–56, 60, 71).  However, the laws of California and Delaware are not materially different.  *See, e.g., Ixchel Pharma, LLC v. Biogen, Inc.*, 470 P.3d 571, 575 (Cal. 2020); *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013).

because they allow corporations to compel lawsuits out of court and into arbitration without facing litigation or argument about the enforceability or fairness of the underlying arbitration procedures; all such arguments must themselves go to arbitration.  *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019) ("When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract.").

As Tubi is forced to acknowledge, each of Keller Postman's clients asserts that the 45-day delay provision contained in the terms is unenforceable.  (Dkt. 1 ¶ 53).  Specifically, each Claimant's demand expressly argued that the delay provision is unconscionable because it unilaterally obligates consumers to delay their claims without obligating Tubi to do anything in return.  (*Id.*, Ex. 15 at 208).  Given the clear delegation requirement in the Terms, the only option Keller Postman's clients had to litigate their threshold dispute with Tubi over the meaning of the Terms was to file an arbitration demand.  Keller Postman's clients accordingly did what the Terms and the law require and initiated arbitrations regarding the enforceability of the delay provision.

During the pre-motion conference, Tubi's counsel suggested that the Court must find a breach here because that is the only way that Tubi can litigate the issue, implying that the Court's failure to do so would allow consumers to avoid the 45-day delay provision merely by challenging it.  *See* Ex. 5, Sept. 4, 2024 Hr'g Tr., at 8:5–11.  But that is simply a request that the Court ignore Claimants' compliance with the Terms because Tubi does not like the practical consequences.  Such a request is particularly unconvincing given that Tubi drafted the Terms and was the author of the delegation clause.  Tubi presumably included the delegation clause because, at the time, it thought it would be procedurally advantageous to channel arguments about the enforceability of the Terms promptly into arbitration.  Now Tubi appears to have changed its mind and would prefer

not to have a delegation clause, at least in this case.  But none of that shows that Claimants breached the Terms by complying with the delegation clause.[4]

As Tubi alleges, Keller Postman's clients are parties to arbitration agreements with Tubi (the agreements that Tubi alleges were breached) (Dkt. 1 ¶ 72); those agreements require arbitration of disputes about pre-conditions to arbitrations (*id.*, Ex. 8 at 130); and Keller Postman's clients dutifully initiated arbitrations of those disputes (*id.* ¶ 53).  Tubi's facts therefore allege compliance, not breach—and without breach, there is no tortious interference.

**B.    Tubi does not allege damages because the purported breach had no impact on Tubi's costs.**

Tubi alleges that it suffered damages from having "to pay ongoing fees to the arbitrator and to JAMS, along with attorneys' fees that it would not have had to pay but for Keller Postman's tortious interference."  (*Id.* ¶ 68).  But to establish its claim, Tubi must show that these damages were *the result of the purported breach*.  *See Casco Marina Dev.*, 834 A.2d at 83.  Here, the breach alleged is that Keller Postman advised its clients to file their demands with JAMS 45 days too early, thereby purportedly violating the 45-day delay provision.

Tubi's Complaint makes clear that Tubi would have incurred precisely the same costs regardless of whether Claimants filed their demands 45 days later.  As described above, Keller Postman filed Claimants' demands between April 5 and April 16, 2024.  But Tubi was not required

---

[4] Tubi may attempt to fault Keller Postman for advising its clients to include their underlying discrimination claims in their demands alongside their threshold dispute.  That choice still was not a breach because the 45-day delay provision is unenforceable.  But the enforceability question is subject to arbitration under the Terms and so, as explained below, should not be reached by this Court.  *See infra*, Argument, Section IV.A.  In all events, Tubi cannot allege any damages resulting from the fact that Claimants included their underlying claims alongside their threshold claim demand.  Tubi has not alleged and cannot allege that it paid any extra money as a result of the demand including both issues.  Filing two separate arbitrations—an initial one regarding the threshold issues and a subsequent one regarding the underlying claims—thereby incurring two sets of fees, could only have increased the costs to Tubi, not decreased them.

to pay *any* fees to JAMS until July 20, 2024.  Specifically, JAMS invoiced Tubi for a single filing fee of $2,000 for the consolidated arbitration.  (Dkt. 1 ¶¶ 5, 68).  That invoice was issued on June 20, 2024.  *See* Ex. 6, JAMS Invoice No. 7216606 (June 20, 2024).  California law gave Tubi 30 days to pay that invoice.  Cal Civ. Proc. Code § 1281.97(a)(1).[5]  In the interim, Keller Postman repeatedly offered to discuss resolving its clients' claims with Tubi.  (Dkt. 1 ¶¶ 57, 61, 63, 64); *see also* Ex. 3 at 5.  And Tubi repeatedly rejected these offers, making clear that it had no desire to engage in informal resolution or narrowing of the disputes of any kind.  *See supra*, Facts, Section  I.

Tubi was perfectly entitled to make the strategic litigation choice that it did.  As noted, the Terms do not impose any obligation on Tubi to engage in good faith settlement discussions prior to arbitration.  *See supra*, Facts, Section I.  But having made clear that it would not engage in any informal dispute resolution efforts with Claimants prior to the commencement of arbitrations, Tubi cannot credibly assert that it was injured by the timing of Claimants' filing.

Tubi cannot cure the flaw in its pleadings by pointing to the allegation that "Keller Postman rushed to file these demands for arbitration and disregarded the mandatory notice and the 45-day informal dispute resolution period because it was aware JAMS was about to reform its rules to curtail the mass arbitration abuses by Keller Postman and other firms."  (Dkt. 1 ¶ 62).  Even assuming the truth of this allegation, the new JAMS rules state on their face that they will only apply if the parties' contract expressly provides for their application.  (*Id.*, Ex. 20 at 233).  But neither version of the Terms attached to the Complaint provides for JAMS arbitration based on the new JAMS rules.  (*Id.*, Exs. 8, 9).  Even if those rules had taken effect during the delay period, they still would not apply to the parties' dispute and Tubi would be in the same position it is now.

---

[5] JAMS does not *commence* arbitrations until after the filing fee has been paid. Ex. 2 at 7 (JAMS Rule 5(b)).

In truth, the Terms Tubi drafted to govern disputes and the corresponding claims Keller Postman's clients filed are the ultimate reasons why Tubi had to retain attorneys and pay $2,000 to JAMS. But it is not a breach of the Terms to file legal claims. To the contrary, the Terms expressly contemplate and allow claims to be filed in arbitration. Counsel for Tubi acknowledged as much at the pre-motion conference, arguing that this case is purportedly different from the usual case because Tubi is focusing on Keller Postman's failure to delay filing of its clients' claims under the 45-day delay provision. *See* Ex. 5 at 7:13–17. Tubi has grounded its theory of breach on the allegation that Keller Postman filed its clients' claims prematurely. But the injuries Tubi identifies do not logically flow from that breach. The tortious interference claim fails for this independent reason.

### C. Tubi alleges facts showing that Keller Postman acted in service of, not independently of, its clients' interests.

Courts have broadly recognized immunity from tortious interference claims for attorneys who "advise[] or assist[] a client to make or break a contract." *See Shenandoah Assocs.*, 322 F. Supp. 2d at 10 (quoting Restatement (Third) of the Law Governing Lawyers § 57 (2000)). To overcome that immunity, a plaintiff must show that the attorney "possess[es] a desire to harm which is independent of the desire to protect his client." *Goldschmidt,* 935 A.2d at 381 (quoting *Fraidin*, 611 A.2d at 1080); *see also Nave v. Newman*, 140 A.3d 450, 456 (D.C. 2016) (same).

Tubi attempts to meet this standard by reciting that Keller Postman's "actions are not about vindicating its clients' rights" (Dkt. 1 ¶ 57) and are "independent of any desire to protect its clients" (*id.* ¶ 69). But such recitation of legal elements should not be credited on a motion to dismiss. This section first examines the proper standard for assessing Tubi's claims on a motion to dismiss. It then explains why Tubi has not adequately pleaded that Keller Postman possessed an interest other than benefitting its clients. Finally, it addresses the extensive allegations in the

Complaint that Tubi included in an apparent attempt to mask the holes in its pleading, but that do not in fact cure the Complaint's flaws.

> **1.   Allegations that are consistent with lawful conduct do not support a claim of unlawful conduct simply because the Plaintiff recites the legal standard and alleges that it is met.**

Tubi's Complaint faces a basic challenge:  Keller Postman's conduct as alleged in the Complaint can be readily explained by an obvious and lawful purpose.  Keller Postman was simply pursuing well-established and lawful practices:  identifying legal claims for consumers who are subject to arbitration clauses, marketing its services to those consumers, resolving its clients' claims for monetary compensation, and then taking a portion of its clients' recovery as compensation for its services.  (Dkt. 1 ¶¶ 16–25).  As part of that, Keller Postman advised clients to file claims without delay—the act Tubi asserts to be a breach—specifically because, according to Tubi, it hoped to gain leverage for its clients.  (*Id.* ¶ 62).

The Supreme Court has repeatedly made clear that where, as here, a defendant's conduct is readily explained by a lawful motive, courts should look past conclusory recitations of the legal standard and insist on well-pleaded factual allegations that make an unlawful explanation more than a mere possibility.  In *Twombly*, the plaintiffs were consumers who alleged that national telecom companies had conspired against local telecom companies, which in turn caused an increase in the rates for local telephone and high-speed Internet services.  550 U.S. at 550.  The consumers' complaint alleged that the telecom companies had committed a range of unsavory acts:  "providing inferior connections to the networks, overcharging, and billing in ways designed to sabotage the [local companies'] relations with their own customers" and a "common failure meaningfully to pursue attractive business opportunities in contiguous markets."  *Id.* at 550–51 (cleaned up).  It then asserted that "in light of the parallel course of conduct that each engaged in to prevent competition from [local telecoms] . . . , Plaintiffs allege upon information and belief

that [the national telecoms] have . . . have agreed not to compete with one another and otherwise allocated customers and markets to one another." *Id*. at 551.

Although the allegation of an "agree[ment] not to compete" was technically an assertion of fact, the Supreme Court refused to credit this allegation and instead held that the complaint should be dismissed. *Id.* at 555. The Court reasoned that the plaintiffs' allegation of an unlawful agreement was simply "a formulaic recitation of the elements of a cause of action." *Id.* The Court instead asked whether the more specific facts alleged in the complaint gave rise to a "plausible suggestion of conspiracy." *Id.* at 565–566. The Court acknowledged that, given the parallel conduct alleged in the complaint, it was *possible* that there was an unlawful agreement; but this was not sufficient because there was "an obvious alternative [and lawful] explanation" for the parallel conduct. *Id.* at 567. In other words, because the complaint pleaded facts that were "merely consistent with" the defendant's liability, it "stop[ped] short of the line between possibility and plausibility of 'entitle[ment] to relief." *Id.* at 557.

The Supreme Court's decision in *Iqbal* reaffirmed *Twombly* and made clear that its requirements apply to all complaints, not just those in the antitrust cases. In *Iqbal*, the plaintiff alleged that he suffered physical abuse while he was detained by the FBI following the September 11 terrorist attacks, and that this abuse was part of a policy established by the FBI to target Arab Muslim men in violation of the Constitution. 556 U.S. at 667. Iqbal further alleged that Attorney General John Ashcroft was the "principal architect" of this policy and FBI Director Robert Mueller was "instrumental in [its] adoption, promulgation, and implementation." *Id.* at 669. Citing *Twombly*, the Court reiterated that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and that a complaint is not adequate when "the well-pleaded facts do not permit the court to infer more than the mere

21

possibility of misconduct." *Id.* at 678–79.  Applying these principles, the Court refused to credit the allegations that Ashcroft was the "principal architect" of the unlawful policy and that Mueller was "instrumental" in adopting it because "[t]hese bare assertions, much like the pleading of conspiracy in *Twombly*, amount to nothing more than a 'formulaic recitation of the elements' of a . . . claim." *Id.* at 681 (quoting *Twombly*, 550 U.S. at 551); *see also id.* ("To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical. . . . It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.").

As explained below, Keller Postman's conduct is wholly consistent with a lawful purpose. The specific facts alleged in Tubi's Complaint do not give rise to a plausible inference of unlawful conduct under *Twombly* and *Iqbal*.  And Tubi's "formulaic recitation[s] of the elements of [its] claim" cannot save the Complaint. *Iqbal*, 556 U.S. at 681 (quoting *Twombly*, 550 U.S. at 551).

> **2.**     **Tubi has not adequately pleaded that Keller Postman possessed an interest other than benefitting its clients and has in fact confessed that Keller Postman was motivated by its clients' interests.**

As noted, the only breach of the Terms identified by Tubi is Claimants' decision to file their demands immediately with JAMS rather than waiting an additional 45 days.  Tubi's Complaint fails to plead specific facts showing that Keller Postman advised clients to adopt this timing with motives "independent" of its obligation to serve its clients.  Epithets and legal labels aside, Tubi's Complaint alleges one, and only one, form of benefit that Keller Postman was seeking by advising this timing:  pecuniary gain from the matters themselves.  That is fatal to Tubi's argument because as Tubi alleges, Keller Postman represents its clients on a contingent basis. (Dkt. 1 ¶¶ 25, 31).  Accordingly, the *only* way Keller Postman can further its own pecuniary interest through the timing of Claimants' filings is by obtaining more money for its clients.  Thus, by definition, Keller Postman's pecuniary interest was *dependent on*, and not "independent of," its

clients' interests.  *See Nave*, 140 A.3d at 456 (quoting *Shenandoah Assocs.*, 322 F. Supp. 2d at 11) (rejecting claim that tort liability attaches because "the lawyer hopes the action will increase the lawyer's fees or reputation as a lawyer").

Tubi's allegations in fact confirm that Keller Postman was acting to further its clients' interests.  Tubi asserts that "Keller Postman rushed to file these demands for arbitration and disregarded the mandatory notice and the 45-day informal dispute resolution period . . . . to force Tubi to settle [with Keller Postman's clients] using the threat of onerous fees." (Dkt. 1 ¶ 62).  Tubi subjectively views this conduct as "unfair[] *to Tubi* . . . ." (*Id.* ¶ 62) (emphasis added).  But Tubi cannot state a claim under *Goldschmidt* and *Nave* by claiming that Keller Postman *advantaged* its own clients at Tubi's expense.  That was Keller Postman's job, which is protected from tort liability under *Goldschmidt* and *Nave*.  On the contrary, Tubi must allege facts to show Keller Postman was doing something that advanced its own interests *instead of* its clients' interests.

Multiple appellate cases confirm that Tubi's allegations here are insufficient to state a claim for tortious interference.  For example, in *Goldschmidt*, the owner of a brewing company, Fischer, made a contract with a broker, Flax, to help secure financing for the brewer, 935 A.2d at 366. When the financing deal fell through, both sides sued each other, but Fischer also attempted to sue Flax's law firm, Paley Rothman, on the theory that their advice to Flax led the financing to fall through and was therefore tortious interference.  *Id.* at 367.  The D.C. Court of Appeals affirmed the trial court's decision to sanction Fischer's lawyers for bringing an entirely unfounded claim for tortious interference.  *Id.* at 382.  The court explained that an attorney cannot be held liable "'where [the] attorney's advice or advocacy is for the benefit of his client and not for the attorney's sole personal benefit.'"  *Id.* at 381 (quoting *Fraidin,* 93 Md. App. at 611).  Rather, to establish liability against an attorney, Fischer was required top show "a desire to harm which is independent

of the desire to protect his client." *Id.* (quoting *Fraidin,* 93 Md. App. at 611).  Fischer's lawyer's attempted to identify an independent interest by asserting that Flax's lawyer was "motivated by malice because of his friendship with Flax." *Id.*  But the court rejected this as "mere speculation [rather than] a legitimate inference" and affirmed the imposition of sanctions. *Id.* at 382.

The decision in *Nave* reaffirmed the teaching of *Goldschmidt* and is on all fours with this case.  Like Tubi, Nave was the defendant in pending legal matters.  140 A.3d at 452.  Like Tubi, she attempted to "turn[] the tables by suing" her opponent's lawyer. *Id.* at 455.  Like Tubi, Nave's basis for suing the attorney was "his conduct in the previous litigation[,]" which she disliked. *Id.* at 456.  The D.C. Court of Appeals held that the complaint should be dismissed because "Nave failed to allege facts from which it could legitimately be inferred that [the attorney] acted with malice, i.e., with a desire to harm Ms. Nave that was independent of his desire to protect [his client]." *Id.* at 457.  Like Tubi, Nave had repeated legal labels such as "bad faith" to try to bolster her claims. *Id.*  But these conclusory labels found no support in facts that plausibly showed some motive "independent" of the attorney's "work in service of his client." *Id.*

The same holds here.  Tubi's sole allegation of breach is that Keller Postman's clients filed their demands for arbitration too soon.  The Complaint identifies one, and only one, motivation: that "Keller Postman rushed to file these demands for arbitration and disregarded the mandatory notice and the 45-day informal dispute resolution period . . . . to force Tubi to settle [with Keller Postman's clients] using the threat of onerous fees."  (Dkt. 1 ¶ 62).  In the face of these specific facts, Tubi's assertions that Keller Postman's advice was "independent of any desire to protect its clients" (*id.* ¶ 69) and was "not about vindicating its clients' rights" (*id.* ¶ 57) are no different from the "formulaic recitation of a cause of action's elements" that the Supreme Court rejected in *Twombly*, 550 U.S. at 555, and *Iqbal*, 556 U.S. at 681.  Tubi's recitation of legal labels cannot

override what is indisputable under the facts alleged:  Keller Postman's facilitation of the purported

breach was an effort to advance its clients' interests at the expense of their adversary.  That was

Keller Postman's job, not a tort.

### 3. Tubi's various attacks on Keller Postman and Claimants' underlying claims cannot substitute for Tubi's failure to plead a motive independent of the clients' interests.

Tubi attempts to fill the logical hole in its tort theory by including a range of complaints

about Keller Postman's unrelated litigations, its communication with its clients, and its legal

arguments in Claimants' arbitrations.  None of these allegations support an inference that Keller

Postman somehow had a (still unidentified) interest in the timing of Claimants' filing that was

independent of Claimants' interests.  Nonetheless, Keller Postman cannot let these meritless

attacks go unaddressed.

First, Tubi repeats the self-serving attacks leveled against Keller Postman by defendants of

mass arbitrations in unrelated cases.  (Dkt. 1 ¶¶ 26–33).  It is unclear what the Court is supposed

to make of these allegations, as Tubi's counsel has argued that this case focuses on a narrow

issue—the timing of Keller Postman's clients' demands—that was not at issue in those cases.  *See*

Ex. 5 at 7:13–17 (describing "centerpiece" of case as Keller Postman's purported "interfering with

Tubi's rights under the terms of use to have this pre-arbitration dispute process").  But it should

also be noted that the courts in those cases all *rejected* allegations by Keller Postman's adversaries

and ruled in favor of Keller Postman and its clients.  *See In re Centurylink Sales Pracs. & Secs.

Litig.*, No. 17-md-02795, 2020 WL 3513547, at *6 (D. Minn. June 29, 2020) (denying motion to

disqualify Keller Postman); *Arena v. Intuit Inc.*, No. 19-cv-02546, 2021 WL 834253, at *4 (N.D.

Cal. Mar. 5, 2021) (denying preliminary approval of class settlement over Intuit's complaint that

by intervening on behalf of arbitrating clients, Keller Postman was not "looking out for its clients'

best interests").

Second, Tubi dresses up unsurprising and mundane allegations about Keller Postman's initial outreach to clients and then asks the Court to leap to wholly conclusory and unfounded assumptions about Keller Postman's subsequent interactions with clients.  For example, Tubi alleges that "Keller Postman's solicitations on social media do not explain critical facts to its prospective clients, including the nature of the claim, the terms of the representation, or even the firm that will be representing them." (Dkt. 1 ¶ 18).  But that is hardly surprising, as advertisements on social media occupy a minute amount of space (typically a portion of the viewer's mobile device), and generally have space for only a handful of words.  The advertisements serve only to grab the attention of potential clients and cannot possibly advise clients of the entire range of issues relevant to a potential engagement.  Yet, from this mundane observation, Tubi then leaps to the claim that "[o]n information and belief, once Keller Postman has gathered a large number of sign-ups, it processes the claims without sufficient further investigation." (*Id.* ¶ 20).  Without any access to privileged materials—which Tubi knows exist (*id.* ¶ 61); Ex. 3 at 5—Tubi has no plausible basis to describe the extent of Keller Postman's interactions with its clients.  Tubi does not know what was disclosed as part of Keller Postman's agreements with clients to investigate their claims.  It does not know what post-engagement interactions Keller Postman had with its clients before advising them to file their claims.  Tubi's conclusory assertion of the legal position that Keller Postman has not conducted "sufficient" investigation is just as baseless a leap, if not more so, than the claim in *Twombly* that the defendants' parallel actions must have been the result of a secret agreement.

Even if the Complaint included well-pleaded allegations that Keller Postman failed to sufficiently investigate its clients' claims (which it does not), that still would not square the circle on Tubi's legal claim.  The breach identified by Tubi's Complaint is the timing of Claimants'

demands.  And as noted, the Complaint asserts that "Keller Postman rushed to file these demands for arbitration and disregarded the mandatory notice and the 45-day informal dispute resolution period . . . . to force Tubi to settle [with Keller Postman's clients] using the threat of onerous fees." (*Id.* ¶ 62).  Thus, Tubi's own Complaint alleges that the purported breach was caused by Keller Postman's desire to obtain a settlement for its clients.  Tubi's assertion that Keller Postman rushed to file Claimants' demands thus remains a claim that Keller Postman rushed *to benefit its clients.*

Nor can Tubi revive its failed theory with conclusory assertions that there was a "conflict" between Keller Postman's advice and its clients' interests.  (*Id.* ¶ 56).  Permitting "an unauthorized surrogate to champion the rights of the . . . client would allow that surrogate to use the conflict rules for his own purposes where a genuine conflict might not really exist.  It would place in the hands of the unauthorized surrogate powerful presumptions which are inappropriate in his hands." *See In re Yarn Processing Pat. Validity Litig.*, 530 F.2d 83, 90 (5th Cir. 1976).  But in all events, Tubi's own allegations again refute its conclusory assertion:  By Tubi's own account, Keller Postman's *failure* to file demands before fee-structure changes benefiting Tubi would have disadvantaged Keller Postman's clients by reducing their bargaining leverage.  (Dkt. 1 ¶ 62). Keller Postman's alleged rushing of the demands was in service of, not "independent" of, its clients' interests.  Even if that advice ends up being wrong, it still reflected an effort to advance the clients' interest, and therefore does not give rise to a cause of action by a non-client.  *See Fischer v. Estate of Flax*, 816 A.2d 1, 6 (D.C. 2003) (citing *Morowitz v. Marvel,* 423 A.2d 196, 199–200 (D.C. 1980)) (rejecting "the notion of a negligence action by third parties against adverse counsel").

Third, and finally, while Tubi asserts that Keller Postman's position on the enforceability of the delay provision is meritless, that assertion is not relevant to this motion to dismiss.  As noted,

taking even a meritless position on behalf of a client against Tubi is not a *breach* of the Terms. The Terms expressly allow, and in fact require, such threshold arguments to be raised in arbitration, even where Tubi believes they lack merit. *See Henry Schein*, 586 U.S. at 68 (rejecting argument that courts should not compel arbitration under agreements to arbitrate when one party argues that the claims are "wholly groundless"). The relevant question is whether Keller Postman advised clients to file their demands without delay based on a motivation independent of the clients' interests. Tubi's assertion that Keller Postman's legal position is meritless does not make any more plausible the unexplained claim that Keller Postman could benefit from its legal position independently from its clients. Finally, to the extent the Court thought the merit of this position was relevant, that would only highlight the need for a stay of this litigation pending resolution of Claimants' arbitrations. *See infra*, Argument, Section IV.

That being said, Keller Postman's legal position is well-founded. In challenging the enforceability of the 45-day delay provision, Claimants are relying on the well-worn principle that "[o]ne of the most common types of promise that is too indefinite for legal enforcement is the promise where the promisor retains an unlimited right to decide later the nature or extent of the promisor's performance." 1 Williston on Contracts § 4:34 (4th ed.). Accordingly, "[i]f one party to an agreement is given an unlimited choice, that party may not be a promisor" and the "other party's promise may be unconscionable and may be wholly or partly illegal." Restatement (Second) of Contracts § 34 (Am. L. Inst. 1981). Those tenets apply to the delay provision in the Terms, which binds Tubi to nothing yet requires consumers to wait 45 days, potentially precluding claims close to a limitations period, just to bring a dispute to arbitration.

Courts in California—where most of Keller Postman's clients live, where Tubi is located, and where contract formation would have occurred—find provisions unenforceable where they

asymmetrically benefit the more powerful party.  *See, e.g.*, *Heckman v. Live Nation Ent., Inc.*, 686 F. Supp. 3d 939, 965 (C.D. Cal. 2023); *Little v. Auto Stiegler, Inc.*, 63 P.3d 979, 983–85 (Cal. 2003) (finding unconscionable a provision allowing appeals of awards exceeding $50,000 because although facially mutual, the right is more valuable to the corporation, which is likely to want to appeal a large award, than to a plaintiff, which is likely to want to appeal a small one).  For example, in *Heckman*, a company imposed an arbitration provision that permitted appeals from grants of injunctive relief, but not from denials of injunctive relief.  686 F. Supp. 3d at 965–66.  The court found this provision unenforceable in part because although this "appeal provision nominally applies to Plaintiffs and Defendants in equal measure, only Defendants will benefit in practice." *Id*. at 965.  Similarly, Tubi imposed an unenforceable 45-day delay provision that was nominally mutual, but in practice benefited only Tubi.

One court recently declined to enforce arbitral staging provisions because they have "an *a priori* chilling effect" on consumers bringing their claims against a company.  *Pandolfi v. AviaGames, Inc.*, No. 23-cv-05971, 2024 WL 4051754, at *5 (N.D. Cal. Sept. 4, 2024).  Such provisions, like the delay provision in the Terms, have "a built-in asymmetry, and with no apparent justification" because consumers are more likely to bring coordinated claims than are companies. *Id.* at *7.

Tubi's own conduct after Keller Postman filed its clients demands confirms that Keller Postman's argument is colorable.  The reissued contract contains new provisions that, unlike the ones governing Claimants, expressly require Tubi to engage in a good faith effort to resolve the dispute.  (Dkt. 1, Ex. 9 at 172) ("After receipt of a completed Notice, the parties shall engage in a good faith effort to resolve the Dispute . . . .").  Tubi presumably would not change its Terms on this point if it did not think there was any good faith argument that they were ambiguous.

While the Complaint includes as much criticism of Keller Postman as Tubi can muster, the Court should not lose sight of the governing standard. To state a claim, Tubi must establish with well-pleaded facts that Keller Postman caused a breach, that this breach damaged Tubi, and that Keller Postman was motivated to cause the breach by something other than obtaining money as a result of obtaining a settlement for its clients. The Complaint fails on every point.

### D. Tubi's theory, if embraced, would chill countless legal representations.

Courts are loath to allow suits like Tubi's not just because of established precedent. They have also recognized the instrumental objectives behind those rules: preservation of the integrity of courts and attorney-client relationships. In dismissing an action against an attorney for inducing a breach of contract, one California court observed:

> [P]ublic policy dictates that attorneys must remain free to counsel their clients without fear of subjecting themselves to liability as a result of the proper discharge of their professional obligations. Clients as well must feel free to seek out an attorney's advice on *any* issue at *any* time. "Any rule to the contrary would constitute a serious impairment to the attorney-client relationship, and a resulting deleterious effect on the administration of justice."

*Schick v. Lerner*, 193 Cal. App. 3d 1321, 1329 (1987) (quoting *Wolfrich Corp. v. United Servs. Auto. Ass'n*, 149 Cal. App. 3d 1206, 1211 (1983)).

The stakes here are similarly high. Courts have long warned of the "specter of abuse" associated with a party's accusations against opposing counsel, which can serve as "a powerful litigation tactic to deny an opposing party's counsel of choice." *In re Cnty. of L.A.*, 223 F.3d 990, 996 (9th Cir. 2000); *see also Paul v. Jud. Watch, Inc.*, 571 F. Supp. 2d 17, 20 (D.D.C. 2008) (warning that accusations against opposing counsel "may be used as 'procedural weapons' to advance purely tactical purposes."); *Appeal of Infotechnology, Inc.*, 582 A.2d 215, 219 (Del. 1990) ("[I]t is impermissible to allow surrogates to enforce the professional obligations of lawyers for tactical advantage at trial."). That is what Tubi tries here.

To consider fully the corrosive implications of embracing Tubi's theory, consider that, every day, lawyers give their clients advice about the enforceability of contract provisions.  Here, for example, Jenner & Block LLP ("Jenner") advised Tubi to ignore the prohibition on multi-claimant proceedings in the Terms, after which Tubi sought arbitral consolidation to avoid fees the Terms required it to pay.  (Dkt. 1 ¶ 5).  To give another example, Jenner is defending the musician Chance the Rapper against a lawsuit by Chance's former manager, Patrick Corcoran, alleging breach of contract.  *See Pat the Manager, LLC v. Chance the Rapper, LLC, et al.*, No. 2020-L-012697 (Ill. Cir. Ct. Nov. 30, 2020).  Jenner has counseled Chance not to cede to Corcoran's view of the contract; *i.e.*, to engage in conduct Corcoran alleges to be a breach.  *See Bennett v. Corcoran*, No. 2021-L-001899 (Ill. Cir. Ct. Feb. 19, 2021).  Imagine Corcoran decides—based on what public information he can glean and ignoring that he lacks lawful access to any privileged communications between Jenner and Chance—that he can accuse Jenner of violating its ethical obligations to Chance by failing to investigate the countersuit, which Corcoran thinks is frivolous.  On this basis, Corcoran self-interestedly concludes Chance would have been better off not filing the countersuit and is therefore in conflict with Jenner, which in Corcoran's mind was just interested in running up the bill.  According to Tubi, that is enough for Corcoran to file a lawsuit against Jenner—in fact, more than enough, because Jenner gets paid by the hour regardless of the outcome of the litigation, whereas Keller Postman only gets paid a portion of the recovery if there is one.

Jenner should not face a tort suit simply because their client's adversary asserts that they counseled their clients to breach a contract, alleges that the breach injured them, and claims that Jenner was motivated by a desire to make money from the representation. The same is true of Keller Postman.

II.     **The Court should dismiss the declaratory relief claims.**

After dismissing Tubi's tortious interference claims, the Court should exercise its discretion to dismiss Tubi's tag-along claims for declaratory relief.  Courts disfavor declaratory relief on matters pending in arbitration, which harms the autonomy of the arbitral process and wastes judicial resources.  But Tubi asks for just that:  a declaration determining the sufficiency of demands Keller Postman's clients are currently prosecuting before JAMS.  Moreover, Tubi lacks standing to raise purported claims on behalf of Keller Postman's clients.  That is Tubi's undisguised attempt to separate its arbitral adversaries from their chosen counsel.  The Court should reject this effort.

A.     **The Court should not duplicate the arbitrator's work.**

Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Tubi seeks a declaration that the "allegations in the claims Keller Postman filed in the purported mass arbitration against Tubi do not provide specific facts to support Unruh Act claims." (Dkt. 1 ¶ 83).  Tubi's underlying legal position lacks merit.  JAMS accepted the sufficiency of Keller Postman's clients' demands, which met the significantly relaxed pleading standards in arbitration.  (*Id.* ¶ 68); *see also Tokura Const. Co. v. Corporacion Raymond, S. A.*, 533 F. Supp. 1274, 1278 (S.D. Tex. 1982) ("arbitration proceedings are not held to the same technical rules of pleading and evidence as lawsuits in federal courts").  But Tubi's claim should fail at the threshold because, as Tubi concedes, the legal question at the center of Tubi's declaratory relief claim is already subject to arbitration before JAMS as the Terms require.  (Dkt. 1 ¶¶ 5, 68).  That provides a compelling reason for the court to exercise its discretion to deny declaratory relief.

The language of the Declaratory Judgment Act is permissive.  It provides that in appropriate circumstances, a federal court "*may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28

U.S.C. 2201(a) (emphasis added).  Courts interpreting this language have emphasized that there is "nothing automatic or obligatory about the assumption of jurisdiction by a federal court to hear a declaratory judgment action."  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995) (internal quotation marks omitted).  "In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration."  *Id.*  Stated differently, this Court has ample authority not to waste judicial resources on Tubi's duplicative claim seeking relief.

Moreover, "bringing a claim via a declaratory judgment action does not allow a litigant to evade the [Federal Arbitration Act] if the underlying dispute falls within the reach of the arbitration provision."  *Tannatt v. Varonis Sys., Inc.*, No. 18-cv-12589, 2019 WL 830482, at *2 (D. Mass. Feb. 21, 2019) (citing *Aeronaves de Mexico, S. A. v. Triangle Aviation Servs., Inc.*, 389 F. Supp. 1388, 1391 (S.D.N.Y. 1974), *aff'd*, 515 F.2d 504 (2d Cir. 1975)).  "Where the issues in an action for a declaratory judgment parallel and duplicate the issues appropriately before the arbitrators, the Court may dismiss the action or deny all relief . . . ."  *Aeronaves de Mexico*, 389 F. Supp. at 1391; *cf. also Franchise Tax Bd. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 16 n.14 (1983) ("Federal courts will not seize litigations from state courts merely because one, normally a defendant, goes to federal court to begin his federal-law defense before the state court begins the case under state law.").  The Court should dismiss Tubi's request for a declaration here, which parallels issues properly in JAMS arbitration.

### B.     Tubi lacks standing to seek declaratory relief related to Keller Postman's obligations to Tubi's adversaries.

The Court should also dismiss Tubi's claim for declaratory relief relating to Keller Postman's duties to its own clients.  The claim seeks to separate the consumers bringing claims against Tubi in arbitration from their chosen counsel.  It also relies on the dubious logic that Keller

Postman treated its consumer clients unethically by pursuing their interests in a way that its adversary would not like.

These arguments fail because Tubi, as the fox hoping to guard the henhouse, lacks standing to bring them.  "[A] motion to dismiss for lack of standing constitutes a motion under Rule 12(b)(1) of the Federal Rules of Civil Procedure because 'the defect of standing is a defect in subject matter jurisdiction.'"  *Matthew A. Goldstein, PLLC v. U.S. Dep't of State*, 153 F. Supp. 3d 319, 330 (D.D.C. 2016), *aff'd*, 851 F.3d 1 (D.C. Cir. 2017) (quoting *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987)).  Standing requires a plaintiff to show (1) injury in fact that is "concrete and particularized" and "actual or imminent" and not merely "conjectural or hypothetical"; (2) a causal connection between the injury and the conduct complained of that is not the result of some independent action by "some third party not before the court"; and (3) that it is "likely" and not "speculative" that the injury will be redressed by a favorable decision.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  In addition, "a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991).  "The standing requirement protects against the strategic exploitation of the rules of ethics long disfavored by the Courts."  *Colyer v. Smith*, 50 F. Supp. 2d 966, 973 (C.D. Cal. 1999) (citation omitted).  "The cost and inconvenience to clients and the judicial system from misuse of the rules for tactical purposes is significant."  *Optyl Eyewear Fashion Int'l v. Style Cos.*, 760 F.2d 1045, 1050 (9th Cir. 1985).

Tubi asserts standing based on its conclusion that "an actual and substantial controversy exists between Tubi and Keller Postman concerning the legality of Tubi's alleged conduct." (Dkt. 1 ¶ 80).  But the facts Tubi alleges show that the only controversy over the legality of Tubi's conduct are the demands before JAMS brought by Keller Postman's *clients*.  (*Id.* ¶ 36).  Tubi's

rule would eviscerate the injury-in-fact, causation, and redressability requirements by giving every litigant standing to pursue declaratory relief against an opponent's lawyers.  That is not the rule. *See Centurylink*, 2020 WL 3513547, at *6.

Tubi cites *CenturyLink*'s references to a similarly situated company's allegations to try and run the same playbook (Dkt. 1 ¶ 27.a.vi), but that district court actually *denied* a motion to disqualify Keller Postman after observing that "CenturyLink asserts that Keller has conflicts that harm its clients, not CenturyLink . . . ." and that "CenturyLink cannot show 'the invasion of a legally protected interest' from Keller's representation of its clients, and certainly not one that is 'not conjectural or hypothetical.'"  *CenturyLink*, 2020 WL 3513547, at *6.

The same is true here.  Tubi claims that it was harmed, but it has not alleged what "legally protected interest" it has.  *See Lujan*, 504 U.S. at 560.  Instead, Tubi concludes—lacking lawful access to materials that would allow it to even evaluate its conclusion—that Keller Postman insufficiently vetted its clients' claims.  Even if this were true, which it is not, the harms to Tubi are speculative at best.  Assuming Keller Postman brought frivolous claims without vetting them as Tubi alleges, that would only result in the "dismissal, potential counterclaims, and potential sanctions" that Tubi threatens.  (Dkt. 1 ¶ 67).  Tubi's Terms provide multiple ways to recover through JAMS the attorneys' fees and costs it claims as its speculative damages here.  (*Id.* ¶ 68); (*id.*, Ex. 8 at 130) ("[I]f the arbitrator, at the request of the winning party, finds that the losing party brought a claim . . . frivolously or for an improper purpose, then regardless of the amount in dispute, the arbitrator must order the losing party to pay both sides' arbitration fees and may order the losing party to pay the winning party's reasonable attorneys' fees"); Ex. 2 at 22 (JAMS Rule 24) (providing for sanctions, such as "costs occasioned by the actionable conduct, including attorneys' fees[,]" where a party fails to "comply with its obligations under any of these Rules[.]").

And by its own estimation, Tubi has already avoided the main "injury" it feared:  having to pay the arbitral initiation fees it obligated itself to pay.  (Dkt. 1 ¶ 68) ("Keller Postman's efforts to force Tubi into a settlement based not on merit but instead on fear of a massive upfront arbitration bill have failed.").  Thus, whatever injury Tubi claims is not imminent enough to confer standing. *See Welborn v. Internal Revenue Serv.*, 218 F. Supp. 3d 64, 76 (D.D.C. 2016) ("Allegations of speculative or possible future injury do not satisfy the requirements of Article III.").  Tubi's rejection of Keller Postman's offer for dialog that would have addressed the concerns it now litigates (Dkt. 1 ¶ 64) demonstrates just how little injury it perceives.

More obviously, the relief Tubi requests here—a declaration that Keller Postman's conduct was unethical—would not redress whatever injury it thinks it has suffered or will suffer. "[N]either a general interest in a just adjudication nor an interest in winning a case is enough to confer standing."  *Sherman v. CLP Res., Inc.*, No. 12-cv-8080, 2015 WL 13542762, at *3 (C.D. Cal. Feb. 4, 2015).  Tubi's core complaint is that it is still "fac[ing] an arbitration process that would not be taking place absent Keller Postman[] . . . ." (Dkt. 1 ¶ 5), and Tubi is seeking an order that would put an effective end to those arbitrations (*id.* ¶ 85).  But a declaration about Keller Postman's duties would not have any impact on those arbitrations.   Third parties—Keller Postman's *clients*—hold the claims against Tubi, and this Court lacks authority to order non-parties to dismiss their claims.  The declaration Tubi seeks would only support the company's broader mission to harm Keller Postman's clients by separating them from their chosen counsel. The Court should not enlist itself in this mission by allowing this suit to proceed further.

## III.    The Court should dismiss this tactical lawsuit with prejudice.

In considering this motion, the Court should place Tubi's lawsuit within the appropriate context.  For lower-value and highly-uniform consumer claims, class actions are orders of magnitude more efficient than any individualized dispute resolution.  But companies have long

assumed that "[t]he *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).  They therefore imposed agreements requiring individualized bilateral arbitration, especially after the Supreme Court held that states could not require companies to use class arbitration.  *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336, 351 (2011).

In selling the legality of these arrangements to the Supreme Court, companies and their proxies held out the possibility that large numbers of individual plaintiffs could pool resources to make individual arbitration more efficient.  At that time, the Chamber of Commerce—upon whose revised assessment Tubi now relies (Dkt. 1 ¶ 16 n.2)—favorably cited the example of attorneys representing "over 1,000 claimants—each making virtually identical allegations" against AT&T.  *See* Br. of the Chamber of Com. of the U.S. as Amicus Curiae Supporting Pet'rs, *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228 (2012) (No. 12-133), 2012 WL 6759408, at *27–30.  It touted how the "Internet and social media can be used effectively to reach out to potential claimants . . . [and to] identify other businesses or individuals with similar claims."  *Id.* at *30.  The naysayers were "mistaken in concluding that class actions . . . are the only effective means . . . of proving small claims."  *Id.*

For the better part of a decade, however, the practical consequence for companies like Tubi, with a bilateral arbitration clause, was the elimination of claims that no one claimant had an incentive to pursue in isolation.  "Scores of claims vanished from the civil justice landscape," and "the legal claims of minorities, women, wage-and-hour workers, and the working poor were systemically and disproportionately foreclosed."  J. Maria Glover, *Mass Arbitration*, 74 Stan. L.

Rev. 1283, 1283 (2022).  "Elimination of those claims would tend to be due to the economics of claiming, not due to their underlying merits."  *Id.* at 1307.

Eventually, consumer attorneys accepted the Chamber's proposal and began using economies of scale to arbitrate small-value, meritorious claims on behalf of large groups of injured consumers.  Companies like Tubi began crying foul.  But recognizing that individuals were only enforcing the modest procedural rights companies left them with, courts have rejected accusations that enforcement of arbitral contracts by many individuals at once constitutes unethical extortion.  Many have reacted like Judge Alsup, who criticized the argument's "hypocrisy."  *Abernathy*, 438 F. Supp. 3d at 1067–68; *see also Adams*, 414 F. Supp. 3d at 1252 n.2 (characterizing fees as a result of company's drafting choices); *Intuit*, 2020 WL 7094231, at *13 (same).

Rather than the result of coercion by lawyers representing consumers, the combined costs of individual arbitration are an inescapable feature of companies' decision to deny consumers the option of a class action and instead impose individual arbitration of relatively low-value claims.  When each arbitration must be pursued individually, the costs can add up.

Companies like Tubi, faced with these costs, have therefore returned to the drawing board.  Some have dropped arbitration provisions from their consumer agreements.  *See* J. Maria Glover, *Recent Developments in Mandatory Arbitration Warfare:  Winners and Losers (So Far) in Mass Arbitration*, 100 Wash. U.L. Rev. 1617, 1625–27 (2023).  Others have tried to sell preclusive class action settlements to the lowest bidder.  *Id.* at 1629–33.  Many, like Tubi, have argued "that the enforcement of *their* arbitration agreements according to *their* terms would be fundamentally unfair—to *them*."  *Id.* at 1628 (citation omitted).  Still others have sued the arbitral fora they designated.  *Id.* at 1633–35.  Tubi now adds to the list its current effort to sue the lawyers representing its users in arbitration.

The Court should reject Tubi's effort and dismiss the Complaint with prejudice. "Dismissal with prejudice is warranted when 'the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1340 (D.C. Cir. 2015). Tubi cannot state a tortious interference claim because it cannot avoid that Keller Postman's clients followed the Terms by contesting the enforceability of the delay provision in arbitration on an accelerated timeline that made no difference to Tubi. Tubi cannot show that Keller Postman was motivated by its own independent interests consistent with the allegations about contingency fee arrangements and Keller Postman's efforts to maximize its clients' bargaining leverage. Tubi cannot obtain a declaration on the sufficiency of Keller Postman's clients' arbitral demands consistent with the allegations that those demands are pending in JAMS. And Tubi cannot obtain a declaration confirming its ethical accusations against Keller Postman because they are not relevant to its failed tortious interference claim and Tubi further lacks standing to raise these complaints.

## IV. Alternatively, the Court should stay this case as Tubi arbitrates the core issues beneath this case with Keller Postman's clients.

### A. Tubi's claims are based on an issue referable to arbitration.

If the Court decides not to dismiss this case, the FAA requires the Court to stay this matter pending JAMS arbitration of the underlying issues between Tubi and Keller Postman's clients. 9 U.S.C. § 3. Section 3 of the FAA requires that when a suit is brought

> upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . .

9 U.S.C. § 3. A "party" in the Section 3 context means a party to the lawsuit, not a party to the arbitration agreement. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630, 630 n.4 (2009).

The plain text of Section 3 requires this litigation to be stayed because (1) there is a valid written agreement to arbitrate; and (2) the litigation involves an issue referable to arbitration. Tubi alleges that its Terms are a valid written agreement to arbitrate. (Dkt. 1 ¶ 72). And the dispositive issue in this suit—whether Keller Postman's clients breached the Terms by challenging the validity of the delay provision in arbitration before complying with it—is both an element of Tubi's tortious interference claim from which its other claims flow (Dkt. 12 at 4) and is referable to arbitration. The Terms refer "any Dispute (as defined herein) between [Claimant] and Tubi" to arbitration, and define "Dispute" to include "any disputes, actions, claims, or controversies between [Claimant] and the [sic] Tubi that arise from or in any way relate to or concern . . . this Arbitration Agreement, [and] any other aspect of these Terms of Use (including their applicability and their conformance to applicable law) . . . ." (Dkt. 1, Ex. 8 at 129–30). The Terms state that "disputes over arbitrability shall be resolved by the arbitrator" and incorporate JAMS Streamlined Rule 8(b), which states that "disputes over the . . . validity, interpretation or scope of the agreement under which Arbitration is sought . . . shall be submitted to and ruled on by the Arbitrator." (*Id.*, Ex. 8 at 130); Ex. 2 at 11 (JAMS Rule 8(b)). Tubi even alleges that "JAMS decided that the issue of whether the claimants met the precondition for arbitration should be left to the still-to-be-assigned arbitrator" (Dkt. 1 ¶ 68) and that it is continuing to participate in the arbitration (*id.* ¶ 5).

The Complaint illustrates the observation that a "suit against a nonsignatory that is based upon the same operative facts and is inherently inseparable from the claims against a signatory will always contain 'issue[s] referable to arbitration under an agreement in writing.'" *Hill v. GE Power Systems, Inc.*, 282 F.3d 343, 347 (5th Cir. 2002) (quoting 9 U.S.C. § 3). In such circumstances, a Section 3 stay is appropriate. Such a stay is also supported by the Court's established discretion to stay parallel proceedings, as a signatory to an arbitration agreement

40

cannot "undermine the arbitration proceedings and thwart the federal policy in favor of arbitration" by filing suit against a nonsignatory closely related to the arbitral proceedings. *Id.*; *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n.23 (1983) (noting courts' discretionary authority to "stay litigation among the non-arbitrating parties pending the outcome of the arbitration").

Notably, Section 3 "does not require that the *claims* in the instant suit be referable to arbitration. Rather, it requires that an '*issue* involved in [the] suit' be referable to arbitration." *CPB Contractors Pty Ltd. v. Chevron Corp.*, No. 16-cv-05344, 2017 WL 7310776, at *4 (N.D. Cal. Jan. 17, 2017) (emphasis added) (quoting 9 U.S.C. § 3); *see also Hill*, 282 F.3d at 347–49 (holding that a Section 3 stay was appropriate even when claims against a nonsignatory defendant could not be compelled to arbitration). In *CPB*, the plaintiff, a signatory to an arbitration contract with Chevron Australia, brought tortious interference claims against nonsignatory defendants closely related to Chevron Australia. *Id.* at *1. Chevron Australia had initiated arbitration against CPB. So, like Keller Postman here, the nonsignatory defendants in *CPB* moved for a stay of litigation pursuant to Section 3 pending the completion of that arbitration. *Id.* at *2. Citing *Hill* and observing that the "application of § 3 to this case is not based on Defendants' ability to base their defense on the arbitration award" but on "the possibility that proceeding with this case will interfere with Chevron Australia's right to have the claims against it decided in arbitration[,]" the Court granted the motion to stay. *Id.* at *5. Likewise, Section 3 mandates a stay here because this lawsuit would interfere with Claimants' contractual right to challenge the delay provision in arbitration. (Dkt. 1 ¶¶ 68, 72).

### B.    Keller Postman has the right to enforce the Terms.

That Keller Postman is not a signatory to the Terms makes no difference to the analysis because Keller Postman has the right to enforce the Terms against Tubi under the doctrine of

equitable estoppel.  Overruling earlier authority that nonsignatories to an arbitration agreement can never obtain Section 3 relief, the Supreme Court explained that "a litigant who was not a party to the relevant arbitration agreement may invoke § 3 if the relevant state contract law allows him to enforce the agreement."  *Arthur Andersen*, 556 U.S. at 632.  "[T]raditional principles of state law allow a contract to be enforced by or against nonparties to the contract through . . . estoppel."  *Id.* at 631 (internal quotation marks omitted).

Since *Arthur Andersen*, courts in this and other jurisdictions have regularly acknowledged that nonsignatories may enforce arbitration agreements against signatories through the doctrine of estoppel.  *See, e.g.*, *Kelleher v. Dream Catcher, L.L.C.*, 278 F. Supp. 3d 221, 225 (D.D.C. 2017); *Riley v. BMO Harris Bank, N.A.*, 61 F. Supp. 3d 92, 99 (D.D.C. 2014); *Hurley v. Emigrant Bank*, No. 19-cv-0011, 2019 WL 5537330, at *4 (N.D. Tex. Oct. 25, 2019) (applying Delaware law); *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128–29 (9th Cir. 2013) (applying California law); *Usme v. CMI Leisure Mgmt., Inc.*, 106 F.4th 1079, 1087–88 (11th Cir. 2024); *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 126–27 (2d Cir. 2010).  As *Arthur Andersen* clarified, that enforcement extends to Section 3.  556 U.S. at 633; *see also Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 526 (5th Cir. 2000) ("[P]roceedings against parties and non-parties to the arbitration agreement are stayed pending the outcome of arbitration, when the action against the non-party is dependent upon interpretation of the underlying contract.").

Such application of estoppel is appropriate where "the non-signatory is seeking to resolve issues that are intertwined with an agreement that the signatory has signed."  *Riley*, 61 F. Supp. 3d at 98–99 (quoting *Fox v. Computer World Servs. Corp.*, 920 F. Supp. 2d 90, 103 (D.D.C. 2013)).  "[F]or a court to find Plaintiff's claims 'intertwined' with the agreements containing the arbitration provision, Plaintiff need not claim that Defendants breached those agreements themselves."  *Id.* at

100.   "[I]nstead, the relevant question is whether the agreements need to be 'relied upon' or are 'integral' to establishing the violation alleged by Plaintiff" and the "plaintiff's actual dependence on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the sine qua non of an appropriate situation for applying equitable estoppel." *Id.* (cleaned up).   "[W]here there would be no claim against the non-signatory defendant but for the contract, applying the doctrine of estoppel is appropriate." *Kelleher*, 278 F. Supp. 3d at 225.   "Claims of tortious interference with contract are particularly well suited for imposing equitable estoppel against the signatory:  But for the contract containing the arbitration clause, there would be no breach and no claim for interference with the contract." *Goldman v. KPMG, LLP*, 173 Cal. App. 4th 209, 226 n.10 (2009); *see also Bitstamp Ltd. v. Ripple Labs Inc.*, No. 15-cv-01503, 2015 WL 4692418, at *5 (N.D. Cal. Aug. 6, 2015) ("Courts routinely allow non-signatory defendants to compel arbitration of tortious interference claims.").

The above standards are easily met here.  This lawsuit is not just intertwined with the Terms or derivative of the Terms; it is Tubi's attempt to convert an ongoing legal dispute over the interpretation of the Terms into a tort claim.  Tubi's tortious interference claim based on that interpretive dispute is the "centerpiece" of this case.  Ex. 5 at 7:13–17.  As JAMS decided and Tubi's allegations recognize (Dkt. 1 ¶¶ 5, 68), Tubi delegated that issue, which goes to arbitrability.  Even absent a delegation agreement, "courts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration." *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 34 (2014); *see also Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 85 (2002) ("[I]ssues of procedural arbitrability, *i.e.*, whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the

arbitrators to decide."). And the Terms include a provision expressly acknowledging the possibility that "[e]ach of you and Tubi may incur attorneys' fees during the arbitration." (Dkt. 1, Ex. 8 at 130). In *Riley*, the fact that the arbitration agreement referenced the non-signatories who later sought to enforce the agreement gave the court added comfort in applying equitable estoppel. 61 F. Supp. 3d at 101.

Given both the mandates of Section 3 and the applicability of the estoppel doctrine, the Court should stay this case until Tubi and Keller Postman's clients are finished arbitrating the key issues the Complaint raises. Tubi cannot prevail against Keller Postman without establishing that Keller Postman's clients breached the Terms and that Tubi incurred damages as a result. Yet Tubi alleges that this very issue is subject to arbitration pursuant to the Terms. The Court should stay Tubi's claims until that arbitration is complete. Any other outcome would usurp the arbitrator's role in determining the delegated issue, which the FAA forbids. *See Henry Schein*, 586 U.S. at 68 ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue.").

## CONCLUSION

For the reasons above, the Court should grant the motion and dismiss this case with prejudice or, in the alternative, stay this case pending the completion of arbitrations between Tubi and Keller Postman's clients.

Dated:  September 25, 2024

Respectfully submitted,

KELLER POSTMAN LLC

By:   /s/ Warren D. Postman
     Warren D. Postman (Bar No. 995083)
      Albert Y. Pak (Bar ID 888314242)
     1101 Connecticut Avenue N.W.
     Suite 1100
     Washington, DC 20036
     (202) 918-1123
     wdp@kellerpostman.com
     albert.pak@kellerpostman.com

     Kiran N. Bhat (Bar No. 1021898)
     2333 Ponce De Leon Boulevard
     Suite 100
     Coral Gables, FL 33134
     (305) 845-4684
     kiran.bhat@kellerpostman.com

     *Attorneys for Defendant*