## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TUBI, INC.,

  Plaintiff,

  v.

KELLER POSTMAN LLC,

  Defendant.

Civil Action No. 1:24-cv-01616-ACR

Judge Ana C. Reyes

## PLAINTIFF TUBI, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT KELLER POSTMAN LLC'S MOTION TO DISMISS THE COMPLAINT WITH PREJUDICE OR, IN THE ALTERNATIVE, TO STAY PENDING ARBITRATION

JENNER & BLOCK LLP
Brandon D. Fox (*pro hac vice*)
Kelly M. Morrison (D.C. Bar No. 1046293)
Sati Harutyunyan (D.C. Bar No. 1049009)
515 South Flower Street, Suite 3300
Los Angeles, CA 90071-2246
Telephone: (213) 239-5100
Facsimile: (213) 239-5199
bfox@jenner.com
kmorrison@jenner.com
sharutyunyan@jenner.com

*Attorneys for Plaintiff Tubi, Inc.*

October 16, 2024

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. iii

INDEX OF EXHIBITS ........................................................................................................ ix

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................ 4

I.      Keller Postman's Mass Arbitration Business Model Brims with Ethical Risks. . 4

II.     Keller Postman's Tortious Interference with Tubi's Contracts. .......................... 6

III.    Keller Postman's Ongoing Interference and Efforts to Stymie Arbitration. ........ 9

LEGAL STANDARD .......................................................................................................... 11

ARGUMENT ....................................................................................................................... 12

I.      Tubi States a Tortious Interference Claim. ......................................................... 12

    A.  Tubi Sufficiently Alleges That Keller Postman Knowingly and Intentionally
        Interfered with a Valid Contractual Relationship Between Tubi and Its Users. . 12

    B.  Tubi Sufficiently Alleges that Keller Postman's Interference Caused Damage. 19

    C.  Keller Postman Cannot Avoid Dismissal by Arguing It Acted in Its Clients'
        Interests. ....................................................................................................... 22

    D.  Denying Keller Postman's Motion to Dismiss Would Not Deter Lawyers from
        Zealously and Ethically Representing Their Clients. ........................................ 29

II.     Tubi Has Properly Pleaded Its Declaratory Judgment Claim. ........................... 32

III.    A Stay Is Unwarranted. ...................................................................................... 36

    A.  Keller Postman is not Entitled to a Stay Under Section 3. .................................. 37

    B.  The Equitable Estoppel Doctrine Does Not Apply. ............................................ 39

    C.  There Is No Basis for a Discretionary Stay. ...................................................... 41

IV.     The Court Should Provide Tubi with Leave to Amend if It Dismisses the
        Complaint. ....................................................................................................... 43

CONCLUSION ................................................................................................................... 44

CERTIFICATE OF SERVICE ............................................................................................ 45

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                     **Page(s)**

*Abernathy v. DoorDash, Inc.*,
  438 F. Supp. 3d 1062 (N.D. Cal. 2020) ...............................................................................21

*Aeronaves de Mexico, S. A. v. Triangle Aviation Servs., Inc.*,
  389 F. Supp. 1388 (S.D.N.Y. 1974), *aff'd*, 515 F.2d 504 (2d Cir. 1975) ..............................33

*Am. Chung Nam, LLC v. Mitsui O.S.K. Lines, Ltd.*,
  No. 2:23-cv-07676-SB-JPR, 2023 WL 8845213 (C.D. Cal. Dec. 19, 2023) .........................18

*Amaplat Mauritius, Ltd. v. Zim. Mining Dev. Corp.*,
  663 F. Supp. 3d 11 (D.D.C. 2023) ......................................................................................24

*Arthur Andersen LLP v. Carlisle*,
  556 U.S. 624 (2009) ....................................................................................................37, 38

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ....................................................................................................11, 22

*Auxier v. Kraisel*,
  466 A.2d 416 (D.C. 1983) ....................................................................................................20

*BDO USA, LLP v. Jia-Sobota*,
  283 A.3d 699 (D.C. 2022) ....................................................................................................15

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................................12

*Bielski v. Coinbase, Inc.*,
  87 F.4th 1003 (9th Cir. 2023) ...................................................................................... *passim*

*Bombardier Corp. v. Nat'l R.R. Passenger Corp.*,
  333 F.3d 250 (D.C. Cir. 2003) .............................................................................................37

*Brown v. Gov't of D.C.*,
  390 F. Supp. 3d 114 (D.D.C. 2019) ...................................................................................9, 24

*Casco Marina Dev. v. D.C. Redevelopment Land Agency*,
  834 A.2d 77 (D.C. 2003) ...............................................................................................12, 15

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
  No. 17-2795, 2020 WL 3513547 (D. Minn. June 29, 2020) ...................................................34

*Close It! Title Servs., Inc. v. Nadel*,
  248 A.3d 132 (D.C. 2021) ....................................................................................................30

**TABLE OF AUTHORITIES**
**(continued)**

**Cases**                                                                   **Page(s)**

*Colyer v. Smith*,
   50 F. Supp. 2d 966 (C.D. Cal. 1999) ...............................................................34, 38

*CPB Contractors Pty Ltd. v. Chevron Corp.*,
   No. 16-cv-05344, 2017 WL 7310776 (N.D. Cal. Jan. 17, 2017)............................................38

*Davenport v. Nvidia Corp.*,
   No. 23-cv-01877-PCP, 2024 WL 832387 (N.D. Cal. Feb. 28, 2024) ....................................18

*Durruthy v. Charter Commc'ns, LLC*,
   No. 20–CV–1374–W–MSB, 2020 WL 6871048 (S.D. Cal. Nov. 23, 2020) ........................19

*Econ. Rsch. Servs., Inc. v. Resol. Econ., LLC*,
   208 F. Supp. 3d 219 (D.D.C. 2016) ...................................................................................23

*EEOC v. Waffle House, Inc.*,
   534 U.S. 279 (2002)................................................................................................................33

*In re Engle Cases*,
   283 F. Supp. 3d 1174 (M.D. Fla. 2017)..........................................................................1, 25

*Flying Food Grp., Inc. v. NLRB*,
   471 F.3d 178 (D.C. Cir. 2006) ........................................................................................15, 24

*Francis v. Rehman*,
   110 A.3d 615 (D.C. 2015) .....................................................................................................15

*Goldschmidt v. Paley Rothman Goldstein Rosenberg & Cooper, Chartered*,
   935 A.2d 362 (D.C. 2007) .............................................................................................. *passim*

*Heckman v. Live Nation Ent., Inc.*,
   686 F. Supp. 3d 939 (C.D. Cal. 2023) ..................................................................................17

*Hill v. GE Power Systems, Inc.*,
   282 F.3d 343 (5th Cir. 2002) ................................................................................................38

*Hulley Enters. Ltd. v. Russian Fed'n*,
   502 F. Supp. 3d 144 (D.D.C. 2020).......................................................................................41

*Jones v. Starz Ent., LLC*,
   No. EDCV 24-0206-KK-DTBX, 2024 WL 1067505 (C.D. Cal. Mar. 11,
   2024), *appeal filed*, No. 24-1645 (9th Cir. Mar. 11, 2019) ....................................................43

**TABLE OF AUTHORITIES**
**(continued)**

**Cases**                                                                 **Page(s)**

*Keeton v. Wells Fargo Corp.*,
    987 A.2d 1118 (D.C. 2010) ...................................................15

*Kelleher v. Dream Catcher, LLC*,
    278 F. Supp. 3d 221 (D.D.C. 2017) .......................................39

*Keller Postman LLC v. PPC Squared Digit. Mkting., Inc.*,
    1:24-cv-02071-ACR (D.D.C. July 16, 2024).............................6

*Heidi Aviation, LLC v. Jetcraft Corp.*,
    573 F. Supp. 3d 182 (D.D.C. 2021) .........................................6

*In re Kennedy*,
    281 A.3d 36 (D.C. 2022) .......................................................26

*Kindig v. Whole Foods Mkt. Grp., Inc.*,
    811 F. Supp. 2d 410 (D.D.C. 2011) .......................................41

*Kisby Lees Mech. LLC v. Pinnacle Insulation, Inc.*,
    No. CIV. 11–5093 .................................................................36

*KLEO AG v. Rivada Networks, Inc.*,
    No. 22-CV-01664 (DLF), 2022 WL 22626490 (D.D.C. Nov. 2, 2022) ................43

*Lannan Found. v. Gingold*,
    300 F. Supp. 3d 1 (D.D.C. 2017) ...................................23, 30

*Liapes v. Facebook, Inc.*,
    95 Cal. App. 5th 910 (2023) ...........................................6, 7, 28

*Little v. Auto Stiegler, Inc.*,
    63 P.3d 979 (Cal. 2003) .......................................................17

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983)...................................................................41

*Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*,
    592 F. Supp. 2d 86 (D.D.C. 2009) .........................................19

*Nave v. Newman*,
    140 A.3d 450 (D.C. 2016) .....................................................25

*NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*,
    957 A.2d 890 (D.C. 2008) ...................................................15

**TABLE OF AUTHORITIES**
(continued)

**Cases**                                                                    **Page(s)**

*O'Donnell v. Barry*,
    148 F.3d 1126 (D.C. Cir. 1998) ........................................................................... 43

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    572 U.S. 545 (2014) .............................................................................................. 31

*Pandolfi v. AviaGames, Inc.*,
    No. 23-cv-05971, 2024 WL 4051754 (N.D. Cal. Sept. 4, 2024) ........................... 17

*POST, LLC v. Berkshire Hathaway Specialty Ins. Co.*,
    No. CV 20-2972 (JDB), 2022 WL 3139022 (D.D.C. Aug. 5, 2022) ...................... 36

*Randolph v. RRR Bowie, LLC*,
    No. 22-cv-2150-PX, 2023 WL 7110516 (D. Md. Oct. 27, 2023) .......................... 18

*Riley v. BMO Harris Bank, N.A.*,
    61 F. Supp. 3d 92 (D.D.C. 2014) ................................................................... 39, 40

*Robert Half Int'l Inc. v. Billingham*,
    317 F. Supp. 3d 379 (D.D.C. 2018) ......................................................... 12, 15, 24

*Robertson v. Cartinhour*,
    883 F. Supp. 2d 121 (D.D.C. 2012) ................................................................. 2, 26

*S.C. Hotel, LLC v. Bayley Constr., LP*,
    No. 823CV00793JVSADSX, 2023 WL 6927349 (C.D. Cal. Sept. 12, 2023) ........ 36

*Schick v. Lerner*,
    193 Cal. App. 3d 1321 (1987) ........................................................................ 30, 31

*SEC v. Kokorich*,
    663 F. Supp. 3d 63 (D.D.C. 2023) ....................................................................... 12

*Shenandoah Associates Ltd. v. Tirana*,
    322 F. Supp. 2d 6 (D.D.C. 2004) ......................................................................... 23

*Shenandoah Assocs. Ltd. P'ship v. Tirana*,
    182 F. Supp. 2d 14 (D.D.C. 2001) .................................................................. 23, 30

*Singletary v. Howard Univ.*,
    939 F.3d 287 (D.C. Cir. 2019) ............................................................................. 21

*Smith v. Spizzirri*,
    601 U.S. 472 (2024) .............................................................................................. 37

## TABLE OF AUTHORITIES
### (continued)

**Cases**                                                                 **Page(s)**

*Sokol Holdings, Inc. v. BMB Munai, Inc.*,
   542 F.3d 354 (2d Cir. 2008)............................................................................40

*Stone & Webster, Inc. v. Ga. Power Co.*,
   968 F. Supp. 2d 1 (D.D.C. 2013).....................................................................16

*Taft v. Henley Enters., Inc.*,
   Case No. SACV 15–1658–JLS, 2016 WL 9448485 (C.D. Cal. Mar. 2, 2016) ......................19

*Tannatt v. Varonis Sys., Inc.*,
   No. CV 18-12589-JGD, 2019 WL 830482 (D. Mass. Feb. 21, 2019)....................................33


## STATUTES, RULES AND REGULATIONS

28 U.S.C. § 1927............................................................................................1

California Code of Civil Procedure § 1281.91(b)(1) ....................................42

Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*...............................4, 32, 33, 42

Federal Arbitration Act, 9 U.S.C. § 3 .........................................36, 37, 38, 41

Unruh Civil Rights Act, CAL. CIV. CODE §§ 51-52............................... *passim*


## OTHER AUTHORITIES

Alex B. Long, *Attorney Liability for Tortious Interference: Interference with*
   *Contractual Relations or Interference with the Practice of Law?*, 18 GEO. J.
   LEGAL ETHICS 471 (2005)................................................................................30

5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND
   PROCEDURE § 1357 (4th ed.)...........................................................................43

D.C. ETHICS OP. 54 ........................................................................................26

D.C. ETHICS OP. 136 ......................................................................................26

D.C. ETHICS OP. 140 ......................................................................................26

D.C. ETHICS OP. 371 ......................................................................................26

## **TABLE OF AUTHORITIES**
### **(continued)**

D.C. ETHICS OP. 386 ...............................................................................................5

D.C. Rule of Professional Conduct 1.2(a)...........................................................28

D.C. Rule of Professional Conduct 1.3 ................................................................35

D.C. Rule of Professional Conduct 1.7................................................................35

D.C. Rule of Professional Conduct 1.8................................................................26

D.C. Rule of Professional Conduct 3.1................................................................34

Federal Rule of Civil Procedure 11 ......................................................................1

Federal Rule of Civil Procedure 12(b)(6) ................................................3, 21, 31

Federal Rule of Evidence 404(b) ........................................................................29

Federal Rule of Evidence 405.............................................................................29

PAUL D. RHEINGOLD, LITIGATING MASS TORT CASES §§ 14:15, 14:17 (2024) ............................23

RESTATEMENT (SECOND) OF TORTS § 767 (1979).........................................................23

U.S CHAMBER OF COMMERCE INSTITUTE FOR LEGAL REFORM, MASS ARBITRATION
    SHAKEDOWN: COERCING UNJUSTIFIED SETTLEMENTS (2023)....................................5

## INDEX OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1 | Compl., *Keller Postman LLC v. PPC Squared Digit. Mkting., Inc.*, 1:24-cv-02071-ACR (D.D.C. July 16, 2024), ECF No. 1 |
| 2 | Resp. to Request for Pre-Mot. Conf., *Keller Postman LLC v. PPC Squared Digit. Mkting., Inc.*, 1:24-cv-02071-ACR (D.D.C. Sept. 25, 2024), ECF No. 14 |
| 3 | Answer to Pet. for Rev., *Liapes v. Facebook, Inc.*, No. S282529 (Cal. Nov. 30, 2023) |
| 4 | Letter from B. Fox to JAMS (Aug. 14, 2024) |
| 5 | Letter from W. Postman to JAMS (Aug. 23, 2024) |
| 6 | Disqualification Notice 1 |
| 7 | Disqualification Notice 2 |
| 8 | JAMS Letter to Parties (Sept. 23, 2024) |
| 9 | Respondent-Appellee Starz Ent. LLC's Answering Br., *Jones v. Starz Ent., LLC*, No. 24-1645 (9th Cir. July 22, 2024), ECF No. 26-1 |
| APPENDIX | Appendix A (Ethics Materials) |

# INTRODUCTION

Tubi is a premium streaming service that offers its users videos on demand for free.  But users who register for the service must agree to Tubi's Terms of Use (the "Terms"), which contain material provisions meant to reduce the costs of disputes between Tubi and its users.  *See* ECF No. 1 ("Compl.") ¶¶ 36–39.  In those Terms, Tubi and its users agreed to arbitrate their disputes.  *Id.* Ex. 8 § 10(8).  Before initiating arbitration, however, the side claiming a grievance must first send a written notice setting forth "the specific facts giving rise to the Dispute" and wait 45 days so that the party receiving the notice "may try to reach a settlement of the Dispute" (the "Informal Dispute Process").  *Id.* § 10(7).  This Informal Dispute Process is neither unusual nor unreasonable; to the contrary, such "[p]re-arbitration dispute resolution procedures are commonplace and can be both 'reasonable and laudable.'"  *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1014 (9th Cir. 2023) (citation omitted).

Notwithstanding the clear and unambiguous Terms, Keller Postman caused its clients to commit a mass breach of the Terms:  It filed 23,747 arbitration demands against Tubi without any of its clients complying with the Informal Dispute Process, including by providing written notice of "the specific facts giving rise to [the client's] Dispute."  Compl. Ex. 8 § 10(7).  Indeed, not only did Keller Postman fail to provide Tubi with "specific facts," Keller Postman itself made no effort to vet the matters at all, resulting in it bringing thousands of patently frivolous demands on behalf of individuals *who were not even registered Tubi users* (approximately 33% of the claimants) or who had not watched any Tubi videos while signed in during the claim period (an additional 10%).[1]  Even for those who did watch content on their registered accounts during the claim period,

---

[1] Based on the number of frivolous claims alone, Keller Postman clearly would be subject to sanctions under Rule 11 and 28 U.S.C. § 1927 if it had brought these claims in federal court.  *See,*

Keller Postman's claims are specious.  The demands claim that Tubi somehow violated registered users' rights by allegedly sending them advertising tailored to demographic information the users voluntarily provided in the registration process.  Pre-Mot. Conf. Tr. ("09/04/24 Tr.") 18:3, 42:4. None of the 23,747 demands identify a single ad that forms the basis of the claim.  None of the demands identify the business opportunity supposedly lost by receiving targeted ads.  And none of the demands specify the date when any of this occurred.

In causing its clients to systematically violate the Informal Dispute Process, Keller Postman was not advancing its clients' individual interests.  Instead, it was promoting its own interest, which was to create a critical mass of arbitration demands so that the arbitration fees alone would compel Tubi to settle *all* claims, without regard to merit, for an aggregate sum that would enrich Keller Postman.  Keller Postman avoids expending its firm's resources by minimizing the work it does on behalf of these clients—making no effort to learn their actual factual circumstances or individual goals and failing to obtain informed consent before filing claims or taking risky litigation steps.  Besides being inconsistent with its duties to its clients, Keller Postman's cookie-cutter, no-investigation approach compelled Tubi users to violate the Informal Dispute Process provision.

Keller Postman took these actions unilaterally and without the informed consent of its clients.  It has put its clients in a precarious position in arbitration, where Keller Postman's failure to engage in the Informal Dispute Process causes its clients' claims to be at risk of being found not to be arbitrable.  Keller Postman's failure also has put its clients at risk of paying Tubi's attorney's

_____

*e.g.*, *In re Engle Cases*, 283 F. Supp. 3d 1174, 1258 (M.D. Fla. 2017) (Rule 11 sanctions and bar referral warranted for failure "to conduct any meaningful investigation before recklessly filing thousands of complaints"); *Robertson v. Cartinhour*, 883 F. Supp. 2d 121, 126 (D.D.C. 2012).

fees and cost of arbitration.

Thus, for its *own* purpose, Keller Postman tortiously interfered with the contractual relationships between Tubi and thousands of its users.  It was not acting as a white knight, as it seeks to portray itself, by "enforcing" the arbitration agreement between Tubi and its users.  Mot. 6.  In fact, Keller Postman has it backwards: Tubi fulfilled its end of the bargain by providing Keller Postman's clients with a free streaming service that generates revenue through ads; Tubi wants the benefit of that bargain, which Keller Postman prevented.  By interfering in Tubi's agreement with its users, Keller Postman has inflicted significant legal costs on Tubi that have nothing to do with the merits of the claims.

Keller Postman ignores the standards governing a Rule 12(b)(6) motion.  It seeks dismissal by disputing Tubi's well-pleaded allegations, which the Court must accept as true, and raises affirmative defenses for which Keller Postman bears the burden.  Keller Postman says it was acting in good faith, but the Court must take as true Tubi's allegations that Keller Postman was instead acting unilaterally, without informed consent, and otherwise in violation of its ethical obligations. The Complaint does not allege the usual practices of plaintiffs' lawyers, class action lawyers, or mass arbitration lawyers acting in the normal course.  It plausibly alleges specific, improper practices that caused a mass breach of Tubi users' contractual obligations—that Keller Postman acted maliciously, fraudulently, and tortiously, and attempted to obtain something for its clients to which its clients are not justly entitled.  Tubi's allegations are more than enough to show that Keller Postman was not operating in good faith.

Keller Postman's primary argument in favor of dismissal is that it believes the Informal Dispute Process to be unenforceable and that its clients raised the issue of enforceability with the arbitrator.  In addition to being an affirmative defense that cannot be a basis for dismissal, Keller

Postman ignores that the arbitration demands it filed do not ask for a declaration that the provision is unenforceable. In any event, a party cannot excuse itself from contractual performance merely by challenging its contractual obligations. Any contrary rule would nullify every pre-dispute informal resolution provision; any party could bypass pre-filing informal resolution, mediation, or other agreed processes simply by asserting that the factfinder must resolve any challenges to the provision as part of the broader arbitration. Such a rule would be at odds with the longstanding recognition that these types of provisions are beneficial to the swift and efficient resolution of disputes. And dismissing the case would give Keller Postman the green light to bypass any pre-dispute process.

Separately, Keller Postman's argument that this lawsuit interferes with the arbitrations and violates the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, fails. As the Court recognized, there is no arbitration agreement between Tubi and Keller Postman. 09/04/24 Tr. 40:11-16. This case is therefore properly before this Court, which will simply resolve the dispute between the two. Tubi is not claiming—and will not claim—that the Court's rulings will have a preclusive effect on the arbitration or that this Court could or should overturn any award, so there is no reason to stay this case pending the (long delayed) mass arbitration.

For these reasons, the Court must deny Keller Postman's motion and allow the case to proceed to discovery.

## FACTUAL BACKGROUND

## I.    Keller Postman's Mass Arbitration Business Model Brims with Ethical Risks.

Keller Postman boasts that it has "pioneered" mass arbitration, a tactic where one law firm initiates thousands of separate but identical and simultaneous arbitration actions on behalf of individual clients. Compl. ¶ 16. Unlike a class action, a mass arbitration has no judicial oversight, including with respect to aggregate settlements, and no procedural protection for claimants who

may be vulnerable to abuses by lawyers acting in their own self-interest over that of their clients. *Id.* ¶ 26 (citing D.C. Ethics Opinion 386, which recognizes that non-class (e.g., mass arbitration) aggregate settlements "present particular concerns due to a lack of court oversight of the resolution of the matter"[2]).

Mass arbitration can be pursued ethically, of course.  But by taking on over 20,000 individual clients at once, Keller Postman puts itself in a position of needing to take more care, not less, particularly against the backdrop of an unregulated legal landscape.  *Id.* ¶¶ 26–33 (setting out ethical risks).  In a mass arbitration it has initiated—as in any representation—Keller Postman has ethical duties, including a duty of loyalty, to each of its individual clients.  *Id.*  Among other things, just as counsel must in filing a complaint in state or federal court on behalf of an individual plaintiff, Keller Postman is required to conduct a client-specific investigation as part of its core duty not to abuse the legal system.  *Id.* ¶ 27(a).  It is required to obtain sufficient information from its client to determine whether conflicts of interest exist.  *Id.*  It is required to determine whether taking specific legal positions could prejudice any of its clients.  *Id.*  To fulfill these duties, it needs to have detailed and continued communications with each client.  *Id.* ¶ 29.

These duties are difficult to discharge faithfully in a mass arbitration setting, due to the en masse nature of communications between counsel and client.  Keller Postman's mass arbitration business model provides a prime example.  As alleged in the Complaint, Keller Postman identifies a claim it wants to pursue and uses online solicitations to seek out and enroll hordes of clients with

---

[2] D.C. Ethics Op. 386, App.A-116; *see also* U.S Chamber of Com. Inst. for Legal Reform, Mass Arbitration Shakedown: Coercing Unjustified Settlements 30–40 (2023) (addressing additional ethical issues mass arbitration poses), App.A-216–26.  For the Court's ease of reference and consistent with its request during the September 4, 2024 Pre-Motion Conference, the legal ethics materials cited in the Complaint and this Response are compiled and appended as **Appendix A**.  Citations to Appendix A are formatted as **App.A-[X]**, where X is the page number.

promises of free and easy money. *Id.* ¶¶ 27, 44.[3]  It then initiates tens of thousands of simultaneous arbitration actions against one target company, its goal being to drive up the target's upfront arbitration costs into the tens or hundreds of millions of dollars and coerce an immediate, aggregate settlement. *Id.* ¶¶ 1–3, 5.  Keller Postman's commitment to a business model that relies on non-individualized communications means the firm does not and cannot adequately assess the specific facts and circumstances underlying every client's case, including individual recovery prospects or goals. *Id.* ¶ 27(a), 42.  Instead, Keller Postman files the same demand on behalf of every one of them. *Id.* ¶ 3.

## II.    Keller Postman's Tortious Interference with Tubi's Contracts.

Here, Keller Postman's approach to mass arbitration did more than raise questions about ethical representation of individual clients—it caused the systematic breach of contract by thousands upon thousands of its clients.  Beginning in March 2024, Keller Postman selected Tubi as a mass arbitration target under a concocted theory that any use of targeted advertisements based even in part on age, sex, or gender violates the Unruh Civil Rights Act ("Unruh Act"), CAL. CIV. CODE §§ 51-52.[4]  Keller Postman used a third party to publish social media advertisements that

---

[3] In some of its matters, Keller Postman itself relies on targeted advertising, including for "marketing and intake" purposes. Ex. 1, Compl. ¶ 13, *Keller Postman LLC v. PPC Squared Digit. Mkting., Inc.*, 1:24-cv-02071-ACR (D.D.C. July 16, 2024), ECF No. 1; *see* Ex. 2, Resp. to Request for Pre-Mot. Conf. at 1, *Keller Postman*, 1:24-cv-02071-ACR (D.D.C. Sept. 25, 2024), ECF No. 14 (noting that the contract at issue involved "Facebook advertising for KP").  Tellingly, Keller Postman refused to answer Tubi's counsel's question about whether it engages in targeted advertising.  Compl. ¶ 66.  The Court may take judicial notice of the court filings in *Keller Postman LLC v. PPC Squared Digital Marketing*. *Heidi Aviation, LLC v. Jetcraft Corp.*, 573 F. Supp. 3d 182, 191 n.4 (D.D.C. 2021).

[4] The claims are loosely based on the California Court of Appeal's decision in *Liapes v. Facebook, Inc.*, 95 Cal. App. 5th 910 (2023).  The *Liapes* complaint, however, contained details Keller Postman has refused to provide to Tubi, such as the specific advertisements that the *Liapes* plaintiff claimed she wanted to receive but allegedly did not due to a specific protected characteristic.  The

omitted critical facts prospective clients would need to make informed decisions, such as the nature

of the claim against Tubi, the terms of the representation, or even that Keller Postman would be

representing them.  Compl. ¶¶ 43–46; *id.* Ex. 13.  Keller Postman had one goal: sign up as many

people as possible through social media with promises of easy money for "2 to 3 minutes" of work

filling out "just a couple questions" about basic demographic information.  *Id.* ¶ 44; *see id.* ¶¶ 42–

45.

Using this misleading process and automated technology, within about one month, Keller

Postman amassed tens of thousands of claimants without sufficiently vetting each claim.  *Id.*

¶¶ 42, 44.  At the most basic level, Keller Postman did not even bother to verify whether its clients

were Tubi users.  Beyond that, Keller Postman failed to investigate, among other things, the basic

information necessary to assess every client's prospective Unruh Act claim, including: (1) the

protected class of each claimant to which the discrimination relates; (2) the specific targeted ads

each claimant saw or did not see; (3) the business transactions each claimant engaged in or did not

engage in after seeing the targeted ads; (4) the harms each claimant suffered by seeing or not seeing

the specific targeted ads; and (5) the approximate dates on which each claimant was exposed or

not exposed to the targeted ads at issue.

Each of Keller Postman's clients who was a registered Tubi user needed to comply with

the Informal Dispute Process.  That bilateral process mandates that, before filing an arbitration

---

court of appeal, in turn, relied heavily on those allegations in finding that the plaintiff pleaded a
viable Unruh Act claim.  *Id.* at 918.  Here, by contrast, Keller Postman has taken the "baffl[ing]"
position that *all* targeted advertising based even in part on age, sex, or gender is unlawful.  09/04/24
Tr. 19:11.  Under Keller Postman's interpretation, it would be illegal to direct, for instance, ads
for retirement communities to older people.  As noted in footnote 2, Keller Postman has filed a
lawsuit against an advertising company it used to place ads on Facebook—the very platform whose
advertising was at issue in *Liapes*.

demand, any party to the Terms (i.e., Tubi or the user) must: (a) give the other side notice of the dispute; and (b) provide the other side with specific facts giving rise to the dispute. *Id.* Ex. 8 § 10(7); *see id.* ¶¶ 1, 3, 5–6, 22, 38–39, 52–54.  The notice containing the specific facts starts a 45-day period during which the user and Tubi "may try to reach a settlement of the Dispute." *Id.* Only if Tubi and the user do not resolve the dispute within 45 days may a party initiate arbitration. *Id.* Ex. 8 § 10(8).

There is good reason for parties to agree to such pre-filing provisions.  They are designed to avoid costly litigation or arbitration by providing the parties an opportunity to assess and resolve potential claims early on.  *See e.g.*, *Bielski*, 87 F.4th at 1014.  And the Terms create additional incentive for Tubi to resolve a user's prospective claim through the Informal Dispute Process: Absent resolution, Tubi must pay all "arbitration costs" associated with the resulting arbitration. Compl. Ex. 8 § 10(9)(a).[5]

Keller Postman had its clients skip this process entirely, thereby indisputably failing to comply with the Terms.  In April 2024, without notice, much less notice containing specific facts giving rise to the dispute, and without complying with the prescribed 45-day period, Keller Postman filed arbitration demands on behalf of each of its 23,747 clients.  *Id.* ¶¶ 48–49.  Before causing a client to breach a contract—regardless of whether Keller Postman intended to argue that the contract was unenforceable—Keller Postman needed to explain to the client what it was doing and obtain the client's consent.  That is particularly so because breaching the contract would put its clients at risk of having an arbitrator find their claims were not arbitrable and awarding Tubi's

---

[5] The Terms also require Tubi to pay arbitration filing fees when a claimant seeks to recover less than $10,000 and to reimburse filing fees to prevailing claimants seeking more than $10,000. Compl. Ex. 8 § 10(10).

attorneys' fees and arbitration costs.  *Id.* ¶ 55.  But Keller Postman failed to adequately explain the risks and to obtain informed consent from each of its tens of thousands of clients before proceeding straight to arbitration.  *Id.*

Keller Postman's 23,747 arbitration demands are cookie-cutter and barebones forms that make no effort to differentiate between the clients' cases or detail specific facts, *id.* ¶¶ 48–49, and they reveal Keller Postman's failure to engage in any meaningful pre-filing assessment of the specific facts underlying its clients' potential Unruh Act claim against Tubi, in violation of both the Terms and basic legal rules.  The firm's failure to investigate is reflected by the large number of fraudulent claimants in the group:  Keller Postman lodged nearly 10,000 demands (roughly 40% of the total) for people without registered Tubi accounts or who did not view Tubi content during the applicable statute of limitations period.  *Id.* ¶ 50; *see generally id.* Ex. 17, Letter from B. Fox to W. Postman re Fraudulent Claims (Apr. 25, 2024).[6]

The demands also seek identical relief on behalf of each claimant: a minimum of $16,000 in statutory damages (approximately $380 million in the aggregate), punitive damages, restitution, attorneys' fees and costs, and "injunctive relief that ends Tubi's discriminatory practices."  *Id.* Ex. 15 at 2.  Notably, and as discussed below, Keller Postman *did not* ask the arbitrator for declaratory relief finding that the Informal Dispute Process was unenforceable.  *Id.*

## III.    Keller Postman's Ongoing Interference and Efforts to Stymie Arbitration.

After initiating arbitration, Keller Postman continued to act in its own self-interest rather than the interests of its clients.  Tubi promptly notified Keller Postman of serious concerns with its demands, including failure to comply with the Informal Dispute Process and data reflecting that

---

[6] *See Brown v. Gov't of D.C.*, 390 F. Supp. 3d 114, 122 (D.D.C. 2019) (court can consider "documents attached as exhibits or incorporated by reference in the complaint").

more than 40% of the claims were fraudulent or frivolous, but Keller Postman refused to address these concerns.  *Id.* ¶¶ 59–60.  Rather than withdraw the claims so it could conduct a further investigation, Keller Postman proposed a settlement of each of the more than 23,000 claims for $3,000 (a total of $71.2 million), without regard to whether the claimants had registered for Tubi accounts or received targeted advertising.  *Id.* ¶ 63.  Keller Postman expressed no interest in differentiating the settlement amounts based on how strong an individual claimant's case might have been, whether the claimant suffered any harm, or the amount of targeted advertising the claimant watched.  *Id.*; *see id.* ¶¶ 32, 50.

Even after filing the arbitration demands, Keller Postman has refused to detail any specific facts.  The firm has not "provide[d] Tubi's counsel the age, gender, or sex of any claimant."  *Id.* ¶ 65.  It has refused to discuss "whether [the firm] even ha[s] information indicating that any claimant received or did not receive a particular advertisement."  *Id.*  And, at the pre-motion hearing, Mr. Postman would only say the firm "do[es] some assessment that ultimately [the claimants] possess the information about which specific ads [they saw]."  9/04/24 Tr. 21:8-22:14.  The Court rightfully found Mr. Postman's response to its questioning about vetting unsatisfactory, noting:  "If you're bringing a claim on behalf of a client [claiming] they were discriminated against because X ad was shown to them only or not shown to them because of some issue, then you're going to have show that they were like at least in the ballpark of where the ads are."  *Id.* at 22:14-20.  Mr. Postman responded by claiming that the firm "investigate[s] *whether they were shown ads*," but notably not answering whether the firm investigates whether a claimant received a particular

or discriminatory advertisement.  *Id*. at 22:21–25 (emphasis added).[7]

In short, as alleged, Keller Postman gambled that causing its clients to breach the Informal Dispute Process requirement would not matter because it could use the threat that Tubi would have to pay approximately $50 million in filing fees to "leverage" Tubi into quickly settling despite the claims' lack of merit—almost half of which are not merely legally meritless, but factually false. Keller Postman lost that bet when Tubi did not cave but instead successfully advocated for JAMS to consolidate the demands into one proceeding, meaning that Tubi only needed to pay a single filing fee of $2,000.  Compl. ¶ 68.  Keller Postman's clients are now worse off due to the breaches. Even for those who somehow might have meritorious claims, they are now at risk of: (a) having their claims denied because of their failure to meet the precondition to arbitration and (b) being ordered to pay Tubi's attorneys' fees and arbitration costs based on Keller Postman's unilateral decision to cause them to breach the Informal Dispute Process.  The breaches caused by Keller Postman harmed both Tubi and Tubi's users, as part of the firm's scheme to secure attorneys' fees through a quick settlement of claims without regard to their merits or the clients' individual interests.

## LEGAL STANDARD

The Court may grant Keller Postman's motion to dismiss only if it finds that Tubi's factual allegations are insufficient to state a claim that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S.

---

[7] Keller Postman also told the Court that it was *Tubi's* burden to provide specific facts supporting its clients' claims and that Tubi not doing so somehow illustrates a refusal "to engage in informal resolution efforts before the commencement of the arbitrations" and the "illusory" nature of the Informal Dispute Process.  09/04/24 Tr. 45:19–46:6; Mot. 10.  But, as the Court recognized, Keller Postman's attempt to shift the burden "illustrates [Tubi's] point that [Keller Postman is] basically trying to do this on the cheap, and [it is] making [Tubi] do all the work and pay all the money." 09/04/24 Tr. 46:7–15.

662, 678 (2009).  Plausibility is not the same as probability; rather, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citation omitted).  In making its decision, the Court "must consider the Complaint in its entirety, accepting all factual allegations in the complaint as true, 'even if doubtful in fact.'"  *SEC v. Kokorich*, 663 F. Supp. 3d 63, 74 (D.D.C. 2023) (quoting *Twombly*, 550 U.S. at 555).

Tubi's complaint easily meets this standard.  Tubi plausibly alleges facts supporting each element of its claim, precluding dismissal.

## ARGUMENT

### I.     Tubi States a Tortious Interference Claim.

Under District of Columbia law, tortious interference requires a plaintiff to prove: (1) a valid contractual or other business relationship; (2) defendant's knowledge of the relationship; (3) defendant's intentional interference with the relationship; and (4) resulting damages.  *Robert Half Int'l Inc. v. Billingham*, 317 F. Supp. 3d 379, 383 (D.D.C. 2018); *see also Casco Marina Dev. v. D.C. Redevelopment Land Agency*, 834 A.2d 77, 84 (D.C. 2003) (reversing dismissal on grounds that a tortious interference claim can be predicated on a "failure of performance, whether by the terms of the contract in question or not").  Tubi's complaint sufficiently alleges each element, precluding dismissal.

### A.     Tubi Sufficiently Alleges That Keller Postman Knowingly and Intentionally Interfered with a Valid Contractual Relationship Between Tubi and Its Users.

Keller Postman does not and cannot dispute that Tubi had a valid contract with the claimants who were registered Tubi users.  Indeed, the Terms and its arbitration agreement *must* be valid, otherwise the claimants could not file arbitration demands.  But that same contract's Informal Dispute Process provision required a party wishing to arbitrate a dispute to "first send by

mail … a written Notice of Dispute ("Notice") that sets *forth … the specific facts giving rise to the Dispute.*" Compl. ¶ 38 (quoting Compl. Ex. 8 § 10(7) (emphasis added)).   As Keller Postman concedes, it was aware of the provision but nevertheless did not send a "written Notice of Dispute" on behalf of any of its clients.[8]   Mot. 9.   Providing the notice would not have been onerous for any individual user, as Tubi has simply and consistently requested the bare minimum disclosure: (1) the basis of the alleged discrimination (age, sex, gender, etc.); (2) the targeted ads each claimant saw or did not see; (3) the business transaction each claimant engaged in or did not engage in as a result of their exposure to targeted ads; (4) the harms each claimant believed they suffered by seeing or not seeing those ads; and (5) the approximate dates on which the alleged discrimination occurred.   But Keller Postman gave *no* notice, much less notice containing specific facts that formed the basis of the dispute.   Compl. ¶ 49.

Keller Postman argues that the complaint should be dismissed for failure to state a breach because § 10(2) of the Terms requires that disputes over arbitrability be decided by an arbitrator, and here, Keller Postman says, it initiated arbitration to resolve the enforceability of the Informal Dispute Process in § 10(7).   Mot. 15–17.   As a result, Keller Postman reasons, Tubi has alleged "compliance, not breach."   *Id.* at 17.   This is wrong for several independent reasons, each of which requires the denial of the motion to dismiss:

First, Keller Postman's insistence that its clients filed arbitration demands to challenge the Informal Dispute Process provision is revisionist history.   Keller Postman's form demand—which

---

[8] The motion to dismiss references "specific facts" primarily in the context of arguing that Tubi's detailed complaint somehow did not provide sufficient specific facts about Keller Postman's behavior.   Mot. 21, 22 ("The specific facts alleged in Tubi's Complaint do not give rise to a plausible inference of unlawful conduct . . . ."), 24.   The motion does not, by contrast, grapple with Tubi's allegation that Keller Postman and its clients have never provided the specific facts giving rise to the dispute, as required by the Terms.

it filed on behalf of each of the 23,747 claimants—seeks statutory damages, punitive damages, restitution, attorneys' fees and costs, and injunctive relief.  Compl. Ex 15 at 2.  It did not seek a declaration that the Informal Dispute Process was unconscionable.  The sole mention of the Informal Dispute Process is in a separate paragraph, after the requested relief, where the demand offers to stay arbitration for 45 days to proceed with mediation—but *only* if Tubi immediately proceeded to mediation and paid for it.  *Id.* ¶ 57; *id.* Ex. 15 at 2.  In other words, Keller Postman disregarded Tubi's benefit of the bargain under the Terms and rejected any provision of the Terms that Keller Postman could not or did not want to honor (i.e., the provision of specific facts and an informal resolution process rather than a formal mediation).[9]

Second, § 10(7) required Keller Postman's clients to provide notice that contained specific facts giving rise to the dispute as a prerequisite to initiating arbitration, and it is not "compliance" with that provision to provide no notice and simply initiate arbitration.  *Id.* ¶¶ 1, 52.  Initiating arbitration without first providing the requisite notice *is* the breach.  Even accepting Keller Postman's version of events—i.e., that it sought a decision on the enforceability of the Informal Dispute Process provision (which it did not)—the firm *concedes* non-compliance while attempting to justify its actions.  In essence, the firm's argument is that it *had* to breach in order to resolve the clause's enforceability.

But Keller Postman's proffered justification for the breach does not negate Tubi's prima

---

[9] Critically, the only portion of the Informal Dispute Process that Keller Postman has argued in its motion is unenforceable is the 45-day period.  Mot. 8–9.  The firm has not claimed that the requirement to disclose specific facts is unenforceable.  *See generally id.*  Nor does Keller Postman contend that its clients would face *any* harm by providing specific facts to Tubi.  Yet it is the failure to provide specific facts to Tubi that is the core of Tubi's claimed injury.  *See infra* at pp. 19–22. Keller Postman also did not discuss in the arbitration demands that the Informal Dispute Process obligated its clients to provide specific facts, or call that requirement unenforceable, instead choosing to simply ignore the language.  *See* Compl. Ex. 15 at 2.

facie case.   A plaintiff is not required to anticipate "potential affirmative defenses" or "affirmatively plead facts in avoidance of such defenses." *Francis v. Rehman*, 110 A.3d 615, 620–21 (D.C. 2015) (citation omitted); *Flying Food Grp., Inc. v. NLRB*, 471 F.3d 178, 183 (D.C. Cir. 2006).   And in the context of tortious interference, a proffered justification for a breach, such as the alleged unenforceability or illegality of the provision breached, is just that: an affirmative defense that must be proven. *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 900 (D.C. 2008).   As another court in this district explained in *Robert Half*, if a complaint adequately pleads facts satisfying the elements of tortious interference—intentional interference with a contract, about which the defendant knew, resulting in damages—it "shifts the burden to the defendant to show its conduct was justified or privileged."   317 F. Supp. 3d at 383.

This is particularly true where, as here, the purported justification for the breach is the alleged unconscionability of the agreement—a "strongly fact-dependent inquiry." *BDO USA, LLP v. Jia-Sobota*, 283 A.3d 699, 710 (D.C. 2022).   Given the "factual nature" of an unconscionability claim, which requires a "more developed record," a ruling on the pleadings is "premature at best." *Keeton v. Wells Fargo Corp.,* 987 A.2d 1118, 1121–22 (D.C. 2010) (directing that on remand the trial court should allow discovery on the alleged unconscionability of the arbitration clause).

Third, a tortious interference claim under D.C. law does not require a plaintiff to prove breach; the interference may cause "merely a failure of performance" by one of the parties. *Casco*, 834 A.2d at 84.   In *Casco*, for instance, the defendant argued that it "*cancelled* the CASCO–MIF contract pursuant to its terms, as opposed to *breaching* it," precluding the plaintiff from recovering for tortious interference. *Id.* (emphasis in original).   The D.C. appellate court rejected the argument: A party is liable for "causing [a] third person *not to perform [a] contract*" even if falls short of "procurement of breach."   *Id*. (citation omitted).   Here, as in *Casco*, the claimants

undoubtedly did not perform their contractual obligations—that of providing notice containing specific facts about the dispute and allowing Tubi 45 days to try to resolve it—thus depriving Tubi of the benefit of its bargain.

Fourth, even if this Court were inclined to address Keller Postman's affirmative defense now, the Court should not dismiss the Complaint. A defendant cannot secure dismissal of a claim asserting breach of an arbitration agreement—where initiating arbitration without complying with an Informal Dispute Provision *is* the failure to perform and the breach—simply by arguing that initiating arbitration was necessary to challenge that precondition to arbitration; otherwise every pre-dispute informal resolution provision would be nullified. Any party could bypass pre-filing informal resolution, mediation, or other agreed processes simply by asserting that the factfinder must resolve challenges to the provision as part of the broader arbitration. Keller Postman's position would make a dead letter of these "commonplace" terms that "can be both reasonable and laudable" because they promote early and cost-saving resolutions of disputes. *Bielski,* 87 F.4th at 1014; *see also Stone & Webster, Inc. v. Ga. Power Co.*, 968 F. Supp. 2d 1, 10 (D.D.C. 2013) (holding that a mediation condition precedent must be enforced, even where a plaintiff challenges the provision and explaining: "If this Court were to decide for Plaintiffs, and allow this suit to proceed in spite of their failure to abide by the condition requiring mediation, it would be setting a precedent that parties may disregard such conditions and pay no consequences … Such a position would plainly render the mediation requirement a nullity").

In any event, Keller Postman is simply wrong that the Informal Dispute Process is unconscionable, and that the firm was therefore justified in having its clients initiate arbitration without complying with the provisions. As an initial matter, the Informal Dispute Process cannot be viewed in isolation. Tubi provides users a free service and access to a huge library of content

in consideration of its users' promise to engage in the Informal Dispute Process.  The users' promise to engage in such a process in exchange for Tubi's vast and free offerings is fair.

Keller Postman's attacks on the Informal Dispute Process itself are unconvincing.  Far from being "illusory, unconscionable, and therefore unenforceable" (Mot. 9), the Informal Dispute Process makes perfect sense: Given that the Terms require Tubi to bear a vast majority of the costs of arbitration, *see* Compl. Ex. 8 § 10(9)(a), it is only fair to require the claimants to provide notice and the specific facts giving rise to the dispute, and to afford Tubi 45 days to try to resolve the dispute.[10]  Keller Postman is wrong in claiming that the process is unconscionable because it "obligates consumers to delay their claims without obligating Tubi to do anything in return."[11]

---

[10] Keller Postman hypothesizes that allowing those 45 days for a potential resolution when a claimant was "close to a limitations period" could preclude a prospective claim.  Mot. 28.  Keller Postman's hypothetical scenario of expiring claims—which ignores that Tubi would undoubtedly have agreed to toll the limitations period—is not before this Court.  Keller Postman's arbitration demands, filed on April 5, 2024, alleged Unruh Act violations beginning in May 2022.  Had Keller Postman allowed its clients to go through the Informal Dispute Process, Tubi would have had until May 20, 2024, to resolve the claims, which is roughly two years after Keller Postman claims the violations of the Unruh Act began.  Keller Postman's demands shed no light on whether any of its clients' claims would have expired during the Informal Dispute Process period.  This is no surprise; given Keller Postman's ineffective vetting of claims, it certainly does not know whether or for whom the limitations period might be an issue.  Nor can a highly individualized concern like this render the whole process illusory and give Keller Postman an excuse to cause a mass breach.  Even if some claimants' claims were on the brink of expiring, Keller Postman's obligations were to each client individually.  And even more critically, Keller Postman has provided no reason it was in the interest of those whose claims would *not* expire during the 45 days to bring them without going through the Informal Dispute Process.

[11] Keller Postman claimed at the pre-motion conference that "there is case law" holding that terms like these are illusory.  *See* 09/04/24 Tr. 45:3-10.  But the only cases it cites involve entirely different types of contractual provisions and do not speak to the enforceability of an informal dispute resolution process.  *Heckman v. Live Nation Ent., Inc.*, 686 F. Supp. 3d 939, 965 (C.D. Cal. 2023) (term governing appellate rights from arbitration awards); *Little v. Auto Stiegler, Inc.*, 63 P.3d 979, 983–85 (Cal. 2003) (same); *Pandolfi v. AviaGames, Inc.*, No. 23-cv-05971, 2024 WL 4051754, at *5, 13 (N.D. Cal. Sept. 4, 2024) (provision permitting incremental batching of arbitration proceedings could cause delay of potentially years).  Neither *Heckman* nor *Pandolfi* stand for a broader proposition that would be helpful to Keller Postman given *Bielski*, which is binding precedent in the Ninth Circuit.

Mot. 16.  As the Court observed during the pre-motion conference, the requirements are bilateral; they apply to *both* parties.  *See* Compl. Ex. 8 § 10(7) ("If either you *or* Tubi wish to arbitrate a claim, you *or* Tubi must first send by mail to the other a written Notice of Dispute" (emphasis added)); *see* 09/04/24 Tr. 45:3-8.  The Terms specifically contemplate situations in which Tubi, not the user, is the complaining party that must provide notice and specific facts.  *See* Compl. Ex. 8 § 10(7) ("Tubi will send any Notice to you at the contact information we have for you or that you provide.").  In any event, even if it were not bilateral, the Informal Dispute Process still would be enforceable.  In *Bielski*, 87 F.4th at 1014, the Ninth Circuit upheld a similar pre-arbitration informal dispute resolution process—even though it was unilateral.  The court held that a process requiring the user to "first try resolving any dispute with Coinbase informally, and if that fails, ... [to] file a formal complaint with Coinbase before initiating arbitration" was "not onerous or beyond the reasonable expectation of the user."  *Id.*

Keller Postman's failure to discuss *Bielski* in its motion was no accident.  Tubi raised the case in response to Keller Postman's Notice of Intent and again at the pre-motion conference. Keller Postman ignored the case because it cannot distinguish it from myriad cases in which courts have routinely upheld these provisions.  *See also, e.g.*, *Davenport v. Nvidia Corp.*, No. 23-cv-01877-PCP, 2024 WL 832387, at *6 (N.D. Cal. Feb. 28, 2024) (the "single straightforward step" of notifying the company of the dispute to give it a "chance to resolve" it was "hardly the kind of onerous hoop" courts have found unenforceable); *Am. Chung Nam, LLC v. Mitsui O.S.K. Lines, Ltd.*, No. 2:23-cv-07676-SB-JPR, 2023 WL 8845213, at *4 (C.D. Cal. Dec. 19, 2023) ("It is commonplace to require informal efforts to resolve a dispute before engaging in more costly formal efforts."); *Randolph v. RRR Bowie, LLC*, No. 22-cv-2150-PX, 2023 WL 7110516, at *5 (D. Md. Oct. 27, 2023) (dismissing claims "because [Plaintiff] ha[d] missed the deadline to submit

the claims for pre-arbitration dispute resolution, a necessary precondition to proceeding to arbitration"); *Durruthy v. Charter Commc'ns, LLC*, Case No. 20–CV–1374–W–MSB, 2020 WL 6871048, at *12 (S.D. Cal. Nov. 23, 2020); *Taft v. Henley Enters., Inc.*, Case No. SACV 15–1658–JLS (JCGx), 2016 WL 9448485, at *8 (C.D. Cal. Mar. 2, 2016) ("That the notice requires a party to 'detail the facts upon which the claims are based' does not unfairly prejudice that party, as it appears to provide no more information than a plaintiff's initial complaint in a judicial proceeding.").

Given Keller Postman's calculated disregard for the mandatory Informal Dispute Process, its clients failure to perform, and the firm's unserious argument that the provision is unenforceable, the Court should reject its argument that its clients complied with the Terms of Service.

**B.     Tubi Sufficiently Alleges that Keller Postman's Interference Caused Damage.**

The remaining element is damages, which Tubi also sufficiently alleges.  It is beyond dispute that Keller Postman's filing of demands on behalf of 23,747 claimants has caused significant financial harm to Tubi.  And the Complaint alleges that, if Keller Postman had been required to provide "specific facts" underlying its clients' individual claims, it could not have simultaneously filed the arbitration demands on behalf of all 23,747 claimants.  That Keller Postman churned out tens of thousands of simultaneous and unvetted claims within weeks of soliciting claimants made it impossible for the firm to learn specific facts about each claim.  Compl. ¶ 22 ("Keller Postman cannot and has no desire to obtain the necessary information to learn specific facts that give rise to the disputes that the firm has manufactured."); *see id.* ¶¶ 3, 54, 56.  Thus, only by causing its clients to breach could Keller Postman cause Tubi to incur the significant costs of defending the demands in the manner Keller Postman brought them.  These allegations easily satisfy Tubi's pleading burden. *See Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*, 592 F. Supp. 2d 86, 100 (D.D.C. 2009) (a tortious interference plaintiff need only allege "consequential

losses for which the interference is the legal cause." (quoting RESTATEMENT (SECOND) OF TORTS § 774A (1979))).

Keller Postman's insistence that the firm's tortious interference has not damaged Tubi, Mot. 13, attacks a straw man. The firm argues that Tubi was not damaged because, after filing the arbitration demands, it "offered to discuss resolving its clients' claims with Tubi." *Id*. at 2. But that is like saying a patent troll who filed vexatious litigation caused no harm because he offered to go away for an undeserved royalty. Additionally, the Informal Dispute Process provisions afford Tubi the right to resolve disputes with each user *individually* based on the "specific facts" underlying the user's situation—the provisions do not require Tubi to resolve nearly 23,747 demands in a global mediation based on generalized and barebones allegations. The notion that Keller Postman's offer to mediate put Tubi in the same position as if all 23,747 claimants filed the required notices is nonsensical. Further, it ignores detailed allegations—including that if Keller Postman *had* respected its clients' obligations to Tubi, it would have been impossible for Keller Postman under its business model to file a mass arbitration, or at least one resembling anything like the one it did file. Compl. ¶¶ 28, 48–50, 68.

The Complaint's allegations are more than sufficient to link Keller Postman's conduct to Tubi's harm. Because Keller Postman caused its clients to breach the Informal Dispute Process, Tubi has been forced, and will continue to be forced, to pay considerable attorneys' fees and costs associated with defending the JAMS arbitration. *See id.* ¶ 68. Tubi also has incurred significant attorneys' fees in litigating the arbitrability of Keller Postman's claims. *Id.* D.C. law allows Tubi to recover those fees. *Auxier v. Kraisel*, 466 A.2d 416, 420 (D.C. 1983) (noting that attorneys' fees can be recovered against a tortfeasor if the tortfeasor wrongfully caused the plaintiff to be

involved in litigation with a third party).[12]   Additionally, Tubi has paid and will have to pay ongoing fees to the arbitrator and to JAMS that would have been unnecessary but for Keller Postman's tortious interference.  Compl. ¶¶ 5, 68.

Keller Postman does not engage with any of these allegations in the Complaint and instead asserts that Tubi's damages are its own fault because, in Keller Postman's view, Tubi should have acquiesced to Keller Postman's shakedown efforts.  Mot. 2.  Not only does this argument completely ignore that Keller Postman's tortious interference denied Tubi the benefit of its bargain (notice of the dispute and the specific facts necessary to assess individually prospective claims and resolve them before being saddled with arbitration fees), but it is packed with impermissible assertions and inferences in Keller Postman's favor (*e.g.*, that Keller Postman's indiscriminate mass settlement "offers" were a viable alternative).  *See Singletary v. Howard Univ.*, 939 F.3d 287, 302 (D.C. Cir. 2019) ("[T]he question at the pleading stage is not whether the facts could be read differently than the plaintiff does.  Instead, we must take all reasonable inferences in favor of [plaintiff].").  It is not proper on a Rule 12(b)(6) motion for Keller Postman to speculate about how settlement discussions might have proceeded with any individual user had they provided specific facts as required.  At the very least, if Keller Postman had vetted its clients—as it would have needed to do if its clients were to comply with the Informal Dispute Process—Keller Postman

---

[12] Keller Postman cites *Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062, 1067–68 (N.D. Cal. 2020) as an example of a court endorsing Keller Postman's mass arbitration model against corporate efforts to avoid arbitration.  Mot. 6.  But the court in *DoorDash* awarded the exact relief that Tubi seeks here, albeit in a context other than a tortious interference claim.  Judge Alsup held that "[i]f it turns out that Keller [Postman] has overstated its authority, or for any procedural reason, petitioners have not perfected their right to arbitrate, this order imposes on Keller [Postman] a requirement to fully reimburse DoorDash for all arbitration fees and attorney's fees and expenses incurred by DoorDash in defending the arbitration, and the arbitrator shall so award them." *Id.* at 1066.  Judge Alsup separately found that Keller Postman improperly filed nearly 1,000 arbitration demands on behalf of claimants who did not even have arbitration agreements with DoorDash. *Id.*

would have rooted out those fraudulent and frivolous claims that make up 40% of their demands. Instead, in the Court's words, Keller Postman's play was to file claims "on the cheap," making Tubi "do all the work and pay all the money." 09/04/24 Tr. 45:19–46:15.

Finally, Keller Postman argues that Tubi's injuries are self-inflicted because Tubi allegedly wrote the Terms in a way that permits Keller Postman to exploit them. Mot. 11–12. This argument is fallacious. Keller Postman did not exploit the Terms—it caused its clients to breach them. The Terms protected Tubi from having unscrupulous lawyers file specious mass arbitrations to try to force an unjustified settlement based on the upfront costs of arbitration. Regardless, finger-pointing is inappropriate on a motion to dismiss, where the question before the Court is whether the plaintiff has plausibly pleaded that the defendant "is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### C.   Keller Postman Cannot Avoid Dismissal by Arguing It Acted in Its Clients' Interests.

The Complaint alleges that Keller Postman caused its clients to breach their contractual obligations to Tubi because the breaches benefited Keller Postman, even though compliance would have cost its clients nothing and avoided significant risk. Compl. ¶¶ 3, 48–49, 56.

Keller Postman seeks dismissal on the ground that its conduct is "protected from tort liability" absent facts that show "Keller Postman was doing something that advanced its own interests *instead of* its clients' interests." Mot. 23. Keller Postman gets the law partially correct: Attorneys can ordinarily claim immunity from a tortious interference claim if they prove they "pursue[d] in good faith [their] client's interests on a matter fairly debatable in the law." *Goldschmidt v. Paley Rothman Goldstein Rosenberg & Cooper, Chartered*, 935 A.2d 362, 381 n.14 (D.C. 2007) (internal quotation marks and citation omitted). But this immunity "does not apply when the attorney acts in a malicious, fraudulent or tortious manner which frustrates the

administration of justice or to obtain something for the client to which the client is not justly entitled." *Id*; *see also Lannan Found. v. Gingold*, 300 F. Supp. 3d 1, 29 (D.D.C. 2017) (a privilege from tortious interference liability "exists when a defendant acts to protect an existing economic interest and if he does not employ improper means," and does not act with "malice, or spite" (citation omitted)); RESTATEMENT (SECOND) OF TORTS § 767 (1979) (identifying factors relevant to determining if defendant utilized "improper means," including the nature of the actor's conduct, the actor's motive, the parties' contractual and other interests, the proximity of the actor's conduct to the interference, and the parties' relationship).

Keller Postman cites to *Shenandoah Associates Ltd. v. Tirana*, 322 F. Supp. 2d 6 (D.D.C. 2004), but the case does not support Keller Postman's request for dismissal. In fact, the court in *Shenandoah* denied a motion to dismiss, finding that the plaintiffs sufficiently stated a tortious interference claim by alleging that the defendant-attorney advised a counterparty to breach agreements for personal financial gain. *Shenandoah Assocs. Ltd. P'ship v. Tirana*, 182 F. Supp. 2d 14, 18, 22 (D.D.C. 2001). The court later granted summary judgment to defendants, but only because discovery did not support the complaint's allegations, including those claiming the attorney's "advice was unlawful, deceptive, or in breach of the standard of care or his ethical duties." *Shenandoah*, 322 F. Supp. 2d at 10–11 & n.8. Here, the allegations are sufficient to state a claim, and Tubi anticipates discovery will show Keller Postman's advice was unlawful, deceptive, and/or in breach of its duties.

Further, because immunity is an affirmative defense, Keller Postman has the burden to plead and prove it. "A plaintiff need not allege wrongful or improper conduct in order to survive a motion to dismiss for failure to state a tortious interference claim under District of Columbia law." *Econ. Rsch. Servs., Inc. v. Resol. Econ., LLC*, 208 F. Supp. 3d 219, 230–31 n.12 (D.D.C.

2016); *see also Robert Half*, 317 F. Supp. 3d at 383 (once four elements of tortious interference are met, burden shifts to defendant to establish privilege or immunity); *Flying Food Grp.*, 471 F.3d at 183 (legal justification or immunity is affirmative defense, which "[is] not an integral part of the plaintiff's claim for relief and lie[s] outside his or her burden of pleading" (cleaned up)); *Brown*, 390 F. Supp. 3d at 123 (Jackson, J.) ("[I]t is well established that the Court's analysis of any applicable defenses ... to claims that have been properly pleaded are to be reserved for later stages of litigation, such as summary judgment or trial.").[13]

As an affirmative defense, Keller Postman's argument that it acted consistently with its clients' interests could be grounds for dismissal only if "the face of the complaint … *conclusively* indicate[s]" that the defense applies. *Amaplat Mauritius, Ltd. v. Zim. Mining Dev. Corp.*, 663 F. Supp. 3d 11, 38 (D.D.C. 2023) (citation omitted; emphasis added). This defense is certainly not apparent in Tubi's Complaint, much less "conclusively" established. The Complaint alleges that Keller Postman concocted specious Unruh Act claims, failed to adequately vet and assess each claim, brought around 8,000 claims on behalf of people who did not have registered Tubi accounts, filed about 2,000 more on behalf of those who did not watch Tubi content during the statute of limitations, did not obtain the informed consent of its clients before causing them to commit a mass breach, caused its clients to be worse off than if they had complied with the Terms (especially because they lost the "leverage" Keller Postman sought with JAMS decision to consolidate), and committed other ethical violations along the way. Compl. ¶¶ 55–56. "[B]y placing its clients in a position where they cannot lawfully recover," Tubi alleges, Keller Postman created risk for its

___

[13] *Iqbal and Twombly* themselves are inapposite here because those cases involved a plaintiff's failure to plausibly allege *elements* of their cause of action, not defeat an affirmative defense. *See* 556 U.S. at 681–82; 550 U.S. at 554–55.

clients that it does not share.  *Id.* ¶ 56.  While its clients would benefit from compliance, "Keller Postman is worse off complying with [Tubi's] terms because it would be required to individually investigate each of its clients' claims (which of course is also an ethical requirement Keller Postman does its best to ignore), and investigating each claim would undermine Keller Postman's business model of extracting quick settlements without spending time on legal work."  *Id.*

The only conclusion that can be drawn from these well-pleaded allegations is that Keller Postman acted in a malicious, fraudulent, or tortious manner that has frustrated the administration of justice and that it has attempted to obtain something for at least some of its clients to which they are not justly entitled.  *Goldschmidt*, 935 A.2d at 381 n.14.[14]

But at the very least, as this Court recognized at the pre-motion conference, Tubi's allegations that Keller Postman did not act in good faith and instead acted with an intent to harm Tubi that was independent of its clients' interests require the Court to resolve a series of embedded factual disputes, such as whether:

- Keller Postman asserted claims on behalf of its clients before learning the factual basis of the claims.  *E.g.*, Compl. ¶¶ 27(a), 42; D.C. R. PRO. CONDUCT 3.1, App.A-62; *see id.* cmt.2 ("Lawyers ...  are required to inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions."), *In re Engle*, 283 F. Supp. 3d at 1221 (noting that the Federal Rules "impose[] the same obligations on a lawyer regardless of whether he files one complaint or 10,000 complaints").  D.C. ETHICS OP. 371 (noting that such investigation may require the lawyer to do more than simply accept the client's representations), App.A-109–10.

---

[14] In *Nave v. Newman*, 140 A.3d 450, 456 (D.C. 2016), which Keller Postman says forecloses Tubi's claim, Mot. 23, the court affirmed dismissal of a claim against an attorney because all the attorney's acts were alleged to have been done in concert with and "in service of his client."  140 A.3d at 457.  But here, Tubi alleges that Keller Postman acted "beyond the scope of [its] honorable employment" and in furtherance of a "personal benefit" "independent of the desire to protect [its] client[s]," conduct that falls squarely within the scope of tortious interference.  *See id.* at 456–57 (citations omitted).  Far from acting in concert with its clients, Tubi has alleged that Keller Postman was playing a solo.

- Keller Postman knowingly or recklessly asserted untrue factual assertions or frivolous claims against another party.  Tubi has alleged that Keller engaged in this behavior with thousands of claimants, Compl. ¶¶ 2, 4, 23, 27(a)(iii)-(vi), 59, 64, 67, 69, contrary to its duty to "ensure that claims and positions are meritorious under Rule 3.1, which requires a non-frivolous basis in law and fact," D.C. ETHICS OP. 371, App.A-110.  The Court can infer that Keller Postman has pursued litigation for an improper purpose by filing and pursuing frivolous claims against Tubi, and has done so to obtain an unwarranted money settlement.  *Robertson*, 883 F. Supp. 2d at 128 (complete lack of merit "give[s] rise to the inference that the action was filed for improper purposes." (citation omitted)).

- Keller Postman failed to obtain informed consent to represent multiple clients with actual or potential conflicts of interest, including conflicts between clients arising from being differently situated with respect to the specific facts they might marshal in support of an Unruh Act claim or with respect to the statute of limitations.  Informed consent requires that an attorney fully explain the basis of the representation and its risks and benefits to the client, including any unique risks stemming from involvement in an aggregate litigation or settlement, which obligation holds true regardless of the number of clients a lawyer represents.  *See In re Kennedy*, 281 A.3d 36, 42 & n.3 (D.C. 2022).[15]  Tubi has alleged Keller breached this obligation.  Compl. ¶¶ 2–3, 22–23, 27–30, 55.[16]

Keller Postman is wrong that its contingency-fee relationship means that its interests are

necessarily aligned with its clients' interests, Mot. 22–23, and its tactics therefore are immune

---

[15] *See also* PAUL D. RHEINGOLD, LITIGATING MASS TORT CASES § 14:15 (2024) ("No one, after all, asked the plaintiffs' firm to take on so many cases.  It took on the cases to make money, but in so doing it could in no way diminish its general duty to represent everyone fairly."), App.A-174; *id.* § 14:17 (noting that aggregate settlements pose ethical risks for these reasons), App.A-178.

[16] Numerous DC Rules of Professional Conduct and Ethics Opinions provide color to these obligations.  Comment 12 to D.C. Rule of Professional Conduct 1.8, for example, explains that attorneys have unique duties in the context of aggregate settlements to discuss the risks "before undertaking the representation, as part of the process of obtaining the clients' informed consent." *Id.* at App.A-34.  D.C. Ethics Opinion 54 ("Propriety of Multiple Representation") notes that even where the interests of two or more clients are not obviously adverse, it is still necessary to obtain informed consent for the representations to guard against adversity that may present itself later in the proceeding.  *See* App.A-102.  And Opinion 136 provides that an attorney may represent multiple clients in the same proceeding only if it is "obvious that he can adequately represent the interests of each and if each consents to the representation after full disclosure."  App.A-104 (capitalization omitted); *see also* D.C. ETHICS OP. 140 ("When an attorney is requested to undertake a multiple representation, the attorney is obliged to conduct a preliminary investigation, including an interview with each client individually, to determine all possible bases of liability. The attorney's ethical obligations thereafter depend on the results of the preliminary investigation."), App.A-106.

from liability.  This blanket statement is contrary to *Goldschmidt*, which found the existence of the affirmative defense where the attorney did not act maliciously, fraudulently, or tortiously, did not frustrate the administration of justice, and did not obtain something to which his client was not justly entitled.  935 A.2d at 381 n.14.  Keller Postman's argument also overlooks Tubi's well-pleaded allegations, discussed above.  Moreover, even if a contingency-fee agreement might align an attorney's interest with a *single* client, it does not necessarily align an attorney's interest with tens of thousands of claimants who might have conflicting interests.  Contrary to Keller Postman's assertions, a contingency fee arrangement common to the clients does not make all 23,700+ clients the same; nor does it mean that Keller Postman was acting in the best interest of all clients when it caused the clients to breach their obligations to Tubi.  It also does not mean it was in its clients' interest for Keller Postman to put in minimal work to vet each claim and learn the specific facts about them.[17]

Keller Postman has an attorney-client relationship with each of its clients.  Compl. ¶¶ 26, 28–30.  If even one client's interests are not aligned with the firm's decision to breach, and the firm did not obtain informed consent from that client, it would defeat the affirmative defense.  For instance, Keller Postman assumes that its clients' sole interest in the representation is in making

---

[17] In simple mathematical terms, a client with a legitimate claim would benefit from an individualized demand, brought in compliance with the Terms.  That client stands to lose by having the specific details of her claims ignored and brought in a manner that breaches the Terms.  Each demand claims $16,000 in statutory damages, but Keller Postman was prepared to settle all the demands for $3,000 a piece—the same price for a facially frivolous demand as for a potentially meritorious one (assuming there is one to be found among the 23,747 filed).  Keller Postman's treatment of all clients' claims alike, without any regard to individualized merit, results not from an alignment of interest, but from *misalignment*: Any client with a meritorious claim does not benefit from being mixed in with other clients that have frivolous claims, but Keller Postman wants to get paid for settling all claims by making its demands en masse.  A contingency arrangement does not cure this misalignment.

as much money as possible.  Even if that were true, Keller Postman's strategy would not maximize each client's potential award.  *See supra* note 18.  But the truth is the firm doesn't know, and it is impossible under Keller's business model to determine, what relief its individual clients want—in contravention of the firm's obligation to consult with and abide by the individual client's decision as to the "objectives of [the] representation." D.C. R. PRO. CONDUCT 1.2(a), App.A-12; *see* Compl. ¶¶ 27(b), 29.  Some claimants might be satisfied if they receive more or less targeted advertising; they might not be satisfied by a payment of money.  Likewise, the best legal position for some claimants might not be Keller Postman's "cockamamie" assertion that targeted advertising, writ large, violates the Unruh Act.[18]  But Keller Postman makes this argument on behalf of all claimants.

Indeed, Keller Postman's argument that it cannot be held responsible for its clients' breach shows that its interests are not aligned with its own clients.  As Tubi has alleged, Keller Postman caused its clients to breach without obtaining their informed consent.  Keller Postman therefore caused the clients to unwittingly take on the risk that their claims would be dismissed and that they might be found personally liable for Tubi's attorneys' fees and costs.  Given the potential consequences of breach for the clients, it would be inequitable for the firm, the orchestrator of the scheme and the one who stands to benefit from it, to dodge liability in the tortious interference

---

[18] Keller Postman interprets *Liapes* to mean that "companies like Tubi violate the Unruh Act if they employ tools that let advertisers target advertisements based on age or gender," citing Facebook's position in a petition for review to the California Supreme Court.  Mot. 8.  This reading is not supported by the text of the *Liapes* opinion, which instead focused on the plaintiff's specific allegations about particular advertisements.  *See, e.g.*, 95 Cal. App. 5th at 918.  It also is at odds with the *Liapes* plaintiff's own understanding of the court's opinion: "the Court of Appeal did not hold that *all* forms of targeted advertising violate the Unruh Act," but instead issued a "narrow opinion."  Ex. 3, Answer to Pet. for Rev. at 16–17, No. S282529 (Cal. Nov. 30, 2023); *see supra* note 3 (court documents are judicially noticeable).

case.

Finally, Keller Postman claims that Tubi cannot use the firm's conduct in prior litigation to "fill" a "hole in its tort theory." Mot. 25. But Keller Postman's prior conduct in other litigation would be admissible under Federal Rule of Evidence 404(b) at a trial if it would help prove Keller Postman's intent, show it had notice that it needed to vet its clients' claims more thoroughly, and be probative of its preparation, plan, knowledge, absence of mistake, and lack of accident. Tubi should be allowed the opportunity to develop the evidence in discovery. Plus, Keller Postman cannot both ask the Court to ignore Tubi's allegations of bad acts and to credit its supposed good acts, as it does in pointing to the purported value of its other mass representations to argue that the case should be dismissed. *See* Mot. 25. Keller Postman cannot have it both ways, especially at this stage when all inferences favor Tubi and when parties are more limited in introducing their good acts at trial compared to their opponent's bad acts. *Compare* FED. R. EVID. 404(b), *with* FED. R. EVID. 405.

### D.      Denying Keller Postman's Motion to Dismiss Would Not Deter Lawyers from Zealously and Ethically Representing Their Clients.

Attempting to hold Tubi to a higher standard than the law requires, Keller Postman asks the Court to presume that a failure to dismiss Tubi's tortious interference claim would "chill countless legal representations." Mot. 30. It would do nothing of the sort. Tubi's action is based on its precise allegations that: (1) Tubi's Terms required Keller Postman's clients to give Tubi notice of their disputes, provide Tubi with specific facts giving rise to the disputes, and allow Tubi 45 days to try to resolve the disputes; (2) Keller Postman did not obtain the informed consent of its clients before breaching the Informal Dispute Process; (3) at least some of Keller Postman's clients would have been better off if the firm had not caused them to breach and instead had allowed them to comply with the Informal Dispute Process; and (4) Keller Postman acted

maliciously, as shown in part by the firm's assertion of thousands of fraudulent and frivolous claims, unethical conduct, and failure to receive informed consent from their clients.

Keller Postman contends that "[c]ourts are loath to allow suits [against lawyers]," Mot. 30, but that consideration is already built into the standard in *Goldschmidt*, which does not extend to an attorney acting in a malicious, fraudulent, or tortious manner that has frustrated the administration of justice or to an attorney attempting to obtain something for a client to which they are not justly entitled. 935 A.2d at 381 n.14. Additionally, Keller Postman ignores the cases where courts have allowed tortious interference claims against lawyers and law firms to proceed. *See, e.g.*, *Close It! Title Servs., Inc. v. Nadel*, 248 A.3d 132, 142 (D.C. 2021); *Lannan*, 300 F. Supp. 3d at 29; *Shenandoah*, 182 F. Supp. 2d at 22 (applying Virginia law).[19]

Keller Postman also claims, Mot. 30, that its conduct should be protected based on the reasoning in *Schick v. Lerner*, 193 Cal. App. 3d 1321, 1329 (1987). Along with not being binding on this Court, the allegations in *Schick* were very different from those here. The plaintiff had a novel theory—one the court rejected—that an attorney owes a duty of care to a third party. In rejecting this argument, the court relied on language from a California Supreme Court opinion that distinguished protections of attorneys based on concerns that they could be "preoccup[ied] or concern[ed] with the possibility of claims based on mere negligence" from allegations based on "fraud or malice" (where attorneys should not receive the same protections). *Schick*, 193 Cal. App. 3d at 1331 (citing *Goodman v. Kennedy*, 18 Cal. 3d 335, 344 (1976)). As reflected by the

---

[19] *See also* Alex B. Long, *Attorney Liability for Tortious Interference: Interference with Contractual Relations or Interference with the Practice of Law?*, 18 GEO. J. LEGAL ETHICS 471, 502, 519 (2005) (discussing how interference torts can deter "the type of misconduct that endangers the legal profession as a whole" and addressing scenarios in which "a violation of a lawyer ethics code could amount to [] independently wrongful conduct"), (App.A-155, 172).

quote Keller Postman includes, Mot. 30, the court in *Schick* emphasized that an attorney must be free to "counsel their clients" "without fear of subjecting themselves to liability as a result of the *proper* discharge of their professional obligations," 193 Cal. App. 3d at 1329 (emphasis added).[20] But, here, Tubi alleges that Keller Postman did *not* properly discharge its professional obligations, including to its clients, as it was operating outside the ethical rules that bind them. Keller Postman's claims to the contrary are defenses that it cannot raise at the Rule 12(b)(6) stage.

By allowing this case to proceed, the Court would not be calling into doubt the tactics of other members of the plaintiff's bar or creating case law that would subject lawyers to civil suits when acting ethically in the ordinary course. It is Keller Postman that seeks a novel and broad rule. To grant the firm's motion to dismiss, the Court would in effect be providing immunity to counsel even if the lawyer allegedly committed malicious and tortious acts without adequately consulting its clients, for its own benefit. Such an outcome is not consistent with the law and would promote bad acts and unethical conduct.[21]

---

[20] Similar exceptions to otherwise-robust immunity doctrines exist in other areas of law. For example, the *Noerr-Pennington* doctrine, grounded in the First Amendment, typically bars claims based on "conduct (including litigation) aimed at influencing decisionmaking by the government." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014). But "activity ostensibly directed toward influencing governmental action does not qualify for *Noerr* immunity if it is a mere sham to cover an attempt to interfere directly with the business relationships of a competitor." *Id.* (cleaned up). This exception has not undermined the applicability of *Noerr-Pennington* doctrine to those engaged in First Amendment protected activity—it has simply identified a narrow instance where the defendant's misconduct precludes it from receiving immunity. The same is true here. Rejecting Keller Postman's Motion based on the specific misconduct Tubi has alleged would neither negate protections courts afford to attorneys nor put all attorneys at risk of being sued.

[21] Keller Postman lists the ways in which Tubi's counsel could be subject to a lawsuit, both based on its advice to Tubi and its representation in an entirely separate matter involving Chance the Rapper. Mot. 31. Keller Postman cannot equate Jenner & Block LLP's representation of single-party sophisticated clients to Keller Postman's representation of 23,747 individuals to whom it is incapable of providing personalized, informed representation. Keller Postman has no

**II.      Tubi Has Properly Pleaded Its Declaratory Judgment Claim.**

In Claim II, Tubi seeks a declaration that: (1) Keller Postman tortiously interfered with the valid and binding notice and Informal Dispute Process provisions of the Terms; (2) the demands Keller Postman filed in the mass arbitration against Tubi do not provide specific facts to support Unruh Act claims; and (3) Keller Postman violated its ethical duties in bringing the arbitration demands.  Keller Postman argues the Court should dismiss Claim II because: (a) with respect to the first and second declaratory requests, Tubi purportedly asks for relief that the FAA precludes because it would duplicate the arbitrator's work, Mot. 32; and (b) with respect to the third request, Tubi supposedly lacks standing because the requested relief "relate[s] to Keller Postman's duties to its own clients," rather than to injury Tubi "has suffered or will suffer," *id*. at 33, 36.

Neither argument has merit.  Keller Postman's first argument misconstrues the FAA and the preclusive effect of the relief Tubi seeks, interpreting both too broadly.  In contrast, Keller Postman's second argument takes too narrow a view of the harm Tubi alleges and the relief Tubi seeks.

---

idea whether its clients are legally sophisticated, and it cannot engage in the ongoing communications that are required between a law firm and its client.  Lawyers who act in good faith, obtain informed consent from their clients before putting them at risk, and performing their duties within the ethical boundaries should not be liable to their clients' adverse parties, and no ruling by the Court will open the floodgates to lawsuits against those attorneys.  By contrast, Tubi has stated a valid tortious interference claim against Keller Postman that distinguishes it from the mine run of plaintiffs' firms.

**A.      The Pending Arbitration Does Not and Should Not Preclude Declaratory Relief.**

Tubi can seek a declaration that Keller Postman tortiously interfered with the valid and binding Informal Dispute Process and that the barebones demands for arbitration do not provide specific facts to support the claimants' Unruh Act claims.

Contrary to Keller Postman's assertions, the FAA does not preclude Tubi's claim, and Tubi's requested relief will not preclude the claimants from arbitrating their claims before JAMS. As reflected by Keller Postman's cited cases, Mot. 33, the FAA precludes declaratory relief "if the underlying dispute falls within the reach of the arbitration provision." *Tannatt v. Varonis Sys., Inc.*, No. CV 18-12589-JGD, 2019 WL 830482, at *2 (D. Mass. Feb. 21, 2019); *Aeronaves de Mexico, S. A. v. Triangle Aviation Servs., Inc.*, 389 F. Supp. 1388, 1391 (S.D.N.Y. 1974) (entrusting issues to arbitrator for decision where the "controversy was encompassed by *the parties'* broad agreement to arbitrate" (emphasis added)), *aff'd*, 515 F.2d 504 (2d Cir. 1975).  The parties to this lawsuit have no agreement to arbitrate.  Nor does Keller Postman even suggest that the *tortious interference claim* should be decided in arbitration.

It would be improper to dismiss Tubi's well-pleaded declaratory relief claims *against Keller Postman* because "the legal question at the center of" this suit overlaps with Tubi's defense against *others* in arbitration.  Mot. 32.  It would violate the rule that, while the FAA directs courts to place arbitration agreements on equal footing with other contracts, it "does not require parties to arbitrate when they have not agreed to do so." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 293–94 (2002) ("It goes without saying that a contract cannot bind a nonparty.").  In *Waffle House*, for instance, where the EEOC was "not a party to the contract" and had not "agreed to arbitrate its claims," it was not bound.  *Id.*  The same reasoning applies here.  Tubi has not agreed to submit its dispute with Keller Postman to arbitration, and the FAA therefore does not limit this Court's

authority to award declaratory relief.

Separately, as Tubi has stated elsewhere, it will not claim that the Court's ruling—or the declaratory relief itself—has a preclusive effect over the claimants' arbitration demands. Accordingly, Keller Postman's concern about stepping on the arbitrator's toes is unfounded.

### B.   Tubi Has Standing to Seek Declaratory Relief.

Keller Postman fares no better with its argument that Tubi lacks standing to obtain declaratory relief over Keller Postman's ethical violations because the firm owes these duties to its clients, and Tubi has not been harmed by its violations.

Tubi's standing to bring its declaratory relief claim is shown by cases Keller Postman itself cites.  Notably, while Keller Postman characterizes *In re CenturyLink Sales Practices & Securities Litigation*, No. 17-2795 (MJD/KMM), 2020 WL 3513547, at *6 (D. Minn. June 29, 2020), as holding that the firm's conflicts "harm its clients, not [the opposing party]," Mot. 35, that court recognized that a litigant may have standing if the litigant can "show how the diminished quality of the representation of an opposing party causes the movant injury," *CenturyLink*, 2020 WL 3513547, at *6 (citation omitted).  Similarly, the court in *Colyer v. Smith*, 50 F. Supp. 2d 966 (C.D. Cal. 1999), Mot. 34, recognized that a non-client can establish standing against an attorney if the alleged ethical breach is "so severe that it 'obstructs the orderly administration of justice.'"  50 F. Supp. 2d at 972.[22]

Here, Tubi has pleaded, supported by detailed factual allegations, that Keller Postman's violations of its ethical duties allowed Keller Postman to carry out its mass arbitration scheme against Tubi.  Tubi alleges, for example, the law firm violated D.C. Rule of Professional Conduct

---

[22] Both *CenturyLink* and *Colyer* addressed the attempted disqualification of counsel, not claims for declaratory relief.

3.1, App.A-62, by bringing claims without having a valid basis in law and fact to do so.  Compl. ¶ 27(a).  Had Keller Postman sufficiently vetted the claims, as required, it would have brought far fewer (or no) claims against Tubi.  The firm's business practice is to bring as many arbitrations as possible to increase its "leverage" over targeted companies based on arbitration costs and fees. Keller Postman, as a self-admitted "pioneer" of this practice, cannot seriously dispute that Tubi was harmed by the law firm's non-compliance with Rule 3.1 if Keller Postman's compliance with that Rule would have meant that it would have brought fewer (or no) claims against Tubi.

Similarly, Tubi alleges that Keller Postman acted unilaterally in causing its clients to breach the Informal Dispute Process and failed to obtain their informed consent before doing so. *Id*. ¶ 29.  The Complaint alleges that this violates D.C. Rules of Professional Conduct 1.7 and 1.3 because Keller Postman puts its own interests above its clients, and places its clients at risk in the process. *Id*. ¶ 56; *see* App.A-14, 24–30.  Tubi further alleges that Keller Postman caused its clients' breach because the law firm's business model did not allow it to learn the specific facts about the dispute needed to comply with the Informal Dispute Process.  Compl. ¶ 54.  Once again, Keller Postman cannot seriously argue that Tubi was unharmed by the law firm's alleged violations of these ethical rules.

Keller Postman suggests that Tubi was not harmed because it can seek relief against the claimants in the arbitration—indeed, Keller Postman cites provisions in the Terms that would allow Tubi to recover attorneys' fees and costs *from Keller Postman's clients*, arguing that this relief (and not relief against Keller Postman itself) is what Tubi should seek.  *See* Mot. 35.  By taking this position, Keller Postman has done something it has specifically denied—it has put itself firmly at odds with its clients.  Its argument can be read no other way than as a request for this Court to rule in Keller Postman's favor and direct Tubi to seek relief against its clients instead.

This contention only reinforces Tubi's allegations that Keller Postman's interests are misaligned with its clients, and that it intentionally caused a breach that placed its clients at risk.

Further, Keller Postman is talking out of both sides of its mouth: to this Court, the firm says Tubi should seek recourse against Keller Postman's clients in arbitration; but to JAMS, when Tubi sought to learn facts to determine whether it should seek attorney's fees and costs from claimants seeking to withdraw from the arbitration, Ex. 4, Letter from B. Fox to JAMS at 1 (Aug. 14, 2024), Keller Postman accused Tubi of bad faith and claimed the law did not allow Tubi to obtain such relief even if the claims were meritless, *see* Ex. 5, Letter from W. Postman to JAMS at 1 (Aug. 23, 2024).[23]

Finally, Keller Postman contends that the Court should dismiss Claim II because "Tubi has already avoided the main 'injury' it feared." Mot. 36. Keller Postman cites no law that would allow the Court to dismiss on grounds that the plaintiff's injury would have been worse had the plaintiff not mitigated the harm. Regardless, Tubi has and will continue to incur arbitration and attorneys' fees, as explained above, and has a ripe claim against Keller Postman for declaratory relief.

### III.    A Stay Is Unwarranted.

Keller Postman argues that if the Court does not dismiss the Complaint, it should stay this case under Section 3 of the FAA, 9 U.S.C. § 3, until the mass arbitration is over. The Court should

---

[23] The Court can take judicial notice of the parties' filings in the mass arbitration. *See POST, LLC v. Berkshire Hathaway Specialty Ins. Co.*, No. CV 20-2972 (JDB), 2022 WL 3139022, at *3 n.4 (D.D.C. Aug. 5, 2022) (taking judicial notice of arbitration ruling); *S.C. Hotel, LLC v. Bayley Constr., LP*, No. 823CV00793JVSADSX, 2023 WL 6927349, at *3 (C.D. Cal. Sept. 12, 2023) (same as to filings from a JAMS arbitration); *but see Kisby Lees Mech. LLC v. Pinnacle Insulation, Inc.*, No. CIV. 11–5093 JBS/AMD, 2012 WL 3133681, at *4 (D.N.J. July 31, 2012) (documents from private arbitration proceedings are not judicially noticeable because they are not public records).

reject that proposal.  Section 3 of the FAA allows a court to stay a case so that the *parties* may arbitrate, but as noted, Keller Postman is not a party to any of the pending arbitrations.  And to the extent Keller Postman seeks a discretionary stay under a source of authority other than Section 3, it has not shown its entitlement to that relief, especially given its successful efforts (described below) to indefinitely delay the adjudication of its clients' claims, as Tubi told the Court at the pre-motion conference Keller Postman would do.

### A.  Keller Postman is not Entitled to a Stay Under Section 3.

Under Section 3 of the FAA, "[i]f any suit or proceeding be brought … upon any issue referable to arbitration under an agreement …, the court … shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  *Id*.  Under Section 3's plain text, a court should grant a stay if the "suit or proceeding" *itself* is "brought … upon any issue referable to arbitration."  In other words, if the *parties* have agreed to arbitrate an issue, the court must enter a Section 3 stay so that the parties may arbitrate that issue and later return to court.  The Section 3 stay "ensures that *the parties* can return to federal court if arbitration breaks down or fails to resolve the dispute."  *Smith v. Spizzirri*, 601 U.S. 472, 477 (2024) (emphasis added); *see Bombardier Corp. v. Nat'l R.R. Passenger Corp.*, 333 F.3d 250, 254 (D.C. Cir. 2003) (a party's motion to stay under Section 3 "presuppose[es] the party's intent to arbitrate its disputes").

Keller Postman is not entitled to a stay under Section 3 because it is not seeking to compel arbitration of Tubi's claims *against Keller Postman*.  Instead, Keller Postman wants *no one*—neither the Court nor an arbitrator—to adjudicate Tubi's claims against Keller Postman, at least not until the mass arbitration brought by nearly 24,000 third parties wraps up.

Contrary to Keller Postman's argument, *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009), does not hold that a court may enter a Section 3 stay for purposes of delaying a case

indefinitely.   There, Carlisle sued Arthur Andersen over a dispute related to an arbitration agreement between Carlisle and a third party.   Arthur Andersen moved to compel arbitration and sought a Section 3 stay, arguing that under the equitable estoppel doctrine, Carlisle was required to arbitrate *against Arthur Andersen*.   *Id.* at 627.   The Court held that if a non-party to an arbitration agreement seeks to enforce that agreement so that *the non-party* can arbitrate, a court can enter a Section 3 stay.   *Id.* at 631.   Here, however, Keller Postman seeks a Section 3 stay so that it can avoid arbitrating or litigating Tubi's tortious interference claim.   Section 3 does not authorize that relief.

Keller Postman relies on *Hill v. GE Power Systems, Inc*., 282 F.3d 343 (5th Cir. 2002), and *CPB Contractors Pty Ltd. v. Chevron Corp*., No. 16-cv-05344, 2017 WL 7310776, at *5 (N.D. Cal. Jan. 17, 2017), for the proposition that Section 3 of the FAA grants district courts discretionary authority to stay claims—even if those claims are not going to be arbitrated—if adjudicating those claims would somehow "undermine" a pending arbitration.   Mot. 40-41.   Such an approach has no grounding in Section 3's text, has never been adopted by the D.C. Circuit, and is incompatible with the Supreme Court's recent *Smith* decision.   In *Smith*, the Supreme Court held that district courts lack authority to dismiss—as opposed to stay—lawsuits where all claims are arbitrable.   601 U.S. at 475–76.   In reaching that conclusion, the Supreme Court held that Section 3 imposes a mandatory, mechanical duty to stay: "the use of the word 'shall' creates an obligation impervious to judicial discretion."   *Id.* at 476 (quotation marks omitted).   This interpretation of Section 3 supersedes *Hill*'s holding that Section 3 confers "discretion to grant a stay" to advance "the federal policy in favor of arbitration."   282 F.3d at 347.

Even under *Hill*, though, a stay is unwarranted because this lawsuit will not "undermine the arbitration proceedings."   *Id*.   Tubi will not argue to the arbitrator that any ruling by the Court

has preclusive effect in the mass arbitration, nor will Tubi argue to this Court that it should undo a ruling in the mass arbitration.

## B. The Equitable Estoppel Doctrine Does Not Apply.

To argue a stay is warranted, Keller Postman invokes the doctrine of equitable estoppel. But the doctrine is irrelevant for multiple reasons.  First, the equitable estoppel doctrine allows a party that is not a signatory to an arbitration agreement to compel the arbitration of claims against a signatory.  *See Kelleher v. Dream Catcher, LLC*, 278 F. Supp. 3d 221, 225 (D.D.C. 2017) (under doctrine of equitable estoppel, individual defendants, who did not sign arbitration agreement, "could have compelled Plaintiff to arbitrate his claims"); *Riley v. BMO Harris Bank, N.A.,* 61 F. Supp. 3d 92, 98–99 (D.D.C. 2014) ("Under the doctrine of estoppel, a non-signatory can compel arbitration with a signatory when the non-signatory is seeking to resolve issues that are intertwined with an agreement that the signatory has signed" (citation omitted)).  Equitable estoppel cases follow the same basic pattern:

- A signs an arbitration agreement with B.

- Later, A has a claim against B.

- To avoid arbitrating, A sues B's affiliate, C, in court.

Courts hold in this scenario that A must arbitrate its claims against C.  *See Kelleher*, 278 F. Supp. 3d at 225–26 (plaintiff signed arbitration agreement with Dream Catcher and sued individuals affiliated with Dream Catcher, including the person who signed the agreement); *Riley*, 61 F. Supp. 3d at 100–01 (plaintiff signed arbitration agreement with lender and sued banks referenced in the arbitration agreement).

Here, if the equitable estoppel doctrine applied, it would not be a basis to stay this litigation, but instead a basis to send Tubi's lawsuit against Keller Postman to arbitration.  Keller Postman,

however, is not asking for such relief.  It instead seeks an indefinite stay until Tubi and Keller Postman's clients finish arbitrating.  Tubi, by contrast, is not trying to *avoid* arbitrating.  Tubi *is* arbitrating in parallel (or at least attempting to do so).  And unlike all of Keller Postman's cases, Tubi is the respondent in the arbitrations, but is the plaintiff in this case.  The basic premise of equitable estoppel cases—that A is suing C to avoid bringing an arbitration demand against B—is absent.

Second, the justification for the equitable estoppel doctrine does not apply here.  The doctrine applies when "the promise to arbitrate by the entity opposing arbitration, was reasonably seen on the basis of the relationships among the parties as extending not only to its contractual counterparty but also to nonsignatory entities that are affiliated or associated with the counterparty in such a manner as to make it unfair to allow the signatory to avoid its commitment to arbitrate on the ground that the nonsignatory was not the very entity with which it had a contract."  *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 361 (2d Cir. 2008); *accord Riley*, 61 F. Supp. 3d at 101 (same, under D.C. law).  By contrast, when the nonsignatory has "wrongfully induce[d]" a signatory to breach, "there would be no unfairness in allowing [the signatory], the victim of the tortious interference, to insist that, while he agreed to arbitrate with his contractual counterparty, he in no way consented to extend that agreement to an entity which tortiously subverted his rights under the agreement."  *Sokol*, 542 F.3d at 361.

Here, at the time of contracting, the claimants were not affiliated with Keller Postman.  Tubi could not have anticipated that Keller Postman would later come on the scene and develop a scheme to induce its clients to breach the contracts.  Tubi did not implicitly agree at the time of contracting to arbitrate against Keller Postman.  It would be inequitable to force Tubi into such an arbitration—and even more inequitable to stay this lawsuit and prevent Tubi from pursuing its

claims against Keller Postman in *any* forum.

###### C.    There Is No Basis for a Discretionary Stay.

Courts have discretionary authority, separate from Section 3, to "stay litigation among the non-arbitrating parties pending the outcome of the arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n.23 (1983). But aside from a citation to *Moses H. Cone* (Mot. 41), Keller Postman does not identify any legal standard for such stays or otherwise develop any argument that a discretionary stay is warranted. To the extent Keller Postman's Motion can be construed as requesting such a stay, it should be denied.

Whether to enter a non-Section 3 stay is a "discretionary decision," requiring the Court's consideration of "economy of time and effort for itself, for counsel, and for litigants." *Kindig v. Whole Foods Mkt. Grp., Inc.*, 811 F. Supp. 2d 410, 416 (D.D.C. 2011) (citation omitted). Further, if "there is even a fair possibility that the stay for which [the party] prays will work damage to some one else," the party seeking the stay must also "mak[e] out a clear case of hardship or inequity in being required to go forward." *Hulley Enters. Ltd. v. Russian Fed'n*, 502 F. Supp. 3d 144, 152 (D.D.C. 2020) (citation omitted). Here, Keller Postman has not met "the heavy burden" of showing that a stay is appropriate. *Kindig*, 811 F. Supp. 2d at 416 (citation omitted). Instead, the facts show that a stay is unwarranted because it would indefinitely delay these proceedings, given Keller Postman's conduct in the mass arbitration it brought but now does not want to prosecute.

Rather than allow its clients' claims to be adjudicated, Keller Postman has brought the arbitration to a standstill. Keller Postman filed its mass arbitration demands in April, but it has not allowed an arbitrator to be appointed. Although the parties engaged in a rank-and-strike process from a list of arbitrators provided by JAMS—a process designed to ensure a mutually agreeable arbitrator—Keller Postman has invoked a California law that allows it to significantly delay the

appointment of an arbitrator.  *See* CAL. CODE CIV. PROC. § 1281.91(b)(1).[24]  Using this law, Keller Postman has already disqualified three appointed arbitrators—attempting (but failing) to have the disqualifications apply to most but not all claimants.  *See* Exs. 6–7 (disqualification notices).[25] And it undoubtedly will continue to disqualify any arbitrator appointed until all six prospective arbitrators on JAMS rank-and-strike list are exhausted.  *See* 09/04/24 Tr. 14:4-12 (Keller Postman confirming to this Court that it "expect[s] this [disqualification of arbitrators] will keep happening"); Ex. 8, JAMS Letter to Parties (Sept. 23, 2024) (informing the parties that if all six prospective arbitrators on JAMS's rank-and-strike list are disqualified, the appointment process will have failed and JAMS "will await the appointment of the arbitrator by a court").  But even then, it will take a long time to have an arbitrator in place—and Keller Postman still will have the ability (if California law were to apply) to disqualify the court-appointed arbitrator. *See* § 1281.91(b)(2).

Keller Postman's dilatory tactics mirror its behavior in another mass arbitration against Starz Entertainment.  There, after JAMS consolidated Keller Postman's clients' claims, Keller Postman proceeded to disqualify five proposed arbitrators from two rank-and-strike lists.[26]  Keller Postman then brought a petition seeking to undo JAMS's consolidation order, which the district

---

[24] Tubi has maintained that California law does not govern the mass arbitration because the Terms call for the FAA and Delaware law to apply.

[25] Tubi accepted the first two appointed arbitrators before moving to disqualify the third arbitrator, who was lower on Tubi's rank-and-strike list than the first two appointed arbitrators, based on the arbitrator's disclosures.

[26] Ex. 9, Respondent-Appellee Starz Ent. LLC's Answering Br. at 15 n.4, *Jones v. Starz Ent., LLC,* No. 24-1645 (9th Cir. July 22, 2024), ECF No. 26-1.  The Court can take judicial notice of this filing.  *See supra* note 3.

court denied.  Keller Postman next appealed to the Ninth Circuit.[27]  Keller Postman's efforts to overturn JAMS's consolidation decision in *Starz* have caused its clients' claims to be effectively on ice since JAMS ordered consolidation 14 months ago—in August 2023.

It therefore could be years before Keller Postman allows an arbitrator to adjudicate the mass arbitration it brought against Tubi.  It does not make sense to allow Keller Postman's dilatory tactics to bring the wheels of justice to a halt here as well.  By the time an arbitrator is appointed, the case before this Court could be well into discovery, or perhaps even past summary judgment or trial.  As a result, Keller Postman's request for a stay does not mean that the Court would stand by while arbitration proceeds—Keller Postman is asking this Court to stand *down* while it grinds the arbitration to a halt and tries to rebuild the leverage of procedural costs to Tubi.  Discretion and equity hardly favor letting Keller Postman do so.

## IV.    The Court Should Provide Tubi with Leave to Amend if It Dismisses the Complaint.

The Court should not dismiss Tubi's Complaint.  But if the Court does do so, Tubi respectfully requests that the Court order dismissal without prejudice and give Tubi leave to amend in accordance with the standard practice in this Circuit to cure any identified deficiencies.  *See O'Donnell v. Barry*, 148 F.3d 1126, 1137 n.3 (D.C. Cir. 1998); *see also KLEO AG v. Rivada Networks, Inc.*, No. 22-CV-01664 (DLF), 2022 WL 22626490, at *2 (D.D.C. Nov. 2, 2022) (dismissing tortious interference claim with leave to amend); 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (4th ed.) ("[T]he plaintiff [should] be given every opportunity to cure a formal defect in the pleading.").

---

[27] *See Jones v. Starz Ent., LLC*, No. EDCV 24-0206-KK-DTBX, 2024 WL 1067505 (C.D. Cal. Mar. 11, 2024), *appeal filed*, No. 24-1645 (9th Cir. Mar. 11, 2019).

**CONCLUSION**

Count I of the Complaint states a valid tortious interference claim against Keller Postman.

Count II states a valid claim to declaratory relief.  Tubi should be allowed to litigate this case while

Keller Postman continues its delay tactics in the mass arbitration.  Accordingly, Tubi respectfully

asks this Court to deny Keller Postman's motion to dismiss, as well as deny its request for a stay.

The Court should order Keller Postman to answer Tubi's Complaint and allow the parties to begin

discovery.

DATED: October 16, 2024                    JENNER & BLOCK LLP

                                           By: /s/ *Brandon Fox*
                                               Brandon D. Fox (*pro hac vice*)
                                               bfox@jenner.com
                                               Kelly M. Morrison (D.C. Bar No. 1046293)
                                               kmorrison@jenner.com
                                               Sati Harutyunyan (D.C. Bar No. 1049009)
                                               sharutyunyan@jenner.com
                                               515 South Flower Street, Suite 3300
                                               Los Angeles, CA 90071-2246
                                               Telephone: (213) 239-5100
                                               Facsimile: (213) 239-5199

                                               *Attorneys for Plaintiff Tubi, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on the 16th day of October 2024, I caused the foregoing to be electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

By: <u>/s/ *Brandon Fox*        </u>
        Brandon D. Fox
