## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TUBI, INC.,
      Plaintiff,

v.

KELLER POSTMAN LLC,
      Defendant.

Case No. 1:24-cv-01616-ACR

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF KELLER POSTMAN LLC'S MOTION TO DISQUALIFY JENNER & BLOCK LLP

KELLER POSTMAN LLC
  Warren D. Postman (Bar ID 995083)
  Albert Y. Pak (Bar ID 888314242)
  Fred Messner (admitted *pro hac vice*)
1101 Connecticut Avenue N.W.
Suite 1100
Washington, DC 20036
(202) 918-1123
wdp@kellerpostman.com
albert.pak@kellerpostman.com
fred.messner@kellerpostman.com

  Kiran N. Bhat (Bar ID 1021898)
2333 Ponce De Leon Boulevard
Suite R-240
Coral Gables, FL 33134
(305) 845-4684
kiran.bhat@kellerpostman.com

*Attorneys for Defendant*

Dated: December 9, 2024

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

INDEX OF EXHIBITS ............................................................................................. v

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 5

    I.   The California Rules of Professional Conduct Bar Contact with Represented
       Persons and Bar Misleading Contact or Efforts to Obtain Confidential Information
       Even with Formerly Represented Persons .................................................................... 5

         A.   When an attorney appears for a client in litigation, the opponent "knows"—
             as a matter of law—that the client is represented. ............................................... 6

         B.   Withdrawal or dismissal of a pleading does not entitle an attorney to
             conclude that an adversary's representation has terminated .............................. 7

         C.   Where a lawyer suspects that a representation may have ended, he is
             obligated to check with opposing counsel or seek leave from a Court before
             contacting a represented person .......................................................................... 9

         D.   An attorney who directs an agent to contact a represented person is
             responsible for his agent's conduct ................................................................... 10

         E.   California Rule of Professional Conduct 4.3 and California Business and
             Professions Code § 6106 impose additional obligations. .................................. 11

    II.  Keller Postman Typically Continues to Represent Clients Who Withdraw
       Arbitration Claims, Especially When They Receive Threats from an Adversary. .. 12

    III. Jenner's Investigator Confronts and Harasses Keller Postman's Current and Former
       Clients Who Withdrew Arbitration Claims. ............................................................. 14

ARGUMENT ....................................................................................................... 19

    I.   Jenner Flagrantly Violated the California Rules of Professional Conduct .............. 20

         A.   Jenner Willfully Contacted Keller Postman Clients in Violation of Rule 4.2 .... 20

         B.   Even Under Mr. Fox's Baseless Assumption, the Contacts with Keller
             Postman Clients Violated Rule 4.3 & § 6106. .................................................... 24

         C.   While Most of the Individuals Mr. Fox and Jenner Contacted Were Current
             Keller Postman Clients, Jenner Violated the Rules Even with Regard to the
             Minority Who Were Former Clients ................................................................... 27

    II.  The Seriousness of the Ethical Violations at Issue Warrant Serious Sanctions. ...... 28

         A.   Disqualification is Warranted. ........................................................................... 28

         B.   The Results of Ms. Talamantez's Investigation Should Be Excluded ............... 33

         C.   The Court Should Award Attorneys' Fees and Costs .......................................... 34

CONCLUSION ..................................................................................................... 34

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abeles v. State Bar*,
 9 Cal. 3d 603 (1973) ............................................................................ 7, 8, 22, 23

*Allstate Ins. Co. v. Inscribed PLLC*,
 571 F. Supp. 3d 823 (E.D. Mich. 2021) ...................................................... 23, 33

*Ambush v. Engelberg*,
 282 F. Supp. 3d 58 (D.D.C. 2017) ...................................................................... 29

*Chronometrics, Inc. v. Sysgen, Inc.*,
 110 Cal. App. 3d 597 (1980) ........................................................................ 29, 33

*San Francisco Unified Sch. Dist. ex rel. Contreras v. First Student, Inc.*,
 213 Cal. App. 4th 1212 (2013) ................................................................. 9, 27, 29

*In re Dale*,
 No. 00-O-14350, 2005 WL 1389226 (Cal. Bar Ct. May 6, 2005) ..................... 2, 8, 9, 11, 27

*Dareltech, LLC v. Xiaomi Inc.*,
 No. 18-cv-8729, 2019 WL 10966202 (S.D.N.Y. Apr. 11, 2019) ......................... 32

*Dareltech, LLC v. Xiaomi Inc.*,
 No. 18-cv-8729, 2019 WL 3287957 (S.D.N.Y. July 22, 2019) ........................... 32

*Engstrom v. Goodman*,
 271 P.3d 959 (Wash. Ct. App. 2012) ................................................................. 10

*Faison v. Thornton*,
 863 F. Supp. 1204 (D. Nev. 1993) ..................................................................... 34

*Grewal v. Guru Nanak Mission Sikh Ctr.*,
 No. F057588, 2010 WL 1668067 (Cal. Ct. App. Apr. 27, 2010) ............... 7, 21, 23

*Haffer v. Temple University*,
 115 F.R.D. 506 (E.D. Pa. 1987) ....................................................................... 34

*Hiett v. Stanislaus Reg'l Hous. Auth.*,
 No. F084828, 2024 WL 4285870 (Cal. Ct. App. Sept. 25, 2024) ..................... 12

*Jackson v. Ingersoll Rand Co.*,
 42 Cal. App. 4th 1163 (1996) ............................................................................. 8

*Lewis v. Tel. Emps. Credit Union*,
 87 F.3d 1537 (9th Cir. 1996) ............................................................................ 29

*Nycomed US Inc. v. Glenmark Generics Ltd.*,
     No. 08-cv-5023, 2010 WL 3173785 (E.D.N.Y. Aug. 11, 2010) .......................................... 32

*Papanicolaou v. Chase Manhattan Bank, N.A.*,
     720 F. Supp. 1080 (S.D.N.Y. 1989) ..................................................................................... 34

*People v. Dowell*,
     No. G052630, 2017 WL 4054238 (Cal. Ct. App. Sept. 14, 2017) ........................................ 8

*Shoney's Inc. v. Lewis*,
     875 S.W.2d 514 (Ky. 1994) ................................................................................................. 33

*Snider v. Superior Ct.*,
     113 Cal. App. 4th 1187 (2003) ...................................................................................... 10, 27

*United States v. Lopez*,
     4 F.3d 1455 (9th Cir. 1993) ................................................................................... 6, 23, 31

*United States v. Sierra Pac. Indus.*,
     857 F. Supp. 2d 975 (E.D. Cal. 2011) ................................................................................. 33

*Verniest v. LeDonne*,
     No. A121310, 2009 WL 1664943 (Cal. Ct. App. June 15, 2009) ................................... 1, 29

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
     No. 07-cv-2866, 2016 WL 7626149 (C.D. Cal. June 22, 2016) ...................................... 7, 21

## Statutes

Cal. Bus. and Profs. Code § 6106 ................................................................................... 11, 27

Cal. Evid. Code § 952 ........................................................................................... 4, 12, 25

## Other Authorities

ABA Model Rule 4.2 .................................................................................................................. 6

Cal. R. Prof. Conduct 1.01 ......................................................................................................... 6

Cal. R. Prof. Conduct 1.6 ............................................................................................ 4, 12, 25

*Cal. R. Prof. Conduct 4.2 .................................................................. 2, 6, 7, 10, 11, 20, 23, 29

*Cal. R. Prof. Conduct 4.3 ............................................................................... 4, 11, 12, 27

District of Columbia R. of Prof. Conduct 8.5(b)(2)(ii) ............................................................ 6

Proposed Cal. R. of Prof. Conduct 4.2, Executive Summary ...................................................... 2, 9

*Restatement (Third) of the Law Governing Lawyers § 99 (2000) ................................ 29, 33, 34

## INDEX OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1 | Affidavit of Stephanie Talamantez, *Gregory v. Tubi, Inc.*, No. 24-LA-209 (Ill. 17th Jud. Cir. Ct. Nov. 25, 2024) |
| 2 | Declaration of Mark L. Tuft, dated Dec. 9, 2024 |
| 3 | Declaration of Monique Dudley, dated Dec. 6, 2024 |
| 4 | Declaration of Monique Dudley, dated Apr. 8, 2024 |
| 5 | Declaration of Lumeah Deschamps, dated Dec. 6, 2024 |
| 6 | Declaration of Lumeah Deschamps, dated Mar. 21, 2024 |
| 7 | Declaration of DeNeisha Ellis, dated Dec. 6, 2024 |
| 8 | Declaration of DeNeisha Ellis, dated Mar. 26, 2024 |
| 9 | Declaration of Darrell Eastman, dated Dec. 6, 2024 |
| 10 | Declaration of Melissa Santos, dated Apr. 7, 2024 |
| 11 | Declaration of Salbador Alonso, dated Apr. 15, 2024 |
| 12 | Declaration of Dolores Lawrence, dated Mar. 28, 2024 |
| 13 | Declaration of Warren D. Postman, dated Dec. 9, 2024 |
| 14 | Affidavit of Brandon Fox, *Gregory v. Tubi, Inc.*, No. 24-LA-209 (Ill. 17th Jud. Cir. Ct. Oct. 30, 2024) |
| 15 | Email from Tubi, Inc., to Marvin Cheng, dated Oct. 17, 2020 |
| 16 | Tubi, Inc.'s Surreply Opposing Objections and Requests for Exclusion, *Gregory v. Tubi, Inc.*, No. 24-LA-209 (Ill. 17th Jud. Cir. Ct. Dec. 3, 2024) |

## INTRODUCTION

In its motion for leave to file the Proposed Amended Complaint, Tubi's counsel at Jenner & Block LLP brazenly admits to having engaged in a pattern of ethical violations targeting Keller Postman's clients.  Specifically, Tubi's lead counsel at Jenner—Los Angeles Managing Partner, Brandon Fox—attempted to gain litigation leverage by directing a former FBI investigator, Stephanie Talamantez, to show up repeatedly at the homes of Keller Postman's clients.  This was not an isolated event; rather, the investigator contacted *close to two dozen* Keller Postman clients.  The investigator then interrogated Keller Postman clients about their claims—without the knowledge or consent of Keller Postman—and pressured some of them into signing declarations under penalty of perjury that described confidential communications and contradicted prior declarations they had signed, also under penalty of perjury.

The only reason Mr. Fox would want to reach out to these individuals is *because* they were Keller Postman's clients.  Mr. Fox perceived having details of Keller Postman's confidential representations and attorney-client communications as beneficial given that he now seeks to include them in the Proposed Amended Complaint.  (Dkt. 22-1 ¶¶ 77–80).  But of course, the purpose of the familiar ethical rule against contact with represented persons is precisely to "preserve the attorney-client relationship from an opposing attorney's intrusion and interference" of this sort.  *Verniest v. LeDonne*, No. A121310, 2009 WL 1664943, at *5 (Cal. Ct. App. June 15, 2009).  Indeed, even if the clients were no longer represented, the investigator's conduct would have violated separate prohibitions on misleading and obtaining confidential information from a formerly represented person.

When Keller Postman discovered this conduct, it immediately complained that Jenner was violating California Rule of Professional Conduct 4.2, which states that "a lawyer shall not communicate directly or indirectly about the subject of the representation with a person the lawyer

knows to be represented by another lawyer in the matter."  Mr. Fox responded that Jenner was permitted to contact Keller Postman's clients because, although Jenner knew about the clients' claims only through Keller Postman, the clients' arbitration demands had been withdrawn without prejudice.  According to Mr. Fox, Jenner was entitled to assume that "[a]ny attorney-client relationship ended once the [demands] were withdrawn."  Ex. 16, Tubi, Inc.'s Surreply Opposing Objections and Requests for Exclusion, *Gregory v. Tubi, Inc.*, No. 24-LA-209 (Ill. 17th Jud. Cir. Ct. Dec. 3, 2024), at 11.

Jenner's response ignores what every lawyer knows: counsel can represent clients in a "matter" regardless of whether a *pleading* has been filed or withdrawn.  It also ignores that the California Rules of Professional Conduct were amended in 2018 specifically to *reject* the argument that the prohibition on contacting a represented party automatically ends when that person is no longer a party to litigation.  *See* Cal. R. Prof. Conduct 4.2 cmt. 2 ("'Subject of the representation,' 'matter,' and 'person' are not limited to a litigation context.  This rule applies to communications with any person, whether or not a party to a formal adjudicative proceeding, contract or negotiation, who is represented by counsel concerning the matter to which the communication relates."); *see also* Proposed Rule of Professional Conduct 4.2, Executive Summary[1] at 1 (explaining that the text of the rule was changed to cover any "person"—rather than the prior term "party"—to avoid the result in *In re Dale*, No. 00-O-14350, 2005 WL 1389226, at *7 (Cal. Bar Ct. May 6, 2005), a case holding that the predecessor to Rule 4.2 allowed counsel to contact a represented "party" once the proceedings in which counsel appeared for the client had ended).  Moreover, even when an attorney suspects that a known representation may have ended, he is obligated to first check with opposing counsel or a court.  *Dale*, 2005 WL 1389226, at *8

---

[1]  *Available at* https://www.calbar.ca.gov/portals/0/documents/rules/rrc2014/final_rules/rrc2-4.2_[2-100]-all.pdf (last accessed Dec. 9, 2024).

("Respondent was not free to unilaterally determine that Geyer was without representation and therefore available to communicate with respondent; he was obliged to either confirm the status of Geyer's representation with [opposing counsel] or at a minimum seek authorization from the criminal court with jurisdiction over Geyer's case.").

Mr. Fox willfully ignored these rules and arranged for Ms. Talamantez to physically confront Keller Postman's clients, unannounced, at their homes, and to confuse, harass, intimidate, and deceive them into signing declarations to support the false narrative Tubi has sought to develop through this lawsuit. Ex. 3, Dec. 6, 2024 Declaration of Monique Dudley ("Dudley Dec. 6 Decl."); Ex. 5, Dec. 6, 2024 Declaration of Lumeah Deschamps ("Deschamps Dec. 6 Decl."); Ex. 7, Dec. 6, 2024 Declaration of DeNeisha Ellis ("Ellis Dec. 6 Decl."); Ex. 9, Dec. 6, 2024 Declaration of Darrell Eastman ("Eastman Dec. 6 Decl."). Tubi now attempts to introduce these forced declarations in a lawsuit seeking to establish that these *same* clients violated their contracts with Tubi and caused Tubi damages. Mr. Fox's investigator, without disclosing this adverse position, led Keller Postman's clients to give sworn statements contradicting earlier sworn statements.[2] This flagrant abuse of represented lay parties by an adversary's attorney is sanctionable in any court in the country.

When Keller Postman raised the issue with its clients, they reported being relentlessly misled, intimidated, and harassed. For example, one client explained that Mr. Fox's investigator showed up repeatedly at her home in a dark suit and said "she came from Washington, DC, and was an FBI agent." Deschamps Dec. 6 Decl. ¶ 4. Clients reported that Ms. Talamantez refused to

---

[2] *Compare* (Dkt. 22-29), *with* Dudley Dec. 6 Decl. *and* Ex. 4, Apr. 8, 2024 Declaration of Monique Dudley ("Dudley Apr. 8 Decl."); *compare* (Dkt. 22-24), *with* Deschamps Dec. 6 Decl. *and* Ex. 6, Mar. 21, 2024 Declaration of Lumeah Deschamps ("Deschamps Mar. 21 Decl."); *compare* (Dkt. 22-27), *with* Ellis Dec. 6 Decl., *and* Ex. 8, Mar. 26, 2024 Declaration of DeNeisha Ellis ("Ellis Mar. 26 Decl.").

leave after being asked to and instead hounded them, including one who had a young child with her and another who was ill, saying that she would go away if they just signed the declaration Mr. Fox sent the investigator to get.  *Id*. ¶ 6; *see also* Ellis Dec. 6 Decl. ¶¶ 4–6.  Perhaps worse, or just equally bad, Mr. Fox's investigator did not always clearly identify that she worked for Tubi's counsel, instead telling Keller Postman's clients that she was "with the attorneys," misleading them into thinking she worked for Keller Postman and that they just needed to sign additional paperwork to effectuate the withdrawal of their demand.  Dudley Dec. 6 Decl. ¶¶ 4, 9–11; Eastman Dec. 6 Decl. ¶¶ 3–4.  It worked.

This misleading and oppressive conduct would have violated ethical rules even if the clients were no longer represented by Keller Postman.  It is doubly improper because the clients *are* still represented.  Jenner's investigation is also independently improper because it was plainly intended to obtain, and did obtain, information about confidential attorney-client communications. Even where a client is no longer represented, an attorney questioning the former client may not "seek to obtain privileged or other confidential information."  Cal. R. Prof. Conduct 4.3(b).  And California law is clear that "confidential communication between client and lawyer" includes "a legal opinion formed and the advice given by the lawyer in the course of that relationship."  Cal. Evid. Code § 952; *see also* Cal. R. Prof. Conduct 1.6 cmt. 2 (providing that confidentiality in California is broader than attorney-client privilege).  In patent disregard for this rule, Mr. Fox arranged for a series of interrogations that was designed to discover the nature of the "legal opinion[s] formed and the advice given by" Keller Postman to its clients.  *Id.*

Jenner's misconduct was no isolated mistake.  Acting "under the direction of Tubi's outside counsel," Ms. Talamantez tried to contact, over a period of months, more than 20 Keller Postman clients whom Keller Postman continued to represent at the time.  Ex. 1, Nov. 25, 2024 Affidavit

4

of Stephanie Talamantez ("Talamantez Aff.") ¶ 2; Ex. 13, Dec. 9, 2024 Declaration of Warren D. Postman ("Postman Decl.") ¶ 17.  This campaign of unethical, repeated, and oppressive contacts is part of a broader pattern of questionable conduct by Jenner.  As described further below, Jenner previously hired a separate investigator—with a documented history of helping attorneys engage in unethical misconduct—to impersonate a potential Keller Postman client in an effort to obtain privileged information about Keller Postman's client intake procedures, violating the terms of that website and the honesty requirements of the Rules of Professional Conduct.  *See* Postman Decl. ¶¶ 26–29.  In addition, Tubi's reckless accusations about how Keller Postman conducts its law practice have now resulted in Mr. Fox being forced to admit that prior allegations in the original Complaint were false.  Jenner's repeated and oppressive interrogations of Keller Postman's clients were beyond the pale.  The pattern of behavior here has all the hallmarks of a lawyer and law firm who believe they are above the law.

These violations of the Rules of Professional Conduct warrant substantial sanctions: disqualification of Jenner from continued representation of Tubi in this matter, exclusion of the improperly obtained statements, and an award of attorneys' fees associated with responding to the violations.

## BACKGROUND

**I.    The California Rules of Professional Conduct Bar Contact with Represented Persons and Bar Misleading Contact or Efforts to Obtain Confidential Information Even with Formerly Represented Persons.**

To understand the egregious nature of the ethical violations in this case, it is helpful to review the applicable rules.[3]  Rule 4.2 of the California Rules of Professional Conduct provides:

---

[3] The California Rules of Professional Conduct apply because all the actors and conduct took place there.  Mr. Fox is licensed in California.  (Dkt. 3-1 ¶ 2).  Keller Postman's clients live in California and brought arbitrations in California. Postman Decl. ¶ 12.  Tubi is a California company.  (Dkt. 1

> In representing a client, a lawyer shall not communicate directly or indirectly about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer.

Cal. R. Prof. Conduct 4.2.

Rule 4.2 recognizes the serious risk of oppression or confusion that arises when an attorney or their agent questions an adverse party without their counsel. ABA Model Rule 4.2 cmt.1 (the Rule "protect[s] a person who has chosen to be represented by a lawyer in a matter against possible overreaching by other lawyers who are participating in the matter"). But Rule 4.2 also protects more broadly against "interference . . . with the client-lawyer relationship." *Id.* For that reason, a represented person cannot waive the rule's protections. *Id.* cmt. 3 ("The Rule applies even though the represented person initiates or consents to the communication."); *United States v. Lopez*, 4 F.3d 1455, 1463 (9th Cir. 1993) (mistake to speak of waiving rights under the anti-contact rule because the rule "is fundamentally concerned with the duties of attorneys, not the rights of parties").

Several aspects of Rule 4.2 and the related Rule 4.3 warrant emphasis.

### A. When an attorney appears for a client in litigation, the opponent "knows"—as a matter of law—that the client is represented.

Whether an attorney knows that an opposing party is represented is measured under an objective standard. Cal. R. Prof. Conduct 1.01(f) ("[K]nowledge may be inferred [by factfinder]

---

¶ 11). And the contact between Tubi's investigators and Keller Postman's clients occurred in California. (Dkts. 22-24–22-29) (declarations each signed in California). This Court's Local Rules provide that "[v]iolations of the Rules of Professional Conduct (as adopted by the District of Columbia Court of Appeals . . . ) by attorneys subject to these Rules shall be grounds for discipline." LCvR 83.15. Rule 8.5(b)(2)(ii) of the District of Columbia Rules of Professional Conduct in turn provides that, for a lawyer admitted to practice in another jurisdiction, "the rules to be applied shall be the rules of the admitting jurisdiction in which the lawyer principally practices" and that if the "particular conduct clearly has its predominant effect in another jurisdiction in which the lawyer is licensed to practice, the rules of that jurisdiction shall be applied to that conduct." The California Rules apply. In all events, the result would be the same under the D.C. Rules, which impose the same restrictions on contacting represented parties.

from the circumstances.").  While that assessment may be ambiguous in some circumstances, the

California Supreme Court has understandably held that, once an attorney appears for a client, the

opponent is charged with the knowledge that the client is represented.  *See Abeles v. State Bar*, 9

Cal. 3d 603, 610 (1973).  That is true regardless of whether the opposing attorney claims he thought

the matter was abandoned.  *Id.*  And it is true even if the client's attorney allegedly lacks authority

to act for the client.  *Id.*  ("In view of the purposes of the rule we believe that 'a party represented

by counsel' includes a party who has counsel of record whether or not that counsel was in fact

authorized to act for the party.").

### B.  Withdrawal or dismissal of a pleading does not entitle an attorney to conclude that an adversary's representation has terminated.

As a matter of common sense, a representation can, and often does, continue after a

pleading has been withdrawn or dismissed.  Therefore, it would be odd to suggest (as Mr. Fox has)

that the mere withdrawal of a pleading without prejudice means that a representation has ended.

Moreover, as it turns out, the California Rules of Professional Conduct have been specifically

amended to reject this position.

The precursor to Rule 4.2, Rule 2-100, barred only contact with a "party" the lawyer knew

to be represented by another lawyer (instead of with a "person").  Most California decisions

sensibly held that Rule 2-100 prohibited attorneys from doing what Mr. Fox and Jenner did here—

assume a representation had ended simply because a specific litigation had concluded.  *See, e.g.*,

*Grewal v. Guru Nanak Mission Sikh Ctr.*, No. F057588, 2010 WL 1668067, at *4 (Cal. Ct. App.

Apr. 27, 2010) (finding violation of former Rule 2-100 where represented parties were dismissed

from litigation and attorney discussed matter with them months later after the parties told the

attorney that they were not represented); *Von Saher v. Norton Simon Museum of Art at Pasadena*,

No. 07-cv-2866, 2016 WL 7626149, at *10 (C.D. Cal. June 22, 2016) (finding violation of former

Rule 2-100 could occur because Rule "encompasses prior parties to a litigation"); *People v. Dowell*, No. G052630, 2017 WL 4054238, at \*5 (Cal. Ct. App. Sept. 14, 2017) (counsel could not communicate with a represented person under former Rule 2-100 simply because she was not a "party"); *Jackson v. Ingersoll Rand Co.*, 42 Cal. App. 4th 1163, 1167 (1996) (the term "'party' broadly denotes 'person' and is not limited to litigants" and so a represented person's "dismissal from the case does not conclusively settle the question."); *Abeles*, 9 Cal. 3d at 610 (affirming attorney discipline under former Rule 2-100 for having an adversary sign an affidavit "'upon a subject of controversy' even though the action may then have been inactive").

But in at least one prominent case, the California Bar Court disagreed.  In *Dale*, 2005 WL 1389226, at \*7, a lawyer contacted a criminal defendant after his case was over, and responded to disciplinary charges by arguing, as Mr. Fox has, that the end of the case meant the representation had ended.  The lawyer argued that former Rule 2-100 restricted only contact with a represented "party" and that, because the defendant was no longer a "party" given that the case was over, the lawyer's contact did not violate the old rule.  The court observed that "a strict construction of the [former] rule [2-100], limiting its applicability only to represented parties to litigation or to a transaction could, as in this case, defeat the important public policy underlying the rule."  *Id.*  But it concluded that it was bound by the former Rule's text: finding "no rule of construction or persuasive legal precedent to support a broad interpretation," it concluded "we are not at liberty to re-write [former] rule 2–100, which by its plain language is limited to a represented 'party.'"  *Id.*

This was such a perverse result that, in 2018, California amended the text of former Rule 2-100, now codified at Rule 4.2, to change the word "party" to "person" and emphasize that the Rule applies to any representation in a "matter."  The drafters expressly noted that this change was

intended to prevent the result in *Dale*—that an attorney could assume that the end of a proceeding meant the end of a representation:

> Paragraph (a), the basic [anti-contact] prohibition, presents a key issue: whether to substitute the term "person" for "party" in current rule 2-100. This substitution has been made by every jurisdiction, either by making the substitution in the black letter provision of its rule 4.2 counterpart or by stating in a comment that "party" applies to any person involved in a matter who is represented by a lawyer. Changing "party" to "person" will also resolve the limitations inherent in using the term "party" that were recognized in *In the Matter of Dale* (Rev. Dept. 2004) 4 Cal. State Bar Ct. Rptr. 798. Given the rule's aforementioned objectives to protect any person who has chosen to be represented by a lawyer in a matter against possible overreaching by lawyers who are employed in the matter, interference by those lawyers with the lawyer-client relationship, or the uncounseled disclosure of confidential information, ***there is no principled reason to limit the protection of the rule to those persons who are parties.***

*See* Executive Summary, Proposed Rule of Professional Conduct 4.2 (Current Rule 2-100) (emphasis added).[4] This change aligned the text of Rule 4.2 with the majority rule adopted by case law: the dismissal or withdrawal of a pleading does not entitle a lawyer to infer the representation has ended. *See* Ex. 2, Dec. 9, 2024 Declaration of Mark Tuft ("Tuft Decl.") ¶ 16 ("[Rule 4.2] prohibits communications with any person who is represented by counsel concerning the matter to which the communication relates. That includes the withdrawn claimants.").

### C. Where a lawyer suspects that a representation may have ended, he is obligated to check with opposing counsel or seek leave from a Court before contacting a represented person.

When a lawyer has any doubt as to whether a known representation has ended, he must check with opposing counsel or a court before asking the represented person whether they are represented. *Dale*, 2005 WL 1389226, at *8 ("Respondent was not free to unilaterally determine that Geyer was without representation and therefore available to communicate with respondent"); *see also San Francisco Unified Sch. Dist. ex rel. Contreras v. First Student, Inc.*, 213 Cal. App.

---

[4] *Available at* https://www.calbar.ca.gov/portals/0/documents/rules/rrc2014/final_rules/rrc2-4.2_%5b2-100%5d-all.pdf

4th 1212, 1233 n.13 (2013) ("attorneys should resolve doubts about whether communications violate the rule by avoiding suspect communications"); *Snider v. Superior Ct.*, 113 Cal. App. 4th 1187, 1212, 1215–16 (2003) ("We emphasize, however, that in cases where an attorney [is unsure of a representation], that attorney would be well advised to . . . communicate with opposing counsel . . . . Failure to do so might further provide support for a more drastic sanction if a violation . . . is found."); *cf. Engstrom v. Goodman*, 271 P.3d 959, 964 (Wash. Ct. App. 2012) (where attorney had "reasonable basis for believing [party] was still represented" he violated rule by "taking the matter into his own hands" and asking client rather than opposing party's attorney); *see also* Tuft Decl. ¶ 17 ("[I]f plaintiff's counsel believed the relationship might have ended, counsel was obligated to communicate with Keller Postman before instructing their investigator to initiate contact with the withdrawn claimants.").

### D. An attorney who directs an agent to contact a represented person is responsible for his agent's conduct.

Rule 4.2's reference to "directly or indirectly" is intended to stop an attorney from avoiding his ethical obligations by delegating to an agent to do indirectly what the lawyer could not do himself. Cal. R. Prof. Conduct R. 4.2 cmt. 3 (The "prohibition against communicating 'indirectly' with a person represented by counsel . . . is intended to address situations where a lawyer seeks to communicate with a represented person through an intermediatory such as an agent [or] investigator."). Accordingly, where an attorney arranges for an agent to contact an individual, he is responsible for the acts of his agent. *See* Tuft Decl. ¶ 18 ("In communicating with the withdrawn claimants, Plaintiff's investigator acted as Plaintiff counsel's agent, and Plaintiff's counsel is responsible for her actions under the rules.").

**E. California Rule of Professional Conduct 4.3 and California Business and Professions Code § 6106 impose additional obligations.**

Because Rule 4.2 generally assumes that an attorney will not have *any* contact with a represented person, it does not speak to *how* an attorney should have contact with a represented person. However, as noted in the comments to Rule 4.2, an attorney is prohibited by Cal. Bus. & Prof. Code, § 6106, from committing "any act involving moral turpitude, dishonesty or corruption" when communicating with any individual. *See* Cal. R. Prof. Conduct 4.2 cmt.9 (noting that, even where exceptions apply to Rule 4.2, the lawyer is still "subject to other restrictions in communicating with the person" including under § 6106).

In the context of attorney conduct, "moral turpitude" includes severe overreaching by an attorney to exploit a less sophisticated non-attorney. For example, in *Dale*, although the court found that the attorney had not violated former Rule 2-100 (because he waited to contact a criminal defendant until the proceeding was over), the lawyer still committed acts of "moral turpitude," 2005 WL 1389226, at *8. As the Court reasoned, "Respondent was so focused on avoiding the technical prohibitions of rule 2–100, he was blinded to the larger issue of the overreaching inherent in the circumstances surrounding his relationship with [the less sophisticated and unrepresented party]." *Id.*

In addition, Rule 4.3 expressly imposes duties on an attorney who arranges for questioning of a person who was formerly represented. The heightened duties imposed by Rule 4.3 reflect a concern about non-attorneys "being misled when communicating with a lawyer who is acting for a client." Cal. R. Prof. Conduct 4.3 cmt.1. Specifically, an attorney may not mislead the person into believing they are disinterested and in fact has a duty to clarify if they suspect the person may believe they are disinterested. Cal. R. Prof. Conduct 4.3 ("In communicating on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer

11

is disinterested.  When the lawyer knows or reasonably should know that the unrepresented person incorrectly believes the lawyer is disinterested in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding.").

Finally, "[i]n communicating on behalf of a client with a person who is not represented by counsel, a lawyer shall not seek to obtain privileged or other confidential information . . . the lawyer is not otherwise entitled to receive." *Id.*; *see also Hiett v. Stanislaus Reg'l Hous. Auth.*, No. F084828, 2024 WL 4285870, at *8 (Cal. Ct. App. Sept. 25, 2024) ("[T]he lawyer should not seek to obtain privileged or confidential information.").  California law provides that "confidential communication between client and lawyer" includes "a legal opinion formed and the advice given by the lawyer in the course of that relationship."  Cal. Evid. Code § 952; *see also* Cal. R. Prof. Conduct 1.6 cmt. 2 (providing that confidentiality in California is broader than attorney-client privilege).  Accordingly, any effort to discover from a formerly represented party the legal opinions or advice he or she received from his or her attorneys is a violation of Rule 4.3.

## II. Keller Postman Typically Continues to Represent Clients Who Withdraw Arbitration Claims, Especially When They Receive Threats from an Adversary.

When clients retain Keller Postman, Keller Postman communicates with them repeatedly before filing claims. Postman Decl. ¶ 13.  Although the substance of those communications is privileged, the subject matter of those communications includes an explanation of the nature of the claim and the arbitration process.  *Id*.  As part of its intake procedures, Keller Postman asks clients questions and has them sign a declaration describing key aspects of their claim under penalty of perjury.  *Id*. ¶ 12.  Such declarations are particularly useful in "desk arbitrations" which are conducted with documents only.  *Id*. ¶¶ 4, 12.

When Keller Postman files demands for thousands of clients, there are naturally a small number of clients who later decide to withdraw.  *Id*. ¶ 22.  These clients may seek to withdraw

claims for various reasons, such as a lack of time or lack of desire to proceed with the process at that particular time. *Id.* Because of the aggressive tactics that many corporations deploy when confronted with numerous arbitrations, Keller Postman's practice is to withdraw demands upon client request, but to continue representing clients regarding the underlying claim. *Id.* ¶ 23. This is particularly true where an opposing party brings or threatens to bring a counterclaim against the client, as Tubi has here. *Id.* Keller Postman's continued representation also makes it easier for Keller Postman to assist the client if the client later wants to refile or could participate in a global settlement of claims. *Id.* Keller Postman does not charge its clients for these services unless they result in a recovery for the client. *Id.* A small number of clients ask to terminate the engagement anyways and, in those situations, Keller Postman of course complies with client requests. *Id.*

In the past, counsel for other companies against whom Keller Postman's clients have litigated have wanted to question Keller Postman clients. But, understanding the clear command of Rule 4.2, every single one of those attorneys has first asked Keller Postman whether the firm continues to represent the persons with whom those opposing attorneys wish to speak. *Id.* ¶ 24. To Keller Postman's knowledge, after litigating dozens of mass arbitrations on behalf of hundreds of thousands of claimants, Jenner is the first law firm and Mr. Fox is the first lawyer to ever unilaterally contact withdrawn claimants. *Id.* Where law firms have asked if they may contact former clients, Keller Postman updates any former clients about the planned outreach from an adversary and asks the clients whether they would like Keller Postman to resume representing them for purposes of dealing with such inquiries. *Id.* ¶ 25. In these circumstances, clients almost universally say they want Keller Postman's assistance, and for obvious reasons. *Id.* Even if a former client were to decline Keller Postman's assistance, Keller Postman would still provide the former client with a reminder about the details of his or her case to help the client avoid being

misled or confused.  *Id.*

A lay client cannot easily be harassed into signing a contradictory statement when they have their own lawyer advocating for them.  Keller Postman advocates for those clients, and so Jenner and Mr. Fox needed to avoid their obligation to ask Keller Postman whether the representation was terminated.  It was all part of a plan—pretend that the withdrawn demands *ipso facto* ended the representation and then send a former FBI agent to intimidate consumer clients into giving Mr. Fox confidential information regarding their claims and Keller Postman's advice.

### III.  Jenner's Investigator Confronts and Harasses Keller Postman's Current and Former Clients Who Withdrew Arbitration Claims.

After learning of Keller Postman's clients' claims in April 2024, Jenner reflexively accused Keller Postman of bringing frivolous claims based on a search of Tubi's records that Tubi must now admit was deficient.  *See infra* at 31–32.  Despite early warnings about the insufficiency of the records search driving Tubi's accusations, (Dkt. 14-4 at 6), Jenner filed this speculative lawsuit for Tubi.  After certain Keller Postman clients withdrew their arbitration claims against Tubi, Mr. Fox perceived a chance to increase Tubi's tactical leverage.  So, without checking with Keller Postman as to whether it still represented clients who withdrew demands in arbitration—as every other defense counsel in a similar position has done—Jenner instead retained Ms. Talamantez, a retired FBI agent and now "Managing Director" at an "investigations, compliance, and business intelligence" firm.  Talamantez Aff. ¶¶ 1–2.  Jenner then assigned Ms. Talamantez to "conduct interviews in connection with" Keller Postman's clients' withdrawn arbitration claims—*directly with Keller Postman's clients*.  *Id.* ¶¶ 2–3.

Ms. Talamantez and an associate began contacting Keller Postman's clients on Jenner's behalf, often confronting them at home multiple times when Keller Postman's clients were in vulnerable situations.  *See* Dudley Dec. 6 Decl. ¶¶ 3–6; Deschamps Dec. 6 Decl. ¶¶ 3–6; Ellis Dec.

14

6 Decl. ¶¶ 3–5; Eastman Dec. 6 Decl. ¶¶ 3–5.  Early on, it appears that Ms. Talamantez and her associates dressed in dark suits and referenced "the FBI"—an obvious effort to misleadingly invoke a level of authority associated with that federal agency.  Deschamps Dec. 6 Decl. ¶ 3.  Some of the 22 people Ms. Talamantez contacted warned that they were represented, so she did not interview those people.  (Dkt. 22-1 ¶ 78).  Yet, blithely assuming that none of the others were represented, and "under the direction of Tubi's outside counsel," Ms. Talamantez pressed on in contacting individuals who had withdrawn their arbitration demands against Tubi.  Talamantez Aff. ¶ 2.

With some clients, Ms. Talamantez tried another tactic and introduced herself in way that suggested to Keller Postman's clients that she was affiliated *with Keller Postman*.  Dudley Dec. 6 Decl. ¶¶ 4, 9–11; Eastman Dec. 6 Decl. ¶ 3–5.  She asked expressly about Keller Postman's representation of these clients *in their claims against Tubi*.  Dudley Dec. 6 Decl. ¶ 5; Deschamps Dec. 6 Decl. ¶ 5.  She asked about attorney-client communications between Keller Postman and its clients and then presented Keller Postman's clients with declarations characterizing those communications.  *See, e.g.*, (Dkt. 22-29 ¶ 5).  Ms. Talamantez also left clients feeling threatened, Eastman Dec. 6 Decl. ¶ 4, and frightened, Deschamps Dec. 6 Decl. ¶ 4.  After all this, Ms. Talamantez presented Keller Postman's clients with declarations to sign and a threatening promise that things would resolve more easily if each client simply signed some declarations.  Dudley Dec. 6 Decl. ¶¶ 6–9; Deschamps Dec. 6 Decl. ¶¶ 5–6; Ellis Dec. 6 Decl. ¶¶ 4–6; Eastman Dec. 6 Decl. ¶ 6.

Although Ms. Talamantez had one Keller Postman client sign one of these declarations a few weeks ago, (Dkt. 22-29), she had the rest of them sign in July, (Dkt. 22-24–22-28).  Yet Jenner decided not to share this misconduct until after Keller Postman refused to back down in this

litigation and has now sought to amend its Complaint to make use of the material it improperly obtained in the summer, before the pre-motion conference on Keller Postman's motion to dismiss.[5]

Overall, most clients contacted by Ms. Talamantez refused to sign a declaration furthering Tubi's narrative—despite what appears to have been incessant pressure to do so. However, some individuals succumbed to the pressure and signed declarations that served to advance Tubi's false narrative. *See* (Dkt. 22-24–22-29). The declarations Ms. Talamantez pressured Keller Postman's clients to sign contained statements that were demonstrably false. *See supra* n.1. For instance, virtually all Tubi's declarations bear some variant of the statement that clients were "not represented by counsel" and "[did] not recall hearing or seeing the name of the law firm Keller Postman." *See, e.g.*, (Dkt. 22-24 ¶ 4). By contrast, each person from whom Tubi extracted a declaration signed an earlier declaration months before Tubi's improper contact—and without repeated pressure from someone who showed up at their homes—indicating that they had "retained Keller Postman LLC . . . to pursue my claims against Tubi, including in arbitration, arising from Tubi's age, sex, or gender discrimination in connection with its display of advertisements[.]" *See* Deschamps Mar. 21 Decl. ¶ 7; Dudley Apr. 8 Decl. ¶ 7; Ellis Mar. 26 Decl. ¶ 7; Ex. 10, Apr. 7, 2024 Declaration of Melissa Santos ("Santos Apr. 7 Decl.") ¶ 7; Ex. 11, Apr. 15, 2024 Declaration of Salvador Alonso ("Alonso Apr. 15 Decl.") ¶ 7; Ex. 12, Mar. 28, 2024 Declaration of Dolores Lawrence ("Lawrence Mar. 28 Decl.") ¶ 7. Although Keller Postman learned of Jenner's misconduct only two weeks ago and continues to investigate it, four Keller Postman clients have already signed declarations stating that Ms. Talamantez deceived them. Dudley Dec. 6 Decl. ¶¶ 8–12; Deschamps Dec. 6 Decl. ¶ 7; Ellis Dec. 6 Decl. ¶¶ 6–7.

Reviewing these four cases demonstrates the pattern of misconduct Mr. Fox directed:

---

[5] Keller Postman is separately filing an opposition to the motion for leave to amend the Complaint.

**Lumeah Deschamps**

- Ms. Deschamps filed her demand on April 5, 2024, and withdrew her demand without prejudice on May 7, 2024.  Postman Decl. ¶ 18.

- She remains represented by Keller Postman.  Deschamps Dec. 6 Decl. ¶ 2.

- Two women showed up at her mother's house, dressed in black suits, and one of them said "she came from Washington, DC, and was an FBI agent."  *Id*. ¶ 4.

- Ms. Deschamps was scared and refused to open the door. But the women questioned her through the window.  The women "just would not let it go." "They kept contacting me, asking me questions about the arbitration demand I had filed against Tubi, and saying that they needed to talk to me.  They came to my mother's house at least once more after that—maybe twice more.  I felt harassed and bullied."  *Id*. ¶¶ 3–5.

- The investigators eventually "said that I would not have to do anything more to do with them if I just signed a document that they showed me.  I signed the document just to get them away from me.  I did not want them continuing to intrude on not only my privacy, but my mother's—and also my nine-year-old son's, who was at home when the women came. He was also scared with the whole process and kept asking me what was happening."  *Id*. ¶ 5.

- According to the Ms. Talamantez-drafted declaration, Ms. Deschamps was questioned on June 10, 2024.  (Dkt. 22-24 ¶ 1).  However, her declaration was not signed until July 9, 2024.  (*Id*. at 3).  This corroborates Ms. Deschamps's account of being reluctant to sign the declaration and being "harassed and bullied" repeatedly to do so.  Deschamps Dec. 6 Decl. ¶ 5.

**DeNeisha Ellis**

- Ms. Ellis filed her demand on April 5, 2024, and withdrew her demand without prejudice on June 14, 2024.  Postman Decl. ¶ 19.

- She remains represented by Keller Postman.  Ellis Dec. 6 Decl. ¶ 2.

- Ms. Ellis is "very sick."  She has an autoimmune disease, has been experiencing vision loss, and was recently hospitalized for four days.  *Id*. ¶ 4.

- "[W]hen this woman came to my house, I told her that I was very sick and that I wanted her to stop bothering me.  But that did not stop her.  She came twice in person to my house and also kept calling me."  *Id*. ¶ 5.

- "She then showed me some papers and told me that if I just signed them, that I would be done.  So I signed them just to get rid of her."  *Id*. ¶ 6.

- According to the Ms. Talamantez-drafted declaration, Ms. Ellis was questioned on June 17, 2024, and July 5, 2024. (Dkt. 22-27 ¶ 1). However, Ms. Ellis's declaration was not signed until July 9, 2024. (*Id*. at 3). This corroborates Ms. Ellis's account of being reluctant to sign the declaration and being harassed into doing so.

## Monique Dudley

- Ms. Dudley filed her demand on April 12, 2024, and withdrew her demand without prejudice on November 13, 2024, after Tubi had asserted counterclaims against her. Postman Decl. ¶ 20.

- She remains represented by Keller Postman. Dudley Dec. 6 Decl. ¶ 2.

- In November, two women showed at Ms. Dudley's house and rang her doorbell. She did not answer the door, but they waited until she signed for an unrelated package and approached her. *Id*. ¶¶ 3–4.

- One woman identified herself "as a representative for the attorneys and immediately followed up by asking me whether I knew Keller Postman. I said I did. And because of the way she asked me about Keller Postman after saying that she was a representative for the attorneys, I thought she was a representative of Keller Postman." *Id*. ¶ 4.

- The third time Ms. Talamantez came to Ms. Dudley's home, Ms. Talamantez presented a declaration for Ms. Dudley to sign. *Id*. ¶ 6. Ms. Dudley responded that she has a busy life and "did not want to have to show up in court for any litigation." *Id*. Ms. Talamantez said that Ms. Dudley "would not have to show up in court if [she] would just sign the document she was showing me." *Id*. And because Ms. Dudley had withdrawn her demand and believed Ms. Talamantez to be a representative for Keller Postman, Ms. Dudley "thought I was signing a document to finalize the withdrawal of my arbitration demand." *Id*. ¶ 7.

- Ms. Dudley learned only after all this that Ms. Talamantez was an agent for Tubi: "I was shocked to learn this. I am upset. And I feel misled. To be clear, at no time did I understand that the woman was on Tubi's side. Instead, she said that she was a representative for the attorneys and then immediately asked me whether I knew Keller Postman, and so I thought she was a representative for my attorneys at Keller Postman. I think that was the impression she was trying to give me." *Id*. ¶¶ 10–11.

- According to the Ms. Talamantez-drafted declaration, Ms. Dudley was questioned on November 18, 2024. (Dkt. 22-29 ¶ 1). However, Ms. Dudley's declaration was not signed until November 21, 2024. (*Id*. at 3). This corroborates Ms. Dudley's account of repeated outreach.

**Darrell Eastman**

- Mr. Eastman filed his demand on April 5, 2024, and withdrew his demand without prejudice on May 7, 2024. Postman Decl. ¶ 21.

- He remains represented by Keller Postman. Eastman Dec. 6 Decl. ¶ 2.

- "[S]ome woman called me out of the blue. She said she was a lawyer or was with a lawyer. I'm not really sure, and I don't know her name. But I interpreted whatever she said to mean that she was my lawyer. So when she asked me about the arbitration demand that I had recently withdrawn, I answered her questions. I was confused because I didn't know why I was being asked these questions again by my lawyer, when I had already withdrawn my arbitration demand. And I was annoyed because I felt like she was putting me to a memory test, asking me all sorts of questions about a claim that I had already withdrawn." *Id.* ¶ 3.

- "It was only after I had given all of that information to that woman that the woman said she was a lawyer or with a lawyer for Tubi. She then became very threatening towards me. I feel misled by the whole experience. I would not have talked to this woman had she told me at the outset that she is from Tubi. It's very upsetting that she was so misleading with me to get information out of me." *Id.* ¶ 4.

## ARGUMENT

The Court should sanction Jenner by (1) disqualifying the firm from continued participation in Tubi's litigation against Keller Postman, (2) enjoining Tubi's use of the fruits of Jenner's ethical violations, (3) ordering Jenner to pay Keller Postman's attorneys' fees associated with this motion, and (4) any other relief or sanctions the Court deems appropriate. Jenner has engaged in an extended and willful pattern of flagrantly violating Rule 4.2. This rule is one of the most serious red lines in the legal profession because violations fundamentally attack the integrity of the adversarial process and because the threat of lawyers manipulating lay adversaries is profound. Jenner's use of the violations in Tubi's motion to amend demonstrates that very point: Mr. Fox and his firm engaged in the violations and now wants to use the fruits of those violations intentionally to undermine the fairness and integrity of the proceedings in this Court.

## I.    Jenner Flagrantly Violated the California Rules of Professional Conduct.

As a matter of law, Jenner "knew" that Keller Postman represented each of the clients for whom it filed arbitration demands.  The mere withdrawal of an arbitration demand did not entitle Jenner to assume the representation had been terminated, particularly where the demand was withdrawn without prejudice or explanation.  Each client was clearly still adverse to Tubi and the "matter" in which Tubi knew Keller Postman to represent the client had not been resolved. Moreover, Mr. Fox's investigator, acting "under the direction" of Mr. Fox, repeatedly misled, pressured, and harassed clients into signing declarations under penalty of perjury that flatly contradicted prior declarations they signed under penalty of perjury.  Finally, even under Jenner's baseless assumption that each client was no longer represented, Jenner plainly still violated the prohibition against seeking to obtain attorney-client confidential information from a formerly represented party.

After learning of Mr. Fox's actions, Keller Postman showed Tubi's Proposed Amended Complaint to Mark Tuft, one of the foremost experts on the California Rules of Professional Conduct.  When California conducted a comprehensive review and restructuring of its Rules of Professional Conduct in 2018, Mr. Tuft served on the committee that drafted the current rules. Tuft Decl. ¶ 8.  As shown in his attached declaration, Mr. Tuft concludes that Jenner's conduct violated the Rules of Professional Conduct in multiple respects.  *Id.* ¶¶ 14–18.

### A.  Jenner Willfully Contacted Keller Postman Clients in Violation of Rule 4.2.

It should be uncontroversial that, after Keller Postman filed arbitration demands for the clients in question and while the demands remained on file, Jenner "knew" that Keller Postman represented those clients and was not permitted to contact them.  Applying the text of the rule, each client was "a person the lawyer [Jenner] knows to be represented by another lawyer in the matter."  Cal. R. Prof. Conduct 4.2.  Jenner has not and cannot dispute this point.  The only

20

question, then, is whether the mere withdrawal of the demands without prejudice allowed Mr. Fox to assume that each client was no longer represented. The rules and case law answer that question with an emphatic no. Jenner had no plausible basis to reach that conclusion: and in fact each client and Tubi were still *adverse*—the claimants had asserted that Tubi had violated their rights and dismissed their demands *without prejudice*.

As cases hold, the mere fact that litigation was over does not justify an assumption that the "matter" was over or the representation had been terminated. *See Grewal*, 2010 WL 1668067, at *4 (finding violation where represented parties were dismissed from litigation and attorney discussed matter with them months after and the parties told the attorney that they were not represented); *Von Saher*, 2016 WL 7626149, at *10 (finding violation because rule "encompasses prior parties to a litigation").

> Likewise, as Mr. Tuft explains:
>
> According to the materials, the claims were withdrawn without explanation. The dispute whether the claimants had a prefiling obligation under Tubi's terms of use remained unresolved, and in some cases Tubi asserted counterclaims against the withdrawn claimants. There [wa]s no evidence that the withdrawn claimants discharged Keller Postman or that Keller Postman withdrew under California Rule 1.16 (declining or terminating representation). Although it might be reasonable for opposing counsel to assume that a lawyer who was counsel of record in the past no longer represented a party after a considerable passage of time; here plaintiff's counsel instructed the investigator to interview Keller Postman's clients shortly after the claimants withdrew their claims and while the issues in dispute remained pending. Based on these circumstances, it is my opinion that it was not reasonable to assume that representation had ended.

Tuft Decl. ¶ 17.

As noted by Mr. Tuft, the adversity between the parties was particularly clear because Tubi had filed counterclaims in arbitration against at least 16 of the individuals it sought to contact before contacting them, and to this day has never released them. Postman Decl. ¶ 17. Moreover, in this case itself, Tubi has publicly threatened to pursue sanctions against Keller Postman's clients

who withdrew their arbitration demands.  (Dkt. 18 at 36) ("Tubi sought to learn facts to determine whether it should seek attorney's fees and costs from claimants seeking to withdraw from arbitration.").

To illustrate the absurdity of Jenner's position, consider what Mr. Fox would have said if, after withdrawing a client's case, Keller Postman reached out to senior Tubi employees with access to a claimant's data and asked them questions about that client's claims.  Jenner of course would have found this improper, regardless of whether Keller Postman limited its investigation to just the withdrawn client's case.  The same conclusion applies to Jenner's investigation here.  Some violations of Rule 4.2 arise from chance interactions between lawyers and represented parties.  *See, e.g., Abeles,* 9 Cal. 3d 603 at 606 (lawyer and represented party "met accidentally at a restaurant"). But Jenner's conduct was no accident; rather, Tubi thought it was worth expending considerable resources to send an investigator to the home of dozens of Keller Postman's clients.  Why did Tubi spend those resources if the matter was over?  In fact, Tubi was hoping to dig up information about the confidential communications between Keller Postman and these clients in furtherance of its suit against Keller Postman, which has always been a transparent ploy to stymie all of the underlying arbitrations.  (Dkt. 1 ¶ 85) (seeking an injunction requiring "withdraw[al] [of] the demands for arbitration").  This was a frontal attack on the attorney-client relationship, one of the very harms Rule 4.2 seeks to avoid.  *See supra* at 13–14.  Moreover, Tubi's claims in this case necessarily require showing that each withdrawn client breached the Terms and caused Tubi damages.  Thus, the purpose of the investigation was to help Tubi establish that the affected clients violated Tubi's rights.  For Jenner to claim that it was not in an adverse relationship to the withdrawn claimants when it directly contacted them borders on the absurd.

Finally, Jenner cannot claim to have cured its violation of Rule 4.2 by pointing to the fact

that Ms. Talamantez allegedly began her interrogations by asking each client whether they were represented. Jenner violated the Rule the moment Ms. Talamantez spoke with each client. *Cf. Allstate Ins. Co. v. Inscribed PLLC*, 571 F. Supp. 3d 823, 835 (E.D. Mich. 2021) ("There is no escape clause for attorneys who speak to represented parties about the subject matter of the representation where the contact is brief and nothing pertinent is discovered." (citation omitted)). Moreover, because the anti-contact rule "is fundamentally concerned with the duties of attorneys, not the rights of parties," *Lopez*, 4 F.3d at 1463, "[t]he Rule applies even though the represented person initiates or consents to the communication." Cal. R. Prof. Conduct 4.2 cmt.3. Consistent with this principle, courts have repeatedly held that attorneys violate the Rule by contacting a person they know to be represented *even if* the client claims to be unrepresented. *Abeles*, 9 Cal.3d at 606–07 (sanctioning attorney for willful violation even though client told attorney he was not represented); *Grewal*, 2010 WL 1668067, at *4 (attorney violated rule by contacting parties following their dismissal from case even though clients "confirmed that they were not, and never had been, represented" by opposing counsel); *see also* Tuft Decl. ¶ 16 ("The rule applies even if the person consents to the communication or expresses a belief they are no longer being represented.").

That makes good sense: when a reasonable lawyer should know that they are not permitted to contact a represented party, it would be perverse—and introduce perverse incentives—if the lawyer could avoid the rule so long as he could mislead the client into stating that they are not represented. That may not concern Jenner, whose clients are typically sophisticated attorneys themselves. But Jenner's approach is facially absurd when applied to the representation of large numbers of unsophisticated consumers. On Jenner's theory, Ms. Talamantez and a team of similar investigators could have shown up at the homes of *all* of Keller Postman's clients, *even those with*

*pending arbitrations*.  If most of them reported that they were represented then the investigators could stop the questioning and, on Jenner's theory, it would be "no harm, no foul."  But if any of them misunderstood or mistakenly stated that they were unrepresented, the investigator could question them about Keller Postman's representation, even while they have a pending case.  That is plainly absurd, but Jenner's position is no less absurd here, because Mr. Fox had no basis to conclude that the known representations had concluded.

Ms. Talamantez's claim that Keller Postman's clients told her they were unrepresented does not cure Jenner's violations of Rule 4.2, even if true.  But given what has been revealed about how she conducted her interrogations, even that claim must be seriously questioned.  Ms. Talamantez misled Keller Postman's clients regarding the nature of her investigation.  *See supra* at 21–22.  She did not just encounter Keller Postman's clients "accidentally in a restaurant."  9 Cal.3d at 606–07.  She willfully invaded the attorney-client relationship, at Mr. Fox's direction.

## B. Even Under Mr. Fox's Baseless Assumption, the Contacts with Keller Postman Clients Violated Rule 4.3 and § 6106.

Even if Mr. Fox had a basis to assume that Keller Postman's representation had been terminated (and he did not), the interrogations he oversaw still would constitute a serious violation of the ethical rules because they were intended to discover confidential communications and were designed to mislead and intimidate.

First, although Mr. Fox claims to have instructed Ms. Talamantez to tell Keller Postman's current and former clients not to disclose privileged communications (Dkt. 22 at 2 n.1), it is clear that she then proceeded to intentionally elicit significant confidential information in violation of Rule 4.3.   Indeed, the declarations Tubi obtained *explicitly reference discussion of such communications*.  (Dkt. 22-24 ¶¶ 5–7) (discussing "agree[ment] to file the claim" and awareness of "Tubi's Terms of Use"); (Dkt. 22-25 ¶¶ 3–4, 8) (discussing process through which individual

sought out representation and agreed to file claim); (Dkt. 22-26 ¶¶ 3, 7) (same); (Dkt. 22-27 ¶¶ 3, 8) (same); (Dkt. 22-28 ¶¶ 3, 7) (same); (Dkt. 22-29 ¶¶ 2, 7) (same). That Ms. Talamantez obtained this confidential information is not surprising—gaining information Tubi could use to describe Keller Postman's communications with its clients was the *entire purpose of her investigation.* And, indeed, Tubi now seeks to use those allegations as one of the two primary revisions in the Proposed Amended Complaint. *See generally* (Dkt. 22-32). It is not credible for Jenner to claim that the interrogations were not intended to discover information about Keller Postman's communications with its clients.

California law provides that "confidential communication between client and lawyer" includes "legal opinion formed and the advice given by the lawyer in the course of that relationship." Cal. Evid. Code § 952; *see also* Cal. R. Prof. Conduct 1.6 cmt. 2 (providing that confidentiality in California is broader than attorney-client privilege). Accordingly, even accepting the false premise that the clients were no longer represented, Jenner's concerted efforts to obtain information from "former" Keller Postman's clients about Keller Postman's communications with the clients is a clear and independent violation of Rule 4.3. *See* Tuft Decl. ¶ 18 ("Even if the withdrawn claimants had not been represented by counsel at the time of the investigator's interviews, Rule 4.3 (communicating with an unrepresented parties) prohibits obtaining of confidential information regarding claimants' relationship with Keller Postman or their awareness or knowledge regarding the claims or the issues in dispute.").

In addition to improperly seeking confidential attorney-client communications, the campaign that Mr. Fox initiated led to the repeated intimidation and deception of Keller Postman's clients. Ms. Talamantez repeatedly showed up unannounced at the homes of the withdrawn claimants. *See* Dudley Dec. 6 Decl. ¶¶ 3–6; Deschamps Dec. 6 Decl. ¶¶ 3–6; Ellis Dec. 6 Decl.

¶¶ 3–5; Eastman Dec. 6 Decl. ¶¶ 3–5.  She dressed in a dark suit and told one Keller Postman client that she was with the FBI agent and from Washington, D.C., implying that the client was under investigation for some kind of misconduct and scaring both the client and the client's nine-year-old son.  Deschamps Dec. 6 Decl. ¶¶ 3–5.  That client signed Ms. Talamantez's declaration so that she "would not have to do anything more . . . with them."  *Id.* ¶ 5.  Ms. Talamantez took advantage of the fact that another of Keller Postman's clients was both irritated with her repeated outreach and sick with serious medical issues.  Ellis Dec. 6 Decl. ¶¶ 3–6.

Worse, Ms. Talamantez misled multiple Keller Postman clients into thinking that she was an agent *of Keller Postman*.  One of those clients understood Ms. Talamantez to claim that she was a lawyer or with a lawyer and interpreted that to mean that she was with *his* lawyers.  Eastman Dec. 6 Decl. ¶ 3.  Upon realizing that Ms. Talamantez was working for Tubi only after an extended conversation, this client felt "misled" and "threatened" and "would not have talked to this woman had she told me at the outset that she is from Tubi."  *Id.* ¶¶ 3–5.  Ms. Talamantez went to the home of another client who did not initially come to the door, waited until that client was signing for an unrelated package, confronted that client claiming to be a "representative for the attorneys" and "immediately followed up by asking me whether I knew Keller Postman."  Dudley Dec. 6 Decl. ¶¶ 3–4.  This led the client to believe that Ms. Talamantez "was a representative of Keller Postman."  *Id.* ¶ 4.  When Ms. Talamantez presented Tubi's declaration, this client "thought [she] was signing a document to finalize the withdrawal of my arbitration demand."  *Id.* ¶ 7.  The client only realized that Ms. Talamantez was not a representative of Keller Postman weeks later.  *Id.* ¶¶ 9–11.

This misdirection would have been a violation even if Keller Postman did not currently represent these clients.  Ms. Talamantez's interrogations, conducted under the supervision of Mr.

Fox, violated Mr. Fox's obligation to avoid questioning clients in a misleading or intimidating manner.  *See* Cal. Bus. & Prof. Code, § 6106.  They also violated the requirement that an attorney or their agent avoid allowing the client to believe they are disinterested.  *See* Cal. R. Prof. Conduct 4.3 (attorney may not "state or imply" that they are disinterested and has affirmative duty to correct any potential misimpression).

### C. While Most of the Individuals Mr. Fox and Jenner Contacted Were Current Keller Postman Clients, Jenner Violated the Rules Even with Regard to the Minority Who Were Former Clients.

During April 2024, 23,747 consumers represented by Keller Postman filed arbitration demands.  Postman Decl. ¶ 14.  Of those, 33 clients requested between April 2024 and November 2024 to withdraw their claims.  For four of these individuals, Tubi refused to consent to withdrawal and pursued baseless requests for sanctions.  (Dkt. 18-4).  Jenner and Mr. Fox apparently used the list of the remaining 29 as the basis for its campaign to violate Rules 4.2 and 4.3.  (Dkt. 22-1 ¶ 78).

Of these 29, Keller Postman's records reflect that 22 remain Keller Postman clients. Postman Decl. ¶ 17.  For each of these 29 clients, Jenner's violations of Rule 4.2 are clear.  *See supra* at 24–30.  For the 22 that remain Keller Postman clients, it does not get any clearer.  But Jenner's efforts to contact the remaining 7 clients were improper too.  As described above, Rule 4.2 is governed by an objective standard, and where an attorney suspects that a known representation *may* have been terminated, he is obligated to check with opposing counsel.  *Dale*, 2005 WL 1389226, at *8; *San Francisco Unified Sch. Dist. ex rel. Contreras*, 213 Cal. App. 4th at 1233 n.13; *Snider*, 113 Cal. App. 4th at 1212, 1215–16.

Had Mr. Fox and Jenner complied with that obligation and contacted Keller Postman before questioning any of the former clients, Keller Postman would have individually contacted each of its former clients to advise of Tubi's intentions and offer to restart its representation to handle any inquiries.  *Id*.  This would have allowed former Keller Postman clients to have the benefits of

retained counsel instead of having to be confronted and harassed by an adversary's investigator at home.  Dudley Dec. 6 Decl. ¶¶ 3–6, 12; Deschamps Dec. 6 Decl. ¶¶ 3–6, 7; Ellis Dec. 6 Decl. ¶¶ 3–5, 7.  Moreover, even if one or two individuals had declined Keller Postman's offer to resume its representation, Keller Postman would have reminded them of the prior communications they had with the client.  Those former clients would then have been better prepared to resist Jenner's efforts to mislead them and obtain confidential information in violation of Rule 4.3.  Most importantly, they would have been less likely to be pressured into giving sworn statements that cannot be squared with prior sworn statements they gave to Keller Postman.

Mr. Fox, Jenner, and Tubi did not care about leading these clients astray *because Tubi is adverse to them* and seeks to prove here that they breached Tubi's Terms.  That is precisely why the Rules required that Mr. Fox consult with Keller Postman before contacting even former clients.  Moreover, and in all events, Mr. Fox still violated Rule 4.3 with regard to these individuals by intentionally eliciting information about Keller Postman's confidential communications with the claimants.  *See supra* at 24–25.

## II.    The Seriousness of the Ethical Violations at Issue Warrant Serious Sanctions.

In light of the seriousness of the violations at issue, Keller Postman respectfully requests that the Court award sanctions in the form of an order (1) disqualifying Jenner from representing Tubi in this matter, (2) excluding the fruits of Ms. Talamantez's tainted investigation, (3) awarding attorneys' fees and costs incurred in preparing this motion and the response to the motion for leave to amend, and (4) awarding any other relief the Court deems appropriate.  The Court may wish to consider further sanctions or relief given the seriousness and scale of this violation.

### A.  Disqualification is Warranted.

Attorneys who engage in *ex parte* contact with represented persons in violation of the anti-contact rule are "subject to sanctions by courts, such as disqualification as counsel . . . under the

district court's inherent powers." *Lewis v. Tel. Emps. Credit Union*, 87 F.3d 1537, 1558 (9th Cir. 1996) (citation omitted); *see also Verniest*, 2009 WL 1664943, at *5 ("We hold, moreover, that the court properly concluded that Gale and Thompson's violation of [the precursor to Rule 4.2] required their disqualification."). "A motion to disqualify counsel is committed to the sound discretion of the district court." *Ambush v. Engelberg*, 282 F. Supp. 3d 58, 61 (D.D.C. 2017).

In determining whether to disqualify counsel, courts frequently ask if the misconduct at issue "will have a continuing effect on the judicial proceedings which are before the court." *Chronometrics, Inc. v. Sysgen, Inc.*, 110 Cal. App. 3d 597, 607 (1980); *see also* Restatement (Third) of the Law Governing Lawyers § 99 (2000) (disqualification is appropriate remedy for a violation of anti-contact rule when "the contact has substantially interfered with the client's relationship with the client's lawyer, or when disqualification is appropriate to deter flagrant or reckless violations.").

Jenner's pattern of violations here meets the high bar for disqualification for five reasons.

***First***, Jenner's misconduct was willful and pervasive. Under Mr. Fox's direction, Ms. Talamantez doggedly hounded close to two dozen Keller Postman clients. Mr. Fox had no reasonable basis for assuming the representation had ended. Rather, his first explanation—that he was entitled to assume that withdrawal of a demand necessarily ends the representation—has been expressly rejected by case law as well as the drafters of the Rules. Given the clarity of the law in this area, Mr. Fox either did not bother to acquaint himself with the applicable rules or willfully chose to disregard or misread them. Both scenarios are equally culpable. Moreover, even under Mr. Fox's incorrect *subjective* view, he was still expressly prohibited from seeking to obtain information about Keller Postman's confidential communications with formerly represented parties. Yet he intentionally did precisely that, and then brazenly sought to introduce this

unethically obtained (and inaccurate) description of confidential information in order to influence this proceeding. This is the polar opposite of an isolated error or an accidental encounter with an opposing party at a restaurant.

*Second*, Keller Postman's clients faced and continue to face significant harm from Jenner's tactics. As a result of Jenner's misconduct, the six declarants who signed declarations drafted by Ms. Talamantez now have signed flatly inconsistent declarations. Moreover, Keller Postman's clients felt upset, harassed, and misled after speaking with Ms. Talamantez. One felt "shocked" and "misled" to learn that Ms. Talamantez was not affiliated with Keller Postman and believes that this "was the impression [Ms. Talamantez] was trying to give" her. Dudley Dec. 6 Decl. ¶¶ 10–11. Another signed something because she wanted Ms. Talamantez—who had repeatedly shown up at her home—to leave her, her mother, and her young son alone. Deschamps Dec. 6 Decl. ¶ 6. A third was "very sick," but Ms. Talamantez would not take no for an answer and instead stopped by twice to present papers to sign as a condition of going away. Ellis Dec. 6 Decl. ¶ 4–6. And a fourth felt "annoyed" and "misled by the whole experience" of encountering Ms. Talamantez. Eastman Dec. 6 Decl. ¶¶ 3, 5.

*Third*, Jenner's conduct here is an undisguised attack on Keller Postman's attorney-client relationships. To take one illustrative example, Keller Postman's client Monique Dudley, from whom Tubi extracted a declaration under false pretenses (Dkt. 22-29), has been Keller Postman's client continuously since before this case began and is represented by Keller Postman in other unrelated matters. Postman Decl. ¶ 20. Ms. Dudley believed that Ms. Talamantez was working with Keller Postman to help finalize the withdrawal of her arbitration demand against Tubi. Dudley Dec. 6 Decl. ¶¶ 7–11. Ms. Talamantez attempted to do the same with another Keller Postman client, Darrell Eastman, by waiting until late in the conversation to disclose that she was

working for Tubi.  Eastman Dec. 6 Decl. ¶¶ 3–5.  This kind of circumvention of the attorney-client relationship is precisely what Rule 4.2 protects against.  *See Lopez*, 4 F.3d at 1463 (anti-contact rule "is fundamentally concerned with the duties of attorneys, not the rights of parties").  And more broadly, Mr. Fox and Jenner seeks to use these localized attacks to impair the other attorney-client relationships Keller Postman has with clients maintaining claims against Tubi in arbitration.

***Fourth***, Jenner's improper contacting of clients is part of a broader pattern of misconduct.  For example, Tubi's original Complaint rested on the false premises that "more than 40%" of Keller Postman's clients' claims were "frivolous" and that "more than 30% of Keller Postman's claimants have ***never*** been registered users" with Tubi.  (Dkt. 1 ¶ 50.a, 50.b).  Keller Postman questioned the veracity of these statistics early on, before Tubi even filed this lawsuit.  (Dkt. 14-4 at 6).  In response, Tubi refused to provide any information, but eventually revealed its inadequate investigation in an Illinois state court case, *Gregory v. Tubi, Inc.*, No. 24-LA-209 (Ill. 17th Jud. Cir. Ct.), in which Tubi colluded with a plaintiff bringing a legally and factually distinct claim to negotiate a class settlement that purports to release Keller Postman's clients' Unruh Act claims.  In the *Gregory* case, Mr. Fox filed an affidavit averring that one of Keller Postman's clients objecting to that settlement, Marvin Cheng, had never registered a Tubi account.  Ex. 14, Oct. 30, 2024 Affidavit of Brandon Fox ("Fox Aff.") ¶ 21.  But Mr. Cheng had received an email from Tubi confirming his account's creation.  Ex. 15, Oct. 17, 2020 Email from Tubi, Inc. to Marvin Cheng. After being caught red-handed, Tubi must now admit its original search—the basis for this lawsuit—was fundamentally flawed.  (Dkt. 22-32 at 23–26).  Specifically, Tubi stores client accounts in two databases, but Jenner failed to check both of them in recklessly accusing Keller Postman's clients of bringing frivolous demands.  (*Id*.).  While Keller Postman maintains Jenner's search is still incomplete, Jenner has already admitted that it failed to perform a reasonable search

of its records before accusing Keller Postman of ethical misconduct. *See Nycomed US Inc. v. Glenmark Generics Ltd.*, No. 08-cv-5023, 2010 WL 3173785, at *1, 5–11 (E.D.N.Y. Aug. 11, 2010) (imposing monetary sanctions for attorney's failure to identify document that was stored in separate database and describing as "inexcusable" the "excuse" that the attorney's simply overlooked the database).

Separately, before bringing this lawsuit, Jenner enlisted Talia Cohen, an investigator with a documented history of helping a lawyer violate New York's equivalents to Rules 4.2 and 4.3. *See Dareltech, LLC v. Xiaomi Inc.* ("*Dareltech I*"), No. 18-cv-8729, 2019 WL 10966202, at *4–5 (S.D.N.Y. Apr. 11, 2019) (finding that attorney directed Ms. Cohen to contact defendant's employees in violation of New York's Rules 4.2 and 4.3); *Dareltech, LLC v. Xiaomi Inc.* ("*Dareltech II*"), No. 18-cv-8729, 2019 WL 3287957, at * 10 (S.D.N.Y. July 22, 2019) (dismissing case); *see also* Postman Decl. ¶¶ 26–29. In line with the pattern of coercion and deception outlined throughout this motion, Jenner had Ms. Cohen pose as a potential claimant hoping to retain Keller Postman to bring a claim *against* Tubi, to *help* Tubi and Jenner bring this lawsuit to defeat such claims, in violation of the relevant website's terms of service. *See* Postman Decl. ¶¶ 26–29. This is not speculation: both the Complaint and Proposed Amended Complaint that Jenner and Mr. Fox signed feature Ms. Cohen's handiwork, as well as her name, email address, and phone number. (Dkt. 1, Ex. 3 at 62) (listing Ms. Cohen's name and contact information in the URL bar); (Dkt. 22-4 at 3–4) (same).

Keller Postman held off on bringing these other matters to the Court's attention until now. While Mr. Fox and Tubi have repeatedly and casually hurled invective at Keller Postman, Keller Postman restrained its impulse to respond in kind. But conducting bullying, in-person interrogations of Keller Postman's clients is simply beyond the pale. And these additional

examples of sharp practices by Jenner underscore the need for meaningful sanctions. If the Court denies sanctions here, there is every indication that Jenner's misconduct will continue to escalate.

**Fifth**, Jenner has not only *engaged* in serious and pervasive violations of the anti-contact rule which harmed Keller Postman's clients but has also made clear that it seeks to *use* that misconduct affirmatively in this proceeding against Keller Postman to gain litigating advantage. *See generally* (Dkt. 22); *Chronometrics*, 110 Cal. App. 3d at 607 (disqualification justified because information improperly obtained through violation of anti-contact rule "cannot be unlearned" and would be "instantly available in [violating counsel's] mind"); *Allstate Ins. Co.*, 571 F. Supp. 3d at 836 (granting motion to disqualify for anti-contact rule violations because violations "raised issues about the fundamental fairness and integrity of the proceedings"); *Shoney's Inc. v. Lewis*, 875 S.W.2d 514, 516–17 (Ky. 1994) (affirming disqualification of counsel after violation of anti-contact rule because "the integrity of the adversarial process [wa]s at stake").

Although disqualification is a serious remedy, violations of Rule 4.2 and Rule 4.3 are serious ethical breaches. Here, Jenner's breaches were pervasive and willful, caused significant harm to clients, were direct attacks on Keller Postman's relationships with its clients, were part of a broader and escalating pattern of questionable conduct, and resulted in evidence Jenner hopes to use to influence this proceeding going forward. Disqualification is therefore appropriate.

### B. The Results of Ms. Talamantez's Investigation Should Be Excluded.

In addition to disqualifying Jenner, the Court should exclude any use of Ms. Talamantez's investigation in full. In addition to disqualification as a remedy for violation of the anti-contact rule, a "court may also suppress or otherwise exclude from evidence statements, documents, or other material obtained in violation of the [anti-contact] rule." Restatement (Third) of the Law Governing Lawyers § 99 (2000); *see also Shoney's*, 875 S.W.2d at 516 ("With respect to the statements wrongfully obtained, the only satisfactory remedy is suppression."); *United States v.*

*Sierra Pac. Indus.*, 857 F. Supp. 2d 975, 984 (E.D. Cal. 2011) ("[T]he proper remedy here is to exclude all evidence or information obtained through the improper contacts."); *Papanicolaou v. Chase Manhattan Bank, N.A.*, 720 F. Supp. 1080, 1088 (S.D.N.Y. 1989) (ordering depositions tainted by anti-contact rule violations deleted from the record).

Although Mr. Fox claims that Ms. Talamantez instructed Keller Postman's current and former clients not to disclose confidential communications, the declarations Ms. Talamantez drafted *explicitly reference discussion of such communications*. *See supra* at 28. And this was hardly an accident; rather, obtaining information about Keller Postman's communications with its clients was the self-evident purpose of Jenner's improper investigation. The Court should not allow Tubi to attempt to benefit from the misconduct of its attorneys and should bar any use of Ms. Talamantez's investigation in this case, even if Jenner is disqualified.

### C. The Court Should Award Attorneys' Fees and Costs.

Finally, Keller Postman seeks an award of fees and costs for having to bring this motion. While less commonly awarded than disqualification and exclusion of evidence, this also is an established remedy ordered by courts for violations of the anti-contact rule. *See* Restatement (Third) of the Law Governing Lawyers § 99 (2000) (noting that "fee-shifting sanctions may be warranted" for violations of anti-contact rule); *Haffer v. Temple University*, 115 F.R.D. 506 (E.D. Pa. 1987) (awarding attorneys' fees for violation of anti-contact rule); *Faison v. Thornton*, 863 F. Supp. 1204, 1208 (D. Nev. 1993) (same). Given the egregious nature of Jenner's violations, it is an appropriate remedy here.

### CONCLUSION

For the reasons above, the Court should grant the motion, disqualify Jenner, bar Tubi from using the fruits of ethical violation in this action, order Jenner to pay Keller Postman's attorneys'

fees associated with responding to the violations, and award any other sanctions the Court deems appropriate.

Dated:  December 9, 2024                    Respectfully submitted,

                                           KELLER POSTMAN LLC

                             By:    /s/ Warren D. Postman
                                    Warren D. Postman (Bar ID 995083)
                                    Albert Y. Pak (Bar ID 888314242)
                                    Fred Messner (admitted *pro hac vice*)
                                    1101 Connecticut Avenue N.W.
                                    Suite 1100
                                    Washington, DC 20036
                                    (202) 918-1123
                                    wdp@kellerpostman.com
                                    albert.pak@kellerpostman.com
                                    fred.messner@kellerpostman.com

                                    Kiran N. Bhat (Bar ID 1021898)
                                    2333 Ponce De Leon Boulevard
                                    Suite 100
                                    Coral Gables, FL 33134
                                    (305) 845-4684
                                    kiran.bhat@kellerpostman.com

                                    *Attorneys for Defendant*