# **<u>EXHIBIT O</u>**

**JAMS, INC.**

| | |
|---|---|
| ██████████, <br> **Claimant,** <br><br> v. <br><br> **TUBI, INC.,** <br> **Respondent.** | JAMS Ref. No.: 1601003760 <br><br><br> [ ██████████████ ] |

## AMENDED DEMAND FOR ARBITRATION

Pursuant to the Tubi, Inc. Terms of Use, effective May 1, 2022 ("Terms"), Rules 5 and 7 of the governing JAMS Streamlined Arbitration Rules and Procedures effective July 1, 2014 ("Rules"), and the post-dispute agreement between the parties, Claimant ██████████ brings this Amended Demand against Respondent Tubi, Inc. ("Tubi").

## INTRODUCTION

1.     America's multibillion dollar media industry is transforming as more consumers "cut the cord" and abandon traditional broadcast and cable television in favor of online video streaming services.

2.     Tubi is both leading and benefiting from this shift.  It operates one of the most popular online video streaming services, which reaches a quarter of all television households in the country.  In 2024, Tubi's 97 million monthly active users streamed 10 billion hours on the platform.

3.     Through Tubi, users can watch hundreds of thousands of prerecorded titles on multiple digital platforms, including Tubi's mobile application and its website, tubitv.com.  Users can watch Tubi without an account but become bound by Tubi's terms of use when they do so. Users who create a Tubi account to use advanced features while they watch are asked to provide Tubi with their age and gender and become bound by Tubi's terms of use as well.

4.      Instead of charging users a subscription fee, Tubi makes money by showing them advertisements.  By early 2025, most Fortune 100 companies were buying advertisements on Tubi.

5.      Tubi knows that it can make more money by targeting and helping advertisers target specific users.  To do this, Tubi collects a trove of data about California users.  The data Tubi collects includes the user's age and gender, the device with which the user accesses Tubi and the device's geolocation, and the interactions the user has with Tubi's services.  Tubi then uses the data it collects to infer a profile of the user's characteristics.  And Tubi next uses and discloses what it collects and infers to target advertisements and help advertisers do so as well.

6.      These practices have led Tubi to financial success.  Tubi's parent company, Fox Corporation ("Fox"), claimed that in the 2024 fiscal year, Tubi's growth helped drive $4.2 billion in revenues to the relevant reporting segment.

7.      Although profit-maximizing, Tubi's practices do not comply with applicable law. Excluding users from receiving certain advertisements based on their age and gender (or predicted age or gender) violates California's Unruh Civil Rights Act ("Unruh Act").  Cal. Civ. Code §§ 51(b), (e)(5)–(6).  This law reflects a simple and well-established principle: commercial actors cannot exclude customers or avoid outreach to them based on tired stereotypes that age or gender predict their interests.  *See Liapes v. Facebook, Inc.*, 95 Cal. App. 5th 910, 925 (2023), *review denied* (Jan. 10, 2024) ("[W]hile businesses can make economic distinctions in serving customers, those distinctions must be based on characteristics that could 'could conceivably be met by any customer' – not personal characteristics." (citation omitted)).  That principle is particularly well-founded here, given that Tubi can easily match advertising to users' interests *based on the shows they watch*, without resorting to age or gender stereotypes.

2

8.    In addition, disclosure of users' personally identifiable information (like the videos they watched) without required written consent violates the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, and section 1799.3 of the California Civil Code.

9.    Claimant watched shows and advertisements on Tubi's mobile application and/or its website, tubitv.com, while living in California, prior to filing an original demand on April 5, 2024.

10.    Tubi admits in its privacy policies that its collects, uses, and discloses data about California users like Claimant, including age and gender data, for purposes of targeted advertising. Accordingly, Tubi violated Claimant's rights under the Unruh Act, the VPPA, and section 1799.3 of the California Civil Code.

11.    Claimant and Tubi agreed through the Terms to resolve any disputes through a confidential individual arbitration at JAMS.  But when Claimant tried to arbitrate with Tubi in April 2024, Tubi responded by disclosing the fact of Claimant's arbitration in a lawsuit against Claimant's counsel in federal court and later identifying Claimant by name in a separate court action.   By publicizing Claimant's arbitration and identity, Tubi breached the Terms' confidentiality requirement.

12.    Although the Terms entitle Claimant to an individual arbitration, Claimant has agreed with Tubi to proceed by way of a consolidated proceeding with approximately 1,500 other individuals, assigned by JAMS, also represented by Claimant's counsel.

13.    Through this Amended Demand, Claimant seeks a declaration confirming that the Arbitrator has authority to hear Claimant's challenge to the enforceability of a requirement in the Terms, a declaration confirming that this requirement is unenforceable, statutory damages and injunctive relief for Tubi's violations of the Unruh Act, the VPPA, and section 1799.3, and

injunctive relief (as expressly authorized by the Terms) barring Tubi's further breach of the Terms' confidentiality requirement.

## THE PARTIES

14.     Claimant ███████ currently resides, or at times relevant to this Amended Demand resided, in ███████. While living in California, and before April 5, 2024, Claimant watched multiple shows and advertisements on Tubi's mobile application or on Tubi's website, tubitv.com.

15.     Respondent Tubi is a Delaware corporation with its principal place of business in San Francisco, California. Tubi operates an eponymous advertising-supported video streaming platform.

16.     Tubi is a subsidiary of Fox. Fox purchased Tubi in March 2020 for $440 million, which Fox CEO Lachlan Murdoch described at the time as a bid to "immediately expand our direct-to-consumer audience and capabilities" and "provide our advertising partners with more opportunities to reach audiences at scale."[1]

## ARBITRATOR'S JURISDICTION

17.     The Arbitrator's authority flows from the consent of the parties. *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010) (arbitration is "a matter of consent, not coercion"). Claimant and Tubi agreed to arbitration before JAMS when Claimant used Tubi before April 5, 2024, forming an arbitration agreement. Exhibit A, Terms, Preamble ("By using any Tubi Services and accepting these Terms of Use you are agreeing . . . to resolve any dispute between you and us through binding, individual arbitration rather than in court." (all caps omitted)).

---

[1]     *Fox Corporation to Acquire Tubi*, FOX (Mar. 17, 2020), https://investor.foxcorporation.com/news-releases/news-release-details/fox-corporation-acquire-tubi.

18.     After initial procedural disagreements, Tubi and Claimant agreed to proceed by way of this consolidated arbitration, governed by the Terms.  The post-dispute agreement thus binds Tubi and Claimant to the Terms.

19.     The Terms contain a pre-dispute notice provision:

> If either you or Tubi wish to arbitrate a claim, you or Tubi must first send by mail to the other a written Notice of Dispute ("Notice") that sets forth the name, address, and contact information of the party giving notice, the specific facts giving rise to the Dispute, the Tubi Service to which the Notice relates, and the relief requested. Your Notice to the Tubi must be sent by mail to:  Arbitration Notice of Dispute, 2121 Avenue of the Stars, 7th Floor, Los Angeles, California, 90067.  Tubi will send any Notice to you at the contact information we have for you or that you provide.  It is the sender's responsibility to ensure that the recipient receives the Notice.  During the first 45 days after you or we send a Notice to the other, you and we may try to reach a settlement of the Dispute.
>
> . . .
>
> If you and we do not resolve the Dispute within 45 days, either you or we may initiate arbitration in accordance with the JAMS Rules.

Ex. A, §§ 10(7), (8).

20.     The Terms also contain a delegation clause:  "[D]isputes over arbitrability shall be resolved by the arbitrator."  *Id.* at § 10(2).  And they incorporate the JAMS Rules, *id.* at § 10(6), which also delegate disputes over arbitrability to the Arbitrator.  Rule 8(b) ("arbitrability disputes, including disputes over the . . . validity, interpretation or scope of the agreement under which Arbitration is sought . . . shall be submitted to and ruled on by the Arbitrator").

21.     In early April 2024, Claimant was among 23,746 individuals represented by Claimant's counsel who each filed a demand with JAMS seeking an individual arbitration pursuant to the Terms.  In the demand, Claimant raised an Unruh Act claim against Tubi and sought to submit a dispute over the enforceability of the 45-day delay requirement in the pre-dispute notice

provision—which Claimant contended was illusory, unconscionable, and unenforceable—to the Arbitrator.

22.    Tubi disagreed and argued that JAMS lacked jurisdiction to administer Claimant's demand because Claimant had to first comply with the delay requirement Claimant asserted was invalid.  Tubi asked JAMS to decline to administer the arbitration until after Claimant had done so.

23.    On May 20, 2024, after receiving briefing from the parties, JAMS determined that Tubi's objection went to arbitrability and that Rule 8(b) delegated disputes over arbitrability to the Arbitrator.  JAMS thus decided that the Arbitrator has the authority to interpret the Terms and to decide the dispute over the validity of the delay requirement in the pre-dispute notice provision.

24.    On January 16, 2025, Claimant and Tubi confirmed to JAMS that they had agreed to the process that resulted in the selection of the Arbitrator for a consolidated arbitration, and that Claimant would not seek to deconsolidate the consolidated arbitration.  Thus, by the post-dispute agreement of the parties, the Arbitrator has authority to preside over the consolidated arbitration.

## FACTUAL ALLEGATIONS

### A.  Tubi Collects A Wide Array Of Personal Data About Claimant

25.    Tubi's current privacy policy, dated July 1, 2024, attached as Exhibit B, "applies to all users, including both those who use the Tubi Services without being registered with the Tubi Services and those who have registered with the Tubi Services."  Ex. B at 1.  The policy provides that "Tubi and our service providers may collect . . . information from and about you" including:

      a.  "Registration Information" like "name, e-mail address, **gender**, zip code, **birthday**";

b. "Activity Information" about the "visits and your usage of the Tubi Services" like "**your IP address, browser type**, and other software or hardware information," "a **unique device identifier** assigned to that device or other transactional information for that device," "[i]n certain circumstances . . . **geolocation data from that device**," and "[c]ookies and other tracking technologies (such as browser cookies, pixels, beacons, local storage, and other mechanisms) . . . to collect and store data," which "[d]epending on your interaction with us . . . may also be used to collect and store information about **your usage of the Tubi Services**, **such as** pages you have visited, search history, and **the video and other content you have viewed**";

c. "Information from Other Sources" including "publicly available information about your online and offline activity from social media services, advertising technology companies, advertisers, commercially available sources, and information from our Tubi Affiliates or business partners."

*Id.* at 2–4 (emphases added).

26.    Tubi in fact collects the data its privacy policy says it "may" collect.  For example, when a user creates a Tubi account to access advanced features, Tubi asks for and collects the registering user's age and gender:



27.    Likewise, although Tubi's privacy policy states that Tubi "may" collect "Information from Other Sources," Tubi in fact has partnerships confirming that it does.  For example, the credit reporting agency TransUnion stated that Tubi uses TransUnion data to "connect the dots to gain a more comprehensive understanding of today's consumer and reach them with confidence" by "building a strong foundation of individual-level identity."[2]  Tubi's Chief Revenue Officer confirmed that the TransUnion partnership was useful to Tubi because "[c]onsumer-level insights lead to more informed audience targeting . . . result[ing] in better performing campaigns."[3]

28.    Independent organizations agree that Tubi collects data about its users.  The Mozilla Foundation concluded that Tubi "matches 3rd party data to existing customers" and allows

---

[2] *TransUnion and Tubi Collaborate to Meet Connected Consumer Needs as Demand for Streaming TV Accelerates*, TransUnion (Apr. 15, 2020), https://perma.cc/59DM-PP9Z.

[3] *Id.*

targeting based on numerous personal characteristics.[4]  Common Sense Media concluded that Tubi

users' "[p]ersonally identifiable information (PII) is collected" and that this collection is "not

limited to product requirements."[5]

29.     Most significantly, as to California users like Claimant, Tubi *itself* admits that it

collects the data it claims elsewhere in its privacy policy that it "may."  In a section of its privacy

policy containing mandatory disclosures pursuant to California law, Tubi "provides details about

the categories of Personal Information of California residents that we have collected, disclosed, or

'sold' or 'shared' during the last 12 months" preceding July 1, 2024.  Ex. B at 10.  Tubi defines

"Personal Information" to mean "information that identifies, relates to, or describes **a particular**

**California resident**."  *Id.* (emphasis added).   Tubi's "Categories of Personal Information

Collected" under this rubric include:

   a.  "**Identifiers**, such as name, IP address, e-mail address, and online and device

       identifiers";

   b.   "**Personal information**, as defined in the California Customer Records law,

       such as contact and financial information";

   c.  "Characteristics of **protected classifications under California law, such as**

       **age or gender**";

   d.  "Internet or network activity information, such as **browsing history and**

       **interactions with our websites, mobile, or connected TV application**s";

---

[4] *Paid Programming: Investigating Streaming Ads During the Election Season*, Mozilla Foundation,  https://foundation.mozilla.org/en/campaigns/paid-programming/tubi/  (last visited Mar. 11, 2025).

[5] *Privacy Evaluation for Tubi TV*, Common Sense, https://perma.cc/6JR6-UC55 (last updated Jan. 25, 2023).

> e.   "Non-Precise Geolocation data, such [as] **device location**"; and
>
> f.   "Inferences drawn from any of the Personal Information listed above to create **a profile or summary about, for example, an individual's preferences and characteristics**."

*Id*. at 10–11 (emphases added).

30.    Tubi has collected these same types of data about California users for years.  Earlier versions of Tubi's privacy policy each contained similar or identical "Categories of Personal Information Collected" for the preceding 12-month periods.  *See* Exhibit C, Tub Privacy Policy dated July 1, 2023, at 9–11; Exhibit D, Tubi Privacy Policy dated July 1, 2022, at 9–10; and Exhibit E, Tubi Privacy Policy dated July 1, 2021, at 8–10.

**B.  To Target Advertisements To Claimant, Tubi Uses And Discloses The Personal Data About Claimant That It Collects**

31.    Tubi's marketing materials, such as a recent report it produced in conjunction with a pollster, show its understanding of the commercial value of targeted advertising.  Exhibit F, "the stream 2024: Streaming Insights for Marketers."   The report advises marketers that "[p]ersonalization is paramount" and states that Tubi "engages all kinds of audiences" of various ages, ethnicities, and sexual orientations.  *Id*. at 10–11.

32.    Tubi admits that it uses the age and gender data it collects specifically to target advertisements.  In the California mandatory disclosures section of the Tubi privacy policy dated July 1, 2021, Tubi admitted that it collects age and gender information from users to "provide advertisements."  Ex. E at 9–10.  And in selling its platform to advertisers, Tubi states, "We Built Our Ad Tech Solutions to Maximize Targeting" for factors including "age" and "demographics."[6]

---

[6] *Advertising Innovation – Born to Tech*, FOX, https://perma.cc/674N-7KBN (last visited Mar. 8, 2025).

33.    Tubi's current privacy policy provides that it "may use and disclose some or all of the information we collect from and about you" for purposes including the "deliver[y] of relevant ads to you when you use the Tubi Services." Ex. B at 4–5. "This may include, for example, sharing certain information with advertising technology companies . . . such as an advertising identifier for your device, IP address, or a 'hash' of an identifier." *Id.* at 5–6.

34.    Although Tubi's current privacy policy again says that it "may" use the data it collects to target advertisements, Tubi in fact admits that it uses and discloses this data to target advertisements to California residents like Claimant. For each of the "Categories of Personal Information" pertaining to "particular California residents" that Tubi "collected, disclosed, or 'sold' or 'shared' during the last 12 months" preceding July 1, 2024, Tubi admits that it "sold" or "shared" that information to "[a]dvertising technology companies; advertisers; [and] Tubi Affiliates" "[f]or the purpose of marketing and targeted advertising." *Id.* at 10–12. Tubi makes this same admission specifically as to data about Californians' "age and gender." *Id.* at 11. And it made the same admissions as to the 12 months preceding July 1, 2023 in its privacy policy bearing that date. Ex. C at 9–11.

35.    Put differently, Tubi admits that it uses and discloses Claimant's age and gender data, other identifying data, and service interaction data to target Claimant with advertisements. It does this even though it has other, less invasive, and more lawful alternatives. Like traditional broadcast and cable television providers, for example, Tubi could offer advertisers placements in programs whose content correlates to those who may be interested in the advertisers' products.

36.    Indeed, technological developments have made it even more effective to pair users with relevant advertising based on their *interests*, without relying on stereotypes based on age and gender. In May 2022, Fox announced a "proprietary technology solution bringing contextual

alignment to digital video" which it called "ATLAS."  This tool offers "contextual targeting" and "leverage[s] AI, and on-screen visual detection to extract data that can be used to build advanced contextual segments that target specific concepts and entities at any point in time during a piece of video content."  This allows Fox "the ability to deliver an advertiser's message adjacent to contextually relevant content."[7]

37.    Despite having access to such cutting-edge nondiscriminatory alternatives, Tubi continues to target advertisements to users like Claimant based on stereotypes about how their age and gender predict their interests.

38.    And despite hedging that it "may" use "the video and other content you have viewed" to "provide you with content and advertising that is more interesting, personalized and relevant to you," Ex. B at 2–4,  Tubi admits that it discloses information about Californians' "interactions with our websites, mobile, or connected TV applications" "[f]or the purpose of . . . targeted advertising," *Id.* at 10.

### C.  Tubi's Practices Violate The Unruh Act, The VPPA, and Section 1799.3

39.    The Unruh Act provides that "[a]ll persons . . . are free and equal, and no matter what their sex, race, [or] color . . . are entitled to the full and equal accommodations . . . in all business establishments of every kind."  Cal. Civ. Code § 51(b).  It prohibits businesses from engaging in discrimination based on sex or gender.  *Id.* at §§ 51(b), (e)(5).  It also prohibits businesses from engaging in discrimination based on age.  *Liapes*, 95 Cal. App. 5th at 920 (citing *Candelore v. Tinder, Inc.*, 19 Cal. App. 5th 1138, 1145 (2018)).

40.    The Unruh Act is a unique statute.  It is narrower than federal civil rights law in that it does not prohibit many forms of disparate impact discrimination. *See, e.g., Munson v. Del*

---

[7] *Fox Corporation Unveils Atlas*, FOX (Mar. 23, 2022), https://perma.cc/HDL3-563Z.

*Taco, Inc.*, 46 Cal. 4th 661, 671–72 (2009). But where a business intentionally promotes itself to customers or limits is availability to customers based on their protected characteristics, it is meaningfully broader. *See, e.g., Koire v. Metro Car Wash*, 40 Cal. 3d 24, 39 (1985) (barring "Ladies' Day" sex-based promotional discounts). California courts thus recognize that "[s]trong public policy" supports the Unruh Act's seemingly anomalous application, even in spheres where "[c]ourts are often hesitant to upset traditional practices." *Id*.

41.     Because the Unruh Act does not prohibit disparate impact discrimination, Tubi is free to target advertising to certain programs that may result in a disproportionate exposure to a certain age or gender. However, when it comes to express stereotyping of consumers based on a protected trait, the Unruh Act is strict. California enacted the Unruh Act "to create and preserve a nondiscriminatory environment . . . by banishing or eradicating" discrimination. *White v. Square, Inc.*, 7 Cal. 5th 1019, 1025 (2019) (cleaned up). "The Act stands as a bulwark protecting each person's inherent right to full and equal access to all business establishments." *Id*. (cleaned up). Courts "must consider [the Act's] broad remedial purpose and overarching goal of deterring discriminatory practices." *Id*. They "interpret the Act's coverage 'in the broadest sense reasonably possible.'" *Ibister v. Boys' Club of Santa Cruz, Inc.*, 40 Cal. 3d 72, 76 (1985) (citation omitted).

42.     Irrespective of whether a business considers discrimination "of minimal importance or to be essentially harmless," or even believes that discrimination benefits its customers, the Unruh Act supplies "a clear and objective standard" making such discrimination "*per se* injurious." *Koire*, 40 Cal. 3d at 29, 33, 39. The "quest for profit maximization can never serve as an excuse for prohibited discrimination among potential customers." *Liapes*, 95 Cal. App. 5th at 925 (quoting *Candelore*, 19 Cal. App. 5th at 1153). And "harm" is not "an essential element to support a claim for statutory damages under" the Unruh Act. *Oliver v. Alta L.A. Hosps., Inc.*, No. B271206,

2017 WL 3124254, at *2–4 (Cal. Ct. App. July 24, 2017).  Instead, it is "the application of the discriminatory policy, not the actual damages, which results in an Unruh Act injury."  *Jones v. Wells Fargo Bank, N.A.*, No. B237282, 2015 WL 661757, at *12 (Cal. Ct. App. Feb. 17, 2015).

43.     In this context, an online platform's targeted advertising based on age or gender violates the Unruh Act.  *Liapes*, 95 Cal. App. 5th at 920–27.  Indeed, Facebook filed a petition for review in *Liapes* by highlighting that "the Court of Appeal embraced plaintiff's boundless theory of liability.  In its view, so long as the intended or actual audience for ads depends in any way on age or gender, an Unruh act claim challenging those ads can survive a demurrer." Exhibit G, Pet. for Review at 25, *Liapes v. Facebook*, No. S282529 (Cal. Oct. 31, 2023).  The California Supreme Court denied review over this objection and denied a request to de-publish the decision, electing instead to let it remain precedential.

44.     As noted, Tubi could easily target advertising based on users' *interests*, as demonstrated by the shows they watch, without resorting to the sort of stereotyping that the California Court of Appeal has held unlawful in a precedential decision.

45.     The VPPA prohibits a "video tape service provider" from disclosing a consumer's "personally identifiable information" to a third party without that consumer's separate express written consent.  18 U.S.C. § 2710(b).  A "video tape service provider" includes "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).  "Personally identifiable information" under the VPPA "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).

46.     Congress enacted the VPPA after a newspaper published details of Judge Robert Bork's video rental history while the Senate was holding hearings on Judge Bork's nomination to the Supreme Court.  *See Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 544 (2d Cir. 2024).  The law guards against providers' unauthorized sharing of such information to third parties.  *Id*. at 545-46.  Congress later updated the law for the internet era, *id*., by allowing a consumer to give informed written consent to such sharing, but "in a form separate from any form setting forth other legal or financial obligations of the consumer."  18 U.S.C. 2710(b)(2)(B).

47.     After Congress passed the VPPA, California's legislature followed suit, enacting a statute providing that "[n]o person providing video recording sales or rental services shall disclose any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual."  Cal. Civ. Code § 1799.3(a).  The purpose behind this law was to "increase the protection of California consumers' privacy in the face of a perceived escalation in the impingement upon privacy interests caused by various business practices."  *Kearney v. Salomon Smith Barney*, *Inc.*, 39 Cal. 4th 95, 125 (2006).

48.     As described above, Tubi states in its privacy policies that it intentionally discloses to third parties Claimant's personally identifiable information, including information about Claimant's identity, Claimant's interactions with the Tubi platform, and data sufficient to connect the two (such as IP address, device identifier, geolocation, or inferred profile), for purposes of targeted advertising.  Further, Tubi did not ask for or obtain Claimant's written consent for such disclosures, either in a form distinct and separate from forms through which Claimant gives other consents or otherwise.

49.     Tubi's disclosure practices give rise to liability under the VPPA and its California analog.  *See Campos v. Tubi, Inc.*, 716 F. Supp. 3d 623, 635-40 (N.D. Ill. 2024) (denying Tubi's motion to dismiss similar VPPA claim).  Indeed, as noted below, Tubi recently settled a putative class's VPPA claim against it for almost $20 million.[8]  Although Tubi denied liability as part of that settlement, court papers in the case indicated that this was largest settlement fund in any VPPA class action to date.

## PROCEDURAL HISTORY

### A.  Claimant Seeks An Arbitration Pursuant To The Terms

50.     Tubi has long required, as a condition of use, that its users agree to bring any legal claims—no matter how standardized or suited to class action litigation—exclusively through individualized arbitrations.  By using Tubi, Claimant agreed to the Terms, which contain this arbitration agreement.  Ex. A, § 10.

51.     Thus, on April 5, 2024, Claimant filed a demand with JAMS seeking to arbitrate Tubi's violation of the Unruh Act and the enforceability of the 45-day delay requirement in the Terms' pre-dispute notice provision.  Claimant's demand was one of 23,746 demands filed around the same date by individuals represented by Claimant's counsel.

### B.  Multiple Disputes Arise Before JAMS

52.     Soon after Claimant filed the demand, Tubi raised multiple objections to JAMS.  First, as described above, Tubi argued that JAMS lacked jurisdiction because Claimant had not complied with the delay requirement in the pre-dispute notice provision before challenging its enforceability via the demand.

---

[8] *Video Streaming Settlement*, *Gregory v. Tubi, Inc.*, https://www.videostreamingsettlement.com/ (last visited Mar. 11, 2025).

53.     The day before raising this jurisdictional objection, Tubi posted new terms of use to its website.[9]  The new terms included revised arbitration procedures that put up new hurdles to Claimant proceeding with arbitration..  Because Claimant filed a demand before Tubi could alter the Terms, the new terms could not govern Claimant's claim.  *See, e.g.*, *Peleg v. Neiman Marcus Grp., Inc.*, 204 Cal. App. 4th 1425, 1465 (2012).

54.     Tubi also complained to JAMS that Claimant's and others' demands reflected an improper strategy to use fee pressure to "extort" Tubi into settling Claimant's and others' claims. Tubi thus requested that JAMS consolidate Claimant's arbitration with the 23,745 arbitrations initiated by individuals also represented by Claimant's counsel, despite the Terms' express bar on "multi-claimant proceedings."  Ex. A, § 10(9) (all caps omitted).

55.     On May 20, 2024, over Tubi's objection, JAMS found that the parties had delegated the jurisdictional dispute to the Arbitrator and stated that it would continue administering Claimant's demand pursuant to the Terms.  The same day, over Claimant's and others' objection, JAMS agreed to consolidation, removing the fee pressure about which Tubi had complained.

56.     On June 17, 2024, Tubi filed a consolidated response to Claimant's and others' demands, raising counterclaims.  Tubi's counterclaims alleged that Claimant and others breached the Terms by filing arbitration demands challenging the delay requirement in the Terms' pre-dispute notice provision without first complying with that delay requirement.

57.     On July 26, 2024, JAMS appointed an arbitrator to preside over a single consolidated arbitration.  The proposed arbitrator made the disclosures required by California law the same day.  Cal. Civ. Proc. Code § 1281.9.

---

[9] *Terms of Use*, Tubi (effective Apr. 18, 2024), https://perma.cc/ZB69-XRNQ.

58.     Based on those disclosures, most, but not all individuals represented by Claimant's counsel chose to disqualify the arbitrator JAMS proposed, which California law gave them the right to do.  *See id.* at § 1281.91(b)(1); *Roussos v. Roussos*, 60 Cal. App. 5th 962, 971 (2021) (describing disqualification right as "absolute").

59.     On August 23, 2024, over Tubi's objection, JAMS decided to honor these disqualifications and notified the parties that it would appoint a new proposed arbitrator for a single consolidated arbitration.  Most but not all individuals represented by Claimant's counsel chose to disqualify the second arbitrator JAMS proposed as well.

60.     On September 23, 2024, over Tubi's objection, JAMS stated that it would continue to propose arbitrators and to honor disqualifications pursuant to California law until the parties exhausted the list of all proposed arbitrator candidates JAMS had initially disclosed.

61.     JAMS appointed, and both Tubi and most, but not all individuals represented by Claimant's counsel disqualified, three additional proposed arbitrators.  On December 23, 2024, JAMS advised that it had exhausted the list of all proposed arbitrator candidates and would await the appointment of an arbitrator by a court.

62.     The parties' January 16, 2025 agreement to proceed by way of this consolidated arbitration obviated the need for additional court proceedings respecting the appointment of the Arbitrator.

### C.  Tubi Files A Federal Lawsuit Against Claimant's Counsel

63.     While JAMS was still in the initial stages of administering Claimant's demand, Tubi filed a lawsuit in federal district court against Claimant's counsel.  Complaint, *Tubi, Inc. v. Keller Postman LLC*, No. 24-cv-01616 (D.D.C. May 31, 2024).  The lawsuit disclosed the fact of

Claimant's arbitration.   But the Terms contain a strict confidentiality clause that bars such disclosure.  It states:

> You and Tubi agree to maintain the confidential nature of the arbitration proceeding **and shall not disclose the fact of the arbitration**, any documents exchanged as part of any mediation, proceedings of the arbitration, the arbitrator's decision and the existence or amount of any award, except as may be necessary to prepare for or conduct the arbitration (in which case anyone becoming privy to confidential information must undertake to preserve its confidentiality), or except as may be necessary in connection with a court application for a provisional remedy, a judicial challenge to an award or its enforcement, an order confirming the award, or unless otherwise required by law or court order.

Ex. A, § 10(14) (emphasis added).  Tubi's lawsuit against Claimant's counsel could not seek any provisional remedy against Claimant, as Claimant was not even a party to Tubi's lawsuit.  Indeed, Tubi disavowed that it was seeking any remedy interfering with Claimant's arbitration in court papers.  Tubi's lawsuit thus breached the confidentiality provision of the Terms.

64.    Claimant's counsel moved to dismiss the lawsuit or to stay the lawsuit pending arbitration.

65.    On December 19, 2024, at the suggestion of the federal court, Claimant agreed to participate in this consolidated arbitration.  The federal court then stayed Tubi's lawsuit.  On January 16, 2025, the parties memorialized their agreement to conduct this consolidated arbitration, governed by the Terms.

**D. Tubi Enters An Illinois VPPA Class Action Settlement**

66.    While JAMS was continuing to administer Claimant's and others' demands, the plaintiff in a putative VPPA class action in Illinois state court announced that she had reached a proposed settlement with Tubi.  Plaintiff's Unopposed Motion in Support of Preliminary Approval of Class Action Settlement, *Gregory v. Tubi, Inc.*, No. 2024-LA-0000209 (Ill. Cir. Ct., 17th Jud. Cir., Winnebago Cnty. Aug. 20, 2024).  The proposed settlement included Claimant as a class

member and contained a release of the class's Unruh Act claims. The Illinois court entered a Final Approval Order and Judgment on January 24, 2025. Claimant validly opted out of the proposed settlement before it became final, electing to proceed with any claims in this consolidated arbitration.

**E. Tubi Files A Delaware Petition To Appoint An Arbitrator**

67. While JAMS was continuing to administer Claimant's and others' demands and to appoint prospective arbitrators, Tubi filed a Verified Petition to appoint an arbitrator to preside over a single consolidated arbitration in the Delaware Court of Chancery. Verified Petition, *Tubi, Inc. v.* ███ No. 2024-1172-MTZ (Del. Ch. Nov. 15, 2024). Tubi attached to this Verified Petition a list naming, among others, Claimant. Because JAMS had not exhausted the list of prospective arbitrators at the time the petition was filed, Tubi had no legal basis to file it. This action once again breached the confidentiality provision of the Terms.

68. The parties stayed briefing in the Delaware action as part of a precursor to the parties' January 16, 2025 agreement to this consolidated arbitration.

## CLAIMS

### CLAIM I: DECLARATORY RELIEF

69. Claimant incorporates by reference paragraphs 1–68 as if each were set forth fully and completely herein.

70. Claimant seeks two forms of declaratory relief regarding threshold arbitrability issues.

71. First, Tubi has taken the position that Claimant was not permitted to challenge the enforceability of the 45-day delay requirement in the Terms' pre-dispute notice provision in arbitration, and that JAMS lacks jurisdiction to hear this challenge. JAMS decided to submit that dispute to the Arbitrator, as the Terms, Ex. A, § 10(2), and Rule 8(b) require.

72.     Contrary to Tubi's position, the Terms expressly state that threshold issues of arbitrability are subject to arbitration at JAMS and may not be litigated in court.  Ex. A, § 10(2) ("[D]isputes over arbitrability shall be resolved by the arbitrator.").  The Terms incorporate the JAMS Rules, *id*., § 10(6), and Rule 8(b) also delegates arbitrability disputes to the Arbitrator.  In light of these delegation clauses, Claimant was not only permitted, but in fact was *required*, to challenge the 45-day delay requirement in the pre-dispute notice provision by filing an arbitration demand.

73.     Tubi has never explained how Claimant could have challenged the enforceability of the 45-day delay requirement in the pre-dispute notice provision *other* than by filing a demand for arbitration.  Nonetheless, Tubi has repeatedly claimed that such a filing constitutes a breach of the Terms.

74.     Claimant accordingly is entitled to a declaration that, pursuant to the delegation clause, the Arbitrator has authority to decide whether the 45-day delay requirement in the Terms' pre-dispute notice provision is enforceable and that Claimant was permitted to raise this issue with the Arbitrator.

75.     Second, Claimant seeks a declaration, pursuant to the delegation clause, that the 45-day delay requirement in the pre-dispute notice provision is not enforceable.  The pre-dispute notice provision purporting to require 45 days of delay is in fact illusory, because it attempts to impose obligations on Claimant but imposes no obligations on Tubi.  Specifically, the provision states that Claimant "shall" provide a notice of a dispute but then provides only that Tubi "may" attempt to settle the dispute.  Ex. A, § 10(7).  "One of the most common types of promise that is too indefinite for legal enforcement is the promise where the promisor retains an unlimited right to decide later the nature or extent of the promisor's performance."  1 Williston on Contracts §

4:34 (4th ed.).  Accordingly, "[i]f one party to an agreement is given an unlimited choice, that party may not be a promisor" and the "other party's promise may be unconscionable and may be wholly or partly illegal."  Restatement (Second) of Contracts § 34 cmt. b (1981).

76.     The provision requiring 45 days of delay is also unconscionably one-sided and unenforceable because it provides the defending party the benefits of delay—which, in this case, Tubi manifestly wanted to use to change the Terms and apply new procedures to consumer claims—without imposing any corresponding obligations.  *See Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670, 686–87 (9th Cir. 2024) (explaining that facially mutual appeal right was unenforceable because it benefited drafter); *Little v. Auto Stiegler, Inc.*, 29 Cal. 4th 1064, 1071–74 (2003) (same).

77.     Claimant accordingly is entitled to a declaration that the 45-day delay requirement in the pre-dispute notice provision is unenforceable and unconscionable, given that Tubi drafted and imposed the provision, did not obligate itself to do anything in return, and designed the provision for the one-sided benefit of the defending party, which it knew as a practical matter it would almost always be.

78.     Alternatively, to the extent the delay requirement in the pre-dispute notice provision is enforceable, Claimant is entitled to a declaration that Claimant has materially discharged any pre-dispute notice obligations.

79.     Claimant's original demand provided all the information the pre-dispute notice provision requires:  Claimant's name, address, contact information, specific facts giving rise to the dispute, the Tubi services to which the dispute related, and the relief requested.  Ex. A, § 10(7). This Amended Demand provides additional information.  And Claimant's counsel has repeatedly offered to attempt to resolve Claimant's claim with Tubi, including by making an opening

settlement demand.  Tubi had close to *a year* to attempt to resolve Claimant's claim, but has chosen not to do so. That is Tubi's prerogative, but any complaint that Tubi has not been afforded a chance to resolve Claimant's claim rings hollow.

      **WHEREFORE**, Claimant respectfully requests that the Arbitrator award a declaration that (1) Claimant was permitted to challenge the enforceability of the 45-day delay requirement in the Terms' pre-dispute notice provision in arbitration and (2) that the requirement is unenforceable and unconscionable.  Claimant further seeks recovery of all associated  costs incurred, attorneys' fees and all such other and further relief as the Arbitrator deems appropriate.

### CLAIM II:  UNRUH ACT

      80.    Claimant incorporates by reference paragraphs 1–68 as if each were set forth fully and completely herein.

      81.    Tubi is a "business establishment" under the Unruh Act because it is headquartered in California; operates an online streaming platform that serves consumers throughout California; and does so for the primary purpose of conducting business and generating revenue from its business activities in California and elsewhere.

      82.    As described above, Tubi has intentionally, knowingly, and purposefully engaged in the practice of serving advertisements to users, including Claimant, targeted based on age, sex, and gender, which practice denies users the full and equal accommodations, advantages, facilities, and services of Tubi's business establishment, in violation of section 51(b) of the California Civil Code.

      83.    In addition, as described above, Tubi has aided, abetted, and incited advertisers and advertising technology companies in violating section 51(b) of the California Civil Code.  Tubi's advertisers and advertising technology companies have themselves violated the Unruh Act by intentionally, knowingly, and purposefully targeting Tubi users for advertisements based on age,

sex, and gender, which practice denies users the full and equal accommodations, advantages, facilities, and services of their businesses. Tubi has aided and abetted such violations by disclosing information about its users to these third parties for purposes of targeted advertising.

84.     Tubi is therefore liable to Claimant both for its own violations of section 51(b) of the California Civil Code and for aiding and abetting third party advertiser and advertising technology companies' violations of the same provision. Claimant is entitled to statutory damages pursuant to section 52(a) of the California Civil Code for each and every such violation, as well as to attorneys' fees, costs, and expenses incurred in bringing this action.

85.     Claimant is further entitled to all other relief available, including injunctive relief, to remedy Tubi's ongoing Unruh Act violations.

**WHEREFORE**, Claimant respectfully requests that the Arbitrator award statutory damages and injunctive relief, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as the Arbitrator deems appropriate.

### CLAIM III:  VIDEO PRIVACY PROTECTION ACT

86.     Claimant incorporates by reference paragraphs 1–68 as if each were set forth fully and completely herein.

87.     Tubi is a VPPA "video tape service provider" because it operates a nationally available online streaming platform and is engaged in the business of delivering, through this platform, hundreds of thousands of prerecorded videos and similar audiovisual materials.

88.     Claimant is a VPPA "consumer" and "subscriber" in that Claimant watched Tubi and became bound by its Terms, which relationship Tubi exploited to gain salable information about Claimant as described above. *See, e.g.*, *Salazar*, 118 F.4th at 550–53 (reversing and remanding district court's dismissal of VPPA claims by "subscribers" to a newsletter from NBA.com).

89.     As described above, Tubi has knowingly, purposefully, and intentionally engaged in the practice of disclosing Claimant's personally identifiable information, including information about Claimant's identity, Claimant's interactions with the Tubi platform, and data sufficient to connect the two (such as IP address, device identifier, geolocation, or inferred profile), for the purpose of targeted advertising.  Further, Tubi did not ask for or obtain Claimant's written consent for such disclosures, in a form distinct and separate from forms through which Claimant gives other consents.

90.     Tubi is therefore liable to Claimant for statutory damages pursuant to 18 U.S.C. § 2710(c)(2)(A) for each and every violation, as well as attorneys' fees, costs, and expenses incurred in bringing this action.

91.     Claimant is further entitled to all other relief available, including injunctive relief, to remedy Tubi's ongoing VPPA violations.

**WHEREFORE**, Claimant respectfully requests that the Arbitrator award statutory damages and injunctive relief, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as the Arbitrator deems appropriate.

### CLAIM IV:  SECTION 1799.3 OF THE CALIFORNIA CIVIL CODE

92.     Claimant incorporates by reference paragraphs 1–68 as if each were set forth fully and completely herein.

93.     Tubi is a "person providing video recording sales or rental services" under section 1799.3 of the California Civil Code because it is headquartered in California; operates an online streaming platform that serves consumers throughout California; and does so for the primary purpose of conducting business and generating revenue from its business activities in California and elsewhere.

94.     As described above, Tubi has knowingly, purposefully, and intentionally engaged in the practice of disclosing Claimant's records, including information about Claimant's identity, Claimant's interactions with the Tubi platform, and data sufficient to connect the two (such as IP address, device identifier, geolocation, or inferred profile), for the purpose of targeted advertising. Further, Tubi did not ask for or obtain Claimant's written consent for such disclosures.

95.     Tubi is therefore liable to Claimant for statutory damages pursuant to section 1799.3(c) of the California Civil Code for each and every violation, as well as attorneys' fees, costs, and expenses incurred in bringing this action.

96.     Claimant is further entitled to all other relief available, including injunctive relief, to remedy Tubi's ongoing violations of section 1799.3 of the California Civil Code.

**WHEREFORE**, Claimant respectfully requests that the Arbitrator award statutory damages and injunctive relief, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as the Arbitrator deems appropriate.

## CLAIM V:  BREACH OF CONFIDENTIALITY PROVISION

97.     Claimant incorporates by reference paragraphs 1–68 as if each were set forth fully and completely herein.

98.     Claimant and Tubi agreed to the Terms when Claimant used Tubi before April 5, 2024.  The Terms contain a valid and enforceable confidentiality provision.  Ex. A, § 10(14).

99.     In filing the original demand on April 5, 2024 without any publicity, Claimant adhered to the confidentiality provision.  But Tubi breached that provision by filing a federal lawsuit on May 31, 2024, against Claimant's counsel.  As described above, the federal lawsuit disclosed the fact of Claimant's arbitration.  And Tubi later exacerbated the breach by filing an action in Delaware state court, without legal basis, naming Claimant publicly.

100.    Claimant's identity and the fact of Claimant's arbitration remain in the public record as the result of Tubi's actions.  Additionally, although Tubi's lawsuit against Claimant's counsel is stayed pending arbitration, Tubi has expressed an intention to proceed with that lawsuit. As a result, Claimant has suffered and will continue to suffer irreparable harm from Tubi's ongoing disregard for the agreed confidential nature of the arbitration and has no adequate remedy at law.

101.    Claimant is therefore entitled to an injunction requiring Tubi to adhere to the Terms' confidentiality provision and to not share the results of this consolidated arbitration outside of this consolidated arbitration.

**WHEREFORE**, Claimant respectfully requests that the Arbitrator award injunctive relief, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as the Arbitrator deems appropriate.

### PRAYER FOR RELIEF

**WHEREFORE**, Claimant requests that the Arbitrator enter an award in Claimant's favor and against Tubi for:

a.    a declaration that Claimant was permitted to challenge, in arbitration, the enforceability of the 45-day delay requirement in the Terms' pre-dispute notice provision;

b.    a declaration that the 45-day delay requirement in the Terms' pre-dispute notice provision is unenforceable and unconscionable;

c.    statutory damages and injunctive relief pursuant to the Unruh Act to redress Tubi's discriminatory targeted advertising practices and its aiding and abetting of third parties' similar practices;

d.    statutory damages and injunctive relief pursuant to the VPPA and section 1799.3 of the California Civil Code to redress Tubi's unlawful disclosure of Claimant's video viewing history and personally identifiable information without the required consents;

e.    injunctive relief to redress Tubi's ongoing breach of the Terms' confidentiality provision;

f.    pre-judgment and post-judgment interest;

g.    reasonable attorneys' fees as provided by law;

h.    costs and expenses of these actions; and

i.    any other relief the Arbitrator may deem just and proper.

Dated: March 14, 2025                Respectfully submitted,

**KELLER POSTMAN LLC**

By:    /s/ Warren D. Postman
       Warren D. Postman (SBN 330869)
       1101 Connecticut Avenue N.W.
       Suite 1100
       Washington, DC 20036
       (202) 918-1123
       wdp@kellerpostman.com

       *Attorney for Claimant*
       ███████████