## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TUBI, INC.,<br>　　　　Plaintiff,<br><br>v.<br><br>KELLER POSTMAN LLC,<br>　　　　Defendant. | Case No. 1:24-cv-01616-ACR |

## DEFENDANT KELLER POSTMAN LLC'S RESPONSE TO PLAINTIFF TUBI INC.'S STATUS REPORT AND REQUEST FOR STATUS CONFERENCE

KELLER POSTMAN LLC
　Warren D. Postman (Bar ID 995083)
　Fred Messner (Bar ID 90032111)
　　(*pro hac vice* and admission forthcoming)
1101 Connecticut Avenue N.W.
Suite 1100
Washington, DC 20036
(202) 918-1123
wdp@kellerpostman.com
fred.messner@kellerpostman.com

　Kiran N. Bhat (Bar ID 1021898)
2333 Ponce De Leon Boulevard
Suite R-240
Coral Gables, FL 33134
(305) 845-4684
kiran.bhat@kellerpostman.com

*Attorneys for Defendant*

Dated:　April 10, 2025

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INDEX OF EXHIBITS ..................................................................................................... iii

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 3

    A.   Recap of Proceedings Before the December 19 Status Conference .................................. 3

    B.   Developments at the December 19 Status Conference ...................................................... 9

    C.   The Parties Reduce Their Agreement to Ten Consolidated Arbitrations to Writing ........ 11

    D.   Ten Rejected Opt Outs Appeal in *Gregory* .................................................................. 12

ARGUMENT .................................................................................................................. 13

    A.   Tubi's Arguments About the Scope of the Post-Dispute Agreement Are Delegated ....... 14

    B.   Keller Postman Complied Fully with the Post-Dispute Agreement ............................... 15

CONCLUSION ............................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Campbell-Ewald Co. v. Gomez*,
 577 U.S. 153 (2016) ................................................................................................13

*Dellia v. Gregory*,
 No. 4–25–0181 (Ill. App. Ct. 4th Dist. Feb. 24, 2025) ..........................................2

*Gregory v. Tubi, Inc.*,
 No. 24-LA-0000209 (Ill. 17th Cir. Ct. Winnebago Cnty. filed July 19, 2024) ........1

*Joiner v. SVM Mgmt., LLC*,
 161 N.E.3d 923 (Ill. 2020) .....................................................................................13

*Keller Postman LLC v. Jenner & Block LLP*,
 No. 24STCV32754 (Cal. Sup. Ct. L.A. Cnty. Dec. 11, 2024) ...................................8

*Miner v. Gillette Co.*,
 428 N.E.2d 478 (Ill. 1981) .....................................................................................13

*Phillips Petroleum Co. v. Shutts*,
 472 U.S. 797 (1985) ...............................................................................................13

**Statutes**

9 U.S.C. § 4 ..................................................................................................................7

Unruh Civil Rights Act, Cal. Civ. Code §§ 51–52 .......................................................6

Del. Code Ann. tit. 10 § 5703 ......................................................................................7

Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq*. ............................................6

### INDEX OF EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| 1 | Defendant-Appellee Tubi, Inc.'s Motion to Dismiss Appeal as Moot, *Dellia v. Gregory*, No. 4–25–0181 (Ill. App. Ct. 4th Dist. Mar. 25, 2025) |
| 2 | Appellants' Objection to Motion to Dismiss Appeal as Moot, *Dellia v. Gregory*, No. 4–25–0181 (Ill. App. Ct. 4th Dist. Apr. 9, 2025) |

## INTRODUCTION

Keller Postman has complied with every commitment it made to this Court and to Tubi. At the last status conference in this case, the Court cautioned the parties against using courts to perform an "end run around . . . the arbitrator's power."  (Dkt. 29 at 16:16–22).[1]  Keller Postman has heeded that advice.  Tubi has not.

In December, Tubi negotiated a process agreement with Keller Postman and its clients to participate in ten consolidated arbitrations to be held at JAMS and governed by the JAMS Streamlined Arbitration Rules and Procedures ("JAMS Rules").  The agreement was reduced to writing after the status conference.  (Dkt. 28-4 at 11) (the "Post-Dispute Agreement").  At that time, most of Keller Postman's clients were attempting to exclude themselves from an Illinois class action settlement that Tubi negotiated with a different plaintiffs' firm after Keller Postman's clients had filed their original arbitration demands.  *Gregory v. Tubi, Inc.*, No. 24-LA-0000209 (Ill. 17th Cir. Ct. Winnebago Cnty. filed July 19, 2024).  Importantly, Tubi negotiated for a rule in the Post-Dispute Agreement that Keller Postman's clients could only participate in the consolidated arbitrations if the *Gregory* Court accepted their exclusion requests (the "Accepted Opt Outs").  Tubi insisted that any Keller Postman clients whose exclusion requests the trial court did *not* accept (the "Rejected Opt Outs") would be barred from participating in the consolidated arbitrations.

Tubi also conditioned its agreement to consolidated arbitrations for the Accepted Opt Outs on the withdrawal of fairness objections made by four Keller Postman clients who chose to remain in the *Gregory* class (the "Objectors").  But Tubi never negotiated for—and neither Keller Postman nor its clients ever agreed to—any requirement that the thousands of other Keller Postman clients

---

[1] Page citations refer to the CM/ECF electronic pagination numbers.

requesting exclusion from the *Gregory* settlement at the time of the Post-Dispute Agreement waive all appellate rights if the *Gregory* Court denied their requests.

Keller Postman has complied with all aspects of this agreement:  The Objectors withdrew their objections and Keller Postman tried to move forward with the consolidated arbitrations for an agreed list of Accepted Opt Outs.  (Dkt. 28-9).  Keller Postman has also continued to advocate zealously for its clients by filing an appeal for ten out of the approximately 8,700 Rejected Opt Outs challenging the *Gregory* Court's authority to bind them to the settlement class.  *Dellia v. Gregory*, No. 4–25–0181 (Ill. App. Ct. 4th Dist. Feb. 24, 2025).

Tubi now returns to this Court because (1) it apparently did not anticipate that any Rejected Opt Outs would appeal the *Gregory* Court's decision and (2) it does not want to proceed with the Accepted Opt Outs' consolidated arbitrations until after the appeal resolves.  But there is nothing in the parties' stipulations or the Post-Dispute Agreement that restricts the Rejected Opt Outs' appellate rights or that conditions the commencement of the consolidated arbitrations on the completion of such an appeal.  To the contrary, Tubi expressly agreed to proceed with the consolidated arbitrations for the Accepted Opt Outs as soon as the list of opt-outs from *Gregory* was finalized.

In addition to mischaracterizing the terms of the parties' agreement, Tubi also suggests incorrectly that Keller Postman's position will produce an inefficient or impractical result.  Keller Postman's position is that the ten consolidated arbitrations covering all the Accepted Opt Outs should proceed immediately as Tubi agreed.  Keller Postman also maintains that the ten Rejected Opt Outs, who were excluded (at Tubi's insistence) from the consolidated arbitrations and were never required to waive their appellate rights in *Gregory*, should be allowed to pursue their appeal.  Tubi claims that their appeal will be dismissed as moot or fail on the merits.  If Tubi is correct, that

will be the end of the matter.  But even if Tubi is wrong and the Illinois appeal is successful, any arbitrations subsequently brought by Rejected Opt Outs would either be joined with the ten consolidated arbitrations or, at most, consolidated into an eleventh consolidated arbitration.  There is nothing absurd about that contingency, and there is nothing in the parties' stipulations or the Post-Dispute Agreement that provides otherwise.

On the other hand, Tubi's preferred approach cannot be reconciled with the parties' agreements.  In Tubi's telling, either (a) Keller Postman was required to unilaterally waive the appellate rights of the Rejected Opt Outs without consulting or informing them, or (b) the Accepted Opt Outs agreed to delay arbitration until the completion of an appeal that does not affect them.  Neither scenario can be squared with the record.  Keller Postman never waived the appellate rights of the Rejected Opt Outs, and could not have done so, as the list of Rejected Opts outs was not even finalized until *after* the parties' finalized their agreement.  And the Post-Dispute Agreement stated that the consolidated arbitrations would proceed once the list of Accepted Opt Outs was finalized; nothing in it was conditioned on the status of potential appeals by the Rejected Opt Outs.

Tubi's request to resume this case and its complaint about the specific claims Keller Postman's clients raised to JAMS is part of a consistent and improper pattern of Tubi seeking to use litigation against Keller Postman in this Court to obtain leverage in separate disputes against Keller Postman's clients.  It should be rejected.

## BACKGROUND

To fully assess Tubi's arguments, it is helpful to recap the events that led to the specific dispute Tubi now raises.

### A.  Recap of Proceedings Before the December 19 Status Conference

This controversy began when Keller Postman filed demands for arbitration with JAMS on behalf of over 23,700 clients in April 2024.  (Dkt. 23-14 at 7, ¶ 14).  The arbitrations were centered

in California: they raised claims under California law, on behalf of California plaintiffs, against a company headquartered in California, and will take place in California. (Dkt. 1, Ex. 15 at 207–09).

The demands Keller Postman filed included a challenge to the enforceability of a 45-day waiting period in the pre-dispute notice provision of the applicable Tubi, Inc. Terms and Conditions ("Terms"). (Dkt. 1, Ex. 15 at 208–09); (*id.*, Ex. 8 at 130, § 10(7)). Keller Postman believed the waiting period in Tubi's terms was unenforceable under California law because it imposed a unilateral burden on Claimants. (Dkt. 19 at 10–15). Because Keller Postman had seen a growing trend of defendants who, upon learning they are facing many claims, push out new "clickwrap" contracts to consumers that impose additional procedural hurdles to arbitration—and because the Terms contained a delegation clause requiring Claimants to raise their unenforceability argument in arbitration—Keller Postman filed the demands without giving Tubi a chance to change the Terms on consumer clients. (*Id.* at 21). That strategy proved prescient—and directly served the clients' interests—because Tubi *did* change the Terms to add more defendant-friendly procedures just days after the demands were filed (suggesting that a change was already in the works). Had Keller Postman not acted so promptly, its clients would potentially be subject to newer terms that Tubi drafted to be more advantageous to the company. (Dkt. 1, Ex. 9).

After filing the demands, Keller Postman argued for its clients that the Terms promised individual arbitration, which in turn meant each Claimant had a right to an individual assignment to an arbitrator.[2] (Dkt. 29 at 33:25–35:16). But Tubi argued that all Claimants should be

---

[2] Individual assignment does not mean that each Claimant would have a unique arbitrator. Rather, in practice this would likely have resulted in 20 to 40 arbitrators each being assigned hundreds of Claimants presenting similar claims. (Dkt. 29 at 34:19–35:6). In Keller Postman's view, this procedure was required by the Terms Tubi drafted and would have been more advantageous for its clients than a single consolidated arbitration. (*Id.*).

consolidated before a single arbitrator and JAMS agreed with Tubi and consolidated Claimants' arbitrations. (Dkt. 1 ¶ 68). Thus, although Tubi has complained repeatedly that Keller Postman is seeking to gain leverage through high arbitration fees, JAMS has made clear since May 20, 2024, that it would charge Tubi only the $2,000 fee for a single consolidated arbitration. (*Id*.).

Had Tubi proceeded with that consolidated arbitration before JAMS, this dispute would not have been noteworthy. Indeed, if Tubi was confident that its legal arguments were correct, it could have paid a $2,000 filing fee and then moved to dismiss the arbitrations with prejudice for failure to comply with the pre-dispute notice requirement, thus ending the entire litigation with minimal expense. Instead, on May 31, 2024, Tubi sued Keller Postman in this Court for tortious interference with contract. (Dkt. 1). As the Court knows, Keller Postman believes this lawsuit is deeply flawed. Tubi cannot state a breach, because the delegation clause allowed, and indeed required, that Claimants file any challenge to the notice provision in arbitration rather than court. (Dkt. 19 at 10–15). And, in any event, claims against opposing counsel for tortious interference are barred unless the plaintiff can show that opposing counsel acted independent of a client's interest and for counsel's sole personal benefit. (*Id*. at 17–20). Tubi's Complaint itself alleges that Keller Postman's motivation for the alleged breach was to increase settlement leverage for its clients. (Dkt. 1 ¶¶ 1, 3, 5, 25, 31, 57–58, 62–63, 68). So Tubi cannot avoid this privilege.

More broadly, Tubi's suit illustrates the dangers the attorney-litigation privilege is designed to avoid. Specifically, Tubi sought to use this litigation against opposing counsel as a collateral attack on the arbitrations, seeking an injunction that would end them. (Dkt. 1 ¶ 85). This Court has already noted the problems with suing opposing counsel for advancing legal arguments for its clients. (Dkt. 29 at 10:2-5) ("I have such a big problem with bringing a tortious interference lawsuit against a law firm for litigation that they're in. I can't begin to tell you how troubling I

find that is."); (*id*. at 11:1–4) (allowing Tubi's lawsuit to proceed would "interfere with [Keller Postman's] ability to be practicing lawyers on behalf of their clients, which I find distasteful"); (*id*. at 19:17-19) (this is "a unique case that [Tubi is] suing [Keller Postman].  It's not a unique case that they're doing what they're [doing].  It's an MDL.  It's every single MDL that has ever been filed.").  In the several months since the status conference, the importance of bright-line immunity for law firms representing disfavored clients against powerful interests has only become clearer.

Tubi opened the next front in this dispute by trying to rope Keller Postman's clients into the settlement of an Illinois class case that, when filed, had nothing to do with them.  (*Id*. at 26:4–15).  *Gregory* was filed by another law firm on July 19, 2024, as a class action asserting privacy claims under the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, *et seq*.  The putative class sought statutory damages for Tubi's alleged practice of sharing video viewing history with third parties.  The *Gregory* complaint did not raise any allegations that Tubi engaged in discriminatory advertising in violation of California's Unruh Civil Rights Act ("Unruh Act"), Cal. Civ. Code §§ 51–52, nor could it have, as the named plaintiff was from Illinois, not California.  And Keller Postman's clients in arbitration had not, at that point, raised any VPPA claims.  Had Tubi settled *Gregory* as a VPPA class, it would have remained irrelevant to Keller Postman's clients and Keller Postman would never have entered an appearance in the case.

However, in settling *Gregory* a week after it was filed, Tubi worked with the named plaintiff to implicate as many of the Claimants' Unruh Act claims as possible.  First, even though the named plaintiff could not assert an Unruh Act claim and even though the settlement provided no additional value to class members with Unruh Act claims, Tubi sought to define the scope of released claims to include Unruh Act claims.  Second, Tubi imposed hurdles to Claimants opting out of that settlement.  Specifically, Tubi argued that exclusion requests should be invalidated if

(1) Keller Postman helped clients to mail in their signed exclusion request, (2) a client used an electronic signature without attaching a certificate verifying the e-signature, (3) Keller Postman emailed the signed exclusion request on behalf of the client who signed it, or (4) Keller Postman submitted the exclusion request without the signature of the client. These arguments were heavily litigated in *Gregory* and that court eventually decided—weeks after the December 19 status conference in this case—that Claimants in categories (1) and (2) would be excluded from the class judgment but that Claimants in categories (3) and (4) would not be. (Dkt. 28-7).

While JAMS was still administering the original demands filed by Keller Postman's clients, Tubi opened a third front in court by filing a petition to compel arbitration in the Delaware Court of Chancery. That petition was not ripe. A party to an arbitration agreement can file a petition to compel only once a party has refused to arbitrate or there is a failure of the arbitral forum to proceed with the arbitration. *See* 9 U.S.C. § 4; Del. Code Ann. tit. 10 § 5703. When Tubi filed, JAMS was still in the process of arbitrator selection, so Tubi's Delaware action was premature.

Even after Tubi launched three offensives in court that Keller Postman viewed as improperly and collaterally attacking the pending arbitrations, Keller Postman did not attempt to expand the litigation and instead remained focused on the arbitrations and responding to Tubi's attacks.

Then, after the motion to dismiss in this action was fully briefed, Tubi moved to amend the complaint to include statements from Keller Postman's clients that Tubi obtained by *ex parte* interrogations of those clients. (Dkt. 22). Tubi's motion revealed a pattern of prohibited and misleading contacts with Keller Postman's clients about their confidential attorney-client communications in violation of the California Rules of Professional Conduct. (Dkt. 23). Specifically, Tubi assumed—with no basis to assess the scope of Keller Postman's engagement

agreements with its clients—that because Keller Postman's clients had withdrawn their arbitration demands without prejudice, Keller Postman's engagements had ended.  Tubi then used this false assumption to justify sending a former FBI agent to the homes of Keller Postman's clients to interrogate them about their recollections of confidential attorney-client communications.  (Dkt. 23-1 at 20–25).[3]

Only after this host of judicial filings by Tubi, which reflected an effort to gain an advantage in the arbitrations, did Keller Postman push back outside of JAMS.  Keller Postman filed a motion to disqualify Jenner & Block LLP ("Jenner") in this case for its pattern of improper communications with Keller Postman's clients.  (Dkt. 23).  And Keller Postman also filed an action in California seeking targeted injunctive relief to prevent future ethical violations.  *Keller Postman LLC v. Jenner & Block LLP*, No. 24STCV32754 (Cal. Sup. Ct. L.A. Cnty. Dec. 11, 2024).  As counsel explained to this Court, Keller Postman concluded California was the appropriate jurisdiction in which to seek injunctive relief because there would be no diversity to support federal jurisdiction in this Court and because California courts are the proper venue for enjoining future violations of the California Rules of Professional Conduct in California involving clients in California.  (Dkt. 29 at 29:24–31:8).  Finally, Keller Postman filed a motion to compel arbitration on behalf of one of its clients in California.  (*Id*. at 44:25–45:5).

---

[3] At the last status conference, the Court expressed skepticism of this assertion based on the general reputation of Tubi's outside counsel's law firm.  (Dkt. 29 at 40:22–24) ("[M]y strong inclination right now would be to deny it.  Here's why, because it's Jenner and Block, they didn't do this on a whim.").  Briefing on the question had not yet been completed, however, so the Court appropriately noted that it would have to review full briefing before forming a final opinion on the issue.  (*Id*. at 40:21–41:9).  Keller Postman maintains that the ethical violations here were clear cut, as confirmed by one of the foremost experts on California ethics rules, who provided a sworn declaration on the issue.  (Dkt. 23-3).  If this case is unstayed and proceeds, Keller Postman intends to refile its motion so that the Court can issue a ruling on the question based on full briefing.

**B. Developments at the December 19 Status Conference**

At the last status conference, the Court admonished the parties for multiplying the litigation and urged the parties to agree to a process to resolve their disputes in arbitration.  (*Id*. at 38:5–12). After the parties conferred, they agreed to participate in ten consolidated arbitrations at JAMS and entered specific stipulations before this Court.  (*Id*. at 43:9–47:5).

Importantly, Tubi's counsel represented to the Court that the parties would work out the specific contours of the arbitrations after the hearing and without involving the Court.  Counsel stated:

> We will agree on a process with the arbitrators where we will go to JAMS and we will ask for a list of -- if they can give us 40 names, 40 names. . . . **We will then figure out what the procedures are for there, but that's not for Your Honor to worry about**.

(*Id*. at 43:15–20) (emphasis added).

Keller Postman then stipulated that it would:

- Withdraw without prejudice its motion to disqualify Jenner from this action (*id*. at 44:5–6);

- Dismiss without prejudice its complaint in California seeking to enjoin Jenner's and Tubi's further ethical violations (*id*. at 44:1–2);

- Dismiss without prejudice the motion to compel arbitration filed on behalf of a client in California (*id*. at 44:25–45:5); and

- Recommend to the four Objectors in the *Gregory* class that they stipulate to dismiss their objections (*id*. at 44:6–10).

Tubi, in return, stipulated that it would dismiss its petition to compel arbitration in Delaware once the arbitrators were appointed in the consolidated arbitrations.  (*Id*. at 43:13–23).

The Court noted that Keller Postman could recommend a waiver of substantive rights to its clients but would ultimately need client consent for such a waiver.  (*Id*. at 44:11–12) ("Now, Mr. Fox, I mean, he can recommend, but if they don't withdraw, they don't withdraw.").  Tubi

acknowledged this dynamic and flagged for the Court that the four Objectors' dismissal of objections in *Gregory* was a material pre-condition to its commitments. (*Id*. at 44:13–16) ("Yes, Your Honor . . . I will say, it's a material point here [that the four Objectors dismiss their objections], so if this doesn't happen then we may be back.").

At bottom, the central agreement was that Tubi and Keller Postman would focus on resolving their disputes at JAMS and play out the string in the Illinois case without advancing other litigation in court. Tubi notes that Keller Postman told this Court that "in light of the parties' agreement, it did not 'anticipate any proceedings outside of JAMS.'" (Dkt. 28 at 7) (quoting Dkt. 29 at 45:20–21). But this comment came in direct response to Tubi's counsel noting that it would not use the declarations it obtained from *ex parte* questioning of Keller Postman's clients outside of JAMS unless this case came unstayed and the multiplying litigation resumed. (Dkt. 29 at 45:16–19). In that context, Keller Postman was stating that it had no issue with Tubi reserving its rights to use the statements in such court proceedings, because it did not anticipate that these various proceedings would resume.

Tubi could not reasonably take counsel's statement as a promise that there would be no further litigation in *Gregory* because further proceedings in *Gregory* were *required*. At the time of the status conference, the *Gregory* Court had not yet ruled on which Keller Postman clients would remain in the class and which would be excluded, and the parties had a live dispute over whether exclusion requests submitted by Keller Postman's clients would be accepted or rejected. The *Gregory* Court only resolved that dispute weeks after the status conference. (Dkt. 28-7). Keller Postman thus clearly could not waive, and did not waive, the appellate rights of not-yet-identified clients who ended up subject to a not-yet-issued adverse decision. Had Keller Postman made any commitment in that regard, it would have had to look like the commitment it made

regarding the Objectors.  That is, as the Court noted, Keller Postman would have agreed to recommend to any clients who might have their opt-out requests rejected that they waive their appeal and Tubi would have stated that such a waiver was a condition of its other commitment. Neither side made any such statements.

### C.  The Parties Reduce Their Agreement to Ten Consolidated Arbitrations to Writing

Consistent with Tubi's statement to this Court, the parties subsequently negotiated a process for commencing the ten consolidated arbitrations, which they reduced to writing in the Post-Dispute Agreement conveyed to JAMS on December 26, 2024.  (Dkt. 28-4 at 11).

The Post-Dispute Agreement provided for a rank and strike process to select ten arbitrators. (Dkt. 28-4 at 11, Item 1).  It also made clear that only the Accepted Opt Outs—the Keller Postman clients whose exclusion requests were accepted by the *Gregory* Court—could be included.  (*Id.*, Item 6).  Specifically, the Post-Dispute Agreement stated that, rather than all 23,700-plus Keller Postman clients being allowed to participate, the participants would range from 15,000 to 23,000 based on the *Gregory* Court's decision regarding exclusion requests.  (*Id.*) ("**Depending on how the court in *Gregory v. Tubi* rules on the pending requests of claimants to opt-out of the class settlement in that case**, the parties expect there to be anywhere between approximately 15,000 and 23,000 claimants." (emphasis added)).  This understanding—that the participants in the consolidated arbitrations would "[d]epend[] on how the court in *Gregory v. Tubi* rules on the pending requests of claimants to opt-out of the class settlement," (*id.*)—was further confirmed by emails from counsel to JAMS stating that the *Gregory* Court needed to finalize the list of Accepted Opt Outs before the parties could share a final list of the Claimants who could participate in the consolidated arbitrations.  (Dkt. 28-4 at 8–9).  Finally, this understanding was confirmed when the parties agreed on a spreadsheet including only the Accepted Opt Outs and excluding all the

Rejected Opt Outs as the list of Claimants who would be participating in the consolidated arbitrations. (Dkt. 28-4 at 2).

In negotiating the process for ten consolidated arbitrations, the parties also agreed that Keller Postman would work to obtain the dismissal of the four Objectors in *Gregory*. Based on Tubi's statements to this Court, Keller Postman understood this to be a condition precedent to Tubi agreeing to the ten consolidated arbitrations. However, Tubi never requested that Keller Postman seek or obtain a waiver of appellate rights from clients who had not objected to the fairness of the *Gregory* settlement and had instead sought to exclude themselves from it, but who ended up having their requests rejected.

Finally, the parties agreed that the consolidated arbitrations would, apart from the modifications mentioned, be governed by the Terms. (Dkt. 28-4 at 11, Item 7) ("Other than the modifications noted here, the parties have not agreed to any other changes to Tubi's May 2022 Terms of Use.").

### D. Ten Rejected Opt Outs Appeal in *Gregory*

On January 24, 2025, after the parties had entered the Post-Dispute Agreement, the *Gregory* Court issued a final approval order and judgment. Tubi and Keller Postman then conferred and, on February 7, 2025, submitted an agreed list of 15,012 Accepted Opt Outs who would proceed in the consolidated arbitrations. (Dkt. 28-9). Keller Postman informed those clients who had their opt-out requests rejected of the *Gregory* Court's decision and their right to appeal it. Out of 8,690 Rejected Opt Outs, ten appealed. The appellants had expressly stated in every filing with the *Gregory* Court that they did not believe they should be subject to its personal jurisdiction or to the judgment. However, at Tubi's request, the *Gregory* Court asserted personal jurisdiction over them and subjected them to an adverse judgment. Their appeal challenges the opt-out requirements imposed by *Gregory* Court as well as that court's personal jurisdiction to impose a judgment on

out-of-state class members where the class representative was not adequate to represent those class members. *See, e.g.*, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811–12 (1985) (explaining requirements for state court to exercise personal jurisdiction over absent out-of-state class members); *Miner v. Gillette Co.*, 428 N.E.2d 478, 481–83 (Ill. 1981) (same).

Tubi first tried to moot the appeal by offering not to enforce the *Gregory* judgment against appellants while asking them to dismiss their appeal voluntarily. But the appellants rejected that offer. And case law is clear that a rejected offer is a nullity for purposes of assessing mootness. *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 162 (2016); *Joiner v. SVM Mgmt., LLC*, 161 N.E.3d 923, 935–36 (Ill. 2020). Tubi also argued that it would not enforce the class judgment against appellants regardless of whether they dismissed their appeal or otherwise provided any consideration in return. But it is blackletter law that a gratuitous promise is not enforceable. And a gratuitous promise is no substitute for the vacatur of an adverse judgment.

The parties' disagreements on these issues gave rise to Tubi's motion to dismiss the appeal as moot, which is under consideration by the Illinois Appellate Court. Ex. 1, Defendant-Appellee Tubi, Inc.'s Motion to Dismiss Appeal as Moot, *Dellia v. Gregory*, No. 4–25–0181 (Ill. App. Ct. 4th Dist. Mar. 25, 2025). Appellants responded in opposition. Ex. 2, Appellants' Objection to Motion to Dismiss Appeal as Moot, *Dellia v. Gregory*, No. 4–25–0181 (Ill. App. Ct. 4th Dist. Apr. 9, 2025). The motion and appeal remain pending.

## ARGUMENT

Tubi is unhappy with the results of the process it bargained for. But Keller Postman has complied with every stipulation it made in this Court. And Keller Postman and its clients have complied with every aspect of the Post-Dispute Agreement to conduct ten consolidated arbitrations. Tubi's displeasure comes not from any breach by Keller Postman, but from ordinary

course litigation that it invited and did not negotiate to prevent.  Once again, Tubi is trying an end run around arbitrations by asking this Court to weigh in on ongoing JAMS proceedings.  This case should remain stayed pending the outcome of those arbitrations and the relief Tubi requests should be denied.

### A.  Tubi's Arguments About the Scope of the Post-Dispute Agreement Are Delegated

As a threshold matter, Keller Postman complied with every stipulation it made to this Court.  It promptly withdrew its motion to disqualify Tubi's counsel in this action without prejudice and dismissed the two actions it had filed in California.  It also recommended that the four Objectors withdraw their objections in *Gregory*, which they did.  Accordingly, if there is any breach to be found, Tubi must find it in the Post-Dispute Agreement to participate in ten consolidated arbitrations.

However, disputes about compliance with the Post-Dispute Agreement must be resolved in arbitration, not this Court.  The Post-Dispute Agreement expressly provides for arbitration at JAMS under the Terms and the incorporated JAMS Rules.  (Dkt. 28-4 at 11, Item 7); (Dkt. 1, Ex. 8 at 130, § 10(6)).  The JAMS Rules in turn state that any dispute over the scope or requirements of an agreement to arbitrate are for the arbitrator to decide.  (Dkt. 14-3 at 13, JAMS Rule 8(b)) ("Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator.").  And Tubi's Terms require the same.  (Dkt. 1, Ex. 8 at 130, § 10(2)) (virtually all "disputes over arbitrability shall be resolved by the arbitrator").

This could hardly come as a surprise to Tubi.  In its motion to dismiss Tubi's complaint in this action, Keller Postman explained at length that its clients did not breach the Terms by challenging the pre-filing notice requirement in arbitration because the delegation clause allowed,

and in fact required, that they raise this argument in arbitration.  (Dkt. 14-1 at 24–26).  Having just litigated delegation issues in this case, Tubi could have negotiated for a provision stating that disputes over the Post-Dispute Agreement would be decided by this Court.  But it did not do so. Instead, Tubi agreed in writing to arbitrate under the Terms, which incorporate the JAMS Rules. Both require Tubi's arguments here to be decided in arbitration.

Indeed, before filing the status report in this Court, Tubi had already acknowledged the delegated nature of the arguments it raises by submitting them to JAMS.[4]  This Court should therefore direct Tubi to resolve its arguments regarding the alleged breach of the Post-Dispute Agreement at JAMS.

### B.  Keller Postman Complied Fully with the Post-Dispute Agreement

To the extent the Court reaches Tubi's claims that Keller Postman breached the Post-Dispute Agreement, it should reject them because Tubi does not identify any provision of that agreement that Keller Postman violated.

Nothing in the Post-Dispute Agreement prohibited the Rejected Opt Outs from appealing. Nor, as noted, did Keller Postman stipulate to any such requirement at the December 19 status conference.  By asking the *Gregory* Court to include Claimants' Unruh Act claims in the *Gregory* settlement and then to invalidate their exclusion requests, Tubi created the possibility that there would be many individuals subject to the *Gregory* judgment against their will, who would then have the right to appeal.  If Tubi wanted to secure the agreement of Rejected Opt Outs not to appeal, it knew how to do that.  Namely, it could have taken the same approach it took regarding the four Objectors and conditioned the other aspects of its agreement on Keller Postman

---

[4] Pursuant to the Terms, the details of proceedings before JAMS are confidential.  (Dkt. 1, Ex. 8 at 130–31, § 10(14)).  Given Tubi's one-sided discussions of Keller Postman's clients' arbitrations throughout this collateral attack on those arbitrations, however, Keller Postman references the JAMS proceedings consistent with its obligation to provide this Court with the complete picture.

recommending that any Rejected Opt Outs waive their appellate rights and that all of those individuals accept that recommendation before any consolidated arbitrations could proceed. Had Tubi insisted on such requirements, Keller Postman would have had significant objections to them. But Tubi did not negotiate such conditions and therefore bore the risk that some portion of the Rejected Opt Outs would exercise their right to appeal.

Tubi next attempts to argue that Keller Postman breached the Post-Dispute Agreement by taking the position that the Rejected Opt Outs are not required to be part of the ten consolidated arbitrations. But the Post-Dispute Agreement plainly did not *allow*, let alone *require*, that the Rejected Opt Outs participate in the consolidated arbitrations. To the contrary, Tubi made clear that *only* the Accepted Opt Outs were allowed into the ten consolidated arbitrations. It confirmed to JAMS that the list of participating Claimants could not be finalized until the list of the Accepted Opt Outs was determined. And it then agreed to a list of Claimants for the ten consolidated arbitrations containing only the Accepted Opt Outs.

Again, Tubi's decision was hardly surprising. Keeping as many of Keller Postman's clients out of the arbitrations seems to have been the central reason Tubi fought their exclusion requests in *Gregory*. The parties engaged in three rounds of briefing and three hearings before the *Gregory* Court in which Tubi argued that the exclusion requests of *every* Keller Postman client should be rejected. The only reason for this significant effort was to terminate Claimants' ability to proceed in arbitration. Indeed, if Keller Postman had agreed to the Post-Dispute Agreement and then later insisted that every Rejected Opt Out still be included in the consolidated arbitration, Tubi surely would have cried foul, and insisted that only the Accepted Opt Outs could participate.

It is also clear that the Post-Dispute Agreement does not condition commencement of the consolidated arbitrations on the status of any appeal of the *Gregory* Court's decisions. To the

contrary, the parties expressly discussed with JAMS the timing of the arbitrations and agreed that the arbitrators would be appointed as soon as the rank and strike process was complete, and the parties could provide a final list of Accepted Opt Outs.  (Dkt. 28-4 at 4).  Once again, if Tubi wanted to condition the commencement of the consolidated arbitrations on the conclusion of any appeal in *Gregory*, its lawyers knew how to do so.

Finally, there is nothing absurd about the results of the parties' agreement such that the Court should depart from the Post-Dispute Agreement's plain text.  Tubi appears to think it is contrary to the spirit of the parties' agreement that it might have to face additional arbitrations outside the ten consolidated arbitrations at JAMS.  But that position has two flawed premises.

First, the appropriate way to determine the spirit of the parties' agreement is to look at the specific terms of that agreement.  The Post-Dispute Agreement was heavily negotiated between sophisticated parties.  If Tubi wished to secure a waiver of appellate rights from Rejected Opt Outs or condition the commencement of the consolidated arbitrations, it should have negotiated for those provisions.  But as noted, there is nothing in the parties' agreement to support Tubi's position.

Second, the potential practical impact of the Keller Postman's position is quite modest. Tubi vigorously maintains that the *Dellia* appeal will be dismissed as moot and, if it is not, it will be dismissed on the merits.  Thus, in Tubi's view, none of the Rejected Opts Outs will escape the judgment in *Gregory* and be allowed to pursue arbitrations at JAMS.  But, even if the appeal is successful—which may take a year or more to determine—that would result in an eleventh consolidated arbitration at JAMS commencing at some point in the future.[5]  That is a perfectly

---

[5] As noted, JAMS determined in May 2024 that all individual arbitrations brought by Keller Postman must be consolidated into a single arbitration.  (Dkt. 1 ¶ 68).  Tubi has consistently ignored this determination to complain about the supposed fee leverage resulting from the arbitrations filed by Keller Postman.  However, if the *Gregory* appellants prevail on their mootness

reasonable result, which would be consistent with what Tubi describes as the Court's suggested goal of "provid[ing] an 'efficient way forward in the [mass] arbitration' pending before JAMS and to narrow the disputes occurring in multiple matters pending in federal and state court." (Dkt. 28 at 3) (second alteration in original) (quoting Dkt. 29 at 42:8-13). There is nothing so absurd about this result as to justify departing from the parties' written agreement that the ten consolidated arbitrations would involve only the Accepted Opt Outs.

Conversely, if Tubi's position were correct, Keller Postman would have been required to either (a) implicitly waive all the 8,690 Rejected Opt Outs' appellate rights or (b) stay the Accepted Opt Outs' ten consolidated arbitrations for a year or more pending the outcome of the *Gregory* appeal. That result would make far less sense than Tubi running a small risk (in its view) of an eleventh consolidated arbitration at some point in the future. And Keller Postman would have had significant objections to such a result. Most importantly, Tubi never negotiated for the process it now demands.

Tubi's final argument is that Keller Postman is somehow violating the parties' agreement by filing amended demands for its clients seeking to enforce the confidentiality provision in the Terms. (Dkt. 1, Ex. 8 at 130–31, § 10(14)). This argument is puzzling, as Tubi never cites any facts to suggest that the parties agreed to restrict the substantive rights of Keller Postman's clients in arbitration. And Tubi cites no authority for the proposition that a sophisticated party must be excused from the inconvenience of a confidentiality provision it drafted (and violated). Tubi likewise does not explain how this Court could order parties who are not before it to waive a claim in a pending arbitration. The arbitration claimants have every right to enforce the Terms Tubi

---

argument, and if they also prevail on the merits of their appeal, it is clear based on JAMS's previous decisions that it would again consolidate their arbitrations into one additional consolidated arbitration.

drafted.  And any dispute about the merits of that claim is for an arbitrator to decide per the multiple delegation clauses in the Terms.

Tubi's argument underscores the fundamental problem with this case.  Tubi is unhappy with the legal advice Keller Postman gave its clients because that advice gives Keller Postman's clients greater advantages over Tubi than they would have otherwise had.  Tubi has a forum in which to dispute those legal arguments:  JAMS.  Indeed, Tubi itself chose that forum for its disputes by drafting an arbitration clause with multiple delegation requirements.  But Tubi does not like the forum it chose and so has sued Keller Postman—in violation of the confidentiality provision Tubi drafted as well as the litigation privilege protecting attorney advice—to try and gain leverage over the Claimants in arbitration.  Tubi complains that Keller Postman's advice in the arbitrations will interfere with Tubi's lawsuit attacking Keller Postman for its legal advice in the arbitrations.  But it is Tubi's lawsuit that is interfering with the arbitrations; not the arbitrations that are interfering with Tubi's lawsuit.  (Dkt. 29 at 11:1–4) (allowing Tubi's lawsuit to proceed would "interfere with [Keller Postman's] ability to be practicing lawyers on behalf of their clients, which I find distasteful").  Tubi is like a baseball fan who reaches into the field of play to catch a foul ball and then complains that the outfielder is interfering with him by trying to catch the ball as well.

## CONCLUSION

For the reasons described above, this case should remain stayed pending the arbitrations before JAMS and Tubi's requested relief should be denied.

Dated: April 10, 2025                    Respectfully submitted,

                                          KELLER POSTMAN LLC

                          By:      /s/ Warren D. Postman
                                   Warren D. Postman (Bar No. 995083)
                                    Fred Messner (Bar ID 90032111)
                                      (*pro hac vice* and admission forthcoming)
                                   1101 Connecticut Avenue N.W.
                                   Suite 1100
                                   Washington, DC 20036
                                   (202) 918-1123
                                   wdp@kellerpostman.com
                                   fred.messner@kellerpostman.com

                                   Kiran N. Bhat (Bar No. 1021898)
                                   2333 Ponce De Leon Boulevard
                                   Suite 100
                                   Coral Gables, FL 33134
                                   (305) 845-4684
                                   kiran.bhat@kellerpostman.com

                                   *Attorneys for Defendant*