```
 1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2

 3   TUBI, INC.,                    )
                                    )
 4           Plaintiff,             )
                                    )
 5       vs.                        ) CASE NO. 1:24-cv-01616-ACR
                                    )
 6   KELLER POSTMAN, LLC,           )
                                    )
 7           Defendant.             )
     _____)
 8

 9                 TRANSCRIPT OF STATUS CONFERENCE
            BEFORE THE HONORABLE ANA C. REYES, DISTRICT JUDGE
10                    Tuesday - April 22, 2025
                      3:19 p.m. - 5:18 p.m.
11                       Washington, DC

12   FOR THE PLAINTIFF:
             Jenner & Block, LLP
13           BY:  BRANDON FOX, SATI HARUTYUNYAN and KELLY MORRISON
             515 South Flower Street, Suite 3300
14           Los Angeles, California 90071
             (213) 239-5101
15

16   FOR THE DEFENDANT:
             Keller Postman, LLC
17           BY:  WARREN POSTMAN and KIRAN BHAT
             1101 Connecticut Avenue, NW, Suite 100
18           Washington, DC 20036
             (202) 918-1870
19

20

21
     _____
22                        SONJA L. REEVES
                   Registered Diplomate Reporter
23                  Certified Realtime Reporter
                  Federal Official Court Reporter
24                 333 Constitution Avenue, NW
                      Washington, DC 20001
25            Transcript Produced from the Stenographic Record
```

1                    (Call to Order of the Court at 3:19 p.m.)

2                    DEPUTY CLERK:  This is Civil Action 24-1616, *Tubi,*

3      *Inc. versus Keller Postman, LLC.*

4                    Would the parties please come forward and identify

5      themselves for the record.

6                    MR. FOX:  Good afternoon, Your Honor.  Brandon Fox,

7      Sati Harutyunyan, and Kelly Morrison on behalf of Jenner &

8      Block, representing Tubi.

9                    MR. POSTMAN:  Good afternoon, Your Honor.

10     Warren Postman and Kiran Bhat from Keller Postman.

11                   THE COURT:  All right.  Good afternoon, everyone.

12                   So I think last time we were here, we started off with

13     the second law of thermodynamics.  Today we're going to start

14     off with Buddhism, and in particular, a book I'm reading called

15     *The Quantum and the Lotus*, which is a scientist who works in

16     quantum mechanics and physics in a conversation with someone

17     who used to be a scientist and now is a practicing Buddhist.

18     And they are actually talking about the -- there are actually a

19     lot of similarities between Buddhism and quantum mechanics.

20                   If we can get quantum mechanics and Buddhism to agree

21     with each other, to have similarities, I am confident we can

22     figure out a way for you guys to move forward in a productive

23     way, where you guys agree on how to move forward, because I

24     have to tell you right now, if anything would drive me to

25     become a practicing Buddhist, it would be you all, like just

1    the back and forth sniping with each other, the sort of

2    allegations of bad faith, just -- I mean, I do think -- you

3    know, just cut it out, everyone.  It's not -- It's not

4    productive.

5         I'm going to -- I know you all feel strongly about

6    your cases.  Everyone is going to get a chance to speak.  I

7    will let everyone speak as long as they want.  But I just need

8    to make sure I understand what the state of play is, so I'm

9    going to ask some questions, and whoever is best able to answer

10   them.  But don't argue why the answer doesn't matter or

11   whatnot.  Like, I will let you argue that later.

12        So my understanding is -- and this is how I think this

13   boils down, is that in the Illinois litigation, separate

14   plaintiffs, separate law firm entered into a settlement -- a

15   class action settlement agreement.  Somehow, some California

16   people got involved and Tubi wanted the settlement agreement to

17   cover releases for the California action.

18        So if you're covered by the class action and the

19   settlement goes forward, everyone in the class has released

20   their California claims and cannot bring arbitration in

21   California.  Do I have that right so far?

22        MR. FOX:  Yes, Your Honor, in every other state.  So

23   it wasn't just California, but yes.

24        THE COURT:  Okay.  So then what happens is, when we

25   were here last time -- and I actually remember the exchange

1   pretty well -- one of -- you guys went off in the world and

2   agreed with each other and came back, and one of the

3   requirements for -- I understand this is hotly debated.  I'm

4   just trying to figure out what the actual disagreement is

5   between the two of you.

6           You all came back, and one of the bullet points, part

7   of the agreement, is that there were four people who were

8   objectors in Illinois.  And I said, you know, Mr. Fox, lawyer

9   can't speak for the clients.  And then you said, yeah, but this

10  is kind of really important.  And Mr. Postman said, we'll get

11  it figured out.  Right?

12          Is my understanding correct -- and one of the issues

13  in the case itself was, there's a settlement agreement, some

14  people are in the settlement -- in the class and, therefore,

15  bound by the settlement agreement, and some people are out of

16  the class and, therefore, not bound by the settlement

17  agreement.  And the question the Court was dealing with is, how

18  do I determine who is in and who is out.  And there was a lot

19  of fights about that, because if you're in the class, that's

20  good for Tubi, because then those people can't sue you in

21  California; if you're out of the class, that's good for Keller

22  Postman because those people can sue or arbitrate in

23  California.  Right?

24          MR. FOX:  That's correct.

25          THE COURT:  Okay.  It seems to me that there are two

1    issues here, just in this small part of the case.  Don't --

2    just in this very small part of the case.  Is whether the

3    agreement was for those who objected to the settlement

4    agreement at all, for the class at all to exist, to withdraw

5    their claims, which they did, or whether it included all

6    objections of any kind, including any sort of further

7    litigation as to who was in the class and who's outside the

8    class.  Like, that's the history of the dispute, right?

9          MR. FOX:  I think there is -- Your Honor, I think that

10    perhaps I would want to make sure that we're talking and I'm

11    understanding you correctly.

12          So there were objectors and there were opt-outs, and

13    the only four objectors were the ones who withdrew their claims

14    as part of our agreement.  The rest of the people were people

15    either attempting to opt out or Keller Postman was attempting

16    to opt them out, even though they hadn't submitted their own

17    opt-out requests.

18          THE COURT:  Right.  But I think -- my -- what I

19    understood after I went back -- I didn't know this was an

20    issue.  So when I went back and read everything, what I

21    understood was that there were four people who were objecting

22    to the existence of the class at all.

23          MR. FOX:  They were objecting to the settlement, not

24    the existence of the --

25          THE COURT:  Oh, the settlement.  Okay.  They were

1    objecting to the settlement at all, no one should settle?

2            MR. FOX:  That the class shouldn't be -- the class

3    should not include and the release should not include all of

4    the state law claims, specifically the California ones, and

5    they had other objections to that.  But yes, it was, in sum,

6    objecting to the preliminary order of approval, the settlement

7    agreement, and the final order, what was going to be the final

8    order of approval.

9            THE COURT:  Okay.  But now, there's no objection

10   that's being pursued as to the terms of the settlement

11   agreement.  It's only being pursued as to who should be

12   included as part of the class and, therefore, bound by the

13   settlement agreement and who should not be included as part of

14   the class and, therefore, not bound by the settlement

15   agreement?

16           MR. FOX:  Incorrect, Your Honor.

17           THE COURT:  I mean, this is, like, what I understand

18   the issue to be, so this is important.

19           MR. FOX:  Yes.  And there is, again, a separate issue

20   that was part of that agreement that's important as well.  The

21   reason why I say incorrect, Your Honor, is in the filing they

22   have in the Illinois court --

23           THE COURT:  Actually, I wanted the -- well, go ahead.

24           MR. FOX:  In the filing they have in the Illinois

25   court, in their notice of appeal, they state that what they're

```
 1    trying to undo is the preliminary order, have it vacated, the
 2    preliminary order and the final order of approval, on behalf of
 3    these ten opt-outs and the 8,700 people that have not wanted to
 4    appeal their claims, did not appeal their claims.
 5           So it's not just the ten opt-outs.  They're trying to
 6    undo the entire judgment, the entire settlement, even though
 7    they did not object to that settlement.
 8           THE COURT:  Okay.  Well, Mr. Postman, can you talk to
 9    me about that, because that seems like broader than what I
10    understood the appeal to be, but you're the one who knows, so.
11           MR. POSTMAN:  Sure, Your Honor.  So --
12           THE COURT:  Wait, wait.  Have you guys -- you filed a
13    notice of appeal.  Has briefing been filed yet?
14           MR. POSTMAN:  Yes.  And -- and the briefing has not
15    been filed as to the merits of the appeal.
16           THE COURT:  Right.  That's what I was asking.
17           MR. POSTMAN:  Tubi has filed a motion to dismiss as
18    moot, and the brief is in the exhibits to this --
19           THE COURT:  Yeah, yeah, but not on the merits?
20           MR. POSTMAN:  Right.
21           THE COURT:  Okay.
22           MR. POSTMAN:  So if I could just make sure we're
23    aligned on terms.  When the preliminary approval order was
24    issued, we filed objections, fairness objections, saying that
25    the class represented wasn't adequate.
```

1          THE COURT:  Right.

2          MR. POSTMAN:  That various arguments on behalf of the

3   four objectors who --

4          THE COURT:  Oh, there's four objectors?

5          MR. POSTMAN:  Correct.

6          THE COURT:  Okay.

7          MR. POSTMAN:  In order to object, they had to say,

8   yes, I'll stay in the class.  If you opt out, you can't object.

9          THE COURT:  Got it.

10          MR. POSTMAN:  There were 23,000, approximately,

11   clients of ours who were not objectors, and we talk about it in

12   the briefing.  They submitted exclusion requests in basically

13   four different ways.

14          THE COURT:  Right.  And two were agreed and two

15   weren't agreed.

16          MR. POSTMAN:  Exactly.

17          THE COURT:  Okay.

18          MR. POSTMAN:  And we had debate about whether those

19   were valid.  Tubi won on two of them.  And ten out of these

20   rejected opt-outs filed an appeal in the only way they could.

21   They're subject to judgment.  So they appealed the judgment

22   against them, and their arguments were, in the main, the Court

23   could not have personal jurisdiction over us, in part because

24   we think our exclusion request should have been properly

25   treated as valid, but also -- and this may tie to what Mr. Fox

1    was saying -- because under Supreme Court precedent, *Shutz*

2    (ph), in order to have personal jurisdiction over out-of-state

3    plaintiffs in a class, you know, normally it would be minimum

4    contacts, but in a class context, the Court can obtain personal

5    jurisdiction so long as they send notice, give a valid

6    opportunity to opt out, and the class representative is

7    adequate.

8            And so there's an overlap in arguments that these

9    rejected opt-outs are making.  But what they are doing is

10   saying, I didn't want to be in this class, the judgment against

11   me is invalid, I'm appealing that judgment.  So yes, if they

12   win, the judgment will be vacated, and at the district court,

13   Tubi would have to narrow the settlement.

14           THE COURT:  But why not just opt out?

15           MR. POSTMAN:  They tried and it was rejected.  Tubi

16   argued vociferously for months.  We tried, and -- and they

17   litigated successfully to keep them in.  And so now -- I should

18   say, the decision to keep them in occurred after our status

19   conference.

20           THE COURT:  I know.  I know.  I got that.

21           MR. POSTMAN:  And so they -- we advised the clients of

22   the adverse judgment against them and their options, and ten

23   out of the 9,000 elected to take an appeal.

24           THE COURT:  Okay.  That's a little bit different than

25   I thought coming in, so I'll have more questions.  But let me

1    just ask you while we're on it, so two questions for you.

2        One, whether or not it moots the appeal, they're

3    saying, we'll let your ten people into the thing, into the

4    arbitration, so, like, why do we care, you know, if it's the

5    appeal or not.  And I take it you're going to tell me, because

6    there is a bunch of appeal people that this appeal would

7    affect?

8        MR. POSTMAN:  Correct.

9        THE COURT:  All right.  So that's that issue.

10       The second issue is, even if it, like, affects -- even

11   if, let's say, you won your appeal and it affects -- and it was

12   8,700 people or something?

13       MR. POSTMAN:  Correct.

14       THE COURT:  Why not just throw them all into the

15   arbitration as one of the ten -- I guess you don't want them

16   all in the arbitration because you don't want higher numbers in

17   the arbitration?

18       Is the class action settlement, is it a set pot of

19   money or is it per person?

20       MR. FOX:  It's a set pot of money, Your Honor, because

21   Mr. Postman told you what they were appealing, it's different

22   than what they put into their notice of appeal and it's

23   different in what he sent to me in a letter, what they're

24   trying to do.

25       So this is Exhibit L to the status report we filed.

1  This is their notice of appeal.  And I'll wait until you get

2  there, Your Honor.

3       THE COURT:  By the way, Mr. Fox, I'm telling you,

4  like, I understand that there's serious disagreement as to what

5  is going on here and whether it's not -- you know, it's covered

6  or not covered, what we agreed.  This does not strike me as in

7  bad faith.  Just --

8       MR. FOX:  Your Honor, I think some more details will

9  show you that it's in bad faith, and I'll explain why.

10       THE COURT:  Just my view coming in.  Go ahead.

11       MR. FOX:  I understand that, Your Honor.  And, again,

12  I think that one of the reasons why -- well, a few reasons why

13  we can show that this was in bad faith is the question that you

14  just asked, Your Honor.  They're trying to have this affect

15  8,700 people, when they asked 8,700 people if they wanted to

16  appeal their lack of being allowed to opt out or not allowed to

17  opt out, and only ten people said, yes, we want to appeal that.

18       So we provided those ten a letter that said, we're not

19  going to hold you to the release.  Their claims, their appeal

20  is then moot.  It's not a contract.  It's estoppel.

21       Mr. Postman wrote to you in his response, and he

22  stated, "The appellants rejected the offer."  That's what he

23  wrote in his response to you.  In our reply, we pointed out

24  that we learned --

25       THE COURT:  I thought you were the appellees.  Now

1  you're the appellants?

2          MR. FOX:  They are the appellants.  We are the --

3          THE COURT:  Right.  Okay.

4          MR. FOX:  Yes.  The appellants.  He said the

5  appellants rejected the offer from Tubi.  One of those ten

6  appellants, we learned, is dead and could not have rejected

7  that offer.

8          THE COURT:  Okay.  Well, the estate could have, no?

9          MR. FOX:  There is no estate, Your Honor.  She died

10  four days before we submitted the offer -- it's not an offer.

11  It was a promise -- before we provided that letter.  And that's

12  not Keller Postman.  I don't believe they're going to say that

13  they represent the estate, Your Honor.  There's a proceeding in

14  California to be able to do that.  That's one issue.

15          And then if you look at what they're trying to do

16  under Illinois law, you can either object or you can opt out.

17  They have not only tried to use these after withdrawing the

18  objections, a material term to Tubi, as you pointed out.  I

19  said that in court, this is a material term to us.  Why would

20  we have agreed and said it's a material term if they could turn

21  around and use any one of the 8,700 people to act as,

22  effectively, an objector?

23          THE COURT:  Well, so what I thought coming in, and I

24  guess you're telling me this is different, what I thought

25  coming in was that -- I mean, I think what I thought coming in

1    just -- I guess I'm wrong about this, which is, I guess, why we

2    have these hearings, that the four objectors were objecting to

3    the fact of a settlement.  Right?  So they were like, we

4    just -- the settlement should go away, plaintiff is not

5    adequate, whatever.

6         But then the people who are appealing aren't

7    appealing -- I guess you're telling me that this is the case,

8    that the people who are appealing currently, what I thought

9    coming in, weren't saying no one should be allowed to settle,

10   it's just we don't want to be in the group.

11        MR. FOX:  Correct.

12        THE COURT:  To me, those are like two fundamentally

13   different things, and I can't understand a situation in which

14   we all thought, I thought, we were talking about objecting to

15   the settlement agreement, the fact of it, versus whether I'm in

16   or out.

17        MR. FOX:  Correct.  And if you look at -- again, I'm

18   pointing you to Exhibit L, paragraph 2.  This is their notice

19   of appeal.  It says, "Appellants are appealing," quote, "all

20   orders and rulings incorporated into the final order, approval

21   order, and judgment, including the preliminary order of

22   approval.  Through this appeal" -- this is later in -- in the

23   same page -- "appellants respectfully request that the Illinois

24   appellate court reverse or vacate the final approval order and

25   judgment and the preliminary approval order."

 1          They're seeking to do the exact same think that the

 2   objectors were trying to do, the exact same arguments.

 3          If you look at Exhibit M to the status report, this is

 4   Mr. Postman's letter to me.  And in that, I believe it's on

 5   page 2, he states, "Our position on appeal is not that

 6   appellants complied with Judge Barch's preliminary approval

 7   order."

 8          So he's not saying that we effectively opted out and

 9   Judge Barch was wrong.  What he's saying, the arguments were

10   laid out --

11          THE COURT:  I'm sorry.  Where are you?

12          MR. FOX:  Your Honor, I'm quoting --

13          THE COURT:  Page 2 of M?

14          MR. FOX:  Let me just quickly find it.

15          Thank you.  It's on page 1.  I apologize, Your Honor.

16          THE COURT:  No worries.

17          MR. FOX:  And if you look at the paragraph starting

18   with "First" on page 1, second sentence, "When I stated I did

19   not" -- I'm sorry, that's the wrong one.

20          "Our position."  So this is the second.  Under the

21   last partial paragraph, paragraph starting with "Second," and

22   the second sentence.

23          "Our position on appeal is not that appellants

24   complied with Judge Barch's preliminary approval order" -- in

25   other words, their opt-outs.  They're not saying complied with

1   the preliminary approval order.  "Rather, it is that

2   Judge Barch's preliminary approval order is legally flawed" --

3   this is an objection, Your Honor -- "and that his final

4   judgment against appellants is not supported by personal

5   jurisdiction."  So it is the same arguments.

6          And then he says --

7          THE COURT:  Go up to the -- I had this marked as a

8   question for you, and since we're already on this page.  He

9   says, "While I stated I would attempt to obtain the consent of

10  objectors to withdraw their objections, we never discussed, let

11  alone agreed, that I would contact the thousands of opt-outs

12  whose exclusion request may be denied."

13         So just to make sure I understand, the opt-outs whose

14  exclusion requests may be denied were those people who were

15  part of the class as constituted and didn't want to be part of

16  the class?

17         MR. FOX:  When you say they didn't want to be part of

18  the class, it's more complicated than that, Your Honor, and

19  here's why.

20         There were 7,600 people out of those 8,700 that

21  Mr. Postman did not hear from, and so he signed on behalf of

22  them.

23         THE COURT:  Okay.  All right.  But let's just --

24         MR. FOX:  So, yes.  I know that you understood that,

25  but I just wanted to point that out.

1          THE COURT:  I mean, that's fair.  I'm just like trying

2     to use less words.  But that's fair.  I understand that that

3     was an issue.  But that was something that the district court

4     figured out, right?  One of those was one of the four things?

5          MR. FOX:  The trial judge said that those were not

6     effective opt-outs because the individuals didn't sign.

7          THE COURT:  Right.

8          MR. FOX:  But they hadn't given Mr. Postman the

9     authority, either.

10          THE COURT:  Basically what we're talking about is

11     people who didn't want to be part of the class who the district

12     court might say, no, you're part of the class.

13          MR. FOX:  Exactly.

14          THE COURT:  Can we call this the forced-in people?

15          MR. FOX:  Although they weren't indicating one way or

16     the other, they were part of the class.

17          THE COURT:  So just like the in people, the in crowd.

18          MR. FOX:  They were the in crowd.

19          THE COURT:  Okay.  So then he says, "And obtain their

20     consent to waive their appeal."

21          Now, it does make sense to me that -- certainly Mr. --

22     I'm sorry.  Mr. Postman, right?

23          MR. POSTMAN:  Yes.

24          THE COURT:  I'm sorry.  I was about to call you

25     Kellerman.

1          That Mr. Postman isn't supposed to reach out to all

2     those people and say, have you waived your appeal.

3          Now, let's assume I agree with you and that I'm

4     actually the proper forum for this, which I'm not sure I am,

5     but we'll get to that.  So what's the sort of answer to that?

6          MR. FOX:  This is a red herring, Your Honor, because

7     there were ten people who appealed and they wanted to be found

8     to have opted out and we granted them that relief.  And so this

9     is not about the ten.  This is about the 8,700 that had no

10    desire --

11         THE COURT:  Right.  But how -- how is Mr. Postman

12    supposed to contact all those people and say, hey, you might

13    lose in the district court, and if you lose in the district

14    court, you're stuck with it, I want you to waive your appeal?

15         MR. FOX:  So, first of all, do they have appellate

16    rights?  And that's not clear under --

17         THE COURT:  Do they have what?

18         MR. FOX:  Do they have appellate rights is not clear

19    under Illinois law at all, do they have appellate rights.  So

20    secondly, it's what can they appeal.  They have no standing, no

21    basis to object.  And if you look at page 2 of that same

22    letter, it's the second line in.  He's talking about -- he

23    says, "You have known of these issues for months," meaning the

24    scope of what they want to appeal, "as they were laid out

25    expressly in our briefing objecting to the restrictions on

1  opt-outs in the preliminary approval order."

2          So he's talking about the objections, Your Honor.

3  He's using the same arguments for the four objectors that he's

4  trying to use on behalf of these people whose only issue should

5  be, if they had appellate rights, that they should be able to

6  opt out.  He's trying to do it on behalf of a class of people,

7  and they didn't intervene, they didn't object.  They just,

8  under his name, attempted to opt out.

9          THE COURT:  Okay.  But those seem like issues that you

10 all should -- I mean, I'm not the Illinois Supreme Court, for

11 good reason.  For lots of reasons, I'm quite confident I would

12 never get put on any appellate court.

13          But the question is -- look, on the one hand, my

14 understanding is that you just wanted finality, you wanted the

15 Illinois thing to be done.  And now you're upset, maybe

16 understandably so, because now when you thought something was

17 done, now we have this thing and it's not done.  In fact, we're

18 like -- we're heading into a lot of appellate litigation, first

19 on personal jurisdiction, and then in and out -- in or out.

20          MR. FOX:  Correct.  And we had -- as you know, we came

21 into the hearing with consolidated arbitration and we traded

22 that for finality.  And -- and we lost out on some efficiency.

23 We traded it for finality.  This was one of the two terms that

24 we considered to be important material.

25          THE COURT:  Yeah, yeah, no, I know.

1        MR. FOX:  And the other term was the ten consolidated

2   arbitrations, Your Honor.

3        THE COURT:  If they were just arguing about whether

4   they should be in or out, no plaintiff adequacy, no personal

5   jurisdiction, would you agree that that's not covered by the

6   agreement, like they would have the right to challenge that

7   somehow?

8        MR. FOX:  Your Honor, I think by doing what we did,

9   providing them the letter, we -- we could either contest -- of

10  course, we could contest whether they validly opted out or --

11       THE COURT:  I'm talking about for the other 8,690 of

12  them.

13       MR. FOX:  And they have not provided any evidence

14  they're interested.  I mean, again, they were not part of the

15  class who by the deadline had opted out.  Instead, Mr. Postman

16  opted them out, for a vast majority of them.  So if you're

17  saying, if there were 15 appeals, 20 appeals, if more than the

18  10 had appealed, what would we do, would we agree to brief it

19  on the merits --

20       THE COURT:  That is a good question, but that's not my

21  question.

22       MR. FOX:  Okay.

23       THE COURT:  My question is just, if their notice of

24  appeal wasn't we want everything undone, if their notice of

25  appeal was only, the Court said that there were these four

categories of people contesting, whether they were in or out,

one and two were out, three and four were in, and we think they

should all have been out, and that's all -- they were just

appealing sort of the one, two, three, four thing.

MR. FOX:  I don't think they can appeal.  In fact, I

know they can't appeal on behalf of a group of people.  They

could appeal potentially on behalf of themselves.

THE COURT:  Okay.  But if that was the basis of the

appeal, that wouldn't have been part of the agreement that we

all reached, right?

MR. FOX:  Again, it depends on who we're talking

about.  Are we talking about a class of people or the

individual?

THE COURT:  Individuals.

MR. FOX:  I'll give you an example that I think is

probably the one where it would be closest to what would be

legitimate.

So if I tried to opt out of a class settlement, I

signed my name to it, did close to what the judge had asked me

to do, but the judge looks at the signature and he doesn't

think it's my name, maybe I have an appellate right there to

say actually I did opt out appropriately, but that's not what

we're dealing with here.

THE COURT:  What if it was something different?  What

if it was, I'm appeal -- they said that anyone who didn't sign,

1  but Keller Postman signed for, are not out, I want them to be

2  out, would that be an appeal?

3          MR. FOX:  That's an objection, Your Honor.  That's not

4  an opt-out issue.  You have the choice of being an objector or

5  an opt-out, which is why we negotiated to have the four

6  objectors withdraw their objections.  That's Illinois law.

7          THE COURT:  Okay.

8          MR. FOX:  And there's a second really important part

9  to this, Your Honor.  And to you they say, well, the 8,700

10  people, if they're brought in, there's only going to be an 11th

11  consolidated arbitration.  So even ignoring that we negotiated

12  for 10, that's not what they have said outside of this

13  courtroom.  They said it to you in a brief, but to us, what

14  they said is they want --

15          THE COURT:  I think in a footnote they reserved the

16  right to do it individually, to me.  I think -- but go ahead.

17          MR. FOX:  As long as we're on the same page with that,

18  Your Honor, then that again is itself a major breach here,

19  because --

20          THE COURT:  Mr. Postman, that would be very contrary

21  to the spirit of -- hold on -- of the agreement.  But we can

22  talk about that.

23          MR. FOX:  Yes.  And that is what they are contesting,

24  Your Honor.  And --

25          THE COURT:  So they have footnote 17.  However -- if

1  you have footnote 5 to "However."

2      "If the Gregory appellants prevail on their mootness

3  argument and if they also prevail on the merits of their

4  appeals it is clear based on JAMS' previous decisions that it

5  would again consolidate their arbitrations into one additional

6  consolidated arbitration."

7      Would you object to that, Mr. Postman?

8      MR. POSTMAN:  No, Your Honor.

9      THE COURT:  Okay.  Well, look.  There you go.

10     MR. FOX:  I think object or try to deconsolidate in

11 any way, Your Honor.

12     THE COURT:  Would you try to deconsolidate in any way,

13 shape, or form?

14     MR. POSTMAN:  We would proceed with one consolidated

15 arbitration.

16     THE COURT:  Bingo.  So now the question is just the

17 delay, the added expense of appellate stuff in Illinois and,

18 you know, the fact that now you have -- how many people are in

19 this class, by the way?

20     MR. FOX:  It's not a class, Your Honor.  But you're

21 saying about the class before Illinois, or are you talking

22 about --

23     THE COURT:  Illinois.  Illinois.

24     MR. FOX:  The Illinois action, there were tens of

25 millions of people in the class.

1          THE COURT:  Okay.  We're dealing with, like, 57,000 or

2    something in California?

3          MR. FOX:  It was originally 23,740-something, and now

4    with the ruling by Judge Barch, it's 15,000 and about, I think

5    12, the last I recall.  And that also includes some people who

6    withdrew.  So that's -- that's it.  And then --

7          THE COURT:  So what we're really dealing with here is

8    continued cost of appealing in Illinois, some not certainty

9    there, and then another 8,000 people who might have a

10   consolidated claim in California?

11         MR. FOX:  Whose claims were wiped out by the agreement

12   of the parties.

13         But I do -- look, I hear what he's saying now, and I

14   appreciate you getting him on record that he's not going to try

15   to deconsolidate or contest this any further.  In a letter to

16   me, he said that he was going to seek truly independent

17   arbitrations on behalf of any single one of them.

18         THE COURT:  Okay.  Well, people before a hanging,

19   their mind's clear.

20         MR. FOX:  Understand, Your Honor.  I'm explaining to

21   you why we submitted the status report to you.

22         THE COURT:  I'm past that.  If I was upset about that,

23   you would have heard a lot more from me.

24         MR. FOX:  Thank you, Your Honor.  Again, we negotiated

25   for one.  So now one -- we had one consolidated arbitration

1    before we negotiated.  You said five to ten.  We agreed to ten.

2    And now there's an 11th, potentially.  And that itself -- and I

3    asked Mr. Postman, would you agree to stay this, and he

4    contested that and said, I will not agree to stay the

5    arbitrations.

6              THE COURT:  Stay pending what?

7              MR. FOX:  Stay the arbitrations while we wait to see

8    what happens with the appeals.

9              THE COURT:  I mean, doesn't that sound like the most

10   straightforward thing to do?  I mean, come on up.

11             I mean, I will tell you, Mr. Postman, that I don't

12   think you're acting in bad faith.  I think you're being a

13   plaintiff's lawyer.  Some people think that's the same thing.

14   Some people don't.  But I don't think you're acting in bad

15   faith.

16             I think, as my law clerk put it, there might be some

17   sharp practices, but, you know, there's a fine line sometimes.

18   But it does seem it's maybe like very sharp elbow to sort of

19   what's -- they wanted, like, the Illinois thing to be done.

20   Like, that was clearly what they wanted.  I mean, if we had

21   come here and we had, like, talked through this, I'm confident

22   that they would have said, no, we just want this to be done.

23             MR. POSTMAN:  A few points on that.

24             First, just briefly on the nature of the appeal by

25   what I would call the rejected opt-outs.  It's important to

1    note that the preliminary approval order is the order that lays

2    out the restrictions on exclusion, and the final order was the

3    one that applied the judgment to them.  So, you know, the

4    notice of appeal -- it's our job as lawyers in the notice of

5    appeal to list everything we could possibly challenge.  So --

6        THE COURT:  Let me ask you this.  If you win on

7    appeal -- well, first, if you win that there's no personal

8    jurisdiction, that's just against your ten clients and you

9    would want these 8,000 other clients.  It wouldn't destroy the

10   whole settlement agreement.

11       MR. POSTMAN:  I mean, it's -- I have to be honest with

12   you.  I think we had no other way to appeal this.  But the

13   ruling in the appellate court would be that the -- if the class

14   rep was not adequate, then there was no personal jurisdiction

15   with regard to any out-of-state plaintiffs because the order

16   either had personal jurisdiction or not.  If there were a way

17   to appeal just like a line in the order, it might have been

18   different, but I think we have to appeal the order.  And I

19   would say that Tubi --

20       THE COURT:  Well, I mean, I think, Mr. Postman, that

21   was clearly -- they wanted this settlement to be a settlement.

22   If we had talked back when in the day and you had said, you

23   know, there might still be people who are going to challenge

24   the fact of the settlement, I'm quite confident that Mr. Fox

25   would have had some words.

1          MR. POSTMAN:  Well, Your Honor, what I would say to

2     that is that I certainly understand that Mr. Fox may not have

3     focused on this at the last status conference and, you know, we

4     all may not have focused on this possibility.  But we did, as

5     you noted earlier in this hearing, you and I had the colloquy

6     where I cannot preemptively waive without talking to my clients

7     about their appellate rights.

8          And so I think it was on -- you know, Tubi has very

9     sophisticated counsel.  They had, like, ten very sophisticated

10    lawyers in that room.  If one side did not anticipate a

11    mechanical issue about the results of them pulling these people

12    into the class, I think it's Tubi's risk to bear.  It's my job

13    as a lawyer to litigate for my clients.

14          So after Judge Barch says, no, 8,000, 9,000 of you are

15    stuck in a class that, you know, we've argued you shouldn't be

16    in, to notify those clients that there's been an adverse

17    judgment, give them -- tell them of their opportunity to appeal

18    and to pursue that appeal for them.

19          So, you know, I'm happy to go more into the merits of

20    the Illinois appeal.  I think that's, as you've alluded to, for

21    the Illinois appellate court to address.  I think the focus

22    should be, what did we agree to.  And as you described, the

23    agreement was specific, and I think Tubi did a good job of

24    enumerating it on page 6 of their briefing where they laid out

25    the bullets.  We complied with every single bullet, and it

1    was --

2            THE COURT:  Yeah, you complied, but -- I mean, I guess

3    the question for Mr. Fox is, you guys knew that there was this

4    dispute about the opt-in or opt-out.  I guess at the time, you

5    didn't know that there was dispute about personal jurisdiction.

6    Or did they know that there was a --

7            MR. POSTMAN:  This was all raised -- if I could, Your

8    Honor.

9            THE COURT:  Yes.

10           MR. POSTMAN:  And I'll let Mr. Fox respond.

11           You know, as we noted, this was in our briefing, the

12   personal jurisdiction point, well before the status conference.

13   I do want to say, you made the sharp elbows comment.  That may

14   be a reference back to my comment in the first status

15   conference.

16           THE COURT:  No, it wasn't.

17           MR. POSTMAN:  So if I can recount, I noted that a lot

18   of the allegations in the complaint reflected very sharp elbows

19   from Tubi's side, and you admonished me, cut it out, you're

20   both big boys and this is high stakes litigation, it's their

21   job to bring litigation, it's your job as a plaintiff's lawyer

22   to make arguments for your clients.  You know, we have to make

23   these arguments for our clients so we can --

24           THE COURT:  There's no way to some way, like, have an

25   agreed limit on the appeal that it's just about this group of

1    people -- I mean, look, I understand -- I understand your

2    issue.  I understand your concern.

3         He's right, Mr. Fox.  He can't just preemptively waive

4    claims.  Hold on.  Calm down.  You're right that clearly they

5    just -- they did not want this issue to upend a settlement that

6    was going to cover -- would you say tens of millions of people?

7         MR. FOX:  Yes, Your Honor.

8         THE COURT:  I mean, clearly that's what they wanted.

9    There's no question that's what they wanted.  Now, whether they

10   were -- you know, whether the people in the room, you know,

11   posed it the same way, I don't -- you might be right.  Maybe

12   you're right technically.  I don't know.  I haven't thought

13   about it enough.

14        MR. POSTMAN:  I would just add that as we note in our

15   briefing, that the practical impact of this, I think, is pretty

16   modest with regard to the arbitrations.  First of all, they --

17   they've, to us, said they think our appeal is frivolous and

18   threatened a sanctions motion.  It hasn't been forthcoming, but

19   if they think that's the case, this all goes away.

20        THE COURT:  Well, why not just stay the arbitration

21   for those 8,700 people?

22        MR. POSTMAN:  You did ask me about that, and thank you

23   for reminding me.

24        We specifically negotiated the timing for these, and

25   we feel like a key part of our job as lawyers for plaintiffs is

1    to push forward to a resolution and a key part of defendant's

2    job is to delay it.  And we negotiated that as soon as the

3    accepted versus rejected opt-outs were determined by the trial

4    court, that we'd then have a list for the ten consolidated and

5    JAMS would move forward right away.

6           THE COURT:  But that all happened, right?

7           MR. POSTMAN:  That all happened.  It could take a year

8    or more for the Illinois appellate court to proceed.

9           THE COURT:  You're going to be in arbitration for at

10   least a year.

11          MR. POSTMAN:  I thought the question was whether we

12   would stay.

13          THE COURT:  Not the entire arbitration, just for these

14   8,000 people.

15          MR. POSTMAN:  I'm sorry.  So commence with the

16   consolidated arbitration for them after the appeal?

17          THE COURT:  Right.

18          MR. POSTMAN:  As I have said, we would be fine with

19   that.

20          THE COURT:  Other than the lack of finality in

21   Illinois, what's the problem with that?

22          MR. FOX:  A huge problem, Your Honor.  I appreciate

23   you trying to come up with creative solutions.

24          THE COURT:  I'm actually just trying to understand

25   what's going on.  We'll get to the creative solutions later.

1          MR. FOX:  Let me go back, because I think that the way

2    he described the agreement is not correct.  And when we talk

3    about appellate rights, remember, Your Honor, we're talking

4    about appellate rights for an individual because they're not

5    objectors.  They're not -- they did not intervene.  They did

6    not object.  All they did is, a single individual, and

7    sometimes Mr. Postman did it himself, is try to opt out.  They

8    don't have rights to represent anyone else in a class setting

9    on appeal in a representative matter.

10         THE COURT:  That's so clear cut.  Just tell it to the

11   appellate court and you'll win.

12         MR. FOX:  We are telling it to the appellate court.

13   But it's not the agreement that we reached, Your Honor.  And

14   now, who is taking on the risk of all of this despite having an

15   agreement?  It's Tubi that is.  And so that's not fair, Your

16   Honor, when we reached an agreement.

17         And when he says to you that these were a carveout of

18   the agreement, I just want to point you to some of the evidence

19   that we had that shows that that wasn't the case, that the

20   entire group of claimants was part of the agreement to have ten

21   consolidated arbitrations.

22         And before I do that, Your Honor, I want to talk about

23   one other thing about appeal.  You deal with this all the time

24   in criminal cases.  The attorney who represents you below is

25   not necessarily the attorney that represents you on appeal.

1          THE COURT:  No one has represented me in a criminal

2   case.

3          MR. FOX:  Thank you.  I hope that stays that way, Your

4   Honor.

5          THE COURT:  I did get a speeding ticket over 70 in

6   Virginia once, and technically that was a misdemeanor.  But I

7   got that knocked down.  There is some, like, *Virginia v. Ana*

8   *Reyes* out there somewhere.  The FBI didn't catch it.

9          MR. FOX:  All right.  Well, my point is, if you were a

10  litigant -- representing litigants, and you reached an

11  agreement like we reached in the room right back there, Your

12  Honor, and then you advise everybody of their supposed

13  appellate rights and then you withdraw the other claims, the

14  other objections, you reach a stipulation that's filed in the

15  court, where you sign your name to that stipulation,

16  withdrawing the objections, and then you have ten people that

17  want to opt out, do you handle that appeal for them?

18          I'm guessing that their engagement letter carves

19  out -- because I know you were a practicing attorney for a long

20  time, Your Honor.  Usually, the appeal is carved out of the

21  engagement letter.  I want you to make no mistake that this is

22  entirely attorney driven to increase the leverage on Tubi.

23          THE COURT:  Well, this is clearly attorney driven.

24  You don't have people -- Mr. Postman, I don't necessarily think

25  it's bad faith attorney driven, but they're not individuals

1    hanging around saying, we want to destroy this class action

2    because we don't want to be in it, and we want to be in

3    California instead, in arbitration, because if that was the

4    case, then ten people would deal with that.

5            MR. FOX:  Correct, there would be ten people.  And,

6    again, he represented to the Court that one of them rejected

7    the offer, what he called an offer, and that person was not

8    alive at the time to reject that.  So --

9            THE COURT:  Look, I've dealt with enough plaintiff's

10    lawyers to know that sometimes these things aren't perfect.

11            But hold on.  Is there someone who was dead?

12            MR. POSTMAN:  May I?

13            THE COURT:  Stay around, Mr. Fox.

14            MR. POSTMAN:  I don't want to get too far down the

15    rabbit hole of accusations back and forth, but he's, I think

16    for the third time, brought this up.  I have to be careful

17    about not disclosing attorney-client communications before Ms.

18    Delia (ph) passed away, but she did pass away.  I would just,

19    to set this up, note that, let's just consider for a second

20    what the ordinary course of behavior of an attorney in such a

21    position would be and why it's so backwards that they think

22    this is an ethical issue.

23            So you have a bunch of clients who are subject to an

24    adverse judgment.  If you as a lawyer have a large number of

25    clients subject to an adverse judgment, you would advise them

1    of that and of their appellate rights, and I don't know why

2    Mr. Fox thinks he can assume what's in our engagement letters.

3         THE COURT:  Yeah, I'm not quite sure -- I mean, I

4    don't -- but anyway.

5         MR. POSTMAN:  If they say, I would like to appeal, and

6    then what happens here, Tubi says, we will not apply the

7    judgment to your clients if they dismiss the appeal, you have

8    until March 11th, and you reach out to your client about that,

9    the ethical violation would obviously be dismissing their

10   appeal without their affirmative consent.  So of course we

11   can't dismiss their appeal --

12        THE COURT:  But why would someone not consent to that?

13        MR. POSTMAN:  Because they want to benefit other

14   members of the class who are similarly situated.  And Mr. Fox

15   seems to have this idea --

16        THE COURT:  That seems -- that seems like that's

17   probably not what's happening.

18        MR. POSTMAN:  Respectfully, it's exactly what's

19   happening.  Let me take the attorney-driven litigation point,

20   because I scowled a bit, not because I dispute that, but

21   because Tubi seems to have this idea that on the plaintiff's

22   side, these consumer clients are supposed to do this all on

23   their own.  Of course they're relying on their counsel to tell

24   them they have the rights.  So it's not some epithet, and the

25   same thing happens in pro bono litigation where --

1          THE COURT:  I know.

2          MR. POSTMAN:  So, yes.  But that's different from then

3     the leap to we don't communicate with our clients.  There's a

4     reason it was only ten and not everyone.  The ten wanted to

5     play this role, and so that's the reason.  And Supreme Court

6     precedent is very clear that when you have an offer and a

7     rejection, that's a nullity for mootness purposes.

8          This is a very meritorious appeal, and I think to get

9     to the heart of what Mr. Fox is saying, I think his core

10    argument is not that there is a specific stipulation or

11    provision in the written arbitration agreement that we

12    breached.  He's never really pointed to one.  It's a spirit of

13    the deal argument.

14         THE COURT:  Yeah, but he -- I mean, but what is the

15    answer to that?  Because, look, clearly what Tubi wanted the

16    last time you were in front of me was for the Illinois thing to

17    be done.  He's right.  I mean, there's no -- I just don't

18    believe they would have been like, A-okay, we'll take the risk

19    of some people appealing and we lose this class settlement.

20    They just want that be to done.

21         MR. POSTMAN:  I think a lot of the heat is because

22    they didn't think through the issue and -- they're very

23    sophisticated lawyers.  They didn't think through the

24    implications of this appeal.  It's not my job to advise them

25    down the line that I might represent my clients in a certain

1    way.

2              It's important to note, as I understood the last

3    status conference, Your Honor did not dictate a result.  Your

4    Honor said, you all should consider -- you should come to an

5    agreement.  We did that.  We came out.  We read specific

6    stipulations into the record.  We then reduced to writing the

7    specific agreement about arbitrations.  Mr. Fox cannot point to

8    any provision that we are violating.  We said we would

9    recommend the dismissal for four objectors.

10             THE COURT:  You did.

11             MR. POSTMAN:  They all did that.  He's saying, well,

12   if we had known or thought about the fact that other people

13   could do something, we wouldn't have agreed.  Well, frankly,

14   it's on them.

15             THE COURT:  I mean, Mr. Fox?

16             MR. FOX:  Yes, Your Honor.  I can point you exactly to

17   the breach.  So this is Exhibit -- I'm sorry.  This is --

18             THE COURT:  I think your client wants a word.  It's

19   fine if you want to take a note.

20             MR. FOX:  Thank you, Your Honor.

21             So if you look at Exhibit D, Your Honor, to the status

22   report, I want you to go, please, to page 10.

23             THE COURT:  My God.  I do not miss these email chains.

24             MR. FOX:  This is --

25             THE COURT:  I miss -- you know, I miss a lot of things

 1   about litigation, but this isn't one of them.

 2          MR. FOX:  The email chains, these are friendly,

 3   actually, email chains.  We're agreeing on a path forward.

 4          THE COURT:  Right.

 5          MR. FOX:  This is after we've already negotiated an

 6   email, what the language should look like.  And Mr. Postman is

 7   emailing JAMS at this point.  And so this is the written

 8   agreement that we have that he's communicating to JAMS.  And

 9   what he says -- this is, by the way, December 26th, a week

10   after we were here, Your Honor.  This is before the Illinois

11   court ruled on the opt-outs.  Okay?

12          At the suggestion of the Court --

13          THE COURT:  Where are you?

14          MR. FOX:  This is page 10, at the very top.

15          "At the suggestion of the court in *Tubi v.*

16   *Keller Postman*, the parties to this consolidated

17   arbitration" -- that means all 23,700 of them -- "have agreed

18   on a process to resolve arbitrator selection."

19          And then in paragraph two, it lays out how arbitrators

20   are going to be selected for the parties.

21          So this is for all 23,000 who still -- who are part,

22   at that point, of the mass arbitration.

23          And then it says in paragraph 3, Mr. Postman says,

24   "For the purposes of fees, JAMS will treat the consolidated

25   arbitrations as no more than ten matters."

1          THE COURT:  So is your point that these people who are

2     now appealing in Illinois had claims in California, that they

3     were already claimants in California?

4          MR. FOX:  At this point, yes.

5          THE COURT:  Their names were in the California

6     database?

7          MR. FOX:  That is correct, Your Honor.  They were in

8     the California database as early as April.  In fact, in April

9     of 2024.  They were in the database in December -- on

10    December 19th, when we reached the agreement before Your Honor,

11    and certainly on this date.  It was only later that he

12    submitted the names of the 15,000 people.  And, Your Honor, if

13    you look at --

14         THE COURT:  I'm sorry.  Where is the language where

15    appealing violates that?

16         MR. FOX:  I'm talking about the ten -- because we're

17    now not talking about 10 consolidated arbitrations.  We're now

18    talking about an 11th.  And what this says is -- you know, you

19    talked about finality and we were negotiating finality.  They

20    do not have an appellate basis to be objecting to the class

21    settlement.  That's what we as sophisticated lawyers knew when

22    we negotiated this.

23         THE COURT:  That's an issue for the Illinois court.

24         MR. FOX:  That's fine, Your Honor.  But it's also

25    breach of the agreement before you.  And maybe that's the

1    spirit of it, that -- that they won't use stand-ins for the

2    objectors.  That's what they're doing, is they're using these

3    ten people to be stand-ins for the objectors.  You reach an

4    agreement back there in your jury room, come back out here,

5    confirm it on the record before Your Honor, and then you're

6    going to go and find ten people to act as objectors after

7    withdrawing the four objections after the date when the

8    objectors were supposed to file, and not in the trial court,

9    but on appeal.

10          I mean, that -- that to me is -- that to me is, you

11   know, again, above anything else.  And, Your Honor, as I

12   mentioned --

13          THE COURT:  By the way, what are these people -- like,

14   what are these people -- I mean, I get -- one day I'm going to

15   frame one of these.  But I usually get like class action

16   settlement and it's like a check for 79 cents.  Like, what do

17   the people get in this settlement?

18          MR. FOX:  The people in the class action settlement

19   are getting a lot of money for a class action settlement.  So

20   based on the submissions, and I'm going to talk about that in a

21   second, but it's over $50 that they're going to be getting,

22   which is significant for a class settlement.

23          I should say this to Your Honor as well.  There are

24   some of the claimants, original claimants, who submitted claims

25   to that class action settlement.  We know of at least a 100 of

1    them who submitted claims.  So these are former clients of

2    Keller Postman.  They are now making it so those former clients

3    are not able to obtain the proceeds of the settlement while

4    they try to undo the judgment.  They're not allowed to take

5    positions that adversely affect their former clients, and

6    they're representing ten.  We've given them the relief that

7    they want.  They're representing ten on appeal.

8             THE COURT:  What's the amount that goes to the

9    plaintiffs' lawyers?

10            MR. FOX:  I believe that it's $6 million, Your Honor.

11   It was a 19 million --

12            THE COURT:  Okay.  If there were 8,000 Postman clients

13   in -- who got settlements, wouldn't Keller Postman get some

14   part of that?

15            MR. FOX:  No, Your Honor.

16            THE COURT:  They're not going to get any part of that,

17   the fees?

18            MR. FOX:  No, Your Honor.

19            THE COURT:  Okay.  All right.  Understood.

20            MR. FOX:  And then if you look at my email on

21   January 2nd.  So this is -- if you flip the page, it's on the

22   bottom of page 8.  This is my email to JAMS.  JAMS has asked me

23   to confirm that this is the agreement that we reached.  And if

24   you look at the -- I say yes.  And look at the -- I think it's

25   the fifth line down.  Start with the fourth: "So that means

1   that there will be roughly 15,000 claimants remaining in this

2   mass arbitration," because at this point the Gregory court had

3   ruled.

4        So I'm talking about this mass arbitration generally,

5   not talking about a subset.  Mr. Postman does not correct this,

6   he does not say, wait, wait, wait, this is not the entire group

7   of mass arbitrants, and then issued a list of 15,000.  So this

8   is certainly revisionist history when he says that there was a

9   thought that there could be this group of people that were out

10  there.  He may have decided when we were in that jury room

11  negotiating that this was something they were going to do, but

12  we would not have negotiated as a material term that they have

13  to withdraw those objections when they're going to use people

14  as stand-ins for those objections and where they're going to

15  not have one consolidated arbitration, not ten, but now, with

16  his concessions, 11 potentially.

17       THE COURT:  But I don't think you care so much about

18  it's 10 or 11, right?  You care that there's no finality on the

19  class settlement and you care that you don't want 8,000 more

20  people than you thought were going to be in California to be in

21  California?

22       MR. FOX:  It's all of that.  Those were the terms that

23  were beneficial to Tubi, and they're trying to take away all of

24  those terms based on the agreement we reached before

25  Your Honor.  I do think --

 1            THE COURT:  They also -- I guess they also drop their

 2    ethics complaint.  But go ahead.

 3            MR. FOX:  I'm sorry, Your Honor?

 4            THE COURT:  They also drop their ethics complaint.

 5            MR. FOX:  Your Honor, I was not concerned about the --

 6    it wasn't an ethics complaint.  It was a disqualification

 7    before Your Honor.

 8            THE COURT:  Okay.

 9            MR. FOX:  You were offering us broad discovery, as you

10    recall.  I don't think that was a benefit to us that they

11    dismissed that.

12            THE COURT:  Okay.

13            MR. FOX:  I think Mr. Postman said we shouldn't assume

14    what's in the engagement letter.  You can certainly look at

15    that.  I could be wrong.  I have a feeling I'm not, but I could

16    be wrong in that.  I have a feeling I'm not, but I could be

17    wrong in that.

18            THE COURT:  I will say, usually in my engagement

19    letters, it was case specific, not district court versus -- I

20    mean, sometimes we opted out of appellate, but that was usually

21    because there was like a pro bono client or something.

22            MR. FOX:  Yes.  And sometimes with your

23    noninstitutional clients you do that because you don't want --

24    and these are noninstitutional clients.  So yes, this is

25    something that is common with law firms.

 1          THE COURT:  Well, talk to me a little bit about his

 2   argument that I'm not the one to decide whether or not this is

 3   within or outside of the agreement, that's subject to

 4   arbitration.  That's your argument, right?

 5          MR. FOX:  He's talking about the delegation?  Is that

 6   correct?

 7          THE COURT:  Yeah.

 8          MR. FOX:  Your Honor, this was an agreement reached,

 9   again, in this court before Your Honor.

10          THE COURT:  What's the arbitration provision that

11   you're relying on, the one in the Tubi agreement?

12          MR. FOX:  There is no arbitration agreement between

13   Tubi and Keller Postman.  So that's our response to that.

14   There -- it's not to be delegated to the arbitrator, and we're

15   talking about an agreement before Your Honor.

16          THE COURT:  Okay.

17          MR. POSTMAN:  I challenged Mr. Fox to identify the

18   provision that was breached, and he pointed you to Exhibit D,

19   page 10.  This is a written agreement to arbitrate submitted

20   with JAMS subject to the JAMS terms.  If we aren't a party to

21   it, we couldn't have breached it.  If we breached it,

22   that's -- -- based on subparagraph 7 -- I, of course, have a

23   different reading of this.  I think this is referring to the

24   number of plaintiffs who will be in the ten consolidated that

25   we agreed to.

```
 1            And Tubi emphasized that the people whose opt-outs
 2    were rejected could not be included.  That was their ask.  But
 3    the meaning of paragraph 7 is an interpretation of a written
 4    agreement to JAMS --
 5            THE COURT:  The written agreement is the email that
 6    you guys exchanged.
 7            MR. POSTMAN:  Mr. Levington is the case administrator
 8    at JAMS --
 9            THE COURT:  No.  You guys exchanged, like, a list of
10    bullet points.
11            MR. FOX:  Your Honor, I have -- I can hand to you
12    Exhibit 1.  This is an email exchange between me and
13    Mr. Postman when we actually hammer out the language.  And I
14    will hand that to Your Honor.
15            THE COURT:  Could you make sure Mr. Postman sees one?
16       (Pause)
17            THE COURT:  What page of this do you want me to look
18    at?
19            MR. FOX:  Your Honor, page 10.  And the red writing is
20    Mr. Postman's on page 10.
21            THE COURT:  This isn't page numbered.
22            MR. FOX:  Yes, I can -- it's the second-to-last page.
23    It starts on the third-to-last page.  The red writing is
24    Mr. Postman's, and this is our agreement on the path forward.
25            THE COURT:  Okay.  And what am I looking at?  Which
```

 1  one do you want me to look at?

 2          MR. FOX:  So, Your Honor, I'm focused mainly on the

 3  ten arbitrations.  And you see -- and, first of all,

 4  paragraph one, "Keller Postman will contact the Gregory

 5  objectors today to seek their consent to stipulation.  As soon

 6  as the objectors consent, the parties will file with Judge

 7  Barch."  And they talk about the stip.  So that's again saying

 8  that they're going to withdraw the objections.

 9          But that's not the primary point I want you to focus

10  on.  If you look at the next page, on paragraph four,

11  Mr. Postman's writing, talking about the ten -- the selection

12  of the ten arbitrators, "We didn't understand the JAMS process

13  to be conditioned on a decision by Judge Barch."

14          So he's saying now that the opt-outs -- Judge Barch

15  doesn't need to rule on the opt-outs for us to begin this

16  process of the JAMS arbitrator selection because they were all

17  part of the process at this point and there's nothing

18  indicating that we should hold off on selecting arbitrators

19  because there could be more claimants later.

20          That's, of course, what you would do if you're trying

21  to protect rights of your clients.  You carve this out so

22  there's not a dispute later, Your Honor.  And this was not part

23  of the carveout.  You wouldn't want --

24          THE COURT:  My guess is that he's going to tell me --

25  and let's see if I've done this correctly -- that when he says

1    we think it's implausible that he, the judge, would reject the

2    stipulation, you're referring to the stipulation for the four?

3          MR. POSTMAN:  Yes.  And making a time and point of can

4    we please get started selecting arbitrators, because by the

5    time we're ready to appoint them, we'll have the list of the

6    15,000 or 18,000 to get going.  It was a pure timing point.

7          THE COURT:  Okay.  Well, look, guys, here's where we

8    are.

9          Mr. Fox, I think you're right.  I think that this

10   approach almost certainly violates the spirit of the agreement

11   and what you all wanted coming out of the agreement.

12         Mr. Postman, I think you're right.  I don't think it's

13   covered by the actual language.  I mean, the actual language of

14   the bullet points, as far as I remember, it was we'll agree to

15   the four objectors.  And that's why I was asking where the

16   language of the actual agreement was.  But --

17         MR. FOX:  And, Your Honor, that's why I think it needs

18   to be read in the context of the ten consolidated arbitrations

19   that they tried to --

20         THE COURT:  I know, Mr. Postman -- I mean, I know

21   Mr. -- Mr. Fox, I understand your argument.  This whole thing

22   doesn't really make sense unless we're including the four

23   objectors.  Maybe it's in the briefing.  Hold on.

24         MR. FOX:  That's absolutely right, Your Honor.  It

25   doesn't make sense unless --

 1          MR. POSTMAN:  Page 6 of filing number one.  The status

 2    report has the list I believe you're referring to.

 3       (Pause)

 4          THE COURT:  I mean, the language is "four clients who

 5    were objecting to the Illinois class action settlement to

 6    withdraw their objections."

 7          Mr. Fox, what is your client most concerned about?  Is

 8    your client most concerned about lack of finality with respect

 9    to the class settlement?  Is your client most concerned about

10    an 11th arbitration?  Or is your client most concerned about

11    having another 8,000 people in California to deal with?

12          MR. FOX:  I think, based on what's happened today,

13    it's the first and the last.  It's the 8,000 people when the

14    relief that they're seeking should not be applied to the 8,000

15    people.  And it's -- the primary issue was the objection and

16    the lack of finality when it was supposed to be a final term.

17    It was already funded, Your Honor.  So this was already funded,

18    and the people should already have their money at this point,

19    but now it's holding it up for potentially years and years.

20          THE COURT:  For everybody?

21          MR. FOX:  For everybody, Your Honor.

22          THE COURT:  Mr. Postman, what can we do about that?  I

23    mean, I imagine that's what is really motivating this.  You

24    want to be done in Illinois, at least with respect to the tens

25    of millions of people that no one is objecting to, right?

1          MR. FOX:  That's correct.

2          THE COURT:  Mr. Postman, what do we do about that?

3          MR. POSTMAN:  I can say on the first point, about the

4    8,000, that if that group were to be out, free from the

5    judgment in the class case, I do not anticipate that we would

6    proceed with arbitrations for 8,000.  As Mr. Fox has noted,

7    there's a large majority, about 7,600, who did not respond to

8    our repeated request.

9          THE COURT:  How many?

10         MR. POSTMAN:  7,600

11         MR. FOX:  Approximately.

12         MR. POSTMAN:  Approximately 7,600 out of 8,700.

13         THE COURT:  Why don't you just drop the appeals for

14   them, if they're not getting back to you?  And then you guys

15   agree not to proceed against 1,000 people, and you put the

16   1,000 people into one of the 10, 100 each.

17         MR. POSTMAN:  So let me just first note what I think I

18   should do as counsel if -- if they were offered to be out of

19   class and why it wouldn't be 8,700.  We would reach out to each

20   of them and tell them they have the opportunity to proceed with

21   the arbitration again, but we need their affirmative commitment

22   to reengage.

23         THE COURT:  They're not getting back to you.  They're

24   not getting back to you one way or the other.  I mean, look,

25   these people are, like, in the wind.  I mean, I don't think

1    that -- I think it's too much of a hurdle to say that we have

2    to wait on 7,600 people to get back to you before we can move

3    one way or the other.  If they haven't gotten back to you, they

4    haven't gotten back to you, right?

5          MR. POSTMAN:  Your Honor, I disagree for the following

6    reason.  In my view, and this is lawyer driven, but it's what I

7    genuinely believe is the right thing to do for the clients I

8    represent, the attempt to pull these people into a class was

9    unlawful, procedural gamesmanship over them, and to impose this

10   requirement on them.  Due to the ten rejected opt-outs who are

11   appealing, there's a path to get them back the opportunity, not

12   the certainty, to proceed.

13         THE COURT:  To proceed where?

14         MR. POSTMAN:  In arbitration.

15         What I was suggesting is that if they were excluded

16   from the class judgment, we would reach back out, and I -- it

17   depends on how many respond and reengage, but I think it would

18   be probably under half who would reengage.

19         THE COURT:  So your proposal is you drop the appeal

20   from the ten people, we're done in Illinois, the class

21   settlement goes forward, and then in the meantime, for the

22   8,690 people, you reach out to them and say, you have the

23   opportunity to file something in arbitration, and if they come

24   back and say, we want to be part of that, then that would be

25   like an 11th arbitration, or the 10th or something?

1          MR. POSTMAN:  I think if we did it right away, they

2   could be in the ten.  There wouldn't need to be an 11th.  I

3   would just note that, as you've acknowledged, the dropping the

4   appeal thing I can't do today, I would have to talk with the

5   appellants.  But I think that --

6          THE COURT:  Mr. Fox, why don't we just do that?

7          MR. FOX:  Your Honor, it's very simple.  They had the

8   opportunity to opt out by October 31st of last year.  That was

9   the deadline to opt out for these 8,700 people.

10          THE COURT:  Yeah, but, Mr. Fox, you want -- look, I

11  get it.  I get it.  But I'm telling you right now that if I had

12  to decide whether or not this was a breach of the agreement, it

13  would be a close call.  I'm telling you right now that I don't

14  see it as clearcut.

15          So with that in mind -- and I don't know which way I

16  would fall.  I'm more inclined to agree that it's a violation

17  of the spirit of the agreement, but not the lettering.  And

18  he's right, it's not his job to represent your client.

19          My guess is what your client really wants at the end

20  of the day, other than for Mr. Postman to go away, which he's

21  not going to do, is to get Illinois done.  Right?  And it seems

22  like we have a way that we get that done, and then you just

23  might be dealing with 4,000 more people in California.

24          MR. FOX:  Your Honor, there's some context here back

25  in that back room that we talked about and I can't get into

1   right now because of the Reyes' privilege, as you said.

2   There's some context there that's really important.

3           THE COURT:  That was privileged?

4           MR. FOX:  Well, you said before we were in the back

5   room that nothing here -- it's all going to be part of the

6   Reyes' privilege.  And we agreed on 408 that the discussions

7   back there would be there.

8           What he's arguing to you is inconsistent -- in part

9   inconsistent with what he's told us then.

10          THE COURT:  I'm just looking at the language of what

11  you all wrote.

12          MR. FOX:  He's not heard from these -- so the notice

13  went out for these -- for the class settlement, I believe in

14  June or July of last year.  They had months to opt out.

15  Mr. Postman signed his own name to 7,600 because he had not

16  heard back from these people after repeated requests to have

17  them opt out.

18          THE COURT:  And the district court judge said that is

19  not enough.

20          MR. FOX:  And that's 7,600 of these people.

21          THE COURT:  Mr. Postman, I mean, look, these guys had

22  a chance to opt out.  They didn't.  The district court

23  disagreed with you that -- that you were allowed to opt out for

24  them.  Which is true, right?  If you haven't heard from them,

25  you can't say that they're opting out.

1          MR. POSTMAN:  I disagree with that.  There are plenty

2    of courts that do allow counsel-signed opt-outs in this

3    context.  And if Mr. Fox wants to litigate in Gregory, we can

4    litigate in Gregory.  I'm offering a way to not litigate in

5    Gregory.  He can't have his cake and eat it too, from my

6    perspective.

7          THE COURT:  Mr. Fox, looks like you have three

8    options.  One, you can wait for me to make a decision as to

9    whether or not this was a breach of the settlement agreement.

10   And I'm telling you right now, I don't know which way I would

11   decide, which I don't usually say from the bench.

12         If you win, if I rule in your favor, I'm just going to

13   say, fine, everything is back on.  You guys -- this is moving

14   forward, California ethics will move forward, Illinois will

15   move forward, California will move forward, Delaware will move

16   forward.  If you lose, you're kind of stuck where you are and

17   you don't have any finality in Illinois.

18         Or option number 3 -- and, look, I understand --

19   option number 3 is, you know, we get rid of Illinois, you have

20   your settlement.  You know, it's done.  You're done with tens

21   of millions of people.  He convinces his ten clients to not

22   continue the appeal.  And he sends out a letter to the 7,600

23   people saying, this is really your last chance, and you get

24   whatever response rate you get and those people go into

25   California in a 10th arbitration.  Maybe those are the 10

1    arbitrations.

2         Now, look, I understand.  If I were in your position

3    right now, I would be losing my mind.  Like, I really would.  I

4    mean, I would be saying every single thing you're saying, that

5    there is no way that this wasn't part of what we were all

6    agreeing to.  Of course what we wanted was finality in

7    Illinois, like of course that's what we wanted.  And, of

8    course, just saying we're going to get rid of these four

9    people, but adding four more people in to replace John Doe with

10   Jane Doe is not what this was all about.

11        And I am basically being, you know, held up at

12   gunpoint by plaintiff's lawyer, who now is trying to get more

13   concessions than they otherwise would get.  So now, instead of

14   the 15,000 people in California, I'm going to have 19,000

15   people in California, and that's outrageous and I'm basically

16   being held up at gunpoint by the plaintiff's attorney.  That's

17   how I would be feeling if I were you.

18        MR. FOX:  And I feel that way, Your Honor.  And

19   there's a second thing I feel, and that's they're getting the

20   benefit of their breach.  That's what they're doing, is they're

21   getting --

22        THE COURT:  No, I understand.  That's holding you up

23   at gunpoint.  I get it.

24        MR. FOX:  And, Your Honor --

25        THE COURT:  Here's where I am as a judge.  I am

1    sympathetic to every single thing.  I would be losing my mind

2    if I were you.  On the other hand, as a judge, I'm just

3    supposed to look at contract language, right?  And I just don't

4    think it's -- if you just look at the language, I mean, you

5    just don't have an actual breach unless I find an ambiguity.

6    If I find an ambiguity, you know, in the language, then you're

7    off to the races and doing better.  But if I find that there's

8    no breach -- there's no ambiguity, then I think, just as a

9    matter of law, he's going to tell me I have to rule for him.

10            MR. FOX:  There are two ways, Your Honor, that you can

11    find breach, even if you don't feel like there is one with

12    respect to having people substitute for the objectors.

13            THE COURT:  I think your client wants you.

14            Sir, why don't you just, like, sit at counsel table so

15    you can talk to each other.

16            MR. FOX:  He is an attorney, so yes.

17            So, Your Honor, there's -- even if you say having

18    people substitute for the objectors, it's not a breach, even if

19    you say that.  And, again, why would we say that that's a

20    material term if others could stand in their place.

21            THE COURT:  No.  I hear you.

22            MR. FOX:  And then there's, of course, the ten

23    consolidated arbitrations.  We're now talking about an

24    eleventh.

25            THE COURT:  Well, I think he says if you do it in

1  time, you could just make it part of the ten.

2          MR. FOX:  It's not going to happen, Your Honor,

3  because --

4          THE COURT:  Okay.  All right.  So you have 11 instead

5  of 10.

6          MR. FOX:  Yes.  So that itself is a breach because we

7  had --

8          THE COURT:  I know, but that's not doing much for me.

9          MR. FOX:  I hear you.  But we started with one.  And

10  11 is one more than 10.  So it's basically taking us back where

11  we've brought 10 consolidated arbitrations in addition to the

12  one we already had.  So that's part of me losing my mind, Your

13  Honor, is the additional one.  That could have been all we were

14  dealing with had we not reached this agreement on December

15  19th.

16          THE COURT:  Right.  But I don't think your client so

17  much cares about 10 versus 11.  It's like $2,000.  I think what

18  your client cares about is an additional 4,000 people

19  potentially in the group of people.

20          MR. FOX:  It's the uncertainty, Your Honor, as part of

21  this.  And then, Your Honor, we're also talking about DC has,

22  of course, like everywhere, any contract you agree -- there is

23  good faith and fair dealing.  And so even if you didn't find a

24  breach of the words, this is violating good faith and fair

25  dealing, Your Honor.

1            THE COURT:  But let's say I agree with you and I am

2    like, all right, there is a breach.  I can't just say -- I know

3    I do not have the power to say you have to withdraw your

4    appeal.

5            MR. FOX:  We're not asking you to do that, Your Honor.

6            THE COURT:  Basically what you're saying is it's like

7    open warfare again.

8            MR. FOX:  I don't know that it's open warfare.  I'm

9    not concerned about the California action.  You said that reeks

10   of bad faith and they should let the California courts know

11   that.  If they want to file a lawsuit against us again, if

12   Mr. Postman doesn't tell the Court that you said that, we

13   certainly will.

14           The Delaware petition is just to appoint an

15   arbitrator.  That's already past.  JAMS has now appointed ten

16   arbitrators, so the Delaware action is not a thing anymore.

17   Once they don't disqualify the ten, we will be proceeding

18   forward with the arbitrations.

19           This is really about whether this case should be

20   stayed, Your Honor.  And based on what's happening now, the

21   appeal, this could be stayed for years.  Because by the time

22   they get a ruling in that case, they may go up to the Illinois

23   Supreme Court, they may go up to the U.S. Supreme Court.  If

24   anybody kicks it back to the trial court, we're talking about

25   three or four years before it's decided.

1          Are you really going to -- Tubi would be prejudiced in
2    this action because witnesses will lose memory, evidence could
3    be lost, so the stay in this case is part of the prejudice that
4    Tubi is suffering by these appeals.  So they shouldn't receive
5    the -- the equities are not on their side anymore.  They should
6    not receive the benefit of that stay, and I think you should
7    lift that stay based on their conduct and their breach.  I
8    think you should, Your Honor.

9          THE COURT:  Can I lift the stay even if I don't find a
10   breach?

11         MR. FOX:  Absolutely.  It's completely discretionary,
12   Your Honor.

13         THE COURT:  I guess he would say then you're violating
14   the agreement.

15         Mr. Postman, I have to say, this does strike me as
16   contrary to what the spirit of this was, so I mean, I honestly
17   don't know what I would do right now.  If I had to, like, bet
18   my vacation funds, I would bet that I would be ruling for
19   Mr. Fox.

20         MR. POSTMAN:  Before addressing that is a second
21   point.  I do just want to say page 6 of their filing says that
22   the parties agreed to have this matter stayed pending a
23   resolution of the mass arbitration.  That's their description.
24   You did not stay it.  We stipulated to a stay.  I believe you
25   would need to find a breach in order to change the --

1            THE COURT:  I kind of do agree with that, Mr. Fox.

2            MR. POSTMAN:  As to the breach, I hear you on the

3    spirit, but, respectfully, I don't think contract law has

4    a "you must comply with the spirit" provision.

5            THE COURT:  Mr. Postman, come on.  Mr. Postman, I

6    mean, look, if you were just thinking this whole time, if you

7    were just sort of lying in wait and sort of seeing that this

8    was this issue and they didn't bring it up and knew you would

9    bring it up later to undo what clearly they wanted --

10           MR. POSTMAN:  Of course, Your Honor, I didn't bring

11   the spirit point to dismiss entirely this idea of this is not

12   what they intended.  I think the proper lens is the one Mr. Fox

13   got to after, which is the covenant of good faith and fair

14   dealing.  If you're going to say that without a specific

15   provision being breached, it's nonetheless a breach of the

16   contract, I think that's the framework to use.

17           And I don't think it's a breach of the covenant of

18   good faith and fair dealing to follow through with something

19   that's not proscribed by a specific term, but that one very

20   sophisticated party failed to anticipate and bargain for.  What

21   I again think happened is the decision hadn't been issued yet.

22   Neither side was focused on that.

23           And then the decision got issued, I, as a lawyer, have

24   a duty to my clients to pursue with them.  So I understand the

25   idea that they did not see themselves in this position, but I

1    don't think it's a breach of the covenant of good faith and

2    fair dealing when a very sophisticated party fails to get a

3    term to protect against a later development.  I don't think

4    that's it.

5            THE COURT:  I mean, maybe we'll have to brief that.

6    Hold on.

7            Mr. Fox, I mean, if I get more briefing or have an

8    actual argument as to whether or not this was a breach, and if

9    I lift the stay, the gun is still to your head in Illinois.

10   Like you still don't have a class action settlement in

11   Illinois.  And I assume that you have really strong views that

12   you're going to win in Illinois, but you never know.

13           MR. FOX:  We're taking on that risk, Your Honor.  And

14   part of this is -- I don't know how to better describe it --

15   the gooeyness of any agreement that we tried to reach already.

16   I don't know that walking out of this courtroom what we're

17   saying here that there is not going to be additional games

18   played because he's going to say we're sophisticated counsel

19   and we should have anticipated something.

20           I think they have actually stipulated to the breach,

21   Your Honor.  We keep focusing on the objectors.  I think that

22   violates the covenant of good faith and fair dealing by having

23   people substitute for them.

24           THE COURT:  Are you agreeing that the people who are

25   appealing are basically objectors?  Are you agreeing with that

1    characterization?  If the question was just whether these

2    people were in or out, then I would have a lot more sympathy,

3    Mr. Postman, for your view if that was the issue, like whether

4    the one or the two should have been included or not included.

5    To me that seems like far closer to, yeah, you didn't agree to

6    that.

7            But if what you're doing on appeal, which it sounds

8    like it is what you're doing is saying this whole settlement

9    has to go away, I don't see how that could not -- I just don't

10   see how you could possibly think that that wasn't what was

11   intended by this agreement and that you have already sort of

12   gotten whatever.

13           MR. POSTMAN:  It's not the same thing in the sense

14   that it is Tubi's doing that in order to challenge their being

15   roped into the class they have to challenge this order.  And --

16           THE COURT:  So is there any way to have an appeal that

17   just challenges who is in and who is out?

18           MR. FOX:  We gave them that in a letter and said here

19   ten, come back --

20           THE COURT:  For the 8,600.

21           MR. FOX:  The 8,700 didn't want to appeal.  He sent

22   them emails and said do you want to appeal, and they didn't

23   respond saying they wanted to appeal, so how are they seeking

24   relief?  I don't understand how they are seeking relief on

25   behalf of 8,700 people who don't want it, Your Honor.

```
 1              THE COURT:  Mr. Postman?

 2              MR. FOX:  They aren't communicating with Mr. Postman

 3  anymore.

 4              MR. POSTMAN:  This goes to fundamentally divergent

 5  views of what a representation should look like for lower --

 6              THE COURT:  I don't think a representation is -- maybe

 7  I just need to get ethics advice on.  I don't think a

 8  representation is I'm representing a bunch of you, I email you

 9  to see if you want to appeal, you don't respond, and so,

10  therefore, I have to appeal on your behalf.

11              If these ten people who did respond weren't appealing,

12  you couldn't just sort of appeal based on -- let's say no one

13  had gotten back to you, right.  Let's say you sent out 8,600

14  people, you have an appeal right, and nobody got back to you.

15  At that point, you wouldn't be able to appeal, right?  You

16  wouldn't be able to say I have to keep my appellate rights open

17  for these 8,700 people, because you wouldn't actually have

18  standing to do that.

19              I'm not sure -- how do your ten clients have standing

20  to -- I guess they have -- how do they have standing to assert

21  the appellate rights of other people?

22              MR. POSTMAN:  They are not seeking any sort of

23  representative standing.  They are raising arguments on their

24  own behalf that if correct would necessarily invalidate the

25  judgment as to everybody else.
```

1          THE COURT:  Those are clearly mooted, right?  They

2     said we will give you what you want.

3          MR. POSTMAN:  As I have noted, these appellants are

4     doing this for an interest broader than their own.

5          THE COURT:  Why do they have standing to appeal for an

6     interest broader than their own?

7          MR. POSTMAN:  If an individual, pro bono litigant, is

8     seeking injunctive relief that applies to them, and the

9     defendant says, "I will give it to you," and they say, "No, I

10    would like an injunction nationwide, please, because I care

11    about this," they don't need some sort of representative

12    standing, they can insist on seeking their own relief.

13         THE COURT:  I don't think that's how it works

14    actually.  I think actually that would be mooted out, and then

15    the only question is whether you have like a *Roe v. Wade*

16    situation where there is capable of repetition, but if they get

17    all the relief they want, they -- it's not a case of

18    controversy anymore.

19         MR. POSTMAN:  I agree with you if a stipulation is

20    entered and the judgment is entered.  The difference we have

21    here is this is the "can't believe all" situation where there

22    was an offer and it was rejected and the Supreme Court has said

23    there there is not relief.  It could have been, but the class

24    rep in *Campbell-Ewald* or the person here has the right to say

25    no, in order --

1          THE COURT:  What's that case you're referring to?

2          MR. POSTMAN:  *Gomez v. Campbell-Ewald.*

3          THE COURT:  What's the cite, please?

4          MR. FOX:  That's a class action case, where the

5  individual was the class rep.

6          THE COURT:  Okay.  Well, that's different.

7          MR. POSTMAN:  That was not the rationale of the

8  decision.  The decision was that whether an offer was made and

9  rejected it's a nullity for purposes of mootness.

10         It's 577 U.S. 153.

11         THE COURT:  One second.  What's the page cite,

12  Mr. Postman?

13         MR. POSTMAN:  I'm sorry, I don't have it.  It's 162.

14  It may start slightly before it, but that's the specific line

15  we quoted.

16         THE COURT:  I mean, I'm just looking at what he is

17  citing me, Mr. Fox, but it does look pretty on point.  Again, I

18  haven't read the whole case.

19         MR. POSTMAN:  I also note we briefed this in depth at

20  Docket 31-2 in this court.  That's the response to mootness

21  which we attached in the Illinois appellate court, so this is

22  the issue on appeal and we have briefed it extensively.

23         MR. FOX:  Your Honor, if I can point you then to our

24  cases in our reply brief on page 8.  These are important -- if

25  you look at *Rosen v. Ingersoll-Rand*, 865 Northeast Second 451.

1        This is on page 8 of our reply brief.

2               THE COURT:  One second, please.

3               MR. FOX:  It's in the first partial paragraph.  There

4        were three cases we cite there, Your Honor.  First one, *Rosen*

5        *v. Ingersoll-Rand*, 865 Northeast Second, 451 pinpoint 457,

6        "Appellants are barred from challenging due process and

7        fairness of settlement where they did not comply exactly with

8        the procedures objecting set forth in the settlement notice."

9        That's the situation we have here.

10              *Mortimer v. River Oaks Toyota* discusses the mutually

11       exclusive -- you're either an opt-out or an objector.  It's

12       mutually exclusive under Illinois law.

13              THE COURT:  I thought we were dealing with a separate

14       issue, of whether the ten people can no longer proceed.

15              MR. FOX:  Can they proceed as objectors.  They are

16       trying to act in a representative capacity to object to the

17       settlement.  That's what they are doing.

18              THE COURT:  Have they opted out?

19              MR. FOX:  They failed to opt out appropriately, and so

20       we have offered them the relief of having their claims be not

21       extinguished by the settlement.

22              THE COURT:  You say it's says opting out and objecting

23       are mutually exclusive, but they haven't opted out, they are

24       just objecting.

25              MR. FOX:  That's the thing is they tried to opt out

1   below and they failed.  There were timelines to do both.  They

2   didn't object.

3          THE COURT:  So you mean they all just like waived

4   their right to appeal?

5          MR. FOX:  Correct, Your Honor.

6          THE COURT:  I was more focused on just the mootness

7   issue.

8          MR. FOX:  But it's also a mootness standing issue.  If

9   you don't have standing to object, if you don't have standing

10  to address the supposed grievances on behalf of 8,700 people

11  who don't have those grievances, but you don't have standing to

12  do that, then how is it not moot when you're told you can come

13  back in and you can be part of this group or you can have any

14  rights you want to have, which is what the letters say.

15         THE COURT:  I think because of *Gomez*, just based on

16  the part I read.

17         MR. FOX:  Your Honor, happy to have you do your

18  research.  You're very intelligent, you're smart, you read

19  cases, you understand them very well, much better than we do.

20         I want to go back, Your Honor, to the breach, because

21  I think, even though you don't think it's a major breach, they

22  are stipulating to a breach, and that breach is we agreed to

23  ten consolidated arbitrations, and now they are saying at most

24  there will be 11.  They are trying to get an 11th consolidated

25  arbitration.  That itself is a breach.  That could make this

1    arbitration and litigation go on for years and years and years,

2    and that's a reason why the stay should no longer be in place.

3        THE COURT:  That's a totally fair point, Mr. Postman.

4    If I say fine, we're off to the races, you guys do what you

5    want, can't they go to the arbitrators at JAMS and say, we no

6    longer agree to this process and we're going to want to start

7    over, and we're going to either challenge the fact it's only

8    one arbitration or we're going to go back to what we were

9    doing.

10        I thought one of the big issues was not just that

11    there was one arbitration, but that they were contending that

12    they could object to basically every single person, because any

13    one of their clients could object.

14        MR. FOX:  This goes to what remedy should exist if a

15    party breaches a contract.  If somebody breaches a contract, a

16    remedy should not be for that part that they should be put in a

17    better position and put back where they were potentially in the

18    first point.

19        We should receive the benefits, or basically make us

20    whole again.  This can be possible to do at this point.  We're

21    asking for one thing.  We're not asking you again to have them

22    dismiss the appeal.  We're not asking to go back to one

23    consolidated arbitration, because the horse has already left

24    the barn, if that's the right term for it.  It's too late at

25    this point.  We know you do not believe, and we're not asking

1  you to, bind other courts, other tribunals.  That's already

2  happened.

3          THE COURT:  If I say, okay, you have breached, so the

4  agreement is no longer in force, isn't he -- why wouldn't he be

5  able to go back and say -- JAMS may agree or not agree, but

6  maybe he'll go back to JAMS and say, look, this was the

7  agreement, the Court has ruled that it's a breach, and she's

8  lifted the stay, and we don't agree it was a breach, but if

9  there is no agreement, if that's the point, then, fine, we want

10 to withdraw what we did, and maybe JAMS says you can and maybe

11 JAMS says you can't.

12         MR. FOX:  We're happy to brief that issue, Your Honor.

13         THE COURT:  That would be an issue for JAMS for sure.

14         MR. FOX:  We believe we would be in a better spot

15 anyway because we would be talking about one consolidated

16 arbitration.

17         THE COURT:  You wouldn't be in a better spot because

18 remember when you were talking about one consolidated

19 arbitration, your problem was that they had -- they were

20 basically stalling not -- you were arguing -- anyway, you

21 weren't -- we weren't able to get agreement on one arbitrator.

22         MR. FOX:  That's what the Ninth Circuit talked

23 about in the *Jones v. Starz* case.

24         THE COURT:  By the way, I actually meant to ask about

25 that.

1          MR. FOX:  They were engaging in the same tactics, and

2    the Ninth Circuit found them to not be wanting to.

3          THE COURT:  This is the paragraph three, the third

4    thing.  I did want to ask you about that, Mr. Postman.

5          MR. FOX:  Your Honor, we're happy to brief the breach

6    and the consequences of the breach if that's something you

7    would like, Your Honor.  We think that we would be in a better

8    position with one consolidated arbitration.  We have the

9    Delaware petition that's on file where they would appoint an

10   arbitrator.  Unless you have another question for me, I'll sit

11   down.

12         THE COURT:  You can go, yeah.

13         MR. POSTMAN:  Your Honor, I would just address the

14   question you addressed to Mr. Fox about what happens if you

15   unstay the litigation.  I actually think that both sides are

16   bound to do the ten arbitrations, and the reason -- maybe it's

17   helpful, the reason that agreement was sent to JAMS is not

18   contingent on the case being stayed or unstayed, so if that

19   clears things up, but that is my view.

20         I have one -- I mean, I don't know if you have a

21   question you wanted to ask.

22         THE COURT:  I wanted your thoughts on this *Jones* case.

23         MR. POSTMAN:  I'm happy to address it.

24         THE COURT:  If you had another thought --

25         MR. POSTMAN:  I guess only that overall I do think

1    there is an issue here that I need to, and will be very careful

2    about, that limits my options here, which is I can recommend to

3    the appellants to dismiss their appeal if I think it's serving

4    their interests and their interests are looking to other people

5    similarly situated, my firm's other clients.

6            THE COURT:  You and I both know there are not ten

7    people who care about this class action.  There just aren't.

8    Maybe you have clients -- maybe I just need to hear from them

9    that they actually care.

10           MR. POSTMAN:  They actually are.  Every class rep is

11   doing the same thing.  I don't understand it personally.  I

12   would never be a class rep.  There is a category of people who

13   want to do this and they have that interest.

14           THE COURT:  When you sent out the emails about who

15   wants to appeal, how many people responded?

16           MR. POSTMAN:  I don't know those numbers off the top

17   of my head.

18           THE COURT:  Someone at your office must know.

19           MR. POSTMAN:  Someone at my office surely knows.

20           THE COURT:  Can you figure that out on a break,

21   because what we can do is --

22           MR. POSTMAN:  Your Honor, this goes to, in terms of

23   what we can do, to my overarching point, which I do feel like a

24   very problematic part of this litigation, and you know our

25   arguments on immunity, is that it's becoming increasingly clear

1   that Tubi is using this to try to gain leverage and advantage

2   against our clients.  I cannot make a concession or a

3   recommendation to my clients that disadvantages them in my

4   assessment in order to save my firm discomfort in this case.

5           THE COURT:  What if I just appoint a neutral expert to

6   advise me, or advise us, on the ethics of you dropping an

7   appeal for people who haven't responded to you?  I mean, if

8   look, let's say there is 8,000 people and 4,000 people said,

9   yeah, we want to pursue an appeal, and then you're saying to

10  me -- and Mr. Fox says fine, those people can come into

11  California, 4,000 people.  I'm not saying Mr. Fox will say

12  that, but let's say he says that.

13          What I understand your concern to be is we have all of

14  these -- say it's 3,000 people, say they want to appeal.

15  Mr. Fox is like, you know, 3,000 people are now blessed and you

16  can get to opt out and go to California.  There are 5,000

17  people you have not heard from.  My understanding is that your

18  concern is that somehow you owe those 5,000 people a duty of

19  responsibility to further the appeal.

20          MR. POSTMAN:  I'm on board with all of that.  To recap

21  to make sure we're on the same page.  If Tubi would agree that

22  those people who reaffirmed that they want to proceed may

23  proceed in California in arbitration, I do think I would

24  recommend to -- I would recommend to the appellants that they

25  dismiss their appeal.

1          THE COURT:  What's wrong with that, Mr. Fox?

2          MR. FOX:  I think the numbers matter, Your Honor.  He

3   just said the same thing, although I don't think that you

4   understood him to say this.  He's basically saying the same

5   thing, which is let me go back to the 8,700 people and see who

6   wants to be part of this arbitration again, when their claims

7   were wiped out because they didn't file opt-outs in October.

8          THE COURT:  I know, Mr. Fox, but you have like -- I

9   know.  I get it.

10          MR. FOX:  The progression is so important here, Your

11   Honor.  They didn't file opt-outs -- 7,600 of them did not file

12   opt-outs.  Mr. Postman signed his name for them.

13          THE COURT:  What if we just said -- what if we agreed

14   that -- so none of the people who are appealing signed opt-outs

15   and that's your concern.

16          MR. FOX:  Half of them didn't sign opt-outs.  The

17   other half, Mr. Postman electronically submitted to the Court.

18          THE COURT:  I'm talking about the 8,700 people who

19   this appeal affects.  How many of those signed opt-outs?

20          MR. FOX:  I believe it's around 1,100 that signed

21   opt-outs and did not submit the appropriate way, and I believe

22   7,600 people he signed the names on behalf of.  And he had not

23   heard from those people.  So --

24          THE COURT:  Why don't we have those 1,000 people go to

25   California and have the 7,600 people -- he drops the appeal.

1      1,000 people go to California.  The 7,600 people, whether they

2      are allowed to now do whatever Mr. -- whether Mr. Postman is

3      permitted to ask them if they want to be part of the

4      arbitration, why doesn't that question go to one of the

5      arbitrators or just have that question in front of me.

6              MR. FOX:  Your Honor, I really like the fact that you

7      try to come up with creative solutions and I think it's great

8      you're doing that.  My problem is we are again negotiating away

9      from what we had in place on December 19th.

10             THE COURT:  Life sucks, Mr. Fox.  I don't know what to

11     tell you.  Sometimes you're fuming and you leave and you talk

12     about that really annoying judge and I wish she would just stop

13     trying to get us to agree and just make a decision.  I said all

14     the things.  I get it.  Here is what -- I'm about to take a

15     break so you guys can think this through.

16             Here is what your client has to consider.  You can

17     stand on principle and have all kinds of things out in the

18     open, the class settlement that was going to be done is now not

19     done potentially for years, you're dealing with this litigation

20     you might win, you might lose.  I still think you would be hard

21     pressed to argue that, Mr. Postman, that you can file a

22     third-party tort suit in front of him, because my understanding

23     of the case law, as I recall, was that in order to have a

24     tortious interference case or some sort of case like that, I

25     would have to make a finding that none of what they were doing

1    was advantageous to their clients, and that's clearly not the

2    case.  Let's put that aside for a moment.

3          I get it.  It sucks.  Defense lawyers think

4    plaintiff's lawyers are plaintiff's lawyers and they are always

5    doing whatever they are doing, and now here we are and I'm

6    going to have to do 11 arbitrations instead of 10, and I'm

7    going to have 18,000 people instead of 16,000 people and it

8    sucks.

9          If you guys on a break are like, yeah, we're going to

10   stand on principle, I'll make a decision and we'll more likely

11   than not, Mr. Fox and Mr. Postman, I would probably lift the

12   stay.  Even if I don't find there is a breach, I just think

13   it's -- I don't know.  I can't imagine that what I would is say

14   it's not a breach and I'm staying this, and I'm continuing the

15   stay, because that's totally unfair to them given what was

16   here.

17         So I get it, Mr. Fox.  I understand the frustration,

18   but the question for you and your client is do you want -- I

19   mean, out of this you have at least gotten a concession, maybe

20   it was not a concession, that they are not going to seek 8,000

21   new arbitrations, so that's good.

22         He could take that away, I guess, if he wants to.  And

23   you have gotten a path forward to getting rid of the Illinois

24   litigation relatively quickly.  You have to give some things up

25   in advance, and I get it, you're mad, because you have already

1    done the negotiating and they are just trying to get more than

2    they were entitled to.  It sucks, but you have to choose the

3    better of two bad options.

4         What I cannot do is order specific -- I cannot force

5    him to drop the Illinois suit.  I just can't.

6         MR. FOX:  On the break, Your Honor, if Mr. Postman can

7    provide you, the Court, with the information about how many of

8    these people responded that they wanted to have this relief, I

9    think then --

10         THE COURT:  Can we get that, Mr. Postman?

11         MR. FOX:  I can talk to my client about those people

12    whether they would be willing to allow those people back in,

13    but I think we would want proof that they wanted to be in.

14         MR. POSTMAN:  I do think it's important to complete

15    the point about what I view as illegitimate about the class

16    proceeding, because the terms and conditions that Tubi pushes

17    out to its consumers, and I will note they are very happy to

18    have a clickwrap consent count there with consumers.  They

19    treat that as full and valid consent.  That takes away their

20    right to a class, and in exchange it says neither party will

21    participate in a class action.

22         And one thing -- if you think about what Tubi is

23    agreeing to by saying they will not participate in a class

24    action, it can only be referring to what they did here, which

25    is to say, well, we'll send out a notice, which by the way the

1    large majority of these notices go to spam filters.  If you

2    don't act -- it was a three-week window when we were reaching

3    out to our clients -- then your claim is erased.  These are

4    clients who had signed up with counsel to pursue a claim and,

5    from my perspective, were pulled illegitimately into a class

6    where they lost their rights.

7            For a consumer with a lower value claim to be

8    inattentive in a few weeks in the fall for us to say, no, you

9    can no longer try to advocate for their interest, I think is

10   illegitimate.  I think the appellants are trying to prove that

11   point.  I don't think the test should be whether they responded

12   in that three-week window.  I think the question should be when

13   we go back to them, would you like to reengage, I think over a

14   one-week incremental period.

15           THE COURT:  Do you have the numbers yet?

16           MR. POSTMAN:  We're working on it, Your Honor.

17           THE COURT:  I'm going to take a break.  Let's come

18   back at 5:05, get the numbers, and then here is what I'm going

19   to do.  I'm going to set a second hearing for next week.  You

20   guys try to figure this out.  If your client -- Mr. Fox, I want

21   to be clear, Mr. Fox.  If your client at the break or tomorrow

22   or whenever says to you I don't care what the consequences are,

23   I want to go forward with the case in front of Judge Reyes, I

24   will, you know, more likely than not, I would lift the stay.

25   I'm not going to force you into an agreement.

1          I'm just telling you you have two bad options, and to

2     me one is badder than another, but I'm not a client for good

3     reason.

4          (Recessed from 4:52 p.m. to 5:06 p.m.)

5          THE COURT:  Let's go back on the record.  So where are

6     we, gentlemen?

7          MR. POSTMAN:  Did you want numbers, Your Honor?  After

8     the trial court issued its decision, we emailed all of the

9     clients who had had their opt-outs rejected.  It's important to

10    note we determined then, and we believe now, that not everyone

11    needed to appeal, because of the issue I was speaking about and

12    doesn't necessarily make sense to file 8,700 docket entries,

13    and so we informed them that we would be appealing and reached

14    out and asked people if they wanted to play this role as

15    appellants.  These numbers are approximate because we get phone

16    calls and texts and emails, and so this is our best estimate,

17    but approximately 80 expressed interest in that, and we

18    ultimately filed ten.

19         Given this point about they didn't all need to appeal,

20    as I said before, I don't think the appropriate measure of

21    whether someone was interested in preserving their rights is

22    whether they filed an appeal.

23         THE COURT:  All right.  Mr. Fox?

24         MR. FOX:  There were key words that Mr. Postman just

25    said there.  Before any of his clients responded, he sent out

1    an email.  After the Court ruled, he sent out an email to his

2    clients saying we will be appealing; who wants to be -- who

3    wants to be the name of the appellant.  He had made this

4    decision.  That's what he just said to Your Honor.

5        THE COURT:  He might have just been talking loosely,

6    Mr. Fox.

7        MR. POSTMAN:  We think we should appeal.  I'm

8    paraphrasing.

9        MR. FOX:  We think we should appeal, reach an

10   agreement with us to withdraw the objections and now we think

11   we should appeal and undo the judgment.  So again, think about

12   it.  You mentioned how mad we would be.  Think about hearing

13   this right now.  We said -- we believe this has been entirely

14   attorney driven.  He walks out of that room before we agree to

15   withdraw the objections.  He signs a stipulation withdrawing

16   the objections.  And then he emails saying we think that we

17   should appeal and try to have the judgment reversed and

18   vacated.

19       THE COURT:  Hold on.  I think Mr. Postman was trying

20   to get us numbers.  I don't want to get caught up in what the

21   email said.  I agree with you this is attorney driven.  There

22   is no doubt in my mind this is attorney driven.  You still have

23   the same two options.  Whether it was attorney driven or Santa

24   Claus driven, you have two options.  You don't need to give me

25   a decision right now.

1          MR. FOX:  Just to lay out what the two options are.  I
2    want to make sure I understand what those two options are.

3          THE COURT:  The first option is you ask me to rule on
4    whether or not what Mr. Postman and his clients did was a
5    breach of the agreement that was reached in my court.  I don't
6    think that's for the arbitrators.  I do think that's for me,
7    Mr. Postman.  And there are two options, two things could
8    happen.  I could say it's not a breach and I'm not lifting the
9    stay.  I could find it is a breach and so I'm lifting the stay.
10   I suppose I could find it's not a breach technically, but
11   because it's in the spirit, I will lift the stay.  I mean
12   that's probably the most likely outcome, just to be honest with
13   everyone, if I can get myself to I can do that legally.

14          If that happens, I mean either way, whatever I decide,
15   if you force a decision, you're going to have the Illinois
16   proceeding continue.  I would take a gander at this *Gomez* case,
17   because I think based on what I saw it's not limited to just
18   class action reps.

19          Or you and Mr. Postman come up to some agreement about
20   the appeal goes away soon, very, very soon.  The class
21   settlement can get settled and people can get their $50 checks.
22   And some group of people can go into the California -- I take
23   it at least the 80 who responded, and it sounds likes what
24   Mr. Postman wants to do is send out another email, and he'll
25   get whatever portion back he gets.  If he got more than ten

1    percent, I would be stunned.  You never know.  It might be all

2    8,000.

3              Those are your two options really.  The option of me

4    giving specific performance of making him drop the appeal is

5    not going to happen.

6              MR. FOX:  Understood.  So it's the two options, and

7    there is a material difference between the 80 who responded and

8    then sending out a new email.

9              THE COURT:  You guys work that amongst yourselves.

10             MR. FOX:  We can work that out and set a date, Your

11   Honor, and then report back to Your Honor.

12             THE COURT:  Why don't you do that.  And I hesitate to

13   say this, but I'm going to say it, because I have read your

14   letters, but I think both of you are excellent attorneys.  We

15   have been talking about it in chambers.  Every time you have

16   been in front of us, including you, Mr. Postman, having been a

17   defense lawyer for 22 years, that's sort of hard to get out,

18   but I think both of you have done very well.  I think part of

19   the problem Mr. Fox is facing is that you're a very good

20   lawyer.

21             I think it might be worthwhile to have two different

22   people from your firms, like not you and Mr. Postman

23   interacting on this point.  Obviously, you should be engaged,

24   but in terms of the day-to-day moving forward, it just might be

25   helpful to have a difference between the Department of State

1    and the Department of War, and you two are very much the

2    Secretaries of Defense, and I have some understanding of the

3    Secretary of Defense role.

4         MR. FOX:  So you are aware, Your Honor, I have been

5    asking other people to engage on the day-to-day things with

6    Keller Postman.

7         THE COURT:  I'm just talking about this particular

8    point.  I mean, this is not in any way, shape or form a

9    criticism of either of you, and maybe you guys can put past

10   aside.  But I have a sense that a little bit of annoyed

11   feelings on both sides is maybe hampering the ability to get

12   things done more efficiently.

13        Nothing that you all have sent me so far has been

14   inefficient.  I think all the work has been excellent.

15   Sometimes it's better to get the Secretaries of State -- maybe

16   not anymore.  We might not have a Secretary of State -- talking

17   to each other.

18        MR. FOX:  Should we reach out to your courtroom deputy

19   about a date next week?

20        THE COURT:  Reach out to Ms. White.  If you guys need

21   more than a week, that's fine.  Mr. Postman, it is highly

22   likely that if you guys don't figure something out that I'm

23   lifting the stay.  I don't see how I can keep the stay in

24   place.

25        MR. FOX:  We believe that while we were deciding these

1  issues, that Keller Postman should agree to a short stay of the

2  JAMS arbitrations until we figure out who the litigants could

3  potentially be before them.  So that would be, as we're talking

4  right now, a week-long stay.  I think that is very reasonable

5  given what we're talking about right now.

6         THE COURT:  I think it's reasonable.  You're the one

7  who can decide how long it's going to take for these people to

8  get back to you.

9         MR. POSTMAN:  Your Honor, I think we're talking about

10  a matter of days --

11         THE COURT:  What's happening in the litigation right

12  now?

13         MR. POSTMAN:  Well, two points on this.  There is an

14  unambiguous confidentiality provision that Tubi does not --

15  they don't dispute that the proceedings in JAMS and the

16  existence of the JAMS arbitration have to be held confidential.

17  It's black and white in the agreement with --

18         THE COURT:  The existence of the fact there is an

19  arbitration?

20         MR. POSTMAN:  Yes.  I'll read it.  The terms the

21  claimants are arbitrating under says, "You and Tubi agree to

22  maintain the confidential nature of the arbitration proceeding

23  and shall not disclose the fact of the arbitration, any

24  documents exchanged as part of the mediation," blah, blah,

25  blah.

1          There is a clause at the end, which I should, in full

2    candor, disclose that says "except as may be necessary in

3    connection with a court application for a provisional remedy."

4    This isn't a provisional remedy proceeding.

5          THE COURT:  Okay.  Technically not.  I hear you.

6          MR. POSTMAN:  I just need to be respectful of the

7    confidentiality piece.

8          THE COURT:  I hear you.

9          MR. POSTMAN:  You've asked me.

10         THE COURT:  Mr. Fox, I assume you have no objection to

11   me him telling me the status of what's going on right now in

12   the arbitration?

13         MR. FOX:  Of course not, Your Honor.

14         THE COURT:  All right.

15         MR. POSTMAN:  The arbitrator assignment process is

16   just getting going.  They're doing docketing proceedings.  I

17   expect it will be about a month before there's any preliminary

18   hearing.  We're just pushing that whole process out for a week.

19         THE COURT:  Your client wants to talk to you, Mr. Fox.

20         MR. FOX:  Your Honor, I mean, what we don't want to

21   have happen is that if, let's say that we would agree to let 80

22   people in, that all of a sudden there's an 11th consolidated

23   arbitration.

24         THE COURT:  Ten arbitrations, Mr. Postman.  All right?

25   10 arbitrations.  You guys figure it out.  It's not just going

1    to be 80, Mr. Fox.  All right.  Ten arbitrations.  Yes, agreed.

2        Thank you, everyone.

3        (Proceedings concluded at 5:18 p.m.)

4

5                              CERTIFICATE

6        I, Sonja L. Reeves, Federal Official Court Reporter in and
     for the United States District Court of the District of
7    Columbia, do hereby certify that the foregoing transcript is a
     true and accurate transcript from the original stenographic
8    record in the above-entitled matter and that the transcript
     page format is in conformance with the regulations of the
9    Judicial Conference of the United States.

10       Dated this 23rd day of April, 2025.

11

12                         /s/ Sonja L. Reeves
                         SONJA L. REEVES, RDR-CRR
13                       FEDERAL OFFICIAL COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$2,000** [1] - 54:17
**$50** [2] - 38:21, 77:21

## /

**/s** [1] - 82:12

## 1

**1** [3] - 14:15, 14:18, 43:12
**1,000** [4] - 47:15, 47:16, 70:24, 71:1
**1,100** [1] - 70:20
**10** [17] - 19:18, 21:12, 35:22, 36:14, 37:17, 40:18, 42:19, 43:19, 43:20, 47:16, 51:25, 54:5, 54:10, 54:11, 54:17, 72:6, 81:25
**100** [3] - 1:17, 38:25, 47:16
**10th** [2] - 48:25, 51:25
**11** [7] - 40:16, 40:18, 54:4, 54:10, 54:17, 64:24, 72:6
**1101** [1] - 1:17
**11th** [9] - 21:10, 24:2, 33:8, 37:18, 46:10, 48:25, 49:2, 64:24, 81:22
**12** [1] - 23:5
**15** [1] - 19:17
**15,000** [6] - 23:4, 37:12, 40:1, 40:7, 45:6, 52:14
**153** [1] - 62:10
**16,000** [1] - 72:7
**162** [1] - 62:13
**17** [1] - 21:25
**18,000** [2] - 45:6, 72:7
**19** [1] - 39:11
**19,000** [1] - 52:14
**19th** [2] - 37:10, 54:15, 71:9
**1:24-cv-01616-ACR** [1] - 1:5

## 2

**2** [4] - 13:18, 14:5, 14:13, 17:21
**20** [1] - 19:17
**20001** [1] - 1:24
**20036** [1] - 1:18

**202** [1] - 1:18
**2024** [1] - 37:9
**2025** [2] - 1:10, 82:10
**213** [1] - 1:14
**22** [2] - 1:10, 78:17
**23,000** [2] - 8:10, 36:21
**23,700** [1] - 36:17
**23,740-something** [1] - 23:3
**239-5101** [1] - 1:14
**23rd** [1] - 82:10
**24-1616** [1] - 2:2
**26th** [1] - 36:9
**2nd** [1] - 39:21

## 3

**3** [3] - 36:23, 51:18, 51:19
**3,000** [2] - 69:14, 69:15
**31-2** [1] - 62:20
**31st** [1] - 49:8
**3300** [1] - 1:13
**333** [1] - 1:24
**3:19** [2] - 1:10, 2:1

## 4

**4,000** [4] - 49:23, 54:18, 69:8, 69:11
**408** [1] - 50:6
**451** [2] - 62:25, 63:5
**457** [1] - 63:5
**4:52** [1] - 75:4

## 5

**5** [1] - 22:1
**5,000** [2] - 69:16, 69:18
**515** [1] - 1:13
**57,000** [1] - 23:1
**577** [1] - 62:10
**5:05** [1] - 74:18
**5:06** [1] - 75:4
**5:18** [2] - 1:10, 82:3

## 6

**6** [4] - 26:24, 39:10, 46:1, 56:21

## 7

**7** [2] - 42:22, 43:3
**7,600** [12] - 15:20, 47:7, 47:10, 47:12, 48:2, 50:15, 50:20,

51:22, 70:11, 70:22, 70:25, 71:1
**70** [1] - 31:5
**79** [1] - 38:16

## 8

**8** [3] - 39:22, 62:24, 63:1
**8,000** [14] - 23:9, 25:9, 26:14, 29:14, 39:12, 40:19, 46:11, 46:13, 46:14, 47:4, 47:6, 69:8, 72:20, 78:2
**8,600** [2] - 59:20, 60:13
**8,690** [2] - 19:11, 48:22
**8,700** [19] - 7:3, 10:12, 11:15, 12:21, 15:20, 17:9, 21:9, 28:21, 47:12, 47:19, 49:9, 59:21, 59:25, 60:17, 64:10, 70:5, 70:18, 75:12
**80** [5] - 75:17, 77:23, 78:7, 81:21, 82:1
**865** [2] - 62:25, 63:5

## 9

**9,000** [2] - 9:23, 26:14
**90071** [1] - 1:14
**918-1870** [1] - 1:18

## A

**A-okay** [1] - 34:18
**ability** [1] - 79:11
**able** [8] - 3:9, 12:14, 18:5, 39:3, 60:15, 60:16, 66:5, 66:21
**above-entitled** [1] - 82:8
**absolutely** [2] - 45:24, 56:11
**accepted** [1] - 29:3
**accurate** [1] - 82:7
**accusations** [1] - 32:15
**acknowledged** [1] - 49:3
**act** [4] - 12:21, 38:6, 63:16, 74:2
**acting** [2] - 24:12, 24:14
**Action** [1] - 2:2
**action** [20] - 3:15,

3:17, 3:18, 10:18, 22:24, 32:1, 38:15, 38:18, 38:19, 38:25, 46:5, 55:9, 55:16, 56:2, 58:10, 62:4, 68:7, 73:21, 73:24, 77:18
**actual** [6] - 4:4, 45:13, 45:16, 53:5, 58:8
**add** [1] - 28:14
**added** [1] - 22:17
**adding** [1] - 52:9
**addition** [1] - 54:11
**additional** [4] - 22:5, 54:13, 54:18, 58:17
**address** [4] - 26:21, 64:10, 67:13, 67:23
**addressed** [1] - 67:14
**addressing** [1] - 56:20
**adequacy** [1] - 19:4
**adequate** [4] - 7:25, 9:7, 13:5, 25:14
**administrator** [1] - 43:7
**admonished** [1] - 27:19
**advance** [1] - 72:25
**advantage** [1] - 69:1
**advantageous** [1] - 72:1
**adverse** [4] - 9:22, 26:16, 32:24, 32:25
**adversely** [1] - 39:5
**advice** [1] - 60:7
**advise** [5] - 31:12, 32:25, 34:24, 69:6
**advised** [1] - 9:21
**advocate** [1] - 74:9
**affect** [3] - 10:7, 11:14, 39:5
**affects** [3] - 10:10, 10:11, 70:19
**afternoon** [3] - 2:6, 2:9, 2:11
**agree** [27] - 2:20, 2:23, 17:3, 19:5, 19:18, 24:3, 24:4, 26:22, 45:14, 47:15, 49:16, 54:22, 55:1, 57:1, 59:5, 61:19, 65:6, 66:5, 66:8, 69:21, 71:13, 76:14, 76:21, 80:1, 80:21, 81:21
**agreed** [16] - 4:2, 8:14, 8:15, 11:6, 12:20, 15:11, 24:1,

27:25, 35:13, 36:17, 42:25, 50:6, 56:22, 64:22, 70:13, 82:1
**agreeing** [5] - 36:3, 52:6, 58:24, 58:25, 73:23
**agreement** [66] - 3:15, 3:16, 4:7, 4:13, 4:15, 4:17, 5:3, 5:4, 5:14, 6:7, 6:11, 6:13, 6:15, 6:20, 13:15, 19:6, 20:9, 21:21, 23:11, 25:10, 26:23, 30:2, 30:13, 30:15, 30:16, 30:18, 30:20, 31:11, 34:11, 35:5, 35:7, 36:8, 37:10, 37:25, 38:4, 39:23, 40:24, 42:3, 42:8, 42:11, 42:12, 42:15, 42:19, 43:4, 43:5, 43:24, 45:10, 45:11, 45:16, 49:12, 49:17, 51:9, 54:14, 56:14, 58:15, 59:11, 66:4, 66:7, 66:9, 66:21, 67:17, 74:25, 76:10, 77:5, 77:19, 80:17
**ahead** [4] - 6:23, 11:10, 21:16, 41:2
**aligned** [1] - 7:23
**alive** [1] - 32:8
**allegations** [2] - 3:2, 27:18
**allow** [2] - 51:2, 73:12
**allowed** [6] - 11:16, 13:9, 39:4, 50:23, 71:2
**alluded** [1] - 26:20
**almost** [1] - 45:10
**alone** [1] - 15:11
**ambiguity** [3] - 53:5, 53:6, 53:8
**amount** [1] - 39:8
**Ana** [1] - 31:7
**ANA** [1] - 1:9
**Angeles** [1] - 1:14
**annoyed** [1] - 79:10
**annoying** [1] - 71:12
**answer** [4] - 3:9, 3:10, 17:5, 34:15
**anticipate** [3] - 26:10, 47:5, 57:20
**anticipated** [1] - 58:19
**anyway** [3] - 33:4, 66:15, 66:20
**apologize** [1] - 14:15
**appeal** [98] - 6:25,

7:4, 7:10, 7:13, 7:15, 8:20, 9:23, 10:2, 10:5, 10:6, 10:11, 10:22, 11:1, 11:16, 11:17, 11:19, 13:19, 13:22, 14:5, 14:23, 16:20, 17:2, 17:14, 17:20, 17:24, 19:24, 19:25, 20:5, 20:6, 20:7, 20:9, 20:25, 21:2, 24:24, 25:4, 25:5, 25:7, 25:12, 25:17, 25:18, 26:17, 26:18, 26:20, 27:25, 28:17, 29:16, 30:9, 30:23, 30:25, 31:17, 31:20, 33:5, 33:7, 33:10, 33:11, 34:8, 34:24, 38:9, 39:7, 48:19, 49:4, 51:22, 55:4, 55:21, 59:7, 59:16, 59:21, 59:22, 59:23, 60:9, 60:10, 60:12, 60:14, 60:15, 61:5, 62:22, 64:4, 65:22, 68:3, 68:15, 69:7, 69:9, 69:14, 69:19, 69:25, 70:19, 70:25, 75:11, 75:19, 75:22, 76:7, 76:9, 76:11, 76:17, 77:20, 78:4

**appealed** [3] - 8:21, 17:7, 19:18

**appealing** [17] - 9:11, 10:21, 13:6, 13:7, 13:8, 13:19, 20:4, 23:8, 34:19, 37:2, 37:15, 48:11, 58:25, 60:11, 70:14, 75:13, 76:2

**appeals** [6] - 19:17, 22:4, 24:8, 47:13, 56:4

**appellant** [1] - 76:3

**appellants** [17] - 11:22, 12:1, 12:2, 12:4, 12:5, 12:6, 13:23, 14:6, 14:23, 15:4, 22:2, 49:5, 61:3, 68:3, 69:24, 74:10, 75:15

**Appellants** [2] - 13:19, 63:6

**appellate** [24] - 13:24, 17:15, 17:18, 17:19, 18:5, 18:12, 18:18, 20:21, 22:17, 25:13, 26:7, 26:21, 29:8, 30:3, 30:4, 30:11, 30:12, 31:13,

33:1, 37:20, 41:20, 60:16, 60:21, 62:21

**appellees** [1] - 11:25

**application** [1] - 81:3

**applied** [2] - 25:3, 46:14

**applies** [1] - 61:8

**apply** [1] - 33:6

**appoint** [4] - 45:5, 55:14, 67:9, 69:5

**appointed** [1] - 55:15

**appreciate** [2] - 23:14, 29:22

**approach** [1] - 45:10

**appropriate** [2] - 70:21, 75:20

**appropriately** [2] - 20:22, 63:19

**approval** [14] - 6:6, 6:8, 7:2, 7:23, 13:20, 13:22, 13:24, 13:25, 14:6, 14:24, 15:1, 15:2, 18:1, 25:1

**approximate** [1] - 75:15

**April** [4] - 1:10, 37:8, 82:10

**arbitrants** [1] - 40:7

**arbitrate** [2] - 4:22, 42:19

**arbitrating** [1] - 80:21

**arbitration** [48] - 3:20, 10:4, 10:15, 10:16, 10:17, 18:21, 21:11, 22:6, 22:15, 23:25, 28:20, 29:9, 29:13, 29:16, 32:3, 34:11, 36:17, 36:22, 40:2, 40:4, 40:15, 42:4, 42:10, 42:12, 46:10, 47:21, 48:14, 48:23, 48:25, 51:25, 56:23, 64:25, 65:1, 65:8, 65:11, 65:23, 66:16, 66:19, 67:8, 69:23, 70:6, 71:4, 80:16, 80:19, 80:22, 80:23, 81:12, 81:23

**arbitrations** [25] - 19:2, 22:5, 23:17, 24:5, 24:7, 28:16, 30:21, 35:7, 36:25, 37:17, 44:3, 45:18, 47:6, 52:1, 53:23, 54:11, 55:18, 64:23, 67:16, 72:6, 72:21, 80:2, 81:24, 81:25, 82:1

**arbitrator** [7] - 36:18,

42:14, 44:16, 55:15, 66:21, 67:10, 81:15

**arbitrators** [8] - 36:19, 44:12, 44:18, 45:4, 55:16, 65:5, 71:5, 77:6

**argue** [3] - 3:10, 3:11, 71:21

**argued** [2] - 9:16, 26:15

**arguing** [3] - 19:3, 50:8, 66:20

**argument** [7] - 22:3, 34:10, 34:13, 42:2, 42:4, 45:21, 58:8

**arguments** [11] - 8:2, 8:22, 9:8, 14:2, 14:9, 15:5, 18:3, 27:22, 27:23, 60:23, 68:25

**aside** [2] - 72:2, 79:10

**assert** [1] - 60:20

**assessment** [1] - 69:4

**assignment** [1] - 81:15

**assume** [5] - 17:3, 33:2, 41:13, 58:11, 81:10

**attached** [1] - 62:21

**attempt** [2] - 15:9, 48:8

**attempted** [1] - 18:8

**attempting** [2] - 5:15

**attorney** [15] - 30:24, 30:25, 31:19, 31:22, 31:23, 31:25, 32:17, 32:20, 33:19, 52:16, 53:16, 76:14, 76:21, 76:22, 76:23

**attorney-client** [1] - 32:17

**attorney-driven** [1] - 33:19

**attorneys** [1] - 78:14

**authority** [1] - 16:9

**Avenue** [2] - 1:17, 1:24

**aware** [1] - 79:4

## B

**backwards** [1] - 32:21

**bad** [10] - 3:2, 11:7, 11:9, 11:13, 24:12, 24:14, 31:25, 55:10, 73:3, 75:1

**badder** [1] - 75:2

**Barch** [6] - 14:9,

23:4, 26:14, 44:7, 44:13, 44:14

**Barch's** [3] - 14:6, 14:24, 15:2

**bargain** [1] - 57:20

**barn** [1] - 65:24

**barred** [1] - 63:6

**based** [10] - 22:4, 38:20, 40:24, 42:22, 46:12, 55:20, 56:7, 60:12, 64:15, 77:17

**basis** [3] - 17:21, 20:8, 37:20

**bear** [1] - 26:12

**become** [1] - 2:25

**becoming** [1] - 68:25

**BEFORE** [1] - 1:9

**begin** [1] - 44:15

**behalf** [14] - 2:7, 7:2, 8:2, 15:21, 18:4, 18:6, 20:6, 20:7, 23:17, 59:25, 60:10, 60:24, 64:10, 70:22

**behavior** [1] - 32:20

**below** [2] - 30:24, 64:1

**bench** [1] - 51:11

**beneficial** [1] - 40:23

**benefit** [4] - 33:13, 41:10, 52:20, 56:6

**benefits** [1] - 65:19

**best** [2] - 3:9, 75:16

**bet** [2] - 56:17, 56:18

**better** [9] - 53:7, 58:14, 64:19, 65:17, 66:14, 66:17, 67:7, 73:3, 79:15

**between** [6] - 2:19, 4:5, 42:12, 43:12, 78:7, 78:25

**BHAT** [1] - 1:17

**Bhat** [1] - 2:10

**big** [2] - 27:20, 65:10

**bind** [1] - 66:1

**Bingo** [1] - 22:16

**bit** [4] - 9:24, 33:20, 42:1, 79:10

**black** [1] - 80:17

**blah** [3] - 80:24, 80:25

**blessed** [1] - 69:15

**Block** [2] - 1:12, 2:8

**board** [1] - 69:20

**boils** [1] - 3:13

**bono** [3] - 33:25, 41:21, 61:7

**book** [1] - 2:14

**bottom** [1] - 39:22

**bound** [5] - 4:15, 4:16, 6:12, 6:14,

67:16

**boys** [1] - 27:20

**BRANDON** [1] - 1:13

**Brandon** [1] - 2:6

**breach** [37] - 21:18, 35:17, 37:25, 49:12, 51:9, 52:20, 53:5, 53:8, 53:11, 53:18, 54:6, 54:24, 55:2, 56:7, 56:10, 56:25, 57:2, 57:15, 57:17, 58:1, 58:8, 58:20, 64:20, 64:21, 64:22, 64:25, 66:7, 66:8, 67:5, 67:6, 72:12, 72:14, 77:5, 77:8, 77:9, 77:10

**breached** [6] - 34:12, 42:18, 42:21, 57:15, 66:3

**breaches** [2] - 65:15

**break** [6] - 68:20, 71:15, 72:9, 73:6, 74:17, 74:21

**brief** [8] - 7:18, 19:18, 21:13, 58:5, 62:24, 63:1, 66:12, 67:5

**briefed** [2] - 62:19, 62:22

**briefing** [9] - 7:13, 7:14, 8:12, 17:25, 26:24, 27:11, 28:15, 45:23, 58:7

**briefly** [1] - 24:24

**bring** [5] - 3:20, 27:21, 57:8, 57:9, 57:10

**broad** [1] - 41:9

**broader** [3] - 7:9, 61:4, 61:6

**brought** [3] - 21:10, 32:16, 54:11

**Buddhism** [3] - 2:14, 2:19, 2:20

**Buddhist** [2] - 2:17, 2:25

**bullet** [4] - 4:6, 26:25, 43:10, 45:14

**bullets** [1] - 26:25

**bunch** [3] - 10:6, 32:23, 60:8

**BY** [2] - 1:13, 1:17

## C

**cake** [1] - 51:5

**California** [34] - 1:14, 3:15, 3:17, 3:20, 3:21, 3:23, 4:21, 4:23, 6:4,

12:14, 23:2, 23:10,
32:3, 37:2, 37:3, 37:5,
37:8, 40:20, 40:21,
46:11, 49:23, 51:14,
51:15, 51:25, 52:14,
52:15, 55:9, 55:10,
69:11, 69:16, 69:23,
70:25, 71:1, 77:22
**calm** [1] - 28:4
**Campbell** [2] - 61:24,
62:2
**Campbell-Ewald** [2]
- 61:24, 62:2
**candor** [1] - 81:2
**cannot** [6] - 3:20,
26:6, 35:7, 69:2, 73:4
**capable** [1] - 61:16
**capacity** [1] - 63:16
**care** [8] - 10:4,
40:17, 40:18, 40:19,
61:10, 68:7, 68:9,
74:22
**careful** [2] - 32:16,
68:1
**cares** [2] - 54:17,
54:18
**carve** [1] - 44:21
**carved** [1] - 31:20
**carveout** [2] - 30:17,
44:23
**carves** [1] - 31:18
**case** [28] - 4:13, 5:1,
5:2, 13:7, 28:19,
30:19, 31:2, 32:4,
41:19, 43:7, 47:5,
55:19, 55:22, 56:3,
61:17, 62:1, 62:4,
62:18, 66:23, 67:18,
67:22, 69:4, 71:23,
71:24, 72:2, 74:23,
77:16
**CASE** [1] - 1:5
**cases** [5] - 3:6,
30:24, 62:24, 63:4,
64:19
**catch** [1] - 31:8
**categories** [1] - 20:1
**category** [1] - 68:12
**caught** [1] - 76:20
**cents** [1] - 38:16
**certain** [1] - 34:25
**certainly** [7] - 16:21,
26:2, 37:11, 40:8,
41:14, 45:10, 55:13
**certainty** [2] - 23:8,
48:12
**CERTIFICATE** [1] -
82:5
**Certified** [1] - 1:23
**certify** [1] - 82:7

**chains** [3] - 35:23,
36:2, 36:3
**challenge** [6] - 19:6,
25:5, 25:23, 59:14,
59:15, 65:7
**challenged** [1] -
42:17
**challenges** [1] -
59:17
**challenging** [1] -
63:6
**chambers** [1] - 78:15
**chance** [3] - 3:6,
50:22, 51:23
**change** [1] - 56:25
**characterization** [1]
- 59:1
**check** [1] - 38:16
**checks** [1] - 77:21
**choice** [1] - 21:4
**choose** [1] - 73:2
**Circuit** [2] - 66:22,
67:2
**cite** [3] - 62:3, 62:11,
63:4
**citing** [1] - 62:17
**Civil** [1] - 2:2
**claim** [4] - 23:10,
74:3, 74:4, 74:7
**claimants** [7] -
30:20, 37:3, 38:24,
40:1, 44:19, 80:21
**claims** [15] - 3:20,
5:5, 5:13, 6:4, 7:4,
11:19, 23:11, 28:4,
31:13, 37:2, 38:24,
39:1, 63:20, 70:6
**class** [74] - 3:15,
3:18, 3:19, 4:14, 4:16,
4:19, 4:21, 5:4, 5:7,
5:8, 5:22, 6:2, 6:12,
6:14, 7:25, 8:8, 9:3,
9:4, 9:6, 9:10, 10:18,
15:15, 15:16, 15:18,
16:11, 16:12, 16:16,
18:6, 19:15, 20:12,
20:18, 22:19, 22:20,
22:21, 22:25, 25:13,
26:12, 26:15, 30:8,
32:1, 33:14, 34:19,
37:20, 38:15, 38:18,
38:19, 38:22, 38:25,
40:19, 46:5, 46:9,
47:5, 47:19, 48:8,
48:16, 48:20, 50:13,
58:10, 59:15, 61:23,
62:4, 62:5, 68:7,
68:10, 68:12, 71:18,
73:15, 73:20, 73:21,
73:23, 74:5, 77:18,

77:20
**Claus** [1] - 76:24
**clause** [1] - 81:1
**clear** [8] - 17:16,
17:18, 22:4, 23:19,
30:10, 34:6, 68:25,
74:21
**clearcut** [1] - 49:14
**clearly** [9] - 24:20,
25:21, 28:4, 28:8,
31:23, 34:15, 57:9,
61:1, 72:1
**clears** [1] - 67:19
**clerk** [1] - 24:16
**CLERK** [1] - 2:2
**clickwrap** [1] - 73:18
**client** [20] - 32:17,
33:8, 35:18, 41:21,
46:7, 46:8, 46:9,
46:10, 49:18, 49:19,
53:13, 54:16, 54:18,
71:16, 72:18, 73:11,
74:20, 74:21, 75:2,
81:19
**clients** [40] - 4:9,
8:11, 9:21, 25:8, 25:9,
26:6, 26:13, 26:16,
27:22, 27:23, 32:23,
32:25, 33:7, 33:22,
34:3, 34:25, 39:1,
39:2, 39:5, 39:12,
41:23, 41:24, 44:21,
46:4, 48:7, 51:21,
57:24, 60:19, 65:13,
68:5, 68:8, 69:2, 69:3,
72:1, 74:3, 74:4, 75:9,
75:25, 76:2, 77:4
**close** [2] - 20:19,
49:13
**closer** [1] - 59:5
**closest** [1] - 20:16
**colloquy** [1] - 26:5
**Columbia** [1] - 82:7
**COLUMBIA** [1] - 1:1
**coming** [7] - 9:25,
11:10, 12:23, 12:25,
13:9, 45:11
**commence** [1] -
29:15
**comment** [2] - 27:13,
27:14
**commitment** [1] -
47:21
**common** [1] - 41:25
**communicate** [1] -
34:3
**communicating** [2] -
36:8, 60:2
**communications** [1]
- 32:17

**complaint** [4] -
27:18, 41:2, 41:4,
41:6
**complete** [1] - 73:14
**completely** [1] -
56:11
**complicated** [1] -
15:18
**complied** [5] - 14:6,
14:24, 14:25, 26:25,
27:2
**comply** [2] - 57:4,
63:7
**concern** [4] - 28:2,
69:13, 69:18, 70:15
**concerned** [6] - 41:5,
46:7, 46:8, 46:9,
46:10, 55:9
**concession** [3] -
69:2, 72:19, 72:20
**concessions** [2] -
40:16, 52:13
**concluded** [1] - 82:3
**conditioned** [1] -
44:13
**conditions** [1] -
73:16
**conduct** [1] - 56:7
**Conference** [1] -
82:9
**CONFERENCE** [1] -
1:9
**conference** [5] -
9:19, 26:3, 27:12,
27:15, 35:3
**confident** [4] - 2:21,
18:11, 24:21, 25:24
**confidential** [2] -
80:16, 80:22
**confidentiality** [2] -
80:14, 81:7
**confirm** [2] - 38:5,
39:23
**conformance** [1] -
82:8
**Connecticut** [1] -
1:17
**connection** [1] - 81:3
**consent** [8] - 15:9,
16:20, 33:10, 33:12,
44:5, 44:6, 73:18,
73:19
**consequences** [2] -
67:6, 74:22
**consider** [3] - 32:19,
35:4, 71:16
**considered** [1] -
18:24
**consolidate** [1] -
22:5

**consolidated** [25] -
18:21, 19:1, 21:11,
22:6, 22:14, 23:10,
23:25, 29:4, 29:16,
30:21, 36:16, 36:24,
37:17, 40:15, 42:24,
45:18, 53:23, 54:11,
64:23, 64:24, 65:23,
66:15, 66:18, 67:8,
81:22
**constituted** [1] -
15:15
**Constitution** [1] -
1:24
**consumer** [2] -
33:22, 74:7
**consumers** [2] -
73:17, 73:18
**contact** [3] - 15:11,
17:12, 44:4
**contacts** [1] - 9:4
**contending** [1] -
65:11
**contest** [3] - 19:9,
19:10, 23:15
**contested** [1] - 24:4
**contesting** [2] - 20:1,
21:23
**context** [5] - 9:4,
45:18, 49:24, 50:2,
51:3
**contingent** [1] -
67:18
**continue** [2] - 51:22,
77:16
**continued** [1] - 23:8
**continuing** [1] -
72:14
**contract** [7] - 11:20,
53:3, 54:22, 57:3,
57:16, 65:15
**contrary** [2] - 21:20,
56:16
**controversy** [1] -
61:18
**conversation** [1] -
2:16
**convinces** [1] -
51:21
**core** [1] - 34:9
**correct** [16] - 4:12,
4:24, 8:5, 10:8, 10:13,
13:11, 13:17, 18:20,
30:2, 32:5, 37:7, 40:5,
42:6, 47:1, 60:24,
64:5
**correctly** [2] - 5:11,
44:25
**cost** [1] - 23:8
**counsel** [7] - 26:9,

33:23, 47:18, 51:2,
53:14, 58:18, 74:4
  **counsel-signed** [1] -
51:2
  **count** [1] - 73:18
  **course** [13] - 19:10,
32:20, 33:10, 33:23,
42:22, 44:20, 52:6,
52:7, 52:8, 53:22,
54:22, 57:10, 81:13
  **court** [32] - 6:22,
6:25, 9:12, 12:19,
13:24, 16:3, 16:12,
17:13, 17:14, 18:12,
25:13, 26:21, 29:4,
29:8, 30:11, 30:12,
31:15, 36:11, 36:15,
37:23, 38:8, 40:2,
41:19, 42:9, 50:18,
50:22, 55:24, 62:20,
62:21, 75:8, 77:5,
81:3
  **COURT** [222] - 1:1,
2:11, 3:24, 4:25, 5:18,
5:25, 6:9, 6:17, 6:23,
7:8, 7:12, 7:16, 7:19,
7:21, 8:1, 8:4, 8:6,
8:9, 8:14, 8:17, 9:14,
9:20, 9:24, 10:9,
10:14, 11:3, 11:10,
11:25, 12:3, 12:8,
12:23, 13:12, 14:11,
14:13, 14:16, 15:7,
15:23, 16:1, 16:7,
16:10, 16:14, 16:17,
16:19, 16:24, 17:11,
17:17, 18:9, 18:25,
19:3, 19:11, 19:20,
19:23, 20:8, 20:14,
20:24, 21:7, 21:15,
21:20, 21:25, 22:9,
22:12, 22:16, 22:23,
23:1, 23:7, 23:18,
23:22, 24:6, 24:9,
25:6, 25:20, 27:2,
27:9, 27:16, 27:24,
28:8, 28:20, 29:6,
29:9, 29:13, 29:17,
29:20, 29:24, 30:10,
31:1, 31:5, 31:23,
32:9, 32:13, 33:3,
33:12, 33:16, 34:1,
34:14, 35:10, 35:15,
35:18, 35:23, 35:25,
36:4, 36:13, 37:1,
37:5, 37:14, 37:23,
38:13, 39:8, 39:12,
39:16, 39:19, 40:17,
41:1, 41:4, 41:8,
41:12, 41:18, 42:1,

42:7, 42:10, 42:16,
43:5, 43:9, 43:15,
43:17, 43:21, 43:25,
44:24, 45:7, 45:20,
46:4, 46:20, 46:22,
47:2, 47:9, 47:13,
47:23, 48:13, 48:19,
49:6, 49:10, 50:3,
50:10, 50:18, 50:21,
51:7, 52:22, 52:25,
53:13, 53:21, 53:25,
54:4, 54:8, 54:16,
55:1, 55:6, 56:9,
56:13, 57:1, 57:5,
58:5, 58:24, 59:16,
59:20, 60:1, 60:6,
61:1, 61:5, 61:13,
62:1, 62:3, 62:6,
62:11, 62:16, 63:2,
63:13, 63:18, 63:22,
64:3, 64:6, 64:15,
65:3, 66:3, 66:13,
66:17, 66:24, 67:3,
67:12, 67:22, 67:24,
68:6, 68:14, 68:18,
68:20, 69:5, 70:1,
70:8, 70:13, 70:18,
70:24, 71:10, 73:10,
74:15, 74:17, 75:5,
75:23, 76:5, 76:19,
77:3, 78:9, 78:12,
79:7, 79:20, 80:6,
80:11, 80:18, 81:5,
81:8, 81:10, 81:14,
81:19, 81:24, 82:13
  **Court** [21] - 1:23, 2:1,
4:17, 8:22, 9:1, 9:4,
18:10, 19:25, 32:6,
34:5, 36:12, 55:12,
55:23, 61:22, 66:7,
70:17, 73:7, 76:1,
82:6, 82:6
  **courtroom** [3] -
21:13, 58:16, 79:18
  **courts** [3] - 51:2,
55:10, 66:1
  **covenant** [4] - 57:13,
57:17, 58:1, 58:22
  **cover** [2] - 3:17, 28:6
  **covered** [5] - 3:18,
11:5, 11:6, 19:5,
45:13
  **creative** [3] - 29:23,
29:25, 71:7
  **criminal** [2] - 30:24,
31:1
  **criticism** [1] - 79:9
  **crowd** [2] - 16:17,
16:18
  **CRR** [1] - 82:12

**cut** [3] - 3:3, 27:19,
30:10

**D**

  **database** [3] - 37:6,
37:8, 37:9
  **date** [4] - 37:11,
38:7, 78:10, 79:19
  **Dated** [1] - 82:10
  **day-to-day** [2] -
78:24, 79:5
  **days** [2] - 12:10,
80:10
  **DC** [4] - 1:11, 1:18,
1:24, 54:21
  **dead** [2] - 12:6,
32:11
  **deadline** [2] - 19:15,
49:9
  **deal** [4] - 30:23, 32:4,
34:13, 46:11
  **dealing** [14] - 4:17,
20:23, 23:1, 23:7,
49:23, 54:14, 54:23,
54:25, 57:14, 57:18,
58:2, 58:22, 63:13,
71:19
  **dealt** [1] - 32:9
  **debate** [1] - 8:18
  **debated** [1] - 4:3
  **December** [5] - 36:9,
37:9, 37:10, 54:14,
71:9
  **decide** [5] - 42:2,
49:12, 51:11, 77:14,
80:7
  **decided** [2] - 40:10,
55:25
  **deciding** [1] - 79:25
  **decision** [13] - 9:18,
44:13, 51:8, 57:21,
57:23, 62:8, 71:13,
72:10, 75:8, 76:4,
76:25, 77:15
  **decisions** [1] - 22:4
  **deconsolidate** [3] -
22:10, 22:12, 23:15
  **defendant** [1] - 61:9
  **Defendant** [1] - 1:7
  **DEFENDANT** [1] -
1:16
  **defendant's** [1] -
29:1
  **Defense** [2] - 79:2,
79:3
  **defense** [2] - 72:3,
78:17
  **Delaware** [4] - 51:15,
55:14, 55:16, 67:9

  **delay** [2] - 22:17,
29:2
  **delegated** [1] - 42:14
  **delegation** [1] - 42:5
  **Delia** [1] - 32:18
  **denied** [2] - 15:12,
15:14
  **Department** [2] -
78:25, 79:1
  **depth** [1] - 62:19
  **DEPUTY** [1] - 2:2
  **deputy** [1] - 79:18
  **describe** [1] - 58:14
  **described** [2] -
26:22, 30:2
  **description** [1] -
56:23
  **desire** [1] - 17:10
  **despite** [1] - 30:14
  **destroy** [2] - 25:9,
32:1
  **details** [1] - 11:8
  **determine** [1] - 4:18
  **determined** [2] -
29:3, 75:10
  **development** [1] -
58:3
  **dictate** [1] - 35:3
  **died** [1] - 12:9
  **difference** [3] -
61:20, 78:7, 78:25
  **different** [12] - 8:13,
9:24, 10:21, 10:23,
12:24, 13:13, 20:24,
25:18, 34:2, 42:23,
62:6, 78:21
  **Diplomate** [1] - 1:22
  **disadvantages** [1] -
69:3
  **disagree** [2] - 48:5,
51:1
  **disagreed** [1] - 50:23
  **disagreement** [2] -
4:4, 11:4
  **disclose** [2] - 80:23,
81:2
  **disclosing** [1] -
32:17
  **discomfort** [1] - 69:4
  **discovery** [1] - 41:9
  **discretionary** [1] -
56:11
  **discussed** [1] -
15:10
  **discusses** [1] -
63:10
  **discussions** [1] -
50:6
  **dismiss** [7] - 7:17,
33:7, 33:11, 57:11,

65:22, 68:3, 69:25
  **dismissal** [1] - 35:9
  **dismissed** [1] -
41:11
  **dismissing** [1] - 33:9
  **dispute** [6] - 5:8,
27:4, 27:5, 33:20,
44:22, 80:15
  **disqualification** [1] -
41:6
  **disqualify** [1] - 55:17
  **District** [2] - 82:6
  **DISTRICT** [3] - 1:1,
1:1, 1:9
  **district** [8] - 9:12,
16:3, 16:11, 17:13,
41:19, 50:18, 50:22
  **divergent** [1] - 60:4
  **Docket** [1] - 62:20
  **docket** [1] - 75:12
  **docketing** [1] - 81:16
  **documents** [1] -
80:24
  **Doe** [2] - 52:9, 52:10
  **done** [19] - 18:15,
18:17, 24:19, 24:22,
34:17, 34:20, 44:25,
46:24, 48:20, 49:21,
49:22, 51:20, 71:18,
71:19, 73:1, 78:18,
79:12
  **doubt** [1] - 76:22
  **down** [7] - 3:13,
28:4, 31:7, 32:14,
34:25, 39:25, 67:11
  **drive** [1] - 2:24
  **driven** [10] - 31:22,
31:23, 31:25, 33:19,
48:6, 76:14, 76:21,
76:22, 76:23, 76:24
  **drop** [6] - 41:1, 41:4,
47:13, 48:19, 73:5,
78:4
  **dropping** [2] - 49:3,
69:6
  **drops** [1] - 70:25
  **due** [2] - 48:10, 63:6
  **duty** [2] - 57:24,
69:18

**E**

  **early** [1] - 37:8
  **eat** [1] - 51:5
  **effective** [1] - 16:6
  **effectively** [2] -
12:22, 14:8
  **efficiency** [1] - 18:22
  **efficiently** [1] - 79:12
  **either** [9] - 5:15,

12:16, 16:9, 19:9, 25:16, 63:11, 65:7, 77:14, 79:9
**elbow** [1] - 24:18
**elbows** [2] - 27:13, 27:18
**elected** [1] - 9:23
**electronically** [1] - 70:17
**eleventh** [1] - 53:24
**email** [14] - 35:23, 36:2, 36:3, 36:6, 39:20, 39:22, 43:5, 43:12, 60:8, 76:1, 76:21, 77:24, 78:8
**emailed** [1] - 75:8
**emailing** [1] - 36:7
**emails** [4] - 59:22, 68:14, 75:16, 76:16
**emphasized** [1] - 43:1
**end** [2] - 49:19, 81:1
**engage** [1] - 79:5
**engaged** [1] - 78:23
**engagement** [5] - 31:18, 31:21, 33:2, 41:14, 41:18
**engaging** [1] - 67:1
**entered** [3] - 3:14, 61:20
**entire** [5] - 7:6, 29:13, 30:20, 40:6
**entirely** [3] - 31:22, 57:11, 76:13
**entitled** [2] - 73:2, 82:8
**entries** [1] - 75:12
**enumerating** [1] - 26:24
**epithet** [1] - 33:24
**equities** [1] - 56:5
**erased** [1] - 74:3
**estate** [3] - 12:8, 12:9, 12:13
**estimate** [1] - 75:16
**estoppel** [1] - 11:20
**ethical** [2] - 32:22, 33:9
**ethics** [6] - 41:2, 41:4, 41:6, 51:14, 60:7, 69:6
**everywhere** [1] - 54:22
**evidence** [3] - 19:13, 30:18, 56:2
**Ewald** [2] - 61:24, 62:2
**exact** [2] - 14:1, 14:2
**exactly** [5] - 8:16, 16:13, 33:18, 35:16,

63:7
**example** [1] - 20:15
**excellent** [2] - 78:14, 79:14
**except** [1] - 81:2
**exchange** [3] - 3:25, 43:12, 73:20
**exchanged** [3] - 43:6, 43:9, 80:24
**excluded** [1] - 48:15
**exclusion** [5] - 8:12, 8:24, 15:12, 15:14, 25:2
**exclusive** [3] - 63:11, 63:12, 63:23
**Exhibit** [7] - 10:25, 13:18, 14:3, 35:17, 35:21, 42:18, 43:12
**exhibits** [1] - 7:18
**exist** [2] - 5:4, 65:14
**existence** [4] - 5:22, 5:24, 80:16, 80:18
**expect** [1] - 81:17
**expense** [1] - 22:17
**expert** [1] - 69:5
**explain** [1] - 11:9
**explaining** [1] - 23:20
**expressed** [1] - 75:17
**expressly** [1] - 17:25
**extensively** [1] - 62:22
**extinguished** [1] - 63:21

## F

**facing** [1] - 78:19
**fact** [12] - 13:3, 13:15, 18:17, 20:5, 22:18, 25:24, 35:12, 37:8, 65:7, 71:6, 80:18, 80:23
**failed** [3] - 57:20, 63:19, 64:1
**fails** [1] - 58:2
**fair** [10] - 16:1, 16:2, 30:15, 54:23, 54:24, 57:13, 57:18, 58:2, 58:22, 65:3
**fairness** [2] - 7:24, 63:7
**faith** [14] - 3:2, 11:7, 11:9, 11:13, 24:12, 24:15, 31:25, 54:23, 54:24, 55:10, 57:13, 57:18, 58:1, 58:22
**fall** [2] - 49:16, 74:8
**far** [5] - 3:21, 32:14,

45:14, 59:5, 79:13
**favor** [1] - 51:12
**FBI** [1] - 31:8
**FEDERAL** [1] - 82:13
**Federal** [1] - 82:6
**federal** [1] - 1:23
**feelings** [1] - 79:11
**fees** [2] - 36:24, 39:17
**few** [3] - 11:12, 24:23, 74:8
**fifth** [1] - 39:25
**fights** [1] - 4:19
**figure** [7] - 2:22, 4:4, 68:20, 74:20, 79:22, 80:2, 81:25
**figured** [2] - 4:11, 16:4
**file** [10] - 38:8, 44:6, 48:23, 55:11, 67:9, 70:7, 70:11, 71:21, 75:12
**filed** [10] - 7:12, 7:13, 7:15, 7:17, 7:24, 8:20, 10:25, 31:14, 75:18, 75:22
**filing** [4] - 6:21, 6:24, 46:1, 56:21
**filters** [1] - 74:1
**final** [8] - 6:7, 7:2, 13:20, 13:24, 15:3, 25:2, 46:16
**finality** [11] - 18:14, 18:22, 18:23, 29:20, 37:19, 40:18, 46:8, 46:16, 51:17, 52:6
**fine** [9] - 24:17, 29:18, 35:19, 37:24, 51:13, 65:4, 66:9, 69:10, 79:21
**firm** [2] - 3:14, 69:4
**firm's** [1] - 68:5
**firms** [2] - 41:25, 78:22
**First** [1] - 14:18
**first** [14] - 17:15, 18:18, 24:24, 25:7, 27:14, 28:16, 44:3, 46:13, 47:3, 47:17, 63:3, 63:4, 65:18, 77:3
**five** [1] - 24:1
**flawed** [1] - 15:2
**flip** [1] - 39:21
**Flower** [1] - 1:13
**focus** [2] - 26:21, 44:9
**focused** [5] - 26:3, 26:4, 44:2, 57:22, 64:6

**focusing** [1] - 58:21
**follow** [1] - 57:18
**following** [1] - 48:5
**footnote** [3] - 21:15, 21:25, 22:1
**FOR** [3] - 1:1, 1:12, 1:16
**force** [1] - 66:4, 73:4, 74:25, 77:15
**forced** [1] - 16:14
**forced-in** [1] - 16:14
**foregoing** [1] - 82:7
**form** [2] - 22:13, 79:8
**format** [1] - 82:8
**former** [3] - 39:1, 39:2, 39:5
**forth** [3] - 3:1, 32:15, 63:8
**forthcoming** [1] - 28:18
**forum** [1] - 17:4
**forward** [18] - 2:4, 2:22, 2:23, 3:19, 29:1, 29:5, 36:3, 43:24, 48:21, 51:14, 51:15, 51:16, 55:18, 72:23, 74:23, 78:24
**four** [24] - 4:7, 5:13, 5:21, 8:3, 8:4, 8:13, 12:10, 13:2, 16:4, 18:3, 19:25, 20:2, 20:4, 21:5, 35:9, 38:7, 44:10, 45:2, 45:15, 45:22, 46:4, 52:8, 52:9, 55:25
**fourth** [1] - 39:25
**FOX** [145] - 1:13, 2:6, 3:22, 4:24, 5:9, 5:23, 6:2, 6:16, 6:19, 6:24, 10:20, 11:8, 11:11, 12:2, 12:4, 12:9, 13:11, 13:17, 14:12, 14:14, 14:17, 15:17, 15:24, 16:5, 16:8, 16:13, 16:15, 16:18, 17:6, 17:15, 17:18, 18:20, 19:1, 19:8, 19:13, 19:22, 20:5, 20:11, 20:15, 21:3, 21:8, 21:17, 21:23, 22:10, 22:20, 22:24, 23:3, 23:11, 23:20, 23:24, 24:7, 28:7, 29:22, 30:1, 30:12, 31:3, 31:9, 32:5, 35:16, 35:20, 35:24, 36:2, 36:5, 36:14, 37:4, 37:7, 37:16, 37:24, 38:18, 39:10, 39:15, 39:18, 39:20,

40:22, 41:3, 41:5, 41:9, 41:13, 41:22, 42:5, 42:8, 42:12, 43:11, 43:19, 43:22, 44:2, 45:17, 45:24, 46:12, 46:21, 47:1, 47:11, 49:7, 49:24, 50:4, 50:12, 50:20, 52:18, 52:24, 53:10, 53:16, 53:22, 54:2, 54:6, 54:9, 54:20, 55:5, 55:8, 56:11, 58:13, 59:18, 59:21, 60:2, 62:4, 62:23, 63:3, 63:15, 63:19, 63:25, 64:5, 64:8, 64:17, 65:14, 66:12, 66:14, 66:22, 67:1, 67:5, 70:2, 70:10, 70:16, 70:20, 71:6, 73:6, 73:11, 75:24, 76:9, 77:1, 78:6, 78:10, 79:4, 79:18, 79:25, 81:13, 81:20
**Fox** [46] - 2:6, 4:8, 8:25, 11:3, 25:24, 26:2, 27:3, 27:10, 28:3, 32:13, 33:2, 33:14, 34:9, 35:7, 35:15, 42:17, 45:9, 45:21, 46:7, 47:6, 49:6, 49:10, 51:3, 51:7, 56:19, 57:1, 57:12, 58:7, 62:17, 67:14, 69:10, 69:11, 69:15, 70:1, 70:8, 71:10, 72:11, 72:17, 74:20, 74:21, 75:23, 76:6, 78:19, 81:10, 81:19, 82:1
**frame** [1] - 38:15
**framework** [1] - 57:16
**frankly** [1] - 35:13
**free** [1] - 47:4
**friendly** [1] - 36:2
**frivolous** [1] - 28:17
**front** [5] - 34:16, 71:5, 71:22, 74:23, 78:16
**frustration** [1] - 72:17
**full** [2] - 73:19, 81:1
**fuming** [1] - 71:11
**fundamentally** [2] - 13:12, 60:4
**funded** [2] - 46:17
**funds** [1] - 56:18

## G

**gain** [1] - 69:1
**games** [1] - 58:17
**gamesmanship** [1] - 48:9
**gander** [1] - 77:16
**generally** [1] - 40:4
**gentlemen** [1] - 75:6
**genuinely** [1] - 48:7
**given** [5] - 16:8, 39:6, 72:15, 75:19, 80:5
**God** [1] - 35:23
**Gomez** [3] - 62:2, 64:15, 77:16
**gooeyness** [1] - 58:15
**granted** [1] - 17:8
**great** [1] - 71:7
**Gregory** [6] - 22:2, 40:2, 44:4, 51:3, 51:4, 51:5
**grievances** [2] - 64:10, 64:11
**group** [10] - 13:10, 20:6, 27:25, 30:20, 40:6, 40:9, 47:4, 54:19, 64:13, 77:22
**guess** [14] - 10:15, 12:24, 13:1, 13:7, 27:2, 27:4, 41:1, 44:24, 49:19, 56:13, 60:20, 67:25, 72:22
**guessing** [1] - 31:18
**gun** [1] - 58:9
**gunpoint** [3] - 52:12, 52:16, 52:23
**guys** [20] - 2:22, 2:23, 4:1, 7:12, 27:3, 43:6, 43:9, 45:7, 47:14, 50:21, 51:13, 65:4, 71:15, 72:9, 74:20, 78:9, 79:9, 79:20, 79:22, 81:25

## H

**half** [3] - 48:18, 70:16, 70:17
**hammer** [1] - 43:13
**hampering** [1] - 79:11
**hand** [4] - 18:13, 43:11, 43:14, 53:2
**handle** [1] - 31:17
**hanging** [2] - 23:18, 32:1
**happy** [6] - 26:19, 64:17, 66:12, 67:5,

67:23, 73:17
**hard** [2] - 71:20, 78:17
**Harutyunyan** [1] - 2:7
**HARUTYUNYAN** [1] - 1:13
**head** [2] - 58:9, 68:17
**heading** [1] - 18:18
**hear** [8] - 15:21, 23:13, 53:21, 54:9, 57:2, 68:8, 81:5, 81:8
**heard** [6] - 23:23, 50:12, 50:16, 50:24, 69:17, 70:23
**hearing** [5] - 18:21, 26:5, 74:19, 76:12, 81:18
**hearings** [1] - 13:2
**heart** [1] - 34:9
**heat** [1] - 34:21
**held** [3] - 52:11, 52:16, 80:16
**helpful** [2] - 67:17, 78:25
**hereby** [1] - 82:7
**herring** [1] - 17:6
**hesitate** [1] - 78:12
**high** [1] - 27:20
**higher** [1] - 10:16
**highly** [1] - 79:21
**himself** [1] - 30:7
**history** [2] - 5:8, 40:8
**hold** [7] - 11:19, 21:21, 28:4, 32:11, 44:18, 45:23, 58:6
**Hold** [1] - 76:19
**holding** [2] - 46:19, 52:22
**hole** [1] - 32:15
**honest** [2] - 25:11, 77:12
**honestly** [1] - 56:16
**Honor** [117] - 2:6, 2:9, 3:22, 5:9, 6:16, 6:21, 7:11, 10:20, 11:2, 11:8, 11:11, 11:14, 12:9, 12:13, 14:12, 14:15, 15:3, 15:18, 17:6, 18:2, 19:2, 19:8, 21:3, 21:9, 21:18, 21:24, 22:8, 22:11, 22:20, 23:20, 23:24, 26:1, 27:8, 28:7, 29:22, 30:3, 30:13, 30:16, 30:22, 31:4, 31:12, 31:20, 35:3, 35:4, 35:16, 35:20, 35:21, 36:10,

37:7, 37:10, 37:12, 37:24, 38:5, 38:11, 38:23, 39:10, 39:15, 39:18, 40:25, 41:3, 41:5, 41:7, 42:8, 42:9, 42:15, 43:11, 43:14, 43:19, 44:2, 44:22, 45:17, 45:24, 46:17, 46:21, 48:5, 49:7, 49:24, 52:18, 52:24, 53:10, 53:17, 54:2, 54:13, 54:20, 54:21, 54:25, 55:5, 55:20, 56:8, 56:12, 57:10, 58:13, 58:21, 59:25, 62:23, 63:4, 64:5, 64:17, 64:20, 66:12, 67:5, 67:7, 67:13, 68:22, 70:2, 70:11, 71:6, 73:6, 74:16, 75:7, 76:4, 78:11, 79:4, 80:9, 81:13, 81:20
**HONORABLE** [1] - 1:9
**hope** [1] - 31:3
**horse** [1] - 65:23
**hotly** [1] - 4:3
**huge** [1] - 29:22
**hurdle** [1] - 48:1

## I

**idea** [4] - 33:15, 33:21, 57:11, 57:25
**identify** [2] - 2:4, 42:17
**ignoring** [1] - 21:11
**illegitimate** [2] - 73:15, 74:10
**illegitimately** [1] - 74:5
**Illinois** [41] - 3:13, 4:8, 6:22, 6:24, 12:16, 13:23, 17:19, 18:10, 18:15, 21:6, 22:17, 22:21, 22:23, 22:24, 23:8, 24:19, 26:20, 26:21, 29:8, 29:21, 34:16, 36:10, 37:2, 37:23, 46:5, 46:24, 48:20, 49:21, 51:14, 51:17, 51:19, 52:7, 55:22, 58:9, 58:11, 58:12, 62:21, 63:12, 72:23, 73:5, 77:15
**illinois** [1] - 22:23
**imagine** [2] - 46:23, 72:13
**immunity** [1] - 68:25

**impact** [1] - 28:15
**implausible** [1] - 45:1
**implications** [1] - 34:24
**important** [12] - 4:10, 6:18, 6:20, 18:24, 21:8, 24:25, 35:2, 50:2, 62:24, 70:10, 73:14, 75:9
**impose** [1] - 48:9
**inattentive** [1] - 74:8
**INC** [1] - 1:3
**Inc** [1] - 2:3
**inclined** [1] - 49:16
**include** [1] - 6:3
**included** [6] - 5:5, 6:12, 6:13, 43:2, 59:4
**includes** [1] - 23:5
**including** [4] - 5:6, 13:21, 45:22, 78:16
**inconsistent** [2] - 50:8, 50:9
**incorporated** [1] - 13:20
**incorrect** [2] - 6:16, 6:21
**increase** [1] - 31:22
**increasingly** [1] - 68:25
**incremental** [1] - 74:14
**independent** [2] - 23:10
**indicating** [2] - 16:15, 44:18
**individual** [5] - 20:13, 30:4, 30:6, 61:7, 62:5
**individually** [1] - 21:16
**individuals** [3] - 16:6, 20:14, 31:25
**inefficient** [1] - 79:14
**information** [1] - 73:7
**informed** [1] - 75:13
**Ingersoll** [2] - 62:25, 63:5
**Ingersoll-Rand** [2] - 62:25, 63:5
**injunction** [1] - 61:10
**injunctive** [1] - 61:8
**insist** [1] - 61:12
**instead** [6] - 19:15, 32:3, 52:13, 54:4, 72:6, 72:7
**intelligent** [1] - 64:18
**intended** [2] - 57:12, 59:11

**interacting** [1] - 78:23
**interest** [5] - 61:4, 61:6, 68:13, 74:9, 75:17
**interested** [2] - 19:14, 75:21
**interests** [2] - 68:4
**interference** [1] - 71:24
**interpretation** [1] - 43:3
**intervene** [2] - 18:7, 30:5
**invalid** [1] - 9:11
**invalidate** [1] - 60:24
**involved** [1] - 3:16
**issue** [26] - 5:20, 6:18, 6:19, 10:9, 10:10, 12:14, 16:3, 18:4, 21:4, 26:11, 28:2, 28:5, 32:22, 34:22, 37:23, 46:15, 57:8, 59:3, 62:22, 63:14, 64:7, 64:8, 66:12, 66:13, 68:1, 75:11
**issued** [5] - 7:24, 40:7, 57:21, 57:23, 75:8
**issues** [6] - 4:12, 5:1, 17:23, 18:9, 65:10, 80:1
**itself** [5] - 4:13, 21:18, 24:2, 54:6, 64:25

## J

**JAMS** [23] - 29:5, 36:7, 36:8, 36:24, 39:22, 42:20, 43:4, 43:8, 44:12, 44:16, 55:15, 65:5, 66:5, 66:6, 66:10, 66:11, 66:13, 67:17, 80:2, 80:15, 80:16
**JAMS'** [1] - 22:4
**Jane** [1] - 52:10
**January** [1] - 39:21
**Jenner** [1] - 2:7
**jenner** [1] - 1:12
**job** [9] - 25:4, 26:12, 26:23, 27:21, 28:25, 29:2, 34:24, 49:18
**John** [1] - 52:9
**Jones** [2] - 66:23, 67:22
**judge** [8] - 16:5, 20:19, 20:20, 45:1,

50:18, 52:25, 53:2,
71:12
   **Judge** [10] - 14:6,
14:9, 14:24, 15:2,
23:4, 26:14, 44:6,
44:13, 44:14, 74:23
   **JUDGE** [1] - 1:9
   **judgment** [22] - 7:6,
8:21, 9:10, 9:11, 9:12,
9:22, 13:21, 13:25,
15:4, 25:3, 26:17,
32:24, 32:25, 33:7,
39:4, 47:5, 48:16,
60:25, 61:20, 76:11,
76:17
   **Judicial** [1] - 82:9
   **July** [1] - 50:14
   **June** [1] - 50:14
   **jurisdiction** [11] -
8:23, 9:2, 9:5, 15:5,
18:19, 19:5, 25:8,
25:14, 25:16, 27:5,
27:12
   **jury** [2] - 38:4, 40:10

## K

   **keep** [5] - 9:17, 9:18,
58:21, 60:16, 79:23
   **KELLER** [1] - 1:6
   **Keller** [14] - 1:16,
2:3, 2:10, 4:21, 5:15,
12:12, 21:1, 36:16,
39:2, 39:13, 42:13,
44:4, 79:6, 80:1
   **Kellerman** [1] -
16:25
   **KELLY** [1] - 1:13
   **Kelly** [1] - 2:7
   **key** [3] - 28:25, 29:1,
75:24
   **kicks** [1] - 55:24
   **kind** [4] - 4:10, 5:6,
51:16, 57:1
   **kinds** [1] - 71:17
   **Kiran** [1] - 2:10
   **KIRAN** [1] - 1:17
   **knocked** [1] - 31:7
   **known** [2] - 17:23,
35:12
   **knows** [2] - 7:10,
68:19

## L

   **lack** [4] - 11:16,
29:20, 46:8, 46:16
   **laid** [3] - 14:10,
17:24, 26:24
   **language** [11] - 36:6,

37:14, 43:13, 45:13,
45:16, 46:4, 50:10,
53:3, 53:4, 53:6
   **large** [3] - 32:24,
47:7, 74:1
   **last** [13] - 2:12, 3:25,
14:21, 23:5, 26:3,
34:16, 35:2, 43:22,
42:23, 46:13, 49:8,
50:14, 51:23
   **late** [1] - 65:24
   **law** [12] - 2:13, 3:14,
6:4, 12:16, 17:19,
21:6, 24:16, 41:25,
53:9, 57:3, 63:12,
71:23
   **lawsuit** [1] - 55:11
   **lawyer** [10] - 4:8,
24:13, 26:13, 27:21,
32:24, 48:6, 52:12,
57:23, 78:17, 78:20
   **lawyers** [10] - 25:4,
26:10, 28:25, 32:10,
34:23, 37:21, 39:9,
72:3, 72:4
   **lay** [1] - 77:1
   **lays** [2] - 25:1, 36:19
   **leap** [1] - 34:3
   **learned** [2] - 11:24,
12:6
   **least** [5] - 29:10,
38:25, 46:24, 72:19,
77:23
   **leave** [1] - 71:11
   **left** [1] - 65:23
   **legally** [2] - 15:2,
77:13
   **legitimate** [1] - 20:17
   **lens** [1] - 57:12
   **less** [1] - 16:2
   **letter** [12] - 10:23,
11:18, 12:11, 14:4,
17:22, 19:9, 23:15,
31:18, 31:21, 41:14,
51:22, 59:18
   **lettering** [1] - 49:17
   **letters** [4] - 33:2,
41:19, 64:14, 78:14
   **leverage** [2] - 31:22,
69:1
   **levington** [1] - 43:7
   **life** [1] - 71:10
   **lift** [6] - 56:7, 56:9,
58:9, 72:11, 74:24,
77:11
   **lifted** [1] - 66:8
   **lifting** [3] - 77:8,
77:9, 79:23
   **likely** [4] - 72:10,
74:24, 77:12, 79:22

**limit** [1] - 27:25
   **limited** [1] - 77:17
   **limits** [1] - 68:2
   **line** [6] - 17:22,
24:17, 25:17, 34:25,
39:25, 62:14
   **list** [6] - 25:5, 29:4,
40:7, 43:9, 45:5, 46:2
   **litigant** [2] - 31:10,
61:7
   **litigants** [2] - 31:10,
80:2
   **litigate** [4] - 26:13,
51:3, 51:4
   **litigated** [1] - 9:17
   **litigation** [14] - 3:13,
5:7, 18:18, 27:20,
27:21, 33:19, 33:25,
36:1, 65:1, 67:15,
68:24, 71:19, 72:24,
80:11
   **LLC** [3] - 1:6, 1:16,
2:3
   **LLP** [1] - 1:12
   **look** [35] - 12:15,
13:17, 14:3, 14:17,
17:21, 18:13, 22:9,
22:13, 28:1, 32:9,
34:15, 35:21, 36:6,
37:13, 39:20, 39:24,
41:14, 43:17, 44:1,
44:10, 45:7, 47:24,
49:10, 50:21, 51:18,
52:2, 53:3, 53:4, 57:6,
60:5, 62:17, 62:25,
66:6, 69:8
   **looking** [4] - 43:25,
50:10, 62:16, 68:4
   **looks** [2] - 20:20,
51:7
   **loosely** [1] - 76:5
   **Los** [1] - 1:14
   **lose** [6] - 17:13,
34:19, 51:16, 56:2,
71:20
   **losing** [3] - 52:3,
53:1, 54:12
   **lost** [3] - 18:22, 56:3,
74:6
   **Lotus** [1] - 2:15
   **lower** [2] - 60:5, 74:7
   **lying** [1] - 57:7

## M

   **mad** [2] - 72:25,
76:12
   **main** [1] - 8:22
   **maintain** [1] - 80:22
   **major** [2] - 21:18,

64:21
   **majority** [3] - 19:16,
47:7, 74:1
   **March** [1] - 33:8
   **marked** [1] - 15:7
   **mass** [5] - 36:22,
40:2, 40:4, 40:7,
56:23
   **material** [7] - 12:18,
12:19, 12:20, 18:24,
40:12, 53:20, 78:7
   **matter** [7] - 3:10,
30:9, 53:9, 56:22,
70:2, 80:10, 82:8
   **matters** [1] - 36:25
   **mean** [44] - 3:2, 6:17,
12:25, 16:1, 18:10,
19:14, 24:9, 24:10,
24:11, 24:20, 25:11,
25:20, 27:2, 28:1,
28:8, 33:3, 34:14,
34:17, 35:15, 38:10,
38:14, 41:20, 45:13,
45:20, 46:4, 46:23,
47:24, 47:25, 50:21,
52:4, 53:4, 56:16,
57:6, 58:5, 58:7,
62:16, 64:3, 67:20,
69:7, 72:19, 77:11,
77:14, 79:8, 81:20
   **meaning** [2] - 17:23,
43:3
   **means** [2] - 36:17,
39:25
   **meant** [1] - 66:24
   **meantime** [1] - 48:21
   **measure** [1] - 75:20
   **mechanical** [1] -
26:11
   **mechanics** [3] -
2:16, 2:19, 2:20
   **mediation** [1] - 80:24
   **members** [1] - 33:14
   **memory** [1] - 56:2
   **mentioned** [2] -
38:12, 76:12
   **meritorious** [1] -
34:8
   **merits** [5] - 7:15,
7:19, 19:19, 22:3,
26:19
   **might** [16] - 16:12,
17:12, 23:9, 24:16,
25:17, 25:23, 28:11,
34:25, 49:23, 71:20,
76:5, 78:1, 78:21,
78:24, 79:16
   **million** [2] - 39:10,
39:11
   **millions** [4] - 22:25,

28:6, 46:25, 51:21
   **mind** [5] - 49:15,
52:3, 53:1, 54:12,
76:22
   **mind's** [1] - 23:19
   **minimum** [1] - 9:3
   **misdemeanor** [1] -
31:6
   **miss** [1] - 35:23,
35:25
   **mistake** [1] - 31:21
   **modest** [1] - 28:16
   **moment** [1] - 72:2
   **money** [4] - 10:19,
10:20, 38:19, 46:18
   **month** [1] - 81:17
   **months** [3] - 9:16,
17:23, 50:14
   **moot** [3] - 7:18,
11:20, 64:12
   **mooted** [2] - 61:1,
61:14
   **mootness** [6] - 22:2,
34:7, 62:9, 62:20,
64:6, 64:8
   **moots** [1] - 10:2
   **Morrison** [1] - 2:7
   **MORRISON** [1] -
1:13
   **Mortimer** [1] - 63:10
   **most** [7] - 24:9, 46:7,
46:8, 46:9, 46:10,
64:23, 77:12
   **motion** [2] - 7:17,
28:18
   **motivating** [1] -
46:23
   **move** [8] - 2:22,
2:23, 29:5, 48:2,
51:14, 51:15
   **moving** [2] - 51:13,
78:24
   **MR** [226] - 2:6, 2:9,
3:22, 4:24, 5:9, 5:23,
6:2, 6:16, 6:19, 6:24,
7:11, 7:14, 7:17, 7:20,
7:22, 8:2, 8:5, 8:7,
8:10, 8:16, 8:18, 9:15,
9:21, 10:8, 10:13,
10:20, 11:8, 11:11,
12:2, 12:4, 12:9,
13:11, 13:17, 14:12,
14:14, 14:17, 15:17,
15:24, 16:5, 16:8,
16:13, 16:15, 16:18,
16:23, 17:6, 17:15,
17:18, 18:20, 19:1,
19:8, 19:13, 19:22,
20:5, 20:11, 20:15,
21:3, 21:8, 21:17,

21:23, 22:8, 22:10, 22:14, 22:20, 22:24, 23:3, 23:11, 23:20, 23:24, 24:7, 24:23, 25:11, 26:1, 27:7, 27:10, 27:17, 28:7, 28:14, 28:22, 29:7, 29:11, 29:15, 29:18, 29:22, 30:1, 30:12, 31:3, 31:9, 32:5, 32:12, 32:14, 33:5, 33:13, 33:18, 34:2, 34:21, 35:11, 35:16, 35:20, 35:24, 36:2, 36:5, 36:14, 37:4, 37:7, 37:16, 37:24, 38:18, 39:10, 39:15, 39:18, 39:20, 40:22, 41:3, 41:5, 41:9, 41:13, 41:22, 42:5, 42:8, 42:12, 42:17, 43:7, 43:11, 43:19, 43:22, 44:2, 45:3, 45:17, 45:24, 46:1, 46:12, 46:21, 47:1, 47:3, 47:10, 47:11, 47:12, 47:17, 48:5, 48:14, 49:1, 49:7, 49:24, 50:4, 50:12, 50:20, 51:1, 52:18, 52:24, 53:10, 53:16, 53:22, 54:2, 54:6, 54:9, 54:20, 55:5, 55:8, 56:11, 56:20, 57:2, 57:10, 58:13, 59:13, 59:18, 59:21, 60:2, 60:4, 60:22, 61:3, 61:7, 61:19, 62:2, 62:4, 62:7, 62:13, 62:19, 62:23, 63:3, 63:15, 63:19, 63:25, 64:5, 64:8, 64:17, 65:14, 66:12, 66:14, 66:22, 67:1, 67:5, 67:13, 67:23, 67:25, 68:10, 68:16, 68:19, 68:22, 69:20, 70:2, 70:10, 70:16, 70:20, 71:6, 73:6, 73:11, 73:14, 74:16, 75:7, 75:24, 76:7, 76:9, 77:1, 78:6, 78:10, 79:4, 79:18, 79:25, 80:9, 80:13, 80:20, 81:6, 81:9, 81:13, 81:15, 81:20
**must** [2] - 57:4, 68:18
**mutually** [3] - 63:10, 63:12, 63:23

**N**

**name** [7] - 18:8, 20:19, 20:21, 31:15, 50:15, 70:12, 76:3
**names** [3] - 37:5, 37:12, 70:22
**narrow** [1] - 9:13
**nationwide** [1] - 61:10
**nature** [2] - 24:24, 80:22
**necessarily** [4] - 30:25, 31:24, 60:24, 75:12
**necessary** [1] - 81:2
**need** [13] - 3:7, 44:15, 47:21, 49:2, 56:25, 60:7, 61:11, 68:1, 68:8, 75:19, 76:24, 79:20, 81:6
**needed** [1] - 75:11
**needs** [1] - 45:17
**negotiated** [9] - 21:5, 21:11, 23:24, 24:1, 28:24, 29:2, 36:5, 37:22, 40:12
**negotiating** [4] - 37:19, 40:11, 71:8, 73:1
**neutral** [1] - 69:5
**never** [6] - 15:10, 18:12, 34:12, 58:12, 68:12, 78:1
**new** [2] - 72:21, 78:8
**next** [3] - 44:10, 74:19, 79:19
**Ninth** [2] - 66:22, 67:2
**NO** [1] - 1:5
**nobody** [1] - 60:14
**none** [2] - 70:14, 71:25
**nonetheless** [1] - 57:15
**noninstitutional** [2] - 41:23, 41:24
**normally** [1] - 9:3
**Northeast** [2] - 62:25, 63:5
**note** [10] - 25:1, 28:14, 32:19, 35:2, 35:19, 47:17, 49:3, 62:19, 73:17, 75:10
**noted** [5] - 26:5, 27:11, 27:17, 47:6, 61:3
**nothing** [3] - 44:17, 50:5, 79:13
**notice** [13] - 6:25,

7:13, 9:5, 10:22, 11:1, 13:18, 19:23, 19:24, 25:4, 50:12, 63:8, 73:25
**notices** [1] - 74:1
**notify** [1] - 26:16
**nullity** [2] - 34:7, 62:9
**number** [5] - 32:24, 42:24, 46:1, 51:18, 51:19
**numbered** [1] - 43:21
**numbers** [8] - 10:16, 68:16, 70:2, 74:15, 74:18, 75:7, 75:15, 76:20
**NW** [1] - 1:17, 1:24

**O**

**Oaks** [1] - 63:10
**object** [14] - 7:7, 8:7, 8:8, 12:16, 17:21, 18:7, 22:7, 22:10, 30:6, 63:16, 64:2, 64:9, 65:12, 65:13
**objected** [1] - 5:3
**objecting** [13] - 5:21, 5:23, 6:1, 6:6, 13:2, 13:14, 17:25, 37:20, 46:5, 46:25, 63:8, 63:22, 63:24
**objection** [5] - 6:9, 15:3, 21:3, 46:15, 81:10
**objections** [18] - 5:6, 6:5, 7:24, 12:18, 15:10, 18:2, 21:6, 31:14, 31:16, 38:7, 40:13, 40:14, 44:8, 46:6, 76:10, 76:15, 76:16
**objector** [3] - 12:22, 21:4, 63:11
**objectors** [26] - 4:8, 5:12, 5:13, 8:3, 8:4, 8:11, 13:2, 14:2, 15:10, 18:3, 21:6, 30:5, 35:9, 38:2, 38:3, 38:6, 38:8, 44:5, 44:6, 45:15, 45:23, 53:12, 53:18, 58:21, 58:25, 63:15
**obtain** [4] - 9:4, 15:9, 16:19, 39:3
**obviously** [2] - 33:9, 78:23
**occurred** [1] - 9:18
**October** [2] - 49:8,

70:7
**OF** [2] - 1:1, 1:9
**offer** [10] - 11:22, 12:5, 12:7, 12:10, 32:7, 34:6, 61:22, 62:8
**offered** [2] - 47:18, 63:20
**offering** [2] - 41:9, 51:4
**office** [2] - 68:18, 68:19
**OFFICIAL** [1] - 82:13
**Official** [1] - 1:23, 82:6
**once** [2] - 31:6, 55:17
**one** [77] - 4:1, 4:2, 4:6, 4:12, 6:1, 7:10, 10:2, 10:15, 11:12, 12:5, 12:14, 12:21, 13:9, 14:19, 16:4, 16:15, 18:13, 18:23, 20:2, 20:4, 20:16, 22:5, 22:14, 23:17, 23:25, 25:3, 26:10, 30:23, 31:1, 32:6, 34:12, 36:1, 38:14, 38:15, 40:15, 42:2, 42:11, 43:15, 44:1, 44:4, 46:1, 46:25, 47:16, 47:24, 48:3, 51:8, 53:11, 54:9, 54:10, 54:12, 54:13, 57:12, 57:19, 59:4, 60:12, 62:11, 63:2, 63:4, 65:8, 65:10, 65:11, 65:13, 65:21, 65:22, 66:15, 66:18, 66:21, 67:8, 67:20, 71:4, 73:22, 74:14, 75:2, 80:6
**one-week** [1] - 74:14
**ones** [2] - 5:13, 6:4
**open** [4] - 55:7, 55:8, 60:16, 71:18
**opportunity** [6] - 9:6, 26:17, 47:20, 48:11, 48:23, 49:8
**opt** [55] - 5:12, 5:15, 5:16, 5:17, 7:3, 7:5, 8:8, 8:20, 9:6, 9:9, 9:14, 11:16, 11:17, 12:16, 14:25, 15:11, 15:13, 16:6, 18:1, 18:6, 18:8, 20:18, 20:22, 21:4, 21:5, 24:25, 27:4, 29:3, 30:7, 31:17, 36:11, 43:1, 44:14, 44:15,

48:10, 49:8, 49:9, 50:14, 50:17, 50:22, 50:23, 51:2, 63:11, 63:19, 63:25, 69:16, 70:7, 70:11, 70:12, 70:14, 70:16, 70:19, 70:21, 75:9
**opt-in** [1] - 27:4
**opt-out** [5] - 5:17, 21:4, 21:5, 27:4, 63:11
**opt-outs** [26] - 5:12, 7:3, 7:5, 8:20, 9:9, 14:25, 15:11, 15:13, 16:6, 18:1, 24:25, 29:3, 36:11, 43:1, 44:14, 44:15, 48:10, 51:2, 70:7, 70:11, 70:12, 70:14, 70:16, 70:19, 70:21, 75:9
**opted** [8] - 14:8, 17:8, 19:10, 19:15, 19:16, 41:20, 63:18, 63:23
**opting** [2] - 50:25, 63:22
**option** [4] - 51:18, 51:19, 77:3, 78:3
**options** [12] - 9:22, 51:8, 68:2, 73:3, 75:1, 76:23, 76:24, 77:1, 77:2, 77:7, 78:3, 78:6
**order** [32] - 6:6, 6:7, 6:8, 7:1, 7:2, 7:23, 8:7, 9:2, 13:20, 13:21, 13:24, 13:25, 14:7, 14:24, 15:1, 15:2, 18:1, 25:1, 25:2, 25:15, 25:17, 25:18, 56:25, 59:14, 59:15, 61:25, 69:4, 71:23, 73:4
**Order** [1] - 2:1
**orders** [1] - 13:20
**ordinary** [1] - 32:20
**original** [2] - 38:24, 82:7
**originally** [1] - 23:3
**otherwise** [1] - 52:13
**out-of-state** [2] - 9:2, 25:15
**outcome** [1] - 77:12
**outrageous** [1] - 52:15
**outs** [26] - 5:12, 7:3, 7:5, 8:20, 9:9, 14:25, 15:11, 15:13, 16:6, 18:1, 24:25, 29:3, 36:11, 43:1, 44:14, 44:15, 48:10, 51:2,

70:7, 70:11, 70:12, 70:14, 70:16, 70:19, 70:21, 75:9
**outside** [3] - 5:7, 21:12, 42:3
**overall** [1] - 67:25
**overarching** [1] - 68:23
**overlap** [1] - 9:8
**owe** [1] - 69:18
**own** [7] - 5:16, 33:23, 50:15, 60:24, 61:4, 61:6, 61:12

## P

**p.m** [6] - 1:10, 2:1, 75:4, 82:3
**page** [28] - 13:23, 14:5, 14:13, 14:15, 14:18, 15:8, 17:21, 21:17, 26:24, 35:22, 36:14, 39:21, 39:22, 42:19, 43:17, 43:19, 43:20, 43:21, 43:22, 43:23, 44:10, 46:1, 56:21, 62:11, 62:24, 63:1, 69:21, 82:8
**paragraph** [11] - 13:18, 14:17, 14:21, 36:19, 36:23, 43:3, 44:4, 44:10, 63:3, 67:3
**paraphrasing** [1] - 76:8
**part** [42] - 4:6, 5:1, 5:2, 5:14, 6:12, 6:13, 6:20, 8:23, 15:15, 15:17, 16:11, 16:12, 16:16, 19:14, 20:9, 21:8, 28:25, 29:1, 30:20, 36:21, 39:14, 39:16, 44:17, 44:22, 48:24, 50:5, 50:8, 52:5, 54:1, 54:12, 54:20, 56:3, 58:14, 64:13, 64:16, 65:16, 68:24, 70:6, 71:3, 78:18, 80:24
**partial** [2] - 14:21, 63:3
**participate** [2] - 73:21, 73:23
**particular** [2] - 2:14, 79:7
**parties** [6] - 2:4, 23:12, 36:16, 36:20, 44:6, 56:22
**party** [6] - 42:20, 57:20, 58:2, 65:15,

71:22, 73:20
**pass** [1] - 32:18
**passed** [1] - 32:18
**past** [3] - 23:22, 55:15, 79:9
**path** [4] - 36:3, 43:24, 48:11, 72:23
**Pause** [2] - 43:16, 46:3
**pending** [2] - 24:6, 56:22
**people** [137] - 3:16, 4:7, 4:14, 4:15, 4:20, 4:22, 5:14, 5:21, 7:3, 10:3, 10:6, 10:12, 11:15, 11:17, 12:21, 13:6, 13:8, 15:14, 15:20, 16:11, 16:14, 16:17, 17:2, 17:7, 17:12, 18:4, 18:6, 20:1, 20:6, 20:12, 21:10, 22:18, 22:25, 23:5, 23:9, 23:18, 24:13, 24:14, 25:23, 26:11, 28:1, 28:6, 28:10, 28:21, 29:14, 31:16, 31:24, 32:4, 32:5, 34:19, 35:12, 37:1, 37:12, 38:3, 38:6, 38:13, 38:14, 38:17, 38:18, 40:9, 40:13, 40:20, 43:1, 46:11, 46:13, 46:15, 46:18, 46:25, 47:15, 47:16, 47:25, 48:2, 48:8, 48:20, 48:22, 49:9, 49:23, 50:16, 50:20, 51:21, 51:23, 51:24, 52:9, 52:14, 52:15, 53:12, 53:18, 54:18, 54:19, 58:23, 58:24, 59:2, 59:25, 60:11, 60:14, 60:17, 60:21, 63:14, 64:10, 68:4, 68:7, 68:12, 68:15, 69:7, 69:8, 69:10, 69:11, 69:14, 69:15, 69:17, 69:18, 69:22, 70:5, 70:14, 70:18, 70:22, 70:23, 70:24, 70:25, 71:1, 72:7, 73:8, 73:11, 73:12, 75:14, 77:21, 77:22, 78:22, 79:5, 80:7, 81:22
**per** [1] - 10:19
**percent** [1] - 78:1
**perfect** [1] - 32:10
**performance** [1] - 78:4

**perhaps** [1] - 5:10
**period** [1] - 74:14
**permitted** [1] - 71:3
**person** [4] - 10:19, 32:7, 61:24, 65:12
**personal** [11] - 8:23, 9:2, 9:4, 15:4, 18:19, 19:4, 25:7, 25:14, 25:16, 27:5, 27:12
**personally** [1] - 68:11
**perspective** [2] - 51:6, 74:5
**petition** [1] - 55:14, 67:9
**ph** [2] - 9:2, 32:18
**phone** [1] - 75:15
**physics** [1] - 2:16
**piece** [1] - 81:7
**pinpoint** [1] - 63:5
**place** [4] - 53:20, 65:2, 71:9, 79:24
**plaintiff** [2] - 13:4, 19:4
**Plaintiff** [1] - 1:4
**PLAINTIFF** [1] - 1:12
**plaintiff's** [8] - 24:13, 27:21, 32:9, 33:21, 52:12, 52:16, 72:4
**plaintiffs** [5] - 3:14, 9:3, 25:15, 28:25, 42:24
**plaintiffs'** [1] - 39:9
**play** [3] - 3:8, 34:5, 75:14
**played** [1] - 58:18
**plenty** [1] - 51:1
**point** [34] - 15:25, 27:12, 30:18, 31:9, 33:19, 35:7, 35:16, 36:7, 36:22, 37:1, 37:4, 40:2, 44:9, 44:17, 45:3, 45:6, 46:18, 47:3, 56:21, 57:11, 60:15, 62:17, 62:23, 65:3, 65:18, 65:20, 65:25, 66:9, 68:23, 73:15, 74:11, 75:19, 78:23, 79:8
**pointed** [4] - 11:23, 12:18, 34:12, 42:18
**pointing** [1] - 13:18
**points** [5] - 4:6, 24:23, 43:10, 45:14, 80:13
**portion** [1] - 77:25
**posed** [1] - 28:11
**position** [8] - 14:5, 14:20, 14:23, 32:21, 52:2, 57:25, 65:17,

67:8
**positions** [1] - 39:5
**possibility** [1] - 26:4
**possible** [1] - 65:20
**possibly** [2] - 25:5, 59:10
**postman** [1] - 45:20
**POSTMAN** [84] - 1:6, 1:17, 2:9, 7:11, 7:14, 7:17, 7:20, 7:22, 8:2, 8:5, 8:7, 8:10, 8:16, 8:18, 9:15, 9:21, 10:8, 10:13, 16:23, 22:8, 22:14, 24:23, 25:11, 26:1, 27:7, 27:10, 27:17, 28:14, 28:22, 29:7, 29:11, 29:15, 29:18, 32:12, 32:14, 33:5, 33:13, 33:18, 34:2, 34:21, 35:11, 42:17, 43:7, 45:3, 46:1, 47:3, 47:10, 47:12, 47:17, 48:5, 48:14, 49:1, 51:1, 56:20, 57:2, 57:10, 59:13, 60:4, 60:22, 61:3, 61:7, 61:19, 62:2, 62:7, 62:13, 62:19, 67:13, 67:23, 67:25, 68:10, 68:16, 68:19, 68:22, 69:20, 73:14, 74:16, 75:7, 76:7, 80:9, 80:13, 80:20, 81:6, 81:9, 81:15
**Postman** [72] - 1:16, 2:3, 2:10, 4:10, 4:22, 5:15, 7:8, 10:21, 11:21, 12:12, 15:21, 16:8, 16:22, 17:1, 17:11, 19:15, 21:1, 21:20, 22:7, 24:3, 24:11, 25:20, 30:7, 31:24, 36:6, 36:16, 36:23, 39:2, 39:12, 39:13, 40:5, 41:13, 42:13, 43:13, 43:15, 44:4, 45:12, 46:22, 47:2, 49:20, 50:15, 50:21, 55:12, 56:15, 57:5, 59:3, 60:1, 60:2, 62:12, 65:3, 67:4, 70:12, 70:17, 71:2, 71:21, 72:11, 73:6, 73:10, 75:24, 76:19, 77:4, 77:7, 77:19, 77:24, 78:16, 78:22, 79:6, 79:21, 80:1, 81:24
**Postman's** [4] - 14:4,

43:20, 43:24, 44:11
**pot** [2] - 10:18, 10:20
**potentially** [8] - 20:7, 24:2, 40:16, 46:19, 54:19, 65:17, 71:19, 80:3
**power** [1] - 55:3
**practical** [1] - 28:15
**practices** [1] - 24:17
**practicing** [3] - 2:17, 2:25, 31:19
**precedent** [2] - 9:1, 34:6
**preemptively** [2] - 26:6, 28:3
**prejudice** [1] - 56:3
**prejudiced** [1] - 56:1
**preliminary** [13] - 6:6, 7:1, 7:2, 7:23, 13:21, 13:25, 14:6, 14:24, 15:1, 15:2, 18:1, 25:1, 81:17
**preserving** [1] - 75:21
**pressed** [1] - 71:21
**pretty** [3] - 4:1, 28:15, 62:17
**prevail** [2] - 22:2, 22:3
**previous** [1] - 22:4
**primary** [2] - 44:9, 46:15
**principle** [2] - 71:17, 72:10
**privilege** [2] - 50:1, 50:6
**privileged** [1] - 50:3
**pro** [3] - 33:25, 41:21, 61:7
**problem** [5] - 29:21, 29:22, 66:19, 71:8, 78:19
**problematic** [1] - 68:24
**procedural** [1] - 48:9
**procedures** [1] - 63:8
**proceed** [11] - 22:14, 29:8, 47:6, 47:15, 47:20, 48:12, 48:13, 63:14, 63:15, 69:22, 69:23
**proceeding** [6] - 12:13, 55:17, 73:16, 77:16, 80:22, 81:4
**proceedings** [2] - 80:15, 81:16
**Proceedings** [1] - 82:3
**proceeds** [1] - 39:3

**process** [8] - 36:18, 44:12, 44:16, 44:17, 63:6, 65:6, 81:15, 81:18
**Produced** [1] - 1:25
**productive** [2] - 2:22, 3:4
**progression** [1] - 70:10
**promise** [1] - 12:11
**proof** [1] - 73:13
**proper** [2] - 17:4, 57:12
**properly** [1] - 8:24
**proposal** [1] - 48:19
**proscribed** [1] - 57:19
**protect** [2] - 44:21, 58:3
**prove** [1] - 74:10
**provide** [1] - 73:7
**provided** [3] - 11:18, 12:11, 19:13
**providing** [1] - 19:9
**provision** [7] - 34:11, 35:8, 42:10, 42:18, 57:4, 57:15, 80:14
**provisional** [2] - 81:3, 81:4
**pull** [1] - 48:8
**pulled** [1] - 74:5
**pulling** [1] - 26:11
**pure** [1] - 45:6
**purposes** [3] - 34:7, 36:24, 62:9
**pursue** [4] - 26:18, 57:24, 69:9, 74:4
**pursued** [2] - 6:10, 6:11
**push** [1] - 29:1
**pushes** [1] - 73:16
**pushing** [1] - 81:18
**put** [8] - 10:22, 18:12, 24:16, 47:15, 65:16, 65:17, 72:2, 79:9

## Q

**Quantum** [1] - 2:15
**quantum** [3] - 2:16, 2:19, 2:20
**questions** [3] - 3:9, 9:25, 10:1
**quickly** [2] - 14:14, 72:24
**quite** [3] - 18:11, 25:24, 33:3
**quote** [1] - 13:19
**quoted** [1] - 62:15

**quoting** [1] - 14:12

## R

**rabbit** [1] - 32:15
**races** [2] - 53:7, 65:4
**raised** [1] - 27:7
**raising** [1] - 60:23
**Rand** [2] - 62:25, 63:5
**rate** [1] - 51:24
**rather** [1] - 15:1
**rationale** [1] - 62:7
**RDR** [1] - 82:12
**RDR-CRR** [1] - 82:12
**reach** [1] - 17:1, 31:14, 33:8, 38:3, 47:19, 48:16, 48:22, 58:15, 76:9, 79:18, 79:20
**reached** [12] - 20:10, 30:13, 30:16, 31:10, 31:11, 37:10, 39:23, 40:24, 42:8, 54:14, 75:13, 77:5
**reaching** [1] - 74:2
**read** [8] - 5:20, 35:5, 45:18, 62:18, 64:16, 64:18, 78:13, 80:20
**reading** [2] - 2:14, 42:23
**ready** [1] - 45:5
**reaffirmed** [1] - 69:22
**really** [16] - 4:10, 21:8, 23:7, 34:12, 45:22, 46:23, 49:19, 50:2, 51:23, 52:3, 55:19, 56:1, 58:11, 71:6, 71:12, 78:3
**Realtime** [1] - 1:23
**reason** [9] - 6:21, 18:11, 34:4, 34:5, 48:6, 65:2, 67:16, 67:17, 75:3
**reasonable** [2] - 80:4, 80:6
**reasons** [3] - 11:12, 18:11
**recap** [1] - 69:20
**receive** [1] - 56:4, 56:6, 65:19
**Recessed** [1] - 75:4
**recommend** [4] - 35:9, 68:2, 69:24
**recommendation** [1] - 69:3
**Record** [1] - 1:25
**record** [6] - 2:5, 23:14, 35:6, 38:5,

75:5, 82:8
**recount** [1] - 27:17
**red** [3] - 17:6, 43:19, 43:23
**reduced** [1] - 35:6
**reeks** [1] - 55:9
**reengage** [4] - 47:22, 48:17, 48:18, 74:13
**Reeves** [2] - 82:6, 82:12
**REEVES** [2] - 1:22, 82:12
**reference** [1] - 27:14
**referring** [5] - 42:23, 45:2, 46:2, 62:1, 73:24
**reflected** [1] - 27:18
**regard** [2] - 25:15, 28:16
**Registered** [1] - 1:22
**regulations** [1] - 82:8
**reject** [2] - 32:8, 45:1
**rejected** [14] - 8:20, 9:9, 9:15, 11:22, 12:5, 12:6, 24:25, 29:3, 32:6, 43:2, 48:10, 61:22, 62:9, 75:9
**rejection** [1] - 34:7
**relatively** [1] - 72:24
**release** [2] - 6:3, 11:19
**released** [1] - 3:19
**releases** [1] - 3:17
**relief** [11] - 17:8, 39:6, 46:14, 59:24, 61:8, 61:12, 61:17, 61:23, 63:20, 73:8
**relying** [1] - 33:23, 42:11
**remaining** [1] - 40:1
**remedy** [4] - 65:14, 65:16, 81:3, 81:4
**remember** [3] - 3:25, 30:3, 45:14, 66:18
**reminding** [1] - 28:23
**rep** [5] - 25:14, 61:24, 62:5, 68:10, 68:12
**repeated** [2] - 47:8, 50:16
**repetition** [1] - 61:16
**replace** [1] - 52:9
**reply** [3] - 11:23, 62:24, 63:1
**report** [6] - 10:25, 14:3, 23:21, 35:22, 46:2, 78:11
**Reporter** [1] - 1:22,

1:23, 1:23, 82:6
**REPORTER** [1] - 82:13
**represent** [5] - 12:13, 30:8, 34:25, 48:8, 49:18
**representation** [3] - 60:5, 60:6, 60:8
**representative** [5] - 9:6, 30:9, 60:23, 61:11, 63:16
**represented** [3] - 7:25, 31:1, 32:6
**representing** [5] - 2:8, 31:10, 39:6, 39:7, 60:8
**represents** [2] - 30:24, 30:25
**reps** [1] - 77:18
**request** [4] - 8:24, 13:23, 15:12, 47:8
**requests** [5] - 5:17, 8:12, 15:14, 50:16
**requirement** [1] - 48:10
**requirements** [1] - 4:3
**research** [1] - 64:18
**reserved** [1] - 21:15
**resolution** [2] - 29:1, 56:23
**resolve** [1] - 36:18
**respect** [4] - 46:8, 46:24, 53:12
**respectful** [1] - 81:6
**respectfully** [3] - 13:23, 33:18, 57:3
**respond** [6] - 27:10, 47:7, 48:17, 59:23, 60:9, 60:11
**responded** [7] - 68:15, 69:7, 73:8, 74:11, 75:25, 77:23, 78:7
**response** [5] - 11:21, 11:23, 42:13, 51:24, 62:20
**responsibility** [1] - 69:19
**rest** [1] - 5:14
**restrictions** [2] - 17:25, 25:2
**result** [1] - 35:3
**results** [1] - 26:11
**reverse** [1] - 13:24
**reversed** [1] - 76:17
**revisionist** [1] - 40:8
**Reyes** [2] - 31:8, 74:23
**REYES** [1] - 1:9

**Reyes'** [2] - 50:1, 50:6
**rid** [3] - 51:19, 52:8, 72:23
**rights** [17] - 17:16, 17:18, 17:19, 18:5, 26:7, 30:3, 30:4, 30:8, 31:13, 33:1, 33:24, 44:21, 60:16, 60:21, 64:14, 74:6, 75:21
**risk** [4] - 26:12, 30:14, 34:18, 58:13
**river** [1] - 63:10
**Roe** [1] - 61:15
**role** [3] - 34:5, 75:14, 79:3
**room** [8] - 26:10, 28:10, 31:11, 38:4, 40:10, 49:25, 50:5, 76:14
**roped** [1] - 59:15
**Rosen** [2] - 62:25, 63:4
**roughly** [1] - 40:1
**rule** [4] - 44:15, 51:12, 53:9, 77:3
**ruled** [4] - 36:11, 40:3, 66:7, 76:1
**ruling** [2] - 23:4, 25:13, 55:22, 56:18
**rulings** [1] - 13:20

## S

**sanctions** [1] - 28:18
**Santa** [1] - 76:23
**Sati** [1] - 2:7
**SATI** [1] - 1:13
**save** [1] - 69:4
**saw** [1] - 77:17
**scientist** [2] - 2:15, 2:17
**scope** [1] - 17:24
**scowled** [1] - 33:20
**second** [15] - 2:13, 10:10, 14:18, 14:20, 14:22, 17:22, 21:8, 32:19, 38:21, 43:22, 52:19, 56:20, 62:11, 63:2, 74:19
**Second** [3] - 14:21, 62:25, 63:5
**second-to-last** [1] - 43:22
**secondly** [1] - 17:20
**Secretaries** [2] - 79:2, 79:15
**Secretary** [2] - 79:3, 79:16
**see** [10] - 24:7, 44:3,

44:25, 49:14, 57:25, 59:9, 59:10, 60:9, 70:5, 79:23
**seeing** [1] - 57:7
**seek** [3] - 23:16, 44:5, 72:20
**seeking** [7] - 14:1, 46:14, 59:23, 59:24, 60:22, 61:8, 61:12
**seem** [2] - 18:9, 24:18
**sees** [1] - 43:15
**selected** [4] - 36:20
**selecting** [2] - 44:18, 45:4
**selection** [3] - 36:18, 44:11, 44:16
**send** [2] - 9:5, 73:25, 77:24
**sending** [1] - 78:8
**sends** [1] - 51:22
**sense** [6] - 16:21, 45:22, 45:25, 59:13, 75:12, 79:10
**sent** [8] - 10:23, 59:21, 60:13, 67:17, 68:14, 75:25, 76:1, 79:13
**sentence** [2] - 14:18, 14:22
**separate** [4] - 3:13, 3:14, 6:19, 63:13
**serious** [1] - 11:4
**serving** [1] - 68:3
**set** [6] - 10:18, 10:20, 32:19, 63:8, 74:19, 78:10
**setting** [1] - 30:8
**settle** [2] - 6:1, 13:9
**settled** [1] - 77:21
**settlement** [53] - 3:14, 3:15, 3:16, 3:19, 4:13, 4:14, 4:15, 4:16, 5:3, 5:23, 5:25, 6:1, 6:6, 6:10, 6:13, 6:14, 7:6, 7:7, 9:13, 10:18, 13:3, 13:4, 13:15, 20:18, 25:10, 25:21, 25:24, 28:5, 34:19, 37:21, 38:16, 38:17, 38:18, 38:19, 38:22, 38:25, 39:3, 40:19, 46:5, 46:9, 48:21, 50:13, 51:9, 51:20, 58:10, 59:8, 63:7, 63:8, 63:17, 63:21, 71:18, 77:21
**settlements** [1] - 39:13
**shall** [1] - 80:23

**shape** [2] - 22:13, 79:8
**sharp** [4] - 24:17, 24:18, 27:13, 27:18
**short** [1] - 80:1
**show** [2] - 11:9, 11:13
**shows** [1] - 30:19
**Shutz** [1] - 9:1
**side** [5] - 26:10, 27:19, 33:22, 56:5, 57:22
**sides** [2] - 67:15, 79:11
**sign** [4] - 16:6, 20:25, 31:15, 70:16
**signature** [1] - 20:20
**signed** [11] - 15:21, 20:19, 21:1, 50:15, 51:2, 70:12, 70:14, 70:19, 70:20, 70:22, 74:4
**significant** [1] - 38:22
**signs** [1] - 76:15
**similarities** [2] - 2:19, 2:21
**similarly** [2] - 33:14, 68:5
**simple** [1] - 49:7
**single** [6] - 23:17, 26:25, 30:6, 52:4, 53:1, 65:12
**sit** [2] - 53:14, 67:10
**situated** [2] - 33:14, 68:5
**situation** [4] - 13:13, 61:16, 61:21, 63:9
**slightly** [1] - 62:14
**small** [2] - 5:1, 5:2
**smart** [1] - 64:18
**sniping** [1] - 3:1
**solutions** [3] - 29:23, 29:25, 71:7
**someone** [6] - 2:16, 32:11, 33:12, 68:18, 68:19, 75:21
**sometimes** [7] - 24:17, 30:7, 32:10, 41:20, 41:22, 71:11, 79:15
**somewhere** [1] - 31:8
**SONJA** [2] - 1:22, 82:12
**Sonja** [2] - 82:6, 82:12
**soon** [4] - 29:2, 44:5, 77:20
**sophisticated** [7] -

26:9, 34:23, 37:21, 57:20, 58:2, 58:18
**sorry** [9] - 14:11, 14:19, 16:22, 16:24, 29:15, 35:17, 37:14, 41:3, 62:13
**sort** [13] - 3:1, 5:6, 17:5, 20:4, 24:18, 57:7, 59:11, 60:12, 60:22, 61:11, 71:24, 78:17
**sound** [1] - 24:9
**sounds** [2] - 59:7, 77:23
**South** [1] - 1:13
**spam** [1] - 74:1
**speaking** [1] - 75:11
**specific** [10] - 26:23, 34:10, 35:5, 35:7, 41:19, 57:14, 57:19, 62:14, 73:4, 78:4
**specifically** [2] - 6:4, 28:24
**speeding** [1] - 31:5
**spirit** [10] - 21:21, 34:12, 38:1, 45:10, 49:17, 56:16, 57:3, 57:4, 57:11, 77:11
**spot** [2] - 66:14, 66:17
**stakes** [1] - 27:20
**stalling** [1] - 66:20
**stand** [6] - 38:1, 38:3, 40:14, 53:20, 71:17, 72:10
**stand-ins** [3] - 38:1, 38:3, 40:14
**standing** [11] - 17:20, 60:18, 60:19, 60:20, 60:23, 61:5, 61:12, 64:8, 64:9, 64:11
**start** [4] - 2:13, 39:25, 62:14, 65:6
**started** [3] - 2:12, 45:4, 54:9
**starting** [2] - 14:17, 14:21
**starts** [1] - 43:23
**Starz** [1] - 66:23
**State** [3] - 78:25, 79:15, 79:16
**state** [6] - 3:8, 3:22, 6:4, 6:25, 9:2, 25:15
**states** [1] - 14:5
**States** [2] - 82:6, 82:9
**STATES** [1] - 1:1
**status** [11] - 9:18, 10:25, 14:3, 23:21,

26:3, 27:12, 27:14, 35:3, 35:21, 46:1, 81:11
**STATUS** [1] - 1:9
**stay** [27] - 8:8, 24:3, 24:4, 24:6, 24:7, 28:20, 29:12, 32:13, 56:3, 56:6, 56:7, 56:9, 56:24, 58:9, 65:2, 66:8, 72:12, 72:15, 74:24, 77:9, 77:11, 79:23, 80:1, 80:4
**stayed** [4] - 55:20, 55:21, 56:22, 67:18
**staying** [1] - 72:14
**stays** [1] - 31:3
**stenographic** [1] - 82:7
**Stenographic** [1] - 1:25
**still** [6] - 25:23, 36:21, 58:9, 58:10, 71:20, 76:22
**stip** [1] - 44:7
**stipulated** [2] - 56:24, 58:20
**stipulating** [1] - 64:22
**stipulation** [8] - 31:14, 31:15, 34:10, 44:5, 45:2, 61:19, 76:15
**stipulations** [1] - 35:6
**stop** [1] - 71:12
**straightforward** [1] - 24:10
**Street** [1] - 1:13
**strike** [2] - 11:6, 56:15
**strong** [1] - 58:11
**strongly** [1] - 3:5
**stuck** [3] - 17:14, 26:15, 51:16
**stuff** [1] - 22:17
**stunned** [1] - 78:1
**subject** [5] - 8:21, 32:23, 32:25, 42:3, 42:20
**submissions** [1] - 38:20
**submit** [1] - 70:21
**submitted** [9] - 5:16, 8:12, 12:10, 23:21, 37:12, 38:24, 39:1, 42:19, 70:17
**subparagraph** [1] - 42:22
**subset** [1] - 40:5
**substitute** [3] -

53:12, 53:18, 58:23
**successfully** [1] - 9:17
**sucks** [4] - 71:10, 72:3, 72:8, 73:2
**sudden** [1] - 81:22
**sue** [2] - 4:20, 4:22
**suffering** [1] - 56:4
**suggesting** [1] - 48:15
**suggestion** [2] - 36:12, 36:15
**suit** [2] - 71:22, 73:5
**Suite** [2] - 1:13, 1:17
**sum** [1] - 6:5
**supported** [1] - 15:4
**suppose** [1] - 77:10
**supposed** [8] - 17:1, 17:12, 31:12, 33:22, 38:8, 46:16, 53:3, 64:10
**Supreme** [6] - 9:1, 18:10, 34:5, 55:23, 61:22
**surely** [1] - 68:19
**sympathetic** [1] - 53:1
**sympathy** [1] - 59:2

---

## T

**table** [1] - 53:14
**tactics** [1] - 67:1
**technically** [4] - 28:12, 31:6, 77:10, 81:5
**ten** [54] - 7:3, 7:5, 8:19, 9:22, 10:3, 10:15, 11:17, 11:18, 12:5, 17:7, 17:9, 19:1, 24:1, 25:8, 26:9, 29:4, 30:20, 31:16, 32:4, 32:5, 34:4, 36:25, 37:16, 38:3, 38:6, 39:6, 39:7, 40:15, 42:24, 44:3, 44:11, 44:12, 45:18, 48:10, 48:20, 49:2, 51:21, 53:22, 54:1, 55:15, 55:17, 59:19, 60:11, 60:19, 63:14, 64:23, 67:16, 68:6, 75:18, 77:25, 81:24, 82:1
**tens** [4] - 22:24, 28:6, 46:24, 51:20
**term** [10] - 12:18, 12:19, 12:20, 19:1, 40:12, 46:16, 53:20, 57:19, 58:3, 65:24
**terms** [10] - 6:10,

7:23, 18:23, 40:22, 40:24, 42:20, 68:22, 73:16, 78:24, 80:20
**test** [1] - 74:11
**texts** [1] - 75:16
**THE** [224] - 1:1, 1:9, 1:12, 1:16, 2:11, 3:24, 4:25, 5:18, 5:25, 6:9, 6:17, 6:23, 7:8, 7:12, 7:16, 7:19, 7:21, 8:1, 8:4, 8:6, 8:9, 8:14, 8:17, 9:14, 9:20, 9:24, 10:9, 10:14, 11:3, 11:10, 11:25, 12:3, 12:8, 12:23, 13:12, 14:11, 14:13, 14:16, 15:7, 15:23, 16:1, 16:7, 16:10, 16:14, 16:17, 16:19, 16:24, 17:11, 17:17, 18:9, 18:25, 19:3, 19:11, 19:20, 19:23, 20:8, 20:14, 20:24, 21:7, 21:15, 21:20, 21:25, 22:9, 22:12, 22:16, 22:23, 23:1, 23:7, 23:18, 23:22, 24:6, 24:9, 25:6, 25:20, 27:2, 27:9, 27:16, 27:24, 28:8, 28:20, 29:6, 29:9, 29:13, 29:17, 29:20, 29:24, 30:10, 31:1, 31:5, 31:23, 32:9, 32:13, 33:3, 33:12, 33:16, 34:1, 34:14, 35:10, 35:15, 35:18, 35:23, 35:25, 36:4, 36:13, 37:1, 37:5, 37:14, 37:23, 38:13, 39:8, 39:12, 39:16, 39:19, 40:17, 41:1, 41:4, 41:8, 41:12, 41:18, 42:1, 42:7, 42:10, 42:16, 43:5, 43:9, 43:15, 43:17, 43:21, 43:25, 44:24, 45:7, 45:20, 46:4, 46:20, 46:22, 47:2, 47:9, 47:13, 47:23, 48:13, 48:19, 49:6, 49:10, 50:3, 50:10, 50:18, 50:21, 51:7, 52:22, 52:25, 53:13, 53:21, 53:25, 54:4, 54:8, 54:16, 55:1, 55:6, 56:9, 56:13, 57:1, 57:5, 58:5, 58:24, 59:16, 59:20, 60:1, 60:6, 61:1, 61:5, 61:13, 62:1, 62:3,

62:6, 62:11, 62:16, 63:2, 63:13, 63:18, 63:22, 64:3, 64:6, 64:15, 65:3, 66:3, 66:13, 66:17, 66:24, 67:3, 67:12, 67:22, 67:24, 68:6, 68:14, 68:18, 68:20, 69:5, 70:1, 70:8, 70:13, 70:18, 70:24, 71:10, 73:10, 74:15, 74:17, 75:5, 75:23, 76:5, 76:19, 77:3, 78:9, 78:12, 79:7, 79:20, 80:6, 80:11, 80:18, 81:5, 81:8, 81:10, 81:14, 81:19, 81:24
**themselves** [3] - 2:5, 20:7, 57:25
**therefore** [5] - 4:14, 4:16, 6:12, 6:14, 60:10
**thermodynamics** [1] - 2:13
**they've** [1] - 28:17
**thinking** [1] - 57:6
**thinks** [1] - 33:2
**third** [4] - 32:16, 43:23, 67:3, 71:22
**third-party** [1] - 71:22
**third-to-last** [1] - 43:23
**thoughts** [1] - 67:22
**thousands** [1] - 15:11
**threatened** [1] - 28:18
**three** [8] - 20:2, 20:4, 51:7, 55:25, 63:4, 67:3, 74:2, 74:12
**three-week** [2] - 74:2, 74:12
**throw** [1] - 10:14
**ticket** [1] - 31:5
**tie** [1] - 8:25
**timelines** [1] - 64:1
**timing** [2] - 28:24, 45:6
**today** [4] - 2:13, 44:5, 46:12, 49:4
**tomorrow** [1] - 74:21
**top** [2] - 36:14, 68:16
**tort** [1] - 71:22
**tortious** [1] - 71:24
**totally** [1] - 65:3, 72:15
**Toyota** [1] - 63:10
**traded** [2] - 18:21, 18:23

**Transcript** [1] - 1:25
**transcript** [3] - 82:7, 82:7, 82:8
**TRANSCRIPT** [1] - 1:9
**treat** [2] - 36:24, 73:19
**treated** [1] - 8:25
**trial** [5] - 16:5, 29:3, 38:8, 55:24, 75:8
**tribunals** [1] - 66:1
**tried** [7] - 9:15, 9:16, 12:17, 20:18, 45:19, 58:15, 63:25
**true** [2] - 50:24, 82:7
**truly** [1] - 23:16
**try** [10] - 22:10, 22:12, 23:14, 30:7, 39:4, 69:1, 71:7, 74:9, 74:20, 76:17
**trying** [21] - 4:4, 7:1, 7:5, 10:24, 11:14, 12:15, 14:2, 16:1, 18:4, 18:6, 29:23, 29:24, 40:23, 44:20, 52:12, 63:16, 64:24, 71:13, 73:1, 74:10, 76:19
**Tubi** [31] - 2:2, 2:8, 3:16, 4:20, 7:17, 8:19, 9:13, 9:15, 12:5, 12:18, 25:19, 26:8, 26:23, 30:15, 31:22, 33:6, 33:21, 34:15, 36:15, 40:23, 42:11, 42:13, 43:1, 56:1, 56:4, 69:1, 69:21, 73:16, 73:22, 80:14, 80:21
**TUBI** [1] - 1:3
**Tubi's** [3] - 26:12, 27:19, 59:14
**Tuesday** [1] - 1:10
**turn** [1] - 12:20
**two** [26] - 4:5, 4:25, 8:14, 8:19, 10:1, 13:12, 18:23, 20:2, 20:4, 36:19, 53:10, 59:4, 73:3, 75:1, 76:23, 76:24, 77:1, 77:2, 77:7, 78:3, 78:6, 78:21, 79:1, 80:13

**U**

**U.S** [2] - 55:23, 62:10
**ultimately** [1] - 75:18
**unambiguous** [1] - 80:14
**uncertainty** [1] -

54:20
**under** [9] - 9:1, 12:16, 14:20, 17:16, 17:19, 18:8, 48:18, 63:12, 80:21
**understandably** [1] - 18:16
**Understood** [1] - 78:6
**understood** [7] - 5:19, 5:21, 7:10, 15:24, 35:2, 39:19, 70:4
**undo** [5] - 7:1, 7:6, 39:4, 57:9, 76:11
**undone** [1] - 19:24
**unfair** [1] - 72:15
**UNITED** [1] - 1:1
**United** [2] - 82:6, 82:9
**unlawful** [1] - 48:9
**unless** [4] - 45:22, 45:25, 53:5, 67:10
**unstay** [1] - 67:15
**unstayed** [1] - 67:18
**up** [19] - 15:7, 24:10, 29:23, 32:16, 32:19, 46:19, 52:11, 52:16, 52:22, 55:22, 55:23, 57:8, 57:9, 67:19, 71:7, 72:24, 74:4, 76:20, 77:19
**upend** [1] - 28:5
**upset** [2] - 18:15, 23:22

**V**

**vacate** [1] - 13:24
**vacated** [3] - 7:1, 9:12, 76:18
**vacation** [1] - 56:18
**valid** [4] - 8:19, 8:25, 9:5, 73:19
**validly** [1] - 19:10
**value** [1] - 74:7
**various** [1] - 8:2
**vast** [1] - 19:16
**versus** [5] - 2:3, 13:15, 29:3, 41:19, 54:17
**view** [5] - 11:10, 48:6, 59:3, 67:19, 73:15
**views** [2] - 58:11, 60:5
**violates** [3] - 37:15, 45:10, 58:22
**violating** [1] - 35:8, 54:24, 56:13

**violation** [2] - 33:9, 49:16
**Virginia** [2] - 31:6, 31:7
**vociferously** [1] - 9:16
**vs** [1] - 1:5

**W**

**wade** [1] - 61:15
**wait** [10] - 7:12, 11:1, 24:7, 40:6, 48:2, 51:8, 57:7
**waive** [4] - 16:20, 17:14, 26:6, 28:3
**waived** [2] - 17:2, 64:3
**walking** [1] - 58:16
**walks** [1] - 76:14
**wants** [11] - 35:18, 49:19, 51:3, 53:13, 68:15, 70:6, 72:22, 76:2, 76:3, 77:24, 81:19
**War** [1] - 79:1
**warfare** [2] - 55:7, 55:8
**Warren** [1] - 2:10
**WARREN** [1] - 1:17
**Washington** [3] - 1:11, 1:18, 1:24
**ways** [2] - 8:13, 53:10
**week** [9] - 36:9, 74:2, 74:12, 74:14, 74:19, 79:19, 79:21, 80:4, 81:19
**week-long** [1] - 80:4
**weeks** [1] - 74:8
**whatnot** [1] - 3:11
**white** [2] - 79:20, 80:17
**whole** [7] - 25:10, 45:21, 57:6, 59:8, 62:18, 65:20, 81:18
**willing** [1] - 73:12
**win** [7] - 9:12, 25:6, 25:7, 30:11, 51:12, 58:12, 71:20
**wind** [1] - 47:25
**window** [2] - 74:2, 74:12
**wiped** [2] - 23:11, 70:7
**wish** [1] - 71:12
**withdraw** [11] - 5:4, 15:10, 21:6, 31:13, 40:13, 44:8, 46:6, 55:3, 66:10, 76:10,

76:15
  **withdrawing** [4] - 12:17, 31:16, 38:7, 76:15
  **withdrew** [2] - 5:13, 23:6
  **witnesses** [1] - 56:2
  **won** [2] - 8:19, 10:11
  **word** [1] - 35:18
  **words** [5] - 14:25, 16:2, 25:25, 54:24, 75:24
  **works** [2] - 2:15, 61:13
  **world** [1] - 4:1
  **worries** [1] - 14:16
  **worthwhile** [1] - 78:21
  **writing** [4] - 35:6, 43:19, 43:23, 44:11
  **written** [5] - 34:11, 36:7, 42:19, 43:3, 43:5
  **wrote** [3] - 11:21, 11:23, 50:11

## Y

  **year** [4] - 29:7, 29:10, 49:8, 50:14
  **years** [9] - 46:19, 55:21, 55:25, 65:1, 71:19, 78:17
  **yourselves** [1] - 78:9